**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiff Oklahoma
Firefighters Pension and Retirement System*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLAZING EMPLOYERS AND GLAZIERS' UNION LOCAL #27 PENSION AND RETIREMENT FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IRHYTHM TECHNOLOGIES, INC., et al.,<br><br>Defendants | Case No. 3:24-cv-706-JSC<br><br>CLASS ACTION<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: April 24, 2025<br>Time: 10:00 a.m.<br>Dept.: Courtroom 8, 19th Floor<br>Judge: Hon. Jacqueline Scott Corley |

Lead Plaintiff's Opposition To Motion To Dismiss
Case No. 3:24-cv-706-JSC

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF ISSUES TO BE DECIDED ..................................................................1

II.  INTRODUCTION ...........................................................................................................1

III. STATEMENT OF FACTS ...............................................................................................4

    A.  iRhythm Distinguished The Zio AT From The Zio XT Due To Its Purported Real-Time Accurate Feedback ...................................................................4

    B.  The Zio AT Was Neither An MCT Nor Appropriate For High-Risk Patients Due To A Fatal Flaw That Prevented Reliable Real-Time Transmission ..........................................................................................................5

    C.  The Zio AT's Patient Reports Were Not Reliably Accurate ..................................8

IV.  ARGUMENT....................................................................................................................9

    A.  The Complaint Alleges That Defendants' Statements Were Misleading ...............9

        1.  Statements Concerning The Zio AT's Use For A "High-Risk" And "At Risk" Patient Population Were Misleading...........................................9

        2.  Statements That The Zio AT Provided "Near Real-Time" Notifications And "Timely Transmission" Were Misleading ...................12

        3.  Statements Concerning The Zio AT's Status As A "Mobile Cardiac Telemetry" Monitor Were Misleading ........................................15

        4.  Statements Concerning The Zio AT's Accuracy Were Misleading ..........16

    B.  The Complaint Adequately Alleges Scienter........................................................18

        1.  The Complaint Alleges A Strong Inference Of Scienter .........................19

        2.  Defendants' Preferred Inference Is Not More Compelling.......................22

    C.  The Complaint Adequately Pleads Loss Causation Under The Controlling Ninth Circuit Standard ........................................................................................24

V.   CONCLUSION...............................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*In re Apple Inc. Sec. Litig.*,
   2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ..........................................................................18

*Aramic LLC v. Revance Therapeutics, Inc.*,
   2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) ..........................................................................23

*Bartelt v. Affymax, Inc.*,
   2014 WL 231551 (N.D. Cal. Jan. 21, 2014) ...........................................................................14

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ...........................................................................................9, 10

*Bhangal v. Hawaiian Electric Industries, Inc.*,
   2024 WL 4505465 (N.D. Cal. Oct. 15, 2024)...................................................................13, 14

*Boston Ret. Sys. v. Uber Techs., Inc.*,
   2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ....................................................................11, 13

*In re BP Prudhoe Bay Royalty Tr. Sec. Litig.*,
   2007 WL 3171435 (W.D. Wash. Oct. 26, 2007) ....................................................................18

*CardioNet, LLC v. InfoBionic, Inc.*,
   816 F. App'x 471 (Fed. Cir. 2020) ........................................................................................16

*In re Citigroup Securities Litigation*,
   2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ..................................................................22, 23

*In re Cloudera, Inc.*,
   121 F.4th 1180 (9th Cir. 2024) ..............................................................................................11

*In re Curaleaf Holdings, Inc. Securities Litigation*,
   519 F. Supp. 3d 99 (E.D.N.Y. 2021) ......................................................................................25

*Curry v. Yelp, Inc.*,
   2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) ........................................................................17

*Cutler v. Kirchner*,
   696 F. App'x 809 (9th Cir. 2017) ...........................................................................................24

*In re Daou Sys. Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ..........................................................................................15, 24

*In re Dot Hill Sys. Corp. Sec. Litig.*,
   594 F. Supp. 2d 1150 (S.D. Cal. 2008)...................................................................................18

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................24

*Evanston Police Pension Fund v. McKesson Corp.*,
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ...................................................................21

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023), *cert. granted in part sub nom.*, 144 S. Ct. 2629
    (2024), and *cert. dismissed as improvidently granted sub nom.*, 604 U.S. 4
    (2024)......................................................................................................................24

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ....................................................................................9

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F. 3d 228 (1st Cir. 2015) ..................................................................................23

*Freedman v. Saint Jude Med., Inc.*,
    4 F. Supp. 3d 1101 (D. Minn. Mar. 10, 2014) .........................................................10

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................................10

*Garcia v. J2 Glob., Inc.*,
    2021 WL 1558331 (C.D. Cal. Mar. 5, 2021)............................................................18

*In re Genzyme Corp. Sec. Litig.*,
    754 F.3d 31 (1st Cir. 2014)......................................................................................23

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ....................................................................................13

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005)................................................................10, 11

*In re Intuitive Surgical Sec. Litig.*,
    2014 WL 7146215 (N.D. Cal. Dec. 15, 2014) .........................................................14

*In re Iso Ray, Inc. Sec. Litig.*,
    189 F. Supp. 3d 1057 (E.D. Wash. June 1, 2016)....................................................12

*Johnson v. Costco Wholesale Corp.*,
    2019 WL 6327580 (W.D. Wash. Nov. 26, 2019) .....................................................21

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .................................................................................25

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ...................................................................................25

Lead Plaintiff's Opposition To Motion To Dismiss
CASE NO. 3:24-CV-706-JSC                                                                            iii

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024) .............................................................................................................3, 9

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..............................................................................................................14, 17

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) .........................................................................25

*In re Maxwell Techs., Inc. Sec. Litig.*,
    18 F. Supp. 3d 1023 (S.D. Cal. 2014)......................................................................................22

*McGovney v. Aerohive Networks, Inc.*,
    2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ...........................................................................23

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ...................................................................................................9

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ...................................................................................4, 24, 25

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) .....................................................................................20

*Mulligan v. Impax Laboratories, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................................20, 21, 23

*Ng. v. Berkeley Lights, Inc.*,
    2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ...........................................................................18

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................................21, 24

*In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*,
    184 F. Supp. 2d 991 (N.D. Cal. 2001) .....................................................................................15

*Nursing Home Pension Fund, Lcl. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .................................................................................................20

*Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*,
    2024 WL 5182634 (9th Cir. Dec. 20, 2024) ......................................................................11, 21

*Oklahoma Police Pension & Ret. Sys. v. Lifelock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ............................................................................................13

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ...................................................................................................19

*Ret. Plan v. Fleetcor Techs., Inc.*,
    2018 WL 4293143 (N.D. Ga. May 15, 2018).............................................................................18

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. Oct. 26, 2016) ....................................................................17

*Sanders v. RealReal, Inc.*,
    2021 WL 1222625 (N.D. Cal. Mar. 31, 2021).........................................................................18

*Schaefer v. Nabriva Therapeutics plc*,
    2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020).........................................................................23

*Scheller v. Nutanix, Inc.*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) ..................................................................................15

*Schueneman v. Arena Pharms, Inc.*,
    840 F.3d 698 (9th Cir. 2016) ...............................................................................................9, 18

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) .....................................................................................10

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ....................................................................................9

*In re Siebel Systems, Inc. Securities Litigation*,
    2005 WL 3555718 (N.D. Cal. 2005) .......................................................................................10

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010).....................................................................................................23

*In re Snap Inc. Sec. Litig.*,
    2018 WL 2972528 (C.D. Cal. June 7, 2018) ...........................................................................11

*In re STEC Inc. Sec. Litig.*,
    2011 WL 2669217 (C.D. Cal. June 17, 2011) .........................................................................10

*Tchrs.' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ...................................................................................................25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).................................................................................................................19

*In re Toyota Motor Corp. Sec. Litig.*,
    2011 WL 2675395 (C.D. Cal. July 7, 2011).............................................................................17

*In re VeriFone Holdings, Inc., Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ...................................................................................................18

*Weiss v. Trader Joe's Co.*,
    2018 WL 6340758 (C.D. Cal. 2018).........................................................................................13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................................15

**STATUTES AND RULES**

Securities Exchange Act of 1934:

§ 10(b), 15 U.S.C. §78j(b) ...............................................................................1

§ 20(a), 15 U.S.C. §78t(a)................................................................................1

Food and Drug Administration:

21 C.F.R. § 803.50............................................................................................6, 7

21 C.F.R. § 820.198(a).....................................................................................6

Securities and Exchange Commission Rule 10b-5,
17 C.F.R. § 240.14a-9(b) .................................................................................3, 9

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff hereby opposes Defendants' motion to dismiss (ECF No. 51, "MTD").[1]

## I.     STATEMENT OF ISSUES TO BE DECIDED

1.     Whether the Complaint alleges facts that, considered holistically, state claims under § 10(b) and § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a).

