QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
Kristin Tahler (Bar No. 261908)
kristintahler@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

Christopher Porter (admitted *pro hac vice*)
chrisporter@quinnemanuel.com
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7000

Jesse Bernstein (admitted *pro hac vice*)
Brenna Nelinson (admitted *pro hac vice*)
Amy Shehan (admitted *pro hac vice*)
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
amyshehan@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| GLAZING EMPLOYERS AND GLAZIERS' UNION LOCAL #27 PENSION AND RETIREMENT FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IRHYTHM TECHNOLOGIES, INC., et al.,<br><br>Defendants. | Case No. 3:24-cv-706-JSC<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Date: April 24, 2025<br>Time: 10:00 a.m.<br>Location: Courtroom 8, 19th Floor<br>Before: Hon. Jacqueline Scott Corley |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ....................................................................................................................1

I.    PLAINTIFF FAILS TO PLEAD ANY MATERIALLY FALSE STATEMENTS...............1

    A.    Defendants' High-Risk Statements Were Not False Or Misleading..........................1

    B.    Defendants' Timing Statements Were Not False Or Misleading...............................3

    C.    Defendants' MCT Statements Were Not False Or Misleading.................................7

    D.    Defendants' Accuracy Statements Were Not False Or Misleading ..........................7

II.   PLAINTIFF FAILS TO PLEAD SCIENTER ........................................................................9

    A.    Plaintiff Fails To Account For More Compelling, Non-Culpable Inferences............9

    B.    Plaintiff Fails To Plead Knowledge Of Falsity Or Deliberate Recklessness ..........10

    C.    Plaintiff's Motive Allegations Are Insufficient ......................................................14

III.  PLAINTIFF FAILS TO PLEAD LOSS CAUSATION...........................................................15

CONCLUSION ....................................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Apple Inc. Securities Litigation*,
2020 WL 6482014 (N.D. Cal. 2020) ........................................................................................ 8

*Aramic LLC v. Revance Therapeutics, Inc.*,
2024 WL 1354503 (N.D. Cal. 2024) ...................................................................................... 14

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................................. 14

*Bhangal v. Hawaiian Electric Industries*,
2024 WL 4505465 (N.D. Cal. 2024) (Corley, J.) ......................................................... 5, 6, 13

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. 2014) ...................................................................................... 14

*Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*,
2025 WL 82206 (N.D. Cal. 2025) .......................................................................................... 14

*In re Cloudera, Inc.*,
121 F.4th 1180 (9th Cir. 2024) ............................................................................................ 1, 7

*In re Cornerstone Propane Partners, LP*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ................................................................................... 8

*Curry v. Yelp Inc.*,
2015 WL 1849037 (N.D. Cal. 2015) ........................................................................................ 8

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017) ............................................................................................... 12

*Diamond v. Corizon Health, Inc.*,
2016 WL 7034036 (N.D. Cal. 2016) (Corley, J.) .................................................................... 9

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ................................................................................................. 12

*In re Herbalife, Ltd. Sec. Litig.*,
2015 WL 12732428 (C.D. Cal. 2015) .................................................................................... 15

*Ikeda v. Baidu, Inc.*,
2021 WL 1299046 (N.D. Cal. 2021) ........................................................................................ 5

*Indep. Towers of Wash. v. Wash.*,
350 F.3d 925 (9th Cir. 2003) ................................................................................................... 4

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

*In re Intel Corp. Sec. Litig.*,
  2019 WL 1427660 (N.D. Cal. 2019).................................................................................. 2, 4

*Kader v. Sarepta Therapeutics, Inc.*,
  2016 WL 1337256 (D. Mass. 2016)........................................................................................ 11

*Kang v. PayPal Holdings, Inc.*,
  620 F. Supp. 3d 884 (N.D. Cal. 2022) .................................................................................. 13

*Kim v. Allakos Inc.*,
  2022 WL 17477094 (N.D. Cal. 2022)..................................................................................... 13

*Lloyd v. CVB Financial Corp.*,
  811 F.3d 1200 (9th Cir. 2016)................................................................................................. 15

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ...............................................................................................................5, 8

*McGovney v. Aerohive Networks, Inc.*,
  367 F. Supp. 3d 1038 (N.D. Cal. 2019) ............................................................................ 4, 5, 6

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................................... 13

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................................... 14

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022)...................................................................................................... 9

*In re Netflix, Inc. Sec. Litig.*,
  2005 WL 1562858 (N.D. Cal. 2005)......................................................................................... 8

*Ng v. Berkeley Lights, Inc.*,
  2024 WL 695699 (N.D. Cal. 2024)........................................................................... 11, 12, 13

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020)..................................................................................................... 9

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014).................................................................................................. 12

*Okla. Firefighters Pension & Ret. Sys. v. Snap Inc.*,
  2024 WL 5182634 (9th Cir. 2024)........................................................................................... 14

*Oklahoma Police Pension & Retirement System v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019).........................................................................................4, 5

*Pardi v. Tricida, Inc.*,
  2024 WL 1056013 (N.D. Cal. 2024)........................................................................................ 11

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

*In re Petco Animal Supplies Inc. Sec. Litig.*,
    2006 WL 6829623 (S.D. Cal. 2006) ...................................................................................... 14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ............................................................................................. 13

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ............................................................................................... 14

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ................................................................................................. 9

*In re Toyota Motor Corp. Sec. Litig.*,
    2011 WL 2675395 (C.D. Cal. 2011) ...................................................................................... 5

*In re U.S. Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ................................................................................ 2

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ........................................................................... 11, 12

