Pages 1 - 64

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

GLAZING EMPLOYERS AND        )
GLAZIERS UNION LOCAL #27     )
PENSION AND RETIREMENT FUND, )
                             )
          Plaintiff,         )
                             )
  VS.                        )   NO. 24-cv-00706-JSC
                             )
IRHYTHM TECHNOLOGIES, INC.,  )
et al.,                      )
                             )
          Defendants.        )
_____)

San Francisco, California
Thursday, April 24, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

        BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
        1251 Avenue of the Americas
        New York, NY 10020
    BY:  **KATHERINE M. SINDERSON, ATTORNEY AT LAW**
        **THOMAS SPERBER, ATTORNEY AT LAW**

For Defendants:

        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
        700 Louisiana Street, Suite 3900
        Houston, TX 77002
    BY:  **CHRISTOPHER D. PORTER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
        Official United States Reporter

<u>APPEARANCES</u>: (Continued)

                    QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                    295 5th Avenue, 9th Floor
                    New York, NY 10016
              BY:   **AMY E. SHEHAN, ATTORNEY AT LAW**
                    **BRENNA D. NELINSON, ATTORNEY AT LAW**

                    QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                    865 S Figueroa Street, 10th Floor
                    Los Angeles, CA 90017
              BY:   **KRISTIN TAHLER, ATTORNEY AT LAW**

Also Present:

                    CHASE RANKIN, EXECUTIVE DIRECTOR

**Thursday - April 24, 2025**                                        **10:30 a.m.**

                               P R O C E E D I N G S

                                    ---o0o---

THE COURTROOM DEPUTY:  Calling Civil Action C 24-0706, Glazing Employers and Glaziers Union Local #27 v. iRhythm.

THE COURT:  Go ahead and make your appearance.

MS. SINDERSON:  Good afternoon -- good morning, Your Honor.  Katie Sinderson, from Bernstein, Litowitz, Berger & Grossmann, for the class and the plaintiffs.  I'm joined by my colleague, Thomas Sperber.

And I would also like to introduce, in the audience, a representative from lead plaintiff, the Executive Director from Oklahoma Firefighters, Mr. Chase Rankin.

THE COURT:  So are you out from Oklahoma?

MR. RANKIN:  Yes.

THE COURT:  Welcome.  I'm sorry it's so cold today.

MR. PORTER:  Morning, Your Honor.  Chris Porter, with Quinn, Emanuel, Urquhart & Sullivan, for the iRhythm defendants.  I am up from Houston today.

THE COURT:  Ah.

MR. PORTER:  And --

THE COURT:  Oh, we don't like Houston --

MR. PORTER:  You don't like Houston right now.

THE COURT:  -- because they beat the Warriors last night.

**MR. PORTER:**  But you all won the first one, so, you know, it's evened out.

Your Honor, today, my colleague, Brenna Nelinson, will be handling the argument.  I would also like to introduce Kristin Tahler, my partner in LA, and also Amy Shehan.  She is here from New York.

**THE COURT:**  Great.  Welcome.

**MR. PORTER:**  Thank you.

**THE COURT:**  Thank you for coming and supporting the San Francisco economy.  And, of course, I appreciate -- and if at any time another lawyer wants to step in -- I'm sure they won't -- but just in case, you're welcome to do so.

Okay.  Well, I don't usually do this.  But we were -- had worked up the case, and so I have a tentative.  But I'm open -- completely open -- but just wanted to frame it a little bit.

So maybe you want to go first, Ms. Nelinson.

**MS. NELINSON:**  I would.  Thank you so much, Your Honor.  It's great to meet you.  Brenna Nelinson on behalf of the defendants, as my colleague mentioned.

Before I get started, we have prepared, to the extent helpful to Your Honor, for reference, just a short demonstrative.  We have a copy for plaintiffs, as well, if you wouldn't mind if I passed it up.

**THE COURT:**  Of course.

**MS. NELINSON:**  Your Honor, thank you for your

tentative.  We had a chance to review it.

I'd like to start today by giving a little bit of context on what the Zio AT is.  I think it would helpful to sort of orient ourselves before we get into some of the legal arguments, because I think it can get lost.  You know, this is a technical product.  It's a medical device.  It can get a little bit lost in the briefing.  And so I want to start by talking about what the Zio AT is and what it is not.

Let's start with what it is not.  It is not a life-saving device.  It is not available over-the-counter.  You cannot walk into your local CVS and get it.  It is not a Life Alert product.  And defendants --

THE COURT:  "It is not a" what?

MS. NELINSON:  A Life Alert product.  Have you seen those -- you know -- those commercials where an elderly person falls down and has to --

THE COURT:  Oh.

MS. NELINSON:  -- press a button so they can be immediately saved.  You know, this is -- this is not meant to --

THE COURT:  I think you're going to have to slow down for the --

MS. NELINSON:  Absolutely.

THE COURT:  -- court reporter.

MS. NELINSON:  This is not meant to be a life-saving

device.  And the company's disclosures throughout the class period made this clear.

THE COURT:  And would I say that -- could I say that, drawing all inferences in the plaintiff's favor?

MS. NELINSON:  That it was not a life-saving device?

THE COURT:  Yeah.  I mean, what's the point of having it, in real time, send what happened to you -- your cardiac event -- to your doctor, if not to, like, save your life?

MS. NELINSON:  Sure.  Yes.  So I think the company explained this.  I think the company, in its statements, explained that -- and this is in some of the statements that are quoted in plaintiff's own complaint.  Maybe, perhaps, it would be helpful to look at the language.

So the company explained that this is meant to be a diagnostic tool.  This is a data collection device for physicians.  So just as one example --

THE COURT:  Wait, I'm going to stop you.  If it's just data collection, why is it sent in real-time?

MS. NELINSON:  So, first, Your Honor, the company said that the transmissions were sent in near-real-time or that they were timely.  And I think it's important to --

THE COURT:  Okay, stop.  Why near-real-time if it's just data collection?

MS. NELINSON:  Because this is for a population of patients whose physicians have decided, after consulting with

their patients, that perhaps having information prior to the end of that two-week wear period would be helpful.  So the company has a --

THE COURT:  Okay, stop.  Helpful how?

MS. NELINSON:  So that -- for use in diagnosing and treating their patients.  Now, that doesn't mean saving their --

THE COURT:  Stop.  Why do they treat them?

MS. NELINSON:  Because they're investigating whether their plaintiffs might have -- excuse me -- whether their patients might have some sort of a cardiac condition.  But --

THE COURT:  And -- I'm going to stop you.  Sorry.

MS. NELINSON:  Of course.

THE COURT:  The heart keeps you alive.

MS. NELINSON:  Of course it does.

THE COURT:  And if you can treat that condition, it would save your life.

MS. NELINSON:  That's certainly true, Your Honor, for some conditions.  But I don't think it is true for all conditions, nor have plaintiffs pled that the -- any condition that the Zio AT was meant to help diagnose or help a doctor treat -- more specifically, you know, any conditions that would cause, you know, someone to pass away.

I think, to the contrary, the company disclosed on its website, in its label, even in its SEC filings reviewed by

investors, that this is not a product that was appropriate for critical care patients.  It is not a product that was appropriate to detect life-threatening arrhythmias.  It was not a product that should be used when real time or in-person monitoring was appropriate.

I mean, these disclosures and these contraindications were available publicly, both before, throughout, and after the class period.  So there could not be any confusion that while this was meant to be a device to assist physicians in diagnosing and collecting data for their patients, that this was meant to be a life-saving device.

The company was very, very clear about that.  And so to assume that this was -- you know -- this was meant to be used for those purposes I think would be to draw an inference that is not supported by the complaint.  It is not supported by the company's disclosures throughout the class period.

So let's talk a little bit more in that vein about what it is.  It's a prescription device that physicians use when they need a little bit of extra visibility into a patient's cardiac activity.

**THE COURT:**  I'm going to stop you.  We're on a motion to dismiss, as you just heard.  When you start using adjectives like "a little bit of extra," you are drawing inferences in defendants' favor.  So it would be more persuasive if you cut out the adjectives --

MS. NELINSON:  Understood.

THE COURT:  -- or at least use the adjectives in plaintiff's favor, because that's what I have to do.

MS. NELINSON:  Understood, Your Honor.

So this is a wearable battery-operated heart monitor.  We can all agree on that.  And there's an image of it in your PowerPoint deck, just to get a little bit of a better idea of what this is if you take a look at Slide 3.

So a patient can go to their doctor.  The doctor will place it on the patient's chest.  And they go on their way.  They go on their way.  Generally, the prescription is for a two-week wear period.  Throughout that wear period, okay, the device is collecting data.  It is constantly collecting data.  Plaintiffs don't take issue with that fact.

Now, to the extent --

THE COURT:  Well, they take issue with it when you've hit the transmission limit.  It's not collecting that data; right?

MS. NELINSON:  So that's actually not correct, Your Honor.  The device for the duration of the two-week wear period continues to collect data.  It continues to work.

Now, let's -- I'm glad you raised --

THE COURT:  It's not transmitting the data.

MS. NELINSON:  Exactly.

Now, I'm glad you -- I'm glad you raised the transmission

limit, because, of course, we can all agree that issue is at the heart of the case that we're here discussing today. I would like to explain a little bit about what the transmission limit is.

So we've talked about the fact that this is a battery-operated wireless cardiac monitor. You can see the image of it here in your slide deck. The way that this was designed was that to ensure that the device can continue collecting data for that two-week period, that there were two -- there were two transmission limits for asymptomatic and arrhythmias. And there were limits placed on those transmissions to ensure that the battery would last long enough to continue to collect data. And it was designed so that those limits would only be hit in extremely rare instances.

Now, plaintiffs, in their complaint, don't set forth any particularized allegations, as they're required to do under the PSLRA, concerning how frequently that limit is hit. Instead, they focus on two generalized pieces of evidence. Generalized, you know, phrases that they cling to.

The first is by describing the transmission limit as a, quote, "hazardous situation." And I want to pause here. Because plaintiffs cling to this language. It is central. It is central to their scienter allegations. They cling to this language in the company's response to the FDA's Form 483 back in September of 2022.

And I'm going to pause here, Your Honor, because plaintiffs are trying to keep iRhythm's response to the FDA's Form 483 out of this case.  They say Your Honor cannot incorporate it by reference despite relying on it -- I think they cite "hazardous situation" over 20 times in their complaint -- despite relying on it for a key element of a securities fraud claim scienter.  They want to keep Your Honor from reviewing that document in its entirety.

THE COURT:  I think I can review it.

MS. NELINSON:  We agree.  So, Your Honor, I want to focus on the description of the transmission limit as a hazardous situation.  Again, this phrase that plaintiffs cling to.

THE COURT:  On iRhythm's description?

MS. NELINSON:  Yes.  So the plaintiffs cling to iRhythm's language in their response to the Form 483.  And I'll -- and I'll -- to help Your Honor, I think it would be helpful to look at -- let's see -- Slide 6 in the deck that we've provided you.

So here you can see -- this is the excerpt from iRhythm's Form 483 response where iRhythm is explaining to the FDA, here -- here is why we have a transmission limit, and here is -- here is when it might become a, quote, "hazardous situation," which, by the way, Your Honor, is a term of art used by the FDA.

Plaintiffs, in their complaint, focus on the very first sentence. It reads, "The hazardous situation of a max transmission design constraint potentially leads to a delayed notification of ECG findings until the final report is posted with all findings from the wear period."

They omit the second sentence. It is nowhere to be found in their complaint. That sentence reads, "The exception would be the population where the physician responded to iRhythm customer care communication to send a second patch prior to the max limit being reached."

Now, I want to just give Your Honor, if you wouldn't mind, a little bit more context here to make sure that we all understand what this means. When a patient is wearing a Zio AT, if that device is approaching either of the transmission limits, a notification is sent to that patient's doctor to let them know the device is approaching a transmission limit. A second notification is sent --

**THE COURT:** Hold on one second.

Did you maybe leave something? You can come look. No problem.

**MS. NELINSON:** A second notification is sent again to the patient's physician when that device hits the transmission limit. The physician, in both instances, is given the opportunity to replace the device so that there is full coverage for the duration of the wear period.

What this excerpt is saying -- that this, quote, "hazardous situation" that plaintiffs cling to for scienter in their complaint -- what this is saying is that two things have to happen for that hazardous situation:  The limit has to be hit and the physician has to ignore or decline iRhythm's outreach --

THE COURT:  Or not see it --

MS. NELINSON:  -- to replace the device.

THE COURT:  Or not see it because they're on vacation, or they're away, or they're busy with all their other patients.

MS. NELINSON:  Sure.

THE COURT:  So to ignore, again, is to draw inferences in defendant's favor.

MS. NELINSON:  So, regardless, Your Honor, in a situation where, for whatever reason, whether intentional or not, a physician chooses not to relace a patient's device prior to the end of a wear period.

So now we have the full context, which means for plaintiffs to rely on the transmission limit, which they characterize as this hazardous situation -- this nefarious -- this nefarious fact -- which is really nothing more than a technical design component of this device, it means that they have to allege to satisfy the stringent pleading requirements of the PSLRA -- how frequently that transmission limit was hit -- and then of that population -- what fraction of that

population did their doctors not replace the device before the transmission limit was hit?

Only in those instances is there a, quote, "hazardous situation." But the complaint is silent on those issues. The complaint does not plead a thing about how frequently the transmission limit is hit.

Now, plaintiffs rely on language from the warning letter. Important fact, however, about the warning letter, Your Honor: The warning letter is sent to iRhythm after every single high-risk statement is made and only after -- and after every single timing statement is made, save for one, that follows the warning letter, which means, to the extent plaintiffs are relying on the warning letter to say, well, iRhythm knew defendants had scienter, because the FDA came back after they sent the Form 483 and said, well, you know, yeah, you tell us it's rare, but if this happens more than rarely, it's a nonconformance, and we think you need to do more. iRhythm didn't have the benefit of that communication when it was making nearly every single one of the false statements in this complaint.

THE COURT: Okay. So let's -- now let's actually just go -- so are you -- what element are you talking about now? The scienter?

MS. NELINSON: Still -- still on scienter.

THE COURT: Okay. And now we're just only -- because

I tentatively granted it as to the defendants, other than Mr. Day and Mr. Blackford.  Are you saying neither of them made any statements after the warning letter?

MS. NELINSON:  There is one timing statement made after the warning letter.  And that statement, I believe, is from Mr. Blackford.  And there are no statements regarding -- that fall into that high-risk category after receipt of the warning letter in May 2023.

THE COURT:  Okay.

MS. NELINSON:  There were --

THE COURT:  So we're talking about -- as I -- the high-risk statement -- what the parties put into four buckets. We're talking about the high-risk bucket and scienter.  And you're saying, alright, as to Mr. Blackford, maybe there's one statement with the warning letter.

MS. NELINSON:  Mm-hm.

THE COURT:  But Mr. Day, there are not any statements.

MS. NELINSON:  Correct.  Well, to be clear, Your Honor, I don't think that any of these statements are actionable.  But just with respect to their specific argument -- you know, that the transmission limit and the fact that it is this so-called hazardous situation -- to the extent that contributes -- you know -- that serves as the foundation --

THE COURT:  It's more than the transmission limit.  It

was the four-hour delay -- or maybe even longer on the weekends -- because technicians had a long queue; right? There's that, as well.

MS. NELINSON:  Sure, Your Honor.  But -- so let's -- let's discuss the four-hour lag time.  The important, I think, thing to keep in mind about the four-hour lag time is that the entirety of those allegations come from a confidential former employee.  That's FE3.  And under very clear precedent, from both the Northern District of California and from the Ninth Circuit, allegations from FE3 cannot be credited.  Let's see what we know about --

THE COURT:  Ever?

MS. NELINSON:  No, no.  From FE3 in this case.

THE COURT:  Because -- but didn't they specifically allege the position and when the person was in the position?

MS. NELINSON:  And that's all we have, Your Honor.  So we know that FE3 was a technician.  And we know that he was a technician from sometime before the class period until November 22nd, which, by the way, Your Honor, is only about halfway through the class period.  So certainly FE3 cannot have knowledge of anything that was happening in iRhythm following the class period.  Okay?  But all we know about FE3 is that he was a technician and he stopped working at iRhythm in 2022.

Northern District of California precedent, including --

THE COURT:  I'm going to stop you just --

MS. NELINSON:  Please.

THE COURT:  What my colleagues do is not precedent. All that's precedent, really, is the Ninth Circuit.  It could be persuasive.

MS. NELINSON:  Understood.

THE COURT:  So case law; right?  Case law.  And maybe that's what you meant.  But some, you haven't done it.  And I'll just give you a little thing that's a pet peeve of mine, is when people say this Court said this.  And I'm thinking, wow, I don't remember that.  And it was my colleague.  So we're not like the Circuit Court, and we're just individual little fiefdoms and can be wrong, therefore, all the time.

MS. NELINSON:  Understood.

THE COURT:  So it's only as persuasive as the reasoning.

MS. NELINSON:  Your Honor -- and I've tried to be careful not to say "this Court."  But, thank you, I appreciate that.  And I will be careful with use of precedent moving forward.

Other courts, certainly, within the Northern District of California --

THE COURT:  Perfect.

MS. NELINSON:  -- as well as the Ninth Circuit, have recognized that where only a title and tenure are pled without any further description of job responsibilities, and specific

detail about what this person was responsible for, and how that, you know, has contributed to particularized allegations that would support scienter or falsity, those allegations cannot be credited.

So I think, Your Honor, the *McGovney* case from the Northern District of California is a good case here.  That case specifically held that where the complaint is lacking important details about employment information, including job description and responsibilities, those allegations and reports cannot be credited.

I think Your Honor faced a similar set of facts in your recent *Hawaiian Electric* case where --

**THE COURT:**  Yeah.  I don't think it's even close, so don't argue that one.  I don't think it's even close.

So, here, they allege that FE3 conducted a final quality assessment review of the data and reports, which were then issued to doctors following observations by these technicians. I mean, what is it that they need to allege more about FE3?

**MS. NELINSON:**  Your Honor, we don't have enough here to know not only if these allegations are credible, but let's assume, for a second, that you do decide to credit these allegations.  Let's look specifically at what FE3 says relative to the lag time.  FE3 says that because of a lag time, the Zio AT was not live and didn't notify doctors of arrhythmias right away.

Well, this is directly contrary to what the company -- disclosures the company made.  The company never said the Zio AT was live.  Now FE3 says it took four hours --

THE COURT:  I'm sorry.  "The company never said the AT was" --

MS. NELINSON:  Was live.  That is not -- that is -- that is contradictory, I believe, to what the company disclosed, which is that while the Zio AT is capable of providing near-real-time transmissions, the timeliness of those transmissions are not consistent with life-threatening arrhythmias.  And that where real-time monitoring should be prescribed -- where real-time monitoring should be prescribed -- the Zio AT is not appropriate.  So the fact that he said it's not live, well, that's a red herring for us here.

So then he goes on to discuss this four-hour lag time. Well, Your Honor, did the four-hour lag time happen every single time?  Did it happen in every device that he was reviewing transmissions for?  We have no idea the severity, the pervasiveness, how widespread the alleged lag time was.  And these allegations are not corroborated anywhere.  There's nothing that's in the complaint that talks about this four-hour lag time that we can credit.

Now, FE3 goes on to say that this problem got worse on weekends because there were less people working.  And so more -- less people doing the work of more.  But FE3 was a

technician.  There is nothing in the complaint that suggests he had anything to do with the staffing of technicians.  And so how he would have knowledge of the number of technicians who were available to be reviewing these data transmissions is nowhere to be found in the complaint.

These -- I think we -- it's always important to remember that we're operating in the world of the PSLRA.  And so while under normal circumstances on a 12(b)(6) motion to dismiss we're talking about plausibility, we're here under Rule 9(b) in the PSLRA where we cannot draw inferences that are not supported by particularized facts.

THE COURT:  So what they allege is that FE3 says it took four hours for any arrhythmia event transmitted to the Zio AT to show up in a queue.  Not sometimes, any.

MS. NELINSON:  I think that that's a little unclear, Your Honor.  But, again, even crediting --

THE COURT:  I'm just reading from the complaint.

MS. NELINSON:  I understand.  I think the allegation is unclear.  Is he really saying that every single time an arrhythmia was meant to be transmitted, it took four hours?  And is there anything else to corroborate that?

And even if that is true, Your Honor, there is not a single allegation in the complaint to suggest that a four-hour, quote/unquote, "lag time" is not timely or near-real-time.  I don't think that they --

THE COURT:  If I draw inferences in plaintiff's favor, a four-hour lag time is not real -- near-real-time.

MS. NELINSON:  Okay.

THE COURT:  Right?

MS. NELINSON:  I -- that's --

THE COURT:  I mean, you can't argue with that if they draw inferences in plaintiff's favor.

MS. NELINSON:  If they draw -- correct.

Again, I don't think, given that we are under -- we're operating under the PSLRA here -- given that we don't have specific details about FE3, given that there is not a single other allegation in the complaint to corroborate this lag time, and given that FE3 is, you know, throwing out allegations about -- giving -- throwing out allegations about, you know, staffing and iRhythm's ability to keep up with these transmissions on the weekends, I don't -- I don't -- again, I don't believe that these are credible, nor do I believe that we have any reason to think that this FE3 would have any reason to know why or how staffing was, you know, less on weekends, such that these -- this lag time was getting worse.

THE COURT:  Which were lots of different places where they were located?

MS. NELINSON:  Where the technicians were located?  I actually don't know the answer to that, Your Honor.  I'm going to be honest with you.  But, again, I would think that those

would be facts that we would expect to see in the complaint when assessing whether these allegations from FE3 are adequate or not.

I mean, if they want to allege that FE3, as a technician, had access to how iRhythm staffed its technicians on the weekends, then they need to include -- it is their burden to include how FE3 had access to that information.  They don't do that.  So, you know, whether I, standing here today, know whether there are different, you know, review centers like there are call centers, that should be something that we can look to the complaint to find out.  And we can't.

THE COURT:  Do you agree, if there's just one, and FE3 worked there, FE3 would have personal knowledge?

MS. NELINSON:  Your Honor, plaintiffs have not pled that.  And I -- and respectfully --

THE COURT:  I had a -- I had a different question.

MS. NELINSON:  Respectfully, no, I wouldn't.  I don't know -- I don't know what FE3 -- even if there's one center, how big is it?  How do they work?  Are they siloed?  Do they know how many people are on call at any given --

THE COURT:  Right.  But, at some point, I'm just drawing -- I'm drawing reasonable inferences in plaintiff's favor.  And so I don't know the detail.

But let me hear from plaintiff a bit first.  So what they seem to be arguing is that pretty much all you have -- that FE3

is insufficiently pled, and, therefore, all you have is the transmission data problem and that you haven't pled enough to make any of the statements as to high risk and the other things false.

MS. SINDERSON:  Thank you, Your Honor.

I think there was a lot there.  There were a lot of factual arguments there.  And, if I may, I would like to focus a little bit on the pleadings in the first instance and just walk through that.  And then, to the extent Your Honor would like to hear more about the outside factual context, perhaps we can discuss that.

So our primary argument, as made clear in our complaint and in our pleadings, were that -- in particular, with respect to the high risk and the near-real-time statements -- that these are, at minimum, actionable half-truths, which the Supreme Court has recently reaffirmed, in a 9-0 decision, are actionable securities fraud claims.

We articulated, in our opposition brief, why these are half-truths and named a number of cases in which courts have found that where you are representing the benefits of, for example, a product and, yet, do not give negative information to the product that may undermine the impression given by those statements, you are committing securities fraud.

Defendants, in their reply, and Ms. Nelinson -- "Nelinson" is how I used to know her.  I'm blanking her current name.

**MS. NELINSON:**  That's still my name.

**MS. SINDERSON:**  My colleague is now articulating -- has not mentioned the word "half-truths."  Defendants don't address the concept of half-truths in their reply.  They abandon that entirely.  From our perspective, they've completely ignored this argument.  They don't address a single one of the cases that we cite.

From our perspective, these particular statements regarding high risk -- the appropriateness of this product for high-risk patients and the ability to produce near-real-time transmissions are undermined by certain key facts, which my colleague didn't address, which are the FDA identified dozens of incidents where the transmission limit prevented transmission, including two deaths right before the beginning of the class period.

Defendants tried to dismiss those deaths as acting outside of the class period; however, the timing of those could not be more critical, given the scienter element that we also need to prove here.  Defendants, in their response to -- or iRhythm -- in their response, and Defendant Blackford, in his response to the FDA in response to the 2022 483, which is Exhibit B to defendants' --

**THE COURT:**  Oh.

Okay.  I just got a note.  And my court reporter has been going since 9:00 this morning.  So I don't mean to interrupt

you, but can we take a 15-minute break just to give her a break?

**MS. SINDERSON:** Absolutely, that's fine.

**THE COURT:** Okay. All right. Thank you.

(Recess taken at 10:57 a.m.)

(Proceedings resumed at 11:11 a.m.)

**THE COURT:** Okay. Can I just have you first address her arguments as to FE3?

**MS. SINDERSON:** So FE3, from our perspective, is fully described in the complaints. We provide her title, we provide her tenure, we provide --

**THE COURT:** Oh, now you just provided her gender.

**MS. SINDERSON:** There we go, even more information.

And we provided an extensive list of, from her perspective, the responsibility she had, the information she had as her -- in her role as a technician. I don't think anything more is required under Ninth Circuit law. And I didn't hear anything other than questioning the credibility of her allegations, which is inappropriate on a Rule 12(b)(6) motion when all inferences should be drawn in favor of the plaintiff.

**THE COURT:** Well, so when she says it took four hours for any arrhythmia, we should read that as it says, which is "for any"?

**MS. SINDERSON:** We should. We should. This is what

the witness informed us and as we accurately portrayed in the complaint.

THE COURT:  Okay.  So why don't you go ahead and just -- and I think this is where you're going.  I understand the law.  That's fine.  And there was, of course, the new Supreme Court case.  I think it maybe came after the briefing.

MS. SINDERSON:  No.  It's referenced in the briefing, Your Honor.

THE COURT:  Oh, okay.  They reversed the Ninth Circuit case, I think.

MS. SINDERSON:  Well, there's been a few Supreme Court cases reversing Ninth Circuit -- or applying the Ninth Circuit decisions.  This was, I think, in reference to a Second Circuit decision that was last year.

THE COURT:  Ah.

MS. SINDERSON:  So, first, Your Honor, on -- as we resume, I would like to just cover, very quickly, the materiality of the facts that we allege were omitted and rendered these statements misleading --

THE COURT:  Okay.

MS. SINDERSON:  -- very briefly.  And then, with Your Honor's patience, I would turn to Defendant Blackford's scienter.

So to return to what I was saying before, the facts that were omitted by defendants' statements regarding the

appropriateness for high-risk patients and near-real-time transmission were critical.  Defendants, themselves, said they were critical.  They said this transmission limit was, quote, "crucial, essential, and creates a hazardous situation when it's hit."

Nothing more could be more material than saying that a limitation is crucial and essential to the workings of the device and, yet, are undisclosed to the market.  Again, as I referenced before, there were two deaths directly before the class period that were reported to --

THE COURT:  Can I stop you for one second?

MS. SINDERSON:  Yes.

THE COURT:  So the complaint alleges that the market -- until I think after the warning letter -- was never -- they never disclosed that the device had this transmission limit for technical specification reasons.

MS. SINDERSON:  So it's slightly different.  So the company issued a customer advisory notice in the fall of 2022.  This is just to doctors, to office managers.  This was not disclosed widely to the market.  We had never seen the customer advisory notice until defendants attached it to their motion.

What I will say is that the materiality of this information is further supported by the fact that when defendants disclosed to the market in November of 2022 that they had issued this customer advisory notice because of

observations from the FDA, they said that this alone -- just telling doctors about the registration limit and the transmission limit -- would cut their growth in half for the quarter.

So the idea that these limitations on the device were somehow irrelevant or immaterial to the market is untenable. So just --

THE COURT:  Can you just point to me the paragraph where that is alleged?

MS. SINDERSON:  Yes, Your Honor.

So the -- I think defendants make some mention in their reply brief that -- and let just me pull up the exact location -- some mention in their reply brief that the market was aware of these limitations once the customer advisory notice was issued to the market.  There's really no evidence of that or argument of that.  There's just a mention of that.  And there's no -- that's contrary to the pleadings.

So in paragraph 123, on November 1st, 2022, iRhythm disclosed downgraded revenue guidance that they attribute to the issuance of this customer advisory notice.  That's paragraph 123 through --

THE COURT:  I see that.  Okay.  Thank you.

MS. SINDERSON:  Yeah.

So if I may, Your Honor, I'd move on to Defendant Blackford's scienter, unless you have further questions on the

materiality of this information.

THE COURT:  So -- right.  So the falsity really comes down from the transmission limit and FE3 and the registration requirement.  That all those things make it sort of not work as advertised and, therefore, materially -- admitted material information that would make it false.

MS. SINDERSON:  Those are the key limitations on the device.  I would also say that the device, itself, was only permitted to be marketed not to high-risk patients.  So by marketing it to high-risk patients alone, the FDA said it was misbranded.

So they went beyond their permissible labeling and marketing of the device by marketing it to high-risk patients, which they tacitly admitted this later, which I will get into in just a moment, if I may.

THE COURT:  Okay.

MS. SINDERSON:  So with respect to Defendant Blackford's scienter -- and there's -- there's one minor clarification I would like to seek from your Court regarding your tentative order, which we saw, and we appreciate your guidance.  You referenced defendants' scienter.  We just want to make it clear that Defendant Blackford's scienter would impute to the corporation --

THE COURT:  Yeah, I didn't -- I'm sorry if I -- I didn't mean to --

MS. SINDERSON:  Not at all.

THE COURT:  Right.  But the other individual defendants unnamed, I didn't feel it was pled as to them.

MS. SINDERSON:  Understood.  Understood.  So putting that aside, that was just one clarification we wanted to make for the record.

I would just note, before getting to Defendant Blackford's scienter, defendants have entirely abandoned their primary argument in their motion to dismiss, made in their motion to dismiss at page 1, that defendants' supposed acquisition of stock during the class period mitigates any inference of scienter.  We showed, in our opposition, at page 24, that these supposed acquisitions were virtually all just the exercise of employee stock options and have nothing to do with scienter here.

And one other thing is, I would note, in defendants' presentation, they reference the *Endologix* case at the beginning.  Ms. Nelinson didn't go into this before.  I'm happy to address how this doesn't apply here at all -- the *Nguyen v. Endologix* case -- but it's not something that Ms. Nelinson raised.  The idea that our scienter theory of fraud does not, quote, "make sense."  Absolutely, that case -- and this is on page 2 of defendants' presentation.

THE COURT:  Okay.  I don't think that's the case.

MS. SINDERSON:  Okay.  Okay.  So there are multiple

facts that support defendant's scienter, including facts that differentiate him and set him uniquely apart from any other defendants.  And these are set forth at paragraphs 158 to 176 of the complaint and 19 through 22 of our opposition.  I'd like to just summarize the three main points that we see as supporting Defendant Blackford's scienter.

So, first, Defendant Blackford placed himself as the focal point of contact with the FDA for matters of this level of regulatory interest.  This is readily demonstrated by Defendant Blackford's leadership and signature of iRhythm's extensive response to the FDA in response to the 2022 Form 483, which is Defendants' Exhibit B.  As you can see by the sheer volume of the response, this is something that he led, he helped author, he signed.  He is the focal point for regulatory contact.

It's also demonstrated by Defendant Blackford's role on iRhythm's compliance committee, which received quarterly reporting on all doctor and patient complaints.  This is at paragraph 162 of the complaint.  The FDA, in its 43 and warning letter, made it clear that iRhythm had received adverse complaints about the Zio AT for years.  The FDA noted that iRhythm had received numerous complaints, since June 2019, about the effects of their registration limit, since 2017 about the effects of their registration limit, and since 2022 about the unreliable data produced by these devices.

Particularly, as I've noted, were -- two of those

incidents were deaths that were not reported to doctors because of the transmission limit.  It just defies reason that Defendant Blackford, as CEO, a member of the compliance committee, and lead contact with the FDA, would not have been told about that.

Second, these limitations on the Zio AT were well known within iRhythm.  And Defendant Blackford positioned himself as the primary spokesperson to the public about the Zio AT's capabilities.  So -- and this is different from the other defendants in this action.

So regarding the transmission limitation, this was not a glitch.  This is not like other products that are the subject of other cases.  This is not a glitch that Blackford may not have been aware of until the FDA raised it with him.  Instead, it's a crucial, quote, "essential," quote, "known design constraint" -- that's at paragraph 160 -- on the Zio AT.  And it created a hazardous situation when the device met the transmission limit.  When Defendant Blackford responded to the FDA, he did not deny that this is a well-known issue with the device.

Unlike every other defendant, from the beginning of the class period, Defendant Blackford consistently spoke to the public and with investors on analyst calls specifically about the Zio AT's capabilities, including claiming the device was best for, quote, "high-risk patients in providing

near-real-time notifications."

He did so not just by signing these lengthy SEC filings that maybe something slipped by him.  He specifically spoke to analysts and investors during conference calls where he chose to bring up this near-real-time capability and this appropriateness for high-risk patients.  And that's at, for example, paragraph 206, 187, 191, 219, 210, and 195.

If Defendant Blackford did not educate himself about the appropriateness of his statements, that alone would speak to his severe recklessness.

So the third point I'd like to make about Defendant Blackford and his unique severe recklessness is the fact that after signing that lengthy response to the FDA in which he personally -- as you can see from Defendants' Exhibit B -- page 11 of their Exhibit B -- he certified that iRhythm would cease marketing this Zio AT to, quote, "high-risk patients" and as providing near-real-time alerts.  He told the FDA, "We will stop doing that."

However, after signing that, he turned around and, when the FDA wasn't watching, he just kept making those same claims to investors.  Specifically, Blackford made these same or stronger claims to investors on September 21st, 2022, 20 days after submitting his response.  He said Blackford had the -- iRhythm had the perfect product putting information into the hands of the patients in a near-real-time base.

On November 14th, 2022, in an interview with the Nasdaq -- again, not some place where the FDA is paying attention -- he touted Zio AT's near-real-time capability. At the J.P. Morgan Healthcare Conference, paragraph 210, he said, "The Zio AT monitored some of the most at-risk patients." So that's a -- that's extremely unique evidence of the severe recklessness of this particular defendant. At minimus, his scienter is well-established as of the issuance of the 483.

**THE COURT:** Well, and you allege the company only had these two products.

**MS. SINDERSON:** Correct.

So, Your Honor, I would rest there with respect to Defendant Blackford's scienter.

**THE COURT:** Okay. And what about Day?

**MS. SINDERSON:** So Day -- I think we have his specific and kind of unique evidence of his knowledge, which is referenced at paragraph 177, which is the fact that he actually is an author and a writer on certain technical documents that show the limitations of this device.

**THE COURT:** Okay. And you don't wish to say anything about the other defendants?

**MS. SINDERSON:** We're happy to rest on our papers there. Thank you, Your Honor.

**MS. NELINSON:** Your Honor, there's a lot I'd like to respond to. I'm going to start with Defendant Day, if that's

okay with you, and then work backwards. Because I think it's -- I think it's clear Defendant Day should be dismissed from this case.

And what I'd like to do is look at the single statement that Defendant Day made. It was -- it's in paragraph 188 on September 21st, 2022. And, again, this is before the receipt of the warning letter.

So plaintiffs allege that Defendant Day spoke with intent to defraud investors when he made a single statement. And his statement is, "Underneath the hood, they're entirely different. The Zio AT device has a Bluetooth capability that enables that kind of timely monitoring capability of the platform. The Zio XT does not."

So they allege, when he made this single statement, he was speaking with an intent to defraud. There is not a single allegation that suffices to establish scienter here. What plaintiffs are relying on for Defendant Day's scienter is core operations. The core operations inference is inappropriate here where there are no allegations of Defendant Day's specific access to information undermining his statements.

Now, what I think is important here speaks to a larger issue, which is whether knowledge of the transmission limit alone is sufficient to establish scienter. And it is not. All they have alleged and all they have suggested that perhaps they are entitled to an inference to is that Defendant Day had

knowledge that the transmission limit existed.

They don't allege he received any complaints.  They don't allege he contributed to the Form 483 response.  There are no allegations that speak at all to Defendant Day's state of mind. And, again, he only made this one statement that occurred prior to the company's receipt of the warning letter.

So I want to use that to segue into the more macro issue of whether knowledge of the transmission limit alone is sufficient for scienter.  And I'll have this conversation alongside falsity, if that's okay with Your Honor, because the same arguments apply.  So let's discuss the fact of the transmission limit and knowledge of the transmission limit. And I'd like to direct Your Honor's attention to Slide 6, please, in the deck, because I think it will be helpful to reference the numbers here.

Plaintiffs began by arguing that what they really are suggesting here is that the high-risk statements and the timing statements were actionable half-truths.  I think it's first important to point out this isn't what plaintiffs pled. Plaintiffs pled that these statements were false.  Then, after briefing, they realized these statements aren't false.  It is true that the AT has the capability to provide transmissions throughout the two-week wear period.  It is true that it was for a different population of patients.  The defendants explained that.  So they can't allege that these statements are

false.  They are literally true statements.

So they pivot to arguing that these are actionable half-truths because they say they created a state of affairs that was different from the one that these -- that these statements gave the impression of.  Okay?  It was materially different.  What do they need to do to establish this?

Now, of course, they want us to be in materiality land; right?  Because they want to say there's a fact issue.  It's a falsity issues.  But the arguments are the same.  The arguments are the same whether we're talking about falsity or materiality.  They need to establish that this transmission limit was such a significant issue -- so significant -- as to both render the statements false and as to suggest scienter.

Let's look what they've pled as to the pervasiveness or the severity of this transmission limit.  They have pled nothing.  Again, all they can do is point to language in the warning letter that says this happened more than rarely.  The warning letter came after these statements were made.

Let's look at what iRhythm told the FDA about the transmission limit.  And this is on Slide 6.  iRhythm told the FDA the transmission limit is hit.  The asymptomatic transmission limit is hit in only 2.46 percent of all Zio ATs at the time of this analysis.  That was 120,000 devices.  And that the symptomatic transmission limit was hit only .87 percent of the time.  That is less than 1 percent.  So that

materiality standard that --

**THE COURT:**  Materially as a matter of law?  Did they tell the investors -- did they tell the market that?

**MS. NELINSON:**  No.  Your Honor, I think --

**THE COURT:**  What about FDA saying that two people had died because of that transmission limit?  Did they tell the patients that?  That this transmission -- did they notify the patients when the transmission limit was hit so they could follow up with their physician?

**MS. NELINSON:**  So, Your Honor, in both of these instances, the Form 483 response explains to the FDA that, yes, the doctors were notified when the transmission limit was hit. But regarding these --

**THE COURT:**  How?  How were they notified?  You see, I think you're just arguing inferences in your favor.  And iRhythm -- I have to say, common sense tells you -- just to say, well, I know -- how did they notify them?  How?

**MS. NELINSON:**  They sent notifications --

**THE COURT:**  To where?

**MS. NELINSON:**  To -- I -- the specifics of it, Your Honor, are nowhere in the complaint.

**THE COURT:**  Exactly.  You don't know.  To what email address?  How many emails do physicians get?  How quickly do they generally respond?  You know what the inference to -- inference is?  That that's -- like, that's not --

MS. NELINSON:  Your Honor --

THE COURT:  And that's why they don't say it anymore. That is not a sufficient thing, when you're dealing with hearts, to say, well, we notified the physician by sending an email.  Can't tell you where.  Therefore, it's all the physician's fault if they don't respond.  You're not drawing -- I'm sorry -- that's not drawing inferences in plaintiff's favor.

Can you cite me a case where it was dismissed on a 12(b)(6) entirely, which is what you're seeking, where you have this kind of record of FDA 483s and then a warning letter or also the defendant then telling the market?  What about that, with the customer care?  Once we told physicians about this, we think we're going to have a big drop in demand.  What inference do I draw from that?

MS. NELINSON:  Your Honor, this is similar to the *Aramic* case.  In the *Aramic* case, decided in the Northern District of California in March of last year, the company received several Form 483s, a warning letter.  They were pervasive issues.  And the Court found no falsity and no scienter.  It's similar here, because there are no allegations as to the state of mind.

I want to return to the deaths --

THE COURT:  There's two products.  He's all over everything.  So putting aside Mr. Day, I understand that, but

Mr. Blackford.

MS. NELINSON:  Sure.

THE COURT:  You're telling me he had no idea any of this stuff was off?  I think the board would want to know that.

MS. NELINSON:  Your Honor, what I'm saying is -- and I'm not arguing that Defendant Blackford had knowledge of the transmission limit.  I couldn't possibly argue that.  We already talked about the lengthy Form 483 response.  What I'm arguing is that there are no allegations to support the falsity or materially or scienter of the transmission limit.  So, again, we were --

THE COURT:  Okay.  I understand that argument.  I think that's drawing inferences in defendants' favor.

MS. NELINSON:  Your Honor --

THE COURT:  I don't think I can say, as a matter of law, that it -- given the FDA warning letter -- what the FDA thought.  So they were wrong.  The FDA's concern -- the FDA was flat-out wrong.  And so I can't draw any inference from the warning letter about the FDA's concern that they're calling it -- you know -- saying for high-risk patients or near-real-time --

MS. NELINSON:  So --

THE COURT:  -- is not appropriate because of this transmission limit, I should draw what inference from the FDA's warning letter?

MS. NELINSON:  Your Honor, I think the important thing to remember -- with respect to scienter for the warning letter -- that the warning letter came after these statements were made.

THE COURT:  Yes.

MS. NELINSON:  And so -- and the -- and the warning letter did not say that the device was not appropriate for high-risk patients or that the device was misbranded because of that marketing.  In fact, the warning letter said that the device needed was, quote/unquote, "misbranded" because better instructions -- more clear instructions -- needed to be provided to doctors.  Plaintiffs do not allege as false any statements that iRhythm provided the most clear instructions to its physicians.  Those aren't there.  We're not aware of any such statements, and no such statements are alleged as false.

With respect to plaintiff's argument that the transmission limit was sufficient to establish -- was sufficient to create a materially different state of affairs, I take your point, Your Honor.  But courts in this District are clear that to sufficiently allege materiality and to meet that standard, that statements created a state of affairs different from the one that existed, plaintiffs need to connect the dots.  They need to explain how that suggested -- created an impression of affairs that was materially false.

How they connect the dots, they have to quantify the

issue.  A good example of this is the *McGovney* case.  In the *McGovney* case, defendants made statements about the personnel issues --

THE COURT:  You're going to have to -- you know -- the court reporter, I think, is probably, like, going --

MS. NELINSON:  Apologies.

THE COURT:  -- crazy right now.

MS. NELINSON:  I'm so sorry.

In the *McGovney* case, the defendants made statements about personnel issues and project execution.  And plaintiffs alleged they were false.  And the Court said, "I cannot establish -- assess the falsity of these statements without you quantifying the personnel issues.  I can't do it."

Again, in the *Toyota* case, the Court said, "It is not inconsistent to assert that quality is stable or increasing while being aware of a potential significant defect."

Again, the *Nutanix* case from 2020.  There, the Court found no falsity, because plaintiffs did not provide details on the significance of hiring freezes and those hiring freezes on the impact of initiatives that the company was undertaking.  The Court said the plaintiff didn't plead how many hiring freezes there were, how long they lasted, how often they were instituted, how many employees they affected, what locations they covered --

THE COURT:  Can I tell you -- again, what inference do

I draw from the telling investors that we're going to see a drop in revenue because of this customer letter?  I think it was in the fall of 2022.

MS. NELINSON:  I'm not sure -- first of all, Your Honor, the registration requirement and the transmission limit were disclosed in November.  So many of the statements that my opposing counsel pointed to as indicative of scienter because they were so egregious came after those disclosures.  So the company was --

THE COURT:  My question is -- because you're arguing materiality --

MS. NELINSON:  Mm-hm.

THE COURT:  -- in part.  You want to say this -- these problems, not material, then why did they expect demand for the product to drop?

MS. NELINSON:  I don't think -- Your Honor, I think that's a different assessment.  And whether the false statements that were made -- or allegedly false statements that were made -- created a state of affairs different from the one that existed -- plaintiffs have, Your Honor --

THE COURT:  Let's go -- let's -- because they raised it, so why don't you address it.  What inferences are to be drawn from the statement to investors, in the fall of 2022, that this customer corrective letter -- what is it? -- customer --

**MS. SINDERSON:** Advisory notice.

**THE COURT:** -- advisory notice was going to lead to a drop in demand? Why was it going to lead to a drop in demand? What inference can I draw from --

**MS. NELINSON:** There's an equally plausible inference to be -- to be drawn -- that when a customer advisory notice is issued, there's something -- you know -- a pharmaceutical device company comes out and says the FDA has -- you know -- we're working through concerns with the FDA, that customers of that pharmaceutical company are perhaps going to, you know, move forward with reservations. Or they might -- you know -- there might be less users or purchasers of those products while those concerns are --

**THE COURT:** What concerns?

**MS. NELINSON:** -- mitigated.

**THE COURT:** What concerns?

**MS. NELINSON:** Concerns from the FDA. This is -- Your Honor, iRhythm is a medical device company. It's a highly regulated industry. There is nothing abnormal or fraudulent about back-and-forth between the FDA and the company while sorting out concerns that the FDA raises to the company. Certainly this happens regularly.

It's a securities fraud case. And so what we are focused on is whether the company defrauded the market -- when making these statements about the Zio AT -- whether they defrauded the

market.  And the entire narrative here is patently inconsistent with an intent to defraud.

THE COURT:  Okay.  So let's --

MS. NELINSON:  Beginning with --

THE COURT:  So what about the last point she made with Mr. Blackford, that after -- in their response to the FDA, if I understood it correctly -- he said we're not going to make certain representations anymore, and then he made those representations?

MS. NELINSON:  I don't -- I'm not sure that that is what he said -- that he wasn't going to make those representations.

THE COURT:  I didn't see where you were pointing to.

MS. NELINSON:  But I think --

THE COURT:  I want to see it.

MS. SINDERSON:  Yeah.  So it is -- and I'll pull it up on here -- paragraph -- or page 11 of their --

THE COURT:  It's ECF Document Number 51-3?

MS. SINDERSON:  Correct, Your Honor.  One moment.

THE COURT:  What ECF number?

MS. SINDERSON:  51-3, correct.

THE COURT:  And what -- and is it ECF page 11?

MS. SINDERSON:  I believe that's correct.  Page 11 of 163, but one moment.  Let me -- that's correct.  R10 at the bottom.

**THE COURT:** Okay. It's -- so it's there on page 11, paragraph 2 and 3. It's true he says it will be removed from the website. An inference that the FDA would draw and any reasonable reader would draw is that we're not going to make those statements anymore, not that we're going to remove them from the website, but say them to other people.

Isn't that an inference to be drawn?

**MS. NELINSON:** No, Your Honor. Respectfully, I don't agree that that's an inference to be drawn. This statement here doesn't say anything about -- I'm sorry. Would you mind asking your question?

**THE COURT:** Well, he says here those statements related to high and high-risk patients for Zio AT will be removed from the company's website. And language related to near-real-time monitoring associated with Zio AT on the website will be removed until new language or clarification of existing language can be assessed and determined as part of an ongoing CAPA plan. Correct?

**MS. NELINSON:** Correct. And while this was happening, defendants were making transparent disclosures to the market about their discourse with the FDA.

**THE COURT:** Yes. But what it's alleged is that shortly after this -- I think it was 20 days later you said -- he said to investors -- or maybe the Nasdaq -- same thing -- made a -- he made that high -- that it's appropriate for high

or high-risk patients again after just telling the FDA that he would not.

MS. NELINSON:  Your Honor, but I think that -- you know -- the premise of plaintiff's falsity argument with respect to relying on high risk, you know, and the use of high risk -- alleging that that language is false -- is an incorrect premise.

I'd like -- if you wouldn't mind flipping to Slide 5 of your slide deck.  These are all the disclosures -- and, frankly, they might not even be fully inclusive -- that the company made throughout -- before and throughout the class period that made abundantly clear that this is not a life-saving device.  High-risk and critical --

THE COURT:  You put in slides and they identified it's appropriate for high-risk patients.  Those were words the company meant.  What did they mean?

MS. NELINSON:  So I think there are two important points to be made here.  First, iRhythm's former CEO, Kevin King, gave a definition of "high risk" just before the class period.  And I believe this is -- I can -- I can point Your Honor -- this is Exhibit J to defendants' brief.

And Mr. King explained that the high-risk Zio population is a group of people who have certain exogenous risk factors that have nothing to do with whether they have some sort of a high-risk cardiac condition.

Now --

THE COURT:  He made the claim in the fall of 2022 to investors, and he talked about high risk again, even after telling the FDA he was going to take that off the website.  He said that, but I'm -- but we're -- this is what we mean by it?

MS. NELINSON:  But, Your Honor, perhaps it was -- it was a poor choice, you know, to make those statements.  Perhaps his wording was imprecise or imperfect.  But there is not an inference to be drawn that those statements were fraudulent.

Again, just because --

THE COURT:  So I disagree.  If you tell the FDA, 20 days earlier, we're taking these off the website because of your concern that they're misleading, and then you tell investors, 20 days later, that same thing, it's true, it could have been innocent or not, but it supports an inference of fraud.  It supports it.  I don't know how it doesn't.

MS. NELINSON:  Because, Your Honor, if it was innocent -- if that is a -- if that is an opposing inference we can draw while taking a look at all of the surrounding circumstances -- that iRhythm was consistently disclosing its correspondence with the FDA to investors, that not a single defendant sold a single share of stock, that by the beginning of November, the fact that the registration requirement and the transmission limit were known to the market -- these circumstances do not suggest fraudulent intent.

There is not a single allegation in plaintiff's complaint that speaks to state of mind.  When we are assessing the two competing inferences here -- fraudulent intent and then perhaps, you know, negligence, imprecision, imperfection in wording -- there are not facts to support --

THE COURT:  It's not imperfection in -- you're not drawing inferences in the plaintiff's favor.  You're asking me to draw --

MS. NELINSON:  It --

THE COURT:  When you say "lack of clarity," that's asking to draw -- as least as to Mr. Blackford --

MS. NELINSON:  But, Your Honor --

THE COURT:  -- at least as to Mr. Blackford has pled.

MS. NELINSON:  -- the PSLRA requires us to assess non-culpable competing inferences.  I understand that if we were operating under -- in a different world -- under a different standard, then drawing these inferences in plaintiff's favor would be required.

But the PSLRA tells us that we have to take both plausible inferences and decide whether the fraudulent inference is more compelling.  Let's, again -- let's look at the deaths.  Okay?  Plaintiffs cling to these two deaths that happened before the class period.  These two deaths were the result -- and you can see this information in the Form 483 response -- were the result of the exact conditions that the company disclosed the

device was not appropriate for.  And, again, this language is on Slide 5 of our slide deck.

My opposing counsel brought up the complaints.  Let's discuss the complaints.  Dozens of complaints, plaintiff says, were ringing into iRhythm that put the company on notice that this was a problem.  That is incorrect.  Let's look at the 2022 Form 483.  That is where the information on the complaints comes in.

The 2022 Form 483 to iRhythm says that there were 28 complaints about the transmission limit, and that those complaints came in from 2019 to 2022.  That is all we know about the complaints.  That there were 28 complaints over the course of a three-year period.  Now, Your Honor, I'm a lawyer; I'm not great at math.  But that's about nine and a half complaints a year, the vast majority of which are prior to the class period.

There are no allegations that complaints about the transmission limit were rolling in --

(Court reporter clarified.)

MS. NELINSON:  Apologies.  Yes, that there was an influx of complaints about the transmission limit while these statements were being made.

This -- you know -- and, in fact, the example of complaints that is given in the Form 483 -- there's a list of, I believe, six or seven complaints -- every single one predates

the class period.  And as I'm sure Your Honor knows --

THE COURT:  But did -- but there's no evidence that the device changed.

MS. NELINSON:  No, there's no evidence that the device changed --

THE COURT:  Right.  So a complaint prior to the class period is relevant.

MS. NELINSON:  Your Honor, to the extent scienter is -- you know -- we're assessing whether there was an intent to defraud, and we're assessing whether there was information that the defendants were coming into possession of that undercut -- that contradicted their statements -- I think we really have to think about the context in which these statements were being made.

THE COURT:  Okay.

MS. NELINSON:  Perhaps if --

THE COURT:  But whether they were made prior to the class -- beginning of the class period -- doesn't matter.  If they knew it, they knew it.  And they knew it at the time they made the statements they made.

It could maybe not be relevant if the device had changed so materially that the complaints weren't relevant.  But, as you said, the device didn't change.  So I don't know why complaints -- just because they existed prior to the beginning of the class period -- so what?

MS. NELINSON:  Because when we're talking about intent, we have to think about, again, what information defendants -- Defendant Blackford -- was in possession of that would have made him think, gee, this is a really significant problem.  So when I say to investors that this device provides near-real-time notifications, I'm really fooling them.

If he received, again, nine complaints in one year from prior to the class period, and then, several years later, in 2021, is making statements about how the device works to investors, I think it is quite relevant that those -- there have been no complaints that came in after that time.

And, Your Honor, the other thing I think that's so important, again --

THE COURT:  Can I ask you, wouldn't he care that he -- they received a complaint in October 2021 of a patient death that occurred while using the monitor, and the physician had requested to be notified immediately of these events.  But the clinician was not notified until eight days after these end-of-life events.  Is that not --

MS. NELINSON:  Sure, Your Honor.  But knowledge of one complaint does not scienter make, nor I don't think --

THE COURT:  That is one of many.

MS. NELINSON:  It is one --

THE COURT:  That's a pretty big complaint.

MS. NELINSON:  Your Honor, 1 of 28 complaints over a

three-year period, the vast majority of which predate the class period, does not suffice --

THE COURT:  Okay.  So what case --

MS. NELINSON:  -- under the PSLRA.

THE COURT:  You say *Aramic*?  Just tell me what case.  I'll go back and look.  *Aramic*?  Because you're saying --

MS. NELINSON:  For the --

THE COURT:  You're saying, as a matter of law, it does not.  So you want me to -- you said *Aramic* is one.  What else should I look at that would support --

MS. NELINSON:  I would look at the -- I would look at the *McGovney* case.  And, Your Honor, are we talking about generally the need to quantify the issue or complaints specifically?

THE COURT:  Well, you just --

MS. NELINSON:  Because I want to make sure --

THE COURT:  You just said to me that the number of complaints here that -- are not sufficient as a matter of law.

MS. NELINSON:  Yes.

THE COURT:  So I'm trying to figure out what you're relying on.

MS. NELINSON:  Yes.  So would look at *Aramic*.  I would look at the *McGovney* case.  I would look at the *Veal* case.

THE COURT:  The which case?

MS. NELINSON:  *Veal*, V-E-A-L.  And I would look at

*Curry v. Yelp.*

THE COURT: Okay. All right.

Okay. I'll give you one other important thing you want to tell me.

MS. NELINSON: Yes. I think it this is important, because it is a big part of plaintiff's argument as to why the high-risk and near-real-time statements were false. This is the registration requirement.

Your Honor, as explained in iRhythm's response to the FDA, the registration requirement is the prescription. The same way that you cannot walk into a pharmacy and say, "Give me this amoxicillin, give me this Xanax," you cannot walk into a pharmacy and say, "Give me a Zio AT." It is -- it is intuitive. It is obvious information that, without a doctor's prescription, the device will not -- it will -- it will collect data, but it will not transmit.

And, importantly, this -- this is including because part of the prescription --

THE COURT: Can I ask you a question? You can get the device without a -- don't you need something from your doctor in the first place?

MS. NELINSON: Exactly. That's exactly my point, Your Honor. Your doctor needs to prescribe it. You have to get it -- "implanted" is the wrong word -- a doctor has to put it on you. And the doctor has to then register you, which is the

prescription.  It's the prescription that initiates monitoring services.  Because the doctor has to specifically select the kind of arrhythmias that it would like to receive notifications of --

THE COURT:  All right.  I think --

MS. NELINSON:  -- throughout the class period.

THE COURT:  -- "prescription" may be a misnomer there. The prescription is usually what you give the patient to go pick something up from a pharmacy; right?  What you're saying is -- and the doctor prescribes it, and the patient -- but, actually, the doctor probably gets the device, not even the patient; right?

MS. NELINSON:  Yes.  But I think -- you know, there's a -- there's a very -- and I would urge Your Honor to, you know, take a look at this -- there's a very clear explanation of this in iRhythm's response to the FDA.  It is -- it is -- and I believe the FDA agreed, it is -- this registration form that needs to be filled out to initiate monitoring -- it is akin to a prescription.  Under federal law, a device like this can't -- literally cannot be used and use cannot be initiated without this registration form.

THE COURT:  No, I understand that.

MS. NELINSON:  Yeah.

So -- so plaintiffs allege that to conceal the registration requirement was misleading.  But that's like

saying the device won't work if I place it on my foot rather than my chest.  Because to say that the device won't transmit without the prescription, without the form that lays out how the doctor wants to receive information and why, this is an obvious fact.

And just one more point, Your Honor, on the registration requirement.  The company disclosed, on its website and in its label, that without a complete registration, functionality would be limited and could result in erroneous data reporting.  And so --

THE COURT:  I understand that.  I thought their complaint was that once there was an incomplete registration, they didn't do anything about it to notify the doctor of the incomplete.  But maybe I misunderstood.

MS. NELINSON:  I don't think that's correct, Your Honor.  I think their complaint is that the registration requirement was concealed.

THE COURT:  Okay.

MS. NELINSON:  And, in fact, if we take a look, again, at the detailed -- at the detailed response that iRhythm gave to the FDA following the Form 483 -- iRhythm explains that when a registration is incomplete, the doctor -- they're almost annoying about it.  They follow up with the doctor multiple times.  And that doctor can see, if it tries to log on, that there's sort of like a notification that says, "You need to

finish this.  You need to finish this."  And so the doctor is notified.

And all of this information is in the Form 483 response that we know plaintiffs had access to, Your Honor, because they submitted a FOIA request, which is how they have all the rest of this FDA correspondence.  And none of this information -- not the information on the registration requirement, not the information that we have here in the slide deck that explains how infrequently the transmission limit is hit, not the information about, you know, the --

**THE COURT:**  I don't know if you're one of those patients that you would call two percent infrequently.  I don't know that.

**MS. NELINSON:**  Your Honor, it's not a products liability case.  You know, we're talking about securities fraud here.  We're talking about whether this --

**THE COURT:**  We are talking about securities fraud, but it's related to products liability.  It's related to it, because it's the statements that they made to the products.

But let me hear about, what is the theory as to the registration requirement -- the plaintiff's theory?

**MS. SINDERSON:**  So, Your Honor, I would say one thing that kind of puts lie to Ms. Nelinson's argument here that this is an intuitive or obvious requirement that you complete your registration.

After the FDA made this observation that multiple patients have been complaining about not receiving transmissions -- they didn't know about this registration requirement -- their doctors didn't know about it -- the -- iRhythm actually changed their labeling to make it clear that you have to fully register the device before you start receiving transmissions.

And iRhythm attached that customer advisory notice we've been referencing as Exhibit F to their motion to dismiss.  And it's at page 3 out of 5 of the ECF labeling at the top.  "The changes to the clinical reference manual requires" -- it makes it clear -- "activation of the monitor does not initiate monitoring services.  A completed patient registration is the prescription order for monitoring services."  This seems, to me, to be an admission.  That patients were not aware of this before this time.

THE COURT:  Okay.  But what is the evidence that would suggest that that was intentionally withheld from the market?  I mean, that just sounds like -- I mean, it's in their interest to have -- it being transmitted; right?  There's no benefit to iRhythm in not sharing that.  So what is the evidence that I could draw any inference of scienter from that?

MS. SINDERSON:  The evidence is that they were receiving complaints about it for years, Your Honor.  They knew this was an endemic problem.  They just didn't want to issue a labeling correction, because, as you saw, it affected their

sales.

THE COURT:  So what paragraphs in the complaint support that?

MS. SINDERSON:  Starting -- the transmission limit -- or the registration limit.

THE COURT:  The registration, which is one theory you have.

MS. SINDERSON:  So, yes, it is one theory.  So paragraphs 94 and 95 lay out the history of complaints they had received regarding the registration limitations, making it clear that iRhythm knew that patient data is held inaccessible without the full registration.

THE COURT:  And what do you say to Counsel's argument that, when you drafted this complaint, you were aware of their response?  So -- but you say they made no effort to notify physicians and patients.  But they, of course, said that they do.  That here's how they do that.  So what is the basis of the allegation in paragraph 94?

MS. SINDERSON:  So two things:  We don't object to the fact that we incorporate Exhibit B -- or we reference Exhibit B -- in the complaint.  That's one mistake I think Ms. Nelinson made earlier.  That's not part of our objection.

Our objection is to the idea that you can pull extraneous -- other parts of that very extensive document, which is -- it's iRhythm's response.  It's a very self-serving

response on their part.  That's what corporations do.  We do not have to take everything they say as --

**THE COURT:**  I agree.  But I'm asking a different question, though, which is you then have an independent basis for saying that what they said in that response is not true.  That they didn't follow up with physicians.  Because what I'm telling you, common sense says they would follow up with physicians.  I can't think of any reason why they wouldn't.

**MS. SINDERSON:**  So the warning letter itself, which follows iRhythm's response to the FDA -- and I'd like to pull up the warning letter -- the warning letter -- part of the findings in the warning letter is that this -- that iRhythm's attempt to address the ill effects of this registration requirement were insufficient.  They find that as part of their criticism in the warning letter.  And that was after the response from iRhythm.

**THE COURT:**  Okay.  Where?  I have it in front of me.

**MS. SINDERSON:**  One moment, Your Honor.

If I may, Your Honor, there's just two minor other things while we're just identifying this part of the warning letter for you.  I don't -- I don't want to distract or get off track, but there were just two other very quick corrections I would like to make for the record.

**THE COURT:**  Okay.

**MS. SINDERSON:**  One item, as Ms. Nelinson earlier

said -- and I think she misspoke -- that plaintiffs are required to come up with a more compelling inference of scienter.  That's not the law in *Tellabs*.

Second, Mr. Nelinson spent a great deal of time talking about there were only 28 complaints over the course of three years.  I would ask Your Honor to look at the *Matrixx* decision by the Supreme Court, which we refer to in our opposition brief, which -- in which there were, I think, 12 complaints about a loss of smell by the product.

The Supreme Court's guidance was very clear.  It's not the bald number of incidents that you look at.  It's the overall materiality of the issue.  Here, where we had 28 complaints, we have two deaths on record --

THE COURT:  Okay, I understand all that.  I understand all that.

MS. SINDERSON:  Okay.

THE COURT:  Okay.  And I will look at -- Ms. Nelinson cited *Aramic* to me and *McGovney*, *Veal*, and *Curry*.  And I'll look at *Matrixx*, as well.

MS. SINDERSON:  So the warning letter, Your Honor, is at Docket Number 43-2.

THE COURT:  Yes.

MS. SINDERSON:  We're looking at page 7 of 13 --

THE COURT:  Yes.

MS. SINDERSON:  -- which specifically highlights that

iRhythm says if this is not a nonconformance --

THE COURT:  At what paragraph on the page?

MS. SINDERSON:  It's about -- it's -- we're looking in section Romanette ii.  Paragraph 3 addresses iRhythm's response.  And it says that this cannot be fully determined.  They don't provide full -- sufficient details for the FDA to fully assess this.

THE COURT:  Okay.  It doesn't say anything about whether they're notifying physicians or anything at all.  So I understand --

MS. SINDERSON:  Yeah.

THE COURT:  -- defendants' argument there.

Okay.  We're going to have to stop, so last word.

MS. NELINSON:  Yes, Your Honor.  Just last point:  I want to just, again, point Your Honor to Slide 5, because I think that this premise is just so important.  It underlies all the arguments here.

If we know nothing else, we know that this, here, is what "high risk" does not mean.  It does not mean life-threatening arrhythmias.  iRhythm said reporting timeliness is not consistent with life-threatening arrhythmias.  It said do not use patients for a history -- with a history of life-threatening arrhythmias.  It said it should not be used when real-time or in-person monitoring should be prescribed.  It is not intended for critical-care patients.

**THE COURT:**  So if they say that somewhere, they can say anything else anywhere else?

**MS. NELINSON:**  Absolutely not, Your Honor.  I don't think that's our argument.

**THE COURT:**  All right.  I just wanted to be clear about that.

**MS. NELINSON:**  That's --

**THE COURT:**  Okay.  All right.  I understand that.  Last word?

MS. SINDERSON:  Nothing further, Your Honor.  We appreciate your time today.

**MS. NELINSON:**  Your Honor?

**THE COURT:**  Yes.

**MS. NELINSON:**  Do you have time for just one last point?  Just one last.

**THE COURT:**  One last.

**MS. NELINSON:**  I just want to make the point that I'm not aware of any case -- and, in fact, I'm aware of authority to the contrary -- that it does not -- that there's no inference of scienter just because a company disagrees with the FDA or because a company's efforts to remediate some issue were insufficient in the eyes of the FDA.

So that's the *Pardi* case, which specifically says that -- that a company disagrees with an FDA's determination or takes a position -- a different position -- from the FDA does not mean

it's sufficient for scienter.

And that's especially true here, where all of this correspondence, the warning letter included, was disclosed to the market just as it came in to iRhythm.  So perhaps the FDA was unhappy with the efforts the company had made.  But the company turned around and told investors, "The FDA says we have to do more."  The -- iRhythm said to investors in its SEC filings, "We're not sure what they're going to think.  We're not sure when this is going to be resolved."

This is very different from companies, such as in the *Impax* case, that said to the market, "We're all done.  Everything's fixed," and then, of course, the FDA came back with more issues.

THE COURT:  Great.  Okay.  Excellent argument on both sides.  Thank you very much.  I'll take the matter under submission.

MS. SINDERSON:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Court is adjourned.

(Proceedings adjourned at 12:01 p.m.)

---oOo---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Sunday, May 4, 2025


_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court