QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
Kristin Tahler (Bar No. 261908)
kristintahler@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

Christopher Porter (*pro hac vice*)
chrisporter@quinnemanuel.com
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7000

Jesse Bernstein (*pro hac vice*)
Brenna Nelinson (*pro hac vice*)
Amy Shehan (*pro hac vice*)
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
amyshehan@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GLAZING EMPLOYERS AND GLAZIERS' UNION LOCAL #27 PENSION AND RETIREMENT FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IRHYTHM TECHNOLOGIES, INC., and QUENTIN BLACKFORD,<br><br>Defendants. | Case No. 3:24-cv-706-JSC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date: September 18, 2025<br>Time:  10:00 a.m.<br>Location: Courtroom 8, 19th Floor<br>Before: Hon. Jacqueline Scott Corley |

**NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

PLEASE TAKE NOTICE THAT on September 18, 2025 at 10:00 a.m. before the Honorable Jacqueline Scott Corley in Courtroom 8, 19th Floor, 450 Golden Gate Avenue, San Francisco, California, Defendants iRhythm Technologies, Inc. ("iRhythm") and Quentin Blackford ("Mr. Blackford" and together with iRhythm, "Defendants") will move this Court for an order granting Defendants' Motion for Judgment on the Pleadings.  This Motion is made pursuant to Federal Rule of Civil Procedure 12(c) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and is based upon the following Memorandum; the Declaration of Kristin Tahler, filed concurrently herewith; Defendants' Motion for Judicial Notice and Incorporation by Reference, filed concurrently herewith; the argument of counsel; and any additional material as may be submitted to the Court before decision.

**STATEMENT OF THE ISSUES**

Whether the allegations in the Complaint that survived the Court's Rule 12(b)(6) dismissal order are sufficient to prove material falsity, scienter, and loss causation as necessary to maintain a claim for violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

FACTUAL BACKGROUND .......................................................................................................3

    A.    FDA Issued A Form 483 And iRhythm Responded On September 1, 2022 .............3

    B.    iRhythm Disclosed The Transmission Limit In The September 26, 2022 CRM ..................................................................................................................4

    C.    iRhythm Issued A Customer Advisory Notice On September 28, 2022 ....................4

    D.    iRhythm Directed Investors To The Customer Advisory Notice And Labeling Updates In November 2022 ........................................................................6

    E.    iRhythm Received And Disclosed The Warning Letter ...........................................7

LEGAL STANDARD ...................................................................................................................7

ARGUMENT .................................................................................................................................9

I.    PLAINTIFF CANNOT ESTABLISH SCIENTER OR LOSS CAUSATION FOR THE REMAINING TIMING STATEMENTS ........................................................9

    A.    Plaintiff Cannot Plead Scienter In Light Of Defendants' Disclosures Of The Transmission Limit And Its Impact On Zio AT Functionality ...............................9

    B.    Plaintiff Fails To Plead Scienter Concerning The Alleged "Lag Time" .................13

    C.    Plaintiff Does Not Plead A Single Corrective Disclosure Concerning The Alleged "Lag Time" And Therefore Fails To Plead Loss Causation ......................15

II.    PLAINTIFF CANNOT PLEAD SCIENTER FOR THE REMAINING HIGH-RISK STATEMENTS ........................................................................................................16

III.    PLAINTIFF CANNOT ESTABLISH SCIENTER FOR THE REMAINING ACCURACY STATEMENTS .......................................................................................18

CONCLUSION ...........................................................................................................................20

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re Apple iPhone Antitrust Litig.*,
846 F.3d 313 (9th Cir. 2017)......................................................................................... 8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017).................................................................................. 14, 20

*In re eHealth, Inc. Sec. Litig.*,
2023 WL 6390593 (N.D. Cal. Sept. 28, 2023)............................................................ 15

*Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004)....................................................................................... 8

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024)............................................................... 2, 12, 14, 15, 19

*In re GeoPharma, Inc. Sec. Litig.*,
411 F. Supp. 2d 434 (S.D.N.Y. 2006)......................................................................... 13

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007)....................................................................................... 12

*Jackson v. Fischer*,
2015 WL 1143582 (N.D. Cal. Mar. 13, 2015).............................................................. 4

*Kong v. Fluidigm Corp.*,
2021 WL 3409258 (N.D. Cal. Aug. 4, 2021)............................................................... 19

*In re Mellanox Techs. Ltd. Sec. Litig.*,
2014 WL 12650991 (N.D. Cal. Mar. 31, 2014).......................................................... 8

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008)..................................................................................... 15

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020).............................................................................. 2, 8, 12

*Pardi v. Tricida, Inc.*,
2024 WL 1056013 (N.D. Cal. Mar. 11, 2024)................................................. 11, 13, 17

*Plumley v. Sempra Energy*,
847 F. App'x 426 (9th Cir. 2021)................................................................................ 19

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
2021 WL 8153575 (N.D. Cal. Sept. 16, 2021)............................................................ 12

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ............................................................................................ 13

*In re Rigel Pharms., Inc. Sec. Litig.*,
    2010 WL 8816155 (N.D. Cal. Aug. 24, 2010) ................................................................ 10, 17

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) .............................................................................................. 12

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .............................................................................................. 19

*Sneed v. AcelRx Pharms., Inc.*,
    2023 WL 4412164 (N.D. Cal. July 7, 2023) ......................................................................... 7

*Sylebra Cap. Partners Master Fund Ltd v. Everbridge, Inc.*,
    2024 WL 2107383 (C.D. Cal. Mar. 18, 2024) ..................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ......................................................................................................... 7, 8

*Tolbert v. Antioch Police Dep't*,
    2023 WL 2959989 (N.D. Cal. Apr. 14, 2023) ....................................................................... 8

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020) ................................................................................ 19

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................................................................ 13

*W. Digital Techs., Inc. v. Viasat, Inc.*,
    2023 WL 7739816 (N.D. Cal. Nov. 15, 2023) ....................................................................... 8

*Webb v. Trader Joe's Co.*,
    999 F.3d 1196 (9th Cir. 2021) .............................................................................................. 9

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ................................................................................................. 7

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) .............................................................................................. 18

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) .............................................................................. 16

*Zaidi v. Adamas Pharms., Inc.*,
    650 F. Supp. 3d 848 (N.D. Cal. 2023) ................................................................................ 20

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .............................................................................................. 14

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

**Statutes**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ...................................... 7, 8

15 U.S.C. § 78u-4(b)(2)(A) .......................................................................................................... 8


**Other Authorities**

Fed. R. Civ. P. 9(b) ...................................................................................................................... 7

Fed. R. Civ. P. 12 ......................................................................................................................... 8

Fed. R. Civ. P. 12(h)(2) ............................................................................................................... 8

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 8

Fed. R. Civ. P. 12(c) ................................................................................................................. 8, 9

**MEMORANDUM OF POINTS AND AUTHORITIES**

In its June 3, 2025 opinion granting in part Defendants' motion to dismiss (ECF No. 77) ("Opinion" or "Op."), this Court dismissed all individual defendants save for Mr. Blackford, all statements related to iRhythm's characterization of the Zio AT as an MCT device, and all statements concerning the Zio "spectrum of care." This Court further held that Plaintiff had not established scienter for Mr. Blackford before July 25, 2022. The question now facing the Court is whether Defendants' remaining statements concerning the capabilities of the Zio AT (¶¶ 184, 187, 190-99, 210-11, 226-31)[1] were made with an intent to defraud. The operative versions of the Zio AT label during the Class Period—which this Court noted were not before it when denying part of Defendants' motion to dismiss—doom any inference of scienter.

Timing Statements. *Every version of the Zio AT label* beginning on September 26, 2022— just *two months* after the start of the operative Class Period—contained an *extensive, explicit disclosure* of both the transmission limit and the effect hitting the transmission limit had on the functionality of the Zio AT. The label stated in no uncertain terms, among other things, that the Zio AT "*has a maximum threshold* of transmitting 100 Patient-Triggers and 500 Auto-Triggers during wear, after which point the device no longer transmits for whichever trigger limit has been reached. If this occurs, unless a patch is promptly replaced when the patient is approaching a maximum transmission limit, *there will be time during the wear period in which transmissions of that type are captured but not transmitted*, and information will not become available until the final report." Two days after the September label update, iRhythm disseminated a Customer Advisory Notice that similarly elaborated on the transmission limits and stated further, among other details, that "[o]nce the maximum transmission limit is reached for either transmission type – symptomatic or asymptomatic – any further transmissions for that specific type will cease." Defendants *directed investors* to these updates. It strains credulity to suggest that Defendants sought to conceal a transmission limit that they repeatedly disclosed. As courts facing similar facts have concluded,

---

[1] References to "¶ __" are to the Complaint, Dkt. 43. Internal citations and quotation marks are omitted and emphasis added unless otherwise noted.

Plaintiff would be "hard-pressed" to establish fraud where Defendants *disclosed the very information* in the product label that Plaintiff claims was the subject of Defendants' alleged fraud. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 417 (9th Cir. 2020). iRhythm's disclosures of the transmission limit are fatal to Plaintiff's claim that Defendants acted with scienter when making the Timing Statements.

Further, to the extent the remaining Timing Statements are predicated on allegations attributed to FE 3 that there was a four hour "lag time" in reporting Zio AT wear-time data to physicians, those claims also fail. The Complaint contains *no* allegations that Mr. Blackford even knew about the supposed "lag time," let alone that he believed four hours was not "timely" or "near-real time." The Ninth Circuit is clear that where a confidential witness is utilized to establish scienter, to the extent those witnesses are reliable, the statements they report "must *themselves be indicative of scienter*." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 536 (9th Cir. 2024). On their face, FE 3's statements regarding the "lag time" do not meet this standard because they do not mention Mr. Blackford. Plaintiff thus has not pled scienter for the Timing Statements to the extent predicated on the alleged "lag time."

Nor can Plaintiff establish loss causation for the Timing Statements to the extent predicated on the "lag time": of the seven alleged corrective disclosures in the Complaint, *not one* references the alleged "lag time." In the Ninth Circuit, to establish loss causation, an alleged corrective disclosure must at the very least "*relate back to the misrepresentation* and not to some other negative information about the company." *Id.* at 540. Plaintiff thus has not pled loss causation for the Timing Statements to the extent they are predicated on the alleged "lag time."

High-Risk Statements. Plaintiff's claims based on the two remaining High-Risk Statements—that the Zio AT is meant for the "most at risk" or "more acute" patients (statements which do not even use the words "high risk")—fail on scienter grounds. Plaintiff's theory is that these statements are false because "high risk" patients need "timely data transmission" to detect "life-threatening heart conditions." But this theory of fraud fails where iRhythm disclosed (i) the transmission limit and (ii) that the Zio AT was not appropriate for critical care patients *because* the reporting timeliness of that device was not consistent with life-threatening arrhythmias. Plaintiff sets forth *no* allegations suggesting that Defendants thought these disclosures were inadequate to establish that the Zio AT was not appropriate for patients at a risk of life-threatening arrhythmias.

Accuracy Statements.  The only allegations propping up the Accuracy Statements—that FE 3 reported issues with CCT data reporting and that the FDA issued a Form 483 to iRhythm on July 31, 2024—are not tied to Mr. Blackford's state of mind.  Indeed, there is not a ***single allegation*** in the Complaint suggesting that Mr. Blackford did not believe the truth of his statements.  The Accuracy Statements should, too, be dismissed for lack of scienter.

Defendants' Motion should be granted and the Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND[2]

### A.      FDA Issued A Form 483 And iRhythm Responded On September 1, 2022

The FDA inspected an iRhythm facility from July 25, 2022 to August 12, 2022 and issued a Form 483 to iRhythm on August 12, 2022.  ¶ 103; *see* Dkt. 43-1.  The 2022 Form 483 contained observations from a single FDA investigator.  Dkt. 43-1 at 3.

iRhythm responded to the 2022 Form 483 on September 1, 2022.  ¶ 108; *see* Dkt. 51-3.[3]  In its response, iRhythm explained to the FDA—as it did in its initial 510(k) submission—that the transmission limit is an essential design component that encourages high patient compliance (i.e., uninterrupted wear for the entire 14-day period) by eliminating the need for a patient to remove the device to recharge it.  Dkt. 51-3 at 33.  iRhythm further explained that, because the Zio AT is a wireless device with finite battery capacity, "[e]liminating the need for recharging . . . necessarily places some limitations on the number of remote data transmissions that can occur."  *Id.*  iRhythm reminded the FDA that the transmission limit was described in the "bench test report" that was "included in the Zio AT 510(k) submission," Dkt. 51-3 at 108, meaning the FDA was aware of the transmission limit when it approved the Zio AT's 510(k) submission, *see id.*

In its Form 483 response, iRhythm also told the FDA that it had "further analyzed [the] current labeling" and concluded that the labeling "would benefit from an explicit statement there are maximum limits for symptomatic and asymptomatic transmissions."  *Id.* at 39.  Therefore, in the

---

[2] A full recitation of the facts is set forth in Defendants' motion to dismiss, Dkt. 51.  Defendants incorporate that factual recitation as if set forth fully herein and repeat only those facts that are necessary to resolve the instant Motion.

[3] The Court ruled that iRhythm's September 1, 2022 response to the 2022 Form 483 (Dkt. 51-3) is incorporated into the Complaint by reference.  Op. at 8.

"Action Plan" iRhythm submitted to the FDA, iRhythm said it would (i) update the Zio AT labeling "to alert HCPs about the **maximum transmission** constraint . . . and **the impact of potentially missed transmissions**" and (ii) issue a Customer Advisory Notice to "Zio AT customers informing them of the maximum transmission constraints [and] the process associated with informing them when a patient is nearing the maximum limit." *Id.* at 43. iRhythm did both of those things that same month.

### B.    iRhythm Disclosed The Transmission Limit In The September 26, 2022 CRM

On September 26, 2022—as it told the FDA it would—iRhythm updated the Clinical Reference Manual ("CRM")—a significant part of the Zio AT label (*see* Dkt. 77 at 9)—to disclose both the existence and effect of the transmission limit on the Zio AT's functionality in detail:

> **The Zio AT patch has a maximum threshold of transmitting 100 Patient-Triggers and 500 Auto-Triggers during wear, after which point the device no longer transmits for whichever trigger limit has been reached.** If this occurs, unless a patch is promptly replaced when the patient is approaching a maximum transmission limit, **there will be time during the wear period in which transmissions of that type are captured but not transmitted**, and information will not become available until the final report.

Ex. 1 at 10;[4] *see also id.* at 5 ("[T]he device has a maximum threshold of transmitting 100 Patient Triggers and 500 Auto Triggers during wear. When a patient is approaching the limit for either transmission type, iRhythm reaches out to the account to determine whether to send another Zio AT device to the patient.").[5]

### C.    iRhythm Issued A Customer Advisory Notice On September 28, 2022

Two days later—on September 28, 2022—iRhythm issued a Customer Advisory Notice to its Zio AT customers specifically addressing the transmission limit. Ex. 9.[6] The Customer Advisory Notice stated that iRhythm updated the Zio AT label and associated Important Information Pamphlet

---

[4] Exhibits ("Ex. _") are attached to the Declaration of Kristin Tahler filed simultaneously herewith.

[5] As explained in Defendants' Motion for Judicial Notice and Incorporation by Reference filed concurrently herewith, this Court has already found earlier versions of the CRM (Dkts. 51-18; 51-20) are judicially noticed and properly considered. Op. at 9. Exhibits 1-4 are judicially noticeable for the same reasons.

[6] The Court ruled that the Customer Advisory Notice (Dkt. 51-7) is incorporated into the Complaint by reference. Op. at 8. Defendants resubmit the Customer Advisory Notice as Exhibit 9 for convenience.

"to inform you of the maximum wireless transmission limits for the Zio AT monitor" and described the transmission limit in detail. *Id.* at 3.

*First*, the Customer Advisory Notice explained the purpose behind the transmission limit: "The transmission limits were established to provide up to 14 days of an uninterrupted monitoring experience for patients without the need for removing the patch and charging the device." *Id.*; *see also id.* at 2 ("Symptomatic (i.e., patient initiated) and asymptomatic (i.e., auto-triggered or device-detected) wireless transmissions from the Zio AT patch have limits to preserve battery life.").

*Second*, the Customer Advisory Notice described what happens when the transmission limit is reached:

> ***Once the maximum transmission limit is reached for either transmission type – symptomatic or asymptomatic – any further transmissions for that specific type will cease.*** Continuous ambulatory ECG diagnostic data is still captured without interruption, even after the wireless transmission maximums are reached, which is manually downloaded from the device when it is returned at the conclusion of the wear period and included in the final report.

*Id.* at 3.

*Third*, the Customer Advisory Notice explained the steps that iRhythm takes when a patient approaches and reaches the transmission limit: When "iRhythm detects that a patient is approaching the maximum limit," iRhythm "customer care will contact you to confirm if another Zio AT patch should be sent" and if customer care is "unable to reach you, [iRhythm] will auto-ship another Zio AT patch," and "Daily Zio AT reports posted to the Zio Suite portal indicate when the maximum transmission limit has been reached." *Id.* at 2.

*Fourth*, the Customer Advisory Notice contained identical language regarding the transmission limit (*supra* at 4) that iRhythm added to the CRM. *Id.* at 4.

*Finally*, the Customer Advisory Notice explicitly warned that "if the scenarios described in this letter occur"—i.e., if the transmission limit is hit—"***they present a risk of a delay*** between the time a patient experiences an arr[h]ythmia and the time when that information is available to the patient's provider." *Id.*

**D.     iRhythm Directed Investors To The Customer Advisory Notice And Labeling Updates In November 2022**

iRhythm's first earnings release and accompanying conference call following the release of the Customer Advisory Notice and CRM labeling updates was on November 1, 2022.  During that call, Mr. Blackford told analysts and investors that iRhythm had "voluntarily issued a customer advisory notice to [its] Zio AT customers," ¶¶ 11, 124; Ex. 5 at 5, and had updated language about "*transmission limits*" in the Zio AT CRM, Ex. 5 at 5—the latter of which Plaintiff omitted from the Complaint, *see* ¶¶ 11, 124.  Mr. Blackford further specifically directed investors to the Zio AT label, which he stated included "updated language related to the precautions in the Zio AT clinical reference manual and important information pamphlet as it relates to the Zio AT patient registration process in Zio AT patients and *auto trigger transmission limits.*"  Ex. 5 at 5.

Three days later, on November 4, 2022, iRhythm filed its Form 10-Q for the third quarter of 2022 with the SEC.  ¶ 129.  In the Form 10-Q, iRhythm *again* disclosed that on September 28, 2022 it disseminated a Customer Advisory Notice "to Zio AT customers regarding a Zio AT labeling correction" which "involve[d] additions and modifications to the Zio AT labeling precautions *relating to the device's maximum transmission limits* during wear."  Dkt. 51-8 at 73;[7] ¶ 129.  The FDA separately posted about the Customer Advisory Notice on its website on November 4, 2022: "On 9/28/2022, Field Safety Notice Labeling Corrections were sent to customers who were informed of labeling changes" pertaining, in part, to the fact that "[p]atches [are] limited to 100 symptomatic and 500 asymptomatic wireless transmissions" and "once the maximum transmission limit is reached for either type*, any further transmissions for that type will cease*."  *See* Ex. 8 at 2.

In other words, no later than November 4, 2022, iRhythm had: (1) distributed a Customer Advisory Notice addressing the transmission limit in detail, ¶ 112; (2) updated the Zio AT label to include an explicit disclosure about the transmission limit and its impact on the Zio AT's functionality, Ex. 1; (3) told investors during iRhythm's first scheduled conference call following those updates that it issued a Customer Advisory Notice and revised the Zio AT label to address the

---

[7] The Court ruled that iRhythm's 2022 Q3 Form 10-Q (Dkt. 51-8) is incorporated into the Complaint by reference.  Op. at 8.

transmission limit, ¶ 124; Ex. 5; and (4) again disclosed in its Form 10-Q for the third quarter of 2022 that it issued a Customer Advisory Notice and updated its Zio AT label to address the transmission limit, ¶ 129; Dkt. 51-8 at 73.

### E.    iRhythm Received And Disclosed The Warning Letter

The FDA issued a twelve-page warning letter to iRhythm on May 25, 2023 which was immediately made public.  Dkt. 43-2; ¶ 115.  The Warning Letter asserted that although iRhythm markets the Zio AT "for near real-time monitoring and high-risk patients, . . . [it] is not cleared for these indications."  Dkt. 43-2 at 10; ¶ 74.  The FDA thus "requir[ed] submission of a new 510(k)." Dkt. 43-2 at 4.  Regarding iRhythm's proposed remedial measures related to the transmission limit, the Warning Letter stated that "***During our inspection*** [in 2022], it was revealed that the labeling does not inform the physician of the existence of a transmission limit, when the transmission limit is reached, or include any information about the action a physician should take if the device reaches the transmission limit. While your firm does provide a small alert on the report when the device is nearing, or has met, the transmission limit, there is no description of [] what the alert means, or next steps the physician should take." *Id.* at 5.  In other words, the FDA ***did not acknowledge*** that ***since the FDA's July 2022 inspection***, iRhythm had updated the Zio AT label to include a fulsome disclosure of the transmission limit and its impact on the Zio AT's functionality, as described above. *See id*. at 4-5.

### LEGAL STANDARD

To state a claim for securities fraud, Plaintiff must allege particularized facts showing (1) a material misrepresentation or omission of fact; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022).  All elements must satisfy the "heightened," "exacting" pleading standards of Rule 9(b) and the PSLRA.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313-14, 319 (2007).  The Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sneed v. AcelRx Pharms., Inc.*, 2023 WL 4412164, at *2 (N.D. Cal. July 7, 2023).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Nguyen*, 962 F.3d at 414. To allege scienter, Plaintiff "must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Id.* Deliberate recklessness is "an *extreme* departure from the standards of ordinary care," which "presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (emphasis in original). Under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see also In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *7 (N.D. Cal. Mar. 31, 2014) ("In determining whether a complaint meets the 'strong inference' requirement, a court must consider the allegations and other relevant facts holistically, not 'scrutinized in isolation.'").

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."[8] "A Rule 12(c) motion is 'functionally identical' to a Rule 12(b)(6) motion, and courts should apply the same standard." *Tolbert v. Antioch Police Dep't*, 2023 WL 2959989, at *2 (N.D. Cal. Apr. 14, 2023) (Corley, J.). Granting judgment on the pleadings is appropriate where a complaint fails to satisfy the pleading standards of the PSLRA. *See Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004) ("[T]he heightened pleading standard under the PSLRA means that, when determining whether the plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences

_____

[8] Rule 12 is explicit that a party may raise a failure-to-state-a-claim defense in a Rule 12(c) motion where that same argument was not raised in the earlier motion to dismiss. Fed. R. Civ. P. 12(h)(2); *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017) ("If a failure-to-state-a-claim defense under Rule 12(b)(6) was not asserted in the first motion to dismiss under Rule 12, Rule 12(h)(2) tells us that it can be raised. . . in a post-answer motion under Rule 12(c), or at trial."); *W. Digital Techs., Inc. v. Viasat, Inc.*, 2023 WL 7739816, at *2 (N.D. Cal. Nov. 15, 2023) ("[A] defendant who omits a defense under Rule 12(b)(6) does not waive that defense; instead, the defense may be raised subsequently . . . by a motion under Rule 12(c)[.]").

unfavorable to the plaintiffs." (emphasis in original)).  In evaluating a Rule 12(c) motion, "courts must consider the complaint in its entirety" and "documents incorporated into the complaint by reference[] and matters of which a court may take judicial notice." *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1201 (9th Cir. 2021).

## ARGUMENT

### I.    PLAINTIFF CANNOT ESTABLISH SCIENTER OR LOSS CAUSATION FOR THE REMAINING TIMING STATEMENTS

Plaintiff alleges the remaining Timing Statements (¶¶ 184, 187, 190-99) are false for concealing the transmission limit (¶ 200) and an alleged "lag time" (¶ 201).[9]  Neither suffices to sustain a securities fraud claim.  *First*, beginning two months into the Class Period, the Zio AT label contained a detailed disclosure about the transmission limit, a fact which is fatal to Plaintiff's scienter allegations.  *Second*, while this Court further sustained the remaining Timing Statements based on FE 3's report that there was a four hour "lag time" for the Zio AT to transmit data, Plaintiff does not allege that Mr. Blackford knew about the "lag time" and thus cannot establish scienter based on the "lag time."  *Finally*, Plaintiff does not allege that any corrective disclosure addressed the "lag time," and therefore cannot establish loss causation for the remaining Timing Statements.  Defendants are entitled to judgment on the pleadings for the remaining Timing Statements.

### A.    Plaintiff Cannot Plead Scienter In Light Of Defendants' Disclosures Of The Transmission Limit And Its Impact On Zio AT Functionality

Plaintiff alleges that the remaining Timing Statements—such as "the Zio AT service offers the option of *timely transmission* of patient-triggered and automatically detected arrhythmia events data to a monitoring center for review and reporting according to physician-selected notification criteria" (¶ 190) (emphasis in original) and "for the MCT monitoring services utilizing our Zio AT System, we rely on the provision of cellular communication services for the *timely transmission* of patient information" (¶¶ 196, 198-99) (emphasis in original)—were made with scienter because the

---

[9] Plaintiff also alleged that the Timing Statements were false and misleading because of the registration requirement.  ¶ 202.  But the Court found that the registration requirement could not be a basis for falsity of the Timing Statements because despite Plaintiff's representation that the registration requirement was concealed, "[t]he FDA Form 483 referencing the registration issue makes no mention of the registration requirement being hidden from users or doctors."  Op. at 16 n.6.  Thus, Defendants do not address the registration requirement in this Motion.

transmission limit was a "known design limitation" that Defendants concealed (¶¶ 10, 109, 158). Put simply, Plaintiff's primary theory of fraud hinges on the false narrative that the transmission limit—and the impact of that limit on the Zio AT's functionality—was "undisclosed" during the Class Period. *See* ¶¶ 6-8, 10, 68, 70, 89, 166, 178(a), 186, 200; *see also* Dkt. 66 (referring to the allegedly "secret" or "undisclosed" transmission limit six times).

Plaintiff is wrong: Defendants' September 2022 disclosure of the transmission limit to both existing and new customers through a Customer Advisory Notice and a revision to the Zio AT label, respectively, only two months into the Class Period, *eliminates* any inference of scienter. It is illogical to suggest Defendants had an intent to deceive investors where Defendants *disclosed to the public* the *very facts* Plaintiff alleges Defendants sought to hide. There is thus no basis for *any* inference—let alone one that is cogent or compelling—that Defendants acted with scienter. *See In re Rigel Pharms., Inc. Sec. Litig.*, 2010 WL 8816155, at *14 (N.D. Cal. Aug. 24, 2010) (dismissing claims where "Defendants' acts actually undermine an inference of scienter"), *aff'd*, 697 F.3d 869 (9th Cir. 2012).

Once the FDA identified concerns regarding the transmission limit, Dkt. 43-1, Defendants disclosed the transmission limit *no less than four times* between September and November 2022:

*First*, version 8 of the Zio AT CRM—dated September 26, 2022, one month after iRhythm's response to the 2022 Form 483 and only two months after the start of the Class Period—disclosed in detail both the existence and effect of the transmission limit on the Zio AT's functionality. The CRM stated in particular that when a transmission limit is hit, "*the device no longer transmits for whichever trigger limit has been reached*," Ex. 1 at 10, and that unless the patch is "promptly replaced" prior to the limit being hit, "*there will be time during the wear period in which transmissions of that type are captured but not transmitted, and information will not become available until the final report*." *Id.*; *see also id.* at 5 ("[T]he device has a maximum threshold of transmitting 100 Patient Triggers and 500 Auto Triggers during wear. When a patient is approaching the limit for either transmission type, iRhythm reaches out to the account to determine whether to send another Zio AT device to the patient."). Thereafter, the Zio AT label contained *detailed* disclosures describing the transmission limit, including the fact that if the limit was hit and

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

the device was not replaced, "there will be time during the wear period in which transmissions of that type are captured but **not transmitted**, and **information will not become available** until the final report." *Id.* at 10; *see also* Ex. 2 at 9; Ex. 3 at 9; Ex. 4 at 7.

*Second*, Defendants disclosed the transmission limit in a detailed Customer Advisory Notice that was disseminated to preexisting Zio AT customers on September 28, 2022. *See* Ex. 9. Among other things, *see supra* at 5, the Customer Advisory Notice contained nearly identical language regarding the transmission limit that iRhythm added to the CRM, described what happens to the Zio AT's functionality when the transmission limit is reached, and explained the steps that iRhythm takes when a patient approaches and reaches the transmission limit, Ex. 9 at 3-4.

In other words, by September 26, 2022, iRhythm had amended the Zio AT label to fully disclose the transmission limit to all **new customers**. And on September 28, 2022, iRhythm issued a Customer Advisory Notice informing all **existing customers** of the exact same information.[10]

*Third*, Defendants **again** disclosed the transmission limit during iRhythm's third quarter 2022 earnings conference call on November 1, 2022, which was the Company's first scheduled investor call following its transmission limit disclosures. *See* Ex. 5. During that conference call, Mr. Blackford directed investors to the updated Zio AT label. Specifically, Mr. Blackford informed investors that iRhythm "voluntarily issued a customer advisory notice" and "updated language related to the precautions in the Zio AT [CRM] as it relates to . . . **transmission limits**." *Id.* at 5; *see Pardi v. Tricida, Inc*., 2024 WL 1056013, at *12 (N.D. Cal. Mar. 11, 2024) ("[T]he fact that Tricida specifically directed the market to information disclosing the location of the trials cuts against any inference of scienter. [] Tricida conveyed this information through articles published by The Lancet, and Klaerner later highlighted the Lancet publication on an earnings call. . . . Such actions further negate any inference of scienter.").

*Finally*, three days later, on November 4, 2022, in iRhythm's third quarter 2022 Form 10-Q, iRhythm again disclosed that the Company "initiated a Customer Advisory Notice to Zio AT

---

[10] This Court dismissed the registration requirement as a basis for Plaintiff's claims because the registration requirement was not concealed from users or doctors. Op. at 16 n.6; *supra* n. 9. The same logic applies to the transmission limit.

customers regarding a Zio AT labeling correction; the labeling changes involve additions and modifications to the Zio AT *labeling precautions relating to the device's maximum transmission limits during wear*." ¶ 129; Dkt. 51-8 at 73.

Plaintiff cannot plausibly allege that Defendants had an intent to defraud the market in making the Timing Statements *at the same time* Defendants publicly disclosed the existence of the transmission limit and the impact those limits have on the Zio AT's ability to timely transmit data during the wear period if they are hit. Indeed, by November, analysts had picked up iRhythm's disclosures about the transmission limit and reported on those disclosures. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 8153575, at *2 (N.D. Cal. Sept. 16, 2021) (finding that "the alleged misrepresentations were publicly known" because they were disclosed "in SEC filings"); Ex. 6 at 2-3 ("The company also issued a voluntary Customer Advisory Notice to Zio AT customers, updating language related to precautions in the Zio AT Clinical Reference Manual and Important Information pamphlet, relating to patient registration process and patient- and auto-triggered transmission limits — this resulted in slower growth within the qtr. and is expected to continue into Q4."); Ex. 7 at 2 ("Early 4Q a voluntary Customer Advisory Notice sent to Zio AT customers updating precautionary language focused on patient registration process and patient and auto-triggered transmission limits.").

And to the extent Plaintiff alleges Defendants made false statements after May 25, 2023, when the FDA sent iRhythm a twelve-page warning letter that was immediately made public and commented on by analysts, the competing inference is even stronger. ¶¶ 195-99. The warning letter repeated information about the transmission limit and, among other things, required that iRhythm submit a new 510(k) for the Zio AT. Dkt 43-2 at 4-5. There can be no argument that Defendants had an intent to deceive investors following the public release of the warning letter. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) ("The securities laws do not require firms to "disclose" information that is already in the public domain.").

Put simply, Plaintiff does not and cannot allege a "conscious effort by Defendants to trick the market" as to the capabilities of the Zio AT. *Sylebra Cap. Partners Master Fund Ltd v. Everbridge, Inc.*, 2024 WL 2107383, at *9 (C.D. Cal. Mar. 18, 2024). A conclusion to the contrary

would be inconsistent with Ninth Circuit authority finding no scienter where defendants disclosed precisely what plaintiff alleged to be concealed. *See, e.g.*, *Espy*, 99 F.4th at 538 (9th Cir. 2024) (no scienter where defendant "disclosed significant detail in its 2017 proxy statement" and plaintiff "does not explain why the information that was left out . . . compels a strong inference of scienter"); *Nguyen*, 962 F.3d at 417 ("plaintiff is hard-pressed to build a fraud case around the Liverpool study when she admits in her complaint that defendant McDermott acknowledged and discussed this very study on an investor conference call in June 2016"); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) ("if the individual defendants were acting based on their belief that they had a financial motive to conceal the 'true' results of the clinical trial, they would not have voluntarily publicly disclosed all the data and the statistical methodology"). *See also Pardi*, 2024 WL 1056013, at *12 ("Tricida conveyed this information through articles published by The Lancet, and Klaerner later highlighted the Lancet publication on an earnings call. . . . Such actions further negate any inference of scienter."); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 818 (N.D. Cal. 2019) ("The disclosure of the FTC investigation—related to the alleged wrongdoing—undermines the inference that Defendants acted with scienter to conceal FTC violations."); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006) ("GeoPharma was not *hiding* anything from the market when it issued the December 1 Release, which drew the market's attention to the very source of information (the FDA) that would 'unravel' the entire scheme. The true nature of the FDA approval of Mucotrol was reasonably available to the public on December 1, and for this reason as well it is difficult to find strong circumstantial evidence of recklessness" (emphasis in original)).

In light of iRhythm's detailed and explicit disclosures concerning the transmission limit, the remaining Timing Statements (¶¶ 184, 187, 190-99) should be dismissed for lack of scienter.

**B.    Plaintiff Fails To Plead Scienter Concerning The Alleged "Lag Time"**

Plaintiff's only other basis for alleging the falsity of the remaining Timing Statements (¶¶ 184, 187, 190-99) is that, according to FE 3, the Zio AT had a "lag time of about four hours." ¶ 178. While this Court found the allegations attributed to FE 3 sufficient to plead the falsity of the Timing Statements at the pleadings stage, it did not separately consider whether those allegations also adequately alleged scienter as to the "lag time." They do not.

There is **not a single fact** in the Complaint suggesting that Mr. Blackford knew about the alleged "lag time." Indeed, the **only** facts in the Complaint concerning the lag time come from FE 3, who Plaintiff does not allege reported to Mr. Blackford, attended meetings with Mr. Blackford, worked with Mr. Blackford, or even spoke with Mr. Blackford. *See* ¶¶ 75-76, 178(a), 201; *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) ("[T]he witnesses lack first hand knowledge regarding what the individual defendants knew or did not know about Intuitive's financial health.").

The Ninth Circuit is clear that "generalized claims about corporate knowledge," such as a confidential witness claiming that defendants "had to have known what was going on with respect to the Company's inventory accounting manipulation," are "not sufficient to create a strong inference of scienter, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009). Here, FE 3 does not even offer generalized claims about Mr. Blackford's knowledge. FE 3 offers nothing.

Without even the most basic scienter allegations, Plaintiff does not—and cannot—allege that Mr. Blackford knew about the alleged "lag time"—much less believed a four hour "lag time" was inconsistent with his Timing Statements. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) ("According to Plaintiff's confidential informants, Cadent's channel stuffing would have been 'readily apparent' from Cadent's financial documents, which Align had direct access to through the data room[.] But Plaintiff does not allege that [defendants] personally accessed the data room, or that the confidential informants personally disclosed Cadent's channel stuffing to [defendants]."); *Jackson v. Fischer*, 2015 WL 1143582, at *17 (N.D. Cal. Mar. 13, 2015) ("There are no facts alleged in the TAC showing what Fischer knew or when he knew it, and nothing contemporaneous suggesting that any alleged misstatement by Fischer was knowingly false when made.").

The Timing Statements should thus be dismissed to the extent they are predicated on the alleged "lag time."

### C.    Plaintiff Does Not Plead A Single Corrective Disclosure Concerning The Alleged "Lag Time" And Therefore Fails To Plead Loss Causation

Plaintiff does not allege *any* corrective disclosure concerning the "lag time" and thus cannot establish loss causation based on Defendants' alleged failure to disclose the "lag time." A corrective disclosure occurs when "information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *Espy*, 99 F. 4th at 540. An alleged corrective disclosure must at the very least "*relate back to the misrepresentation* and not to some other negative information about the company." *Id.* at 540; *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (no loss causation where the complaint "does not allege that the [alleged corrective disclosures] disclosed—or even suggested—to the market that Corinthian was [engaging in] the fraudulent activity that Metzler contends forced down the stock that caused its losses").

Plaintiff alleges seven corrective disclosures, *none* of which relate to the alleged "lag time":

- The first and second disclosures (November 1 and 4, 2022) concern the Customer Advisory Notice and updates to the Zio AT label to address the transmission limit. ¶¶ 122-33;

- The third disclosure (May 4, 2023) relates to iRhythm's receipt of the DOJ subpoena. ¶¶ 134-36;

- The fourth disclosure (May 30, 2023) concerns iRhythm's receipt of the Warning Letter. ¶¶ 137-40;

- The fifth disclosure (July 1, 2024) relates to the DOJ moving to enforce its subpoena. ¶¶ 141-45;

- The six and seventh disclosures (August 1 and 9, 2024) concern iRhythm's receipt of the 2024 Form 483, ¶¶ 146-53, which is not related to any alleged lag time, *see* Dkt. 43-3.

Critically, Plaintiff does not allege—nor could it—that *a single one* of these disclosures had anything to do with the "lag time." *See* ¶¶ 122-53.

To the contrary, "lag time" appears in the Complaint only seven times and never in relation to any loss causation or corrective disclosure allegations. *See* ¶¶ 75-76, 178(a), 201. This is fatal. *See In re eHealth, Inc. Sec. Litig.*, 2023 WL 6390593, at *2 (N.D. Cal. Sept. 28, 2023) (granting defendants' Rule 12(c) motion based on failure to plead loss causation where "plaintiff does not sufficiently allege that the Q2 2020 earnings results constitute a corrective disclosure because

Plaintiff does not allege that those results revealed, in whole or in part, the truth concealed by the defendant's misstatements."); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012) ("[N]one of the alleged comments, however, mentions ClinAdvisor in any manner. In the absence of any such allegation, or other allegation showing the market became aware of the alleged fraud, plaintiff has not adequately alleged loss causation.").

Plaintiff does not plead that any alleged corrective disclosure so much as "related back" to the "lag time" rather than "some other negative information about" iRhythm. *Espy*, 99 F.4th at 540. Because Plaintiff does not plead a corrective disclosure concerning the "lag time," it cannot support a securities fraud claim for the remaining Timing Statements (¶¶ 184, 187, 190-99).

## II. PLAINTIFF CANNOT PLEAD SCIENTER FOR THE REMAINING HIGH-RISK STATEMENTS

Following the Court's Opinion, only two High-Risk Statements remain: (i) "[w]ith *respect to MCT*, you're monitoring *some of the most at-risk* patients" (¶ 210) and (ii) the Zio AT is "appropriate for *more acute* patients that require timely notification" (¶ 211).[11] Plaintiff alleges that these two statements—which *do not use the words "high risk"*—were made with an intent to defraud because of the transmission limit. *See* ¶ 212. In particular, Plaintiff's theory of fraud is that "iRhythm sold investors on the Zio AT's near real-time transmission capabilities for 'high-risk' patients, who needed the kind of 'timely data transmission capabilities' that the Zio AT supposedly provided in order to detect life-threatening heart conditions in time for treatment." ¶ 3. In other words, Plaintiff alleges Defendants' statements referring to the Zio AT patient population as "high risk" are misleading because those patients need "timely data transmission" to detect "life-threatening heart conditions."

Plaintiff has not alleged scienter under this theory. The remaining two statements should be dismissed for lack of scienter on the basis that they do not even use the words "high risk." These statements should also be dismissed in light of iRhythm's *express disclosures* in the Zio AT label

---

[11] Out of the High-Risk Statements, four were dismissed for lack of scienter because they predate July 25, 2022 (¶¶ 203-06), one was dismissed for lack of scienter because Mr. Devine is the speaker (¶ 207), and two were dismissed based on the Court's spectrum-of-care ruling (¶¶ 208-09).

throughout the Class Period, which this Court noted it did not have before it when assessing Defendants' motion to dismiss.[12]

*First*, Plaintiff has set forth **no facts** establishing that Defendants used the words "most at-risk" (¶ 210) and "more acute" (¶ 211) with an intent to defraud, nor has the FDA ever said that such terminology is an improper way to describe the Zio AT patient population. Indeed, there are no allegations in the Complaint equating "at risk" or "more acute" to "high risk," let alone any allegations that Defendants believed them to be the same thing.

*Second*, Plaintiff's theory fails in any case given iRhythm's explicit disclosures that negate any inference of scienter: As explained in detail above, Defendants ***disclosed the transmission limit*** and its impact on the Zio AT's functionality both in a detailed Customer Advisory Notice and in an updated version of the Zio AT label itself and then directed investors to those public documents during iRhythm's third quarter earnings call in November 2022. *Supra* at 4-7. Further, iRhythm disclosed in all Class Period Zio AT labels that the device is not "intended for use in critical care patients ***because the reporting timeliness is not consistent with life-threatening arrhythmias.***" Ex. 1 at 15; Ex. 2 at 13; Ex. 3 at 13. These disclosures negate any inference of scienter as to the High-Risk Statements given that Plaintiff's theory of fraud is that Defendants falsely marketed the Zio AT to patients who needed more "timely" transmissions.

*Finally*, Plaintiff does not set forth a ***single allegation*** suggesting that Defendants believed these disclosures were not sufficient to explain that the Zio AT is inappropriate for patients who needed the type of transmissions that could detect life-threatening arrhythmias. *See In re Rigel Pharms., Inc. Sec. Litig.*, 2010 WL 8816155, at *12 ("Plaintiff has not pointed to a single document showing or a confidential witness attesting that Defendants actually believed that the side effects they characterized as more mild and disclosed in October 2008 were actually not mild and should have been disclosed with the initial key results."). *Cf. Pardi*, 2024 WL 1056013, at *12 ("there are

---

[12] Out of respect for the Court's decision on Defendants' motion to dismiss, Defendants are not raising any arguments relating to the falsity of the High-Risk Statements herein. However, given the Court's observation that the CRMs submitted with Defendants' motion to dismiss "do not demonstrate what later CRMs—during the class period—disclosed," Op. at 14, Defendants have raised those here in support of their scienter argument.

no allegations in the SAC plausibly pleading that [defendants'] risk disclosures meet the high 'so obvious' standard such that [defendants] would have to know that [their] disclosures would be misleading"). These disclosures negate any inference of scienter. *Supra* at 12-13.

In light of Defendants' Class Period disclosures and the absence of *any* allegations in the Complaint suggesting that Defendants did not believe these disclosures were sufficient, these statements should be dismissed for lack of scienter. *See Rigel Pharms.*, 2010 WL 8816155, at *14 ("upon a thorough and holistic review of Plaintiff's allegations and the facts upon which the Court may take judicial notice . . . a reasonable person would not deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

## III. PLAINTIFF CANNOT ESTABLISH SCIENTER FOR THE REMAINING ACCURACY STATEMENTS

This Court found that Plaintiff adequately alleged the Accuracy Statements were false or misleading based on Plaintiff's allegations that, according to FE 3, "the Company wanted to show doctors very 'clean' reports instead of 'ugly' reports," and that the FDA issued a Form 483 to iRhythm on July 31, 2024, providing that iRhythm had received "approximately 4,014 complaints related to" the CCTs from May 2022 through July 2024. Op. at 20-21.[13] On their face, those allegations do not support a finding of scienter as to the remaining Accuracy Statements (¶¶ 226-31), such as the "long-term continuous patch-based monitoring, such as that performed with our Zio Systems, *more accurately measures Afib burden*" (¶ 228) and "[o]ur ability to deliver value across the continuum of care by quickly and *accurately detecting arrhythmias* for [the] benefit of patients by enabling better clinical outcomes [is] even more important in today's environment" (¶ 229).[14]

*First*, Plaintiff alleges that, according to FE 3, "the Company wanted to show doctors very 'clean' reports instead of 'ugly' reports, and when a report was 'ugly,' technicians were sometimes instructed to 'artifact' the data in question—which resulted in deletion of the data, and it would never be seen by the patient's physician in the final report." ¶ 232; *see also* ¶ 85. But there is not a

---

[13] Out of respect for the Court's Opinion on Defendants' motion to dismiss, Defendants are not raising any arguments relating to the falsity of the Accuracy Statements herein.

[14] In its Opinion, the Court dismissed two Accuracy Statements for lack of scienter because one predates July 25, 2022 (¶ 224) and another is made by Mr. Devine (¶ 225).

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

single fact alleged in the Complaint showing that Mr. Blackford even knew about such an instruction, let alone that he ever gave one himself. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("The plaintiffs produced no direct evidence of any scienter on the part of the Officers."). And even assuming such an instruction was given—which Plaintiff has not pled—Plaintiff has failed to establish that telling technicians to "artifact" data is indicative of an intent to defraud investors about the accuracy of the Zio AT. *See, e.g.*, *Espy*, 99 F.4th at 536 ("First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge ***must themselves be indicative of scienter***."); *accord Kong v. Fluidigm Corp.*, 2021 WL 3409258, at *11 (N.D. Cal. Aug. 4, 2021) ("The [confidential witnesses] do not relay any statements made by the individual defendants that are themselves indicative of scienter.").

*Second*, Plaintiff sets forth ***no*** facts alleging that Mr. Blackford received a single one of the complaints detailed in the 2024 Form 483. *See Plumley v. Sempra Energy*, 847 F. App'x 426, 430 (9th Cir. 2021) ("The facts alleged in the SAC do not show when Defendants learned of the complaints reported to the South Coast Air Quality Management District, nor is it clear from the SAC when Defendants allegedly became aware of the mounting complaints and how that timing related to their ongoing public statements about health risks."); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008) (plaintiffs must "bridge the gap between the existence of the reports and actual knowledge on the part of the defendants"). All Plaintiff alleges is that Mr. Blackford's participation in the Compliance Committee ***suggested*** he would have received those complaints, but as this Court correctly found, those allegations are insufficient to establish that Mr. Blackford received any complaints. Op. at 23 n.8 ("Plaintiff fails to allege membership in the [Compliance] Committee would have actually given Mr. Blackford knowledge of particular customer complaints."). And even had Plaintiff so alleged, that still would not be enough for Plaintiff to allege that Mr. Blackford believed his statements to be false. *See In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 889 (N.D. Cal. 2020) ("Even if they were aware of the effects of suspending data sharing, [k]nowledge of the problem . . . is insufficient to infer that [defendants] acted with the intent

to defraud or with deliberate recklessness in not reporting the issue publicly."), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022).

*Finally*, Plaintiff relies on the 2024 Form 483's statement that the Company "routinely do[es] not report complaints and events alleging that [its] [CCT] personnel have misread or misinterpreted cardio-graphic arr[h]ythmia event data." Dkt. 43-3 at 6; ¶ 169. Plaintiff alleges that "Defendants would have been especially alert to correcting iRhythm's complaint reporting following the regulatory scrutiny from the initial" 2022 Form 483. ¶ 169. But Plaintiff does not allege Mr. Blackford knew complaints about CCT personnel misreading data were not reported, nor does Plaintiff allege that Mr. Blackford was involved in the complaint reporting process in any way. The Ninth Circuit is clear that "would-have-been" allegations are insufficient to establish a strong inference of scienter. *See City of Dearborn Heights Act 345 Police*, 856 F.3d at 620; *accord Zaidi v. Adamas Pharms., Inc.*, 650 F. Supp. 3d 848, 862 (N.D. Cal. 2023) (no scienter where "[Plaintiff] does not allege Merriweather actually received that information; he merely states FE4 would have been 'surprised' if Merriweather did not have it").

Plaintiff does not allege any facts establishing that Mr. Blackford believed the Accuracy Statements to be untrue. Those statements should therefore be dismissed for lack of scienter.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Judgment on the Pleadings.

DATED: July 18, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Kristin Tahler*

Kristin Tahler (Bar No. 261908)
kristintahler@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

Christopher Porter (*pro hac vice*)
chrisporter@quinnemanuel.com
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7000

Jesse Bernstein (*pro hac vice*)
Brenna Nelinson (*pro hac vice*)
Amy Shehan (*pro hac vice*)
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
amyshehan@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000

*Attorneys for Defendants*
*iRhythm Technologies, Inc. and*
*Quentin Blackford*

Case No. 3:24-cv-706-JSC
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS