BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Lead Plaintiff Oklahoma
Firefighters Pension and Retirement System*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLAZING EMPLOYERS AND GLAZIERS' UNION LOCAL #27 Pension And Retirement Fund, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>IRHYTHM TECHNOLOGIES, INC. et al.,<br><br>Defendants. | Case No. 3:24-cv-706-JSC<br><br>CLASS ACTION<br><br>LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS<br><br>Date: October 9, 2025<br>Time: 10:00 a.m.<br>Dept.: Courtroom 8, 19th Floor<br>Judge: Hon. Jacqueline Scott Corley |

Lead Plaintiff's Opposition To Motion To Dismiss
Case No. 3:24-cv-706-JSC

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................................1

I.     STATEMENT OF ISSUES TO BE DECIDED ...................................................................1

II.    INTRODUCTION ..............................................................................................................1

III.   STATEMENT OF FACTS ..................................................................................................5

      A.     iRhythm Told Investors And Customers That The Zio AT Provided Near-Real Time Alerts For High-Risk Patients, And Was Highly Accurate...................5

      B.     The FDA Issued The August 12, 2022 Form 483 Warning That The Zio AT Was Being Improperly Marketed, Was Not Near Real-Time, And Was Inappropriate For High-Risk Patients ........................................................................6

      C.     iRhythm Quietly Issues The Customer Advisory Notice In An Attempt To Appease The FDA....................................................................................................7

      D.     iRhythm Continues To Misrepresent The Zio AT As Near-Real Time And Highly Accurate ...................................................................................................7

      E.     The FDA Issued The May 30, 2023 Warning Letter Revealing The Issues The FDA Privately Warned iRhythm About In August 2022 ................................8

      F.     The Zio AT's Patient Reports Were Not Reliably Accurate ..................................9

      G.     The Court Sustains Claims Against Defendant Blackford And The Company ..............................................................................................................10

IV.    LEGAL STANDARD........................................................................................................10

V.     DEFENDANTS' REQUEST FOR JUDICIAL NOTICE...................................................11

VI.    ARGUMENT.....................................................................................................................12

      A.     The Complaint Adequately Pleads Scienter For Defendant Blackford ................12

            1.     Defendants' Scienter Arguments Should Be Rejected ..............................15

            2.     Defendants' Proffered Scienter Inference Is Not More Compelling .........23

      B.     Plaintiff Adequately Pled Loss Causation ...........................................................24

VII.   CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...................................................................................................13

*In re Amgen Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................................24

*In re Amgen, Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) .................................................................................14

*In re Amylin Pharms., Inc. Sec. Litig.*,
2003 WL 21500525 (S.D. Cal. May 1, 2003)...................................................................15, 24

*In re Apollo Grp., Inc. Sec. Litig.*,
2010 WL 5927988 (9th Cir. June 23, 2010) ..........................................................................19

*In re Apple Inc. Sec. Litig.*,
678 F. Supp. 3d 1147 (N.D. Cal. 2023) .................................................................................23

*Berson v. Applied Signal Tech.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................................25

*Bielousov v. GoPro, Inc.*,
2017 WL 3168522 (N.D. Cal. July 26, 2017).........................................................................15

*Boston Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .........................................................................18

*Buttonwood Tree Value Partners, LP v. Sweeney*,
2012 WL 13026910 (C.D. Cal. Dec. 10, 2012) .....................................................................24

*Chae v. SLM Corp.*,
2008 WL 11342464 (C.D. Cal. Jan. 17, 2008) ......................................................................16

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
660 F.3d 1170 (9th Cir. 2011)................................................................................................18

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ...............................................................................................12

*In re Doximity, Inc. Sec. Litig.*,
2025 WL 1449598 (N.D. Cal. May 13, 2025).........................................................................11

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).................................................................................................................24

*Eastman v. Apple, Inc.*,
    2019 WL 3934805 (N.D. Cal. Aug. 20, 2019) ..........................................................................11

*In re eHealth, Inc. Sec. Litig.*,
    2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) .........................................................................25

*Espy v. J2 Glob., Inc.*,
    99 F.4th 527 (9th Cir. 2024) ...................................................................................................17

*Evanston Police Pension Fund v. McKesson Corp.*,
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ....................................................................................13

*Fleming v. Pickard*,
    581 F.3d 922 (9th Cir. 2009) ...................................................................................................10

*In re GeoPharma, Inc. Sec. Litig.*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006)......................................................................................17

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...........................................................................................18, 24

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ...................................................................................................23

*In re Iso Ray, Inc. Sec. Litig.*,
    189 F. Supp. 3d 1057 (E.D. Wash. 2016) ...........................................................................18, 19

*Jackson v. Fisher,*
    2015 WL 1143582 (N.D. Cal. Mar. 13, 2015) ........................................................................20

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...................................................................................................11

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .............................................................................................15, 24

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .................................................................................................25

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ..................................................................................15

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) .........................................................................................5, 24, 25

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ...................................................................................................17

*Nursing Home Pension Fund, Lcl. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .................................................................................................13

Lead Plaintiff's Opposition To Motion For Judgment On The Pleadings
CASE NO. 3:24-CV-706-JSC                                                                                    iii

*Pardi v. Tricida, Inc.*,
  2024 WL 1056013 (N.D. Cal. Mar. 11, 2024)......................................................................17, 18

*Patel v. Axesstel, Inc.*,
  2015 WL 631525 (S.D. Cal. Feb. 13, 2015) .........................................................................17, 23

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ...........................................................................23

*Plaskin v. Newsight Reality, Inc.*,
  2020 WL 1651995 (C.D. Cal. Feb. 6, 2020)...............................................................................23

*Plumley v. Sempra Energy*,
  847 F. App'x 426 (9th Cir. 2021) ...............................................................................................22

*Police Retirement System of St. Louis v. Granite Construction, Inc.*,
  2021 WL 8153575 (N.D. Cal. Sept. 16, 2021) ...........................................................................18

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ....................................................................................................20

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ....................................................................................................19

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ......................................................................................................13

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
  2010 WL 8816155 (N.D. Cal. Aug. 24, 2010) ...........................................................................17

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
  697 F.3d 869 (9th Cir. 2012) ......................................................................................................17

*SEC v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ....................................................................................................23

*In re Snap Inc. Sec. Litig.*,
  2018 WL 2972528 (C.D. Cal. June 7, 2018) ..............................................................................12

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ......................................................................................................22

*In re Splunk Inc. Sec. Litig.*,
  592 F. Supp. 3d 919 (N.D. Cal. 2022) ........................................................................................11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..........................................................................................................12, 22, 23

*Todd v. STAAR Surgical Co.*,
  2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ............................................................................22

*In re Twitter, Inc. Securities Litigation*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020) ........................................................................24

*In re Vantive Corp. Securities Litigation*,
    283 F.3d 1079 (9th Cir. 2002) ....................................................................................22

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ........................................................................17

*In re ViroPharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014) ............................................................................13

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ........................................................................11

*In re Worlds of Wonder Securities Litigation*,
    35 F.3d 1407 (9th Cir. 1994) ......................................................................................22

*Wozniak v. Align Technology, Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ......................................................................25

*Zucco Partners, LLC v. Digimarc Corporation*,
    552 F.3d 981 (9th Cir. 2009) ......................................................................................20

*In re Zynga Inc. Sec. Litig.*,
    2015 WL 1382217 (N.D. Cal. Mar. 25, 2015)............................................................24

**STATUTES AND RULES**

Securities Exchange Act of 1934:

    § 10(b), 15 U.S.C. §78j(b) ...........................................................................................1

    § 20(a), 15 U.S.C. §78t(a) ............................................................................................1

Fed. R. Civ. P.:

    Rule 12(b)(6)..........................................................................................................16, 24

    Rule 12(c)...............................................................................................................10, 16

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Plaintiff hereby opposes Defendants' Motion for Judgment on the Pleadings (ECF No. 88, "Motion" or "Mot.").[1]

## I.    STATEMENT OF ISSUES TO BE DECIDED

1.    Whether the Complaint alleges facts that, considered holistically, state claims under § 10(b) and § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a).

## II.    INTRODUCTION

After a robust round of briefing on Defendants' motion to dismiss (over 1,100 pages), and a thorough oral argument, the Court found that Plaintiff alleged every element of § 10(b) as to Defendants' timing statements, high-risk statements, and accuracy statements between July 2022 and August 2024. Of particular note, the Court found that Plaintiff had adequately alleged scienter for iRhythm's CEO, Mr. Blackford, as to each category of statements and that the Complaint adequately alleged loss causation as to every sustained false statement. The Court found a "strong" and "compelling" inference of Defendant Blackford's scienter based on, *inter alia*, Blackford's knowledge of the harmful impact of the transmission limit identified in the FDA's 2022 inspection, Blackford's admission of the "hazardous situation" the transmission limit caused, Blackford's signature on SEC filings reporting on FDA correspondence, Blackford's promise to the FDA to avoid certain language in marketing the Zio AT, and Blackford's choice to continue making misleading statements nonetheless. *See* ECF No. 77 at 22-24, Order Re: Defendants' Motion To Dismiss ("Order"). Since the Court's decision on Defendants' motion to dismiss, no new facts have come to light, and no new binding authority has been issued concerning the legal questions previously considered by the Court.

Now, Defendants want a do-over, re-raising many arguments that were made (and failed) at the motion to dismiss stage and advancing arguments that ignore the Complaint's well-pled

---

[1] Unless otherwise noted, citations to "¶ _" are to the Second Amended Complaint (ECF No. 43), citations to "Mot." are to the Defendants' Motion for Judgment on the Pleadings (ECF No. 88); citations to "RJN" are to Defendants' Request for Judicial Notice (ECF No. 89); citations to "MTD" are to Defendants' Motion to Dismiss (ECF No. 51); emphasis is added; and internal citations, alterations, and quotations are omitted.

allegations. Defendants' veiled request for reconsideration of the Court's ruling based on these failed arguments should be rejected.

Defendants' principal argument is that Blackford and iRhythm cannot have scienter because iRhythm purportedly disclosed the existence of the Zio AT's transmission limit in Customer Advisory Notices ("CANs") and labeling changes. *See*, *e.g*., Mot. at 9-12. This argument fails for several reasons.

*First*, the Court has already considered—and rejected—the arguments set forth in Defendants' 12(c) Motion. For example, in the Motion, Defendants claim that scienter is undermined by the purported fact that iRhythm "responded swiftly to the FDA," including with "corrective measures to change its labeling regarding the transmission limits." Order at 24. But the Court explicitly found that iRhythm's corrective measures were not made "quickly," and were "vague at best." Order at 24. Likewise, Defendants now argue that language in iRhythm's September 26, 2022 alteration to the Zio AT's label (which Defendants had all along) exculpates Defendants. Mot. at 10-11. But the Court already incorporated by reference and considered the September 28, 2022 CAN (Order at 8)—which has the ***exact same language*** from the label alteration that Defendants now claim is completely exculpatory. *Compare* ECF No. 51-7 at 4 ("there will be time during the wear period in which transmissions of that type are captured but not transmitted, and information will not become available until the final report"), *with* Defs' Ex. 1 at 10 ("there will be time during the wear period in which transmissions of that type are captured but not transmitted, and information will not become available until the final report"). There is nothing meaningfully new in Defendants' 12(c) Motion. It should be denied on that basis alone.

*Second*, Defendants' inference ignores that their "disclosures" were hardly voluntary, but instead, were "a result of the FDA Inspection" "meant to provide containment." The fact that Defendants were required to issue the CAN and label changes—or, at minimum, offered them to head off FDA enforcement actions—does not "doom" any inference of scienter. Mot. at 1. Similarly, Defendants' public disclosure of the CAN and labeling changes in the first alleged corrective disclosures on November 1 and 4, 2022 was done solely to explain iRhythm's negative financial results and to assure investors that the impact was purely temporary.

***Third***, days after responding to the FDA's 2022 Form 483 and in response to the FDA's concerns, Blackford himself agreed that statements related to "high/higher risk patients" and "near-real-time monitoring" associated with the Zio AT should be removed from the Company's public statements. Blackford and iRhythm then scrubbed all references to "high-risk patients" from the website entirely. Despite this knowledge, Blackford "continued to make statements suggesting that the Zio AT was appropriate for high risk patients, contradicting the FDA's findings." Order at 23. This must be more than simply "an innocent lack of clarity in iRhythm's marketing." MTD at 25.

***Fourth***, because Defendants' September 26, 2022 label alteration and September 28, 2022 CAN were meant only to pacify the FDA, they did not adequately outline the full scope of harm resulting from the transmission limit issues. For example, Defendants' disclosures fail to address that the Zio AT was inappropriate or even dangerous for use in "high-risk" patients, that there were dozens of complaints of severe cardiac events going unreported, or that the Zio AT "was a contributing factor [in a] patient's death." And, as later noted by investigative journalists, Defendants' CAN and labeling alteration were carefully worded to help iRhythm "control the narrative" and "downplay the potential frequency of the problem." Indeed, the FDA clearly found the CAN and label changes to be insufficient—it had full access to these materials when it issued the 2023 Warning Letter outlining iRhythm's "non-conformities" to medical device reporting, labeling violations, and quality system requirements.

***Fifth***, as the Court observed in its Order, any remedial efforts made by iRhythm were undermined by Blackford's statements to investors thereafter stating otherwise. Order at 22-23. In the weeks and months following Blackford's response to the FDA, Blackford continued to assure investors that the Zio AT was "putting information into the hands of patients on a near real-time basis," and was appropriate for "some of the most at-risk patients." The fact that Blackford repeatedly touted the exact claims he had confirmed the Company ***stop*** making must certainly establish his scienter.

Given all these facts, Defendants' latest submission does nothing to undermine the Court's well-founded scienter analysis.

Defendants' remaining arguments fare no better. ***First***, Defendants contend that there can

be no scienter for statements regarding "timely transmission" (which they have dubbed "lag time" statements) and accuracy statements because Plaintiff did not adequately allege that FE 3 interacted with Blackford. Mot. at 13-14. This completely ignores the Court's Order. The Court found Plaintiff had adequately alleged scienter for Blackford with respect to the timing and accuracy statements based on numerous facts, including that (i) Blackford "admitted involvement in the internal investigation into the FDA's Form 483 claims, and his knowledge of the transmission limit issues," (ii) "signed iRhythm's responses to the FDA's 2022 Form 483 in which he attested 'the wireless transmission limit is an essential design constraint'" and agreed to remove statements related to "high/higher risk patients" and "near-real-time monitoring" associated with the Zio AT from the Company's website, (iii) "signed the SEC Forms 8-K and 10-Q that reported on FDA correspondence, including the 2024 Form 483," and (iv) "the 2023 Warning Letter that followed was addressed to him." Order at 22. In advancing this argument, Defendants simply ignore the fact that FE 3 was not a meaningful part of the Court's scienter analysis.

**Second**, Defendants contend that the Complaint does not contain allegations that Blackford received any of the complaints detailed in the 2024 Form 483 process or that he was "involved in the complaint reporting process in any way." Mot. at 20. As a result, Defendants argue, the accuracy statements should be dismissed for lack of scienter. *Id.* This argument defies logic. Blackford was undoubtedly aware of these complaints after serving as the Company's liaison with the FDA, responding to the 2022 Form 483 in which he acknowledged serious failings in the Company's patient complaint handling process and promised significant remedial measures and an outside audit, and serving as the recipient of the 2023 Warning Letter. Given his admitted involvement, it would be absurd to suggest he was without knowledge of the complaints.

**Third**, Defendants nitpick the semantics of the high-risk statements, insisting that the sustained statements could not have been made with an intent to defraud because they use descriptors like "some of the most at-risk" and "more acute," and not "high-risk." Mot. at 16-18. This argument defies the Court's explicit acknowledgment that in sustaining these statements it would use the term "'high-risk' as shorthand for all alleged statements," even though "not every allegedly false statement in this category uses the words 'at-risk or 'high-risk.'" Order at 11. Even

setting this aside, Defendants merely recapitulate their already-rejected falsity argument as a scienter argument, which cannot suffice. *See* Order at 11-12. Whether Defendants used "some of the most at-risk," "more acute," or "high-risk" is of no moment—what matters is that the high-risk statements were misleading, and Defendants made them with an intent to defraud.

*Finally*, Defendants' loss causation arguments fail, again. Defendants contend that none of the corrective disclosures specifically reported iRhythm's delayed reporting or reporting "lag time." Mot. at 15-16. But the level of specificity demanded by Defendants is not required. As the Ninth Circuit explained in *First Solar*, pleading loss causation only requires that the allegations meet "the familiar test for proximate cause," which can be met in "an 'infinite variety' of ways." *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Here, for example, the disclosures related to the Department of Justice's investigation into iRhythm specifically concerned delays in reporting that Defendants had concealed from investors. And allegations "showing that the stock price fell upon the revelation" are sufficient "even if the market was unaware at the time that fraud had concealed" the truth. *First Solar*, 881 F.3d at 754. Defendants' entire Motion should be denied.

## III.   STATEMENT OF FACTS

### A.   iRhythm Told Investors And Customers That The Zio AT Provided Near-Real Time Alerts For High-Risk Patients, And Was Highly Accurate

During the Class Period, Defendants represented to investors that iRhythm's heart monitoring device, the Zio AT, was appropriate for "high risk" and "*the most at-risk* patients" because of its "*near real-time*" reporting. ¶¶55-59. Defendants boasted of the Zio AT's "highly predictable, highly accurate" use, likening the device's ability to "diagnose heart rate arrhythmias with the *accuracy of a panelist of cardiologists*." ¶¶65-66, 225. Meanwhile, Defendants were aware that the Zio AT's transmission limit presented a "known design constraint," that there was regularly at least a four hour "lag time" between when the device identified a significant arrhythmia and when healthcare providers were notified, and that CCT personnel were not only misreading arrhythmia data but were providing misclassified data to end users for diagnostic purposes. ¶¶98-100, 117, 163. These crucial deficiencies rendered the device inaccurate and

incapable of providing near real-time alerts for high-risk patients, as promised.

Due to these material deficiencies, during the Class Period, Defendants received scores of critical customer complaints concerning the Zio AT's failure to transmit accurate and timely arrhythmia data. ¶¶77-86, 117-21, 232. In fact, the complaints indicated that many patients wearing the device had suffered serious arrhythmias while wearing their Zio ATs but, having unknowingly hit the transmission limit, their doctors received zero notifications. ¶¶8, 90-92. In one instance, the device even "failed to report [] life-threatening arrhythmia[s] until *1 week later.*" ¶92.

**B.    The FDA Issued The August 12, 2022 Form 483 Warning That The Zio AT Was Being Improperly Marketed, Was Not Near Real-Time, And Was Inappropriate For High-Risk Patients**

Amidst the influx of complaints, the FDA initiated a twelve-day inspection of iRhythm from July 25, 2022 to August 12, 2022, which resulted in issuance of the Form 483 on the final day (the "2022 Form 483"). ¶103. The 2022 Form 483 identified multiple dangerous deficiencies with the Zio AT, including that the "Zio AT was a contributing factor [in a] patient's death." *Id*. The FDA warned that given the transmission limit, the Zio AT was inappropriate or even dangerous for use in "high-risk" patients and could "contribute to serious injury or death because life-threatening arrhythmias may not receive timely treatment." ¶74. Additionally, the FDA highlighted that the Company had received dozens of complaints since June 2019 of severe cardiac events that were not reported to physicians as required. ¶106. The FDA found that Defendants had failed to "implement corrective actions to address this device limitation." ¶107.

In September 2022, Blackford submitted responses to the warnings issued in the 2022 Form 483, in which he did not deny the FDA's claims regarding the Zio AT's undisclosed limitations. ¶¶108-09. Instead, he admitted the transmission limit was a "known design constraint" that was "crucial" and "essential" to the functioning of the device. ¶109. Blackford also admitted that iRhythm had "conducted a risk assessment" and found that "[t]he hazardous situation of a max transmission design constraint potentially leads to a delayed notification of ECG findings until the final report is posted with all findings from the wear period." *Id.*

In the response letter, Defendants stated that they would take certain "corrective" actions in response to the observations made by the FDA. ECF No. 51-3. Blackford offered to issue

customer advisory notices to "Zio AT customers informing them of the maximum transmission constraints, the process associated with informing them when a patient is nearing the maximum limit." *Id.* at 43. Defendants also agreed to update the labeling of the Zio AT to alert healthcare providers "about the maximum transmission constraint for both asymptomatic (500) and symptomatic (100) and the impact of potentially missed transmissions." *Id.*

Finally, Defendants agreed that statements related to "high/higher risk patients for Zio AT will be removed from the company website," as well as statements related to "near-real-time monitoring." ECF No. 51-3 at 11; *see also* ¶¶167-68.

### C. iRhythm Quietly Issues The Customer Advisory Notice In An Attempt To Appease The FDA

On September 28, 2022, iRhythm issued a CAN to doctors that included a "labeling correction" regarding the device's "maximum transmission limits during wear." ¶112. But as set forth in Plaintiff's Complaint, and as already found by this Court, the CAN only ***partially*** shared the truth about the Zio AT's transmission limit. ¶¶122-33; Order at 24. Per a former iRhythm employee, the CAN "appear[ed] to downplay the potential frequency of the problem and highlight the technical limitations as a benefit to patients," and that it "only had to be signed and returned by a member of a practice's administrative staff rather than the prescribing cardiologist." ¶113. Notably, the CAN fell far short of addressing the full scope of the harm which could result from the transmission limit and the FDA's concerns, including that there were dozens of complaints of severe cardiac events going unreported, and that the Zio AT "was a contributing factor [in a] patient's death." *See supra* §III.B.

### D. iRhythm Continues To Misrepresent The Zio AT As Near-Real Time And Highly Accurate

While taking steps to appease the FDA and promising to cease claims regarding "near real-time" reporting, Defendants continued to paint a false picture of the Zio AT to investors. On September 21, 2022, after receiving the Form 483 and submitting his responses, Blackford stated at iRhythm's Investor Day: "We have a perfect product to address, ***putting information into the hands of the patient on a near real-time basis.***" ¶¶114, 176, 186-87.

On November 1, 2022, iRhythm issued a press release in which it disclosed downgraded revenue guidance for the quarter. In order to explain the Company's degraded financial performance, Defendants admitted to issuing a CAN, but did not disclose the substance of the CAN or the FDA's findings from the August 2022 inspection. ¶¶123-24. Afterwards, on a conference call with analysts and investors, Blackford attempted to quiet investor concerns by stating that the financial issues the Company faced were *only a "near-term" headwind*, and that they merely involved updates to "packaging" and "labeling." ¶128. On November 4, 2022, the Company filed with the SEC its quarterly report on Form 10-Q, which acknowledged that the CAN concerned issues raised by the FDA during an inspection that culminated in a Form 483, and that the CAN noted a "labeling correction" related to "the device's maximum transmission limits during wear[.]" ¶129. The Form 10-Q concluded by noting that the Company did not "expect this Zio AT labeling correction or the activities associated with the topics raised in the FDA inspection to present a material risk to our business at this time." ¶131. Defendants' downplaying of the FDA's concerns (and continued concealment of the deaths and injuries caused by the Zio AT) mitigated investor concern about the FDA's inquiries.

Then, on November 14, 2022, in a NASDAQ interview, Blackford stated, "We have a device that *provides near real-time capability* and can put that information right at their fingertips." ¶191. And on a January 10, 2023 investor call, Blackford announced that the Zio AT was intended for "some of the most at-risk patients." ¶¶59, 210. In short, despite knowing the "hazardous situation" presented by the Zio AT and promising to cease these misleading claims, Defendants continued to misrepresent the device.

**E.     The FDA Issued The May 30, 2023 Warning Letter Revealing The Issues The FDA Privately Warned iRhythm About In August 2022**

On May 25, 2023, iRhythm received a Warning Letter from the FDA (the "Warning Letter") confirming the issues in the 2022 Form 483. ¶115. The Warning Letter ultimately determined that the transmission limit "introduce[d] a nonconformance" that rendered the Zio AT "not remotely capable of delivering near-real time monitoring for high-risk patients." ¶116. The Warning Letter also found iRhythm had committed labeling violations by making untrue

statements (that the Zio AT was for "high-risk patients" and provided "near real-time continuous transmission"), and quality system regulation violations because iRhythm had known about these violations since 2019 and had done nothing about them. *Id.* Finally, the Warning Letter found that iRhythm had committed medical device reporting ("MDR") violations because the Company had failed to report to the FDA when it became aware of information that reasonably suggested that the Zio AT may have caused or contributed to death or serious injury. *Id.*

Defendants disclosed that iRhythm had received the Warning Letter in a Form 8-K filed with the SEC on May 30, 2023, after the market closed. ¶137. On May 4, 2023, the Company had disclosed that the Department of Justice had issued a subpoena to iRhythm, which investors later learned was regarding concerns that "the Zio Systems were failing to timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event." ¶134. And on July 1, 2024, the DOJ filed suit to enforce its subpoena, revealing the focus on the Zio AT's "***fail[ure] to timely transmit patient cardiac data to physicians***." ¶141.

### F.    The Zio AT's Patient Reports Were Not Reliably Accurate

During the Class Period, Defendants also repeatedly cited to the Zio AT's "incredible accuracy" and that the CCT personnel "ensure[d] high accuracy and quality of reports before delivering them to the prescribing physician." ¶¶65-66, 224-31. However, in addition to the fatal transmission limits, the Zio AT routinely provided inaccurate data. Starting in at least May 2022, iRhythm received ***thousands*** of complaints that the CCT personnel were misreading arrhythmia data and providing misclassified data to end users for diagnostic purposes. ¶117; *see also* ¶¶98-100, 163 (such complaints reported to senior management). On July 31, 2024, the FDA issued ***another*** Form 483 (the "2024 Form 483"), which observed that iRhythm had received over 4,000 complaints concerning CCT personnel, was still routinely failing to report these complaints to the FDA, and was not adequately investigating the "recurring quality problems." ¶¶117-18.

On August 1, 2024, iRhythm disclosed the existence, but not the contents, of the 2024 Form 483. ¶¶146, 148. On August 9, 2024, Capitol Forum reported details from the 2024 Form 483, including the over 4,000 complaints relating to inaccurate reports, and reports from former employees describing that CCTs were trained to provide inaccurate reports. ¶152. Analysts were

stunned by these revelations, remarking on "what feels like a never-ending series of external pressures," that the Warning Letter joins a "now growing list of regulatory considerations," and that "full ramifications of potential remediation are unknown." ¶138.

### G.    The Court Sustains Claims Against Defendant Blackford And The Company

On June 3, 2025, this Court sustained claims against Defendant Blackford and the Company. In determining that Blackford had the requisite scienter, the Court relied on the fact that Blackford "signed iRhythm's responses to the 2022 Form 483, in which he attested 'the wireless transmission limit is an essential design constraint,'" that "the 2023 Warning Letter that followed was addressed to him," and that he signed "the SEC Forms 8-K and 10-Q which reported on FDA correspondence, including the 2024 Form 483." Order at 22. The Court reasoned that given Blackford's "admitted involvement in the internal investigation into the FDA's Form 483 claims, and his knowledge of the transmission limit issues," Blackford had been aware of issues "which contradicted his assertions about the Zio AT's capabilities." *Id.* at 22-23. In determining that Plaintiff had adequately alleged scienter as to Blackford, the Court rejected Defendants' argument that the allegations simply show "an innocent lack of clarity in iRhythm's marketing that was quickly, and publicly, remedied." *Id.* at 23. Rather, the Court concluded that iRhythm's public disclosures of FDA correspondence were not made "quickly," and "***even as iRhythm took corrective measures to change its labeling regarding the transmission limits, public statements about the transmission limit were vague at best.***" *Id.* at 23-24.

The Court also found Defendants' loss causation arguments in their motion to dismiss "unavailing." Order at 27. Namely, the Court determined that the Complaint adequately alleged that stock price declines in response to each of the seven corrective events (¶¶122-53) could be "traced back to the very facts about which [Defendants] lied." *Id.*

### IV.    LEGAL STANDARD

"Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). For a Rule 12(c) motion, courts "accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Id.*

## V.    DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Defendants' Motion cites extensively to eight Exhibits, for the truth of their contents, in an improper effort "to present their own version of the facts at the pleading stage," and thus "short-circuit the resolution of a well-pleaded claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1003 (9th Cir. 2018). As such, Defendants' RJN should be denied in significant part.[2]

Plaintiff agrees that, consistent with the Court's prior Order, Exhibits 1-4 and 6-8 are judicially noticeable "not for the truth of their contents," but only "to determine the information available to the market." Order at 8-9 (citing *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 872 (N.D. Cal. 2023)). But Defendants make no pretense that they are introducing any of their Exhibits to show what information was available to the market, or indeed for any purpose other than for the "truth" that they "disclosed precisely what plaintiff alleged to be concealed," which, in their view, "eliminates any inference of scienter." Mot. at 16. This is an impermissible use of judicial notice.

As discussed below, Defendants' interpretation of what each of their Exhibits "disclosed" and the interplay of these "disclosures" with Defendants' scienter is subject to "reasonable dispute," and thus it is inappropriate to notice these Exhibits to "resolve factual disputes at the pleading stage." *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 946 (N.D. Cal. 2022); *Eastman v. Apple, Inc.*, 2019 WL 3934805, at *5 (N.D. Cal. Aug. 20, 2019) ("whether the document[] actually disclosed" what is alleged to have been omitted is a dispute "that the Court cannot resolve via judicial notice" at the pleading stage).

Indeed, as the Ninth Circuit held in *Khoja*, courts may not make factual determinations based on documents that contain statements "subject to varying interpretations" and where "[r]easonable people could debate what exactly [those documents] disclosed." *Khoja*, 899 F.3d at 1000 (finding it to be an abuse of discretion to judicially notice investor call transcript "to determine what the investors knew"); *In re Doximity, Inc. Sec. Litig.*, 2025 WL 1449598, at *2 (N.D. Cal. May 13, 2025) (holding that arguing "at the pleadings stage, the facts relating to what

---

[2] Plaintiff agrees Exhibit 5, a transcript of the November 1, 2022 earnings call, is "incorporated by reference" in the Complaint and that the Court may take judicial notice of the fact that Defendants made the statements contained therein.

Lead Plaintiff's Opposition To Motion For Judgment On The Pleadings
CASE NO. 3:24-CV-706-JSC                                                                    11

investors did (or not) understand [defendants'] statements to mean" is improper); *see also In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *4 n.12 (C.D. Cal. June 7, 2018) (refusing to take judicial notice of documents offered to show what "the market understood" because resolving competing inferences and factual disputes is "improper at this stage of litigation").

## VI.    ARGUMENT

### A.    The Complaint Adequately Pleads Scienter For iRhythm And Blackford

To plead scienter, a plaintiff must allege that the defendant "made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). At the pleadings stage, Plaintiff need only raise a "strong inference" of scienter, which "need not be irrefutable . . . or even the most plausible." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-24 (2007). A "smoking gun" is not required; the inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

This Court ***already found*** that the allegations in the Complaint satisfied this standard. Specifically, the Court determined that the below-listed facts gave rise to a strong inference that Blackford was aware of "transmission and inaccuracy issues and the resulting inappropriateness of the Zio AT for patients requiring near real-time transmission." Order at 24.

***First***, the Court found that Blackford's "admitted involvement in the internal investigation into the FDA's Form 483 claims, and his knowledge of the transmission limit issues" supported an inference that "specific information" related to the fraud was conveyed to him, "at least as of the date of the FDA investigations in July of 2022." Order at 22. The Complaint alleges that Blackford reviewed the FDA's 2022 Form 483, which warned Defendants that because of the Zio AT's transmission limit, the device did not provide "near real-time" warnings and was thus inappropriate or even dangerous for use in high-risk patient populations. ¶¶103-09; Order at 22. The 2022 Form 483 also stated that iRhythm was aware of the issues raised by the FDA since at least 2019 and had received 28 complaints in that time concerning severe patient arrhythmias not being transmitted to their doctors because the transmission limit was triggered. ¶¶158-60; Order at 5, 16, 23.

Lead Plaintiff's Opposition To Motion For Judgment On The Pleadings
CASE NO. 3:24-CV-706-JSC                                                          12

In addition, Blackford *signed and sent* iRhythm's lengthy response to the 2022 Form 483, which admitted that the transmission limit posed a "hazardous situation" but was "crucial" and "essential" and a "known design constraint." ¶160; Order at 22. Tacitly acknowledging that these concepts were misleading in light of the FDA's concerns, Blackford stated that iRhythm would scrub "high-risk" language and "[l]anguage related to 'near real-time monitoring' associated with Zio AT'" in accordance with its response to the FDA's 2022 Form 483. ECF No. 51-3 at 17; ¶¶167-68. Given that Blackford admitted knowledge of the transmission limit issues, "[i]t is unclear what further facts [Plaintiff] would need to plead to create a stronger inference" that Blackford "had access to information [he] discussed publicly." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (2017); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019) (admission of knowledge "sufficient to demonstrate" "access," or at minimum, create a "question of fact not appropriate for resolution on a motion to dismiss").

**Second**, it is undisputed that Blackford received numerous warnings from the FDA, including the Warning Letter and the 2022 Form 483. ¶¶108-09, 115-16, 160. The 2022 Form 483 and Warning Letter made clear to Blackford that, due to the transmission limit and its documented impact on patients, the Zio AT could not be used in high-risk patients. ¶¶108-09, 115-16, 128, 160. "The most direct way to show" scienter is to include allegations—such as those here—of "contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Lcl. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705-06 (9th Cir. 2021) (scienter where "memo informed senior executive leadership" about problem); *see also In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014) (scienter where "FDA made it known to Defendants on five occasions that the []study was inadequate").

**Third**, Blackford's unique, severe recklessness is further demonstrated by the fact that, directly after he personally signed a letter to the FDA in which he certified that iRhythm would cease marketing the Zio AT to "high-risk" patients and as providing "near real time" alerts, he "continued to make statements suggesting the Zio AT was appropriate for high risk patients,

contradicting the FDA's findings." Order at 23; *see supra* §III.G. As discussed above, Defendants' response to the 2022 Form 483 makes clear that Blackford agreed to remove language related to "high-risk" patients and "near real-time" transmission from iRhythm's website and from customer-facing marketing. *See supra* §III.B. But in the weeks and months following the response, when he thought the FDA was not watching, Blackford continued to make these claims (or stronger ones) to investors, stating that the Zio AT was "***putting information into the hands of the patient on a near real-time basis***," "***provides near real-time capability*** and can put that information right at their fingertips," and was intended for "some of ***the most at-risk*** patients." ¶¶59, 114, 176, 186-87, 191, 210. This undoubtedly establishes his scienter. *In re Amgen, Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1026 (C.D. Cal. 2008) ("cogent and compelling" inference of scienter where company touted results of a trial it knew was not designed to allay FDA concerns).

**_Fourth_**, by no later than August 2022, Blackford was aware that the FDA was scrutinizing the Company's handling of patient complaints. ¶169. The FDA's August 2022 Form 483 found that iRhythm had received—but not disclosed—a "significant number of complaints" related to the transmission limit. ¶¶158, 169. In response, Blackford acknowledged that, "During the inspection, the FDA investigator spent a significant amount of time focused on" patient complaints (or "MDR" complaints) received by iRhythm, ECF No. 51-3 at 35, and stated that, in response to the FDA's concern, iRhythm "analyzed the data contained in the reports" related to the "28 patients with complaints." *Id.* at 36. As part of iRhythm's proposed corrective measures to avoid FDA enforcement, Blackford promised that iRhythm would "review the Zio AT risk management files . . . to ensure that the severity of harm and probability of occurrence ratings are properly aligned with . . . complaint trends and data." *Id.* at 20; ¶169. Blackford also promised that iRhythm would have an audit of iRhythm's complaint-handling process done by an external auditor to ensure that iRhythm's "major enhancement effort" to ensure proper reporting and transparency of patient complaints. *Id.* at 16. Nevertheless, when the FDA issued its second Form 483, the FDA found ***additional*** MDR violations, noting that although iRhythm had received over 4,000 patient complaints concerning accuracy issues since the FDA's last inspection, the Company routinely did not report complaints to the FDA as they were required to do and were faulted for not doing so in

the 2023 Warning Letter. ¶¶77, 169.

***Fifth***, that Blackford signed "the SEC Forms 8-K and 10-Q, which reported on FDA correspondence, including the 2024 Form 483" (Order at 22), further supports scienter because such attestations require him to have "to access sufficient reporting information to certify that the information provided did not omit any material facts to make the report not misleading." *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at \*7 (N.D. Cal. July 26, 2017). "For these certifications to have any substance, signatories to the certifications must be held accountable for the statements." *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007).

***Sixth***, the Court concluded that iRhythm knew of "accuracy-related issues since at least 2017" and iRhythm "routinely do[es] not report complaints and events alleging that [its] [CCT] personnel have misread or misinterpreted cardio-graphic arrhythmia event data." Order at 23.

Taken together, the Court concluded that these facts established a strong inference that Blackford acted with scienter. Order at 24. The Complaint's well-pled allegations lead to a strong inference that Defendants took the minimum corrective measures needed to avoid FDA enforcement, all the while knowing those measures were insufficient and misleading investors as to the Zio AT's dangerous flaws. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (scienter alleged where defendants took a "gamble" by "concealing bad news in the hope that it will be overtaken by good news"); *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at \*5 (S.D. Cal. May 1, 2003) (finding scienter where defendant "knew that there may be a problem" with drug trial data but "took the calculated risk of continuing the trials and application process as originally planned"). Defendants' Motion should fail on this basis alone.

### 1.    Defendants' Scienter Arguments Should Be Rejected

In their motion to dismiss, Defendants argued that it is "illogical" that Defendants acted with scienter when they "simultaneously disclosed" the transmission limit. MTD at 16-19. The Court rejected this argument, noting that Defendants' "public statements about the transmission limit issue were vague at best." Order at 24. Defendants now seek a do-over, raising several arguments that not only ignore the Complaint's well-pled allegations and misconstrue the law, but bear a striking resemblance to arguments that this Court has already considered and rejected.

***First***, Defendants argue that, with respect to the statements in ¶¶184, 187, 190-99, 210-12, they cannot have scienter because iRhythm purportedly disclosed the existence of the Zio AT's transmission limit in CANs and labeling changes. Mot. at 9-12. This recycled argument fails.

To start, the Court has already considered—and rejected—Defendants' arguments that scienter is undermined by the purported fact that iRhythm "responded swiftly to the FDA," including with "corrective measures to change its labeling regarding the transmission limits." Order at 24. Defendants claim to have only recently discovered iRhythm's September 26, 2022 alteration to the Zio AT's label, which supposedly contains "detailed disclosures describing the transmission limit." Mot. at 10-11. Their discovery does not add anything to the Court's prior analysis. Defendants ***already*** provided the Court with the September 28, 2022 CAN—which has the ***exact same language*** as that of the label alteration that Defendants now claim is newly and completely exculpatory. *Compare* ECF No. 51-7 at 4 *with* Defs' Ex. 1 at 10 (same). For this reason—and with respect to each argument that Defendants reiterate from their Rule 12(b)(6) motion—Defendants' post-pleadings motion should be rejected. As Defendants themselves tacitly admit (Mot. at 8, n.8), a party may ***only*** raise on a Rule 12(c) motion arguments that were ***not*** raised in the earlier motion to dismiss. *Chae v. SLM Corp.*, 2008 WL 11342464, at *1 (C.D. Cal. Jan. 17, 2008) (denying Rule 12(c) motion where the "instant motion for judgment on the pleadings essentially requests the Court reconsider that [Rule 12(b)(6)] ruling").

This threshold issue aside, Defendants' disclosures were vague (at best) and certainly do not constitute a fulsome disclosure that could—potentially—mitigate any inference of Defendants' scienter. As alleged, the November 1 and 4 disclosures referencing the CAN and labeling changes were provided to explain the Company's degraded performance and convince investors that this was simply a "near term" "headwind." *See* ¶113 (former iRhythm employee: the CAN "appear[ed] to downplay the potential frequency of the problem and highlight the technical limitations as a benefit to patients").[3]

---

[3] Accordingly, Defendants' cases meant to support the proposition that there is no scienter "where defendants disclosed precisely what plaintiff alleged to be concealed" (Mot. at 12-13) are

Defendants' corrective disclosures on November 1, 2022 (Mot. at 10-11) disclosing the CAN in order to explain the Company's deteriorated financial performance is just that, a partial disclosure of the fraud—not a get-out-of-jail-free card for the fraud already committed and continuing. Neither the November 1, 2022 disclosure, nor the CAN or labeling fine print, reveal the many *other* highly material facts related to the FDA's 2022 inspection. *See supra* §II. For this reason, Defendants' reliance on *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869 (9th Cir. 2012) and *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, 2010 WL 8816155, at \*14 (N.D. Cal. Aug. 24, 2010) (Mot. at 10, 13) undermines their argument. There, unlike here, plaintiffs' scienter theory was largely based on the defendants' motive to raise capital in a stock offering and to increase the value of their personally held stock. But the defendants disclosed the most severe of the allegedly undisclosed adverse effects of the drug *before* any capital raise and the remaining truth before the defendants sold a single share of stock. Here, Defendants quietly disclosed the bare minimum in the November 1 and 4, 2022 corrective disclosures as they desperately—and unsuccessfully—sought to head off more severe regulatory action.

In analyzing the competing inferences of scienter—the context in which Defendants purport to offer the information available to the market—the fact Defendants disclosed the CAN just to excuse the Company's financial performance, and to claim the financial pressure was temporary, rather than a longer-term issue, actually *supports* the scienter inference. *See, e.g.*, *Patel v. Axesstel, Inc.*, 2015 WL 631525, at \*13 (S.D. Cal. Feb. 13, 2015) (rejecting defendants' argument that "their voluntary restatement weighs against scienter" because the more compelling inference was that defendants "came clean" when "they likely had no other choice"). *Pardi v.*

---

irrelevant. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 538 (9th Cir. 2024) (highly material information had been freely disclosed, not in a corrective disclosure of fraud; allegedly withheld information was either accurately disclosed, inadequately alleged to be known, or less important than the disclosed information); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 417 (9th Cir. 2020) (study used to demonstrate falsity was fully disclosed by defendants during the class period, before corrective disclosures); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 818 (N.D. Cal. 2019) (no adequate allegations of scienter; voluntary disclosure of FTC investigation undermined "motive" allegations); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 443 (S.D.N.Y. 2006) (in a two-day class period, alleged scheme was "tenuous" where the false statement referenced the FDA, who corrected alleged misstatement and immediately dissipated any inflation, which defendants "must have realized" would happen if fraud was purposeful rather than negligent).

Lead Plaintiff's Opposition To Motion For Judgment On The Pleadings
CASE NO. 3:24-CV-706-JSC                                                                                    17

*Tricida, Inc.*, 2024 WL 1056013 (N.D. Cal. Mar. 11, 2024), on which Defendants heavily rely (Mot. at 11, 13, 17), makes this distinction clear. There, defendants voluntarily and in the normal course referenced documents containing the information that plaintiffs allege was concealed (that a study conducted in "Europe" was actually conducted in "Eastern Europe.'). *Id.* at 12. Here, ***in the first alleged corrective disclosures*** and explicitly to explain financial pressure resulting from FDA demands—i.e., not in the normal course and not strictly voluntarily—Defendants disclosed the CAN, label change, and its financial impact. ¶¶123-26.[4]

In reality, Defendants' argument is nothing more than a thinly veiled "truth-on-the-market" defense that raises "a merits issue to be reached at trial," *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), *aff'd sub nom*, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013), and thus is "not available at the motion to dismiss stage." *Boston Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020). Defendants give the game away when they rely on analyst reports responding to the November 1, 2022 corrective disclosure to show that some analysts had picked up on the transmission limit. Mot. at 12, citing Exs. 6-7. Whether analysts commented on the transmission limit may later be relevant if Defendants argue that the truth was fully revealed on November 1, 2022 or November 4, 2022; ***not*** to Defendants' state of mind in making the previous and subsequent misstatements. With that context, Defendants' argument presents factual issues regarding what the market understood that cannot be resolved as a matter of law. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008). Defendants fail to show that the supposedly exculpatory facts were "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations." *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1079 (E.D.

---

[4] Defendants simply misread *Police Retirement System of St. Louis v. Granite Construction, Inc.*, 2021 WL 8153575 (N.D. Cal. Sept. 16, 2021). There, the special master noted in discussing the element of reliance that "the alleged misrepresentations were publicly known (here, in SEC filings)" (*id*. at *2) (cleaned up). In other words, the element of reliance was met because the misrepresentations were public; not, as Defendants seem to think, that the element of ***scienter*** was not met because the ***truth*** was public.

Lead Plaintiff's Opposition To Motion For Judgment On The Pleadings
CASE NO. 3:24-CV-706-JSC                                                      18

Wash. 2016) ( "[a] reasonable inference is that [the prior disclosure] had not been communicated with the same intensity and credibility as IsoRay's May 20 Press Release and therefore, investors failed to appreciate the significance of the information . . .") (citing *In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010)).

**_Second_**, Defendants contend that Blackford lacked scienter for the statements regarding "timely transmission" in ¶¶184, 187, 190-99 (which they have dubbed the "lag time" statements). Mot. at 13-14. According to Defendants, the only allegations in the Complaint concerning "lag time" come from FE 3, who does not allege facts concerning Blackford's knowledge of those issues. Similarly, Defendants argue that Blackford lacked scienter for the statements in ¶¶226-31 because, in their view, the only allegations concerning accuracy came from FE 3. Mot. at 16-17.

Defendants, again, ignore the Court's Order. The statements that Defendants call "lag time" statements were encompassed in the Court's analysis of the "timing" statements. Order at 16. The Court has already found that the Complaint adequately pled Blackford's scienter as to these statements because (i) he "signed iRhythm's responses to the FDA's 2022 Form 483 in which he attested "the wireless transmission limit is an essential design constraint," (ii) the 2023 Warning Letter was addressed to Blackford, (iii) he "signed the SEC Forms 8-K and 10-Q which reported on FDA correspondence, including the 2024 Form 483, (iv) and he "admitted involvement in the internal investigation into the FDA's Form 483 claims, and his knowledge of the transmission limit issues." *See supra* §III.G.; Order at 22-23; ¶¶146, 158, 168-69, 209-10. The Court also found that Plaintiff had provided "ample specific and plausible" allegations to establish falsity for the timing statements, in part by crediting FE 3's statements. Order at 19. Blackford himself also agreed that iRhythm should cease making statements related to "high/higher risk patients" and "near-real-time monitoring." ECF No. 51-3 at 11. On this basis alone, Defendants' arguments concerning the lag time statements should be dismissed.

Defendants' arguments are otherwise misplaced. First, none of the sustained statements are solely based on "lag time"—these statements are based on the full scope of the issues found by the FDA in its investigation and set forth in the Form 483. Second, none of the Court's scienter analysis was based on FE 3. Order at 22-23; ¶¶75-76, 85, 201, 232. Instead, the Court only

analyzed FE 3's allegations as they pertained to *falsity*. Order at 13, 18-19, 20-21.[5]

To the extent the Court further analyzes Blackford's knowledge or recklessness with respect to lag time (which is not necessary given the FDA's findings as to the impact of the transmission limits), the Complaint alleges an abundance of other facts that give rise to a strong inference that Blackford knew or recklessly disregarded that iRhythm had at least a four-hour delay in transmitting reports of the data gathered by the Zio AT—even when it was working. As alleged in the Complaint, the FDA raised significant concerns in the Form 483 regarding the timing limitations of the device and explicitly found that these limitations were known to iRhythm for years. ¶87. Blackford, in response to the Form 483, promised the FDA that iRhythm would analyze the accuracy of its reporting statements and investigate the delay in transmitting data to physicians. ¶201. The Zio AT's multi-hour reporting delays was standard, as reported by FE 3. *Id.* And the Court credited these allegations, holding that they supported an inference that Blackford was aware of "transmission and inaccuracy issues and the resulting inappropriateness of the Zio AT for patients requiring near-real-time transmission." Order at 24.

***Third***, Defendants argue that the statements in ¶¶210-11 should be dismissed for lack of scienter because "they do not even use the words 'high risk'"—instead, the sustained "high risk" statements refer to the patient population as "*some of the most at-risk*" and "*more acute*." Mot. at 16. As an initial matter, the Court sustained the statement set forth in ¶208 to the extent it refers to "high risk" patients (dismissing the "spectrum of care" portion). Order at 15 (distinguishing

---

[5] Because FE 3's allegations do not form the basis of the Court's scienter decision, the cases Defendants cite, Mot. at 14, are irrelevant. They are also distinguishable. *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.* did not require "direct contact," as the Defendants claim (Mot. at 14), but rather found insufficient an unexplained statement from a single salesperson that "100% that hospitals were cutting back." 759 F.3d 1051, 1063 (9th Cir. 2014). Likewise, *Zucco Partners, LLC v. Digimarc Corporation*, Mot. at 14, is inapposite because the FEs in that case "were not employed by Digimarc during the time period in question," "base[d] their knowledge on vague hearsay," and offered only "conclusory assertions about the defendants' scienter." 552 F.3d 981, 996-98 (9th Cir. 2009). In *Jackson v. Fischer*, Mot. at 14, the court found the scienter standard was not met when plaintiff failed to allege any allegations specific to the defendant. 2015 WL 1143582, at *17 (N.D. Cal. Mar. 13, 2015). Finally, unlike in *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, Plaintiff alleges that Blackford had ready access to and a stated commitment to reviewing the information at issue. 856 F.3d 605, 615-16 (9th Cir. 2017).

statements regarding "high-risk" and "at-risk" patients," from "spectrum of care" statements). Defendants fail to address the "high risk" portion of ¶208 at all.

With respect to the other statements, Defendants argue that the statements were made without scienter, since Plaintiff's theory of fraud somehow exclusively depends on Defendants' statements referring to the Zio AT patient population with the specific term "high risk." *Id.* But the Court considered and rejected this argument in its Order. In sustaining these statements, the Court explicitly noted that: "Not every allegedly false statement in this category uses the words 'at-risk' or 'high-risk.' The Court uses the term 'high-risk' as shorthand for all alleged statements the parties placed into this category." Order at 11 n.3. Defendants' argument is entirely irrelevant.

Even setting aside the Court's clear rejection of this argument, Defendants knew full well that language such as "most at-risk" and "more acute" was misleading in the same way that the term "high risk" was misleading. This is a distinction without any difference.

***Fourth***, Defendants again argue that because iRhythm disclosed that the Zio AT was not meant for "critical care" patients, this was adequate "to establish that the Zio AT was not appropriate for patients at a risk of life-threatening arrhythmias." Mot. at 2, 17. This is simply a rehash of Defendants' failed arguments at the motion to dismiss. There, Defendants argued that Plaintiff failed to allege that the Zio AT was inappropriate for high-risk patients because iRhythm had supposedly "disclose[d] a definition of 'high risk' to investors" and iRhythm always disclosed it was inappropriate for "critical care" patients. MTD at 7. The Court rejected these arguments, noting that none of Defendants' disclosures "show the 'high risk' statements did not mislead as a matter of law." Order at 14. The Court should do so again.

***Fifth***, Defendants argue that the statements in ¶¶226-31 should be dismissed for lack of scienter because the Complaint purportedly does not contain allegations that Blackford received the 4,000 complaints detailed in the 2024 Form 483, nor does it allege that Blackford "was involved in the complaint reporting process in any way." Mot. at 20. Defendants' argument with respect to the over 4,000 complaints identified by the FDA is simply not credible after the 2022 inspection and Form 483. As discussed above, Defendants' own response to the FDA shows that Blackford acknowledged the FDA was highly focused on the patient complaint handling process,

stated that "we analyzed" the 28 complaints the FDA had highlighted, and committed to reviewing future complaints "to ensure that the severity of harm and probability of occurrence ratings are properly aligned with . . . complaint trends and data." ECF No. 51-3 at 20, 36; 155-63 (discussing FDA's "Observation #4" criticizing lack of procedures to analyze patient complaints that "can result in delayed transmission to clinicians of critical or life-threatening arrhythmias"; providing remedial and corrective actions, including an outside audit of procedures to be conducted in 2023); ¶169.[6] Here, given Blackford's personal confirmation to the FDA—iRhythm's regulator—that iRhythm would specifically focus on patient complaints, the severity of harm alleged in the complaints, and the probability of occurrence, Defendants' argument fails. *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *12-14 (C.D. Cal. Apr. 12, 2016) (holding that "it would be reasonable" to infer that defendants "closely monitor[ed] any possible violations of FDA regulations" when violations over ten years prior had resulted in a Warning Letter that caused "significant damage" to company's stock and a lawsuit).

Remarkably, Defendants rely on the Ninth Circuit's decision in *South Ferry LP, No. 2 v. Killinger* to argue that Plaintiff must demonstrate that Blackford actually received the patient complaints and reviewed them, citing the Ninth Circuit's quotation from *In re Vantive Corp. Securities Litigation,* 283 F.3d 1079, 1087-88 (9th Cir. 2002) that plaintiffs must "bridge the gap between the existence of the reports and actual knowledge on the part of the defendants." 542 F.3d 776, 783 (9th Cir. 2008).[7] But the Ninth Circuit concluded in *South Ferry* that the language from *Vantive*—which Defendants rely on here—is "***too demanding and focused too narrowly***" following the Supreme Court's decision in *Tellabs. See S. Ferry LP*, 542 F.3d at 784. Following *Tellabs*, the Ninth Circuit concluded, a defendant's role, their access to contrary information, and

---

[6] This is in stark contrast to the pre-PSLRA case Defendants rely on, *In re Worlds of Wonder Securities Litigation*, where plaintiffs set forth only speculative inferences arising from officers' unnamed "suspicious conduct." 35 F.3d 1407, 1425 (9th Cir. 1994).

[7] Defendants' reliance on *Plumley v. Sempra Energy*, 847 F. App'x 426, 430 (9th Cir. 2021) is equally misplaced. Mot. at 19. In *Plumley*, the plaintiffs alleged "wholly conclusory" allegations of knowledge without any information regarding the number of complaints, when they were received, how they were reported, and why the executives would be focused on and have access to such reports. 847 F. App'x at 430.

their focus on the topic at issue—information Plaintiff has more than adequately pled here with respect to Blackford, along with all of the other facts alleged in the Complaint—is adequate to allege scienter. *Id*. at 785.

### 2.     Defendants' Proffered Scienter Inference Is Not More Compelling

Defendants fail to identify any non-fraudulent "opposing inference" that is more "compelling" than that of scienter. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). At best, Defendants' *sole*, non-fraudulent inference is that they cannot have acted with the requisite scienter because they disclosed various facts concerning the transmission limit, and they believed those disclosures were adequate. Mot. at 10-12. But whether Defendants' disclosures were adequate is a disputed fact issue that cannot be resolved now. *See In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *19 (N.D. Cal. Aug. 17, 2022) (rejecting argument that an inference of scienter is undermined by defendants' disclosures because "reasonable minds could differ as to what the disclosures in question revealed"). The same is *even more* true for their argument that they "believed" their disclosures to be adequate. *See In re Apple Inc. Sec. Litig.*, 678 F. Supp. 3d 1147, 1156 (N.D. Cal. 2023) (although "evidence of good faith . . . can cut against a finding of scienter, *such evidence is to be weighed by the jury*" (emphasis added)); *Plaskin v. Newsight Reality, Inc.*, 2020 WL 1651995, at *6 (C.D. Cal. Feb. 6, 2020) (same); *see also SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094-95 (9th Cir. 2010) ("If such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud.").

Leaving aside that Defendants' preferred inference depends on disputed facts, their inference is far from credible, let alone compelling. Defendants' response to the first Form 483 makes clear that their half-hearted "disclosures" were hardly voluntary, but "a result of the FDA Inspection" "meant to provide containment." ECF No. 51-3 at 11. That Defendants disclosed the financial impact of their minimal corrective measures—or offered these measures in an attempt to head off FDA enforcement actions—does not "doom" any inference of scienter. *Patel*, 2015 WL 631525, at *13 (rejecting defendants' argument that "their voluntary restatement weighs against scienter" because the more compelling inference was that defendants "came clean" when "they

likely had no other choice"); *Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 13026910, at *1-2 (C.D. Cal. Dec. 10, 2012) (holding that "[d]espite that allegations in the TAC suggest that [the defendants] at least made some disclosures to outsiders," the scienter inference was still strong when those disclosures could "hardly be characterized as 'voluntary'").[8]

The far more compelling inference is that Defendants disclosed the bare minimum to explain away the financial impact of the remedial measures iRhythm had taken in the hopes of satisfying the FDA, while misleading investors as to the Zio AT's dangerous flaws. *See Tellabs*, 513 F.3d at 710 (scienter alleged where defendants took a "gamble" by "concealing bad news in the hope that it will be overtaken by good news"); *Amylin*, 2003 WL 21500525, at *5 (finding scienter where defendant "knew that there may be a problem" with drug trial data but "took the calculated risk of continuing the trials and application process as originally planned").

In any event, to the extent the Court finds that both theories are equally plausible, the "tie goes to the Plaintiff." *In re Amgen Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).

### B.    Plaintiff Adequately Pled Loss Causation

Pleading loss causation is "not meant to impose a great burden upon a plaintiff." *In re Zynga Inc. Sec. Litig.*, 2015 WL 1382217, at *7 (N.D. Cal. Mar. 25, 2015) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). That is why, generally, loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Gilead*, 536 F.3d at 1057. To plead loss causation, a "plaintiff need only show a causal connection between the fraud and the loss . . . by tracing the loss back to the very facts about which the defendant lied." *First Solar*, 881 F.3d at 753. The test for loss causation is a "general proximate cause test": "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* at 752-53.

The Complaint alleges seven corrective events, each of which reflected a partial revelation of, or materialization of concealed risks related to, the Zio AT's dangerous limitations, and analysts

---

[8] Defendants' attempt to find support in *In re Twitter, Inc. Securities Litigation* fails. 506 F. Supp. 3d 867, 889 (N.D. Cal. 2020) (alleged falsity of statements not "patently obvious" in part given topic of misstatements had minimal impact on financials).

connected each of the disclosures to iRhythm's stock price declines and to the facts that Defendants misstated or omitted. ¶¶123-53. Thus, these allegations easily plead loss causation. *See First Solar*, 881 F.3d at 754; *Berson v. Applied Signal Tech.*, 527 F.3d 982, 989-90 (9th Cir. 2008) (loss causation alleged where omitted facts "caused revenue to fall" and "revenue reduction caused the stock price to drop"). And the Court held that the Complaint adequately alleges that stock price declines following each of the corrective events (¶¶122-53) can be "traced back to the very facts about which [Defendants] lied." Order at 27.

Faced with the Complaint's sustained and well-pled allegations, Defendants assert that none of the corrective disclosures can support loss causation for the so-called "lag-time" statements because they do not contain a word-for-word admission of falsity. Mot. at 15-16. The specificity demanded by Defendants is not required by law; the disclosure need only be "causally connected" to the misrepresentation. *First Solar*, 881 F.3d at 753-54. These corrective disclosures easily clear the *First Solar* standard: for example, the disclosure of the DOJ subpoena specifically concerned the lag time that Defendants had concealed from investors. *See* ¶134 (the DOJ subpoena "sought communications and other documents concerning . . . that the Zio Systems were failing to timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event").[9] As the Court already determined, because each loss can be "traced back to the very facts about which the defendant lied," Plaintiff has adequately pled loss causation. Order at 27 (citing *First Solar*, 881 F.3d at 753). Nothing more is required.

## VII.    CONCLUSION

Defendants' motion should be denied, or alternatively, Plaintiff requests leave to amend.

---

[9] Defendants wrongly rely on *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). Mot. at 15. *First Solar* made clear that pleading "a causation theory based on market revelation of the fraud," which requires *Metzler*'s "more restrictive test," is "simply one of the infinite variety" of ways to plead loss causation. *First Solar*, 881 F.3d at 752-54 (discussing *Metzler*). *Wozniak v. Align Technology, Inc.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012) similarly pre-dates *First Solar*. In *eHealth*, the short-seller report that revealed the fraud had "no identified author" and "contained only public information" and thus did not satisfy "the high bar that plaintiffs must meet in relying on self-interested and anonymous short-sellers" for corrective disclosures. *In re eHealth, Inc. Sec. Litig.*, 2023 WL 6390593, at *7-8 (N.D. Cal. Sept. 28, 2023).

Lead Plaintiff's Opposition To Motion For Judgment On The Pleadings
CASE No. 3:24-CV-706-JSC                                                                                      25

Dated: August 15, 2025                    Respectfully submitted,


                                         BERNSTEIN LITOWITZ BERGER
                                           & GROSSMANN LLP

                                         */s/ Katherine M. Sinderson*
                                         JOHN J. RIZIO-HAMILTON (*pro hac vice*)
                                         (johnr@blbglaw.com)
                                         KATHERINE M. SINDERSON (*pro hac vice*)
                                         (katiem@blbglaw.com)
                                         THOMAS Z. SPERBER (*pro hac vice*)
                                         (thomas.sperber@blbglaw.com)
                                         ABBY KRITTA (*pro hac vice*)
                                         (abygail.kritta@blbglaw.com)
                                         1251 Avenue of the Americas
                                         New York, NY 10020
                                         Tel:      (212) 554-1400
                                         Fax:      (212) 554-1444

                                         JONATHAN D. USLANER (Bar No. 256898)
                                         (jonathanu@blbglaw.com)
                                         2121 Avenue of the Stars, Suite 2575
                                         Los Angeles, CA 90067
                                         Tel:      (310) 819-3470

                                         *Counsel for Lead Plaintiff Oklahoma Firefighters*
                                         *Pension and Retirement System*

Lead Plaintiff's Opposition To Motion For Judgment On The Pleadings
CASE NO. 3:24-CV-706-JSC