QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Kristin Tahler (Bar No. 261908)
kristintahler@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

Christopher Porter (*pro hac vice*)
chrisporter@quinnemanuel.com
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7000

Jesse Bernstein (*pro hac vice*)
Brenna Nelinson (*pro hac vice*)
Amy Shehan (*pro hac vice*)
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
amyshehan@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| GLAZING EMPLOYERS AND GLAZIERS' UNION LOCAL #27 PENSION AND RETIREMENT FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IRHYTHM TECHNOLOGIES, INC. and QUENTIN BLACKFORD,<br><br>Defendants. | Case No. 3:24-cv-706-JSC<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL**<br><br>Date: February 26, 2026<br>Time: 10:00 a.m.<br>Location: Courtroom 8, 19th Floor<br>Before: Hon. Jacqueline Scott Corley |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ..................................................................................2

    A.    FDA Issued A Form 483, And iRhythm Responded On September 1, 2022 ...........3

    B.    iRhythm Disclosed The Transmission Limit In The September 26, 2022 CRM .................................................................................................................4

    C.    iRhythm Issued A Customer Advisory Notice On September 28, 2022..................4

    D.    In November 2022, iRhythm Directed Investors To The CRM And CAN, And The FDA Publicly Posted The CAN On Its Website .......................................5

    E.    DOJ Issued Subpoenas To Ambulatory ECG Monitoring Companies ....................6

    F.    iRhythm Received And Disclosed The Warning Letter............................................6

    G.    DOJ Moved To Resolve A Privilege Dispute Related To The Subpoena ................7

    H.    iRhythm Received And Disclosed The 2024 Form 483 ..........................................7

    I.    Post-Class Period Developments .............................................................................8

RELEVANT PROCEDURAL HISTORY ................................................................8

LEGAL STANDARD ..............................................................................................9

ARGUMENT ...........................................................................................................9

I.    PLAINTIFF IS NOT ENTITLED TO THE *BASIC* PRESUMPTION OF RELIANCE ...........................................................................................................10

    A.    The Timing Statements Had No Price Impact ........................................................11

        1.    The Timing Statements Had No Front-End Price Impact ............................11

        2.    The Timing Statements Had No Back-End Price Impact .............................12

        3.    There Was No Corrective Disclosure Of The Purported "Lag Time" .........18

    B.    The Two Remaining Risk Statements Had No Price Impact ..................................18

        1.    The Risk Statements Had No Front-End Price Impact ................................18

        2.    The Risk Statements Had No Back-End Price Impact .................................19

    C.    The Accuracy Statements Had No Price Impact.....................................................20

        1.    The Accuracy Statements Had No Front-End Price Impact ........................20

            2.       The Accuracy Statements Had No Back-End Price Impact ........................20

II.       PLAINTIFF HAS NOT PROPOSED A COMMON DAMAGES METHODOLOGY THAT CAN RELIABLY CALCULATE CLASS-WIDE DAMAGES ...............................................................................................22

III.     THE CLASS PERIOD CANNOT BEGIN BEFORE AUGUST 5, 2022 ...........................25

CONCLUSION ........................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ................................................................................... 9, 15

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023).................................... 12, 13, 14, 15, 18, 19, 20, 21

*Bailey v. Rite Aid Corp.*,
    338 F.R.D. 390 (N.D. Cal. 2021) ............................................................... 9

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................. 1, 10, 18

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2019 WL 5287980 (S.D.N.Y. 2019) ......................................................... 11

*Comcast v. Behrend*,
    569 U.S. 27 (2013) ............................................................. 2, 9, 22, 23, 25

*In re Concho Res., Inc. Sec. Litig.*,
    2025 WL 1040379 (S.D. Tex. 2025)....................................................... 13, 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015) .......................................................... 11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) .................................................................................. 9

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) .................................................................. 17

*In re FibroGen Sec. Litig.*,
    2024 WL 1064665 (N.D. Cal. 2024)............................................. 15, 16, 17, 18, 19

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 6026244 (N.D. Cal. 2017)....................................................... 11

*Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014).............................................................. 22

*Gambrill v. CS Disco, Inc.*,
    2025 WL 3771433 (W.D. Tex. 2025) .................................................... 13, 21

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    594 U.S. 113 (2021) ................................................... 1, 11, 12, 13, 14, 15, 16, 22

*Grigsby v. Bofl Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020)............................................................ 15, 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ...................................................................................... 9, 10

*Ind. Pub. Ret. Sys. v. AAC Holdings*,
    2023 WL 2228987 (M.D. Tenn. 2023) ................................................................ 25

*Jaroslawicz v. M&T Bank Corp.*,
    2024 WL 2975766 (D. Del. 2024) ....................................................................... 24

*In re Key Energy Servs., Inc. Sec. Litig.*,
    166 F. Supp. 3d 822 (S.D. Tex. 2016) ................................................................ 17

*In re Kirkland Lake Gold Sec. Litig.*,
    2024 WL 1342800 (S.D.N.Y. 2024) ........................................ 12, 13, 19, 20, 21, 22

*Kottaras v. Whole Foods Mkt., Inc.*,
    281 F.R.D. 16 (D.D.C. 2012) ............................................................................. 24

*Loritz v. Exide Tech.*,
    2015 WL 6790247 (C.D. Cal. 2015) ........................................................ 23, 24, 25

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ................................................................... 11, 19

*Mulderrig v. Amyris, Inc.*,
    340 F.R.D. 575 (N.D. Cal. 2021) ....................................................................... 25

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio 2018) ................................................................. 24

*Pardi v. Tricida, Inc.*,
    2024 WL 4336627 (N.D. Cal. 2024) ...................................................... 13, 15, 18, 21

*In re Qualcomm Inc. Sec. Litig.*,
    2023 WL 2583306 (S.D. Cal. 2023) ....................................................... 12, 13, 16, 18

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ........................................................................... 22

*In re Sanofi-Aventis Sec. Litig.*,
    293 F.R.D. 449 (S.D.N.Y. 2013) ........................................................................ 25

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    798 F. Supp. 3d 416 (S.D.N.Y. 2025) ................................................................ 13

*Sneed v. Talphera, Inc.*,
    147 F.4th 1123 (9th Cir. 2025) ..................................................................... 15, 16

*In re Vaxart, Inc. Sec. Litig.*,
    738 F. Supp. 3d 1259 (N.D. Cal. 2024) .............................................................. 18

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants iRhythm Technologies, Inc. and Quentin Blackford respectfully submit this memorandum in opposition to Plaintiff's Motion for Class Certification (Dkt. 114, the "Motion").

## STATEMENT OF THE ISSUES PURSUANT TO L.R. 7-4(a)(3)

Whether the Court should deny class certification where individual issues predominate as to reliance and economic damages.

## PRELIMINARY STATEMENT

Plaintiff seeks to certify a securities fraud class even though it cannot establish through common proof that investors relied on the alleged misstatements. That failure is dispositive. In its Motion, Plaintiff nonetheless treats certification as routine, ignoring both Supreme Court precedent and the realities of Plaintiff's theory of liability that render class certification inappropriate. In particular, Plaintiff relies on the fraud-on-the-market presumption of class-wide reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to satisfy Rule 23(b)'s predominance requirement. But that presumption is rebuttable where Defendants show—as here—that the alleged misstatements had no impact on iRhythm's stock price. Absent price impact, "*Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.* ("*Goldman I*"), 594 U.S. 113, 119 (2021).

Given that there was no discernable increase in iRhythm's stock price when the alleged misrepresentations were made, Plaintiff relies instead on the *inference* that the alleged corrective disclosures demonstrate on the "back end" that the alleged misstatements caused stock price inflation. But the Supreme Court has held that the "inference that the back-end price drop equals front-end inflation starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman I*, 594 U.S. at 123. This "mismatch" is endemic in Plaintiff's allegations, precluding an inference of price impact and therefore rebutting the *Basic* presumption.

Plaintiff alleges as false three categories of broad statements—(i) the Zio AT provided "timely" or "near real time" data transmissions, (ii) the Zio AT's use for "at risk" or "more acute" patients, and (iii) descriptions of Zio products generally as offering "superior clinical accuracy." But each of these generic statements was mismatched from Plaintiff's highly specific alleged corrective

-1-

disclosures, rendering inappropriate an inference that the stock drops following those disclosures represent front-end inflation under *Goldman I.*

And in fact, further precluding an inference of price impact, those disclosures did not reveal any new information to the market about the Zio AT because they are consistent with how investors interpreted the alleged misstatements.  Plaintiff's theory that the market understood the alleged misstatements to mean the Zio AT provided immediate transmission of data for critical care patients is baseless.  Indeed, as Dr. George Thomas, Director of the Weill Cornell-NYP Cardiac Device Clinic, explains, physicians—and the investors who consulted them—understood that the Zio AT "did not provide real time [transmission] in a literal sense," rather offered during-wear transmissions where physicians "deem that potential access to arrhythmia reports during the wear period is necessary."

And that the Zio AT had a transmission limit—the alleged concealment of which Plaintiff claims rendered iRhythm's statements about the Zio AT false—"does not," according to Dr. Thomas, "impact the types of patients and conditions MCT devices are appropriate for."  In any event, the transmission limit was disclosed no later than November 1, 2022 when Defendants directed investors to updated documents that provided detailed descriptions of the transmission limit.  As such, the alleged misstatements could not have had price impact—if at all—beyond November 2, 2022.

Individual issues predominate for the independent reason that Plaintiff cannot offer a damages model that can calculate damages on a class-wide basis as required by *Comcast v. Behrend*, 569 U.S. 27, 34 (2013).  Instead, Plaintiff's expert describes a definitional formula that he recycles from case to case without engaging with the specific economic issues Plaintiff's theory raises.  Plaintiff argues that certification is usually appropriate in securities cases, so the same result should follow here.  Rule 23 demands more.  Because Plaintiff cannot establish price impact or damages using common proof, individual questions of reliance and loss predominate and preclude class certification.

## FACTUAL BACKGROUND

iRhythm develops monitoring and diagnostic solutions for detection of cardiac arrhythmias. ¶ 29.[1]  During the Class Period, iRhythm manufactured two prescription-only, extended-wear heart

---

[1] References to "¶_" are to Plaintiff's Second Amended Complaint ("Complaint"), Dkt. 43.  Internal citations and quotation marks are omitted, and emphasis is added, unless otherwise noted.

monitors:  the Zio XT provides continuous recording of ECG data that is analyzed by Certified

Cardiographic Technicians ("CCTs") who generate an end-of-wear report, ¶¶ 2, 43, while the Zio AT

provides the same continuous recording and the same end-of-wear report as the Zio XT, but it also

provides during wear transmissions and reports, ¶ 44. ███████████████████

███████████████████████████████████ Ex. 3 at 105:25-106:3.

In June 2017, the FDA issued a 510(k) clearance for the Zio AT.  Ex. 4.  "A 510(k) is a

premarket submission made to FDA to demonstrate that the device to be marketed is as safe and

effective, that is, substantially equivalent, to a legally marketed device." Ex. 5.  Accordingly, the Zio

AT Clinical Reference Manual ("CRM") warns that the Zio AT "is not intended for use in critical

care patients because the reporting timeliness is not consistent with life-threatening arrhythmias," Ex.

6 at 14, and further that the Zio AT is contraindicated "when real-time or in-patient monitoring should

be prescribed" and for "patients with known history of life-threatening arrhythmias," *id.* at 6.

iRhythm's website included similar disclosures before and throughout the Class Period.  Exs. 7, 8.

Because the Zio AT is a wireless device and constrained by finite battery power, iRhythm

designed the Zio AT to have a transmission limit.  Ex. 9 at R32.  iRhythm included the transmission

limit in the Zio AT 510(k) submission that was cleared by the FDA in June 2017.  *Id.* at R107.

**A.    FDA Issued A Form 483, And iRhythm Responded On September 1, 2022**

On July 25, 2022, the FDA initiated an inspection of iRhythm's Cypress facility, which

culminated in the FDA issuing a Form 483 on August 12, 2022 ("2022 Form 483").  ¶ 103; Dkt. 43-1.

In its September 1, 2022 response to the 2022 Form 483, iRhythm explained to the FDA that the Zio

AT transmission limit is an essential design component that encourages high patient compliance (i.e.,

uninterrupted wear) by eliminating the need for a patient to remove the device to recharge it.  Ex. 9

at R32.  iRhythm explained that, because the Zio AT is a wireless device with finite battery capacity,

"[e]liminating the need for recharging . . . necessarily places some limitations on the number of

remote data transmissions." *Id.*  iRhythm also reminded the FDA that the transmission limit was in

the "bench test report" that was "included in the Zio AT 510(k)," *id.* at R107, meaning it was in

materials iRhythm submitted for consideration in the FDA's clearance of the 510(k), *see id.*

iRhythm told the FDA that it had "further analyzed [the] current labeling" and concluded that

1   the labeling "would benefit from an explicit statement there are maximum limits for symptomatic and

2   asymptomatic transmissions." *Id.* at R38.  Therefore, in the "Action Plan" iRhythm submitted to the

3   FDA, iRhythm said it would (i) update the Zio AT labeling "to alert HCPs about the ***maximum***

4   ***transmission*** constraint . . . and ***the impact of potentially missed transmissions***" and (ii) issue a

5   Customer Advisory Notice ("CAN") to "Zio AT customers informing them of the maximum

6   transmission constraints [and] the process associated with informing them when a patient is nearing

7   the maximum limit." *Id.* at R42.  iRhythm initiated both of those things that same month.

**B.    iRhythm Disclosed The Transmission Limit In The September 26, 2022 CRM**

9        On September 26, 2022, iRhythm updated the Clinical Reference Manual ("CRM")—part of

10   the Zio AT label (Dkt. 77 at 9)—to disclose both the existence and effect of the transmission limit:

> ***The Zio AT patch has a maximum threshold of transmitting 100 Patient-Triggers***
> ***and 500 Auto-Triggers during wear, after which point the device no longer***
> ***transmits for whichever trigger limit has been reached.***  If this occurs, unless a patch
> is promptly replaced when the patient is approaching a maximum transmission limit,
> ***there will be time . . . in which transmissions of that type are captured but not***
> ***transmitted***, and information will not become available until the final report.

15   Ex. 6 at 9; *see also id.* at 4.

**C.    iRhythm Issued A Customer Advisory Notice On September 28, 2022**

17       Two days later—on September 28, 2022—iRhythm issued a CAN to Zio AT customers.  Ex.

18   10.  The CAN stated that iRhythm updated the Zio AT label "to inform you of the maximum wireless

19   transmission limits for the Zio AT monitor" and described the transmission limit in detail.  *Id.* at 2.

20   *First*, the CAN explained that the "transmission limits were established to provide up to 14 days of

21   an uninterrupted monitoring experience for patients without the need for removing the patch and

22   charging the device." *Id.*; *see id.* at 1 ("[W]ireless transmissions from the Zio AT patch have limits

23   to preserve battery life.").  *Second*, the CAN described what happens when the limit is reached:

> ***Once the maximum transmission limit is reached for either transmission***
> ***type . . . any further transmissions for that specific type will cease.***  Continuous
> ambulatory ECG diagnostic data is still captured without interruption, even after the
> wireless transmission maximums are reached, which is manually downloaded from
> the device when it is returned . . . and included in the final report.

27   *Id.* at 2.  *Third*, the CAN explained the steps taken when a patient's Zio AT approaches and reaches

28   the transmission limit:  When "iRhythm detects that a patient is approaching the maximum limit,"

iRhythm "customer care will contact you to confirm if another Zio AT patch should be sent" and if customer care is "unable to reach you, [iRhythm] will auto-ship another Zio AT patch," and "Daily Zio AT reports posted to the Zio Suite portal indicate when the maximum transmission limit has been reached." *Id.* *Fourth*, the CAN included the transmission limit language (*supra* p. 4) that iRhythm added to the CRM. *Id.* at 3. *Finally*, the CAN warned that "if the scenarios described in this letter occur"—i.e., if a transmission limit is hit—"***they present a risk of a delay*** between the time a patient experiences an arr[h]ythmia and the time when that information is available to the patient's provider." *Id.* Before distributing the CAN, iRhythm solicited FDA input on the draft CAN on September 22, and iRhythm "incorporate[d]" that feedback "into [its] final version" of the CAN. Ex. 11.

**D.    In November 2022, iRhythm Directed Investors To The CRM And CAN, And The FDA Publicly Posted The CAN On Its Website**

iRhythm's first conference call following the release of the CAN and the CRM updates was on November 1, 2022. ¶ 124. During that call, Mr. Blackford said that iRhythm had "voluntarily issued a [CAN] to [its] Zio AT customers" and had "updated language" about "***transmission limits***" in the Zio AT CRM. Ex. 12 at 4; ¶ 124. Mr. Blackford directed investors to "updated language related to the precautions in the Zio AT [CRM], and important information pamphlet as it relates to the Zio AT . . . ***auto trigger transmission limits.***" Ex. 12 at 4. Analysts reported on iRhythm's disclosures, noting the Zio AT reaches the transmission limit "in less than 1% of devices." Ex. 13.

On November 4, 2022, iRhythm filed its Form 10-Q for the third quarter of 2022. ¶ 129. iRhythm ***again*** disclosed that it disseminated the CAN "to Zio AT customers regarding a Zio AT labeling correction" which "involve[d] additions and modifications to the Zio AT labeling precautions ***relating to the device's maximum transmission limits***." Ex. 14 at 68; ¶ 129. iRhythm also disclosed it had "been in dialogue with the FDA" and those communications were "ongoing," and warned that "FDA observation responses [and] field action or corrections . . . can be unpredictable and can present regulatory and commercial risks and uncertainties." Ex. 14 at 68; *see also* Ex. 3 at 164:12-165:3 ███████████████████████████

███████████. iRhythm further warned about the potential for a warning letter ***five times*** in this Form 10-Q, Ex. 14 at 41-42, 69-70, and throughout the Class Period, Ex. 15 at 21, 29; Ex. 16 at 40.

The same day, November 4, the FDA posted a description of the CAN on its website: "On 9/28/2022, Field Safety Notice Labeling Corrections were sent to customers who were informed of labeling changes" pertaining, in part, to the fact that "[p]atches [are] limited to 100 symptomatic and 500 asymptomatic wireless transmissions" and "once the maximum transmission limit is reached for either type, *any further transmissions for that type will cease*." Ex. 17 at 2. The FDA website explicitly warned that there was a "[r]isk of delayed reporting to health providers." *Id.*

To be clear, no later than November 4, 2022, iRhythm had (1) updated the CRM to include an explicit disclosure about the transmission limit and its impact on the Zio AT's functionality; (2) initiated distribution of the CAN which addressed the transmission limit in detail; (3) told investors during an earnings call that it revised the CRM and issued the CAN; and (4) disclosed in a Form 10-Q that it revised the CRM and issued the CAN, and warned of the potential for further regulatory activity. The FDA also posted a description of the CAN on its website.

**E.    DOJ Issued Subpoenas To Ambulatory ECG Monitoring Companies**

In April 2023, the DOJ issued subpoenas to companies in the ambulatory ECG monitoring business, including iRhythm and its competitor, Boston Scientific. ¶ 134; Ex. 18 at 29. iRhythm disclosed the DOJ subpoena in its Form 10-Q for the first quarter of 2023, filed with the SEC on May 4, 2023. Ex. 16 at 55. Analysts commented that the subpoenas indicated "a broader probe into the ambulatory ECG industry rather than any one company." Ex. 19 at 1; *see also* Ex. 20 at 1 ("We view it as a positive that this seems to be related to the industry and is not IRTC-specific."); Ex. 21 at 1 ("the DOJ may be conducting more of an industrywide look"). ██████████████ ████████████████████████████████████████████ Ex. 3 at 255:3-7.

**F.    iRhythm Received And Disclosed The Warning Letter**

On May 25, 2023—as iRhythm warned—the FDA issued a Warning Letter. Dkt. 43-2; ¶ 115. iRhythm disclosed the Warning Letter on May 30, Ex. 22, and the FDA posted the Warning Letter on its website on June 6, Ex. 1 ¶ 131 & n.221. The Warning Letter included matters relating to the transmission limit—the same limit that iRhythm had previously disclosed to the FDA in the initial Zio AT 510(k) and to the public through the CAN, CRM, November 1, 2022 earnings call, November 4, 2022 Form 10-Q, and the FDA's website. The Warning Letter asserted the FDA reviewed

complaints—two of which involved a death—where arrhythmias were not reported due to the transmission limit. Dkt. 43-2 at 6. It claimed—without more—that these complaints "reveal that the device was hitting the transmission limit more often than expected." *Id.* It also asserted that the marketing of the Zio AT for "high-risk patients" "describ[es] a new patient population [that] could significantly affect the safety and effectiveness." *Id.* at 3. The FDA thus "required the submission of a new 510(k)." *Id.* The Warning Letter also stated that "***During our inspection*** [in 2022], it was revealed that the labeling does not inform the physician of the existence of a transmission limit." *Id.* at 5. In other words, the FDA ***did not acknowledge*** that ***since the inspection***, iRhythm had updated the CRM to disclose the transmission limit and its impact on the Zio AT's functionality. *Supra* p. 5.

███████████████████████████████████████████████████████████████████ Ex. 3 at 218:16-18; *see also id.* at 221:13-16 ██████. Analysts were solely concerned with whether the FDA might require iRhythm to remove the Zio AT from the market while the issues were addressed. Ex. 1 ¶ 179 (citing analyst reports). That concern did not materialize, and ██████████████████████████████████ ██████████████████████████ Ex. 3 at 220:17-19; *see also id.* at 240:15-22 █████████ █████████████████████████. Nor did the Warning Letter change analysts' views on whether iRhythm had been improperly marketing the Zio AT, Ex. 1 ¶¶ 183, 185, and ████████ ████████████████████████████ Ex. 3 at 110:15-111:1. To address the Warning Letter, iRhythm filed two 510(k) submissions in January 2024. Ex. 23; Ex. 24.

**G.      DOJ Moved To Resolve A Privilege Dispute Related To The Subpoena**

On July 1, 2024, the DOJ filed a petition to resolve a privilege dispute over a subset of documents sought by the DOJ subpoena. *United States v. iRhythm Techs., Inc.*, Dkt. 1, Case No. 3:24-cv-03967 (N.D. Cal. July 1, 2024); ¶ 141. Analysts commented on this privilege dispute: "DOJ asked a court to make IRTC disclose three consultant reports . . . . IRTC claims work product / attorney-client privilege as reasons the request should be denied." Ex. 25 at 1.

**H.      iRhythm Received And Disclosed The 2024 Form 483**

The FDA inspected iRhythm's San Francisco facility and issued a Form 483 on July 31, 2024 ("2024 Form 483"). ¶ 146; Dkt. 43-3; Ex. 26. The 2024 Form 483 stated that iRhythm "received

approximately 4,014 complaints related to [its CCT] personnel operations from 05/02/2022 to 07/19/2024, including issues/events related to CCT personnel misreading arrhythmia data and providing such misclassified data to end users for diagnosis purposes." Dkt. 43-3 at 2; ¶ 152. One day later, on August 1, 2024, iRhythm voluntarily disclosed the 2024 Form 483 in its Form 10-Q for the second quarter of 2024. ¶ 146. On August 9, 2024, Capitol Forum issued a short seller report that relied on confidential sources when discussing the 2024 Form 483. ¶ 152; Ex. 27.

## I.    Post-Class Period Developments

In October 2024, the FDA approved both Zio AT 510(k) submissions, Ex. 23; Ex. 24, which analysts viewed as "a major step forward," Ex. 28. Today, iRhythm continues to market the Zio AT as an MCT device, Ex. 29, for "more acute" patients, Ex. 30 at 11—despite Plaintiff alleging iRhythm defrauded investors using that very marketing, e.g., ¶¶ 6, 211. iRhythm continues to exceed Street expectations, in large part due to robust growth from the Zio AT. Ex. 31 at 1; Ex. 32 at 1.

## **RELEVANT PROCEDURAL HISTORY**

This case was filed on February 6, 2024. Dkt. 1. On October 11, 2024, Plaintiff filed the Complaint, alleging Defendants made false or misleading statements about the timeliness of the Zio AT's transmissions (the "Timing Statements"), the appropriate patient population for the Zio AT (the "Risk Statements"), the characterization of the Zio AT as an MCT, and the accuracy of the Zio AT reports created by technicians (the "Accuracy Statements") over a Class Period beginning on November 5, 2021. Dkt. 43. Defendants moved to dismiss. Dkt. 51. In its June 3, 2025 opinion granting in part Defendants' motion to dismiss, this Court narrowed the case in several ways. *First*, this Court dismissed (i) all individual defendants except for Mr. Blackford, (ii) all alleged misstatements about MCT characterization, (iii) all alleged misstatements concerning the Zio "spectrum of care," and (iv) the registration requirement as a basis for falsity. Dkt. 77. *Second*, this Court held that Plaintiff failed to allege scienter for Mr. Blackford before July 2022, *id.* at 22 & n.8, meaning the Class Period starts on August 5, 2022, the date of the first remaining misstatement.

On November 3, 2025, Plaintiff moved to certify a class of investors who purchased iRhythm stock between July 25, 2022 to August 9, 2024. Mot. 1-2. To satisfy the Rule 23(b)(3) requirement that "common questions of law and fact predominate over individual questions" as to the Section

10(b) element of reliance, Plaintiff's Motion invokes the fraud-on-the-market presumption of reliance from *Basic*. *Id*. 17-18. The Motion also relies on the Expert Report of Dr. Matthew Cain to assert that class-wide damages will be determined by a "common methodology." *Id*. 23.

## LEGAL STANDARD

A "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33. Thus, "a party seeking to maintain a class action must affirmatively demonstrate [its] compliance with Rule 23." *Id*. A plaintiff bears the burden of "prov[ing]—not simply plead[ing]—that [its] proposed class satisfies each [Rule 23] requirement": numerosity, typicality, commonality, and adequacy. *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 275 (2014). Plaintiff must also prove that common questions of fact and law predominate over individual questions. Fed. R. Civ. P. 23(b)(3). Predominance "often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 810 (2011). A plaintiff's failure to "establish[] that damages are capable of measurement on a classwide basis" will also violate the predominance requirement. *Comcast*, 569 U.S. at 34. The court "must resolve all factual and legal disputes relevant to class certification, even if doing so overlaps with the merits." *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 396-97 (N.D. Cal. 2021). Certification "is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23]" are met. *Comcast*, 569 U.S. at 33.

## ARGUMENT

Plaintiff's Motion should be denied because Plaintiff cannot meet its burden to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *see also* Mot. 12. Predominance turns on the required elements of the relevant cause of action. *Halliburton I*, 563 U.S. at 809. In a Section 10(b) case, Plaintiff must demonstrate that it can prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 461-62. Here, individualized questions predominate over common questions, precluding class

certification.  *First*, because there was no price impact associated with the alleged misstatements or the corrective disclosure dates, the fraud-on-the-market presumption is rebutted.  Without that presumption, Plaintiffs will need to prove reliance on an individualized basis, and individual questions will predominate.  *Second*, Plaintiff has failed to meet its burden to produce a class-wide damages methodology consistent with their theory of liability.  Without this, Plaintiffs will need to prove damages on an individualized basis, and individual questions again will predominate.

## I.    PLAINTIFF IS NOT ENTITLED TO THE *BASIC* PRESUMPTION OF RELIANCE

"If every plaintiff had to prove direct reliance on the defendant's misrepresentation, individual issues then would . . . overwhelm[] the common ones, making certification under Rule 23(b)(3) inappropriate."  *Halliburton II*, 573 U.S. at 268.  Thus, Plaintiff does not allege that any investor actually relied on the alleged misrepresentations.  Instead, Plaintiff attempts to invoke the fraud-on-the-market presumption from *Basic*, Mot. 17, under which "the price of stock traded in an efficient market reflects all public, material information—including material misstatements," *Halliburton II*, 573 U.S. at 263.  The essential premise is that "anyone who buys or sells the stock at the market price may be considered to have relied on those misstatements."  *Id.*

However, Defendants can—and here do—rebut the *Basic* presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," *Basic*, 485 U.S. at 248, including by showing that the "misrepresentation (or its correction) did not affect the market price," *Halliburton II*, 573 U.S. at 279-280.  If the misstatements did not impact the stock price, "the basis for finding that the fraud had been transmitted through market price would be gone," *Basic*, 485 U.S. at 248, and there is no basis to presume investors relied on the misstatements, *Halliburton II*, 573 U.S. at 283.  A defendant can show a lack of price impact "by a preponderance of the evidence."  *Goldman I*, 594 U.S. at 126.  Courts must "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact."  *Id.* at 126-27.  "That is so regardless whether the evidence is also relevant to a merits question like materiality" because "a court has an obligation before certifying a class to determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits."  *Id.* at 122.  Courts must conduct this analysis on a

1   statement-by-statement basis and can reject certification as to a subset of the alleged misstatements.

2   *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *25-39 (S.D.N.Y. 2019)

3   (price impact rebutted as to one of seven alleged corrective disclosure dates), *adopted in relevant part*

4   *by* 2020 WL 1329354 (S.D.N.Y. 2020); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251,

5   269-80 (N.D. Tex. 2015) (price impact rebutted as to five of six alleged disclosure dates).   The

6   analysis should be "aided by a good dose of common sense."  *Goldman I*, 594 U.S. at 122.

7         A.      **The Timing Statements Had No Price Impact**

8               1.      The Timing Statements Had No Front-End Price Impact

9         When a stock price does not move in a statistically significant manner in response to an

10  alleged misstatement, defendants "sever[] the link" on the front end between the alleged misstatement

11  and price impact.  *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011).  And if an

12  alleged misstatement "had no price impact, it cannot be presumed that the [later corrective

13  disclosures] revealed a latent price impact," and the fraud-on-the-market theory fails.  *In re Finisar*

14  *Corp. Sec. Litig.*, 2017 WL 6026244, at *8 (N.D. Cal. 2017) (denying certification where there was

15  no statistically significant price increase on date of alleged misstatement).  As Plaintiff and Dr. Cain

16  concede, iRhythm's stock price did not increase in a statistically significant manner—if at all—when

17  any of the Timing Statements were made, save for two examples ***after*** the transmission limit had been

18  disclosed and one that analysts attributed exclusively to other factors.  Dkt. 114-3 ("Cain Rep.") ¶ 80

19  & p. E-6; Ex. 1 ¶ 163 n.265 (explaining increase on February 24, 2023).

20        Common sense reinforces the point:  "The generic nature of a misrepresentation often will be

21  important evidence of a lack of price impact" because "a more-general statement will affect a

22  security's price less than a more-specific statement on the same question."  *Goldman I*, 594 U.S. at

23  122-23.  And here, each Timing Statement is highly generic.  *E.g.*, ¶ 184 ("Zio AT [] offers the option

24  of timely transmission of . . . arrhythmia events"); ¶ 191 (Zio AT "provides near real-time

25  capability"); ¶ 194 (Zio AT "provid[es] actionable transmissions during the wear period").  These

26  generic statements lack the type of content likely to impact investment decisions.  *See In re Qualcomm*

27  *Inc. Sec. Litig.*, 2023 WL 2583306, at *12 (S.D. Cal. 2023) ("the generic nature of the alleged

28  misrepresentations makes it less likely that those misrepresentations deceived the market").  Indeed,

there is no indication that any analyst discussed any Timing Statement when made. *In re Kirkland Lake Gold Sec. Litig.*, 2024 WL 1342800, at *9 (S.D.N.Y. 2024) ("Evidence from contemporaneous analyst reports also supports the absence of price impact" because "no analysts referenced or discussed either of the M&A Statements at all"). That no analyst discussed the statements is powerful evidence that the alleged "misrepresentations did not impact [iRhythm's] stock price." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman II*"), 77 F.4th 74, 104-05 (2d Cir. 2023).

Nor can Plaintiff "beef up a generic disclosure with a healthy dose of detail and thereby transform it into something that, as then consumed by investors, it was not." *Id.* at 102. Here ,there is no basis to conclude that the market interpreted the Timing Statements to mean that the Zio AT provided instantaneous transmission as Plaintiff suggests. *See Qualcomm*, 2023 WL 2583306, at *12 (rejecting plaintiffs' speculation about how the market "interpreted the[] generic statements"). To the contrary, investors and physicians understood the terms "timely" and "near real-time" not to mean instantaneous, but as describing the key product feature of the Zio AT: that it provides during wear notifications, where other types of monitors, like the Zio XT, do not. Ex. 2 ¶¶ 25, 27-28, 34; Ex. 1 ¶¶ 144, 148, 152-54. As Dr. Thomas explains, this "advantage is what primarily distinguishes the Zio AT from the Zio XT." Ex. 2 ¶ 27. He explains further that "up to a few hours [for transmissions] is typical and expected. There is not an expectation that the data will be transmitted and analyzed . . . within minutes . . . because, as is well understood among healthcare providers, there are numerous steps that must be completed before the data are processed and analyzed." *Id.* ¶ 28.[2] Investors, relying on industry experts to understand how medical devices are used, understood the same. *E.g.*, Ex. 1 ¶¶ 144, 148, 152-54; Ex. 3 at 54:20-55:12 ███████████████████; Ex. 33 (summarizing call with cardiologist and electrophysiologist).

### 2.    The Timing Statements Had No Back-End Price Impact

Nor can Plaintiff invoke a "price maintenance" theory to excuse the lack of any front-end price movement and instead point to later stock declines as evidence of price impact. Under a price-maintenance theory, a plaintiff "point[s] to a negative disclosure about a company and an associated

---

[2] Courts credit expert testimony at the class certification stage to determine "how market participants would have perceived and reacted to" a defendant's statements. *Kirkland*, 2024 WL 1342800, at *9.

drop in its stock price; alleg[es] that the disclosure corrected an earlier misrepresentation; and then claim[s] that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Goldman I*, 594 U.S. at 126. The theory relies on an inference that a stock drop following the alleged "corrective disclosure" shows that the earlier challenged statements artificially maintained the stock price. But that "final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id*.; *accord Kirkland*, 2024 WL 1342800, at *6. To avoid this breakdown, there must be "a closer fit (even if not precise) between the front-and back-end statements than courts have required when analyzing the loss causation element of securities fraud." *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *8 (N.D. Cal. 2024). Put simply, a corrective disclosure must "expressly and specifically negat[e] the alleged false statement," and its "corrective effect" must be "obvious" to infer price impact. *Goldman II*, 77 F.4th at 98.

**No disclosure matches the alleged Timing Statements.** Mismatch occurs when the alleged misstatement is generic and the corrective disclosure is specific. *See In re Concho Res., Inc. Sec. Litig.*, 2025 WL 1040379, at *13 (S.D. Tex. 2025) ("A mismatch in specificity between the [misstatement and corrective disclosure] undercuts a plaintiff's theory that investors would have expected more from the front-end disclosure."); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 435 (S.D.N.Y. 2025) (mismatch occurs "where a misrepresentation is generic and the later corrective disclosure is specific, because it is less likely that the specific disclosure actually corrected the generic misrepresentation"); *Gambrill v. CS Disco, Inc.*, 2025 WL 3771433, at *11 (W.D. Tex. 2025) (no price impact where there was "too great a distinction in the specificity of the matters discussed"). Price impact cannot be inferred where a comparison of the "genericness of a misrepresentation with its corrective disclosure" reveals a mismatch, *Goldman II*, 77 F.4th at 81, meaning Plaintiff cannot "(a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud, unless the front-end disclosure is sufficiently detailed in the first place," *id*. at 102. Instead, the price maintenance theory is viable only if Plaintiff proves that "a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price." *Id*.

1    A commonsense application of this rule precludes an inference that back-end stock drops

2    reflect front-end inflation here.  As this Court previously recognized, Dkt. 77 at 16, Plaintiff's theory

3    of falsity is that the Timing Statements were misleading because the Zio AT had an "undisclosed"

4    transmission limit, ¶¶ 6-8, 10, 68, 70, 89, 166, 178(a), 186, 200, and an alleged four-hour lag time,

5    ¶ 178.  The question, then, is "what would have happened" to iRhythm stock on the Timing Statement

6    dates "if [Defendants] had spoken truthfully"?  *Goldman II*, 77 F.4th at 97.  Put differently: would a

7    "truthful—but equally generic—substitute" for the Timing Statements have moved iRhythm's stock

8    price?  *Id.* at 102.  It would not.  A truthful generic substitute would have conveyed that transmissions

9    occur during the wear period but can be subject to certain limitations—precisely the type of generic

10   qualifier that would not alter investor expectations about a wireless device.  *See* Ex. 2 ¶ 28.

11   But each of the alleged corrective disclosures is attenuated from the Timing Statements in

12   specificity and substance and thus cannot be used to infer price impact.  *See* ¶¶ 11-18; Mot. 20-21.

13   On November 1, 2022, Mr. Blackford told investors that iRhythm had "voluntarily issued a customer

14   advisory notice to [its] Zio AT customers" and updated language about "transmission limits" in the

15   Zio AT label.  *Supra* pp. 5-6.  He discussed "updated language related to the precautions in the Zio

16   AT [CRM] and important information pamphlet as it relates to the Zio AT patient registration process

17   in Zio AT patients and auto trigger transmission limits."  *Id.*  The same specific information was

18   repeated in iRhythm's Form 10-Q filed on November 4, 2022.  ¶ 129.  Under *Goldman I*, such a

19   specific "substitute looks nothing like the original" generic statements.  It therefore cannot be used to

20   infer that those generic statements had price impact.  *Goldman II*, 77 F.4th at 99-100.

21   Each subsequent alleged disclosure suffers from a similar mismatch problem.  The May 30

22   disclosure of the Warning Letter and ensuing discussion of adverse events—what Plaintiff refers to

23   as "the full scope of the harm," Mot. 6—includes detail far beyond anything stated in the Timing

24   Statements, and far beyond Plaintiff's theory of falsity and the theory adopted by this Court.  ¶¶ 137-

25   38; Dkt. 77 at 16.[3]  Under *Goldman I*, there is no basis to treat such detailed information as a "truthful

26

27   _____

[3] Nor is such iteration of the alleged truth supportable given the Ninth Circuit's mandate that "[t]he
FDCA imposes different legal requirements and targets a different audience" than the Exchange Act,

28   meaning "FDA regulations may require the disclosure of information to medical personnel that a

1    substitute" for these statements, which say simply that the Zio AT provided "timely" or "near real-

2    time" transmissions, ¶¶ 184, 187, 190-99, and do not refer to adverse events.  Treating stock price

3    reaction to those specific details as proof of inflation maintained by the Timing Statements would

4    "turn[] securities claims into a game of litigation-by-hindsight."  *Goldman II*, 77 F.4th at 101.

5            Plaintiff's alleged DOJ-related disclosures are mismatched for a separate reason:  they are not

6    corrective of statements that predate them.  On May 4, 2023, iRhythm disclosed the DOJ subpoena,

7    ¶ 134, and on July 1, 2024, the DOJ filed a petition to compel production of certain documents, ¶ 141.

8    But the DOJ subpoena could not have been disclosed contemporaneously with the Timing Statements

9    that pre-dated it, ¶¶ 184, 187, 190-94, and thus cannot be corrective of those statements, *In re*

10   *FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. 2024) (information that did not exist at

11   the time the misstatements were made is not corrective); *Pardi*, 2024 WL 4336627, at *10-11 (same);

12   *see also Amgen*, 568 U.S. at 472 ("A security's market price cannot be affected by a misrepresentation

13   not yet made[.]").  The same is true for the DOJ's petition, which was filed after all but one (¶ 199)

14   of the Timing Statements and thus cannot be a "truthful substitute" for the Timing Statements.

15           As with the front-end evidence, no analyst reacted to any of these disclosures by expressing

16   surprise or concern at the timeliness of the Zio AT's transmission capabilities, Ex. 1 ¶¶ 104, 110-11,

17   117-19, 125, an unsurprising fact given that these generic disclosures were consistent with the

18   market's understanding of the Zio AT, Ex. 2 ¶¶ 27-28, *supra* p. 12.  Because Plaintiff cannot identify

19   any corrective disclosure that matches its alleged truth, *Basic* is rebutted.

20           ***No "new" information was disclosed after November 1, 2022.***  Setting aside that none of the

21   "corrective disclosures" match the alleged misrepresentations, the four alleged disclosures after

22   November 1, 2022 independently fail because the allegedly concealed information—the transmission

23   limit—was disclosed no later than November 1.  In an efficient market, only new and value-relevant

24   information can move a company's stock price.  *Grigsby v. Bofl Holding, Inc.*, 979 F.3d 1198, 1205

25   (9th Cir. 2020).  To the extent later disclosures reiterate information from a prior disclosure, the

26   associated price drop cannot be a proxy for price impact.  *Goldman I*, 594 U.S. at 123 (stock price

27

28   reasonable investor would not need."  *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1133 (9th Cir. 2025).
     The alleged truth cannot consist of facts that iRhythm had no duty to disclose.

1  reaction to a disclosure of information already in the market is not indicative of "the amount of

2  inflation maintained by the earlier misrepresentation."). As such, a finding of back-end price impact

3  requires proof that the information disclosed was "new (unknown to the market prior to [the corrective

4  disclosure date])" and "value relevant (i.e., caused at least some of the stock price decline)."

5  *FibroGen*, 2024 WL 1064665, at *12.

6        Here, Defendants have "severed the link" between the alleged misstatements and allegedly

7  corrective information after November 1, 2022. *See Qualcomm*, 2023 WL 2583306, at *12-13 (no

8  price impact where "the corrective disclosures did not actually contain new information correcting

9  the alleged misrepresentations"). iRhythm told investors during the November 1, 2022 earnings call

10  that it had "voluntarily issued a [CAN] to [its] Zio AT customers" and had updated language about

11  "transmission limits" in the CRM, while directing investors to the "updated language related to . . .

12  transmission limits" in the CRM. Ex. 12 at 4. Both the CAN and CRM elaborated on the transmission

13  limits, including by disclosing the precise transmission limits Plaintiff alleges were concealed.

14  *Compare* ¶ 6 (Timing Statements were false because "after transmitting an undisclosed number of

15  arrhythmia events, the monitor stopped transmitting any data at all"), *with* Ex. 10 at 2 ("Each Zio AT

16  patch is limited to 100 symptomatic . . . and 500 asymptomatic . . . wireless transmissions. . . . Once

17  the maximum transmission limit is reached . . . further transmissions for that specific type will

18  cease"), *and* Ex. 6 at 9 ("The Zio AT patch has a maximum threshold of transmitting 100 Patient-

19  Triggers and 500 Auto-Triggers during wear, after which point the device no longer transmits for

20  whichever trigger limit has been reached."). Those documents were accessible to investors and would

21  have been reviewed by investors in connection with this disclosure. *See Sneed*, 147 F.4th at 1133

22  ("We expect reasonable investors to read an entire document, including the fine print."); Ex. 3 at

23  156:2-23 ██████████████████████████████████████

24  ████████████████. Analysts reported on the transmission limit the same day and in more detail

25  than was discussed during the earnings call. Ex. 1 ¶ 92; *e.g.*, Ex. 34 at 1 (CAN discussed "battery

26  limitation caps for symptomatic and asymptomatic transmissions" and noting "the updated labeling

27  is still in-line with that of competitors"). Plaintiff has no response to these disclosures other than to

28  call them "self-serving," Ex. 35, but cannot explain how these disclosures omitted any material

information.  Nor could they, given that the FDA reviewed both the CAN and the CRM.  *See* Ex. 11.

Accordingly, even assuming a sufficient "match" on November 1, the following trading day is the latest date as of which the alleged concealment of the transmission limit could have impacted iRhythm's stock price in an efficient market.  Ex. 1 ¶ 101; Ex. 36 at 256:19-257:20.  The remaining alleged disclosures either repeated information that was already public regarding the transmission limit or did not disclose corrective information regarding the relevant truth at all.  For example, the November 4, 2022 Form 10-Q repeated the same information disclosed on November 1, 2022 about the transmission limit.  *Grigsby*, 979 F.3d at 1205 ("information already known by the market [] will not cause a change in stock price"); *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) ("if the market has already become aware of the allegedly concealed information, [it] would already be reflected in the stock's price").  Analysts did not comment on the transmission limit following the November 4 Form 10-Q, nor was there a statistically significant price decline that day, consistent with that information having already been incorporated into the market.  Ex. 1 ¶¶ 102, 104.

The May 30, 2023 disclosure of the Warning Letter was also not "new" information, but rather reflected a previously disclosed risk.  *Supra* pp. 5-6; *see In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 865 (S.D. Tex. 2016) ("the materialization of risks that the Company has previously disclosed and warned against are not corrective disclosures"); Ex. 3 at 218:15-18 ██████████ ██████████████████████████████████████████████████████████████; *id.* at 164:12-165:3 ████████████████████████████████████████████████████████████████████ ████████████████████████████████████.  Plaintiff does not, and cannot, contend that the Warning Letter was the first time the market learned of the transmission limit.  "Rather, this is when the market learned about the FDA's reaction, a fact which cannot properly be characterized as a corrective disclosure because it was not previously known to Defendants and did not contradict a previously uncorrected misstatement."  *FibroGen*, 2024 WL 1064665, at *12-13.

And even if the Warning Letter contained new incremental information, including specific information about isolated complaints related to the "relevant truth" allegedly concealed by the Timing Statements, such new information cannot establish price impact because it is far more specific than the Timing Statements themselves.  *Supra* pp. 14-15.  But even under this construct of a "truthful

1   substitute" for the Timing Statements—which requires defying *Goldman*—the full truth was

2   disclosed by June 6, 2023 when the FDA posted the full Warning Letter. Ex. 1 ¶¶ 128-39.

3       But the Court need not look to June 6 because to the extent the Court infers price impact at

4   all—it should not—the transmission limit was disclosed no later than November 1, 2022 after market

5   close. Later declines necessarily reflect market response to ***other*** information—even if related to the

6   transmission limit—not a correction of any concealed fact. *Id.* ¶¶ 13, 98, 100; *In re Vaxart, Inc. Sec.*

7   *Litig.*, 738 F. Supp. 3d 1259, 1266-67 (N.D. Cal. 2024) (information can "cause a temporary stock

8   drop [] even if the story reveals no information that the market hadn't already absorbed"); *Qualcomm*,

9   2023 WL 2583306, at *12-13. The *Basic* presumption is thus rebutted after November 2.

10              3.    <u>There Was No Corrective Disclosure Of The Purported "Lag Time"</u>

11      Nor can Plaintiff rely on the disclosure of the purported "four-hour lag time" to infer price

12  impact because no corrective disclosure mentions the lag time. ¶¶ 122-53. Indeed, the first public

13  mention was ***in the Complaint***. Ex. 1 ¶ 138. And there was no statistically significant abnormal

14  decline when it was filed or the following day, *id.*, indicating the alleged lag time was not value-

15  relevant, *FibroGen*, 2024 WL 1064665, at *12 ("value relevant" means "caus[ing] at least some of

16  the stock price decline"); Ex. 36 at 58:4-12. To the extent Plaintiff argues the lag time was disclosed

17  in the DOJ petition and that disclosure can thus be used to infer price impact for the Timing

18  Statements, *e.g.*, Dkt. 96 at 15, Plaintiff is wrong. "Common sense" precludes an inference that the

19  petition—which stated that the subpoena "sought communications and other documents

20  concerning . . . the Zio Systems['] fail[ure] to timely transmit patient cardiac data to physicians for

21  review after the occurrence of a cardiac event" (¶ 141 (emphasis omitted))—disclosed the four-hour

22  lag time. *Goldman II*, 77 F.4th at 101; *Pardi*, 2024 WL 4336627, at *8 (avoiding mismatch requires

23  "a closer fit" than "courts have required when analyzing . . . loss causation"). Thus, no disclosure

24  can be used to infer that the alleged omission of the "lag time" impacted iRhythm's stock price.

25      **B.    The Two Remaining Risk Statements Had No Price Impact**

26              1.    <u>The Risk Statements Had No Front-End Price Impact</u>

27      Plaintiff theorizes that two remaining Risk Statements—that the Zio AT was meant for "at-

28  risk," ¶ 210, or "more acute," ¶ 211, patients—falsely communicated that the Zio AT was appropriate

for patients at risk of life-threatening arrhythmias.   ¶ 212.  Neither of these statements caused a statistically significant rise in iRhythm's share price when made, Ex. 1 ¶ 163 & n.265, and no analyst mentioned either statement, *id.* ¶¶ 163-65.  That absence confirms these statements, "*as [spoken]*," had no price impact.  *Goldman II*, 77 F.4th at 100.

This lack of market reaction is straightforward:  Neither physicians (iRhythm's customers) nor analysts interpreted the Risk Statements to have the meaning that Plaintiff has ascribed to them; that is, that the Zio AT was appropriate for critical care patients with life-threatening arrhythmias. Ex. 2 ¶ 34; Ex. 1 ¶¶ 144, 157, 163-66; *see Moody's*, 274 F.R.D. at 493 (alleged misrepresentations that comport with the "status quo" do not have a price impact); *Kirkland*, 2024 WL 1342800, at *9, *12 (analyzing price impact in light of industry context).  Dr. Thomas explains that physicians understood the Zio AT to be a diagnostic tool for patients who require cardiac monitoring to assess whether those patients are at risk of arrhythmias. Ex. 2 ¶ 13.  Physicians also understand that MCTs— including the Zio AT—are not appropriate for critical care patients, in part because data is not transmitted on an uninterrupted basis during the wear period. *Id.* ¶ 34.  In other words, Plaintiff's theory of falsity is inconsistent with industry practice.  As such, statements that the Zio AT was appropriate for "more acute patients," ¶ 211 (language which iRhythm still uses today, Ex. 30 at 11), and "at-risk patients," ¶ 210, did not result in artificial inflation in iRhythm's stock price because the market did not interpret those statements as Plaintiff claims.  Ex. 2 ¶ 34; Ex. 1 ¶¶ 163-66.

### 2.    The Risk Statements Had No Back-End Price Impact

The alleged corrective disclosure for the Risk Statements—the May 30, 2023 disclosure of the Warning Letter—does not establish "back end" price impact because it did not reveal new information to the market.  *See FibroGen*, 2024 WL 1064665, at *12.  Specifically, because the market never understood the Risk Statements to mean the Zio AT was appropriate for critical care patients, Ex. 1 ¶¶ 163-66, the Warning Letter—which questioned the Zio AT's appropriateness for patients with "life-threatening arrhythmias"—did not convey new information about the relevant patient population for the Zio AT, *id.* ¶¶ 173-82, and was instead consistent with the market's understanding of that device.  In other words, it conveyed the FDA's views, but did not change the market's views.  *See id.*

███████████████████████████ Ex. 3 at 110:15-111:1, and analysts viewed the Zio AT as suitable for the MCT market both before and after the Warning Letter, Ex. 1 ¶ 146; Ex. 2 ¶¶ 13, 34. Further, no analyst reported concern that the device was "dangerous" or "inappropriate" for certain patient populations, and no analyst shared the FDA's concerns regarding the patient population following the release of the Warning Letter. Ex. 1 ¶ 173-82. Analysts instead attributed iRhythm's stock price decline to the risk that the Zio AT might be pulled from the market while iRhythm worked with the FDA. *Id.* ¶ 179. ██████████████ Ex. 3 at 240:15-241:12. Any price reaction therefore reflects regulatory risk, not a correction of any alleged misstatements.

### C.    The Accuracy Statements Had No Price Impact

#### 1.    The Accuracy Statements Had No Front-End Price Impact

The Accuracy Statements—highly generic statements about the capabilities of the ***entire*** Zio suite of products and services, *e.g.*, ¶ 226 ("Zio Service delivers superior clinical accuracy"); ¶ 230 ("Ease of use, accuracy, and simple workflow of Zio Monitor and ZioSuite . . . is resonating within the primary care channel"); *see also* ¶¶ 227-29, 231—unsurprisingly did not cause a statistically significant rise in iRhythm's stock price when made, Ex. 1 at Ex2-1; *id.* ¶ 163 n.265. Consistent with the generic nature of these statements, there is no indication that analysts reported on them, confirming that the statements, "*as [spoken]*," had no price impact, *Goldman II*, 77 F.4th at 100.

#### 2.    The Accuracy Statements Had No Back-End Price Impact

A back-end price drop following an alleged corrective disclosure supports an inference of front-end price impact only where there is a close "match" between the statements and the disclosures in both specificity and in subject matter. *Supra* pp. 12-13. Plaintiff alleges that disclosures on August 1 and August 9, 2024 corrected the Accuracy Statements, but neither "substantive[ly] []match[es]," *Kirkland*, 2024 WL 1342800 at *11, the statements in an "obvious" manner so as to answer "what would have happened" if Defendants had "spoken truthfully," *Goldman II*, 77 4th at 98-99.

*First*, Plaintiff asserts a narrow theory of falsity for the Accuracy Statements. Plaintiff alleges those generic statements were misleading because CCTs misreported arrhythmia data for physicians, ¶ 232, and that the statements were corrected through disclosures on August 1 and August 9, 2024 addressing observations in the 2024 Form 483, Mot. 10; ¶¶ 146, 152. But the Accuracy Statements

***do not mention the Zio AT*** and instead refer to the Zio Systems, the Zio Service, the ZioSuite, or Zio products more broadly, *e.g.*, ¶¶ 226-31, meaning there is "too great a distance between the content of" the statements and disclosures to infer price impact, *Gambrill*, 2025 WL 3771433, at *11.[4]

*Second*, iRhythm's disclosure of the 2024 Form 483 on August 1, 2024 is mismatched from the Accuracy Statements for another reason:  Plaintiff alleges the August 1 disclosure revealed issues with "process controls," "medical device reporting," "complaint handling," and "risk analysis." ¶¶ 146-51.  Simply, ***none*** of that information disclosed on August 1 mentioned accuracy at all, creating a further mismatch that precludes an inference of price impact.  *Kirkland*, 2024 WL 1342800, at *12.  This is not the "closer fit" that *Goldman* requires.  *Pardi*, 2024 WL 4336627, at *8.

*Third*, while Plaintiff alleges the August 9, 2024 Capitol Forum report revealed additional specifics about the 2024 Form 483, ¶¶ 152-53, the only observations related to accuracy in that article provided that iRhythm received complaints that CCTs misreported data in the reports provided to physicians for Zio AT patients.  The problem here is that even if the Accuracy Statements did relate to the Zio AT (they do not), those statements, ***at most***, address the capabilities of the device generally and not the specific issue of reports created by the CCTs.  *See Gambrill*, 2025 WL 3771433, at *11.

*Finally*, the above issues notwithstanding, Plaintiff's theory again suffers from a generic/specific mismatch because a "mismatch in specificity between the [alleged misstatement and corrective disclosure] undercuts a plaintiff's theory that investors would have expected more from the front-end disclosure." *Concho*, 2025 WL 1040379, at *13.  Disclosures about complaint handling and risk analysis, or even CCT operations more broadly, are significantly more specific than the generic Accuracy Statements, causing the "inference that the back-end price drop equals front-end inflation [to] start[] to break down." *Goldman II*, 77 F.4th at 102.  *Goldman* is particularly instructive here—there, disclosures of specific conflict of interest issues did not support an inference of price impact connected with earlier, general statements about the firm's processes and ability to manage conflicts.  *Id.* at 104; *see also Concho*, 2025 WL 1040379, at *14.  It is "common sense" that the

---

[4] Both Zio System and Zio products refer collectively to the Zio XT, Zio AT, and Zio Monitor; Zio Service refers broadly to iRhythm's "cardiac monitoring services, including long-term continuous monitoring" and "short-term continuous monitoring"; and ZioSuite is iRhythm's "proprietary, web-based portal" where physicians may access reports for their patients. Ex. 30 at 4, 8.

market reaction to general statements about accuracy, some bordering on puffery (e.g., "superior clinical accuracy"), cannot be substituted with specific Form 483 observations, which carried ongoing regulatory risk, to infer back-end price impact. *Goldman I*, 594 U.S. at 122; *see* ¶ 146.

The market's reaction to the August 2024 disclosures reinforces this point: Analysts focused on the timeline and costs associated with resolution with the FDA, not purported implications about the accuracy of the device. *See, e.g.*, Ex. 37 at 2 (2024 Form 483 did not address "device-specific issues"); Ex. 38 at 1 (summarizing observations, which were all "tied to [iRhythm's] certified cardiographic technicians," and analyzing the "risk that [iRhythm] receives another warning letter"). Analysts did not connect the August 1 or August 9 disclosure with the Accuracy Statements, further undermining any inference of price impact. Ex. 1 ¶ 206 n.351; *Kirkland*, 2024 WL 1342800, at *12.

## II.    PLAINTIFF HAS NOT PROPOSED A COMMON DAMAGES METHODOLOGY THAT CAN RELIABLY CALCULATE CLASS-WIDE DAMAGES

Class certification should be rejected for the independent reason that Plaintiff fails to provide "evidentiary proof" of a methodology capable of measuring damages on a class-wide basis consistent with Plaintiff's theory of liability. *Comcast*, 569 U.S. at 33-35. Although damages calculations need not be exact at the certification stage, "courts must conduct a rigorous analysis to determine whether" a proposed damages methodology is consistent with its liability case. *Id.* at 35; *see In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) (following *Comcast*, it is "the role of the district court to scrutinize the evidence" of a plaintiff's proposed damages methodology "before granting certification, even when doing so requires inquiry into the merits of the claim").

A plaintiff must offer more than an expert's unelaborated "say-so" that a viable model of class-wide damages exists. *Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014). Yet that is all Plaintiff provides. Dr. Cain outlines only the concept of a plan—not a concrete model—stating he will analyze the impact of alleged corrective disclosures on iRhythm's stock price using an "out-of-pocket damages methodology." Cain Rep. ¶¶ 99, 104. Beyond asserting that this approach "begin[s] with" an event study, he offers no case-specific explanation of how damages can be calculated. *Id.* ¶ 103; Ex. 1 ¶ 188. Although he gestures toward "the nature of the claims," Cain Rep. ¶¶ 112, 103, he never engages with them. Instead, he asserts

1   that the out-of-pocket methodology is "standard" in securities litigation.  *Id.* ¶ 101; *see also* Ex. 36 at

2   219:20-22.  That assertion merely parrots the legal definition of damages in a Section 10(b) case; it

3   does not supply a method to calculate them.  Dr. Cain himself acknowledges that his approach simply

4   "calculates damages formulaically as the artificial inflation in the prices of the Company's Common

5   Stock at the time of purchase minus the artificial inflation in the prices of the Company's Common

6   Stock at the time of sale."  Cain Rep. ¶ 101.  This is not a methodology—it is the conclusion Plaintiff

7   must prove.  Ex. 1 ¶ 190 ("saying that one will apply the 'out-of-pocket' formula as a methodology

8   for measuring damages is the same as saying that one will measure artificial inflation as artificial

9   inflation").  Courts reject this type of abstraction because "discuss[ing] general techniques for

10  computing damages in securities fraud cases" is insufficient where the expert fails "to propose one

11  model explaining how he would use the[] techniques in concert to calculate damages **in this case**."

12  *Loritz v. Exide Tech.*, 2015 WL 6790247, at *22 (C.D. Cal. 2015).

13      Dr. Cain dismisses the case-specific factors that his "methodology" fails to account for.  In

14  *Loritz*, the court denied certification where the expert failed to engage meaningfully with "multiple

15  alleged misrepresentations" and "corrective information [that] was allegedly disclosed at multiple

16  times."  *Id.*  Those same problems are pervasive here, along with non-fraud-related ("confounding")

17  information disclosed alongside allegedly corrective information and significant economic gaps

18  between the purported corrective disclosure.  Dr. Cain has thus not proposed a damages methodology

19  that can support the "rigorous analysis" required.  *Comcast*, 569 U.S. at 35.

20      *First*, Plaintiff alleges multiple misrepresentations and corrective disclosures that purportedly

21  affected iRhythm's stock price at different times, necessarily implying that inflation varied over the

22  class period.  Dkt. 77 at 3-5, 27-28; *see also* Ex. 1 ¶¶ 212-17 (explaining an appropriate damages

23  model in this case must account for varying inflation over time, including because the number of

24  complaints varied over time).  Dr. Cain concedes that time-varying inflation is a problem his proposed

25  methodology cannot solve.  Cain Rep. ¶ 105; Ex. 36 at 231:21-25.  He also admits that an event study

26  alone "does not provide all the information" needed to determine whether and how inflation evolved.

27  Ex. 36 at 245:14-17; Ex. 1 ¶¶ 193-95.  Although he suggests other techniques might be used, he

28  provides only abstract references to "principles of finance, economics, valuation analysis," and

maybe other sources of information. Ex. 36 at 232:14-22; Cain Rep. ¶ 109. But absent "[tying] these theories to the facts of this case," such generalized assurances do not satisfy *Comcast*. *Loritz*, 2015 WL 6790247, at *22 (discrediting expert opinion that "describes generally some techniques he asserts can be used to address" varying inflation); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio 2018) (damages model that "simply asserts . . . that there are unspecified tools available to measure damages . . . amounts to no damages model at all, and the class cannot be certified."), *rev'd on other grounds*, 64 F.4th 731 (6th Cir. 2023).

*Second*, Dr. Cain acknowledges his event study cannot account for confounding information. In securities cases, confounding information is information that caused part of the price decline on a corrective disclosure date but is not related to the alleged fraud. Ex. 1 ¶ 200. The effect of any confounding information must be removed to calculate damages consistent with Plaintiff's theory of liability. *Id.*; Cain Rep. ¶ 105. Dr. Cain asserts that his methodology "can be modified" to address confounding factors "using certain economic techniques," but he stops there. Cain Rep. ¶ 107; Ex. 36 at 245:2-5; *see also* Ex. 1 ¶ 192. Courts routinely reject such open-ended proposals. *See, e.g.*, *Jaroslawicz v. M&T Bank Corp.*, 2024 WL 2975766, at *8 (D. Del. 2024) (expert's methodology insufficient to support certification where "Plaintiff[] have not proposed any mechanism for incorporating intervening or confounding factors into their proposed damages calculations"); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25-26 (D.D.C. 2012) (declining certification where expert's proposed methodology failed to account for "[confounding] factors").

*Finally*, Dr. Cain's proposed methodology does not account for the economic differences between the alleged misstatements and "corrective" disclosures. Cain Rep. ¶¶ 24-26. The Accuracy Statements that survived Defendants' motion to dismiss were all made on or before May 2, 2024. Ex. 1 ¶ 204 & n.347; Dkt. 77 at 24. The Form 483 observation Dr. Cain identifies as corrective was issued ***after*** the final Accuracy Statement, creating a gap between the truth allegedly concealed by those statements and the "corrective" facts disclosed in connection with the Form 483. Ex. 1 ¶ 206. iRhythm could not have disclosed the Form 483 before it was received. To the extent Plaintiff's theory is that these events are materializations of risks that existed when the statements were made, courts repeatedly reject that theory absent an explicit explanation as to how the out-of-pocket formula

accounts for it. *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 590 (N.D. Cal. 2021) ("because the proposed [out-of-pocket] damages model does not attribute damages to a materialization of the risk theory . . . the court declines to authorize class-action treatment as to this theory"); *Ind. Pub. Ret. Sys. v. AAC Holdings*, 2023 WL 2228987, at *24 (M.D. Tenn. 2023) (similar).

A parallel problem exists with respect to the Timing and Risk Statements (which Dr. Cain combines, Ex. 1 ¶ 202). The DOJ subpoena and petition post-dated both surviving Risk Statements and most surviving Timing Statements, meaning those events could not have been disclosed at the time those statements were made, Ex. 1 ¶ 209, and were already known to the market when later statements issued. This sequence of events poses serious problems for Dr. Cain's proposed event-study methodology that he neither acknowledges nor addresses. *See Mulderrig*, 340 F.R.D. at 590; *AAC Holdings*, 2023 WL 2228987, at *24-25. As in *Loritz*, Dr. Cain's proposed methodology cannot withstand the "rigorous analysis" required by Rule 23. 2015 WL 6790247, at *4, *22; *Comcast*, 569 U.S. at 34-35 (absent a showing of an appropriate class-wide damages methodology, "[q]uestions of individual damage calculations [would] inevitably overwhelm questions common to the class").

## III.    THE CLASS PERIOD CANNOT BEGIN BEFORE AUGUST 5, 2022

Plaintiff moved to certify a class for the period between July 25, 2022 to August 9, 2024. Mot. 1-2. To the extent Plaintiff's Motion is granted—and it should not be—the Class Period cannot begin before August 5, 2022. As the Court ruled on Defendants' motion to dismiss, August 5, 2022 is the date of the first surviving alleged misstatement and therefore the earliest date on which iRhythm's stock price could have been artificially inflated. *See* Dkt. 77. A class period cannot begin before the first alleged misstatement because it is the introduction of misinformation into the market that can distort a stock's price. *See, e.g.*, *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 459 & n.12 (S.D.N.Y. 2013) (rejecting plaintiffs' proposed class period because "the class period begins on the date of the first misstatement, as it is the injection of misinformation into the market[] that distorts the price of the stock"). Plaintiff has no principled legal or economic basis to begin the Class Period on July 25, 2022, a date that precedes the first actionable statement.

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiff's Motion for Class Certification.

1

2
DATED: January 5, 2026

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: */s/ Kristin Tahler*

Kristin Tahler (Bar No. 261908)
kristintahler@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

Christopher Porter (*pro hac vice*)
chrisporter@quinnemanuel.com
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7000

Jesse Bernstein (*pro hac vice*)
Brenna Nelinson (*pro hac vice*)
Amy Shehan (*pro hac vice*)
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
amyshehan@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000

*Attorneys for Defendants*