## II.     INTRODUCTION

This is a straightforward securities fraud. Defendants claimed that one of iRhythm's two cardio-monitoring products—the Zio AT—had specific capabilities that made it a premium product appropriate for "*high risk*" patients. The Zio AT supposedly transmitted in "*real time*" patients' cardiac activity data, so that iRhythm could review the data immediately to provide "*actionable*" and "*accurate*" alerts to the patient's doctors. These capabilities purportedly elevated the Zio AT over iRhythm's flagship product, the Zio XT, which only provided historic reports, days after cardiac arrhythmias might take place. As a result, iRhythm touted its abilities to provide products "*across the spectrum of care*": the Zio AT for high-risk patients who needed real-time alerts for their safety, and the Zio XT for all other patients who did not need actionable alerts. Analysts credited these claims, terming the Zio AT "a premium device compared to the Zio XT."

As investors ultimately learned only after the FDA issued a public Warning Letter to iRhythm for "mislabeling" the Zio AT for "high risk" patients, these statements were false and misleading. iRhythm had known for years that a secret "transmission limit" nullified the Zio AT's transmission capabilities, causing multiple reported delays in reporting—including at least two *fatal* arrhythmias that went unreported (which Defendants learned ten days before the Class Period began). iRhythm also knew that other undisclosed limitations, including a failure to transmit data if device registration was incomplete, also frequently resulted in a non-transmitting device. Over the Class Period, iRhythm also received thousands of adverse event reports relating to routine and material inaccuracies of the Company's data reports.

---

[1] Unless otherwise noted, citations to "¶_" are to the Second Amended Complaint (ECF No. 43), citations to "Mot." are to the Defendants' Motion to Dismiss (ECF No. 51); emphasis is added; and internal citations, alterations, and quotations are omitted.

The FDA privately warned iRhythm of what Defendants already knew: that iRhythm was making false and misleading statements about the Zio AT. In August 2022, the FDA issued a lengthy private "Form 483" investigative report to iRhythm. The Form 483 noted that "your firm has **yet to implement corrective actions** to address this device [transmission] limitation that **your firm has been aware of since 2019** that can contribute to failure to notify clinicians of severe patient episodes, including life-threatening arrhythmias[.]" In September 2022, Defendant Blackford privately responded to the FDA, admitting that the transmission limit was a "**known design constraint**" that was "**crucial**" and "**essential**," and acknowledged "**[t]he hazardous situation**" that could arise when a patient hit the transmission limit. Incredibly, despite these admissions, Blackford blamed **doctors** for their failures to detect the (undisclosed) limitations.

Investors did not learn any of these facts until November 2022, when iRhythm disclosed a "Customer Advisory Notice" ("CAN") that had driven reduced growth in the Zio AT, which in turn was in response to (undisclosed) FDA findings. Then, in May 2023, Defendants revealed that iRhythm had received a subpoena from the Civil Division of the DOJ. As was revealed later, the DOJ sought documents concerning the fact "that the Zio Systems were failing to timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event." The news of the subpoena shocked analysts, who noted that the disclosure was a "big surprise" and "unsettling." In response to each of these disclosures, the Company's stock price dropped significantly.

But the real bombshell was revealed later that month, when investors learned that iRhythm had received a "Warning Letter" from the FDA. As investors learned, the Warning Letter stated, *inter alia*, that iRhythm had falsely marketed the Zio AT as approved for use in "high-risk" patients that require "real-time cardiac monitoring." In truth, when used with a high-risk patient population, "the Zio AT System **may cause or contribute to serious injury or death**." The Warning Letter also publicly disclosed, for the first time, the myriad customer complaints and deaths associated with the Zio AT since 2019. Astonishingly, the Warning Letter stated that "**your firm has been aware of customer complaints related to this [transmission limit] issue since at least 2019**" and "**[s]ince at least 2017, your firm has been aware of this [registration] issue where your clinical care team cannot access the patient's data**." iRhythm's stock price again plummeted.

Lead Plaintiff's Opposition To Motion To Dismiss
CASE NO. 3:24-CV-706-JSC                                                                    2

Then, on July 1, 2024, investors learned that the DOJ was explicitly investigating problems with the Zio AT and that it was escalating its investigation. On that day, the DOJ filed a petition to enforce its subpoena seeking documents from iRhythm and explained to the Court that the DOJ was investigating issues relating to the fact that the Zio AT was "***failing to timely transmit patient cardiac data to physicians***[.]" The stock price fell by 7.3% the next day.

The FDA launched a new round of undisclosed inspections in 2024, this time focused on the ***accuracy*** of the Zio AT. In August 2024, investors learned that the FDA had issued new Form 483s finding that iRhythm's technicians were routinely misreading patients' arrhythmia data, leading to the transmission of inaccurate arrhythmia reports to patients and doctors. The FDA noted that the Company had received over 4,000 complaints about this issue since May 2, 2022. In response, iRhythm's stock price declined materially yet again.

Notwithstanding the strength of these allegations, Defendants move to dismiss on the pleadings. Defendants' arguments largely rely on improperly raised factual issues, and conspicuously ignore the explicit warnings given by the FDA (and Defendants' candid admissions). ***First***, Defendants argue that their statements about the Zio AT's "near real-time" transmissions were not false because the device was, at times, "capable of" performing the way it was described to investors. Mot. at 9-11. But such argument ignores that at a minimum, Defendants misleadingly omitted that the device had a "known design constraint" that led to "hazardous" situations—particularly for the "high risk" populations for which iRhythm promoted the device. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.,* 601 U.S. 257, 263 (2024) ("Rule 10b–5(b) ... prohibits omitting a material fact necessary to make the statements made not misleading" and thus "bars ... half-truths"). Defendants also advance thinly veiled "truth-on-the-market" affirmative defenses by relying on extrinsic documents to argue that they had warned investors that their device did not always work as advertised. Mot. at 10-11. Notably, Defendants do not point to a single extrinsic document that actually warned investors of the transmission and registration limitations. And Defendants insist that the Court abandon Plaintiff's well-pled allegations and instead rely on alternate definitions of relevant industry terms that better suit their arguments. Mot. at 13. Such misdirection is improper at the motion to dismiss stage—particularly

Lead Plaintiff's Opposition To Motion To Dismiss
CASE NO. 3:24-CV-706-JSC                                                                                      3

where the Complaint provides a clear and well-sourced definition.

*Second*, Defendants contest scienter by asserting, without support, that (i) Plaintiff's theory of fraud does not "make sense," and that Defendants' years of misstatements were "an innocent lack of clarity in iRhythm's marketing" (Mot. at 17), and (ii) Defendants lacked actual knowledge and even *access* to information undermining their misleading statements. Mot. at 17-19. These arguments are incredible considering the volume of patient complaints and adverse event reports Defendants received (some of which involved patient deaths) and Defendants' admissions.

*Finally*, Defendants' loss causation arguments ignore more recent Ninth Circuit precedent holding that only a "causal connection" to the fraud is required for loss causation. *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 752 (9th Cir. 2018).

As explained below, the Motion should be denied.

## III.    STATEMENT OF FACTS

During the Class Period, iRhythm made just two products: the Zio XT and the Zio AT. ¶¶175-76. Both devices are heart monitors that record arrhythmic heart events that can lead to heart failure and stroke. ¶¶43-44. iRhythm's first heart monitor and mainstream product, the Zio XT, is a continuous electrocardiography ("ECG") device. ¶¶43, 46. After patients wear the device for 14 days (the "wear period"), it is mailed to iRhythm, and a technician reviews the data and sends a report to the prescribing physician. ¶50. The Zio XT is "retrospective," meaning the data provided can only be analyzed and reviewed after the wear period. ¶187. In 2017, iRhythm revealed that it had developed a new heart monitoring device to supplement the Zio XT: the Zio AT. ¶44.

### A.    iRhythm Distinguished The Zio AT From The Zio XT Due To Its Purported Real-Time Accurate Feedback

The Company claimed that the Zio AT incorporated two additional features compared to the Zio XT. *First*, Defendants claimed that the Zio AT offered "the full benefits of [the] Zio XT Service, *with the addition of* real-time data transmission and notification" to a patient's doctor during the wear period. ¶44. *Second*, the data passed through a team of Certified Cardiographic Technicians ("CCT"), who observed and reviewed the data as it was transmitted from the Zio AT devices. *Id*. Physicians and analysts understood the Zio AT to be the more "premium device

compared to the Zio XT." ¶48; *see also* ¶¶49-50 (Stanford Medicine Children's Health highlighting that the AT's "real time" transmission was "important" for detecting "more serious" pediatric arrhythmias, while the XT was a "more affordable" option providing data after-the-fact).

Defendants claimed that, while the Zio XT was an ECG device, the Zio AT was a Mobile Cardiac Telemetry ("MCT") device. ¶¶48, 60, 213-23. The Mayo Clinic defines an MCT as "a continuous cardiac monitoring test that uses the mobile device to monitor cardiac activity" and "provides near-real-time data, the ability to analyze the patient's heart rhythm, and overview monitoring by certified technicians 24/7 in order to alert a patient's care team of critical events as they are observed."[2] ¶45. Characterizing the Zio AT as an MCT had significant implications for iRhythm's revenue and Defendants' compensation, because CMS reimbursed companies like iRhythm *four times more* for an MCT than an ECG. ¶¶32-42, 61, 172-75.

Defendants consistently touted the supposed benefits of their purported MCT. On the first day of the Class Period, Defendants stated that the Zio AT was an MCT that provided "timely transmission of data during the wear period" for "patients that require more timely action." ¶¶179, 213. Later, Defendants made even more explicit claims about the capabilities of the Zio AT, including that it was appropriate for "high-risk" and "*the most at-risk patients*" because of its "*near real-time*" reporting. ¶¶57, 204, 206. Defendants further touted the Zio AT's "incredible accuracy." ¶¶224, 231. As explained below, these statements were materially misleading.

**B.    The Zio AT Was Neither An MCT Nor Appropriate For High-Risk Patients Due To A Fatal Flaw That Prevented Reliable Real-Time Transmission**

Notwithstanding their public statements touting the Zio AT's unique capabilities, iRhythm secretly designed the Zio AT to have a "transmission limit" that undermined each of those distinguishing attributes. ¶¶10, 109, 158, 160, 166. This limit was not only a "known design constraint," but a "crucial" and "essential" flaw that limited the number of transmissions the device could send. *Id*. As a result, once the Zio AT transmitted a certain number of arrhythmia events, the monitor, without warning, stopped transmitting any data at all during the wear period. ¶¶68-69, 200. Furthermore, doctors were not aware that unless they perfectly complied with a device

---

[2] The Mayo Clinic is the top-ranked hospital system in the nation. https://www.mayoclinic.org/.

registration requirement, the device would not even start transmitting arrhythmia data. ¶¶73-74. As a result, the Zio AT would become functionally indistinguishable from the Zio XT. ¶69.

iRhythm received numerous complaints regarding the failure of the Zio AT to transmit arrhythmia data beginning as early as 2017—the year the device was introduced to the market. ¶¶94, 107, 116. Indeed, just weeks before the start of the Class Period, iRhythm learned of two complaints in which patients died of heart attacks while using the Zio AT—but, because the transmission limit had been triggered, their doctors received no notifications until after the wear period. ¶70. Serious complaints continued throughout the Class Period. *See, e.g.,* ¶92 (doctor not alerted of "32 minutes of sustained ventricular tachycardia with loss of consciousness" during wear period). While the Defendants marketed the Zio AT as providing "near real-time" transmissions without reservation, it "failed to report [] life-threatening arrhythmia[s] until 1 week later." ¶92.

At minimum, Defendants were aware of or recklessly disregarded these patient reports. ¶¶16, 94. Medical device companies must "establish and maintain procedures for receiving, reviewing, and evaluating complaints" (21 C.F.R. § 820.198(a)) and serious complaints must be reported to management and the FDA. ¶¶98, 163. Further, when a device may have "caused or contributed to a death or serious injury," medical device companies must "conduct[] an investigation of each event and evaluat[e] the cause of the event." 21 C.F.R. § 803.50; ¶99. These events must also be reported to the FDA within 30 days. ¶99. Furthermore, iRhythm's Compliance Committee—on which Defendants Blackford and Devine sat—received reports concerning all complaints on a quarterly basis (¶96), which were categorized as low, medium, or high priority. ¶¶100 ("[L]eaders meet at least quarterly to review … quality systems performance indicators"), 162 (FE 2 reported complaints to Compliance Committee).

On August 12, 2022, the FDA issued a lengthy private inspection report to iRhythm on Form 483 (the "2022 Form 483") arising from a twelve-day inspection. ¶¶103-07. The 2022 Form 483 identified multiple dangerous deficiencies with the Zio AT device, including that the "***Zio AT was a contributing factor [in a] patient's death***." ¶103. The FDA warned Defendants that "[t]he claim that the device is intended as [an MCT] implies this device is intended for high-risk patients and near real-time monitoring," and that given the transmission limit, the Zio AT was inappropriate

or even dangerous for use in "high-risk" patients. ¶105. The FDA also found that Defendants failed to "implement corrective actions to address this device limitation." ¶107. Days later, iRhythm quietly scrubbed its website description of the Zio AT's intended use by "high risk" patients. ¶167.

On September 1, 2022, Defendant Blackford privately responded to the 2022 Form 483 on behalf of iRhythm and admitted that the transmission limit was a "known design constraint." ¶¶108-09. Defendant Blackford further acknowledged that the transmission limit created a "hazardous situation." *Id*. However, Defendant Blackford proposed no resolution of this "hazardous situation," instead placing the blame on doctors and patients. ¶110.

On September 21, 2022, Defendants continued to promote the supposed fact that the Zio AT transmitted data "on a near real-time basis." ¶187. Defendants also repeated that the Zio AT, along with the Zio XT, "provide[d] monitoring solutions across the risk spectrum." ¶¶206, 209.

Then, on September 28, 2022, iRhythm issued a "customer advisory notice" ("CAN") to doctors that included a "labeling correction" regarding the device's "maximum transmission limits during wear." ¶112. On November 1, 2022, iRhythm disclosed the CAN, explaining that it would lead to reduced Zio AT growth, leading the price of iRhythm common stock to decline by $19.67 per share. ¶¶123-24, 127. However, during the same call, Defendants continued to misleadingly assert that the Zio AT would "grow our market share in the MCT space." ¶220. On November 4, 2022, iRhythm disclosed additional details about the CAN, including that it was in response to the 2022 Form 483. ¶129. In response to this news, the price of iRhythm common stock declined by $2.43 per share. ¶130. Once again, Defendants continued to mislead investors, asserting in the same November 4, 2022 SEC Form 10-Q that the Zio AT offered "timely transmission" (¶190), and that the 2022 Form 483 was "more of a near-term impact." ¶128.

Despite the FDA's damning observations in the 2022 Form 483, and Defendants' admissions, Defendants kept painting a false picture of the Zio AT in the months that followed. For example, Defendant Blackford claimed in comments on a January 10, 2023 investor call that the Zio AT was an "MCT" intended for "***some of the most at-risk patients***." ¶210.

On May 25, 2023, iRhythm received a Warning Letter from the FDA (the "Warning Letter") confirming the issues in the 2022 Form 483, ultimately determining that the transmission

Lead Plaintiff's Opposition To Motion To Dismiss

limit "introduce[d] a nonconformance" that rendered the Zio AT "not remotely capable of delivering near-real time monitoring for high-risk patients." ¶¶115, 212. More concerning, the Warning Letter determined that physicians and patients did not know the transmission limit existed and were not warned when it was reached. ¶¶70-72. Ultimately, the FDA determined that "the Zio AT [] *may cause or contribute to serious injury or death*." ¶¶67, 74, 116. The Warning Letter also reiterated that Defendants' failure to report these issues to the FDA (which Defendants were aware of since before the Class Period) constituted violations. ¶116. The FDA determined that iRhythm was improperly marketing the Zio AT as an MCT for "high-risk" patients, and that it was only appropriate for patients for whom "real-time monitoring is not needed." ¶7.[3]

In the meantime, on May 4, 2023, Defendants disclosed the DOJ subpoena (resulting in a $9.25 stock drop). ¶¶134, 136. Investors did not know the subject of the DOJ's investigation until July 1, 2024, when the DOJ publicly filed an enforcement action making it clear the subpoena was related to the undisclosed transmission limit. ¶¶134, 141, 143 (news drove $10.88 stock drop).

### C.    The Zio AT's Patient Reports Were Not Reliably Accurate

Defendants also repeatedly cited to the Zio AT's "incredible accuracy" and that the CCT personnel "ensure[d] high accuracy and quality of reports before delivering them to the prescribing physician." ¶¶65-66, 224-32. However, in addition to the fatal transmission and registration limits, the Zio AT also routinely provided inaccurate data to patients and physicians. Starting in at least May 2022, iRhythm received *thousands* of complaints that the CCT personnel were not only misreading arrythmia data but were providing misclassified data to end users for diagnostic purposes. ¶117; *see also* ¶¶98-100, 163 (such complaints reported to senior management).

On July 31, 2024, iRhythm received another Form 483 (the "2024 Form 483"), which found that iRhythm had received over 4,000 complaints concerning CCT personnel, was *still* routinely failing to report these complaints to the FDA, was "not adequately analyzing these complaints, issues, or events to identify the rate of occurrence or detect recurring quality problems," and had not "investigate[d] the cause … of this quality problem." ¶117-18. On August

---

[3] When the public learned about the Warning Letter on May 30, 2023, the price of iRhythm common stock declined by $16.03. ¶¶137, 139.

Lead Plaintiff's Opposition To Motion To Dismiss
CASE NO. 3:24-CV-706-JSC                                                                 8

1, 2024, iRhythm disclosed the 2024 Form 483, though not its contents. ¶¶146, 151 ($10.34 stock drop). On August 9, 2024, *Capitol Forum* reported details from the 2024 Form 483, including the over 4,000 complaints relating to inaccurate reports, and reports from former employees describing that CCTs were trained to provide inaccurate reports. ¶¶152, 153 ($6.35 stock drop).

## IV.    ARGUMENT

### A.    The Complaint Alleges That Defendants' Statements Were Misleading

Section 10(b) protects investors from both false statements and omissions of material fact that render a statement misleading ("half-truths"). Even "literally accurate" statements "can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.,* 519 F.3d 879, 886 (9th Cir. 2008). The Supreme Court very recently affirmed that "half-truths" are actionable under the securities laws. *Macquarie*, 601 U.S. at 263 ("Rule 10b–5(b) ... prohibits omitting a material fact necessary to make the statements made not misleading" and thus "bars ... half-truths"). A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). If an issuer touts positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharms, Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016). "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal. 2017).

### 1.    Statements Concerning The Zio AT's Use For A "High-Risk" And "At Risk" Patient Population Were Misleading

Defendants repeatedly touted the Zio AT as an arrhythmia monitor for "high-risk" patients and asserted that iRhythm thus provided devices for patients "across the risk spectrum." As discussed above, these statements were false and misleading. The Zio AT was inappropriate and even ***dangerous*** for high-risk patients because of its known—but not disclosed—design limitations. At the very least, Defendants' "high-risk" statements are materially misleading,

Lead Plaintiff's Opposition To Motion To Dismiss
CASE NO. 3:24-CV-706-JSC                                                    9

because they gave a "reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson,* 527 F.3d at 985; *Freedman v. Saint Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1120-21 (D. Minn. Mar. 10, 2014) (statements concerning Form 483 were misleading because they "created the impression that the FDA had not paid any particular attention to any one particular device ... when it had allegedly focused sharply" on the functionality of the device); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1020 (S.D. Cal. 2005) (optimistic statements about drug's efficacy misleadingly omitted study results to the contrary).[4]

Defendants' arguments miss the mark. ***First***, Defendants wrongly argue that Plaintiff does not define "high-risk." Mot. at 7. But Defendants themselves defined the benchmark against which the Zio AT's capability should be measured: the Zio XT and its "low-risk" patient population. The FDA found that the Zio AT was no more appropriate for high-risk patients than was the Zio XT.[5] The supposed difference mattered to investors, with RBC noting that the Zio AT was "a premium device ***compared to the Zio XT, which does not provide real-time reporting***."

Indeed, the FDA determined that the "high risk" patients iRhythm targeted with the Zio AT was a "new patient population" to which iRhythm did not have authorization to market the device—and that the device was in fact ***unsafe*** for "high risk" patient populations. ¶137. *See Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at *3 (9th Cir. Dec. 20, 2024) (finding falsity and noting that defendants' "alternative reading" of alleged false statement "cannot appropriately be resolved at the motion to dismiss stage"). It was, at minimum,

---

[4] *See also SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897-900 (E.D. Pa. 2018) (holding that statements "heralding favorable abuse trends and the crush-resistant formulation" for opiate "painted a favorable picture without including the details that would have presented a complete and less favorable one" and were thus "misleading"); *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *6-7 (C.D. Cal. June 17, 2011) (allegation that announcement of customer contract omitted that such agreement "was not an ordinary course contract"); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1181 (D. Or. 2015) ("After Galena chose to disclose a lengthy list of reasons why its stock price might fluctuate, it needed to include in that list the alleged scheme that Galena was manipulating the stock price").

[5] For this reason, *In re Siebel Systems, Inc. Securities Litigation* (Mot. at 7) supports ***Plaintiff's*** position. The court found that a claim a product was "highly accurate" was inactionable where the plaintiffs had not alleged "highly accurate ***compared to what?***" 2005 WL 3555718, at *3 (N.D. Cal. 2005). But Defendants themselves compared the Zio AT's high-risk patient population to the Zio XT's low-risk patient population.

misleading to claim the Zio AT was appropriate for "high-risk" populations when the known (but undisclosed) limitations instead rendered the device "hazardous" for those patients.[6]

Defendants cite to a passing comment regarding "high risk" patients on a call by iRhythm's ex-CEO Kevin King, which pre-dates the Class Period by two-and-a-half years, to suggest that Defendants "disclose[d] a definition of 'high risk' to investors." Mot. at 7 (citing D.Ex. J at 9). Besides the fact that such transcript is entirely extrinsic, Mr. King does not purport to define the Zio AT's patient population, nor does he articulate how "patients that meet the profile of high-risk factors" does not include patients at higher risk of arrhythmias—exactly the patient population who should be informed that their monitor may simply stop transmitting (or never start).

*Second*, Defendants argue that Plaintiff improperly rely on the FDA's warning that the Zio AT was inappropriate for "critical care patients" who could suffer from "life-threatening arrhythmias" to allege the falsity of the "high risk" statements. Mot. at 7-8. But the FDA explicitly equated the two terms. *See* ¶137 (according to iRhythm's "marketing materials, website, and other documentation, the Zio AT System is intended for 'near real-time monitoring' and 'high-risk patients,'" even though "the Zio AT system is not cleared for these indications.").

Defendants lift two lines from iRhythm's Clinical Reference Manual ("CRM")—which was not referenced in the Complaint—to suggest that because iRhythm contraindicated the device "for patients with a ***known*** history of life threatening arrythmias" or "critical care patients," their statements that the Zio AT was appropriate for "high-risk" patients could not mislead investors. Mot. at 7-8 (citing D.Ex. Q at 3, 9; D.Ex. S at 3, 9). Defendants' thinly veiled "truth-on-the-market" affirmative defense should be rejected as "not available at the motion to dismiss stage." *Boston Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020).[7] Even if the CRM disclosed the truth—which Defendants do not establish—Defendants also do not demonstrate that the CRM was "transmitted to the public with a degree of intensity and credibility

---

[6] *In re Cloudera, Inc.*, 121 F.4th 1180, 1189 (9th Cir. 2024) (Mot. at 7) is inapposite, as the plaintiff failed to sufficiently define the term "cloud-native," which "lack[ed] a plain or ordinary meaning."

[7] *See also Immune Response*, 375 F. Supp. 2d at 1036 (rejecting truth-on-the-market defense based on extrinsic documents); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018) (same).

sufficient to effectively counterbalance any misleading impression created by" the misstatements. *See In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073-74 (E.D. Wash. June 1, 2016).

**Third**, Defendants argue that Plaintiff does not plead the falsity of "more generalized" statements concerning the "spectrum of care" or merely "at-risk" patients, including because Plaintiff purportedly omitted that the Zio AT patient population is "relative to the Zio XT population." Mot. at 8. Defendants' arguments simply confirm Plaintiff's allegations: the population to which the Zio AT was marketed did "require[] timely notifications" (Mot. at 8), but, unbeknownst to these high-risk patients, the Zio AT could not be relied on to provide such notifications. The stated Zio AT patient population **was** "higher risk" (*id.*), but, unbeknownst to these "higher risk" patients, the Zio AT "may cause or contribute to serious injury or death because life-threatening arrhythmias may not receive timely treatment."

**Finally**, Defendants wrongly assert that "[t]he warning letter does not state that the Zio AT is improper for 'high-risk' patients." Mot. at 8. The Warning Letter concluded that the Zio AT was "misbranded" because the labeling for the device—claiming to provide "near real time monitoring for high-risk patients" who need timely treatment—was untrue. The FDA further stated that iRhythm's claims that the Zio AT was an MCT "impl[y] this device is intended for high-risk patients and near real-time monitoring"—which was not true. ¶71.

### 2. Statements That The Zio AT Provided "Near Real-Time" Notifications And "Timely Transmission" Were Misleading

Defendants repeatedly touted the Zio AT as providing "near real-time" notifications and "timely transmission" of arrhythmia data to patients' healthcare providers "during the wear period." ¶¶179-202. For example, Defendant Blackford told investors—**months** after receipt of the 2022 Form 483—that the Zio AT would "put[] information into the hands of the patient on a near real-time basis," without disclosing anything about the devices' limitations. ¶187. As discussed above, these statements were false and misleading when made because, as Defendants knew, the transmission limit and the onerous registration requirement conspired to render the Zio AT incapable of providing near real-time or timely alerts to healthcare providers. ¶200. These statements are actionable. *See Oklahoma Police Pension & Ret. Sys. v. Lifelock, Inc.*, 780 F. App'x

480, 483 n.2 (9th Cir. 2019) (sustaining claims where device did not provide "real-time" alerts, but often sent "stale" alerts that came through up to one week after a threat).[8]

Defendants' arguments are inapt. ***First***, Defendants argue that the timing statements "are vague and imprecise." Mot. at 9. But the Ninth Circuit held that this precise language ("near real-time … alerts") is actionable. *See Lifelock*, 780 F. App'x at 483 n.2; *cf. Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023) (holding that "tracking very well" and "very large pipeline" were misstatements of verifiable facts).[9] Defendants also argue that "Plaintiff suggests" that Defendants claimed "the Zio AT provides timely notifications to detect life-threatening arrhythmias." Mot. at 9. But the Complaint alleges that Defendants claimed Zio AT was appropriate to provide "near real-time" notifications of ***any*** notable arrhythmia data, life-threatening or otherwise, while omitting the key facts that the device could go silent at any time.

***Second***, Defendants argue that the registration requirement did not render the timing statements false because Defendants warned that incomplete registration would result in "limited functionality." Mot. at 9-10. Defendants' truth-on-the-market defense fails to demonstrate that either doctors or patients understood their vague warning to disable data transmission—and the Complaint directly contradicts such an inference. ¶73; *Uber Techs.*, 2020 WL 4569846, at *6. Defendants cite *Bhangal v. Hawaiian Electric Industries, Inc.*, 2024 WL 4505465 (N.D. Cal. Oct. 15, 2024), but it actually supports Plaintiff's argument. There, the defendants made "an overarching argument that no challenged statement was false or misleading because HEI disclosed the risk Plaintiffs allege they concealed, … rely[ing] on short phrases lifted from lengthy regulatory filings, which are separate from the documents containing the challenged statements." *Id.* at *9. This Court noted that because it was "required to draw all reasonable inferences in

---

[8] Indeed, much like in *Lifelock*, the Zio AT may not transmit even severe arrhythmias to healthcare providers for a week or more. ¶92 (patient complaint where "Device designed to report daily events remotely and failed to report [] life-threatening arrhythmia until 1 week later"); ¶140 (report submitted by iRhythm to the FDA that arrhythmias were "only detected when the device was sent back to iRhythm for analysis, often weeks after the event occurred").

[9] Defendants' case (*Weiss v. Trader Joe's Co.*, 2018 WL 6340758 (C.D. Cal. 2018)) concerns a claim that a brand of water will "refresh" consumers—a far cry from the temporal statements here.

Plaintiff's favor, the Court cannot dismiss Plaintiffs' claims on this ground." *Id.*[10]

*Third*, Defendants argue that the transmission limit was immaterial because Plaintiff did not quantify "how often the Zio AT hit the transmission limit." Mot. at 10. But the Supreme Court rejected adopting "a bright-line rule that reports of adverse events associated with a pharmaceutical company's products cannot be material absent a sufficient number of reports to establish a statistically significant risk that the product is in fact causing the events." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39-40 (2011) (finding reports from "more than 10 patients" were sufficient for materiality). Notably, the FDA's Warning Letter cites the pervasiveness of the transmission limit issue. ¶116 (FDA noted "the device was hitting the transmission limit more often than expected" and "introduce[d] a nonconformance."). Defendants' attempt to rely on their own Class Period claims to create a factual dispute as to how often the Zio AT hit the transmission limit (Mot. at 4, 10) should be rejected as improper at this stage.

*Fourth*, Defendants argue that Plaintiff's allegations of customer complaints and patient deaths, "while unfortunate," do not allege that their "near real time" statements were misleading. Mot. at 11. But "adverse events" certainly "equate to securities fraud" (Mot. at 11) where such adverse events reveal product limitations and "hazardous situations" that render a defendant's statements about such products false and misleading. *See Matrixx*, 563 U.S. at 30-31, 49 (sustaining misrepresentations concerning safety of drug where company had failed to disclose hundreds of adverse event reports); *Bartelt v. Affymax, Inc.*, 2014 WL 231551, at *10 (N.D. Cal. Jan. 21, 2014) (falsity of claims that "safety and efficacy were already fairly well-established" for drug when "over 100 'adverse events' tied to the drug were reported to the FDA"); *In re Intuitive Surgical Sec. Litig.*, 2014 WL 7146215, at *3 (N.D. Cal. Dec. 15, 2014) (sustaining statements "pronouncing" a medical device product as a "beneficial, safe, and effective alternative to traditional surgery" where "Intuitive failed to disclose unreported adverse event reports"). Further,

---

[10] Defendants assert that "Plaintiff allege[d] the market knew about the transmission limit and registration requirement no later than November 4, 2022." Mot. at 9 n.7. But on that date, Defendants only disclosed that "maximum transmission limits" and "registration" requirements existed (¶129), not that the Zio AT silently stopped transmitting data when the limits were hit, or the "dangerous condition" caused by the transmission limit and registration requirement.

Lead Plaintiff's Opposition To Motion To Dismiss
CASE NO. 3:24-CV-706-JSC                                                                14

Plaintiff does not rely exclusively on the complaints, but also on both the FDA and former employees reporting that the AT could not do near real-time transmissions for high-risk patients.

**Fifth**, Defendants suggest that Plaintiff insufficiently described FE 3. Mot. at 11-12. Not so. Plaintiff pled FE 3's role and approximate dates of employment, along with personal observations describing the mechanism at iRhythm that injected the four-hour or more "lag time" in iRhythm's reporting. ¶76. *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005).[11]

**Finally**, Defendants argue repeatedly that "[t]he Warning Letter did not state the Zio AT was **never capable** of providing 'timely' or 'near real-time' transmissions." Mot. at 11; *see also* Mot. at 9, n.9; 10, 13-14. Nor did Plaintiff allege that the Zio AT **never** provided near real-time transmission. Instead, Plaintiff alleged that Defendants' statements that the Zio AT provided "near real-time" alerts were misleading without disclosing the device's material limitations.

### 3. Statements Concerning The Zio AT's Status As A "Mobile Cardiac Telemetry" Monitor Were Misleading

Plaintiff alleged that to maximize the reimbursement rates applied by CMS to the Zio AT, Defendants falsely referred to the Zio AT as an MCT. An MCT "provides near-real-time data" that is reviewed "by certified technicians 24/7 in order to alert a patient's care team of critical events as they are observed." ¶45. Plaintiff alleged that the statements identifying the Zio AT as an MCT were misleading because, thanks to the transmission limit and registration requirement, the Zio AT did not meet the definition of an MCT, and **the FDA identified that it was not an MCT**. ¶71.

**First**, Defendants argue that "Plaintiff fails to adequately allege that 'MCT' has a universal and well-understood meaning." Mot. at 12. The Mayo Clinic definition cited in the Complaint cites the key characteristics of "near-real time data" and "overview monitoring by certified technicians 24/7 in order to alert a patient's care team of critical events." This is consistent with the Warning

---

[11] Defendants' cases are distinguishable. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996-98 (9th Cir. 2009) (former employees "were not employed by Digimarc during the time period in question," "base[d] their knowledge on vague hearsay" and offered "conclusory assertions about the defendants' scienter"); *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1036 (N.D. Cal. 2020) (former employees who were not alleged to have personal knowledge of hiring policy could not establish falsity of statements concerning company's hiring plans); *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1000 (N.D. Cal. 2001) ("[T]he complaint does not discuss what the specific duties of [the former employees] were, or how they came to learn of the information they provide in the complaint.").

Letter, which observes that an MCT is a device "intended for high-risk patients and near real-time monitoring." ¶71. As an initial matter, Defendants' attempt to create a factual dispute regarding definitions should be rejected at the pleadings stage. In search of a counter-definition that fits their narrative, Defendants rely exclusively on a patent case from the Federal Circuit, *CardioNet, LLC v. InfoBionic, Inc.* Mot. at 12-13. But the definition in *CardioNet* is uncited, does not purport to be complete, and is not a "definition" at all—rather, the court there described certain functions of an MCT relevant to the patent dispute at issue, none of which concerned the timing or frequency of wireless transmission of arrhythmia data. 816 F. App'x 471 (Fed. Cir. 2020).[12]

Defendants then take their shaky logic a step farther by claiming that the *CardioNet* MCT description was similar to the product code description the FDA created for the Zio AT (after the FDA found that the Zio AT was *not* an MCT). Mot. at 13 (citing D.Ex. R). But the new product code does *not* claim to describe the Zio AT as an MCT—it instead creates a new product category of an "Outpatient Cardiac Telemetry" ("OCT"). And the OCT description includes no reference to real-time data transmission, a key feature of an MCT. This strengthens Plaintiff's allegations.

*Second*, Defendants argue that because the Zio AT "*was capable of*" providing near real-time data—except when it hit the known but undisclosed transmission and registration limits—the Zio AT thus met the Mayo Clinic's definition. But given that the device only worked as described *sometimes*, while at other times was "unsafe," Defendants' statements were misleading.[13]

### 4.    Statements Concerning The Zio AT's Accuracy Were Misleading

Defendants repeatedly described the Zio AT as being "highly" or "incredibly" "accurate." ¶¶224-32. For example, in iRhythm's 2021 Form 10-K, Defendants touted the Zio AT's "high accuracy and quality of reports." ¶224. Then, on May 2, 2024, Defendant Blackford trumpeted the

---

[12] Defendants also argue that Plaintiff had to have pled that such definition was accepted "when Defendants made the challenged statements." Mot. at 13. But the Mayo Clinic offered this same definition throughout the Class Period. *See* "Mobile Cardiac Telemetry – Tech," Mayo Clinic, https://web.archive.org/web/20221208000950/https://cardiovascularservices .mayoclinic.com/mobile-cardiac-telemetry-tech/ (last visited Jan. 29, 2025).

[13] Plaintiff does not "concede" that the Zio AT did provide near real-time data when the transmission limit was not hit and when there were no registration issues. Mot. at 14. Plaintiff alleged that even then, there was regularly at least a four hour "lag time" between when the device identified a significant arrhythmia and when healthcare providers were notified. ¶75.

Zio AT's "incredible accuracy" and added that it was "highly predictable" and "highly accurate." ¶231. Such statements were false and misleading because iRhythm (i) had received thousands of complaints that iRhythm's reports were riddled with errors including missed arrhythmias, and (ii) encouraged technicians to provide inaccurate reports, such that they would appear "clean" to healthcare providers. ¶232. Courts have sustained similar claims. *See Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1029 (N.D. Cal. Oct. 26, 2016) (sustaining statements that devices have "highly accurate measurements" where the device "significantly undercounted users' heart rates").

*First*, Defendants argue that "the 2024 Form 483" which Plaintiff relies on "does not specify how many of the 4,014 complaints were attributable to CCTs misreading or misclassifying data." Mot. at 14. As discussed above, the Supreme Court has rejected a bright-line rule for requiring a certain amount or percentage of customer complaints. *See Matrixx*, 563 U.S. at 39-40. The FDA's focus on these complaints, which the FDA identified as related to the CCT reporting, demonstrates that a meaningful number of those complaints addressed the CCT errors the FDA flagged. Further, the 2024 Form 483 asserted specifically that iRhythm failed to "adequately analyz[e] these complaints ... to identify the rate of occurrence or detect recurring quality problems." ¶117. Any ambiguity as to how many of the complaints concerned CCT review accuracy is caused by iRhythm; a failure that should not be resolved in Defendants' favor.[14]

*Second*, Defendants suggest, without support, that Plaintiff's reliance on investigative reporting by the Capitol Forum should be discounted. Mot. at 14-15. The Complaint supports the indicia of reliability for these investigative accounts, including that former employees attested to personally and routinely identifying errors in iRhythm reports that were scrubbed so that the final report would "match" the data provided during the wear period (¶¶80-83), which FE 3 corroborated. ¶85 (recounting that FE 3 was personally trained to give "clean" reports rather than

---

[14] Defendants' cases are inapposite. *Curry v. Yelp Inc.* concerned complaints about the accuracy of *user-generated* business reviews—not the Company's own statements. 2015 WL 1849037, at *6 (N.D. Cal. Apr. 21, 2015); Mot. at 13-14. The court in *In re Toyota Motor Corp. Sec. Litig.* did not decide falsity as to Toyota's "generalized quality and safety statements" (2011 WL 2675395 (C.D. Cal. July 7, 2011)), and iRhythm did not merely suggest that the Zio AT was "safe" or of a "high quality" (as in *Toyota*) but specifically touted how "accurately" it could identify arrhythmias.

Lead Plaintiff's Opposition To Motion To Dismiss
CASE NO. 3:24-CV-706-JSC                                                                    17

accurate reports). *See*, *e.g.*, *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at \*11 (N.D. Cal. Nov. 4, 2020) ("When other types of information corroborate the witness statements, such detailed descriptions [of unnamed sources] are not necessary"); *Sanders v. RealReal, Inc.*, 2021 WL 1222625, at \*11 (N.D. Cal. Mar. 31, 2021) (relying on former employee accounts that were "corroborated by news reporting" to find falsity).[15]

*Third*, Defendants argue that allegations attributed to FE 3 and Capitol Forum sources that employees were directed to provide inadequate reports are "conclusory." Mot. at 15-16.[16] But these sources provided detailed accounts of precisely how they were instructed to modify reports, including examples of how they did so. ¶¶121, 170.

*Finally*, Defendants argue that Plaintiff did not support the allegation that Defendants manipulated iRhythm's accuracy analysis of its Zio AT reports. Mot. at 16. But the FDA found that iRhythm methodically excluded certain data inputs of errors (such as false positives) from its accuracy analyses, which made iRhythm's reports appear more accurate than they were. ¶120.

## B.    The Complaint Adequately Alleges Scienter

"Scienter can be established by intent, knowledge, or certain levels of recklessness." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); see also *Arena*, 840 F.3d at 705 ("deliberate recklessness" suffices). Deliberate recklessness exists when a defendant "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary

---

[15] Defendants' cases on unnamed sources are distinguishable. *See In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008) (reports from "hallway conversations and other vague claims of common knowledge" deemed unreliable); *Ng. v. Berkeley Lights, Inc.*, 2024 WL 695699, at \*10 (N.D. Cal. Feb. 20, 2024) (unidentified and unspecified sources in report by short-seller with "obvious self-interest"); *Garcia v. J2 Glob., Inc.*, 2021 WL 1558331, at \*15 (C.D. Cal. Mar. 5, 2021) (complaint "lack[ed] facts regarding the employee's responsibilities" and lacked "firsthand" knowledge of allegations). Other courts have credited such reports. *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at \*14 (N.D. Ga. May 15, 2018) (finding that plaintiffs plausibly relied on Capitol Forum investigative reports).

[16] Defendants also incorrectly suggest that these sources need to supply a motive for iRhythm to instruct technicians to provide inaccurate reports. Not only is motive not required (*see In re BP Prudhoe Bay Royalty Tr. Sec. Litig.*, 2007 WL 3171435, at \*3 (W.D. Wash. Oct. 26, 2007)), but the Complaint explains that iRhythm wanted the reports to be "clean," or consistent with any wear-period reporting, to support the illusion of reliability by the Company's algorithmic analysis.

effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). Importantly, the standard is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). A court must "constantly assum[e] ... plaintiff's allegations to be true." *Id.* at 326-27. The scienter inference "need not be irrefutable," a "smoking gun," or even the "most plausible of competing inferences"—a scienter inference that is merely as likely as any other suffices, because a "tie" goes to the plaintiff. *Id.* at 324. Here, Plaintiff's Complaint adequately pleads a strong inference that Defendants acted with scienter.

### 1.    The Complaint Alleges A Strong Inference Of Scienter

Plaintiff alleges with particularity numerous facts that give rise to a strong inference that Defendants knew or recklessly disregarded that their statements were false and misleading.

***Defendants' Admitted Knowledge Of The Fatal Transmission Flaw And Its Hazards***. Defendants have not only admitted knowledge of (i) the undisclosed fatal transmission limit and (ii) the "hazardous situation" the limit created, but the Company and Defendant Blackford also admitted in September 2022 that (iii) the "known design constraint" was both "crucial" and "essential" to the Zio AT. ¶¶10, 109, 158, 160, 166; *see also* Mot. at 3. These facts rendered their statements materially misleading because Defendants were aware that once the Zio AT reached its limit, it did not transmit events at all until after the wear period, and thus at that point, was (by Defendants' own standard) not appropriate for high-risk patients.

***FDA Correspondence***. The 2022 Form 483 explicitly stated that iRhythm was aware of the issues raised by the FDA since at least 2019 and had received 28 complaints in that time concerning severe patient arrhythmias not being transmitted to their doctors because the transmission limit was triggered. At minimum, Defendants gained actual knowledge of these issues upon receipt of the 2022 Form 483 on August 12, 2022.[17] Indeed, the 2022 Form 483 made clear that due to the transmission limit, the Zio AT could not be used in high-risk patients, and that without reliable near-real-time transmissions, the Zio AT could not be considered an MCT. ¶128.

---

[17] "Form 483s are intended ... to inform top management of significant objectionable conditions." *Mulligan v. Impax Laboratories, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014). "FDA warnings and failed inspections [are] crucial to a pharmaceutical company" so that even "outside directors were presumed to be aware." *Id* at 942, 970.

All statements after August 12, 2022—including *all* alleged false statements made by Defendants Bobzien, Day, Patterson, and Turakhia—were made following this express warning.

*iRhythm's Response To The Form 483.* iRhythm's lengthy response to the 2022 Form 483 admitting the intentionality of the "hazardous" transmission limit, signed by Defendant Blackford, no doubt required multiple inputs by the executive leadership of the Company. ¶¶109, 158. In addition, iRhythm's other actions within weeks of receiving the 2022 Form 483, including quietly removing all references to the Zio AT being appropriate for high-risk patients from its website and issuing the CAN, are further evidence of its executives' scienter. ¶¶112, 167.

*Extensive Patient and Provider Complaints.* The adverse event reporting regarding the Zio AT was extensive and put iRhythm on notice years before the Class Period. iRhythm received "a significant number" of complaints, including regarding the registration requirements (since 2017), the transmission limits (since 2019), and the unreliable CCT data reports (since 2022). *See, e.g.,* ¶¶79, 88, 117, 158, 202. This includes two incidents where patients died while using the Zio AT (¶¶70; 89-92); at least twenty-eight reports from patients who had severe episodes that were not reported to their doctors during their wear period due to the transmission limit (¶¶89, 158); and *thousands* of undisclosed reports of iRhythm's inaccurate CCT reporting (¶117). Given how integral the success of the Zio AT was to iRhythm's business, the known limitations on the device, and the seriousness and frequency of the patient complaints, Plaintiff's allegations plausibly infer collective scienter at minimum. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 66281, at *14 (N.D. Cal. Jan. 4, 2017).

*Blackford's and Devine's Membership On iRhythm's Compliance Committee.* The Company's Compliance Committee, which reports directly to the Audit Committee of iRhythm's Board of Directors, also had actual knowledge of the Zio AT's limitations. FE 2 explains, and the Company's own SEC filings corroborate, that the Compliance Committee received adverse event reports on a monthly basis. ¶¶96, 162. As a result, Compliance Committee members Blackford and Devine had knowledge of the complaints. *See, e.g., Nursing Home Pension Fund, Lcl. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show" scienter is through "contemporaneous reports or data, available to" the defendant); *Mulderrig v. Amyris, Inc.,*

Lead Plaintiff's Opposition To Motion To Dismiss
CASE NO. 3:24-CV-706-JSC                                                          20

492 F. Supp. 3d 999, 1026 (N.D. Cal. 2020) ("Particularized allegations that defendants had actual access to the disputed information may raise a strong inference of scienter.").

*Defendants' Public Statements.* Throughout the Class Period, Defendants emphasized their own individual focus on, and oversight of, iRhythm's regulatory compliance. For example, Blackford stated that "we began in 2021 to really invest into the whole quality regulatory organization of the company." ¶¶97, 164. Devine emphasized his own involvement, stating "[w]e've moved all the operations groups under me." ¶101. Further, Chief Technology Officer Day worked "underneath the hood" on the "product side" of iRhythm, and was an ███████████ ████████████████████████████████████. ¶177. Such statements by Defendants "indicate not just a willingness to monitor the market, but access to information putting them on notice." *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602-03 (N.D. Cal. 2019); *see also Snap*, 2024 WL 5182634, at *2 (crediting allegations that defendant regularly spoke to investors and worked with advertisers). "[I]t was at least deliberately reckless not to investigate" the Zio AT's deficiencies. *McKesson Corp.,* 411 F. Supp. 3d at 602.

*Core Operations.* iRhythm's entire portfolio consists of only two products, the Zio AT and the Zio XT. ¶175. Defendants spoke about, and answered questions regarding, the Zio AT at *every* investor conference and on *every* earnings call during the Class Period. ¶¶175-76. Defendants have admitted that the hazardous flaw was not only known, but "crucial" to the Zio AT's functioning. ¶¶10, 109, 158, 160, 166. Further, FDA compliance was fundamental to iRhythm's success, particularly in light of Defendants' history with problems with the FDA (¶¶31-33, 29-42), and Blackford said that he put extraordinary focus on regulatory compliance. ¶164. Thus, "it would be 'absurd' to suggest that management was without knowledge of the matter." *Snap*, 2024 WL 5182634, at *2-3; *Impax,* 36 F. Supp. 3d at 970, (citing *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)) (it "would be absurd to think that … the CEO and CFO" *and* "outside directors" "would be unaware" of FDA's concerns, particularly in light of "the repeated Form 483s and the Warning Letter from the FDA.").

*Defendants' Motive*. While "motive is not required to plead securities fraud," *Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at *21 n.18 (W.D. Wash. Nov. 26, 2019), Plaintiff

Lead Plaintiff's Opposition To Motion To Dismiss
CASE NO. 3:24-CV-706-JSC                                                                        21

has sufficiently alleged motive here. Every Defendant had "incentive-based compensation [that] could be increased or decreased based on Medicare reimbursement rates," which were four times higher for MCTs. ¶¶32, 34, 36, 38, 40, 42, 165, 172. *See In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1044 (S.D. Cal. 2014) ("The existence of performance-based compensation provides motive for the individual defendants to order or ignore misconduct").

All of these facts, taken collectively, show that Defendants had actual knowledge of, or at the very least would have been reckless in not knowing, the falsity of their statements. Indeed, contrary to Defendants' conclusory assertion that Plaintiff's theory of fraud is "illogical" (Mot. at 17), Plaintiff sufficiently alleged that Defendants prioritized profits from its supposedly "premium" device, while misleading investors as to its dangerous (and even fatal) flaws.

### 2.    Defendants' Preferred Inference Is Not More Compelling

Defendants fail to identify any non-fraudulent "opposing inference" that is more "compelling" than Plaintiff's proposed inference of scienter.

*First*, Defendants argue that their actions reflect an "innocent lack of clarity in iRhythm's marketing." Mot. at 17. This argument directly contradicts Defendants' Class Period admissions that the transmission limit was "known," "crucial," "essential," and posed a "hazardous situation." ¶¶10, 87, 109, 158, 160, 166. It is also contradicted by the adverse incident reports showing that at least two patients died of heart attacks while wearing the Zio AT, their doctors were not provided any arrhythmia notifications due to the transmission limitations, and both doctors and iRhythm's *own salespeople* were not aware of the device's limitations. ¶72. This was not an "innocent lack of clarity" and is not a *more* compelling story than the Complaint's collective allegations of fraud.

*Second*, Defendants' arguments regarding the Form 483s and Warning Letter (collectively, the "FDA Correspondence") misapprehend Plaintiff's allegations. Importantly, Plaintiff is not alleging that the FDA Correspondence is indicative of scienter only because of its existence (Mot. at 17-20), or because Defendants delayed announcing the receipt of such correspondence (Mot. at 18). Instead, the Complaint alleges that the *findings* in the FDA Correspondence support scienter. ¶158. Defendants' reliance on cases where the mere existence of such correspondence, or the timing of the disclosure of such correspondence, was found insufficient to support scienter, are

Lead Plaintiff's Opposition To Motion To Dismiss

therefore not applicable. Mot. at 17-20. In contrast to *In re Citigroup Securities Litigation*, 2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023), Plaintiff does more than simply allege regulators "[c]ommunicated concerns with some aspects of [the company's] risk management system at different times." *Id.* at *22. Plaintiff pled specific allegations of the FDA's findings, including that iRhythm knew before the start of the Class Period that the Zio AT transmission limit and registration requirements resulted in critical data not being transmitted. ¶158.[18]

Defendants also argue that the 2022 Form 483 was simply "interim feedback" given by the FDA, and not a "final Agency determination." Mot. at 17-18. But Defendants did not deny any of these findings in their response, and the Warning Letter confirmed ***all*** of the issues that had been raised by the 2022 Form 483. Relatedly, iRhythm's "prompt response" to the FDA following the 2022 Form 483 (Mot. at 17) is ***supportive*** of Plaintiff's theory of scienter.[19] *Supra* at 20. Defendants further claim that the Company's voluntary disclosure of the Form 483 "undermines any inference of scienter." Mot. at 17. But Defendants downplayed the impact of the 2022 Form 483, stating that it did not "present a material risk to our business at this time." D.Ex. G at 68. [20]

***Third***, Defendants claim that Plaintiff has not "set forth a single fact suggesting any Defendant received even one of the ... complaints." Mot. at 21. But as members of the Compliance Committee, Defendants Blackford and Devine received "high" severity complaint and adverse event reports at least quarterly. ¶¶9, 100, 162. The Complaint also bases these allegations on the

---

[18] Defendants' reliance on cases relating to a ***pre-approval*** Form 483, not a Form 483 for an existing medical device, is unavailing. *See Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at *14 (N.D. Cal. Apr. 2, 2024) (pre-approval 483); *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014) (same); *Schaefer v. Nabriva Therapeutics plc,* 2020 WL 7701463, at *12 (S.D.N.Y. Apr. 28, 2020) (same). A pre-approval Form 483 is a normal part of the initial FDA approval process for a new device, while a post-approval Form 483 is reserved for informing "top management" of "significant objectionable conditions." *See Impax*, 36 F. Supp. 3d at 970. Further, cases dealing with voluntary requests for FDA guidance are inapt. *See, e.g., Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F. 3d 228, 244 (1st Cir. 2015).

[19] Defendants' reliance on out-of-circuit authority, including *Slayton v. American Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010), which did not concern regulatory correspondence, or the speed of the defendant's response, is unavailing.

[20] Defendants' cited authority, *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *23 (N.D. Cal. Aug. 7, 2019), is distinguishable as it has nothing to do with regulatory investigations, but instead extensive disclosures made by a company regarding its cost-reduction measures

testimony of FE 2 (¶¶96, 162), as well as iRhythm's SEC filings (*Id.*), and the Company's ESG Report (¶100), which *all* corroborate the fact that Blackford and Devine reviewed the complaints on at least a quarterly basis. Finally, it would be "absurd" to suggest that the Company's executive leadership would not be apprised of serious adverse event reporting of one of the Company's two devices, particularly where the reports involved patient deaths.[21]

*Fourth*, Defendants claim (without evidence) that they substantially increased their iRhythm stock holdings. Mot. at 1, 17. But nearly *98%* of these shares were acquired through stock option grants as part of compensation packages—not through open-market purchases. Sinderson Decl. ¶2. *See also Am. W. Holding*, 320 F. 3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period").

### C.    The Complaint Adequately Pleads Loss Causation

Loss causation is a "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Pleading loss causation "should not prove burdensome," *id.* at 347, as the allegations need only meet "the familiar test for proximate cause." *First Solar*, 881 F.3d at 753. The Complaint states each corrective event, its connection to the fraud, and the stock price reaction. ¶¶122-53. Nothing more is required.

Defendants' arguments fail. *First*, Defendants argue the November 1, 2022 disclosure is not corrective because it merely revised revenue guidance. Mot. at 24. But Defendants disclosed the CAN and that it *led to* the announced lower revenue guidance. ¶¶123-24; *First Solar*, 881 F.3d at 753-54 (loss causation established by "showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss").[22]

*Second*, Defendants claim that the disclosures announcing receipt of the Form 483s,

---

[21] Defendants also baldly assert that FE 2 "lacks reliability." Mot. at 23. However, allegations attributed to unnamed former employees constitute scienter evidence if the complaint "describe[s] with sufficient particularity to establish their reliability and personal knowledge." *Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017); *see also In re Daou Sys. Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (former employee statements evaluated in light of "corroborative nature of the other facts alleged").

[22] *See also In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 956 (9th Cir. 2023), *cert. granted in part sub nom.*, 144 S. Ct. 2629 (2024), and *cert. dismissed as improvidently granted sub nom.*, 604 U.S. 4 (2024) (loss causation where negative earnings release linked to alleged fraud).

Warning Letter, and the DOJ investigation were not corrective because the FDA Correspondence disclosures "did not reveal any information to the market,"[23] and announcements of investigations "cannot be corrective." Mot. at 24-25 (citing *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014)). Not so. The November 4, 2022 disclosure revealed new information that the CAN was in response to the FDA's observations in the 2022 Form 483. ¶129. Likewise, the May 30, 2023 disclosure announced that the FDA issued the Warning Letter, which "allege[d] non-conformities … relating to the … Zio AT," and was followed on June 1, 2023 by more details about the FDA's concerns with "untimely patient registration" and "trigger warning limits" shared with analysts. ¶137. And the August 1, 2024 disclosure included that the 2024 Form 483 observations "centered on complaint handling and medical device reporting" and could "contribute to greater risk of potential escalation" of issues raised in the Warning Letter. ¶146. As to the DOJ disclosures, the Ninth Circuit held (*after* the cases Defendants rely on)[24] that "the announcement of an investigation *can* form the basis for a viable loss causation theory." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (disclosures revealing investigation establishes loss causation); *see also In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *11-13 (C.D. Cal. Jan. 26, 2021) (loss causation alleged for disclosure of whistleblower letter where letter's contents not disclosed).

*Finally*, Defendants argue that the August 9, 2024, *Capitol Forum* article revealing the contents of the 2024 Form 483 only revealed a "risk" of misconduct. Mot. at 25. But it contained detailed findings of the Zio AT's inaccuracies. ¶¶152-53. This sufficiently alleges "a causal connection between the material misrepresentation and the loss.'" *First Solar*, 881 F.3d at 753.

## V.    CONCLUSION

Defendants' motion should be denied, or alternatively, Plaintiff requests leave to amend.

---

[23] Defendants cite to *In re Curaleaf Holdings, Inc. Securities Litigation*, 519 F. Supp. 3d 99, 110 (E.D.N.Y. 2021) to suggest that because the existence of the 2022 Form 483 and CAN were disclosed, the Warning Letter was just a materialization of disclosed risk. Mot. at 25. *Curaleaf* concerned a warning letter targeting a cannabis product that the public already knew the FDA could not approve, because federal law prohibited it. *Curaleaf*, 519 F. Supp. 3d at 110.

[24] *See* Mot. at 25 (citing *Loos*, 762 F.3d 880 and *Tchrs.' Ret. Sys. of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007)).

DATED:    January 29, 2025                    Respectfully submitted,


                                             */s/ Katherine M. Sinderson*
                                             **BERNSTEIN LITOWITZ BERGER**
                                                **& GROSSMANN LLP**
                                             JOHN J. RIZIO-HAMILTON (*pro hac vice*)
                                             (johnr@blbglaw.com)
                                             KATHERINE M. SINDERSON (*pro hac vice*)
                                             (katiem@blbglaw.com)
                                             THOMAS Z. SPERBER (*pro hac vice)*
                                             (thomas.sperber@blbglaw.com)
                                             BRITTNEY BALSER (*pro hac vice*)
                                             (brittney.balser@blbglaw.com)
                                             1251 Avenue of the Americas
                                             New York, NY 10020
                                             Tel: (212) 554-1400

                                             JONATHAN D. USLANER (Bar No. 256898)
                                             jonathanu@blbglaw.com
                                             2121 Avenue of the Stars, Suite 2575
                                             Los Angeles, CA 90067
                                             Tel: (310) 819-3470

                                             *Counsel for Lead Plaintiff Oklahoma*
                                             *Firefighters Pension and Retirement System*