*In re Versant Object Tech. Corp.*,
    2001 WL 34065027 (N.D. Cal. 2001) .................................................................................. 12

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. 2017) ........................................................................................ 12

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................................................................... 13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................................................................... 6, 9, 12, 15

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

**PRELIMINARY STATEMENT**

Plaintiff's Opposition is divorced from reality and substitutes rhetoric and drama for well-pled facts and cogent legal arguments.[1]  Plaintiff attacks statements addressing the Zio AT's "high-risk" patient population but ***cannot define*** what "high risk" means beyond referencing FDA correspondence that posits the Zio AT is improper for ***critical care*** patients, the precise population for which iRhythm disclosed the Zio AT should ***not*** be used.  Plaintiff also argues Defendants' statements that the battery-operated Zio AT provided "near real-time" transmissions were false because of a transmission limit that posed a "hazardous situation."  But Plaintiff cannot quantify how frequently that limit was reached, nor does it have a rejoinder to iRhythm's correspondence to the FDA making clear that the "hazardous situation" occurred only when the transmission limit was ***both hit and ignored*** by HCPs.  The Opposition underscores the SAC's failure to plead a cogent and compelling inference of scienter for many of the same reasons.  Lacking any particularized facts, Plaintiff argues that it would be "absurd" to assume Defendants did not have "knowledge," but Plaintiff does not explain what the Court should assume Defendants had knowledge of such that they had an intent to defraud.  Finally, Plaintiff's loss causation arguments do not recognize that the alleged "disclosures" are not corrective under the securities laws.  The SAC should be dismissed.

**ARGUMENT**

**I.   PLAINTIFF FAILS TO PLEAD ANY MATERIALLY FALSE STATEMENTS**

**A.    Defendants' High-Risk Statements Were Not False Or Misleading**

Plaintiff's fractured arguments as to the High-Risk Statements each fail. *First*, the Opposition confirms that Plaintiff cannot define the parameters of a "high-risk" patient population, making it "impossible to evaluate the truth or falsity of [the High-Risk] [S]tatements without understanding what [a] phrase[] like [high risk] meant." *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024). Instead, Plaintiff concedes that the words have no precise meaning but nonetheless argues that Defendants "defined the benchmark against" which the Zio AT "should be measured" (i.e., the Zio XT and its "low-risk" patient population).  Opp. at 10.  This new comparative "definition" does not

---

[1] Capitalized terms have the meanings ascribed in Defendants' Motion, Dkt. 51 ("Mot."). Emphases are added, quotations and citations are omitted, and alterations are adopted, unless stated otherwise.

save Plaintiff:  Plaintiff does not dispute that the Zio XT provides only an end-of-wear report, ¶ 2, while the Zio AT provides ***both*** an end-of-wear report ***and*** daily wear-time reports, ¶ 170.[2]  As such, a Zio AT patient does, indeed, receive "more timely action" than a Zio XT patient.  That is true ***even if*** the Zio AT hits the transmission limit or has an alleged "lag time" because the Zio AT patient still got ***some*** wear-time reports, while the Zio XT patient got zero.  Plaintiff erroneously argues—without citation—that the FDA "found" the "Zio AT was no more appropriate for high-risk patients than was the Zio XT," Opp. at 10, but the FDA made no "findings" comparing the devices, Dkt. 43-1; Dkt. 43-2.  Nor did the FDA "determine[]" the Zio AT was "unsafe," Opp. at 10 (emphasis omitted), rather the FDA suggested "high risk" "describe[d] a new patient population."  Dkt. 43-2 at 3.

Plaintiff also takes issue with former CEO Kevin King's definition of "high risk."  Opp. at 11; Mot. at 7.  That definition—the only one provided by iRhythm—makes clear that, contrary to Plaintiff's allegations, iRhythm never suggested that "high risk" refers to patients with life-threatening arrhythmias.  Plaintiff wrongly claims that Mr. King was not discussing Zio patients (he was, *see* Ex. J at 8-9) and argues that the definition predates the Class Period (which does not matter, *see In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1067 n.3 (N.D. Cal. 2002) ("Any information that sheds light on whether class period statements were false…is relevant.")).

*Second*, Plaintiff incorrectly argues—without citation—that the FDA "equated" "critical care" and "high-risk" patients, Opp. at 11, but the FDA said the transmission limit could result in a failure to notify HCPs about "***life-threatening arrhythmias***," Dkt. 43-1 at 3—precisely the population for which iRhythm disclosed the Zio AT was ***not appropriate***, Mot. at 3, 8.  Plaintiff calls these disclosures an improper truth-on-the-market argument based on the CRM.  Opp. at 11.  This is not a truth-on-the-market defense, but rather holding Plaintiff to their burden of "demonstrat[ing] that [the High-Risk Statements], when ***read in light of all the information then available*** to the market conveyed a false or misleading impression."  *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *10 (N.D. Cal. 2019) (emphasis in original).  And the argument does not rest only on the "extrinsic" CRM that Plaintiff seeks to ignore at all costs, Opp. at 3, 11; iRhythm also disclosed on its website and in

---

[2]  iRhythm's website identifies that distinction between the two devices to this day.  *See* https://www.irhythmtech.com/us/en/solutions-services/irhythm-service.

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

SEC filings that the Zio AT *was improper* for critical care patients or patients with a history of life-threatening arrhythmias. *E.g.*, Mot. at 2 n.3; Ex. E at 30. As such, the interim observations in the 2022 Form 483—that the transmission limit could result in a failure to notify HCPs about "life-threatening arrhythmias," Dkt. 43-1 at 3—are consistent with iRhythm's disclosures, *see* Mot. at 8.

*Third*, Plaintiff fails to explain how statements that the ***Zio service*** provides solutions across the "spectrum" of care or risk, ¶¶ 206-09, are false or misleading. Mot. at 8. Plaintiff argues only that it was improper for iRhythm to target "high-risk" patients because the Zio AT did not provide prompt notifications adequate to capture "life-threatening arrhythmias." Opp. at 12. This argument is nonresponsive and ignores disclosures that the Zio AT was contraindicated for life-threatening arrhythmias. Mot. at 3, 8. Plaintiff cannot dispute that, unlike the Zio XT, the Zio AT provides wear-time reports, meaning the Zio service, indeed, provides solutions across the spectrum of care.

*Finally*, Plaintiff claims the Warning Letter stated the Zio AT does not provide "near real time monitoring for high-risk patients." Opp. at 12. This assertion is belied by the document. The Warning Letter stated that "***when the transmission limit is hit,*** the device can ***no longer provide*** near-real time monitoring for high-risk patients." Dkt. 43-2 at 5. In other words, the Warning Letter acknowledged that ***unless*** the transmission limit is hit, the Zio AT provides "near real-time" monitoring, and Plaintiff fails to allege how frequently the transmission limit was hit. *See infra* at 5; Mot. at 10. Nor does Plaintiff dispute that when the limit was hit, HCPs were notified and given the option to replace the device. Ex. B at R32-R33. Plaintiff also mistakenly claims the Warning Letter said the Zio AT labeling was "untrue" and thus "misbranded" because it "claim[s] to provide near real time monitoring for high-risk patients." Opp. at 12. The FDA did ***not*** allege the Zio AT was misbranded because it does not provide near real-time notifications, rather it tied this misbranding allegation to an assertion that the Zio AT's "labeling ***fails to bear adequate directions*** related to the [] transmission limit." Dkt. 43-2 at 5-6. Those two reasons are materially distinct.

**B.     Defendants' Timing Statements Were Not False Or Misleading**

Plaintiff argues that the Timing Statements were false because the transmission limit (necessary to preserve battery life) and the "onerous" registration requirement (HCPs had to register patients on a simple online portal) prevented "timely" and "near real-time" data transmissions at an

unidentified frequency.  Opp. at 12-15.  This argument fails.  *First*, Plaintiff does not meaningfully respond to Defendants' argument that the Timing Statements are vague and ambiguous.  Mot. at 9.  Instead, Plaintiff claims the Ninth Circuit in *Oklahoma Police Pension & Retirement System v. LifeLock, Inc.*, 780 F. App'x 480 (9th Cir. 2019) held that "near real-time" statements are actionable as a matter of law.  Opp. at 13.  But *LifeLock* did **not even address** the question whether the statements were vague to the point of being nonactionable because the parties never raised it.  Briefs of Appellants & Appellees, No. 17-16895 (9th Cir.); *see Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (Ninth Circuit does not "consider[] arguments that are not briefed").  In any case, every statement in *LifeLock* was about "real time" alerts—as opposed to "near real time"—save for one, which the court resolved in a footnote without analysis.  *See* 780 F. App'x at 483 n.2.  The **only** concrete definition Plaintiff puts forth—that "timely" and "near real time" mean timely enough to detect life-threatening arrhythmias—is directly contrary to iRhythm's **repeated disclosures** that the Zio AT was contraindicated for critical care patients, for life-threatening arrhythmias, and when "real-time" monitoring should be prescribed.  Mot. at 9.

*Second*, Plaintiff all but abandons its claim that the registration requirement rendered the Timing Statements false, arguing only that Defendants fail to show "either doctors or patients understood" iRhythm's warning that incomplete registration would result in "limited functionality" to mean it "disable[s]" transmissions.  Opp. at 13.[3]  Unable to explain what else "limited functionality" could mean, Plaintiff calls this disclosure an improper truth-on-the-market defense.  *Id.*  Not so.  Plaintiff mistakenly alleges that Defendants omitted to disclose the registration requirement, *e.g.*, ¶ 6, but iRhythm disclosed—on its website and in the Zio AT labeling—that incomplete registration risked "limited functionality or erroneous ECG reporting," Mot. at 2 n.3; Exs. Q, S, T at 5; Ex. B at R67.[4]  That Defendants disclosed "exactly what Plaintiff[] claim[s] [Defendants] omitted" renders the statement not misleading.  *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038,

---

[3] Plaintiff does not respond to Defendants' argument that Plaintiff does not allege how frequently the registration requirement interfered with transmissions, Mot. at 10, and therefore waives it.

[4] At a minimum, the market was aware of the risk of incomplete registration by September 28, 2022 when iRhythm disclosed in the CAN that "notifications of clinically actionable arrhythmias will be delayed until patient registration is complete."  Ex. F at 2; *Intel Corp.*, 2019 WL 1427660, at *10.

1056 (N.D. Cal. 2019); *see also Ikeda v. Baidu, Inc*., 2021 WL 1299046, at *11 (N.D. Cal. 2021) (statements not misleading where disclosures addressed risks). *Bhangal v. Hawaiian Electric Industries* is in accord. Opp. at 13. There, unlike here, the alleged concealed risk of an equipment-induced wildfire was buried in "79- and 142-page" regulatory filings that merely "reference[d] wildfire risk" and "note[d] the possibility of failing poles" but did "not spell out the risk that [defendant's] equipment could spark a wildfire." 2024 WL 4505465, at *9 (N.D. Cal. 2024) (Corley, J.). That differs from Defendants' clear and repeated warning on registration.

*Third*, Plaintiff's only response to its lack of allegations about how frequently the Zio AT hit the transmission limit is to cite *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39-40 (2011) for the irrelevant proposition that there is no "bright-line rule" for the number of adverse events needed "to establish a statistically significant risk that the product is in fact causing the events." Opp. at 14. Plaintiff attacks a strawman. Defendants do not argue materiality, rather that without **any** allegations of how frequently the transmission limit was hit, Plaintiff cannot credibly claim that the Timing Statements are **misleading**. *McGovney*, 367 F. Supp. 3d at 1056 (falsity inadequately pled where "Plaintiffs do not provide allegations that quantify the actual staffing problems"); *In re Toyota Motor Corp. Sec. Litig*., 2011 WL 2675395, at *2 (C.D. Cal. 2011) ("[I]t is not necessarily inconsistent to assert that quality is stable or even increasing on the whole, while being aware of a potentially significant defect."); *cf. LifeLock*, 780 F. App'x at 483 (falsity of "real-time" statement adequately alleged where "***[a]ccording to the complaint***,…***more than 70%***" of an alert type "were stale"). Plaintiff does not allege any facts concerning the frequency of the "issues," including any facts inconsistent with iRhythm's data showing only ***2.46%*** of Zio AT devices hit the asymptomatic transmission limit and ***0.87%*** hit the symptomatic transmission limit (an average of 1.67%). Mot. at 3 (citing Ex. B at R40). The Warning Letter's nonspecific assertion that the limit was hit "more often than expected," Opp. at 14, does not resuscitate Plaintiff's argument because Plaintiff does not plead what was "expected" or how much more often the limit was reached.

*Fourth*, Plaintiff's response to Defendants' argument that adverse events do not establish the falsity of the Timing Statements is that the adverse events "reveal product limitations and hazardous situations," but, once again, Plaintiff does not quantify the frequency or pervasiveness of these

"limitations." *Id.* Plaintiff's case law is irrelevant: In *Matrixx*, *Bartelt*, and *Intuitive Surgical*, the statements professed the ***safety*** of the drug or medical device, so of course adverse events would bear on whether such statements are false or misleading. *See id.* Here, Plaintiff provides no detail about the complaints or their substance, and Plaintiff's allegations on the two deaths have no bearing on whether the Timing Statements were false when made because they predate the Class Period and one patient died from ventricular fibrillation, ¶ 91, the ***exact condition*** for which iRhythm was clear the Zio AT is not intended. Mot. at 11. Plaintiff ignores these facts.

*Fifth*, Plaintiff's one-sentence defense of FE 3's reliability, Opp. at 15, ignores the many deficiencies Defendants noted in FE 3's report, Mot. at 11-12. Plaintiff, for example, does not reconcile the fact that FE 3 wanted to "look at critical and end-of-life arrhythmias" and thought many Zio AT patients "should have been monitored live," ¶ 76, yet those are situations for which iRhythm ***explicitly said*** the Zio AT was inappropriate. Plaintiff does not contest that FE 3 has no knowledge about the falsity of any statement made after FE 3 left iRhythm. Mot. at 12. And for the brief portion of the Class Period FE 3 was at iRhythm, Plaintiff does not allege how FE 3 knew about the supposed "lag time." *Id.* Plaintiff's argument that FE 3 made "personal observations" about the lag, Opp. at 15, is nonresponsive, as it fails to explain how FE was "positioned to know the information alleged," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009); *see also McGovney*, 367 F. Supp. 3d at 1053 ("[W]ithout describing the particular responsibilities of each" CW, the complaint "fails to adequately allege that the CWs were in a position to have the knowledge they profess.").

*Finally*, in rebuttal to Defendants' argument that the Timing Statements do not say the Zio AT ***always*** provided "timely" or "near real-time" transmissions, Mot. at 9 (citing *Bhangal*, 2024 WL 4505465, at *9), Plaintiff's only (circular) response is to reiterate that the Timing Statements "were misleading without disclosing the device's material limitations," Opp. at 15. But Plaintiff cannot establish the Timing Statements are misleading without particularized allegations corroborating its description of the "limitations" as "material."[5] *See supra* at 5.

---

[5] Plaintiff concedes Defendants disclosed the transmission limit and registration requirement no later than November 4, 2022, *see* ¶ 129; *see also* Mot. at 9 n.7. Defendants actually made those disclosures no later than September 28, 2022, *see* Ex. F at 2-3.

### C.    Defendants' MCT Statements Were Not False Or Misleading

Plaintiff cannot define "MCT," let alone establish that the MCT Statements are false. *First*, Defendants argued that there is no widely-accepted definition of "MCT," as evidenced by the definition in *CardioNet* which, unlike the Mayo Clinic definition, does not mention the timing of transmissions at all, Mot. at 13, let alone as a "key feature," Opp. at 16; ¶ 45. The Court cannot "evaluate the truth or falsity of [the MCT Statements] without understanding what" MCT "meant at the time the statements were made." *Cloudera*, 121 F.4th at 1187. Because MCT "lack[s] a plain or ordinary meaning," Plaintiff was required to "plead facts supporting" that the Mayo Clinic definition was *the* market's definition when Defendants made the challenged statements, *id.* at 1189, but the SAC offers only a passing reference to the Mayo Clinic definition, ¶ 45. Nor can Plaintiff rely on the Warning Letter to define MCT, Opp. at 15-16, as the FDA issued the Warning Letter in May 2023— months *after* the last MCT Statement. ¶¶ 213-21 (last MCT Statement dated 1/10/23).

*Second*, Plaintiff insists the FDA concluded the Zio AT was "not an MCT" because of the registration requirement, Opp. at 15 (emphasis omitted), but the FDA *never* raised the registration requirement when addressing the MCT categorization. Dkt. 43-1; Dkt. 43-2. Further, Plaintiff can quibble all it wants with the differences between the OCT product code (i.e., QYX) and Plaintiff's definition of MCT, Opp. at 16, but Plaintiff cannot avoid that the FDA *sua sponte* assigned Product Code QYX to the Zio AT following iRhythm's response to the Warning Letter, *see* Ex. R; Ex. N, and iRhythm continues to market the Zio AT as an MCT today.[6]

### D.    Defendants' Accuracy Statements Were Not False Or Misleading

Plaintiff's use of nonspecific complaints and unreliable confidential witness reports to establish the falsity of the Accuracy Statements fails. Opp. at 16-18. *First*, Plaintiff's argument that there are over 4,000 complaints about CCTs misreading patients' arrhythmia data, *id.* at 17, is contradicted by the 2024 Form 483, which states that iRhythm received "4,014 complaints related to [its CCT] personnel operations from 05/02/2022 to 07/19/2024, *including* issues/events related to CCT personnel misreading arrhythmia data," Dkt. 43-3 at 2. Plaintiff fails to allege *how many* of the

---

[6] *See* https://www.irhythmtech.com/us/en/solutions-services/irhythm-service/zio-at.

4,014 complaints relate to "misreading arrhythmia data"—perhaps only one is related. In any event, because "every large company can expect to have some customer complaints," *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *7 (N.D. Cal. 2005), they "generally do not…establish the veracity of the allegations contained therein and the falsity of a defendant's representations to the contrary," *Curry v. Yelp Inc.*, 2015 WL 1849037, at *8 (N.D. Cal. 2015). Plaintiff nonetheless concludes that the "FDA's focus on these complaints…demonstrates that a meaningful number" addressed CCT errors. Opp. at 17. Such rank speculation does not pass muster under the PSLRA. *In re Cornerstone Propane Partners, LP*, 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005) (noting the PSLRA's "strong mandate" "to avoid speculation"). *Matrixx* does not require a different result: it held that "the mere existence of reports of adverse events…will not satisfy [the materiality test]. Something more is needed," 563 U.S. at 44, yet Plaintiff does not plead "[s]omething more," *see* Mot. at 14. Nor does Plaintiff explain how iRhythm's alleged failure to "adequately analyze" the complaints translates to "ambiguity as to how many…concerned CCT review accuracy." Opp. at 17.

*Second*, the allegations attributed to FE 3 and anonymous CCTs lack coherence and plausibility, Mot. at 14-16, yet Plaintiff's only response is to repeat the allegations attributed to those sources, Opp. at 17-18. The CCTs lack reliability because the SAC provided no information on their responsibilities or dates of employment, Mot. at 15, and the allegations attributed to them are vague at best and illogical at worst, *e.g.*, ¶ 81 ("we felt we couldn't get accurate readings"; "it did not feel accurate"). *In re Apple Inc. Securities Litigation*, Opp. at 18, is distinguishable because the allegations were based on "detailed reports that provide[d] specific numbers," 2020 WL 6482014, at *11 (N.D. Cal. 2020). Here, every allegation attributed to the CCTs and FE 3 is conclusory and lacks key information such that it cannot be credited. Mot. at 15-16. For example, one CCT believed "QA leadership" "downplay[ed]" a "complete heart block" "to sell the narrative that the Zio is intended for long term life threatening arrhythmia monitoring." ¶¶ 83-84. This nonsensical report runs contrary to iRhythm's messaging that the Zio AT is ***not*** intended for life-threatening arrhythmias, Mot. at 2 n.3; Exs. Q, S at 9, and includes no details to support the contention that "QA leadership" was "downplaying" rather than legitimately correcting the CCT's analysis. Plaintiff's bare assertion that the anonymous CCTs and FE 3 "provided detailed accounts," Opp. at 18, does not make it so.

*Finally*, Plaintiff draws the erroneous conclusion that, somehow, the way iRhythm calibrated its "accuracy analyses" made its reports "appear more accurate than they were." *Id*. Plaintiff's point is both unclear and irrelevant to whether CCTs purposely falsified patient data. Plaintiff otherwise does not respond to *any* of the issues with Plaintiff's Accuracy Statement allegations, Mot. at 14-16, including that to accept its allegation that iRhythm purposely falsified patient data requires this Court to "check [its] disbelief at the door," *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).

## II. PLAINTIFF FAILS TO PLEAD SCIENTER

The Opposition shows Plaintiff fails to state with *particularity* facts giving rise to a strong inference that *each* defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2)(A). Plaintiff does not respond to, and thus concedes, Defendants' argument that Plaintiff improperly uses group pleading by lumping together Defendants' alleged "knowledge." Mot. at 16-17 & n.13; *Diamond v. Corizon Health, Inc.*, 2016 WL 7034036, at *4 (N.D. Cal. 2016) (Corley, J.). This failure alone warrants dismissal. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (Rule 9(b) "requires plaintiffs to differentiate their allegations when suing more than one defendant").[7] Plaintiff's arguments otherwise amount to conclusory assertions that emphasize the SAC lacks "the requisite particularity to survive dismissal under the PSLRA's heightened pleading standard." *Zucco*, 552 F.3d at 987.

### A. Plaintiff Fails To Account For More Compelling, Non-Culpable Inferences

Plaintiff cannot overcome Defendants' proffered competing, non-culpable inference and offers no rejoinder to Defendants' argument that Plaintiff's theory of fraud requires the Court to assume Defendants would jeopardize both the viability of their product and the health of patients by concealing information on how the Zio AT works and purposely falsifying data, Mot. at 17. Assumptions have no place in the PSLRA's exacting framework. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022). Plaintiff's allegations demonstrate why. *First*, it "does not make a whole lot of sense," *Nguyen*, 962 F.3d at 415, for iRhythm to convince a patient population it can use the Zio AT by using phrases like "high risk" and "near real-time," while simultaneously

---

[7] At a minimum, any alleged false statements by Bobzien, Patterson, and Turakhia should be dismissed because Plaintiff does not respond to Defendants' argument that Plaintiff did not even attempt to plead facts that Bobzien, Patterson, or Turakhia acted with scienter. Mot. at 16 n.13.

-9-                    Case No. 3:24-cv-706-JSC

telling that patient population the Zio AT is not appropriate for them, Mot. at 2 n.3; Exs. Q, S, T at 3; Ex. E at 30. *Second*, it similarly defies logic for iRhythm to conceal the registration requirement, *e.g.*, ¶¶ 6, 73, yet simultaneously disclose that "[r]egistration errors may result in limited functionality or erroneous ECG reporting," Ex. B at R67; Exs. Q, S, T at 5. *Third*, a company determined to defraud investors would not have acted quickly, voluntarily, and publicly when the FDA indicated further clarity was needed:  Defendants promptly disclosed FDA correspondence—despite no duty to do so, Mot. at 18—and repeatedly disclosed the risk of a warning letter, *id.* at 5.  The SAC capitalizes on ordinary discourse between the FDA and a medical device company.  That is not fraud.

### B.     Plaintiff Fails To Plead Knowledge Of Falsity Or Deliberate Recklessness

***"Hazardous Situation."*** Plaintiff ascribes great weight to iRhythm's mention of a "hazardous situation" in its 2022 Form 483 response, Opp. at 19, but conveniently omits that the "hazardous situation" of the transmission limit leading to a delayed notification occurs ***only if the HCP does not replace the device when the limit is reached***.  *See* Mot. at 4; Ex. B at R36 ("The exception [to the hazardous situation] would be the population where the [HCP] responded to iRhythm['s] [] communication to send a second patch prior to the max limit being reached.").  Plaintiff does not allege how frequently the Zio AT hit the transmission limit nor how frequently HCPs then ignored notifications concerning the transmission limit.  Indeed, Plaintiff does not even respond to iRhythm's data that, on average, only ***1.67%*** of Zio AT devices ever hit the transmission limit, and the "hazardous situation" happens ***only in the fraction of the 1.67%*** where the HCP ignores iRhythm's multiple attempts at outreach and does not replace the device prior to the limit being reached.  *Id.* Thus, all Plaintiff has actually alleged is Defendants' knowledge of a potential risk inherent in the design of a battery-operated device that may come to pass less than 1.67% of the time.  Plaintiff sets forth no authority suggesting this supports a strong inference of scienter.

***2022 Form 483.*** Contrary to Plaintiff's assertion, Opp. at 19, the 2022 Form 483 did not "ma[k]e clear" that the Zio AT could not be used for "high-risk" patients, nor did it state that the Zio AT is not an MCT:  Indeed, the 2022 Form 483 does not even mention MCT and only refers to "high-risk" patients in an introductory sentence.  Dkt. 43-1 at 2.  Plaintiff then claims that the 2022 Form 483 shows "iRhythm was aware" of 28 complaints about the transmission limit since at least 2019

and that, at a minimum, "Defendants" gained "actual knowledge" of "these issues" upon receipt of the 2022 Form 483. Opp. at 19. That is conclusory and insufficient: Plaintiff does not explain *who* knew *what* and *when*. *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *13 (N.D. Cal. 2024) (no scienter where complaint did "not plead with particularity that the [defendants] knew about any of the…customer complaints"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019) (no scienter where complaint did "not identify any specific information that was either received or communicated by" Defendants "that would contradict any public statement at the time it was made").[8]

    ***2022 Form 483 Response.***[9] Plaintiff's claim that iRhythm's 2022 Form 483 response "no doubt required multiple inputs by the executive leadership," Opp. at 20, is pure speculation and underscores Plaintiff's inability to allege scienter with particularity. Plaintiff argues the "executives' scienter" is established because iRhythm "quietly remov[ed] all references to the Zio AT being appropriate for high-risk patients from its website," *id.*, but that fails to engage with Defendants' argument, Mot. at 20. Even though the 2022 Form 483 never said the Zio AT could not be used for "high-risk" patients, *see* Dkt. 43-1, iRhythm removed references to "high/higher risk patients" from its website while it sorted through the "verbiage" with the FDA, Ex. B at R10; *see also* Mot. at 20. Plaintiff does not explain how responding to the FDA's concerns by removing this language demonstrates that Defendants intended to defraud investors by using the language *prior* to that time. Regardless, Defendants' caution should not be penalized, as there must be some space for regulatory back-and-forth. *Pardi v. Tricida, Inc.*, 2024 WL 1056013, at *7 (N.D. Cal. 2024) (no requirement "for a company to engage in a rolling, communication-by-communication disclosure of every detail arising from the back-and-forth dialogue with the FDA…or to adopt the FDA's position as correct and share it with the public when discussing its product").

    ***Complaints.*** Plaintiff argues two pre-Class Period deaths, 28 complaints about the transmission limit, and an unidentified number of complaints on CCTs misreading arrhythmia data

---

[8] Plaintiff does not respond to Defendants' argument that—***even assuming each*** Defendant knew about the 28 complaints—mere awareness of complaints is not sufficient for scienter. Mot. at 21.

[9] Plaintiff places significance on the fact iRhythm "privately" responded to the FDA, Opp. at 2, 7, but "companies are under no obligation to disclose their written communications with the FDA to the general public," *Kader v. Sarepta Therapeutics, Inc.*, 2016 WL 1337256, at *18 (D. Mass. 2016).

Case No. 3:24-cv-706-JSC

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

establish scienter. Opp. at 20. Not even close. To start, "customer complaints do not give rise to a strong inference of scienter." *Veal*, 423 F. Supp. 3d at 815; *see also In re Versant Object Tech. Corp.*, 2001 WL 34065027, at *6 (N.D. Cal. 2001) (customer complaints, "which are received by every company, do not give rise to a strong inference of deliberate recklessness"). Further, two deaths as well as 28 complaints from June 2019 to August 2022 (an average of 9.3 complaints per year—not so "frequen[t]," Opp. at 20) are not of such a high volume to raise a strong inference of scienter. *Curry v. Yelp Inc.*, 875 F.3d 1219, 1227-28 (9th Cir. 2017) (2,000 complaints represented 1 complaint for every 26,500 reviews on Yelp and "complaints regarding such a small portion of Yelp's business do not support a strong inference of scienter"). Regardless, a company is "not required to disclose that its product had experienced defects or recite the specifics of all customer complaints." *Ng*, 2024 WL 695699, at *8. Further, Plaintiff's claim that there were "thousands" of complaints on "inaccurate CCT reporting," Opp. at 20, is not supported by the 2024 Form 483, *supra* at 7-8. And Plaintiff does not explain ***who*** knew about these complaints and ***when***. *Supra* at 11. Conceding the inadequacy of these allegations, Plaintiff argues that they at least amount to an inference of collective scienter. Opp. at 20. But to the extent the Ninth Circuit permits such a theory, *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008), the statements are not "so dramatically false" that they "create a strong inference that at least some corporate officials knew of the[ir] falsity," *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014); *id.* at 1063 & n.13 (statements "so dramatically false" where company said "it had sold one million SUVs" but "the actual number was zero").[10]

***Compliance Committee.*** Plaintiff concedes that the SAC contains no information on ***when*** Blackford and Devine served on the Compliance Committee or what ***specifically*** they learned of while on that Committee. Mot. at 22. Instead, Plaintiff argues that, according to FE 2, "the Compliance Committee received adverse event reports on a monthly basis," so "Blackford and Devine had knowledge of the complaints." Opp. at 20. Such a conclusory and general assertion— that a "committee" received "reports" equals ***Defendants'*** scienter—is insufficient. *Zucco*, 552 F.3d

---

[10] Plaintiff's citation to *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, Opp. at 20, is inapt because there it was "reasonable to infer that at least some corporate officials knew Volkswagen was falsely touting the emissions compliance of 11 million vehicles…when in fact ***none*** of the vehicles were in compliance," 2017 WL 66281, at *14 (N.D. Cal. 2017).

-12-                                                                    Case No. 3:24-cv-706-JSC
DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

at 1000 (must allege "actual," as opposed to hypothetical, access to information); *Ng*, 2024 WL 695699, at *14 ("access to reports containing customer complaints…is insufficient"); *Kim v. Allakos Inc.*, 2022 WL 17477094, at *4 (N.D. Cal. 2022) ("receipt of unspecified weekly or monthly reports[] [is] not sufficient"). Plaintiff also does not defend FE 2's reliability: In a footnote, Plaintiff regurgitates the law that a complaint must describe a confidential witness "with sufficient particularity to establish their reliability and personal knowledge," Opp. at 24 n.21, but does not explain how the SAC meets that requirement for FE 2. *But see* Mot. at 23.[11]

***Public Statements.*** Plaintiff points to three statements from Blackford, Devine, and Day that supposedly "emphasize[]" their "focus" on and "oversight" of "iRhythm's regulatory compliance" such that they had scienter. Opp. at 21. Not so. Those statements, ***at most***, show "general awareness of the day-to-day workings of" iRhythm and do not "contain allegations of specific information conveyed to management and related to the fraud." *Bhangal*, 2024 WL 4505465, at *15. Blackford's statement that iRhythm "began in 2021" to "invest" in the "quality regulatory organization," ¶ 164, does not explain what specific information related to the fraud was conveyed to management, *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 900 (N.D. Cal. 2022) (statement about "heavy investment in compliance" was "far from sufficiently specific" to infer scienter). Plaintiff's reliance on Devine's statement that "[w]e've moved all the operations groups under me," ¶ 101, is a veiled attempt to use Devine's position to establish scienter, which courts "regularly" reject, *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1174 (C.D. Cal. 2007). And that Day worked "underneath the hood" on the "product side," ¶ 177, does not show Day had "access to information putting [him] on notice," Opp. at 21, such that he knew his only challenged statement, ¶ 188, was false.

***Core Operations.*** Proof under the core operations theory "is not easy." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Plaintiff's insistence that Defendants had scienter because "iRhythm's entire portfolio consists of only two products," Opp. at 21; ¶ 175, misses the mark because adopting such a standard "would eviscerate the core-operations

---

[11] *Mulderrig v. Amyris, Inc.*, Opp. at 20-21, proves Defendants' point: Plaintiff's vague allegations about the Compliance Committee do not provide "[p]articularized allegations that defendants had actual access to the disputed information," 492 F. Supp. 3d 999, 1026 (N.D. Cal. 2020).

test and turn it into an automatic presumption of comprehensive knowledge on the part of management," *Browning v. Amyris, Inc.*, 2014 WL 1285175, at \*15 (N.D. Cal. 2014).

Lacking particularized facts, Plaintiff argues that a core operations inference is appropriate because it would be "absurd" to suggest that "management" was "without knowledge of the matter." Opp. at 21. Not only is this "absurdity" test met in only "exceedingly rare" cases, *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008), but Plaintiff does "not identif[y] ***what relevant fact is of such prominence*** that it would be absurd to suggest that [Defendants were] unaware of it," *Browning*, 2014 WL 1285175, at \*15. This case stands in contrast to *Berson v. Applied Signal Tech., Inc.*, where the "absurdity" test was met because the defendant received "stop-work" orders from its largest customers which halted millions of dollars of work and had "a devastating effect" on revenue. 527 F.3d 982, 987-89 & n.5 (9th Cir. 2008).[12] To the extent Plaintiff argues it is "absurd" to suggest Defendants did not have knowledge of the pervasive nature of the transmission limit, Plaintiff pleads no facts to that end. To the extent Plaintiff relies on the mere existence of the transmission limit, that is not enough. *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at \*24 (S.D. Cal. 2006) ("The vagueness of Plaintiffs' allegations regarding the operational problems significantly weakens the inference they ask the Court to draw about the defendants' supposed knowledge of such a minor and esoteric problem."). Plaintiff cannot ask this Court to infer Defendants' scienter without identifying what they purportedly had scienter of. *Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*, 2025 WL 82206, at \*2 (N.D. Cal. 2025) (no core operations where "complaint does not state with enough specificity what it is that the defendants must have known").

### C.      Plaintiff's Motive Allegations Are Insufficient

"Defendants' general financial motives cannot show scienter." *Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at \*15 (N.D. Cal. 2024). Plaintiff ignores Defendants' argument that for bonus compensation to support scienter, the allegations "must demonstrate a strong correlation—including comparisons to previous years' bonuses—between the bonuses and the

---

[12] *Accord Okla. Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at \*3 (9th Cir. 2024) ("absurdity" test met where issue "threatened more than half of Snap's revenue"); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) (noncompliant conditions "pervading" the "manufacturing and quality control divisions").

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

company's bottom line." Mot. at 24. In *Zucco*, for example, the complaint made "only the bare assertion that executive-level bonuses were based in part on Digimarc's financial performance," which the court found inadequate because it "fails to provide specifically, with comparisons to prior years bonuses, the correlation between [defendants'] compensation and Digimarc's bottom line." 552 F.3d at 1005. The same result applies here given the SAC's bare assertion that bonuses "could be increased or decreased based on Medicare reimbursement rates." ¶¶ 32, 34, 36, 38, 40, 42.

## III.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Plaintiff's strained arguments as to its seven alleged corrective disclosures fall short. *First*, Plaintiff still fails to explain how the November 1, 2022 revenue reduction is connected to any alleged misrepresentation. Mot. at 24. *Second*, Plaintiff does not respond to, and thus concedes, Defendants' argument that because iRhythm issued detailed risk disclosures warning of the potential for labeling changes, the November 4, 2022 disclosure of labeling changes was the materialization of a known risk. *Id*. *Third*, Plaintiff's statement that the Warning Letter "alleged non-conformities relating to the Zio AT," Opp. at 25, confirms Defendants' argument that the May 30, 2023 disclosure "did not reveal any information to the market" because by this time, investors were well aware of the 2022 Form 483 and the CAN, making the Warning Letter the materialization of a disclosed risk. Mot. at 25. *Fourth*, Plaintiff admitted in ¶ 152 that the August 1, 2024 disclosure did not disclose any "specific details" about the 2024 Form 483's "findings," so it could not have revealed new information to the market. *Id*. *Fifth*, Plaintiff's contention that the August 9, 2024 article "contained detailed findings of the Zio AT's inaccuracies," Opp. at 25, does not change the fact that it contained only mere speculation as to fraudulent conduct. *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12732428, at *2 (C.D. Cal. 2015). *Lastly*, Plaintiff's argument that iRhythm's two disclosures concerning the DOJ subpoena are "corrective" under *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200 (9th Cir. 2016) fails because there, unlike here, the defendant issued multiple ***corroborating*** disclosures.[13]

### <u>CONCLUSION</u>

For the reasons in the Motion and herein, the Court should dismiss the SAC with prejudice.

---

[13] Plaintiff does not defend its allegation that the DOJ Motion was corrective, nor can it, because a motion to enforce a subpoena does not reveal the falsity of any misstatement.

DATED: March 10, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Kristin Tahler*

Kristin Tahler (Bar No. 261908)
kristintahler@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

Christopher Porter (admitted *pro hac vice*)
chrisporter@quinnemanuel.com
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7000

Jesse Bernstein (admitted *pro hac vice*)
Brenna Nelinson (admitted *pro hac vice*)
Amy Shehan (admitted *pro hac vice*)
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
amyshehan@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000

*Attorneys for Defendants*

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS