# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| GLAZING EMPLOYERS AND GLAZIERS' UNION LOCAL #27 PENSION AND RETIREMENT FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IRHYTHM TECHNOLOGIES, INC., et al.,<br><br>Defendants. | Case No. 3:24-cv-706-JSC |

**EXPERT REPORT OF PROFESSOR DOUGLAS SKINNER, PH.D.**

**January 5, 2026**

# Table of Contents

I.      Qualifications ................................................................................................................. 1

II.     Assignment and Compensation.................................................................................... 2

III.    Summary of Opinions .................................................................................................. 3

        A.      The Economic Evidence of Lack of Price Impact of the Timing Statements After
                November 2, 2022......................................................................................................... 4

        B.      The Economic Evidence of Lack of Price Impact of the Risk Statements ............ 6

        C.      Evaluation of Dr. Cain's Purported Damages Methodology ................................. 8

IV.     Background on iRhythm and Zio AT ......................................................................... 10

        A.      The AECG Market........................................................................................................ 11

        B.      Background on Zio AT ................................................................................................. 17

V.      Implications of Market Efficiency .............................................................................. 20

VI.     Summary of Allegations ............................................................................................. 22

        A.      Plaintiff's Challenged Statements............................................................................ 22

                1.      Timing Statements ................................................................................... 22

                2.      Risk Statements........................................................................................ 24

                3.      Accuracy Statements................................................................................ 25

        B.      Alleged Corrective Disclosures ................................................................................ 27

                1.      November 1, 2022:  iRhythm Q3 2022 Earnings Disclosures and Earnings
                        Call................................................................................................................ 28

                2.      November 4, 2022:  iRhythm Q3 2022 Form 10-Q Disclosure of FDA
                        Form 483 and "Labeling Correction" ....................................................... 28

                3.      May 4, 2023:  iRhythm Q1 2023 Form 10-Q Disclosure of DOJ Subpoena
                        ........................................................................................................................ 29

                4.      May 30, 2023:  iRhythm Form 8-K Disclosure of FDA Warning Letter . 30

                5.      July 1, 2024:  DOJ Court Filing to Enforce Subpoena ........................... 31

                6.      August 1, 2024:  iRhythm Q2 2024 Earnings Disclosures and Form 10-Q
                        Disclosure of FDA Form 483s................................................................... 32

                7.      August 9, 2024:  *Capitol Forum* Article.................................................. 33

VII.    Analysis of the Economic Evidence of Price Impact of the Timing Statements After
        November 2, 2022........................................................................................................ 33

        A.      Based on Alleged Truth #1, the Economic Evidence Is Consistent with the Timing
                Statements Not Impacting the Price of iRhythm Stock After November 2, 2022 37

1.    The Information Comprising Alleged Truth #1 Was Publicly Available by November 2, 2022 and, in an Efficient Market, by That Date Would Have Been Fully Incorporated into the Price of iRhythm Stock........................ 37

2.    In an Efficient Market, Stock Price Changes Following the Alleged Corrective Disclosures That Occurred After November 2, 2022 Do Not Provide Economic Evidence of Price Impact of the Timing Statements.. 43

B.    Based on Alleged Truth #2, the Economic Evidence Is Consistent with the Timing Statements Not Impacting the Price of iRhythm Stock After June 6, 2023 ......... 57

VIII.    The Economic Evidence Is Consistent with the Risk Statements Having No Impact on the Price of iRhythm Stock........................................................................................ 62

A.    Securities Analysts Considered That Zio AT, Unlike Zio XT, Was Suitable for Patients in the MCT Segment and Some Noted That Products in This Segment Did Not Always Provide Uninterrupted Transmission of ECG Data ................... 64

B.    After Release of the Customer Advisory Notice and Disclosure of the Transmission Limits on November 1, 2022, Securities Analysts Did Not Express Concerns About Whether Zio AT Was Appropriate for MCT Patients and Continued to Describe Zio AT as a Product for the MCT Segment ..................... 66

C.    Securities Analyst Commentary Following the Risk Statements Indicates That Securities Analysts Did Not Change Their Views About the Type of Patients for Which Zio AT Was Indicated ................................................................................ 70

D.    Securities Analyst Commentary After the Alleged Corrective Disclosures on May 30, 2023 and When the Warning Letter Was Published Does Not Indicate That Securities Analysts Changed Their Views Regarding Whether Zio AT Was Appropriate for the MCT Patient Population........................................................ 73

1.    After the Alleged Corrective Disclosures on May 30, 2023 and Any Subsequent Company Disclosures Regarding the Warning Letter, There Is No Evidence Securities Analysts Changed Their Views Regarding Whether Zio AT Was Appropriate for the MCT Segment ....................... 74

2.    There Is No Evidence Securities Analysts Changed Their Views as to Whether Zio AT Was Appropriate for the MCT Patient Population After the FDA Published the Warning Letter on June 6, 2023 ......................... 76

E.    After the FDA Published the Warning Letter, and Throughout the Rest of the Putative Class Period, Securities Analysts Continued to Describe Zio AT as Suitable for the MCT Market................................................................................. 80

IX.    Dr. Cain Fails to Provide a Reliable Damages Methodology Consistent with Plaintiff's Theory of Liability in This Matter ................................................................................. 83

A.    Summary of Dr. Cain's Opinion Regarding a Purported Methodology to Calculate Damages on a Class-Wide Basis......................................................................... 83

B.    By Itself, an Event Study Can Only Reliably Measure Artificial Inflation in Limited Circumstances ....................................................................................... 86

C.     Dr. Cain Fails to Provide a Methodology to Account for Economic Differences Between Information Plaintiff Alleges as Corrective and Information That iRhythm Would Have Been Able to Disclose Earlier in the Putative Class Period ............................................................................................................................ 90

     1.    Examples of Economic Differences with Respect to the Accuracy Statements ................................................................................................ 91

     2.    Examples of Economic Differences with Respect to the Timing Statements and Risk Statements ............................................................. 94

D.     Dr. Cain Fails to Provide a Methodology to Account for How Alleged Artificial Inflation May Have Evolved During the Putative Class Period .......................... 95

## I.     Qualifications

1.     I am the Sidney Davidson Distinguished Service Professor of Accounting at the University of Chicago, Booth School of Business.  I have been a tenured full professor at the University of Chicago since 2005, and previously served as Deputy Dean for Faculty and Interim Dean.  Prior to my appointment at the University of Chicago, I was the KPMG Professor of Accounting at the Ross School of Business, University of Michigan, where I held tenured and tenure-track appointments from 1989 until 2005 and served as chair of the accounting department.

2.     I hold a B. Econ. (First Class Honors in Accounting and Finance) from Macquarie University in Sydney, Australia and an M.S. and Ph.D. (Applied Economics:  Accounting and Finance) from the University of Rochester.  I have taught undergraduate upper-class students, full-time and part-time MBA students, Executive MBA ("EMBA") students, executives, consultants, and Ph.D. students.   I have taught introductory financial accounting, intermediate financial accounting, accounting for financial instruments, corporate financial reporting and analysis, financial statement analysis, managerial (cost) accounting, corporate finance, investments, valuation, and empirical methods in accounting research.  Most recently, I have taught Corporate Finance and Valuation, as well as Managerial Accounting, in the University of Chicago's EMBA program at campuses in Chicago, London, and Hong Kong, and a Ph.D. class in empirical capital markets research.

3.     From 2006 to 2021, I was a Senior Editor of the *Journal of Accounting Research*, one of the preeminent academic accounting journals in the world.  Before moving to Chicago, I was Co-Editor of the *Journal of Accounting and Economics*, also one of the world's leading academic accounting journals.  I also served as editor of the *Review of Accounting Studies*, and for several terms on the editorial board of *The Accounting Review*.  I am a member of the American Accounting Association and the American Finance Association.  I frequently present my research at major accounting and finance conferences and prominent universities.  I have supervised doctoral students who have accepted faculty positions at major business schools including Stanford, Harvard, Wharton, MIT, Columbia, Cornell, Michigan, Yale, and Chicago.

4.     I have published research on a variety of topics in accounting, auditing, capital markets, investments, and corporate finance, including how security prices respond to corporate disclosures

(including event studies of earnings disclosures); corporate managers' incentives to disclose forward-looking information, including guidance; the payout practices of public companies (*i.e.*, firms' dividend and repurchase decisions); corporate managers' financial reporting, disclosure, and capital management decisions; how accounting information is used in contracts between the various corporate stakeholders; and the nature of corporate debt agreements.

5. My research is published in leading accounting and finance journals, including *The Accounting Review*, the *Journal of Accounting and Economics*, the *Journal of Accounting Research*, the *Journal of Business*, *The Journal of Finance*, and the *Journal of Financial Economics*. My research has been featured in articles in *The Wall Street Journal*, *The New York Times*, *The Financial Times*, *The Economist*, and *Bloomberg Businessweek*.

6. I serve as an Independent Trustee and chair of the Audit Committee for Harbor Funds, Harbor Funds II, and Harbor ETF Trust.

7. My curriculum vitae, which includes a list of the publications I have authored, is included as **Appendix A**. A list of my deposition and trial testimony over the last four years is included as **Appendix B**.

## II.    Assignment and Compensation

8. I have been retained by counsel for defendants iRhythm Technologies, Inc. ("iRhythm" or the "Company") and Quentin Blackford (together, "Defendants") to analyze, as a matter of economics: (i) whether the surviving alleged misstatements ("Challenged Statements") regarding certain limits to the transmission functionality of Zio AT, a cardiac monitoring device ("Timing Statements") impacted the price of iRhythm stock after November 2, 2022; and (ii) whether there is any evidence the Challenged Statements regarding the suitability of Zio AT for certain patient populations ("Risk Statements") impacted the price of iRhythm stock during the putative class period in this matter, which I understand extends from August 5, 2022 through August 9, 2024

("Putative Class Period").[1,2]  In addition, I was asked to evaluate whether Dr. Cain, in his expert report dated November 3, 2025 ("Cain Report"), provided a methodology that could reliably estimate damages on a class-wide basis in a manner consistent with Plaintiff's theory of liability in this matter.

9.    In formulating my opinions, I have relied on my knowledge, prior experience, academic research on relevant topics, experience as a journal editor reviewing academic research articles, and formal training in economics, finance, and accounting.  A list of materials I have considered in preparing this report is attached as **Appendix C**.

10.    I am currently being compensated at my standard billing rate of $1,325 per hour in this matter.[3]  I have been assisted in this matter by staff at Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.  My work on this case is ongoing; I reserve the right to modify or supplement my opinions in the event I become aware of additional information.

## III.    Summary of Opinions

11.    Based on my analysis to date, as well as my skills, knowledge, expertise, education, and training, I have formed the following opinions.

---

[1] Expert Report of Matthew D. Cain, Ph.D., November 3, 2025 ("Cain Report"), ¶ 1.  Dr. Cain states that the putative class period extends from July 25, 2022 through August 9, 2024.  I understand that the Court issued an opinion denying in part and granting in part Defendants' motion to dismiss and held that "Plaintiff's scienter allegations do not predate the July 2022 [FDA] investigation."  *See* Order Re: Defendants' Motion to Dismiss, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, June 3, 2025 ("MTD Order"), footnote 8.  I further understand from counsel that Defendants take the position that the Putative Class Period begins on August 5, 2022, the date of the first alleged misstatement after July 2022 that survived the MTD Order.  *See* Second Amended Class Action Complaint for Violations of Federal Securities Laws, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, October 11, 2024 ("Complaint"), ¶ 184.

[2] For purposes of my analysis, I have been asked to assume that the market for iRhythm common stock was efficient during the Putative Class Period.

[3] My standard billing rate changed as of January 1, 2026.  I was compensated at the rate of $1,200 per hour for work done in 2025.

**A.    The Economic Evidence of Lack of Price Impact of the Timing Statements After November 2, 2022**

12.    In **Section VII**, I analyze the economic evidence of price impact from the Timing Statements after November 2, 2022 under two alternative specifications of the relevant truth that Plaintiff alleges was concealed by those statements and that counsel for Defendants has asked me to consider. These specifications of the relevant truth are consistent with my understanding of the allegations, without offering a legal opinion.

13.    The first specification of the relevant truth that Plaintiff alleges was concealed ("Alleged Truth #1") is that Zio AT did not always timely transmit electrocardiogram ("ECG") data as a result of certain transmission limits. In **Section VII.A.1**, I show that the information that comprises Alleged Truth #1 was publicly available no later than after market close on November 1, 2022. Assuming iRhythm common stock traded in an efficient market during the Putative Class Period, the information comprising Alleged Truth #1 would have been fully reflected in the price of iRhythm common stock by market close on November 2, 2022. As a result, any subsequent declines in the Company's stock price (after November 2, 2022) cannot, in an efficient market, be attributed to information that comprises Alleged Truth #1. Instead, as shown in **Section VII.A.2**, any new information that became available and was discussed by securities analysts following the alleged corrective disclosures that occurred after November 2, 2022 and that Dr. Cain associates with the Timing Statements—namely, the alleged corrective disclosures on November 4, 2022, May 4, 2023, May 30, 2023, and July 1, 2024—is information that, even if potentially related to Alleged Truth #1, is distinct from Alleged Truth #1 (*i.e.*, at most represents additional detail regarding the transmission limits issue and its potential consequences). Consequently, any stock price declines that followed these alleged corrective disclosures do not provide evidence of price impact from an alleged failure to disclose Alleged Truth #1. Taken together, these findings show that, under Alleged Truth #1, the economic evidence is consistent with the Timing Statements having no price impact after November 2, 2022, even assuming they had price impact before that date.

14.    The second specification of the relevant truth that Plaintiff alleges was concealed ("Alleged Truth #2") comprises four elements: (i) Alleged Truth #1, as defined above ("Statement 1 of Alleged Truth #2"); (ii) iRhythm had received complaints about serious cardiac events, including

events that involved two deaths, that were not reported to providers during the wear period because of the transmission limits ("Statement 2 of Alleged Truth #2"); (iii) the transmission limits had been reached more often than expected during the wear period ("Statement 3 of Alleged Truth #2"); and (iv) there was a lag of four hours or more before Zio AT data could reach the technicians' queue for review ("Statement 4 of Alleged Truth #2").

15.    In **Section VII.B**, I show that, under Alleged Truth #2, the economic evidence is consistent with the Timing Statements having no price impact after June 6, 2023 (when the FDA published the Warning Letter), even assuming they had price impact before that date. First, as discussed above, Statement 1 was publicly available well before this date, no later than after market close on November 1, 2022. Second, I show that Statements 2 and 3 of Alleged Truth #2 had been publicly available no later than June 6, 2023, and so, in an efficient market, would have been incorporated into the price of iRhythm stock on or before that date. Thus, if the market for iRhythm stock was efficient, there is no evidence the alleged failure to disclose these statements had price impact after June 6, 2023. Third, I show that, based on my review of the Complaint, Plaintiff does not allege (or otherwise identify) any public disclosure or other revelation of Statement 4 of Alleged Truth #2 (the purported four-hour lag issue) on any of the alleged corrective disclosure dates. Based on my review of Company releases and disclosures (including SEC filings), public press, and securities analyst reports that were published or otherwise publicly available on or after the beginning of the Putative Class Period, the earliest reference to the purported four-hour lag issue in the public domain that I have identified is in the operative Complaint, which is dated (and so became publicly available on) October 11, 2024. Based on Dr. Cain's event study model, there was no statistically significant decline in the price of iRhythm stock on either that date or the following trading day. Moreover, based on my review of available securities analyst reports, no securities analyst report was issued the day of or during the seven calendar days after the Complaint was filed. Taken together, this evidence is consistent with a lack of price impact from an alleged failure to disclose Statement 4 of Alleged Truth #2.

16.    This economic evidence regarding the purported four-hour lag issue (Statement 4 of Alleged Truth #2) also implies that even if Alleged Truth #1 were to be augmented to also include the purported existence of a lag of four hours or more before Zio AT data could reach the technicians' queue for review, the economic evidence would still be consistent with the Timing

Statements having no price impact after November 2, 2022, even assuming they had price impact before that date.

**B.      The Economic Evidence of Lack of Price Impact of the Risk Statements**

17.      In **Section VIII**, I observe that (i) Plaintiff alleges the Risk Statements indicated that Zio AT "was … marketed to 'high-risk' patients," which allowed iRhythm "to expand into the lucrative Mobile Cardiac Telemetry ('MCT') space"[4]; and (ii) in its Motion to Dismiss Order (the "MTD Order") the Court indicated that "the FDA understood the term" "[h]igh-risk patients" to mean those who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death."[5]  I show that throughout the Putative Class Period, including the periods before and after the Risk Statements, securities analyst commentary is consistent with analysts maintaining the view that the relevant patients for Zio AT were those in the mobile cardiac telemetry ("MCT") or mobile cardiac outpatient telemetry ("MCOT") segment, which excludes high-risk patients as "the FDA understood the term"; that is, those who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death."  Thus, the economic evidence is consistent with there never having been a perception among market participants during the Putative Class Period that Zio AT was appropriate for patients who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death."  Consequently, as a matter of economics, the Risk Statements had no impact on the price of iRhythm common stock during the Putative Class Period.

18.      In **Section VIII.A**, I show that, although market participants sometimes described MCT devices as offering (near) real-time monitoring capabilities, securities analysts consistently noted that these devices had limitations that constrained their ability to transmit data due to, for example, limits on battery life, constraints on cellular coverage, or poor or improper use by patients. Therefore, it was not expected that in many circumstances MCT devices would transmit data on an uninterrupted basis during the wear period.  Securities analysts' descriptions of MCT devices,

---

[4] Complaint, ¶ 1.
[5] MTD Order, p. 12.

including Zio AT, as offering "real-time" or "near real-time" transmission should be interpreted in the context of these limitations.

19.    As shown in **Section VIII.B**, I find no evidence that the release of the customer advisory notice (on September 28, 2022) and disclosure of the transmission limits on November 1, 2022 led securities analysts to change their views about Zio AT's indications for patients or its target market; securities analysts continued to describe Zio AT as suitable for the MCT segment.

20.    In **Section VIII.C**, I explain that, assuming Plaintiff alleges the Risk Statements made on January 10, 2023 and February 23, 2023 misled investors into thinking that Zio AT was indicated for patients who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death," I would expect securities analysts to explicitly revise their views and comment on the appropriate use and target population of Zio AT.  However, there is no evidence in securities analyst commentary issued in the wake of the Risk Statements that they changed their views about Zio AT or the type of patients for which it was indicated as a result of these statements; securities analysts continued to characterize Zio AT as a product for the MCT market.

21.    In **Section VIII.D**, I show that there is no evidence the alleged corrective disclosures on May 30, 2023, any subsequent Company disclosures regarding the Warning Letter, or publication of the Warning Letter itself led securities analysts to change their views regarding whether Zio AT was suitable for the MCT segment.  Securities analyst commentary does not indicate that these events informed securities analysts that Zio AT was "inappropriate or even dangerous" for the MCT patient population.[6]  Instead, securities analysts generally reported the factual content of the disclosures and commented on concerns and uncertainties about the process the FDA might require of iRhythm to address and resolve FDA concerns.  For example, some securities analysts noted concerns regarding whether Zio AT would have to be temporarily removed from the market until the Company was able to resolve FDA concerns.

22.    Finally, in **Section VIII.E**, I find that securities analyst commentary throughout the rest of the Putative Class Period continued to describe Zio AT as suitable for the MCT segment.  In fact, less than two months after the Warning Letter was made public, iRhythm reported having largely reached agreement with the FDA regarding appropriate labeling changes for Zio AT, ensuring the

---

[6] Complaint, ¶ 212.

Company could continue to market it as an MCT device.  Securities analysts reported on this information.

### C.    Evaluation of Dr. Cain's Purported Damages Methodology

23.    In **Section IX**, I show that, as a matter of economics, Dr. Cain fails to provide a methodology that can be used to reliably measure damages on a class-wide basis for iRhythm common stock in a manner consistent with Plaintiff's theory of liability in this matter.

24.    First, as discussed in **Section IX.A**, although Dr. Cain appears to understand that estimating damages in this matter requires a methodology to reliably measure artificial inflation, the only reference to a methodology that Dr. Cain offers is his discussion of the use of an event study to measure stock price declines at the time of alleged corrective disclosures.  However, Dr. Cain fails to provide any indication of how an event study could be applied to estimate inflation in this matter, and provides no analytical support for his claim that, if adjustments to event study results are necessary to properly measure inflation, such adjustments can actually be made.

25.    In **Section IX.B**, I discuss that, as a matter of economics, abnormal stock price declines (as measured by an event study) that follow alleged corrective disclosures can only serve as a reliable measure of inflation during a class period in limited circumstances (*i.e.*, when certain assumptions hold).  Specifically, it must be the case that, absent the alleged fraud:  (i) the information conveyed on the alleged corrective dates would have been publicly disclosed or fully anticipated by the market from the beginning of the Putative Class Period and so, in an efficient market, fully reflected in the Company's stock price at that time; (ii) the implications for value (and so the stock price) of this information would not have changed over time, regardless of changes in the Company's business, operations, or the macroeconomic environment in which it operates; and (iii) any abnormal stock price declines following the alleged corrective dates exclusively represent the implications for value of information that would have been available or anticipated at the beginning of the Putative Class Period.  Dr. Cain fails to provide any economic analysis that might support the validity of these assumptions—which are necessary for an event study to reliably measure inflation—in this matter.

26.    In fact, in **Section IX.C**, I describe how the first of these assumptions fails to hold here because of economic differences between information iRhythm would have been able to disclose

at the time of the Challenged Statements (*i.e.*, the relevant truth that Plaintiff alleges was concealed) and that which Plaintiff alleges as corrective. Dr. Cain fails to offer a damages methodology that can reliably account for these economic differences. For example, as discussed in **Section IX.C.1**, I understand that, in light of the Court's determination in the MTD Order, all of the surviving Accuracy Statements (defined below) occurred before the July 2024 FDA inspection that led to the Form 483 that Plaintiff alleges as part of the relevant alleged corrective disclosures for the Accuracy Statements. Consequently, the FDA inspection and associated Form 483 is not information Plaintiff could reasonably claim iRhythm should have disclosed at the time any of the surviving Accuracy Statements were made. Similarly, in **Section IX.C.2**, I provide examples of economic differences between the alleged corrective disclosures and what Plaintiff alleges as the relevant truth with respect to the Timing Statements and Risk Statements.

27.    In **Section IX.D**, I explain that the first assumption fails to hold for the additional reason that the economic implications (for the value of iRhythm stock) of the relevant truth Plaintiff alleges was concealed (and thus any artificial inflation) may have changed over time, as the alleged issues that comprise the relevant truth evolved during the two years of the Putative Class Period. If the implications of the relevant truth for the value of iRhythm stock changed over the course of the Putative Class Period, any abnormal stock price declines following the alleged corrective disclosures (measured using an event study) cannot serve as a reliable measure of artificial inflation consistent with Plaintiff's theory of liability. Dr. Cain fails to provide a methodology to account for this challenge. For example, because Plaintiff alleges that iRhythm failed to disclose it had received "thousands of complaints regarding the accuracy of the Zio AT," Plaintiff appears to allege that, on the dates each of the Accuracy Statements were made, iRhythm should have disclosed the then-existing number of complaints it had received regarding the accuracy of Zio AT (the "Accuracy Complaints").[7] Because the number of these complaints increased over time, the number of complaints Plaintiff appears to allege as part of the relevant truth iRhythm should have disclosed at the date of each Accuracy Statement would also have increased over time. In addition, given the higher per-quarter *rate* of Accuracy Complaints during the later part of the period between May 2, 2022 and July 19, 2024 ("Accuracy Complaints Period") relative to the earlier

---

[7] Complaint, ¶ 232.

part, any alleged issues with respect to "misinterpretation by the Company's technicians" that allegedly led to the Accuracy Complaints may have become more severe later in this period.[8]

## IV.   Background on iRhythm and Zio AT

28.   iRhythm is a digital healthcare and medical device company that was incorporated in Delaware in 2006, with headquarters in San Francisco, California.[9]  During the Putative Class Period, iRhythm's common stock traded on the Nasdaq under the ticker "IRTC."[10]

29.   At the beginning of the Putative Class Period, iRhythm had commercialized two cardiac monitoring devices, Zio XT and Zio AT, and launched a third, Zio Monitor, in 2023 as the next generation Zio XT.[11]  I understand that Zio XT, Zio AT, and Zio Monitor were each marketed (and viewed by the market) as ambulatory electrocardiogram (ECG) monitoring devices ("AECGs").[12]  iRhythm commercialized these devices as part of its "Zio Systems" offerings and provided "Zio Services" that utilized the devices and included data analytics as part of a suite of ambulatory ECG

---

[8] Complaint, ¶ 232.

[9] iRhythm Technologies, Inc., Form 10-K for Fiscal Year Ended December 31, 2024, filed February 20, 2025 ("iRhythm 2024 Form 10-K"), p. 4 ("Our principal business is the design, development, and commercialization of device-based technology to provide ambulatory cardiac monitoring services that we believe allow clinicians to diagnose certain arrhythmias quicker and with greater efficiency than other services that rely on traditional technology.… The Company was incorporated in the state of Delaware in September 2006.  Our principal executive offices are located at 699 8th Street, Suite 600, San Francisco, California 94103.").

[10] iRhythm 2024 Form 10-K, p. 4 ("Our common stock is listed on The Nasdaq Global Select Market under the symbol 'IRTC'").

[11] iRhythm Technologies, Inc., Form 10-K for Fiscal Year Ended December 31, 2023, filed February 22, 2024 ("iRhythm 2023 Form 10-K"), pp. 6–7, 68 ("We currently offer three Zio System options – the Zio Monitor System, the Zio XT, and the Zio AT System.… The Zio XT System is the previous generation of the Zio Monitor System.… During 2023, we purchased additional [printed circuit board assemblies] for use with Zio XT and in anticipation of the Zio Monitor commercial launch[.]").  *See also* "iRhythm Launches Next Generation Zio Monitor and Enhanced Zio Service: Its Smallest, Lightest and Thinnest Cardiac Monitor," *GlobeNewswire*, September 26, 2023, 8:05 AM ET.

[12] iRhythm 2023 Form 10-K, pp. 4, 6 ("Our principal business is the design, development, and commercialization of device-based technology to provide ambulatory cardiac monitoring services that we believe allow clinicians to diagnose certain arrhythmias quicker and with greater efficiency than other services that rely on traditional technology.… We have provided our Zio ambulatory cardiac monitoring services.… We have developed a proprietary system that … continuously records ECG data.  We currently offer three Zio System options – the Zio Monitor System, the Zio XT, and the Zio AT System').  *See also, e.g.*, "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 15 ("[The] Total Ambulatory ECG Market [includes the] Zio XT Patch [and the] Zio AT Patch."); "IRTC: Growth Trajectory and Profitability Already Priced In; Initiate at Hold," *Needham & Company*, September 11, 2020, p. 9 ("Ambulatory cardiac monitoring can include several modalities such as: Holter monitors, event recorders, mobile cardiac telemetry (MCT) devices, and implantable loop recorders (ILRs) … iRhythm Technologies' Ambulatory Cardiac Monitoring.").

monitoring services.[13]  iRhythm reported revenues of approximately $411 million, $493 million, and $592 million for FY 2022, FY 2023, and FY 2024, respectively.[14]  I understand that Zio AT represented approximately 10% of the Company's revenue during this period.[15]

### A.    The AECG Market

30.    I understand that AECGs are prescribed by medical professionals to diagnose heart rhythm disorders (*i.e.*, arrhythmias) when the results from a traditional ECG conducted in a physician's office are judged to be insufficient or inconclusive.[16]  AECGs allow a physician to monitor a patient for an extended period and, thus, identify arrhythmia events that occur while the patient is

---

[13] iRhythm 2024 Form 10-K, pp. 4, 6 ("We have provided our Zio ambulatory cardiac monitoring services, including long-term continuous monitoring, short-term continuous monitoring, and mobile cardiac telemetry ('MCT') monitoring services (collectively, the 'Zio Services'), using our Zio Systems (as defined below).… We have developed a proprietary system that combines an FDA-cleared and CE-marked wire-free, patch-based, 14-day wearable biosensor that continuously records ECG data, with a proprietary FDA-cleared and CE-marked cloud-based data analytic platform to help physicians monitor patients and diagnose arrhythmias (collectively, the 'Zio System').  We currently offer three Zio System options – the Zio Monitor System, the Zio XT System, and the Zio AT System.").

[14] iRhythm 2024 Form 10-K, p. 78 ("Consolidated Statements of Operations (In thousands, except per share data) … Revenue, net … 2024[:] $591,839 … 2023[:] $492,681 … 2022[:] $410,921.").

[15] *See, e.g.*, "iRhythm Technologies Inc at Morgan Stanley Global Healthcare Conference (Virtual)," *Refinitiv StreetEvents*, September 9, 2021, 5:00 PM ET, p. 5 ("So we're very happy with the progress we've made with Zio AT.  AT now having crossed 10% of our revenue, and we do expect it to continue to grow as a percentage of our revenue from there."); "iRhythm Technologies Inc at William Blair Growth Stock Conference," *Refinitiv StreetEvents*, June 7, 2023, 5:00 PM ET, p. 3 ("Zio AT is about 10% of the overall business."); "iRhythm Technologies Inc Company Conference Presentation," *S&P Global Market Intelligence*, January 8, 2024, 7:30 PM ET, p. 6 ("Another market opportunity for us and one that gets us very excited about our future, and you're starting to hear us talk more and more about it is the MCT space, mobile cardiac telemetry space.  We have not played in this space historically in a large way.  It's about 7% market share for us today.  It's about 10.5% of our overall business.").

[16] *See, e.g.*, Expert Report of Dr. George Thomas, M.D., January 5, 2026 ("Thomas Report"), ¶¶ 11, 19 ("Patients deemed not high enough risk for hospital admission, but who require cardiac monitoring to assess whether certain medical conditions may be caused by heart problems are often prescribed outpatient, mobile AECG monitoring devices.  These devices enable monitoring of a patient's cardiac activity while the patient performs daily activities outside of healthcare facility settings.… When physicians do not have a high suspicion that a patient presentation was consistent with an elevated chance of a dangerous arrhythmia, standard diagnostic tests such as ECG, echocardiogram (an ultrasound of the heart's structure and function), short-term Holter monitoring, and blood work often exhibit low rates of identifying the underlying cause of the syncope—about 5% to 18% of the time, according to different studies.  Moreover, these tests are typically most useful in older patients who already present with signs or symptoms of cardiac dysfunction.  This lack of efficacy in diagnosing the cause of syncope (i.e., low 'diagnostic yield') has prompted the development of outpatient AECG modes of monitoring—namely in the forms of extended outpatient mobile telemetry monitoring, extended Holter monitoring, and newer form factors such as patch AECG devices that can improve patient compliance."); "IRTC: Growth Trajectory and Profitability Already Priced In; Initiate at Hold," *Needham & Company*, September 11, 2020, p. 9 ("To diagnose these arrhythmias, patients typically undergo an in-office test which can include an electrocardiogram (ECG) and/or an echocardiogram.  If either of these tests do not detect an arrhythmia or the doctor believes a longer monitoring period is required, the doctor can prescribe an ambulatory cardiac monitor in order to monitor the patient for a longer duration.").

not in the physician's office and is engaging in routine daily activities.[17]  The goal is to allow physicians to gather the data necessary to more effectively diagnose patients.[18]

31.     I understand that AECGs are primarily diagnostic tools, but under specific circumstances may also be used for non-diagnostic monitoring purposes such as for observation following surgery or to ascertain the effectiveness of an arrhythmia medication.[19]  Importantly, it is my understanding that AECGs are not intended to substitute for inpatient monitoring in situations where immediate medical attention may be required, including for patients at risk of immediate, life-threatening arrhythmias.[20]

32.     I understand that the overall AECG market spans a variety of device types with different functionality.[21]  Consequently, when prescribing an AECG, physicians must determine which type of AECG is most appropriate under the specific circumstances of each patient, including patient medical history, risk factors, symptoms, or whether data transmission is needed as well as cost effectiveness.[22]

---

[17] Thomas Report, ¶ 19 ("These outpatient AECG devices allow patients who do not need hospital admission to monitor cardiac activity through a wearable instrument while performing daily activities outside of healthcare facility settings."); "Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust*, January 7, 2020, p. 20 ("By extending ECG monitoring outside the physician's office, devices are able to collect more continuous data over a longer observational periods, increasing diagnostic yield of these devices.").

[18] *See, e.g.*, "Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust*, January 7, 2020, p. 20 ("Continuously recording data for an extended period of time has been shown to increase the likelihood of arrhythmia detection as demonstrated by a retrospective analysis of patients continuously monitored for 14-days that saw >50% of detected arrhythmias occurring beyond the traditional 48-hour monitoring period.").

[19] "Unique 'Device-Enabled' Services Business, But Stock is Pricing-In Expected Share Gains; Initiate with Perform," *Oppenheimer*, October 21, 2019, p. 24 ("A variety of conditions require AECG monitoring, such as syncope, unexplained palpitations, Wolff Parkinson syndrome, monitoring for AF poststroke, monitoring post-surgery, determining the utility of an antiarrhythmic drug, etc.").  *See also* Thomas Report, ¶ 32 ("MCT monitoring is also indicated in other situations after an inpatient stay where a patient is discharged from a healthcare facility, but further need for detecting and characterizing symptomatic transient arrhythmias is deemed necessary.").

[20] Thomas Report, ¶¶ 16–17 ("After the initial assessment, which may also include basic laboratory work and an electrocardiogram ('ECG'), the evaluating clinician will determine which type of monitoring is more appropriate given the patient's condition: inpatient telemetry monitoring (which can require the patient staying for a longer duration—up to multiple days—in a healthcare facility for further in-person monitoring by clinical staff) or outpatient rhythm monitoring via an AECG device (in which a patient may return home but is issued a device to monitor cardiac activity).  Inpatient cardiac telemetry monitoring is indicated for patients at significant risk of immediate, life-threatening arrhythmias (problems with the heart rhythm) that could require immediate intervention to prevent significant morbidity (disease or symptom of a disease) or mortality (risk of death).").

[21] *See, e.g.*, "Unique 'Device-Enabled' Services Business, But Stock is Pricing-In Expected Share Gains; Initiate with Perform," *Oppenheimer*, October 21, 2019, p. 23 ("Advantages / Disadvantages of Various AECGs[:] HOLTER … PATCH AECG … EXT. LOOP RECORDERS … EVENT RECORDER … MCOT"); "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 15 ("Today, traditional first- and second-line ACMs [ambulatory cardiac monitors] include devices like Holter monitors, event monitors, mobile cardiac telemetry (MCOT) devices, and implantable loop recorders (ILRs).").

[22] Thomas Report, ¶ 24 ("The type of AECG device prescribed by a physician depends on various factors including the intended study duration, presence or absence of symptoms, the need for continuous recording versus intermittent

33.    I present below my understanding of the features and functionality of different devices in this AECG market. Market participants sometimes distinguish "first-line" AECG devices (*e.g.*, traditional Holter monitors) that physicians may prescribe initially from "second-line" AECG devices (which include event recorders, devices that record data for longer periods such as Zio XT, and MCOT devices like Zio AT) that are primarily employed when a first-line device yields inconclusive results or a longer monitoring period is otherwise indicated.[23]

34.    The traditional, most basic AECG device is a Holter monitor, usually seen as a first-line device.[24] Holter monitors consist of multiple electrodes that attach to the patient's body and that connect to a recording device, typically carried in the patient's pocket or bag or clipped to the patient's belt.[25] Patients typically wear a Holter monitor for one to two days, during which the device continuously records data (assuming the device remains properly attached).[26] The patient

---

symptom-triggered monitoring, the ability of the patient to activate recording, and the patient's lifestyle (which may affect the preferred form of device, e.g., monitor with multiple leads (wires) versus patch).”); “Unique ‘Device-Enabled’ Services Business, But Stock is Pricing-In Expected Share Gains; Initiate with Perform,” *Oppenheimer*, October 21, 2019, p. 24 (“At the same time, a clinician has to make a decision on the diagnostic yield from the particular AECG and what kind of clinically relevant decisions can be made with the particular reading. Is it OK for a patient to intervene and record something, should real time data transmission be required, what is the level of risk of the patient, what is patient history prior to diagnosis—these are questions that determine the choice of a particular AECG.”); “Initiate Buy, $102 PT; We Don’t Think They’ll Skip a Beat,” *SunTrust*, January 7, 2020, p. 25 (“Physicians typically will initially prescribe a first-line traditional Holter monitor if outpatient monitoring is required –i.e. physician isn’t able to diagnose patients during an in-office, resting ECG reading – and will prescribe a second-line device (event monitoring, extended wear monitoring, MCOT, implantable cardiac monitors) based on a multitude of factors weighing anticipated wear time and diagnostic yield with overall cost.”).

[23] Thomas Report, ¶¶ 21–22 (“A Holter is commonly perceived as a first line to assess electrical heart problems. If the data from the Holter are inconclusive or if further monitoring is deemed necessary, the healthcare provider may prescribe other AECG devices designed for monitoring over a longer duration. Longer term monitoring devices include event monitors, external loop recorders, external patch recorders, extended Holter monitors, and MCTs.”); “Initiate Buy, $102 PT; We Don’t Think They’ll Skip a Beat,” *SunTrust*, January 7, 2020, p. 26 (“MCOT: … Second-line therapy, improving on traditional ECG monitoring systems by adding real-time communication and technician evaluation, which is valuable in situations when ECG data may help physicians react to urgent arrhythmias (such as syncope; portion of AF symptom patients), and/or if traditional first-line devices are unable to detect an arrhythmia in the prescribed wear-time[.]”).

[24] Thomas Report, ¶ 21 (“A traditional, basic AECG device commonly prescribed by clinicians is a ‘Holter’ or ‘Holter monitor.’ … A Holter is commonly perceived as a first line to assess electrical heart problems.”); “More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating,” *William Blair & Company*, January 9, 2020, p. 16 (“Holter monitors represent the ACM gold standard and first-line therapy for patients and physicians when trying to diagnose cardiac arrhythmias.”).

[25] Thomas Report, ¶ 21 (“When a Holter is prescribed, small conducting patches known as ‘electrodes’ are attached to a patient’s chest and connected to a recording device that the patient carries (usually in his or her pocket or bag).”); “Initiate Buy, $102 PT; We Don’t Think They’ll Skip a Beat,” *SunTrust*, January 7, 2020, p. 25 (“Traditional Holter: … Device is bulky and is clipped to belt & electrodes are directly connect [*sic*] to chest by a series of wires.”).

[26] Thomas Report, ¶ 21 (“After the patient wears the Holter for a set period—typically 24 to 48 hours—the device is returned to the provider’s office, where the collected data are analyzed for potential abnormal cardiac electrical activity.”); “Unique ‘Device-Enabled’ Services Business, But Stock Is Pricing-In Expected Share Gains; Initiate with Perform,” *Oppenheimer*, October 21, 2019, p. 35 (“During Holter monitoring, a patient is typically connected to 3-5 ECG electrodes.… After the 1-2-day recording period is completed, the patient returns the monitor.”).

then returns the device and the data are analyzed by technicians, who provide a report to the prescribing physician.[27]

35.    If a Holter monitor yields inconclusive results or, more generally, an extended monitoring period is indicated, second-line devices may be prescribed.[28]  These devices include both wearable AECGs typically used by patients for a period of a few weeks to a few months as well as implantable loop recorders that are used when multi-year monitoring is indicated (*e.g.*, recurrent and unexplained palpitations, history of atrial fibrillation or heart attack).[29]

36.    One type of second-line device is an event monitor (or event recorder).[30]  Event monitors do not record data continuously but are instead activated (and begin to record data) by patients when they experience symptoms, either by applying the device to the chest (non-loop recorders) or pressing a button (loop recorders).[31]  Event monitors typically store a limited amount of data,

---

[27] "Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust*, January 7, 2020, p. 25 ("Traditional Holter: … Typically monitor patients for 1-2 days, continuously monitoring patients & ECG analysis is done retrospectively once patient uploads data from device (flash drive) for analysis.").

[28] Thomas Report, ¶¶ 21–22 ("If the data from the Holter are inconclusive or if further monitoring is deemed necessary, the healthcare provider may prescribe other AECG devices designed for monitoring over a longer duration.  Longer term monitoring devices include event monitors, external loop recorders, external patch recorders, extended Holter monitors, and MCTs."); "Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust*, January 7, 2020, p. 25 ("Physicians typically will initially prescribe a first-line traditional Holter monitor if outpatient monitoring is required – i.e. physician isn't able to diagnose patients during an in-office, resting ECG reading – and will prescribe a second-line device (event monitoring, extended wear monitoring, MCOT, implantable cardiac monitors) based on a multitude of factors weighing anticipated wear time and diagnostic yield with overall cost.").

[29] "Unique 'Device-Enabled' Services Business, But Stock is Pricing-In Expected Share Gains; Initiate With Perform," *Oppenheimer*, October 21, 2019, p. 37 ("The implantable loop recorder (ILR) is a subcutaneous, single-lead, electrocardiographic (ECG) monitoring device used for diagnosis in patients with recurrent unexplained episodes of palpitations or syncope, for long-term monitoring in patients at risk for or with documented atrial fibrillation (AF), and for risk stratification in patients who have sustained a myocardial infarction (MI) and those who have certain genetic disorders.").  This report depicts a chart that shows "Wearable Prolonged AECG" monitors that have wear times that range from 72 hours to 60 days.  A "Standard HOLTER" is depicted as having a wear time from 24 hours to 72 hours and an "Implantable Loop Recorder" as having a wear time of up to three years. *See also* Thomas Report, ¶¶ 22–23.

[30] Thomas Report, ¶ 22 ("Longer term monitoring devices include event monitors, external loop recorders, external patch recorders, extended Holter monitors, and MCTs.  These devices may be capable of transmitting cardiac data either through manual patient activation or through automatic triggering.  Event monitors are patient-activated recording devices capable of transmitting data via telephone lines to a central monitoring station.  Patients using event monitors typically must 'activate' the device to record and transmit events.  An external loop recorder may be patient-activated (e.g., when symptoms are presented) and / or auto-triggered (e.g., during asymptomatic arrhythmias) to record events shortly prior to, during, and shortly after the triggered event.  Both event monitors and external loop recorders typically record data for up to multiple weeks."); "Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust*, January 7, 2020, p. 25 ("Event Monitor [is a s]econd-line therapy (alongside MCOT)[.]").

[31] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 18 ("A symptom event monitor is the size of a pager; patients hold it up to their chest when they feel an arrhythmia symptom and push a button to start recording (the device has electrodes on the back of it).… A loop event monitor is a wearable monitor that continuously records ECG readings, but only saves the data if activated by the patient.") (emphasis removed from original).

which means that data must be promptly transmitted to a central monitoring service for analysis.[32] Because they require patient intervention, event monitors generally only capture symptomatic events.[33]

37.    AECGs have evolved over time.  For example, some loop recorders allow recording to be triggered automatically (without patient intervention) when the device detects an arrhythmia, allowing the device to capture asymptomatic events.[34]  Further, extended-wear devices have been introduced to provide continuous recording of ECG data over multi-week periods,[35] which may be particularly important for certain diagnostic purposes.[36]  Some securities analysts characterized Zio XT as a patch-based extended-wear recorder.[37]

---

[32] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 18 ("[E]vent monitors have several drawbacks, including: … Limited data storage (about 10 minutes) means patients must transmit the data in the monitor relatively quickly or they will not be able to record additional events.").

[33] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 18 ("[E]vent monitors have several drawbacks, including[:] … [a]symptomatic events cannot be recorded because a patient would not feel anything and thus would not activate the recorder.").

[34] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 18 ("Some loop event monitors are auto-triggered, which means the device will automatically save the before, during, and after event data when it senses the beginning of an arrhythmia (can therefore record asymptomatic events).").

[35] "Unique 'Device-Enabled' Services Business, But Stock is Pricing-In Expected Share Gains; Initiate with Perform," *Oppenheimer*, October 21, 2019, p. 36 ("Patch Recorders[:] Typically, patients are connected by three-four ECG electrodes to a battery-powered sensor for up to 30 days."); "Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust*, January 7, 2020, p. 26 ("Extended-wear Monitoring Service [is w]orn for 1-2 weeks, with continuous monitoring to record 100% of ECG data gathered during wear time that is provided to physicians in summary format after use is complete.  No-real time communications, which is important for patients that require urgent treatment."); "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 18 ("Cardiac Event Monitors … An important advantage to these monitors versus Holter monitors is that they are worn for longer periods (typically 30 days)."); "Unlikely to Miss Many Beats but Seems Fairly Valued; Initiate at Neutral," *Baird*, September 1, 2020, p. 3 ("For patients with milder or less-frequent symptoms, physicians may prescribe an event monitor, which typically can be used for up to 30 days.… Event monitors, typically, are continuously monitoring but not continuously saving ECG data. Rather, Event monitors are designed to archive just a few minutes at a time in response to a trigger from either the patient or the device.") (emphasis removed from original).  As discussed in **Section VIII.A** below, "continuous" recording of ECG data for AECGs is subject to patient compliance with device instructions, among other practicalities.

[36] "Unique 'Device-Enabled' Services Business, But Stock Is Pricing-In Expected Share Gains; Initiate with Perform," *Oppenheimer*, October 21, 2019, p. 16 ("Electrocardiographic monitoring over an extended period provides a physician with the kinds of data essential to identifying the underlying cause of sporadic cardia concerns, especially rhythm disorders, and other physiological events of potential concern.").

[37] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, pp. 23–24 ("Today, Zio XT is still the leader in the growing patch-based ECG market.… Zio is a novel product and service that can be viewed as an extended Holter monitor (Zio XT).").

38.     Mobile cardiac telemetry (MCOT or MCT) devices represent another segment of the overall AECG market.[38]  When discussing iRhythm's business, securities analysts, including in initiation reports, consistently characterized Zio AT as an MCT device.  For example:

- *SunTrust, January 7, 2020*:  "[T]he company has expanded its offering to include **ZioAT, a mobile cardiac telemetry (MCOT) solution** for patients who require real-time monitoring/communication."[39]

- *William Blair & Company, January 9, 2020*:  "iRhythm **entered the MCOT market with its latest product, Zio AT**."[40]

- *Canaccord Genuity, December 20, 2021*:  "**ZioAT** provides a 14-day wearable with the added ability to transmit data real time during the wear period and allows IRTC to notify physicians of significant events while the patient is still wearing the patch – which is **more in line with a traditional Mobile Cardiac Telemetry (MCOT) device.**"[41]

39.     As with event monitors, MCT devices are prescribed when traditional Holter monitors are inconclusive or inappropriate.[42]  MCT devices can record both symptomatic and asymptomatic events and use wireless technology to transmit data.[43]

40.     Some securities analysts noted that this makes MCT devices particularly appropriate for patients who experience more serious symptoms such that more timely access to ECG data and diagnosis by the prescribing physician and, potentially, expedited medical intervention, may be indicated.  For example, some securities analysts noted that MCT devices are prescribed for

---

[38] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 15 ("Today, traditional first- and second-line ACMs include devices like Holter monitors, event monitors, mobile cardiac telemetry (MCOT) devices, and implantable loop recorders (ILRs).").

[39] "Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust*, January 7, 2020, p. 3 (emphasis added).

[40] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 20 (emphasis added).

[41] "CMS Payment Challenges Baked In, Higher CMS Payment and Verily Wearable are Upside; Reinstating Coverage with BUY, $125 PT," *Canaccord Genuity*, December 20, 2021, p. 4 (emphasis added).

[42] Thomas Report, ¶¶ 21–22 ("If the data from the Holter are inconclusive or if further monitoring is deemed necessary, the healthcare provider may prescribe other AECG devices designed for monitoring over a longer duration.  Longer term monitoring devices include event monitors, external loop recorders, external patch recorders, extended Holter monitors, and MCTs."); "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 19 ("Patients who are prescribed MCOT therapy typically have symptoms indicative of a heart arrhythmia (like palpitations, syncope, or presyncope) but the arrhythmia could not be diagnosed with certainty by an initial Holter monitor or patient-activated symptom/loop event recorder because the symptoms were too infrequent, too brief, asymptomatic, or rendered a patient unable to activate the recorder.").

[43] "IRTC: Initiating Coverage at Overweight, $150 Price Target," *Wells Fargo*, February 7, 2023, p. 16 ("Mobile cardiac telemetry (MCT) usually uses wireless technology (e.g. cell phone network) to transmit event data during wear to a monitoring facility where the data is analyzed.  The data recorded can be patient-triggered or auto-detected events.") (emphasis removed from original).

patients who experience syncope[44]—a loss of consciousness (*i.e.*, fainting) that can be due to a reduction in blood flow to the brain.[45]  I understand that diagnosing the causes of syncope is potentially important given the heightened mortality risk to which patients with these symptoms are subject, but that this type of diagnosis is not always possible in an ambulatory setting.  As William Blair & Company securities analysts explained, "half of the patients admitted to hospitals for syncope leave without a diagnosis due to inadequate diagnostic options, **making MCOT all the more important**."[46]

### B. Background on Zio AT

41.    I understand that Zio AT (a Zio System offered by iRhythm) was commercialized before the beginning of the Putative Class Period, and comprises:  (i) a battery-powered patch to record ECG data, (ii) a gateway that allows transmission of ECG data, (iii) a proprietary event detection algorithm based on machine learning, and (iv) a portal through which the clinician accesses patient reports and other information ("ZioSuite").[47]  In contrast, Zio XT is an extended-wear cardiac monitor that also continuously records ECG data but without the capability to transmit data.[48]

---

[44] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, pp. 3, 19 ("Supplementing Zio XT, and rounding out the company's ACM offering, is the Zio AT real-time monitoring patch that is applicable to approximately 500,000 annual diagnostic cases, largely used for patients with syncope.… Patients who are prescribed MCOT therapy typically have symptoms indicative of a heart arrhythmia (like palpitations, syncope, or presyncope)."); "IRTC: Growth Trajectory and Profitability Already Priced In; Initiate at Hold," *Needham & Company*, September 11, 2020, p. 9 ("MCT devices are generally prescribed for patients experiencing higher acuity symptoms such as syncope (fainting).").

[45] "Syncope," *National Institute of Neurological Disorders and Stroke*, https://www.ninds.nih.gov/health-information/disorders/syncope ("Syncope is used to describe a loss of consciousness for a short period of time.  It can happen when there is a sudden change in the blood flow to the brain.").

[46] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 19 (emphasis added).

[47] "Clinical Reference Manual: Zio AT," *iRhythm Technologies, Inc.*, September 26, 2022 ("September 26, 2022 Zio AT CRM"), p. 4 ("Zio AT connected continuous ambulatory monitoring system ('Zio AT system') is an electrocardiogram (ECG) monitoring system. It consists of four components: (1) Zio AT patch ECG monitor that records continuously through the entire wear period, (2) Zio AT wireless gateway that provides connectivity between the patch and the iRhythm monitoring center, (3) Zio arrhythmia detection algorithm and (4) ZioSuite clinician portal.").  *See also* iRhythm 2023 Form 10-K, p. 9 ("Our Zio Services utilize advanced FDA-cleared artificial intelligence ('AI') with a deep-learned algorithm to detect arrhythmias.").  Unless otherwise indicated, this discussion (and my report) relates to the version of Zio AT marketed by iRhythm during the Putative Class Period.

[48] iRhythm 2023 Form 10-K, p. 7 ("The Zio XT System … is a prescription-only, remote ECG monitoring system that consists of a patch ECG monitor (the 'Zio XT patch') that records the electric signal from the heart continuously for up to 14 days and the ZEUS [Zio ECG Utilization Software] System, which supports the capture and analysis of ECG data recorded by the Zio XT patch at the end of the wear period, including specific arrhythmia events detected by the ZEUS System.").

42.    According to the September 26, 2022 Zio AT Clinical Reference Manual ("CRM") ("September 26, 2022 Zio AT CRM"), the Zio AT patch was applied to the patient's chest and is designed to continuously record ECG data for up to 14 days without patient interaction.[49]  Indeed, I understand that Zio AT was designed to optimize battery power so that patients did not need to recharge or change the battery, which reduced the extent to which the patient would have to remove and reapply the patch.[50]

43.    Once activated, Zio AT recorded and automatically transmitted ECG data to an iRhythm monitoring center.[51]  To transmit data, the patch needed to be within 10 feet of the gateway, not in proximity of interfering devices (such as baby monitors), and in a location with a stable cellular connection.[52]  I understand that Zio AT could automatically detect arrhythmia events (*i.e.*, asymptomatic) but that if patients became aware of an event they could press a trigger button to manually record a short strip of ECG data (*i.e.*, symptomatic).[53]

44.    Once the ECG data were transmitted, they were analyzed by iRhythm's proprietary algorithm and technicians, who reviewed the data and prepared a report for the prescribing

---

[49] September 26, 2022 Zio AT CRM, p. 4 ("The Zio AT patch is applied and activated by the patient. Once activated, the patch records ECG without patient interaction, with the goal of improving patient compliance via simplicity of operation.… Zio AT is a Mobile Cardiac Telemetry (MCT) monitoring solution [that] … offer[s] patients 14-day continuous monitoring without any patient manipulations required.").

[50] September 26, 2022 Zio AT CRM, pp. 4, 18 ("Zio AT is a Mobile Cardiac Telemetry (MCT) monitoring solution designed to optimize battery power in order to offer patients 14-day continuous monitoring without any patient manipulations required.… DO NOT attempt to reapply the Zio AT patch.").

[51] September 26, 2022 Zio AT CRM, p. 17 ("The patch is recording every heartbeat.… The gateway sends the heart rhythm data recorded by your patch to iRhythm using a cellular connection.").

[52] September 26, 2022 Zio AT CRM, pp. 17–19 ("What happens if I am in an area with poor or no cell reception?  If you are in an area with poor or no cell reception, the gateway will not transmit data from the patch.… In the event, the connection is not re-established, data (both auto triggered and patient triggered events) will NOT be transmitted to iRhythm.… What can affect wireless connection between the patch and the gateway?  The patch and gateway communicate well as long as they are in close and clear proximity.  However, there are some situations that can cause interference.  Wireless devices that use 2.4 GHz signals such as baby monitors, TV senders, and wireless routers can interrupt communication between the patch and gateway if used within 6 feet of either the patch or gateway.  In addition, do not place objects inside the gateway as this can also cause communication problems.… What happens if my patch and gateway are not in close proximity to each other?  Your patch and gateway are designed to continuously send your heart rhythm data as long as they are within a 10 foot range of each other and you are in a place with good cellular reception.  Do your best to keep the gateway in front of you and within 10 feet of you.  If the patch and gateway are too far apart and not communicating, the patch will not transmit data to the gateway, and data will not transmit to iRhythm.").

[53] September 26, 2022 Zio AT CRM, p. 21 ("What should I do if I feel a symptom?  First, press the button on your patch.  [P]lease log your symptom(s) in the MyZio mobile app or patient booklet so your doctor can view this information when reviewing your heart rhythm information.  Please choose only one option for recording your symptoms.… What if I forget to press the button when I feel a symptom?  Don't worry, your Zio AT patch is always recording your heartbeat and the gateway will transmit the information that is important for your doctor to know.").

physician.[54]  The physician could access reports via the ZioSuite patient portal.[55]  ZioSuite also provided the physician with access to additional data, such as transmission reports and any diary entries provided by patients to report symptoms that they experienced; physicians could also request data on an interim basis via Device Data Requests.[56]

45.    Zio AT CRMs dated April 11, 2018, April 20, 2020, and September 26, 2022 provided instructions and other information, including Zio AT's indications for use and contraindications.[57] Specifically, the CRMs consistently stated that Zio AT "is indicated for use on patients 18 years or older who may be asymptomatic or who may suffer from transient symptoms such as palpitations, shortness of breath, dizziness, lightheadedness, pre-syncope, syncope, fatigue, or anxiety" and that Zio AT is contraindicated for, among others, "critical care patients because the reporting timeliness is not consistent with life-threatening arrhythmias such as ventricular fibrillation," "patients with known history of life threatening arrhythmias," and "patients with

---

[54] September 26, 2022 Zio AT CRM, pp. 4–5 ("Upon receipt of symptomatic/asymptomatic transmissions or downloaded continuous ECG data at iRhythm's Independent Diagnostic Testing Facility (IDTF) Clinical Center, the data is processed by iRhythm's proprietary algorithm before an iRhythm Certified Cardiographic Technician (CCT) reviews the results and generates a report.  Upon explicit request from a clinician responsible for the patient's healthcare, segments of ECG data from the continuous recording on the patch can also be wirelessly retrieved during the wear period.").

[55] September 26, 2022 Zio AT CRM, pp. 14, 26 ("All Zio AT Reports will be available in ziosuite.com.  Note: Transmission time may vary significantly depending on how effectively the patient maintains patch-gateway proximity and gateway cellular reception.  Transmission reports will be provided after iRhythm receipt and analysis of ECG strips.") (emphasis removed from original).

[56] September 26, 2022 Zio AT CRM, pp. 13, 26 ("In special circumstances, when patient data needs to be accessed by the physician during the wear period, a Device Data Request can be made. In order to make a Device Data Request, the clinician should call iRhythm at 1.888.693.2401. (Note: Device Data Requests are limited by availability of remaining battery power and may not be successful late in a monitoring period.) … For patients with the Zio AT Patch, Ziosuite provides a timeline screen that displays along with Transmission, [Device Data Requests], Daily, and Final reports, patient provided diary entries.  For each diary entry the date and time of the symptom reported is displayed.").

[57] September 26, 2022 Zio AT CRM, pp. 6, 14; "Clinical Reference Manual: Zio AT," *iRhythm Technologies, Inc.*, April 20, 2020 ("April 20, 2020 Zio AT CRM"), pp. 3, 9; "Clinical Reference Manual: Zio AT," *iRhythm Technologies, Inc.*, April 11, 2018 ("April 11, 2018 Zio AT CRM"), pp. 3, 9.  I understand that the Zio AT CRM was considered part of the labeling and/or distributed materials used by physicians when prescribing Zio AT.  *See, e.g.*, iRhythm Response to FDA, September 1, 2022, p. 68, Exhibit B to Defendants' Notice of Motion and Motion to Dismiss Second Amended Complaint, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, December 10, 2024 (emphasis removed from original) ("Labeling[:] iRhythm provides healthcare providers with information on patient registration, and the importance of completing the patient registration, in its labeling and other distributed materials[,]" listing "Zio AT Clinical Reference Manual" as one of the items under the "Labeling" header); Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Lead Plaintiff's Memorandum of Points and Authorities In Support Thereof, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, November 3, 2025, p. 6 ("On September 26, 2022, iRhythm updated the Clinical Reference Manual ('CRM') used by physicians to disclose the number of triggers before the device reaches a maximum transmission threshold.").

symptomatic episodes where variations in cardiac performance could result in immediate danger to the patient or when real-time or in-patient monitoring should be prescribed."[58]

## V.    Implications of Market Efficiency

46.    According to Plaintiff, "at all relevant times, the market for iRhythm securities was open, efficient, and well developed."[59]  Dr. Cain opines that "[t]he market for iRhythm's Common Stock was efficient throughout the Class Period."[60]  I have not been asked to evaluate or respond to Dr. Cain's efficiency opinions.  For purposes of this report, I have been asked to assume that iRhythm common stock traded in an efficient market during the Putative Class Period.

47.    In an efficient market, securities prices react quickly to fully reflect the implications of new, value-relevant public information,[61] and represent the market's consensus expectation of the present value (accounting for riskiness) of the relevant expected future cash flows.[62]  Academic studies find that, in an efficient market, it may take only minutes for securities prices to reflect new, value-relevant information.[63]

48.    The repetition of information already in the public domain ("old news") cannot, in an efficient market, affect securities prices because any implications of that information for a

---

[58] September 26, 2022 Zio AT CRM, pp. 6, 14; April 20, 2020 Zio AT CRM, pp. 3, 9; April 11, 2018 Zio AT CRM, pp. 3, 9.

[59] Complaint, ¶ 236.

[60] Cain Report, ¶ 3.

[61] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, 1970, pp. 383–417 ("Fama (1970)").

[62] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (McGraw-Hill/Irwin, 2011), p. 80; Fama, Eugene F., *Foundations of Finance: Portfolio Decisions and Securities Prices* (Basic Books, Inc., 1976), p. 133; Fama (1970), p. 383.  The efficient market hypothesis, which holds that "prices of securities observed at any time are based on 'correct' evaluation of all information available at that time," posits three "forms" of efficiency:  weak, semi-strong, and strong.  *See* Fama (1970).  Definitions of the three increasingly restrictive forms of efficiency are as follows:  (i) weak form efficiency requires that "past price (or return) histories" cannot be used to predict future prices; (ii) semi-strong form efficiency requires that prices immediately adjust to "publicly available information"; (iii) strong form efficiency requires that prices also reflect non-public information possessed by "any investor or groups."  *See* Fama (1970), p. 388.  When discussing market efficiency in this report, unless indicated otherwise, I am referring to semi-strong form market efficiency.

[63] For example, a study by Greene and Watts (1996) provides evidence that stock prices adjust quickly (over the first half hour after an announcement) on both the NYSE and NASDAQ.  *See* Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1, 1996, pp. 19–42 ("Greene and Watts (1996)").  Another study, by Busse and Green (2002), examines intraday stock price movements in response to CNBC shows (namely, Morning Call and Midday Call) and states that "stocks discussed positively experience a statistically and economically significant price impact beginning seconds after the stock is first mentioned and lasting approximately one minute.  The response to negative reports is more gradual, lasting 15 minutes, perhaps due to the higher costs of short selling."  *See* Busse, Jeffrey A., and Green, T. Clifton, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3, 2002, pp. 415–437 at p. 416.

security's value would previously have been incorporated into its price.  At deposition, Dr. Cain agreed that stock prices would not respond to "stale" news in an efficient market.[64]

49.    Academic literature explains that, in an efficient market, "prices reflect information to the point where the marginal benefits of acting on information (the profits to be made) do not exceed the marginal costs."[65]  Thus, market efficiency is not predicated on the notion that all investors access, analyze, and trade on public information; it is sufficient that some investors identify and trade on public information such that its implications are reflected in securities prices.[66]  For a digital healthcare company such as iRhythm whose business involves offering device-based technology to patients, it is not necessary for all investors to be aware of all public information concerning, for example, the market for the company's services or the relevant patient population. Instead, it is sufficient that some market participants obtain the relevant public information and trade on this information such that its implications are reflected in the price of iRhythm stock.  I note that Dr. Cain agreed with this at deposition.[67]  Consistent with this, sell-side securities analysts covering iRhythm commented on the relevant target markets and patient population for the Company's Zio Services (including Zio XT and Zio AT) based on surveys, discussions with cardiologists, and other industry research, among other sources of public information.[68]  In an efficient market, this information would have been quickly incorporated into the price of iRhythm common stock.

---

[64] Deposition of Matthew D. Cain, Ph.D., December 11, 2025 ("Cain Deposition"), 123:5–23 ("Q. And do you agree that stocks trading in an efficient market don't respond to information that is not new?  A.…[T]o the extent that a piece of information is entirely stale, and that nothing has changed in the information environment relative to the previous disclosure of that same information, then I would not expect the stock price movement to be in direct response to the publication of completely stale information like that.").

[65] Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617 at p. 1575.

[66] *See, e.g.*, Fama (1970), p. 388 ("[T]he market may be efficient if 'sufficient numbers' of investors have ready access to available information.").

[67] Cain Deposition, 79:20–80:2 ("Q. Do you agree that information doesn't need to be known by every market participant to be incorporated into stock prices in an efficient market?  A. Yes.").

[68] *See, e.g.*, "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, pp. 47–68 (referencing responses from cardiologists who participated in a survey and follow-up calls with the securities analysts regarding their experience with Zio Services and related devices). *See also* "CMS Payment Challenges Baked In, Higher CMS Payment and Verily Wearable are Upside; Reinstating Coverage with BUY, $125 PT," *Canaccord Genuity*, December 20, 2021, pp. 7–8 ("According to our industry checks, in terms of size and growth, short-term Holter is the largest market.… Long-term Holter is smaller than short-term … but is the fastest growing … and a smaller but high growth segment of MCT.… IRTC has products in both the long-term Holter segment and the MCT segment with its Zio XT and Zio AT devices, respectively.").

## VI.   Summary of Allegations

50.     I understand that Plaintiff alleges four categories of misrepresentations in the Complaint: (i) "the Zio AT's 'near real-time' notifications and 'timely transmission' of arrhythmia data 'during the wear period'" ("Timing Statements"); (ii) "the Zio AT's use for a 'high-risk' and 'at-risk' patient population" ("Risk Statements"); (iii) "the Zio AT's status as a 'mobile cardiac telemetry' [(MCT)] monitor" ("MCT Statements"); and (iv) "the accuracy of the Zio AT" ("Accuracy Statements").[69]  I further understand that allegations pertaining to the MCT Statements were dismissed by the Court in its MTD Order.[70]  Plaintiff alleges that the Risk Statements and Timing Statements "allowed iRhythm to expand into the lucrative [MCT] space."[71]

51.     In **Section VI.A**, I describe, based on my review of the Complaint and the MTD Order, my understanding of those alleged false and misleading statements that remain actionable (*i.e.*, the Challenged Statements).  In **Section VI.B**, I summarize my understanding of what Plaintiff alleges to be the corrective events and disclosures.

### A.   Plaintiff's Challenged Statements

#### 1.   Timing Statements

52.     Plaintiff alleges that, through the Timing Statements, Defendants misled investors by representing that "the Zio AT monitor provided 'near real-time' notifications of significant arrhythmias to the prescribing physician."[72]  According to Plaintiff, the Timing Statements were false and misleading because "when the device reached an undisclosed and arbitrary transmission limit, the Zio AT stopped transmitting any telemetry data, and accordingly a provider would not learn of even serious cardiac events until a report was generated at the end of the wear period. Defendants were aware of many instances where serious cardiac events, including cardiac events that caused the death of the patient, were not reported to providers during the wear period because

---

[69] Complaint, Sections VII.A–VII.D (capitalization adjusted from original).
[70] Plaintiff alleged that, through the MCT Statements, Defendants misled investors by representing that "Zio AT was a 'mobile cardiac telemetry' or 'MCT' monitor."  *See* Complaint, ¶ 178.  The Court found that Plaintiff failed to "provide a definition for an MCT device supported by well-pleaded, particular factual allegations" and "substantiate its definition of MCT as including the 'near-real-time' and 'continuous' requirements."  *See* MTD Order, pp. 19–20.
[71] Complaint, ¶ 1.
[72] Complaint, ¶ 178.

the device exceeded the transmission limit."[73]   Plaintiff alleges that the transmission limits "materially interfered with the Zio AT's ability to provide near-real-time transmissions," noting that the FDA found "the device was hitting the transmission limit more often than expected."[74]

53.   Plaintiff further alleges that the Timing Statements were false and misleading because "[Zio AT] had a lag time of about four hours or more before the arrhythmia data could even reach the technicians' queue for review" and that the queue would grow "overnight and on the weekends" and that "technicians had … no way to sort the queue so that critical arrhythmias could be reviewed first."[75]

54.   I understand that, in its MTD Order, the Court dismissed certain related allegations regarding Plaintiff's claim that "iRhythm repeatedly failed to properly inform patients and providers that the Zio AT's registration system required patients to fully register with iRhythm … before any data could be transmitted from the monitor to a provider."[76]

55.   According to the Complaint, the allegedly false and misleading Timing Statements include the following:

> On August 5, 2022, iRhythm filed its quarterly report on Form 10-Q for the second quarter of 2022, signed by Defendants Blackford and Devine.  In that report, iRhythm repeatedly misrepresented the Zio AT as providing "timely transmission" of arrhythmia events during the wear period:
>
> - [T]he Zio AT service offers the option of *timely transmission* of patient-triggered and automatically detected arrhythmia events data to a monitoring center for review and reporting according to physician-selected notification criteria
> - Zio AT . . . is designed to provide timely transmission of data during the wear period
> - [F]or the Zio AT monitor, we rely on the provision of cellular communication services for the *timely transmission* of patient information and reportable events.
> - **During the patient wear period**, the Zio AT monitoring system is intended to capture, analyze and report symptomatic and asymptomatic cardiac events and continuous ECG information.  While continuously recording patient ECG data, both patient-triggered and automatically detected

---

[73] Complaint, ¶ 200 (emphasis removed from original).  *See also* MTD Order, p. 3 (emphasis removed from original).
[74] MTD Order, pp. 17–18 (emphasis removed from original).  *See also* Complaint, ¶ 116 (emphasis removed from original).
[75] Complaint, ¶ 201.  *See also* MTD Order, p. 3.
[76] Complaint, ¶ 202; MTD Order, p. 16, footnote 6.

arrhythmia events are **transmitted to a monitoring center for review and reporting according to physician-selected notification criteria**.[77]

On November 14, 2022, in a Nasdaq interview Behind the Bell: iRhythm, Defendant Blackford stated, "We have a device that **provides near real-time capability** and can put that information right at their fingertips."[78]

56.    The full set of what I understand to be the surviving Timing Statements is presented in **Exhibit 1**.

### 2.    Risk Statements

57.    Plaintiff alleges that the Risk Statements misled investors by representing that "the Zio AT is an arrhythmia monitor for 'high risk' patients."[79]  According to the Complaint and as noted in the MTD Order, Plaintiff claims the Risk Statements were false and misleading because iRhythm allegedly "did not have FDA clearance to market the Zio AT as intended for 'high-risk patients,' or patients who 'require timely notifications.'"[80]  According to the Complaint, the Risk Statements indicated Zio AT "was … marketed to 'high-risk' patients," which allowed iRhythm "to expand into the lucrative Mobile Cardiac Telemetry ('MCT') space."[81]

58.    I understand that, in its MTD Order, the Court pointed to the FDA's definition of "high-risk patients," under which these patients "need near-real-time monitoring":

> Based on the Company's own statements, "high-risk" or "at-risk" meant patients who had a risk of arrhythmias and so were likely to need near-real-time monitoring for their condition.  This is how the FDA understood the term:  "High risk patients need near real-time monitoring because they are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death."[82]

---

[77] Complaint, ¶ 184 (emphasis in original).
[78] Complaint, ¶ 191 (emphasis in original).
[79] Complaint, ¶ 178.
[80] Complaint, ¶ 212.  *See also* MTD Order, p. 4.
[81] Complaint, ¶ 1.  Similarly, Plaintiff alleges that the Timing Statements allowed iRhythm to market Zio AT to "high-risk" patients in the MCT space.  *See* Complaint, ¶ 45 ("[G]iven the Zio AT's purported capabilities to provide 'real-time' notifications of arrhythmic events, iRhythm explicitly marketed the Zio AT device to 'high-risk' patients as a 'mobile cardiac telemetry' ('MCT') device.").
[82] MTD Order, p. 12.

59. I understand that, in its MTD Order, the Court dismissed certain alleged misstatements that related to "the Zio AT provid[ing] monitoring 'across the spectrum of care.'" [83] I further understand that, according to the MTD Order, only two Risk Statements remain actionable, both of which were made months after the beginning of the Putative Class Period:

> On January 10, 2023, at the JP Morgan Healthcare Conference, Defendant Blackford misrepresented the Zio AT as appropriate for use in "some of the most at-risk patients." While discussing the "AT product" "in the MCT space," Defendant Blackford specified, "[w]ith respect to MCT, **you're monitoring some of the most at-risk patients**."[84]

> On February 23, 2023, iRhythm filed its annual report on Form 10-K for the year 2022, signed by Defendants Blackford and Bobzien. In that report, iRhythm misrepresented the Zio AT as "appropriate **for more acute patients that require timely notification**."[85]

### 3. Accuracy Statements

60. Plaintiff alleges that, through the Accuracy Statements, Defendants misled investors by representing that "the Zio AT provides accurate data." [86] Plaintiff claims that the Accuracy Statements were false and misleading because, first, according to a Form 483 issued by the FDA in July 2024 and former iRhythm employees, the Company allegedly failed to disclose that it had "received thousands of complaints regarding the accuracy of the Zio AT" and "[its] reports to patients and doctors routinely included inaccurate arrhythmia data or failed to include arrhythmias altogether due to misinterpretation by the Company's technicians" (*i.e.*, iRhythm's Certified Cardiographic Technicians ("CCTs")).[87] Specifically, as noted by the Court, Plaintiff alleges the Company's CCTs were "told" to ensure that the "final report match what the patients experienced

---

[83] MTD Order, p. 15.

[84] Complaint, ¶ 210 (emphasis in original). Mr. Blackford's remarks at the J.P. Morgan Healthcare Conference began at 4:30 PM ET, after market close, on January 10, 2023. Therefore, the impact date for this statement is January 11, 2023, the next trading day. *See* "iRhythm Technologies, Inc. Company Conference Presentation," *S&P Global Market Intelligence*, January 10, 2023, 4:30 PM ET, p. 1.

[85] Complaint, ¶ 211 (emphasis in original). The 2022 Form 10-K was filed after market close on February 23, 2023. Therefore, the impact date for this statement is February 24, 2023, the next trading day. *See* iRhythm Technologies, Inc., Form 10-K for Fiscal Year Ended December 31, 2022, filed February 23, 2023 ("iRhythm 2022 Form 10-K"). The timestamp of the submission, 5:16 PM ET, is available at "iRhythm Technologies, Inc., Form 10-K for Fiscal Year Ended December 31, 2022," *SEC*, February 23, 2023, https://www.sec.gov/Archives/edgar/data/1388658/000138865823000007/0001388658-23-000007-index.htm.

[86] Complaint, ¶ 178.

[87] Complaint, ¶ 232. *See also* MTD Order, pp. 4, 20.

during the wear time" even if that meant omitting information about life-threatening arrhythmias, and that the Company' CCTs were sometimes "instructed" to "'artifact' the data" to generate "'clean' reports" and that the reports were the subject of "'approximately 4,014 complaints'" received by the Company between May 2022 and July 2024.[88]

61.    According to the Complaint, and as described in the MTD Order, Plaintiff further alleges that the Accuracy Statements were false and misleading because, per the July 2024 Form 483 for the San Francisco facility, "the Company failed to analyze these thousands of complaints, failed to take any action to investigate the cause of these complaint [*sic*], failed to evaluate this risk of misreporting patients' arrhythmias, failed to appropriately monitor the functionality of the algorithm used to detect and identify arrhythmias, and manipulated the data used to evaluate the accuracy of the Company's reports—meaning that the Company had no reasonable basis to make these statements."[89]    Plaintiff alleges that "iRhythm failed to include appropriate 'data input sources'—including false positive arrhythmia events and 'duplicated algorithm miss events'—in the process iRhythm uses 'for algorithm functionality monitoring.'"[90]    As noted in the MTD Order, "the FDA observed the Zio AT Zeus System Software algorithm also misclassified or misread arrhythmia events."[91]

62.    For example, the Complaint alleges the following as false and misleading Accuracy Statements:

> On February 23, 2023, iRhythm held an earnings call for the fourth quarter of 2022, during which Defendants Blackford and Bobzien spoke.  Defendant Blackford stated about the Zio, "I remain convinced that you're going to see this market expand dramatically as we continue to push into the primary care setting, just given how easy it is to use the product, **how accurate it is** and the downstream benefits that you get with monitoring these patients sooner."[92]
>
> On May 2, 2024, iRhythm held an earnings call for the first quarter of 2024, during which Defendants Blackford and Bobzien spoke.  Defendant Blackford stated about the Zio, "[P]rimary care is absolutely the place that this device is ultimately going to get applied into the future, just with its ease of use, its high diagnostic yield, ***its incredible accuracy***."  Defendant Blackford further stated about the Zio, "it's

---

[88] MTD Order, p. 20.  *See also* Complaint, ¶¶ 77, 121, 232.
[89] Complaint, ¶ 232.  *See also* MTD Order, p. 4.
[90] Complaint, ¶¶ 120, 171, 232.  *See also* MTD Order, p. 20.
[91] MTD Order, p. 21.
[92] Complaint, ¶ 227 (emphasis in original).

natural to step into this and take advantage of what we've built to-date and the service offering that we've become known for, which is easy to use and ***highly predictable, highly accurate***."[93]

63.    The full set of what I understand to be the surviving Accuracy Statements is presented in **Exhibit 2**.

## B.    Alleged Corrective Disclosures

64.    Plaintiff alleges that the relevant truth concealed by the Challenged Statements was revealed through a series of seven partially corrective disclosures and events that occurred over a 21-month period, on November 1, 2022, November 4, 2022, May 4, 2023, May 30, 2023, July 1, 2024, August 1, 2024, and August 9, 2024.[94]  I briefly summarize Plaintiff's allegations with respect to each of these below.

65.    According to Dr. Cain, the relevant truth allegedly concealed by the Timing Statements and Risk Statements (which he appears to collectively refer to as "Transmission Claims"[95]) was revealed on the first five alleged corrective dates—November 1, 2022, November 4, 2022, May 4, 2023, May 30, 2023, and July 1, 2024[96]—while the relevant truth allegedly concealed by the Accuracy Statements was revealed on August 1, 2024 and August 9, 2024.[97]  Dr. Cain does not articulate a basis for this opinion.[98]

---

[93] Complaint, ¶ 231 (emphasis in original).

[94] Complaint, Section IV.H.

[95] Cain Report, ¶ 16 ("The Complaint alleges that Defendants misled investors by making materially false and misleading statements in relation to:  a. Zio AT's near-real-time transmission of arrhythmia data and appropriateness of the device's use for 'high-risk' patients, and concealed the dangerous condition caused by the device's transmission limit and other flaws ('Transmission Claims').").

[96] Cain Report, ¶¶ 18–23.

[97] Cain Report, ¶¶ 24–26.

[98] At his deposition, Dr. Cain stated that he "didn't make any sort of analysis or assessment in terms of how [the Challenged Statements] should be categorized" and his summary of categories of the Challenged Statements was "based on reading the complaint, the motion to dismiss order, and also conversations with [Plaintiff's] counsel."  *See* Cain Deposition, 31:11–16, 172:3–9.  Dr. Cain also stated at his deposition that he "ha[s] not formed any opinions on what any corrective information, in fact, was released on" a given alleged corrective disclosure date.  *See* Cain Deposition, 276:4–13 ("Q. What's your understanding of what new information was released in this August 1, 2024 disclosure that corrected prior misstatements?  A. Well, I have not formed any opinions on what any corrective information, in fact, was released on this date, but, rather, summarizing the allegations in the complaint.").

### 1.     November 1, 2022:  iRhythm Q3 2022 Earnings Disclosures and Earnings Call

66.     On November 1, 2022, after market close, iRhythm released its Q3 2022 results and held an earnings call.[99]  According to Plaintiff, these disclosures included a downward revision of the Company's FY 2022 revenue guidance, from between $415 million and $420 million to between $407 million and $411 million due to various factors including "Zio AT utilization."[100]  Plaintiff further alleges that, during the earnings call, iRhythm's CEO, Mr. Blackford, explained that the reduction in revenue guidance was in part because iRhythm had "voluntarily issued a Customer Advisory Notice to [its] Zio AT customers" and consequently had "seen reduced growth with Zio AT within the fourth quarter to-date."[101]  Plaintiff alleges that Mr. Blackford indicated during the earnings call that "[w]ith the Customer Advisory Notice … [the Company had] adjusted [its] Zio AT forecast for the quarter to grow closer to approximately 20%, which is a step down from the upper 40% growth [it] had seen through the first nine months of the year."[102]

67.     Plaintiff alleges that, "[a]s a result of these disclosures, the price of iRhythm common stock declined by $5.60 per share, or 4.4%, from a closing price of $126.77 on November 1, 2022, to a closing price of $121.17 on November 2, 2022" and "declined by an additional $14.07 per share, or 11.6%, to a closing price of $107.10 on November 3, 2022."[103]

### 2.     November 4, 2022:  iRhythm Q3 2022 Form 10-Q Disclosure of FDA Form 483 and "Labeling Correction"

68.     On November 4, 2022, after market close, iRhythm filed its Form 10-Q for the third quarter of 2022 ("Q3 2022 Form 10-Q").[104]  According to Plaintiff, the Company disclosed in the Q3 2022 Form 10-Q that it "initiated the Customer Advisory Notice on September 28, 2022, following

---

[99] Complaint, ¶¶ 123–124; iRhythm Technologies, Inc. Press Release, "iRhythm Technologies Announces Third Quarter 2022 Financial Results," *GlobeNewswire*, November 1, 2022, 4:05 PM ET; iRhythm Technologies, Inc., "FQ3 2022 Earnings Call Transcripts," *S&P Global Market Intelligence*, November 1, 2022, 4:30 PM ET ("Q3 2022 Earnings Call Transcript").

[100] Complaint, ¶ 123.

[101] Complaint, ¶ 124.

[102] Complaint, ¶ 124.

[103] Complaint, ¶ 127.

[104] Complaint, ¶ 129; iRhythm Technologies, Inc., Form 10-Q for Quarterly Period Ended September 30, 2022, filed November 4, 2022 ("iRhythm Q3 2022 Form 10-Q").  The relevant timestamp, 5:07 PM ET, is available at "iRhythm Technologies, Inc., Form 10-Q for Quarterly Period Ended September 30, 2022," *SEC*, November 4, 2022, https://www.sec.gov/Archives/edgar/data/1388658/000138865822000159/0001388658-22-000159-index.htm.

issues raised by the FDA during an inspection that culminated in an inspection observation report on Form 483 (without describing the inspection report), and that the Customer Advisory Notice warned patients of a 'labeling correction' related to 'the device's maximum transmission limits during wear, and also to the need for [healthcare providers] to complete registration to initiate monitoring services.'"[105]  Plaintiff further alleges that the Company disclosed in the Q3 2022 Form 10-Q that it "reported this Customer Advisory Notice and related information to the FDA under 21 C.F.R., Part 806, and [was] in ongoing communication with the FDA on this matter."[106]

69.    Plaintiff alleges that, "[a]s a result of these disclosures, the price of iRhythm common stock declined by $2.43 per share, or nearly 2.4%, from a closing price of $102.87 on November 4, 2022, to a closing price of $100.44 on November 7, 2022."[107]

### 3.    May 4, 2023:  iRhythm Q1 2023 Form 10-Q Disclosure of DOJ Subpoena

70.    On May 4, 2023, after market close, iRhythm filed its Form 10-Q for the first quarter of 2023 ("Q1 2023 Form 10-Q").[108]  According to Plaintiff, the Company disclosed in the Q1 2023 Form 10-Q that "on April 4, 2023, [it] received a Subpoena Duces Tecum from the Consumer Protection Branch, Civil Division of the U.S. Department of Justice [("DOJ")] [(the "DOJ Subpoena")], requesting production of various documents regarding [its] products and services."[109]  According to the Complaint, after the Putative Class Period the DOJ revealed that the subpoena "'sought communications and other documents concerning potential issues related to the Company's Zio Systems, including that the Zio Systems were failing to timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event.'"[110]

---

[105] Complaint, ¶ 129.
[106] Complaint, ¶ 129.
[107] Complaint, ¶ 130.
[108] Complaint, ¶ 134; iRhythm Technologies, Inc., Form 10-Q for Quarterly Period Ended March 31, 2023, filed May 4, 2023 ("iRhythm Q1 2023 Form 10-Q").  The relevant timestamp, 5:15 PM ET, is available at "iRhythm Technologies, Inc., Form 10-Q for Quarterly Period Ended March 31, 2023," *SEC*, May 4, 2023, https://www.sec.gov/Archives/edgar/data/1388658/000138865823000051/0001388658-23-000051-index.htm.
[109] Complaint, ¶ 134.
[110] Complaint, ¶ 134.

71.    Plaintiff alleges that "[t]his news caused the price of iRhythm common stock to decline by $9.25 per share, or 6.9%, from a closing price of $134.04 on May 4, 2023, to a closing price of $124.79 on May 5, 2023."[111]

### 4.    May 30, 2023:  iRhythm Form 8-K Disclosure of FDA Warning Letter

72.    On May 30, 2023, after market close, iRhythm filed a Form 8-K with the SEC.[112] According to Plaintiff, the Company disclosed the receipt of a Warning Letter (the "Warning Letter") "from the FDA, which 'resulted from the inspection of the Company's facility located in Cypress, California that concluded in August 2022' and 'alleges non-conformities to regulations for medical devices, including medical device reporting requirements, relating to the Company's Zio AT System and medical device quality system requirements.'"[113]  According to the Complaint, iRhythm "share[d] certain details about the Warning Letter's contents with analysts behind the scenes"—for example, as stated in a June 1, 2023 Oppenheimer analyst report, that (i) "the Warning Letter identified issues concerning 'untimely patient registration,' 'trigger warning limits, traditional MCOT definition' and 'device changes'"; and (ii) "'Zio AT has patient and device trigger event limits (100 and 500, respectively),' and that once 'wearers hit these limit[s] . . . [the] patch becomes a passive monitor.'"[114]  The Complaint alleges that "when the Warning Letter was published, it confirmed that iRhythm had falsely marketed the Zio AT as approved for use in high-risk patients that require real-time cardiac monitoring."[115]

73.    Plaintiff alleges that "[t]hese disclosures caused the price of iRhythm common stock to decline by $7.41 per share, or 6.1%, from a closing price of $121.68 on May 30, 2023, to a closing

---

[111] Complaint, ¶ 136.

[112] Complaint, ¶ 137; iRhythm Technologies, Inc., Form 8-K, filed May 30, 2023.  The relevant timestamp, 4:15 PM ET, is available at "iRhythm Technologies, Inc., Form 8-K," *SEC*, May 30, 2023, https://www.sec.gov/Archives/edgar/data/1388658/000138865823000070/0001388658-23-000070-index.htm.

[113] Complaint, ¶ 137.

[114] Complaint, ¶ 137.

[115] Complaint, ¶ 137.  I understand that the FDA published the Warning Letter on its website on June 6, 2023, at which point its contents would have been publicly available.  I note that the Complaint states that "the Warning Letter required iRhythm to submit a new 510(k) because iRhythm's 'labeling describes a new patient population' which 'affect[s] the safety or effectiveness of the device.'"  *See* Complaint, ¶ 137.  Plaintiff further alleges that the Warning Letter "publicly disclosed, for the first time, the myriad customer complaints (including the instances of patient deaths that went unreported) associated with the Zio AT since 2019."  *See* Complaint, ¶ 16.

price of $114.27 on May 31, 2023" and that "[a]s the market digested the disclosure" the stock "fell an additional 7% over June 1-2, 2023, to a closing price of $105.66 on June 2, 2023."[116]

### 5.  July 1, 2024:  DOJ Court Filing to Enforce Subpoena

74.    Plaintiff alleges that on July 1, 2024, the DOJ filed suit to enforce its previously disclosed subpoena, which "sought communications and other documents concerning potential issues related to the Company's Zio Systems, including that the Zio Systems were failing to timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event."[117]  Plaintiff further alleges that the DOJ noted that iRhythm had "refused to produce three third-party consultant reports assessing the design history of their devices, as well as hundreds of related communications that do not involve an attorney," which were meant to determine "whether the Company's cardiac monitoring devices were developed in accordance with the approved design plan."[118]  According to the Complaint, this filing allegedly revealed "that the DOJ inquiry was in fact about the Zio AT's failure to timely transmit patient data to doctors" and "the seriousness with which the DOJ was pursuing its investigation, given that it was now seeking court intervention to obtain these documents about the Zio AT over a year after the DOJ inquiry had been disclosed" and after "months of negotiations."[119]

75.    Plaintiff alleges that "[t]his news caused the price of iRhythm common stock to decline by $10.88 per share, or 10.1%, from a closing price of $107.64 on June 28, 2024, to a closing price of $96.76 on July 3, 2024 as investors digested the news."[120]

---

[116] Complaint, ¶ 139.
[117] Complaint, ¶ 141 (emphasis removed from original).
[118] Complaint, ¶ 142.
[119] Complaint, ¶ 141.
[120] Complaint, ¶ 143.

      **6.**      **August 1, 2024:  iRhythm Q2 2024 Earnings Disclosures and Form 10-Q Disclosure of FDA Form 483s**

76.    On August 1, 2024, after market close,[121] iRhythm filed its Form 10-Q for the second quarter of 2024 ("Q2 2024 Form 10-Q").[122]  According to Plaintiff, in the Q2 2024 Form 10-Q the Company disclosed:

> On July 15, 2024, FDA initiated inspections of our Cypress and San Francisco FDA-registered facilities.  We received Form 483 observations [the "August 2024 Form 483"] at the close of the inspections of our Cypress and San Francisco facilities.… These inspections broadly evaluated medical device quality system requirements and other medical device regulatory topics, and the observations generally centered on complaint handling and medical device reporting, risk analysis regarding the involvement of the technicians to prepare the Zio ECG reports, the corrective and preventive action process, process controls and statistical techniques.
>
> As we are already subject to an FDA warning letter associated with our Cypress facility, the inspection results may contribute to greater risk of potential escalation, which could involve issuance of additional warning letters, or there is a possibility that FDA could initiate consent decree discussions.[123]

77.    According to Plaintiff, on the same date, and also after market close,[124] iRhythm filed a Form 8-K disclosing that "Brice Bobzien resigned from his position as Chief Financial Officer of the Company, and his employment with the Company, effective August 31, 2024."[125]

78.    Plaintiff alleges that the "disclosure of [iRhythm's] receipt of new Form 483s caused the price of iRhythm common stock to decline by $10.34 per share, or 12.2%, from a closing price of $84.22 on August 1, 2024, to a closing price of $73.88 on August 2, 2024."[126]

---

[121] iRhythm Technologies, Inc., Form 10-Q for Quarterly Period Ended June 30, 2024, filed August 1, 2024 ("iRhythm Q2 2024 Form 10-Q").  The relevant timestamp, 5:10 PM ET, is available at "iRhythm Technologies, Inc., Form 10-Q for Quarterly Period Ended June 30, 2024," *SEC*, August 1, 2024, https://www.sec.gov/Archives/edgar/data/1388658/000138865824000143/0001388658-24-000143-index.htm.

[122] Complaint, ¶ 146; iRhythm Q2 2024 Form 10-Q.

[123] Complaint, ¶ 146.

[124] iRhythm Technologies, Inc., Form 8-K, filed August 1, 2024.  The relevant timestamp, 4:07 PM ET, is available at "iRhythm Technologies, Inc., Form 8-K," *SEC*, August 1, 2024, https://www.sec.gov/Archives/edgar/data/1388658/000138865824000140/0001388658-24-000140-index.htm.

[125] Complaint, ¶ 147.

[126] Complaint, ¶ 151.

### 7.    August 9, 2024:  *Capitol Forum* Article

79.    According to Plaintiff, on the evening of August 9, 2024,[127] *Capitol Forum* disseminated an article titled "iRhythm: Recent FDA Inspection Reports Obtained by Capitol Forum Detail Significant Problems with Company's Technicians and Operations; Company Received Over 4,000 Complaints Regarding Technicians Misreading Data Yet Did Nothing" (the "*Capitol Forum* Article").[128]  Plaintiff alleges that this article "disclosed specific details of the FDA's findings in the Form 483s" and that it "revealed the FDA findings … including the 4,014 complaints that iRhythm received related to technicians' misreading of arrhythmia data and providing that misclassified data to patients and doctors, and the Company's failure to analyze these complaints and report them to the FDA."[129]

80.    Plaintiff alleges that "[t]his news caused the price of iRhythm common stock to decline by $6.35 per share, or 8.9%, from a closing price of $70.99 on August 9, 2024, to a closing price of $64.64 on the next business day, August 12, 2024."[130]

## VII.    Analysis of the Economic Evidence of Price Impact of the Timing Statements After November 2, 2022

81.    Counsel has asked me to analyze the economic evidence as to whether the Timing Statements impacted the price of iRhythm common stock after November 2, 2022 under two alternative specifications of the relevant truth that Plaintiff alleges was concealed by those statements.[131]  I describe these below.  As noted above, for purposes of my analysis I assume iRhythm common stock traded in an efficient market, as Plaintiff alleges and Dr. Cain opines.[132]

---

[127] Based on my review of public documents, I have not been able to confirm the timing of the *Capitol Forum* Article that Plaintiff alleges was publicly released on August 9, 2024.  This is relevant for purposes of identifying the date when, in an efficient market, any new information conveyed by the *Capitol Forum* Article would have been incorporated into the price of iRhythm common stock.  Thus, based on materials available to date, I have not been able to determine whether, in an efficient market, any new information conveyed by the *Capitol Forum* Article would have been incorporated into the price of iRhythm stock on August 9, 2024 (a Friday) or on the next trading day, August 12, 2024 (a Monday).

[128] Complaint, ¶ 152.

[129] Complaint, ¶ 152.

[130] Complaint, ¶ 153.

[131] Both specifications of the relevant truth allegedly concealed by the Timing Statements are consistent with my review of the Complaint and the Court's MTD Order as I understand them, without offering a legal opinion.

[132] Complaint, ¶ 236 ("[A]t all relevant times, the market for iRhythm securities was open, efficient, and well developed."); Cain Report, ¶ 3 ("The market for iRhythm's Common Stock was efficient throughout the Class Period.").

82.  As discussed in **Section VII.A.1**, under the first specification of the relevant truth allegedly concealed by the Timing Statements, the economic evidence is consistent with the Timing Statements *not impacting* the price of iRhythm stock after November 2, 2022.  That relevant truth is that Zio AT did not always timely transmit ECG data as a result of certain transmission limits (Alleged Truth #1).[133]  I show that, given the disclosures made by iRhythm in (i) the September 26, 2022 Zio AT CRM; (ii) its customer advisory notice (to Zio AT's customers) on September 28, 2022 ("September 28, 2022 Customer Advisory Notice");[134] and (iii) its Q3 2022 earnings call and related disclosures after market close on November 1, 2022, in which the Company discussed the transmission limits in the context of updating the September 26, 2022 Zio AT CRM and issuance of the September 28, 2022 Customer Advisory Notice, information comprising Alleged Truth #1 was publicly available no later than after market close on November 1, 2022.

83.  As explained in **Section V** above, in an efficient market, the implications of new information that becomes publicly available are quickly and fully reflected in securities prices. Consequently, the information comprising Alleged Truth #1 would have been fully reflected in the price of iRhythm stock during or soon after market hours on November 2, 2022.  Moreover, in an efficient market, repeating information that was already in the public domain cannot affect security prices, and so cannot cause additional security price changes.  Thus, any subsequent declines in the Company's stock price (after November 2, 2022) cannot, in an efficient market, be attributed to Alleged Truth #1.  This means that any declines in the price of iRhythm stock after November 2, 2022 do not provide economic evidence of price impact from the alleged failure to disclose Alleged Truth #1.  Consistent with this observation, in **Section VII.A.2** I show that information discussed by securities analysts after the alleged corrective disclosures that occurred after November 2, 2022 that Dr. Cain associates with the Timing Statements comprises information distinct from the existence of transmission limits that comprises Alleged Truth #1 and, thus, does not provide evidence of price impact from the alleged failure to disclose Alleged Truth #1.

---

[133] Consistent with this understanding of the allegedly concealed truth, the Court, in its MTD Order, stated that "iRhythm's statements about the timeliness of Zio AT's notifications … were false or misleading for three reasons: (1) … when the device reached an undisclosed and arbitrary transmission limit, the Zio AT stopped transmitting any telemetry data."  *See* MTD Order, p. 3 (emphasis removed from original).  *See also* Complaint, ¶ 200 (emphasis removed from original).

[134] "Urgent Field Advisory Notice:  Zio AT Labeling Correction," *iRhythm Technologies, Inc.*, September 28, 2022 ("September 28, 2022 Customer Advisory Notice").

84.    Turning to the second specification of the relevant truth allegedly concealed by the Timing Statements, as discussed in **Section VII.B**, the economic evidence is consistent with the Timing Statements—under that specification of the relevant truth (Alleged Truth #2)—*not impacting* the price of iRhythm stock after June 6, 2023.

85.    Alleged Truth #2 comprises four elements:  (i) Alleged Truth #1, as defined above (Statement 1 of Alleged Truth #2);[135] (ii) iRhythm had received complaints about serious cardiac events, including events that involved two deaths, that were not reported to providers during the wear period because of the transmission limits (Statement 2 of Alleged Truth #2);[136] (iii) the Zio AT transmission limits were reached more often than expected during the wear period (Statement 3 of Alleged Truth #2);[137] and (iv) Zio AT had a lag of four hours or more before the ECG data could reach the technicians' queue for review (Statement 4 of Alleged Truth #2).[138, 139]

---

[135] Consistent with this understanding of the alleged relevant truth, in its MTD Order the Court stated that "the 2023 FDA Warning Letter states: … owing to the transmission limit 'the device is only able to transmit 100 patient-triggered and 500 automatically detected arrhythmia events.  Once the transmission limit is hit, the device can no longer be used for its intended purpose.'"  *See* MTD Order, p. 16.  *See also* Complaint, ¶ 68.

[136] Consistent with this understanding of the alleged relevant truth, in its MTD Order the Court stated that "iRhythm's statements about the timeliness of Zio AT's notifications … were false or misleading for three reasons:  (1) … 'Defendants were aware of many instances where serious cardiac events,' some which even resulted in death of the patient, 'were not reported to providers during the wear period because the device exceeded the transmission limit.' … two deaths [were] noted in the FDA's 2022 Form 483, which were caused by reportable events while the patients were wearing the Zio AT, but which the device did not report until much later.… And iRhythm investigated and found, in these instances 'the device had reached its upper limit of notifications that can be transmitted.'… As the FDA made public at the end of the Class Period, iRhythm received 'critical customer complaints' beginning in 2019—or two years before the Class Period began—indicating that scores of patients suffered serious arrhythmias while wearing their Zio ATs but, having unknowingly hit the transmission limit, their doctors received zero notifications."  *See* MTD Order, pp. 3, 14, 16.  *See also* Complaint, ¶¶ 8, 70, 200.

[137] Consistent with this understanding of the alleged relevant truth, in its MTD Order the Court stated that "drawing all reasonable inferences in Plaintiff's favor, the Court cannot conclude, as a matter of law, that these numbers mean the Zio AT 'rarely' hit the transmission limit in a way that did not affect the truthfulness of its statements.  Indeed, the FDA's Warning Letter—sent eight months after receiving iRhythm's response—found:  '[T]he customer complaints reviewed during the inspection reveal that the device was hitting the transmission limit more often than expected."  *See* MTD Order, p. 18 (emphasis removed from original).  *See also* Complaint, ¶ 116 (emphasis removed from original).

[138] Consistent with this understanding of the alleged relevant truth, in its MTD Order the Court stated that "iRhythm's statements about the timeliness of Zio AT's notifications … were false or misleading for three reasons:  … (2) … the Zio AT 'had a lag time of about four hours or more before the arrythmia data could even reach the technicians' queue for review.'"  *See* MTD Order, p. 3.  *See also* Complaint, ¶ 201.

[139] According to the MTD Order, Plaintiff alleges "iRhythm's statements about the timeliness of Zio AT's notifications … were false or misleading for three reasons," the third reason being that "[t]he Company required 'patients to fully register with iRhythm' before any data could be transmitted to a provider.… And '[b]ecause iRhythm did not notify patients when their registration was incomplete, patients were often unaware that they had not completed iRhythm's registration requirements.'"  *See* MTD Order, pp. 3–4.  As discussed in **Section VI.A.1**, I understand that in its MTD Order the Court has dismissed allegations related to patient registration.  *See* MTD Order, p. 16, footnote 6; Complaint, ¶ 202.

86.     I show below that, apart from Statement 4 of Alleged Truth #2 (regarding the purported four-hour lag issue), the relevant truth as defined by Alleged Truth #2 was publicly available no later than June 6, 2023, when the FDA publicly released its May 25, 2023 Warning Letter. Consequently, in an efficient market, this information would have been fully incorporated into the price of iRhythm stock by June 6, 2023; as a result, any subsequent declines in the price of iRhythm stock cannot provide economic evidence of price impact from the alleged failure to disclose these elements of Alleged Truth #2.

87.     With respect to Statement 4 of Alleged Truth #2 (regarding the purported four-hour lag issue), I understand that Plaintiff does not identify or allege any direct disclosure of that information on any alleged corrective disclosure date.  I show that, following the earliest public revelation of the purported four-hour lag issue that I have been able to identify, the price of iRhythm stock did not experience a statistically significant abnormal price decline and no securities analyst reports were identified, let alone securities analyst reports that commented on this issue.  Thus, the economic evidence I have analyzed is consistent with a lack of price impact from an alleged failure to disclose Statement 4 of Alleged Truth #2.[140]

88.     In sum, the economic evidence is consistent with the Timing Statements having no price impact after June 6, 2023, assuming that Alleged Truth #2 was the relevant truth allegedly concealed by the Timing Statements.  Moreover, I show that there was no discussion of any element of Alleged Truth #2 in the analyst commentary following the release of the only post-June 6, 2023 alleged corrective disclosure that Dr. Cain associates with the Timing Statements (*i.e.*, the July 1, 2024 alleged corrective disclosure).  Thus, any stock price declines following the July 1, 2024 alleged corrective disclosure do not provide evidence of price impact from the alleged failure to disclose Alleged Truth #2.

---

[140] This economic evidence regarding the purported four-hour lag issue also implies that even if Alleged Truth #1 were to be augmented to also include the purported existence of a lag of four hours or more before Zio AT data could reach the technicians' queue for review, the economic evidence would still be consistent with the Timing Statements having no price impact after November 2, 2022, even assuming they had price impact before that date.

**A.      Based on Alleged Truth #1, the Economic Evidence Is Consistent with the Timing Statements Not Impacting the Price of iRhythm Stock After November 2, 2022**

89.      In **Section VII.A.1**, I show that Alleged Truth #1—that Zio AT did not always timely transmit ECG data as a result of certain transmission limits—was publicly available no later than after market close on November 1, 2022.  Specifically, I explain that the information that comprises Alleged Truth #1 was included in disclosures made by iRhythm in:  (i) the September 26, 2022 Zio AT CRM; (ii) the September 28, 2022 Customer Advisory Notice; and (iii) its Q3 2022 earnings call and related disclosures after market close on November 1, 2022.  As a result, and assuming an efficient market for iRhythm stock during the Putative Class Period, the information comprising Alleged Truth #1 would have been fully reflected in the price of iRhythm stock by market close on November 2, 2022, and any subsequent declines in the Company's stock price (after November 2, 2022) cannot, in an efficient market, be attributed to new information that comprises Alleged Truth #1.  Instead, as shown in **Section VII.A.2**, the information discussed by securities analysts after the release of the alleged corrective disclosures that Dr. Cain associates with the Timing Statements is distinct from the existence of transmission limits that comprises Alleged Truth #1.  Taken together, these analyses show that, in an efficient market, the economic evidence is consistent with the Timing Statements not impacting the price of iRhythm stock after November 2, 2022.

**1.      The Information Comprising Alleged Truth #1 Was Publicly Available by November 2, 2022 and, in an Efficient Market, by That Date Would Have Been Fully Incorporated into the Price of iRhythm Stock**

90.      As explained above, Alleged Truth #1 is that Zio AT did not always timely transmit ECG data as a result of certain transmission limits.

91.     After market close on November 1, 2022, iRhythm announced its Q3 2022 financial results and held an earnings call with securities analysts ("Q3 2022 Earnings Call").[141, 142]  During this call, the Company disclosed:

> [C]oming into the fourth quarter, we voluntarily issued a customer advisory notice to our Zio AT customers.  We have updated language related to the precautions in the Zio AT clinical reference manual and important information pamphlet as it relates to the Zio AT patient registration process in Zio AT patients and auto trigger transmission limits.[143]

92.     Following the Q3 2022 Earnings Call and earnings disclosures, securities analysts commented on the Zio AT transmission limits, iRhythm's issuance of the September 28, 2022 Customer Advisory Notice, and the September 26, 2022 Zio AT CRM.  For example:

- *J.P. Morgan, November 1, 2022*:    **"[Zio] AT customer advisory notice [discussed] battery limitation caps for symptomatic and asymptomatic transmissions**, with management highlighting that the updated labeling is still in-line with that of competitors."[144]

- *Truist Securities, November 1, 2022*:  "The company also **issued a voluntary Customer Advisory Notice to [Zio AT] customers, updating language related to precau[t]ions in the Zio AT Clinical Reference Manual and Important**

---

[141] iRhythm Technologies, Inc. Press Release, "iRhythm Technologies Announces Third Quarter 2022 Financial Results," *GlobeNewswire*, November 1, 2022, 4:05 PM ET; Q3 2022 Earnings Call Transcript.

[142] Plaintiff alleges that the disclosure of downgraded revenue guidance due to the September 28, 2022 Customer Advisory Notice (issued in connection with Zio AT) through a press release and the Q3 2022 Earnings Call occurred after market close on November 1, 2022, and caused investor losses on November 2–3, 2022.  *See* Complaint, ¶ 127 ("As a result of these disclosures, the price of iRhythm common stock declined by $5.60 per share, or 4.4%, from a closing price of $126.77 on November 1, 2022, to a closing price of $121.17 on November 2, 2022.  As the market digested this news and multiple analysts cut their price targets, the price of iRhythm common stock declined by an additional $14.07 per share, or 11.6%, to a closing price of $107.10 on November 3, 2022.").  For purposes of my analysis in this report, I have adopted Dr. Cain's event study regression model.  My adoption of his model should not be construed as indicating that I agree with his modeling decisions.  According to Dr. Cain's event study model, the abnormal return on November 2, 2022 (-0.08%) is not statistically significant using a 95% confidence interval (*t*-statistic = -0.03) and the abnormal return on November 3, 2022 (-8.45%) is statistically significant using a 95% confidence interval (*t*-statistic = -3.00).  *See* Cain Report Backup Materials.  To the extent that Plaintiff claims that any decline in the price of iRhythm stock on November 3, 2022 was caused by the information revealed in the press release and Q3 2022 Earnings Call after market close on November 1, 2022, that claim is inconsistent with its claim that the market for iRhythm common stock was efficient during the Putative Class Period.  In an efficient market, any stock price decline on November 3, 2022 cannot be attributed to information disclosed after market close on November 1, 2022.

[143] Q3 2022 Earnings Call Transcript, p. 6.

[144] "Better than Expected Final PFS and Healthy Underlying Trends Outweigh Near-Term Challenges; Reiterate OW," *J.P. Morgan*, November 1, 2022, p. 1 (emphasis added).

**Information pamphlet**, relating to patient registration process and **patient- and auto-triggered transmission limits**."[145]

- *Canaccord Genuity, November 2, 2022*: "On the earnings call, iRhythm called out that it **voluntarily issued a Customer Advisory Notice to Zio AT customers related to** the patient registration process and **transmission limits**."[146]

- *Oppenheimer, November 2, 2022*: "Zio-AT growth slowed to 20% (4Q22E), driven by **Customer Advisory notice on managing event trigger limits**..."[147]

- *William Blair & Company, November 2, 2022*: "iRhythm made information clearer around the **triggers of the Zio device** that could prevent recordings (i.e., if the patient completes more than 100 push recordings, the device would need to be replaced; we note that this occurs in less than 1% of devices)."[148, 149]

93.    As discussed below in **Section VIII.B**, based on my review of the available securities analyst reports issued over the seven calendar days that followed the Q3 2022 Earnings Call, none of the securities analysts provided negative commentary or expressed surprise with respect to the functionality (or lack thereof) of Zio AT.[150]

---

[145] "Mixed Qtr & Lwr Guide, but +ve CMS Rate Shld Help Offset Ptn'l Headwinds Spilling into '23," *Truist Securities*, November 1, 2022, pp. 1–2 (emphasis added).

[146] "Q3 Light and Q4 Guidance Not Comforting – But Likely Just a Bump in the Road; Maintain BUY, Lower PT to $155," *Canaccord Genuity*, November 2, 2022, p. 1 (emphasis added).

[147] "3Q Miss and 4Q Guide Down Disappoints," *Oppenheimer*, November 2, 2022, p. 1 (emphasis added).

[148] "Short-Term Shortfall Manageable While CMS Final Rule Looks Better Than Expected and Clears the Way for Adoption," *William Blair & Company*, November 2, 2022, p. 2 (emphasis added).

[149] I understand that, according to the September 26, 2022 Zio AT CRM and the September 28, 2022 Customer Advisory Notice, once the transmission limits were reached, no further transmission of ECG data would occur but that data would still be captured and recorded.  *See* September 26, 2022 Zio AT CRM, p. 9 (emphasis added) ("[A]fter [the transmission limits are triggered] the [Zio AT] device no longer transmits for whichever trigger limit has been reached.  If this occurs, unless a patch is promptly replaced when the patient is approaching a maximum transmission limit, **there will be time during the wear period in which transmissions of that type are captured but not transmitted, and information will not become available until the final report**.").  *See also* September 28, 2022 Customer Advisory Notice, p. 2 (emphasis added) ("Once the maximum transmission limit is reached for either transmission type – symptomatic or asymptomatic – any further transmissions for that specific type will cease.  **Continuous ambulatory ECG diagnostic data is still captured without interruption, even after the wireless transmission maximums are reached, which is manually downloaded from the device when it is returned at the conclusion of the wear period and included in the final report**.").  Consistent with this understanding, a securities analyst noted that Zio AT would continue to record ECG data after the transmission limit(s) were reached.  *See* "Correction: FDA Warning Letter Received," *Oppenheimer*, June 1, 2023, p. 1 ("Zio AT has patient and device trigger event limits (100 and 500, respectively) made to conserve battery life.  Roughly a low-single digit percentage of wearers hit these limit [*sic*] and afterwards patch becomes a passive monitor.").

[150] Following the Q3 2022 earnings disclosures, securities analysts also noted other issues such as staffing challenges and macro factors negatively impacting iRhythm's financial performance and outlook.  Those factors were unrelated to the September 28, 2022 Customer Advisory Notice, which Plaintiff alleges partially contributed to the reduced FY 2022 revenue guidance and reduced growth that Zio AT announced during the Q3 2022 earnings disclosures.  *See* Complaint, ¶ 124.  *See also, e.g.*, "IRTC: 2H22 Issues Should Be Transitory; Underlying Momentum Remains Strong," *Needham & Company*, November 2, 2022, p. 1 ("IRTC missed the revenue consensus in 3Q22 and management lowered its 2022 revenue guidance.  Ongoing staffing challenges and a lower rate of returned monitors impacted growth in the quarter."); "Q3 Light and Q4 Guidance Not Comforting – But Likely Just a Bump in the Road; Maintain BUY, Lower PT to $155," *Canaccord Genuity*, November 2, 2022, p. 1 ("The underlying cause of shortfall

94.     As indicated by iRhythm in the Q3 2022 Earnings Call, the Company published the September 26, 2022 Zio AT CRM and issued the September 28, 2022 Customer Advisory Notice that notified Zio AT customers of "important updates to the Zio AT System Clinical Reference Manual" and described the changes in the updated CRM.[151]   I understand that the Customer Advisory Notice was distributed via email or in-person[152] to Zio AT customers, who were its then-existing active Zio AT prescribers, including physician practitioners and medical facilities.[153, 154]

---

and the reduced expectations is mostly ongoing staffing and capacity challenges in cardiology practices."); "National Pricing a Long-term Tailwind vs. Near-Term Macro Headwinds," *Morgan Stanley*, November 2, 2022, p. 1 ("From a fundamental perspective, the 3Q miss primarily reflected macro dynamics, with the guide down contemplating sustained recent headwinds, coupled with AT growth deceleration on the heels of a recently issued customer service advisory.").

[151] Q3 2022 Earnings Call Transcript, p. 6; September 28, 2022 Customer Advisory Notice, p. 1.

[152] *See* Email from Sarah Keenan to Michael Elton, et al., "Follow-up: Zio AT Update Call," with attachments, September 27, 2022, iRhythm00004866–81 at 67 ("Any accounts highlighted in yellow have been identified … as one that should receive the CAN by hand delivery vs. DocuSign.  Please ensure that you visit with these accounts as soon as possible to share the CAN.  No [Zio Account Representative] Email Contact List:  For accounts with no [Zio Account Representative] contact listed, we will use the contact and email addresses contained on this document (approx. 80 accounts).").

[153] *See* Email from Jason Shaw to ORA Devices Recalls, "3021769057-09/28/22-001-C," with attachments, October 4, 2022, iRhythm00005806 ("[iRhythm] began a voluntary field action in the form of a Customer Advisory Notice on September 28, 2022"); "Voluntary Recall # 3021769057-09/28/22-001-C," iRhythm00005807–16.  iRhythm stated in the attachment to its email to the FDA that with respect to the customer advisory notice, "[t]he **consignee list includes all currently active Zio AT prescribers, thus including the full population of [healthcare providers] which may be impacted by this advisory notice**."   The Company further explained that "iRhythm is in the process of updating language related to precautions in the Zio AT Clinical Reference Manual and Important Information Pamphlet as it relates to the Zio AT patient registration process and Zio AT patient triggered and auto-triggered transmissions limits. **In addition to updating the Zio AT Clinical Reference Manual and Important Information Pamphlet, iRhythm initiated a Customer Advisory Notice (CAN) to all currently active Zio AT accounts**.  The initiation date of this action is September 28, 2022.  Per FDA's guidance documents, **recipients were asked to read and acknowledge receipt by signing and returning the Response Form document to iRhythm**."  Moreover, the Company explained the steps it would take to "[c]onfirm receipt and understanding" of the September 28, 2022 Customer Advisory Notice, stating that "[c]onsignee acknowledgements will be reviewed for actions taken with overall consignee responses tracked.  **Consignees will be asked to take the following two actions:  1. Confirm receipt and understanding of the Advisory Notice, and 2. Confirm the information has been brought to the attention of all relevant users**.…  The following steps will be taken with each step an escalation if the previous step was unsuccessful in getting a response:  1. Email notification with request for e-signature from customer[;] 2. Mail via USPS (certified mail)[;] 3. In-person visit or telephone communication."   *See* "Voluntary Recall # 3021769057-09/28/22-001-C," iRhythm00005807–16 at 09–10, 14 (emphasis added).  *See also* iRhythm00005821 (indicating that the consignees receiving the September 28, 2022 Customer Advisory Notice included hospitals, other medical facilities, and physician practitioners).  *See also* Email chain from Jason Shaw to ORA Devices3 Recalls, "RE: [EXTERNAL] April 2023 Update - RES 90954 (iRhythm)," with attachment, March 31, 2023, iRhythm00004954–5169 at 4955 ("iRhythm has distributed the Customer Advisory Notice to 100% of impacted consignees and consider all to be effective.").

[154] *See also* "Class 2 Device Recall Zio AT Clinical Reference Manual," *FDA*, November 4, 2022, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm?id=196267 ("On 9/28/2022, Field Safety Notice Labeling Corrections were sent to customers who were informed of labeling changes and that the firm intends to enhance the process of notifying patients that they are approaching the maximum limit for either symptomatic or asymptomatic transmissions by auto shipping another Zio AT patch to the patient.  Customers are asked to do the following:  1) Please review this letter and disseminate it to the appropriate system providers and any personnel at your facility.  Please share this notification with all device users within your facility to ensure they are aware of this notice.  2) Complete and return the customer reply form.").

The updated CRM had been published on September 26, 2022 and the Customer Advisory Notice was issued on September 28, 2022.[155]  Both documents were publicly available.

95.    The September 26, 2022 Zio AT CRM indicated that:

> Zio AT is a Mobile Cardiac Telemetry (MCT) monitoring solution designed to optimize battery power in order to offer patients 14-day continuous monitoring without any patient manipulations required.  As a result, **the device has a maximum threshold of transmitting 100 Patient Triggers and 500 Auto Triggers during wear** … after which point the device no longer transmits for whichever trigger limit has been reached.  If this occurs, unless a patch is promptly replaced when the patient is approaching a maximum transmission limit, there will be time during the wear period in which transmissions of that type are captured but not transmitted, and information will not become available until the final report.[156]

96.    The Company made similar disclosures in the September 28, 2022 Customer Advisory Notice, and further noted the "risk of a delay between the time a patient experiences an arrythmia and the time when that information is available to the patient's provider" as a result of the transmission limits for Zio AT:

> The Zio AT connected continuous ambulatory monitoring system (the "Zio AT System") is a prescription-only ambulatory ECG monitoring system used by physicians and Independent Diagnostic Testing Facilities ("IDTFs") to perform Mobile Cardiac Telemetry ("MCT") monitoring services.
>
> …The Clinical Reference Manual and associated Important Information Pamphlet for Zio AT System are being updated to inform you of the maximum wireless transmission limits for the Zio AT monitor.  **Each Zio AT patch is limited to 100 symptomatic (i.e., patient initiated) and 500 asymptomatic (i.e., auto-triggered or device-detected) wireless transmissions**.… The transmission limits were established to provide up to 14 days of an uninterrupted monitoring experience for patients without the need for removing the patch and charging the device.  Once the maximum transmission limit is reached for either transmission type – symptomatic or asymptomatic – any further transmissions for that specific type will

---

[155] September 26, 2022 Zio AT CRM, p. 53; September 28, 2022 Customer Advisory Notice, p. 1.  In the MTD Order (p. 9), the Court stated, "Given the CRMs were publicly distributed and widely available, the Court judicially notices the CRMs from April 2018 and April 2020.… [T]he Court takes judicial notice of them 'not for the truth of their contents,' but for non-hearsay purposes, such as 'to determine the information available to the market.'"  The current CRM as of today is available from iRhythm's website at "Clinical Reference Manual: Zio AT," *iRhythm Technologies, Inc.*, https://go.irhythmtech.com/hubfs/Instructions%20for%20Use%20(IFUs)/US/2025/October%20Updates/ALB0031.14%20-%20ZIO%20AT%20CLINICAL%20REFERENCE%20MANUAL%20LTE.pdf.

[156] September 26, 2022 Zio AT CRM, pp. 4, 9 (emphasis added).

> cease.   Continuous ambulatory ECG diagnostic data is still captured without interruption, even after the wireless transmission maximums are reached, which is manually downloaded from the device when it is returned at the conclusion of the wear period and included in the final report.…
>
> Risks Related to the Above Topics[:] As explained, **if the scenarios described in this letter occur, they present a risk of a delay between the time a patient experiences an arrythmia and the time when that information is available to the patient's provider**.  This could include information that a provider would consider clinically relevant and would elect, in his or her clinical judgment, to use to influence treatment and care decisions.  The potential impact to a patient would be a delay in treatment. [157]

97.     Thus, in both the September 26, 2022 CRM and the September 28, 2022 Customer Advisory Notice, both of which were publicly available, iRhythm explained to its customers that Zio AT operated with certain transmission limits—namely, transmission limits of 100 patient-triggered and 500 auto-triggered events—and that it would no longer transmit ECG data once such transmission limits were reached.

98.     In the Q3 2022 Earnings Call, the Company explained that it had updated the CRM to include information related to the Zio AT transmission limits, and these changes had also been included in the Customer Advisory Notice it had issued.  Given the Company's discussion in the Q3 2022 Earnings Call of the transmission limits for Zio AT, which referenced the September 26, 2022 Zio AT CRM and September 28, 2022 Customer Advisory Notice, to the extent those transmission limits were value-relevant information, in an efficient market, one would expect at least some investors and securities analysts to have reviewed the September 26, 2022 Zio AT CRM and September 28, 2022 Customer Advisory Notice to evaluate their implications for iRhythm and the value of its common stock.[158]

---

[157] September 28, 2022 Customer Advisory Notice, pp. 1–3 (emphasis removed from original; emphasis added).

[158] There is evidence that analysts sought information regarding the transmission limits issue on November 1, 2022 that goes beyond the contents of the Q3 2022 Earnings Call.  A J.P. Morgan analyst report issued on November 1, 2022 references the transmission limits in terms of "battery limitation caps for symptomatic and asymptomatic transmissions" and that "management highlight[ed] that the updated labeling is still in-line with that of competitors[.]"  *See* "Better than Expected Final PFS and Healthy Underlying Trends Outweigh Near-Term Challenges; Reiterate OW," *J.P. Morgan*, November 1, 2022, p. 1.  The discussion of patient-triggered and auto-triggered limits as symptomatic and asymptomatic triggers and its attribution to "battery limitation[s]" did not occur during the Q3 2022 Earnings Call.  I note that the language regarding transmission limits used in the J.P. Morgan report includes terms that are used in the September 28, 2022 Customer Advisory Notice, which states "Symptomatic (i.e., patient initiated) and asymptomatic (i.e., auto-triggered or device-detected) wireless transmissions from the Zio AT patch have limits to preserve battery life."  *See* September 28, 2022 Customer Advisory Notice, p. 1.  Moreover, there was no discussion

99.     In sum, Alleged Truth #1—that Zio AT did not always timely transmit ECG data as a result of certain transmission limits—was public information no later than after market close on November 1, 2022.  As a result, in an efficient market, this information would have been incorporated into the price of iRhythm stock by or soon after November 2, 2022.  Moreover, as discussed in the next section, any subsequent iRhythm stock price declines, including declines that followed later alleged corrective disclosures, cannot serve as evidence of price impact from the alleged failure to disclose Alleged Truth #1 because, in an efficient market, such price declines cannot be attributed to information that comprises Alleged Truth #1.  Thus, the economic evidence is consistent with the Timing Statements having no price impact after November 2, 2022, assuming that Alleged Truth #1 was the relevant truth allegedly concealed by the Timing Statements.

> **2.     In an Efficient Market, Stock Price Changes Following the Alleged Corrective Disclosures That Occurred After November 2, 2022 Do Not Provide Economic Evidence of Price Impact of the Timing Statements**
>
> **a)     November 4, 2022:  iRhythm Q3 2022 Form 10-Q Disclosure of FDA "Labeling Correction"**

100.     On November 4, 2022, after market close, iRhythm filed its Q3 2022 Form 10-Q.[159]  As discussed in **Section VI.B.2** above, according to Plaintiff, the Company disclosed in the Q3 2022 Form 10-Q that it "initiated the Customer Advisory Notice on September 28, 2022, following issues raised by the FDA during an inspection that culminated in an inspection observation report on Form 483 (without describing the inspection report), and that the Customer Advisory Notice warned patients of a 'labeling correction' related to 'the device's maximum transmission limits during wear, and also to the need for [healthcare providers] to complete registration to initiate monitoring services.'"[160]  Plaintiff further alleges that the Q3 2022 Form 10-Q disclosed that the Company "reported this Customer Advisory Notice and related information to the FDA under 21

---

during the Q3 2022 Earnings Call as to whether "the updated labeling is still in-line with that of competitors," which suggests some additional discussion with management occurred between the Q3 2022 Earnings Call (which started at 4:30 PM ET) and the time the J.P. Morgan analyst report was issued on November 1, 2022 (8:58 PM ET).  *See* Q3 2022 Earnings Call Transcript.

[159] iRhythm Q3 2022 Form 10-Q.

[160] Complaint, ¶ 129.

C.F.R., Part 806, and [is] in ongoing communication with the FDA on this matter."[161]  Plaintiff alleges that the Q3 2022 Form 10-Q caused investor losses on November 7, 2022.[162]

101.    As discussed in **Section VII.A.1**, the information that comprises Alleged Truth #1 (the existence of transmission limits) was publicly available and, in an efficient market, would have been fully incorporated into the price of iRhythm stock by November 2, 2022.  Therefore, in an efficient market, any iRhythm stock price decline on November 7, 2022, following the disclosure of the FDA "labeling correction" in the Q3 2022 Form 10-Q, cannot be attributed to disclosure of the existence of transmission limits (Alleged Truth #1).  In any event, as discussed below, there is no reliable basis to attribute the stock price decline after disclosure of the Q3 2022 Form 10-Q to any company-specific information because the decline (on November 7, 2022) is not statistically significant according to Dr. Cain's event study model.  Further consistent with the lack of stock price reaction, as discussed below, information about the September 28, 2022 Customer Advisory Notice and the "labeling correction" disclosed in the Q3 2022 Form 10-Q was not discussed by securities analysts in the days that followed the filing.

102.    According to Dr. Cain's event study model, the abnormal return on November 7, 2022 is not statistically significant.[163]  Abnormal returns that are not statistically significant cannot be reliably attributed to any new information regarding a company, as they cannot be distinguished from the typical price fluctuations of the company in the absence of new information (*i.e.*, they are not reliably different from zero).  Thus, there is no basis to attribute the abnormal return on November 7, 2022 to any new company-specific information disseminated to the market between market close on November 4, 2022 and market close on November 7, 2022.

103.    Based on my review of Company disclosures and public press, disclosures that may have impacted the price of iRhythm common stock include the Q3 2022 Form 10-Q, which included quarterly financial information, among other information, and a press release describing the results

---

[161] Complaint, ¶ 129.

[162] Complaint, ¶ 130 ("As a result of these disclosures, the price of iRhythm common stock declined by $2.43 per share, or nearly 2.4%, from a closing price of $102.87 on November 4, 2022, to a closing price of $100.44 on November 7, 2022.").

[163] According to Dr. Cain's event study model, the abnormal return on November 7, 2022 (-2.72%) is not statistically significant using a 95% confidence interval (*t*-statistic = -1.00).  *See* Cain Report Backup Materials.

of an apparently new analysis of a previous scientific study of the efficacy of the Company's Zio services.[164]

104.    Based on my review of securities analyst reports, analyst commentary following the release of the Q3 2022 Form 10-Q is consistent with any price decline that followed it being attributed to information other than Alleged Truth #1. I identified one analyst report issued during the seven calendar days that followed filing of the Q3 2022 Form 10-Q.[165] That analyst report, issued by Wolfe Research, did not express concerns regarding the timeliness of transmission of Zio AT, let alone comment on the fact that Zio AT did not always timely transmit ECG data as a result of certain transmission limits (*i.e.*, Alleged Truth #1) specifically, nor did it comment on the September 28, 2022 Customer Advisory Notice or the related labeling correction.[166] Instead, that analyst report focused on discussion of an upgrade in the analyst's rating for iRhythm from Underperform to Peer Perform.[167]

---

[164] iRhythm Q3 2022 Form 10-Q; iRhythm Technologies, Inc. Press Release, "New Research Confirms that Zio® by iRhythm Provides High Value From a Health Economic Perspective," *GlobeNewswire*, November 6, 2022, 12:30 PM ET.

[165] I note that an industry analyst report from Truist Securities was issued on November 14, 2022, or 10 calendar days after the release of iRhythm's Q3 2022 Form 10-Q. *See* "MedTech Bay Area Bus Tour Takeaways - In Our View Mtgs Incrementally +ve Across the Board For ISRG, PEN, IRTC, PRCT," *Truist Securities*, November 14, 2022 ("November 14, 2022 Truist Report"). This report incorporated information from meetings with iRhythm management that occurred on November 10, 2022 and November 11, 2022 (*i.e.*, after November 7, 2022) and the report discussed certain takeaways from the analysts' conversation with management, including "(1) mgmt believes it has a good handle on the 2-main issues that led to the FY22 guide down, and CEO Blackford expressed a high level of confidence the impact from these issues are transient and should likely be (mostly) resolved by early 2023 if not sooner. (2) The ZioAT customer advisory notice, specifically should be fully remediated in December." *See* November 14, 2022 Truist Report, pp. 1–2, 10 (emphasis removed from original). The November 14, 2022 Truist Report also stated that "the unexpected ZioAT advisory notice" "played a part in the inability for the company to hit their initial guide" and that "ZioAT growth (without the advisory notice) could have been enough to offset ZioXT weakness & ultimately enable the company to hit the initial guide for FY22." *See* November 14, 2022 Truist Report, p. 10. Moreover, the report included additional details from the conversation with management regarding the September 28, 2022 Customer Advisory Notice, and concluded that "this headwind is very manageable." *See* November 14, 2022 Truist Report, p. 11 (emphasis removed from original) ("Mgmt provided more details around the underlying challenges associated with the ZioAT customer advisory notice, specifically noting that the notice required updates to information around the patient registration process and trigger transmission limits. As previously noted, the notification primarily has been impacting the company's ability to open new accounts. Given that opening new accounts with ZioAT has been a core driver for overall ZioAT volumes, the customer advisory notice provided an additional hurdle in process. Mgmt believes that field reps haven't felt confident calling on new centers with the customer advisory notice in place, thus impacting the ability to open these accounts. However, CEO Blackford noted that this will be resolved in December, as the new language is included on the [Instructions For Use] for ZioAT. This will remove the need for field reps to present the advisory notice to new accounts. Mgmt believes that with advisory notice removed, field reps should feel confident calling on new centers again, therefore enabling new center activation to return toward historical trends & drive accretive growth.… Our sense from the discussion is that this headwind is very manageable. Mgmt has a very good handle on the pathway to resolution, however, it could linger as a headwind into part of 1Q.").

[166] "Upgrade to Peer Perform," *Wolfe Research*, November 6, 2022, pp. 1–2.

[167] "Upgrade to Peer Perform," *Wolfe Research*, November 6, 2022, pp. 1–2.

b)  **May 4, 2023:  iRhythm Q1 2023 Form 10-Q Disclosure of DOJ Subpoena**

105.  After market close on May 4, 2023, iRhythm filed its Q1 2023 Form 10-Q.[168]  As discussed above in **Section VI.B.3**, in this filing the Company disclosed that, according to Plaintiff, "on April 4, 2023, [it] received a Subpoena Duces Tecum from the Consumer Protection Branch, Civil Division of the [DOJ], requesting production of various documents regarding [its] products and services."[169]  According to the Complaint, after the Putative Class Period, the DOJ revealed the subpoena "sought communications and other documents concerning potential issues related to the Company's Zio Systems, including that the Zio Systems were failing to timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event."[170]  Plaintiff alleges this disclosure caused investor losses on May 5, 2023.[171]

106.  As discussed in **Section VII.A.1**, information that comprises Alleged Truth #1 (the existence of transmission limits) was publicly available and would, in an efficient market, have been fully incorporated into the price of iRhythm stock by November 2, 2022.  Therefore, in an efficient market, any stock price decline that occurred more than six months later, on May 5, 2023, following disclosure of the DOJ Subpoena in the Q1 2023 Form 10-Q, cannot be attributed to disclosure of the existence of transmission limits that comprises Alleged Truth #1.  Instead, any stock price decline that followed disclosure of the DOJ Subpoena on May 5, 2023 would have been due to information other than Alleged Truth #1, including information that, even if potentially related to Alleged Truth #1, is distinct from Alleged Truth #1 (the existence of transmission limits).  As discussed below, analyst commentary following the Q1 2023 Form 10-Q indicates that securities analysts did not discuss any new information that comprises Alleged Truth #1.  Instead, securities analyst commentary related to uncertainty about the subject of the DOJ's inquiry and any implications for the Company and its products as well as related uncertainties given the limited information then available about the DOJ Subpoena.  Securities analysts noted that a similar DOJ

---

[168] iRhythm Q1 2023 Form 10-Q.
[169] Complaint, ¶ 134.
[170] Complaint, ¶ 134.
[171] Complaint, ¶ 136 ("This news caused the price of iRhythm common stock to decline by $9.25 per share, or 6.9%, from a closing price of $134.04 on May 4, 2023, to a closing price of $124.79 on May 5, 2023.").  According to Dr. Cain's event study model, the abnormal return on May 5, 2023 (-9.89%) is statistically significant using a 95% confidence interval ($t$-statistic = -3.86).  *See* Cain Report Backup Materials.

subpoena had recently been issued to an iRhythm competitor, suggesting the DOJ may have had a broad interest in AECG manufacturers.

107.    After market close on May 4, 2023, in addition to the Q1 2023 Form 10-Q, iRhythm announced its financial results for Q1 2023 ("Q1 2023 Earnings Release") and held an earnings call ("Q1 2023 Earnings Call").[172]  In the Q1 2023 Form 10-Q, iRhythm stated that it received the DOJ Subpoena and was "cooperating fully on these matters."[173]  The Company noted in the Q1 2023 Earnings Call that it was "very early" in the process of engaging with the DOJ and it was "too early to speculate on the precise motivations behind [the DOJ's] inquiry or any anticipated duration of the engagement":

> [A]fter the quarter closed on April 4, we received an inquiry from the Civil Division of the U.S. Department of Justice seeking information and documents regarding the company's products and services.  Our teams are working on responding to the DOJ's inquiry, and we will fully cooperate with the department's request.  At this point, we are very early in this process of engaging with them, and it's too early to speculate on the precise motivations behind their inquiry or any anticipated duration of the engagement.  As we have more information, we will be sure to provide the necessary updates.[174]

108.    In the Q1 2023 Earnings Release and Q1 2023 Earnings Call, iRhythm discussed various aspects of its quarterly financial results.  For example, the Company disclosed an increase in its Q1 2023 revenue compared to Q1 2022 and that "outperformance in the quarter was driven by the strength of [its] Zio XT business" due to "better-than-expected volume and another record quarter of new account openings."[175]  The Company also discussed growth in its Zio AT business, noting improved device return rates and strong registration growth.[176]  The Company also disclosed increased FY 2023 revenue guidance.[177]

---

[172] iRhythm Q1 2023 Form 10-Q; iRhythm Technologies, Inc. Press Release, "iRhythm Technologies Announces First Quarter 2023 Financial Results," *GlobeNewswire*, May 4, 2023, 4:05 PM ET ("Q1 2023 Earnings Release"); iRhythm Technologies, Inc., "FQ1 2023 Earnings Call Transcripts," *S&P Global Market Intelligence*, May 4, 2023, 4:30 PM ET ("Q1 2023 Earnings Call Transcript").
[173] iRhythm Q1 2023 Form 10-Q, p. 18.
[174] Q1 2023 Earnings Call Transcript, p. 6.
[175] Q1 2023 Earnings Call Transcript, p. 4; Q1 2023 Earnings Release.
[176] Q1 2023 Earnings Call Transcript, p. 9.
[177] Q1 2023 Earnings Release; Q1 2023 Earnings Call Transcript, p. 7.

109.    In addition, iRhythm reported a decline in gross margin and higher operating expenses.[178] Specifically, the Company explained that the lower gross margin was primarily driven by an expected decrease in average selling prices due to updated Medicare insurance rates since January 2023.[179]  The Company stated that the increase in operating expenses was primarily due to "increased personnel expenses to support volume growth and elevated commissions for volume outperformance in [its] core business" as well as costs incurred to establish a business services center in the Philippines.[180]  The Company also discussed incremental research and development expenditures related to its next-generation products—Zio Monitor, which it was preparing for commercial launch later in 2023, and Zio MCT, which it planned to submit for regulatory approval in Q3 2023.[181]

110.    Based on my review of analyst reports issued during the week following the Q1 2023 Form 10-Q, none of the securities analysts discussed any new information that comprises Alleged Truth #1.  Analyst reports issued following the Q1 2023 Form 10-Q did not discuss concerns regarding Zio AT transmission limits or timeliness and instead discussed certain iRhythm disclosures, including the DOJ Subpoena and various aspects of its Q1 2023 financial results and guidance.

111.    With respect to the DOJ Subpoena, securities analysts did not link the subpoena to the existence of the Zio AT transmission limits; some analysts noted that there was, at that stage, limited information available regarding the subpoena and that DOJ interest may represent an "overhang" for the Company.  For example:

- *BTIG, May 4, 2023*: "[I]t is difficult to predict what next steps for this inquiry could be, any potential impact on the company's commercial operations, or timelines. We do not see any reason for panic at this point, but acknowledge that this is unsettling and that it may be a small overhang on the stock."[182]

- *Wolfe Research, May 4, 2023*:  "Don't know what DOJ interest is."[183]

---

[178] Q1 2023 Earnings Call Transcript, p. 7.
[179] Q1 2023 Earnings Call Transcript, p. 7.
[180] Q1 2023 Earnings Call Transcript, p. 7.
[181] Q1 2023 Earnings Call Transcript, p. 7.
[182] "We Expected Great Results and Conservative Guide; Impact of DoJ Subpoena in AECG Harder to Predict But We Are Not Panicking; Trimming Multiple, PT from $170 to $165," *BTIG*, May 4, 2023, p. 1.
[183] "IRTC: Good Update but Can't Tell If Fourth Strong Enough or If Stock Could Cinco in Mayo," *Wolfe Research*, May 4, 2023, p. 1.

- *Morgan Stanley, May 5, 2023*: "iRhythm disclosed receipt of an inquiry from the Civil Division of the DOJ in early April seeking info and documents.… The process is in the early stages with limited information available at this time."[184]

- *William Blair & Company, May 5, 2023*: "[The DOJ Subpoena] is likely to remain an overhang until we gain more information on the matter."[185]

112.    Securities analysts also noted that a similar DOJ subpoena had recently been disclosed by Boston Scientific Corporation, an iRhythm competitor, suggesting a broader inquiry by the DOJ into AECG manufacturers:

- *BTIG, May 4, 2023*: "A similar subpoena was also disclosed by Boston Scientific (BSX, Buy, $55 PT) related to its ambulatory ECG (AECG) monitoring business. We view it as a positive that this seems to be related to the industry and is not IRTC-specific."[186]

- *J.P. Morgan, May 5, 2023*: "With other industry players like Boston Scientific also targeted by [the DOJ] within one day of iRhythm, we view this as a broader probe into the ambulatory ECG industry rather than any one company."[187]

- *William Blair & Company, May 5, 2023*: "[O]ne of iRhythm's competitors, Boston Scientific (BSX $51.94), released its 10-Q following first-quarter results mentioning it had also received a subpoena from the DOJ in April relating to its ambulatory electrocardiography monitoring business, suggesting that the DOJ may be conducting more of an industrywide look."[188]

113.    With respect to Company results, securities analysts noted that iRhythm reported above-consensus Q1 2023 revenue and raised its FY 2023 revenue guidance due to growth in its Zio XT and Zio AT businesses.  Some analysts partially attributed the Company's Q1 2023 growth to continued recovery of Zio AT volume growth after the slowdown due to the September 28, 2022 Customer Advisory Notice:

- *Canaccord Genuity, May 4, 2023*: "Q1/23 was a strong revenue-driving quarter for IRTC.  The company generated $111.4M (+20.6%) in sales compared to estimates of $107M by CG and the Street.  Growth of Zio XT and AT volumes were the main story.… Zio AT revenue growth was noted by management as 21% Y/Y in the quarter, while volume growth was noted to be in the mid-30's.  This marks a

---

[184] "1Q Beat, with Guidance Raise Still Striking a Conservative Tone," *Morgan Stanley*, May 5, 2023, p. 2.

[185] "First-Quarter Beat with Strongest Registration Growth in Nearly Two Years," *William Blair & Company*, May 5, 2023, p. 1.

[186] "We Expected Great Results and Conservative Guide; Impact of DoJ Subpoena in AECG Harder to Predict But We Are Not Panicking; Trimming Multiple, PT from $170 to $165," *BTIG*, May 4, 2023, p. 1.

[187] "A 1Q Beat with Plenty Left in the Tank; DOJ Subpoena is Asymptomatic For Now, but Monitoring is Warranted," *J.P. Morgan*, May 5, 2023, p. 1.

[188] "First-Quarter Beat with Strongest Registration Growth in Nearly Two Years," *William Blair & Company*, May 5, 2023, p. 1.

recovery for the business as it continues to move past the Customer Advisory Notice…"[189]

- *Wells Fargo, May 4, 2023*:  "Q1 rev of $111.4M (+20.6% y/y, -1.0% Q/Q) was ahead of consensus of and our estimate of ~$107M and ahead of IRTC's prior outlook of ~16% y/y growth.  IRTC indicated that Zio AT revenue grew ~21%, implying volumes grew ~36% (ahead of our 20% estimate).  We believe this implies Zio XT volumes grew ~21%, ahead of our 13% estimate.… IRTC raised 2023 revenue guide by $5M to $480-490M (+17-19% y/y), which compares to prior consensus of $481M and our forecast of $484M (+17.7% y/y).… IRTC noted that it is pleased with progress in improving its return device rate and Zio AT volumes after the customer advisory notice."[190]

- *William Blair & Company, May 5, 2023*:  "iRhythm announced first-quarter sales of $111.4 million (21% year-over-year growth), beating our estimate by approximately $3.5 million.  First-quarter growth was driven by continued recovery of its Zio AT business (21% revenue growth), a record number of new accounts, and further penetration into existing accounts…"[191]

114.    Some analysts described the Company's plans to launch its next-generation products as "[k]ey product development initiatives" and "catalysts":

- *Wells Fargo, May 4, 2023*:  "Key product development initiatives.  IRTC continues to expect the launch of Zio Monitor later in 2023, which will initially over time replace Zio XT.  Next, IRTC plans to launch a bluetooth-enabled Zio Monitor (Zio MCT), which will replace the Zio AT."[192]

- *William Blair & Company, May 5, 2023*:  "Stock Thoughts and Conclusions … [we] will focus on catalysts like the launch of its next-gen Zio monitor (full U.S. market launch in second half 2023, limited launch today), next-gen Zio AT, Zio watch…"[193]

115.    Some securities analysts noted that the Company reported gross margin below consensus along with higher operating expenses.  For example:

- *Wolfe Research, May 4, 2023*:  "Operating loss $11M wider than modeled… Result included $6M of 1x business transformation expenses.  Also included unquantified cost     duplication     related     to     certain     business     process     transitions.

[189] "Strong Q1 Driven by Resurging Volume Growth as Challenges Resolved; Reaffirm BUY, PT to $153," *Canaccord Genuity*, May 4, 2023, pp. 1–2.

[190] "IRTC: Solid Q1 Beat & Raise; Guidance Seems Conservative," *Wells Fargo*, May 4, 2023, p. 1.

[191] "First-Quarter Beat with Strongest Registration Growth in Nearly Two Years," *William Blair & Company*, May 5, 2023, p. 1.

[192] "IRTC: Solid Q1 Beat & Raise; Guidance Seems Conservative," *Wells Fargo*, May 4, 2023, p. 2.

[193] "First-Quarter Beat with Strongest Registration Growth in Nearly Two Years," *William Blair & Company*, May 5, 2023, p. 2 (emphasis removed from original).

Thus … implicitly … core OpEx running a touch higher than desired right now. By design.  Gross margin was nearly 68%, down 200 bps QQ, up 100 bps YY."[194]

- *Needham & Company, May 5, 2023:*  "IRTC's gross margin of 67.9% was up 110 bps Y/Y and was below consensus of 68.7%.  IRTC's GAAP operating expenses of $115.2M were up $4.9M Y/Y.  IRTC's adjusted EBITDA of ($12.0M) missed consensus of ($6.0M)"[195]

### c)    May 30, 2023:  iRhythm Form 8-K Disclosure of FDA Warning Letter

116.    After market close on May 30, 2023, iRhythm filed a Form 8-K with the SEC.[196]  As discussed above in **Section VI.B.4**, according to Plaintiff, the Form 8-K disclosed the Warning Letter and provided a brief summary of its contents.  Plaintiff also alleges the Company "share[d] certain details about the Warning Letter's contents with analysts behind the scenes."[197]  Plaintiff alleges that these disclosures caused investor losses on May 31, 2023–June 2, 2023.[198]

117.    As discussed in **Section VII.A.1**, information that comprises Alleged Truth #1 (the existence of transmission limits) had become publicly available and, in an efficient market, fully incorporated into the price of iRhythm stock by November 2, 2022.  Therefore, in an efficient market, any stock price declines that occurred over six months later, over a three-trading-day window from May 31, 2023 through June 2, 2023, following disclosure of the Warning Letter, cannot be attributed to disclosure of the existence of transmission limits (Alleged Truth #1).  Instead, any stock price decline that followed disclosure of the Warning Letter can only be attributable to information other than Alleged Truth #1, including information that, even if potentially related to Alleged Truth #1, is distinct from Alleged Truth #1.  As discussed below,

---

[194] "IRTC: Good Update but Can't Tell If Fourth Strong Enough or If Stock Could Cinco in Mayo," *Wolfe Research*, May 4, 2023, p. 1 (emphasis removed from original).

[195] "IRTC: 1Q23 Showed Improving Underlying Trends," *Needham & Company*, May 5, 2023, p. 1.

[196] Complaint, ¶ 137.

[197] Complaint, ¶ 137.

[198] Complaint, ¶ 139 ("These disclosures caused the price of iRhythm common stock to decline by $7.41 per share, or 6.1%, from a closing price of $121.68 on May 30, 2023, to a closing price of $114.27 on May 31, 2023.  As the market digested the disclosure of the Warning Letter and the additional details shared with analysts, it fell an additional 7% over June 1-2, 2023, to a closing price of $105.66 on June 2, 2023.").  According to Dr. Cain's event study model, the abnormal returns on May 31, June 1, and June 2, 2023 (-5.83%, -5.67%, and -5.97%, respectively) are all statistically significant using a 95% confidence interval (*t*-statistics = -2.47, -2.40, and -2.53, respectively).  *See* Cain Report Backup Materials.  I note that Plaintiff's claim that the price of iRhythm stock declined on June 1 and June 2, 2023 due to information revealed in the Form 8-K disclosure of the Warning Letter is inconsistent with its claim that the market for iRhythm common stock was efficient during the Putative Class Period.  In an efficient market, any stock price declines on June 1 and June 2, 2023 cannot be attributed to information disclosed after market close on May 30, 2023.

analyst commentary shows the Company's Warning Letter disclosure on May 30, 2023 is information that is distinct from the disclosure of the existence of transmission limits. Instead, securities analysts raised and discussed uncertainties regarding the process and timing through which the Company could address and resolve the FDA's concerns, as opposed to the existence of transmission limits.

118.    Indeed, the Form 8-K provided general information about the Warning Letter that was not specific to transmission limits:

> The warning letter alleges non-conformities to regulations for medical devices, including medical device reporting requirements, relating to the Company's Zio AT System and medical device quality system requirements.… The warning letter does not directly restrict the manufacture, production or shipment of any of the Company's products in the United States or require the withdrawal of any product from the U.S. marketplace.[199]

119.    Although some securities analysts discussed information potentially related to the transmission limits issue, none expressed concerns regarding the Zio AT transmission limits or timeliness. The information that analysts commented on was distinct from the existence of transmission limits (Alleged Truth #1), and included the FDA's discussion regarding whether iRhythm should have used a Form 510(k) instead of a "letter-to-file" for past Zio AT changes. More specifically:

- *Truist Securities, May 30, 2023*: "Following our conversation with mgmt. our sense is that several issues in the [Warning Letter] may revolve around: (1) readdressing, or better addressing, items that the company had already made an effort to address when previously handling the 483, (2) some new items about patient education, awareness, marketing literature, as well as, (3) questions around the clearance process for updating the AT monitoring algorithm (i.e. whether Letter-to-File was sufficient or if a 510k is needed)."[200]

- *Wells Fargo, May 30, 2023*: "[Warning Letter] includes the topics outlined in the original 483 observations as well as two additional topics. Two new updates are (1) past changes to Zio AT under the letter to file approach vs new 510k, and (2)

---

[199] iRhythm Technologies, Inc., Form 8-K, filed May 30, 2023.
[200] "Zio AT Warning Letter an Incremental Overhang & Likely to Pressure the Stock," *Truist Securities*, May 30, 2023, p. 1 (emphasis removed from original).

specific terminology IRTC uses in its marketing to describe Zio AT within the MCT space."[201]

- *William Blair & Company, May 31, 2023*: "[M]anagement suggested that in addition to the topics outlined in the initial Form 483 there were several additional topics, namely around the company's past changes to Zio AT under a letter to file approach and terminology used to describe Zio AT."[202]

- *Oppenheimer, June 1, 2023*: "Warning letter noted 3 issues:  1) untimely patient registration; 2) device construct … 3) letter to file (device changes).… Device Construct:  Zio AT has patients and device trigger limits (100 and 500, respectively) made to conserve battery life.  Roughly a low-single digit percentage of wearers hit these limit(s) and afterwards patch becomes a passive monitor.  Per IRTC, the FDA is claiming that Zio AT doesn't conform to a traditional MCOT since other devices don't have trigger limits (though necessary to be recharged)."[203]

120. Securities analysts noted that the Company's Warning Letter disclosure was likely to pressure the stock because it created uncertainty regarding the FDA's demands and how they might be resolved.  Some securities analysts commented that shipments of Zio AT may have to be suspended pending resolution of the issues raised by the FDA.  For example:

- *Truist Securities, May 30, 2023*: "Zio AT Warning Letter an Incremental Overhang & Likely to Pressure the Stock… The [Warning Letter]'s outcome could ultimately be benign/ limited while a more severe outcome could require AT (which represents ~13% of our estimated 2023E rev and a growth engine) to be removed from the market for some period of time.… Still, **we recognize that without greater clarity around timing of resolution---which could be weeks/months---this [Warning Letter] could very well serve as an extended overhang on shares.… Mgmt. noted that the company has been in touch with the FDA and dealing with/in dialogue with respect to many of these issues for 9 months.  This could mean that since a recall was not issued alongside this [Warning Letter], it may be a sign that the product will not need to come off of the market.**  But ultimately it seems like this all took mgmt. by surprise and full ramifications of potential remediation are unknown."[204]

- *J.P. Morgan, June 2, 2023*: "We expect to see **these challenges pressuring the stock given how difficult it is to risk-adjust for these types of binary events**, but we believe fears around a potential Zio AT shipment hold are overdone.… [W]e

---

[201] "IRTC: We See Limited Impact from Zio AT Warning Letter," *Wells Fargo*, May 30, 2023, p. 1 (emphasis removed from original).

[202] "Warning Letter Regrettable but Manageable with Likely Minimal Impact to Results," *William Blair & Company*, May 31, 2023, p. 1.

[203] "Correction: FDA Warning Letter Received," *Oppenheimer*, June 1, 2023, p. 1 (emphasis removed from original).

[204] "Zio AT Warning Letter an Incremental Overhang & Likely to Pressure the Stock," *Truist Securities*, May 30, 2023, p. 1 (emphasis partially removed from original).

think an appropriate base case should factor in little to no disruption from the warning letter with confidence in the full-year guide."[205]

#### d)    July 1, 2024:  DOJ Court Filing to Enforce Subpoena

121.    On July 1, 2024, attorneys for the DOJ filed a Petition for Order to Show Cause and Application for Enforcement of Administrative Subpoena (the "DOJ Petition").[206]  As discussed above in **Section VI.B.5**, Plaintiff claims that the DOJ Petition revealed "that the DOJ inquiry was in fact about the Zio AT's failure to timely transmit patient data to doctors" and "the seriousness with which the DOJ was pursuing its investigation, given that it was now seeking court intervention to obtain these documents about the Zio AT over a year after the DOJ inquiry had been disclosed."[207]  Plaintiff alleges that the DOJ Petition caused investor losses over a three-trading-day window, from July 1, 2024–July 3, 2024.[208]

122.    As discussed in **Section VII.A.1**, the information that comprises Alleged Truth #1 was publicly available and, in an efficient market, would have been fully incorporated into the price of iRhythm stock by November 2, 2022.  Therefore, in an efficient market, any stock price declines 20 months later, over July 1, 2024–July 3, 2024, after the DOJ Petition was filed, cannot be attributed to the revelation of information that comprises Alleged Truth #1.  Instead, any stock

---

[205] "Additional Regulatory Risk is Never Good, but Ship Hold Fears are Likely Overblown," *J.P. Morgan*, June 2, 2023, p. 1 (emphasis added).

[206] Petition for Order to Show Cause and Application for Enforcement of Administrative Subpoena, *United States of America v. iRhythm Technologies, Inc.*, July 1, 2024 ("DOJ Petition").

[207] Complaint, ¶ 141.

[208] Complaint, ¶ 143 ("This news caused the price of iRhythm common stock to decline by $10.88 per share, or 10.1%, from a closing price of $107.64 on June 28, 2024, to a closing price of $96.76 on July 3, 2024 as investors digested the news."). According to Dr. Cain's event study model, the abnormal returns on July 1 and July 3, 2024 (-1.04% and -2.62%, respectively) are not statistically significant using a 95% confidence interval ($t$-statistics = -0.39 and -1.00, respectively); the abnormal return on July 2, 2024 (-7.34%) is statistically significant using a 95% confidence interval ($t$-statistic = -2.79). *See* Cain Report Backup Materials.  Based on my review of public documents, I have not been able to confirm the time at which the DOJ Petition was filed with the court on July 1, 2024.  This is relevant for purposes of identifying the date when the DOJ Petition would have been incorporated into the price of iRhythm common stock in an efficient market.  Thus, based on materials available to date, I have not been able to determine whether, in an efficient market, the DOJ Petition would have been incorporated into the price of iRhythm stock on July 1, 2024 or on July 2, 2024.  Plaintiff's claim that the price of iRhythm stock declined on July 3, 2024 due to information revealed in the DOJ Petition is inconsistent with its claim that the market for iRhythm common stock was efficient during the Putative Class Period.  Moreover, as discussed previously, there is not a statistically significant negative abnormal return on July 3, 2024.  *See* Cain Report Backup Materials.  Abnormal returns that are not statistically significant cannot be reliably attributed to any new information regarding the company, as they cannot be distinguished from the typical price fluctuations of the company in the absence of new information (*i.e.*, they are not reliably different from zero).  Thus, there is no basis to attribute the abnormal return on July 3, 2024 to any new company-specific information disseminated to the market between market close on July 2, 2024 and market close on July 3, 2024.

price decline following the DOJ Petition can only be attributable to information other than Alleged Truth #1, including information that, even if potentially related to Alleged Truth #1, is distinct from Alleged Truth #1.  As discussed below, analyst commentary following the DOJ Petition did not comment on the Zio AT transmission limits information (Alleged Truth #1) but noted instead that the DOJ Petition raised questions as to what certain documents sought by the DOJ might contain and why the Company had not produced them.

123.    The DOJ Petition stated that "[i]n furtherance of an ongoing investigation involving federal health care offenses" it had issued a subpoena to iRhythm "for certain documents" and that "[a]lthough responsive to the subpoena, the Company has refused to produce three third-party consultant reports assessing the design history of their devices, as well as hundreds of related communications that do not involve an attorney, while claiming them to be privileged and/or attorney-work product."[209]  The DOJ Petition disputed iRhythm's claim that the "three third-party consultant reports" were "privileged and/or attorney-work product" and asked the court to "order iRhythm to show cause why it should not be required to produce the materials at issue and, absent a showing of good cause, order iRhythm to produce such materials without further delay."[210]  The DOJ Petition stated that "the Subpoena sought communications and other documents concerning potential issues related to the Company's Zio Systems, including that the Zio Systems were failing to timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event."[211]

124.    Based on my review of analyst reports, analyst commentary during the week that followed the DOJ Petition is consistent with any stock price decline being attributable to information other than Alleged Truth #1.  I identified one analyst report issued over the seven calendar days that followed the filing of the DOJ Petition.  That analyst report, issued by Wolfe Research, did not comment on Zio AT timeliness of transmission and also did not comment on any claim that "Zio Systems were failing to timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event."[212]

---

[209] DOJ Petition, p. 1.
[210] DOJ Petition, p. 1.
[211] DOJ Petition, p. 3.
[212] DOJ Petition, p. 3.

125.    Instead, the analyst noted that the DOJ Petition raised questions as to "what might these [third-party consultant] reports [sought by the DOJ] 'say' and why isn't the company disclosing them":

> *Wolfe Research, July 3, 2024*: "This >10% move in share price last two days seems dumb. Represents >$350M of deleted value. All because the Department of Justice (DOJ) wants three reports? DOJ inquiry has been/remains a known risk, has been for years. New info emerged earlier this week – DOJ asked a court to make IRTC disclose three consultant reports that have not yet been shared as part of responding to the subpoena. IRTC claims work product / attorney-client privilege as reasons the request should be denied. Obviously not a "good look" – what might these reports "say" and why isn't the company disclosing them? But like … does this really change potential financial consequences of this matter vs what we already should have been braced for? Probably not? The reports in question were produced in 2017, seemingly in response to a now former employee's complaint about regulatory compliance."[213]

126.    Thus, analyst commentary is consistent with any stock price declines following the DOJ Petition being due to the revelation and possible implications of a legal dispute between iRhythm and the DOJ as to whether certain documents had to be produced to the DOJ, and concerns as to what might have been contained in those materials. Even if this information were potentially related to Alleged Truth #1, as Plaintiff appears to allege,[214] this information is distinct from Alleged Truth #1 which, as of July 1, 2024, had been publicly available for months and so, in an efficient market, would previously have been reflected in the stock price. Thus, any stock price

---

[213] "IRTC: The DOJ Wants Three More Reports & that Means Delete >10% from this Stock? What?," *Wolfe Research*, July 3, 2024, p. 1 (emphasis removed from original). The July 3, 2024 Wolfe Research report (at p. 1) also appears to quote iRhythm as stating: "The U.S. Department of Justice filed a Petition for Order to Show Cause and Application for Enforcement of Administrative Subpoena seeking the production of certain documents that the Company has withheld on the basis of legal privilege. The Petition was filed in connection with the Department's April 4, 2023, Subpoena Duces Tecum (disclosed in iRhythm's Q1 2023 Form 10-Q). The Company disagrees with the Department's position and attempts to invade the attorney client privilege and the protection afforded to attorney work product. Our last discussion with the Department on this matter was last December before they reached out again late last week asking us to waive our privilege. We responded consistently with our prior communications and informed the Department that we would not be waiving our privilege. They responded (as expected) by filing the Petition. We intend to file our opposition to their petition, and the current deadline to respond is July 15, 2024. It is our strong belief that the attorney-client privilege and attorney work product doctrine are bedrock principles in the law. These privileges allow attorneys and their clients to speak freely with complete candor in their communications to ensure that clients are getting sound legal advice. We believe that it is in the best interest of the company to maintain these privileges and to not set an unnecessary precedent."

[214] Complaint, ¶ 141.

decline resulting from the DOJ Petition does not provide evidence of price impact from the Timing Statements under Alleged Truth #1.

### B. Based on Alleged Truth #2, the Economic Evidence Is Consistent with the Timing Statements Not Impacting the Price of iRhythm Stock After June 6, 2023

127.    As explained above in **Section VII**, Alleged Truth #2 is that:  (i) Zio AT did not always timely transmit ECG data as a result of certain transmission limits (Alleged Truth #1, which I also refer to as Statement 1 of Alleged Truth #2); (ii) iRhythm had received complaints about serious cardiac events, including events that involved two deaths, that were not reported to providers during the wear period because of the Zio AT transmission limits (Statement 2 of Alleged Truth #2); (iii) the Zio AT transmission limits were reached more often than expected during the wear period (Statement 3 of Alleged Truth #2); and (iv) there was a purported lag of four hours or more before the Zio AT ECG data could reach the technicians' queue for review (Statement 4 of Alleged Truth #2).  As shown below, the economic evidence is consistent with the Timing Statements having no price impact after June 6, 2023 (the date the FDA published the Warning Letter), assuming Alleged Truth #2 is the relevant truth allegedly concealed by the Timing Statements.

128.    I first address Statements 1 through 3 of Alleged Truth #2, which were publicly available no later than June 6, 2023 and that, consequently, in an efficient market, would have been incorporated into the price of iRhythm stock on or soon after that date, which was a trading day.

129.    With respect to Statement 1 of Alleged Truth #2, as discussed above as part of my analysis of price impact under Alleged Truth #1, during the Q3 2022 Earnings Call on November 1, 2022, the Company had discussed transmission limits in the context of the September 26, 2022 Zio AT CRM and the issuance of the September 28, 2022 Customer Advisory Notice.  Therefore, Statement 1 of Alleged Truth #2 would have been fully reflected in the price of iRhythm stock by market close on November 2, 2022.[215]  As discussed above, after these disclosures securities analysts commented on the existence of transmission limits.[216]  For example:

---

[215] *See* **Section VII.A.1**.
[216] *See* **Section VII.A.1**.

- *Canaccord Genuity, November 2, 2022*: "On the earnings call, iRhythm called out that it **voluntarily issued a Customer Advisory Notice to Zio AT customers related to** the patient registration process and **transmission limits**."[217]

- *BTIG, December 6, 2022:* "In October, IRTC issued a voluntary customer advisory notice. This included two updates to the device packaging and labeling that we view as minor. The first was to make clear to physicians that Zio AT patient registration had to be complete before notifications can be received. The second was specifications regarding transmission limits for AT. The limit for patient triggers is 100 and the limit for autotrigger transmission is 500.[218]

130.     Thus, Statement 1 of Alleged Truth #2 was publicly available well before June 6, 2023.

131.     Statements 2 and 3 of Alleged Truth #2 were included in the Warning Letter. The FDA sent the Warning Letter to iRhythm on May 25, 2023; it related to the Form 483 issued by the FDA on August 12, 2022 regarding Zio AT.[219] As discussed above, on May 30, 2023, iRhythm filed a Form 8-K in which it disclosed the Company "had received a Warning Letter from the FDA."[220] The Warning Letter was publicly released by the FDA on its website no later than 12:08 PM ET on June 6, 2023.[221]

132.     The Warning Letter stated, among other things:

---

[217] "Q3 Light and Q4 Guidance Not Comforting – But Likely Just a Bump in the Road; Maintain BUY, Lower PT to $155," *Canaccord Genuity*, November 2, 2022, p. 1 (emphasis added).

[218] "Near-Term Headwinds in Focus During Investor Meetings; LRP Intact," *BTIG*, December 6, 2022, p. 3. *See also* "Correction: FDA Warning Letter Received," *Oppenheimer*, June 1, 2023, p. 1 ("Zio AT has patient and device trigger event limits (100 and 500, respectively) made to conserve battery life. Roughly a low-single digit percentage of wearers hit these limit [*sic*] and afterwards patch becomes a passive monitor.").

[219] "Warning Letter: iRhythm Technologies, Inc.," *FDA*, June 6, 2023, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/irhythm-technologies-inc-643474-05252023 ("Warning Letter").

[220] Complaint, ¶ 137. *See also* iRhythm Technologies, Inc., Form 8-K, filed May 30, 2023, p. 2.

[221] "Warning Letters," *FDA*, December 23, 2025, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters. According to a securities analyst report issued by Canaccord Genuity at 12:08 PM ET on June 6, 2023, the Warning Letter was published in the morning of June 6, 2023. *See* "Warning Letter Sheds Light on FDA Issues; Zio AT (~11% of Sales) May Need a New 510(k) Clearance," *Canaccord Genuity*, June 6, 2023, p. 1 ("The FDA warning letter for iRhythm, which the company indicated in a May 30 press release that it had received, was posted to the FDA website this morning."). Thus, in an efficient market, the information conveyed by the Warning Letter would have been incorporated into the price of iRhythm stock by market close on June 6, 2023. *See also* "IRTC: Warning Letter Seems Manageable; Reiterate Overweight," *Wells Fargo*, June 6, 2023, p. 1 ("This morning (6/6) the Zio AT Warning Letter (WL) was posted."); "Warning Letter More Worrisome than Expected," *Oppenheimer*, June 7, 2023, p. 1 ("Yesterday morning … the FDA warning letter to IRTC was posted."). I note that the Oppenheimer analyst report that was issued on June 7, 2023 characterizes "[y]esterday morning" as "(6/5)[.]" Based on my review of relevant materials, this appears to be a typo as the posting date on the FDA website is listed as June 6, 2023 and other analysts note that the letter was published on the morning of June 6, 2023.

[iRhythm] implemented a transmission limit on how many times the Zio AT System transmits data. As a result, the device is only able to transmit 100 patient-triggered and 500 automatically detected arrhythmia events. Once the transmission limit is reached, the patient's data stops being transmitted for review/reporting.…

[The FDA's] inspection revealed that [iRhythm] knew that the device's transmission limit, which was explained in the previous section, was resulting in data not being transmitted. Records reviewed during [the FDA's] inspection indicate that [iRhythm] has been aware of customer complaints related to this issue since at least 2019. Specifically, [the FDA's] inspection found a **significant number of complaints regarding this issue, which revealed two deaths as well as significant arrythmias that were not reported to physicians**. As designed, the device transmission limit should only be reached in rare cases. However, the customer complaints reviewed during the inspection reveal that **the device was hitting the transmission limit more often than expected**. When the transmission limit is reached more often than expected, it introduces a nonconformance.[222]

133. Thus, the Warning Letter conveyed, among other things, the second and third elements of Alleged Truth #2; that is, that (i) iRhythm was aware of customer complaints related to the transmission limits issue, including "two deaths as well as significant arrythmias that were not reported to physicians" (*i.e.*, the information that comprises Statement 2 of Alleged Truth #2); and (ii) Zio AT "was hitting the transmission limit more often than expected" (*i.e.*, the information that comprises Statement 3 of Alleged Truth #2).[223] Thus, Statements 2 and 3 of Alleged Truth #2 became publicly available no later than when the Warning Letter was released in the morning on June 6, 2023.

134. Consistent with Statements 2 and 3 of Alleged Truth #2 being publicly available by June 6, 2023, securities analysts commented on specific information comprising each of Statements 2 and 3 of Alleged Truth #2 shortly after public release of the Warning Letter.

135. With respect to Statement 2 of Alleged Truth #2, some securities analysts noted that iRhythm was aware of customer complaints related to the Zio AT transmission limits, including two deaths, according to the Warning Letter:

- *Canaccord Genuity, June 6, 2023*: "FDA noted that IRTC has been aware of customer complaints related to the Zio AT transmission limits since 2019, which

---

[222] Warning Letter, pp. 4–5 (emphasis added).
[223] Warning Letter, pp. 4–5.

was higher than expected and included significant arrythmias and two patient deaths…"[224]

- *Truist Securities, June 6, 2023*:  "It's hard to pinpoint exactly what is most concerning but, the language/items [in the Warning Letter] that are probably touching a nerve relate to: … an inspection revealing two deaths."[225]

136.    With respect to Statement 3 of Alleged Truth #2, Oppenheimer analysts noted on June 7, 2023 that the "FDA alleges inadequate quality reporting systems due to: … transmission limits being reached more often than expected."[226]

137.    Because Statements 2 and 3 of Alleged Truth #2 were publicly available no later than the morning of June 6, 2023, in an efficient market, they would have been fully incorporated into the price of iRhythm stock by market close on that date.  Moreover, any subsequent iRhythm stock price declines, including declines following later alleged corrective disclosures, cannot serve as evidence of price impact from the alleged failure to disclose these statements of Alleged Truth #2 because, in an efficient market, such declines cannot be attributed to information that was already publicly available, including the information that comprises these statements.  Thus, the economic evidence is consistent with a lack of price impact after June 6, 2023 from an alleged failure to disclose Statements 2 and 3 of Alleged Truth #2.

138.    Third, I address Statement 4 of Alleged Truth #2, namely, that Zio AT had a purported lag of four hours or more before the relevant ECG data could reach the technicians' queue for review.  Based on my review of the Complaint, Plaintiff does not allege (or otherwise identify) any public disclosure of this purported four-hour lag issue on any of the alleged corrective disclosure dates.[227]  Moreover, based on my review of available Company disclosures, public press, and securities analyst reports issued after the beginning of the Putative Class Period, the earliest reference to the purported four-hour lag issue in the public domain that I have identified is in the operative Complaint itself, which is dated October 11, 2024.[228]  Based on Dr. Cain's event study model, there

---

[224] "Warning Letter Sheds Light on FDA Issues; Zio AT (~11% of Sales) May Need a New 510(k) Clearance," *Canaccord Genuity*, June 6, 2023, p. 1.

[225] "Warning Letter Published, We Think Stock Largely Pricing in a Worst Case," *Truist Securities*, June 6, 2023, p. 1.

[226] "Warning Letter More Worrisome than Expected," *Oppenheimer*, June 7, 2023, p. 1.

[227] I understand from counsel that the May 4, 2023 and July 1, 2024 alleged corrective disclosures did not relate to the purported four-hour lag issue.  *See* Complaint, ¶¶ 75, 134–136, 141–143, 201.

[228] To identify potential mentions of the purported four-hour lag issue in these public materials, I performed a keyword search of the relevant materials using the following keywords:  "lag," "delay," "four hour," "four-hour," "4 hour," "4-hour," "hour," and "transmission."  For my public press search, I used *Factiva* to identify articles that were tagged

was no statistically significant decline in the price of iRhythm stock on either the day the Complaint was filed or on the following trading day.[229] In addition, based on my review of available securities analyst reports, no securities analyst report was issued the day of or during the seven calendar days that followed the filing of the Complaint.[230] Taken together, this evidence is consistent with a lack of price impact from an alleged failure to disclose Statement 4 of Alleged Truth #2 in connection with the Timing Statements.

139.    In sum, the economic evidence is consistent with the Timing Statements having no price impact after June 6, 2023, assuming Alleged Truth #2 was the relevant truth that Plaintiff alleges was concealed by the Timing Statements.

140.    This conclusion is further supported by the fact that, as discussed in **Section VII.A.2.d** above, analyst commentary is consistent with any stock price declines that followed the only alleged corrective disclosure after June 6, 2023 that, according to Dr. Cain, corresponded to the Timing Statements—namely, the DOJ Petition—being attributed to the revelation of the legal dispute between iRhythm and the DOJ as to whether certain materials sought by the DOJ (such as the third-party consultant reports mentioned in the DOJ Petition) had to be produced to the DOJ, and concerns as to what might have been contained in those materials. Even if this information were potentially related to Alleged Truth #2, it is distinct from Alleged Truth #2.[231] Thus, any stock price decline resulting from that information is not evidence of price impact from the Timing Statements under Alleged Truth #2.

---

under iRhythm or IRTC or included the keywords "iRhythm," "IRTC," "Zio System," or "Zio AT" in the headline or lead paragraph of the article, and that were published between August 5, 2022 and October 14, 2024. This search included all *Factiva* sources (as opposed to major business publications only). I also identified *Bloomberg* articles that were tagged under iRhythm or included the keywords "iRhythm," "IRTC," "Zio System," or "Zio AT" in the headline or first 50 words of the article, and that were published between August 5, 2022 and October 14, 2024. For my securities analyst report search, I reviewed the securities analyst reports covering iRhythm that were available to me (*i.e.*, securities analyst reports mentioned in **Appendix C**). *See* Complaint, ¶ 201 ("The Zio AT additionally did not provide 'near real-time' notifications because, according to FE 3, it had a lag time of about four hours or more before the arrhythmia data could even reach the technicians' queue for review.").

[229] According to Dr. Cain's event study model, the abnormal returns on October 11, 2024 and October 14, 2024 (-1.98% and 0.83%, respectively) are not statistically significant using a 95% confidence interval (*t*-statistics = -0.75 and 0.31, respectively). *See* Cain Report Backup Materials.

[230] I have also not identified any news between October 11, 2024 and October 14, 2024 (the subsequent trading day) via a search of public press that would be expected to offset any negative inference from the revelation of the purported four-hour lag issue.

[231] As explained above, Statement 1 of Alleged Truth #2 was publicly available after market close on November 1, 2022. Additionally, Statements 2 and 3 of Alleged Truth #2 were publicly available no later than June 6, 2023 and so, in an efficient market, would have been reflected in the iRhythm stock price by that date. Moreover, as noted in footnote 227 above, I understand from counsel that the May 4, 2023 and July 1, 2024 alleged corrective disclosures did not relate to the purported four-hour lag issue.

**VIII.    The Economic Evidence Is Consistent with the Risk Statements Having No Impact on the Price of iRhythm Stock**

141.    The two statements that Plaintiff alleges as misleading regarding the suitability of Zio AT for certain patient groups (the Risk Statements) were made on January 10, 2023 and February 23, 2023.  As Plaintiff alleges, those statements indicated that Zio AT "was … marketed to 'high-risk' patients," which allowed iRhythm "to expand into the lucrative Mobile Cardiac Telemetry ('MCT') space."[232]  Similarly, Plaintiff claims that "given the Zio AT's purported capabilities to provide 'real-time' notifications of arrhythmic events, iRhythm explicitly marketed the Zio AT device to 'high-risk' patients as a 'mobile cardiac telemetry' ('MCT') device."[233]

142.    Plaintiff alleges the Risk Statements were materially false and misleading for several reasons, including that:  (i) "iRhythm did not have FDA clearance to market the Zio AT as intended for 'high-risk patients,' or patients who 'require timely notifications'"; (ii) the "FDA noted in its Form 483 that the Zio AT was inappropriate or even dangerous for use in high-risk patient populations"; and (iii) "the FDA determined that because 'the transmission limit is exceeded more than rarely … the device is unable to transmit ECG information for monitoring and is not remotely capable of delivering near-real time monitoring for high-risk patients."[234]

143.    In its MTD Order, the Court indicated that "the FDA understood the term" "[h]igh-risk patients" to mean patients who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death" and that these patients "were likely to need near-real-time monitoring for their condition."[235]  I understand that the Court explained that the basis for the alleged falsity of the Risk Statements was the truth allegedly concealed by the Timing Statements.[236]  The Court also noted Plaintiff's claim that Zio AT was not an MCT device because it was not "intended for high-risk patients and near real-time monitoring."[237]

---

[232] Complaint, ¶ 1.

[233] Complaint, ¶ 45.

[234] Complaint, ¶ 212.

[235] MTD Order, p. 12.

[236] For example, the Court stated that the "plausibly pled transmission limit and lag time issues support an inference the product was not appropriate for patients who 'need near real-time monitoring because they are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death.'  As the FDA observed, 'when the transmission limit is hit, the device can no longer provide near-real time monitoring for high-risk patients.'"  *See* MTD Order, p. 14.

[237] MTD Order, p. 19.

144.    In this section, I show that throughout the Putative Class Period, including the periods before and after the Risk Statements, securities analyst commentary is consistent with them having the view that the relevant patients for Zio AT were those in the MCT segment.  I understand that the MCT segment excludes patients who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death."  Specifically, I show that information discussed by securities analysts indicates that, with respect to devices in the MCT space (such as Zio AT), for various reasons (such as the need to recharge the device or lack of cellular coverage necessary for transmission), it was not expected that telemetry data would be sent on an uninterrupted basis during the device wear period.  In other words, the type of transmission interruption or delay that sometimes occurred with Zio AT was not unusual among MCT devices.[238]

145.    Following iRhythm's disclosures regarding the Zio AT transmission limits on November 1, 2022, securities analysts continued to describe Zio AT as suitable for the MCT segment.  In addition, following the Risk Statements in early 2023, there is no securities analyst commentary indicating that securities analysts had changed their views about the nature of the patient populations for Zio AT, or that this group included patients who "are more likely to have a life-

---

[238] During the Putative Class Period, the transmission of data could stop due to the limitations previously discussed. I understand that when iRhythm determined that the transmission limits would soon be reached, iRhythm would promptly reach out to healthcare providers and offer to send a replacement Zio AT patch. *See* iRhythm Response to FDA, September 1, 2022, pp. 33–34, Exhibit B to Defendants' Notice of Motion and Motion to Dismiss Second Amended Complaint, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, December 10, 2024 ("When a patch reaches either of the following threshold scenarios, a Zticket is auto generated for Customer Care to contact account within 1 day:

- Symptomatic Transmissions - 80/100 max transmissions
- Asymptomatic Transmissions - 425/500 max transmissions

Customer Care calls the HCP location to notify them their patient is nearing maximum transmissions.  The HCP location decides whether to ask iRhythm to send an additional patch or continue with current patch.  Sometimes the HCP will decide to continue with the existing patch (especially if, for example, at Day 12).  If HCP location says declines the additional patch, Customer Care does not contact the patient unless the HCP location specifically asks Customer Care to do so.  If the HCP location says 'yes,' Customer Care reaches out to the patient to let them know iRhythm is sending an additional patch.  When a patch reaches maximum transmission limit for either symptomatic or asymptomatic transmissions, iRhythm's system creates a Zticket.  Customer Care will reach out to the HCP account again to advise them of maximum transmission.  During this call, Customer Care offers to send an additional patch to the patient if needed.  Should the HCP confirm the need for an additional patch, a new device would be shipped to the patient via Overnight Mail (Monday – Friday).  A replacement request received over the weekend would be processed Monday.… If the symptomatic transmission limit (100) is reached, this does not impact the asymptomatic transmission limit (once a patch hits the 100 symptomatic transmission maximum, the asymptomatic transmissions still continue as usual).  Similarly, if the asymptomatic transmission limit (500) is reached, this will not impact the symptomatic transmission limit (once the patch hits the asymptomatic transmission maximum, the symptomatic transmissions still continue as usual).") (emphasis removed from original). *See also* September 28, 2022 Customer Advisory Notice, pp. 1–2.

threatening arrhythmia, which requires timely treatment to prevent serious injury or death." Finally, after the Warning Letter was published, securities analysts continued to describe Zio AT as being suitable for the MCT market. Concerns raised in securities analyst commentary following the Warning Letter were not that they learned that Zio AT was "inappropriate or even dangerous for use in high-risk patient populations" (using the FDA definition of "high-risk patient(s)," meaning those who "are more likely to have a life-threatening arrhythmia, which requires timely notification to prevent serious injury or death") and/or that Zio AT was not suited for the MCT segment. Securities analyst commentary also does not indicate that securities analysts shared the FDA's concerns after the release of this information. Instead, securities analysts' concerns related to possible implications of the process the FDA might require iRhythm to follow in order to address concerns raised by the FDA in the Warning Letter. For example, some securities analysts expressed concerns (and noted heightened uncertainty) about a possible temporary recall of Zio AT until the FDA concerns were addressed, including the time required for this to occur.

146. In sum, I show in this section that there is no evidence that, over the course of the Putative Class Period, securities analysts changed their views regarding the suitability of Zio AT for the MCT segment; securities analysts continued to describe Zio AT as suitable for the MCT segment (*i.e.*, that it was an MCT device) in all relevant periods—before and after the Risk Statements, after the relevant alleged corrective disclosures, and after the revelation of the Warning Letter and its contents. Further, commentary from securities analysts does not support a finding that the Risk Statements misled investors into thinking Zio AT was indicated for patients who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death." As a result, the economic evidence is consistent with the Risk Statements not impacting the price of iRhythm common stock during the Putative Class Period.

> **A.** **Securities Analysts Considered That Zio AT, Unlike Zio XT, Was Suitable for Patients in the MCT Segment and Some Noted That Products in This Segment Did Not Always Provide Uninterrupted Transmission of ECG Data**

147. As discussed in **Section IV.A**, securities analysts viewed Zio AT as suitable for the MCT segment. While Zio AT and other MCT devices offer more timely access to data than traditional AECGs, I understand that MCT devices are not substitutes for in-patient monitoring and so are

unsuitable for patients who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death."[239]

148.    Although market participants often described MCT devices as offering (near) real-time monitoring capabilities, I show that securities analysts consistently discussed limitations of these devices that constrained their ability to transmit data.

149.    First, the data transmission capability of MCT devices is constrained by the fact that they typically rely on cellular connection through a phone-like device connected wirelessly to the sensors. For example, in an October 2019 report, an Oppenheimer analyst explained that "data from the sensor is sent to the handheld device **when it is within 10-300 feet of the patient**. Once the patient is **in a location with available cellular coverage**, the stored ECG data are transmitted from the handheld device to a central monitoring station."[240] As such, the ability of MCT devices to transmit data is compromised when there is poor (or no) cellular coverage or the patient is outside the range of the handheld device.

150.    Further, most MCT devices rely on batteries that usually have insufficient capacity for the wear periods typical of these devices. As William Blair & Company analysts explained in a January 2020 report, certain MCT devices "require patients to take off their sensors and **recharge the patch at up to 7 days (takes about 1.5 hours to charge) and transmission devices every few days (takes up to 4 hours to recharge the phones)**."[241] As such, over the course of the prescribed wear period, there would typically be periods in which the patients do not wear the device and/or the device was unable to transmit data.

---

[239] "Unique 'Device-Enabled' Services Business, But Stock is Pricing-In Expected Share Gains; Initiate with Perform," *Oppenheimer*, October 21, 2019, p. 23 ("AECG selection has to take into account diagnostic power, monitoring, risk stratification accuracy, consideration about cost-effectiveness, patient acceptance, degree of automaticity, and local availability and experience, as well as symptom frequency, the overall patient clinical condition, and the probability of life-threatening arrhythmia."). *See also* Thomas Report, ¶¶ 25, 30, 34 ("The primary utility of MCTs is to provide timely diagnosis of cardiac arrhythmias, particularly in patients presenting with infrequent or transient symptoms. MCTs are primarily diagnostic tools. They are ***not*** a substitute for inpatient or emergency room evaluation for critical cardiac complaints, nor do they provide medical care or treatment in 'real time' in a literal sense.… MCT is not indicated for patients at risk for life-threatening arrhythmias where in-person monitoring by clinical staff and inpatient admission (i.e., a stay at a healthcare facility) are instead recommended.… In my experience, it is understood by healthcare providers ordering MCT devices that such devices are not a replacement for attended inpatient telemetry for patients who need critical care or have life-threatening arrhythmias (e.g., non-sustained VT, VF, high-grade AV block, bradycardia, and QT prolongation).").

[240] "Unique 'Device-Enabled' Services Business, But Stock Is Pricing-In Expected Share Gains; Initiate With Perform," *Oppenheimer*, October 21, 2019, p. 36 (emphasis added).

[241] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 20 (emphasis added).

151.     Further, as with other AECGs, the functionality of an MCT device is dependent on patient use (compliance with device instructions).  Wells Fargo analysts mentioned in a February 2023 report that "[e]lectrode-wire MCTs require daily electrode changes, and thus, **patient acceptance is reduced for long-term monitoring applications**."[242]  William Blair & Company analysts noted in a 2020 report that certain MCT devices "involve[] a locked-down Android cell phone, which **could hinder patient compliance with their devices**."[243]

152.     Even putting aside these limitations, MCT devices are typically not designed to transmit data instantaneously.  For example, a Canaccord Genuity analyst noted in a December 2021 report that "[f]or Zio AT, event data is **periodically uploaded to the cloud** with events reported to the physician during its wear."[244]

153.     Moreover, even before the start of the Putative Class Period, the Zio AT CRM dated April 2020 explicitly noted that "[t]ransmission time may vary significantly depending on how effectively the patient maintains patch-gateway proximity and gateway cellular reception"[245] and that Zio AT "is not intended for use in critical care patients because the reporting timeliness is not consistent with life-threatening arrhythmias such as ventricular fibrillation."[246]

154.     In sum, securities analysts discussed that MCT devices are constrained by technological and human factors, which means, as they noted, that these devices do not always provide continuous and immediate data transmission.  Securities analysts' descriptions of MCT devices, including Zio AT as offering "real-time" or "near real-time" transmission, should be interpreted in the context of these known limitations.

> **B.    After Release of the Customer Advisory Notice and Disclosure of the Transmission Limits on November 1, 2022, Securities Analysts Did Not Express Concerns About Whether Zio AT Was Appropriate for MCT**

---

[242] "IRTC: Initiating Coverage at Overweight, $150 Price Target," *Wells Fargo*, February 7, 2023, p. 17 (emphasis added).

[243] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage with Outperform Rating," *William Blair & Company*, January 9, 2020, p. 20 (emphasis added).

[244] "CMS Payment Challenges Baked In, Higher CMS Payment and Verily Wearable are Upside; Reinstating Coverage with BUY, $125 PT," *Canaccord Genuity*, December 20, 2021, p. 5 (emphasis added).

[245] April 20, 2020 Zio AT CRM, p. 9.  As noted in the CRM, the gateway was most effective if positioned in front of and within 10 feet of the sensor.  *See* April 20, 2020 Zio AT CRM, p. 12.  As discussed in **Section IV.B**, I understand that the transmission may also be impaired by proximity to devices that transmit at certain radio frequencies, such as baby monitors, which was also noted in the CRM.  *See* April 20, 2020 Zio AT CRM, p. 13.

[246] April 20, 2020 Zio AT CRM, p. 9.  This language was also included in the first Zio AT CRM dated April 11, 2018. *See* April 11, 2018 Zio AT CRM, p. 9.

**Patients and Continued to Describe Zio AT as a Product for the MCT Segment**

155.    As discussed in **Section VI.B**, on November 1, 2022, iRhythm disclosed that it had "voluntarily issued a customer advisory notice to … Zio AT customers [and] updated language related to the precautions in the Zio AT clinical reference manual and important information pamphlet as it relates to … Zio AT … auto trigger transmissions limits."[247]  iRhythm further explained it was working "the advisory notice into the formal packaging and labeling and the field action notice ultimately [would] end up going away."[248]

156.    My review of securities analyst reports issued after these disclosures shows that there is no evidence these disclosures led securities analysts to change their views about Zio AT's indications and target market; securities analysts continued to describe Zio AT as an MCT device suitable for the MCT segment.

157.    As an initial matter, I understand that the "precautions" noted during the Q3 2022 Earnings Call related, in part, to the 100 patient-triggered and 500 auto-triggered event limits, and that no revisions were made to device contraindications in the September 26, 2022 Zio AT CRM.  Indeed, the Zio AT CRM that had existed at the beginning of the Putative Class Period[249] noted that Zio AT "is not intended for use on critical care patients"[250] and is not suitable (*i.e.*, is contraindicated) for patients "with symptomatic episodes where variations in cardiac performance could result in immediate danger to the patient or when real-time or in-patient monitoring should be prescribed" and patients "with known history of life threatening arrhythmias."[251]  These contraindications did not change when the Company issued the revised September 26, 2022 Zio AT CRM.[252]  Further, as noted above, the April 20, 2020 Zio AT CRM warned that Zio AT's transmission capability could be hampered, as with other MCT devices, by (lack of) patient compliance, and that it "is not intended for use in critical care patients because the reporting timeliness is not consistent with life-threatening arrhythmias such as ventricular fibrillation."[253]

---

[247] Q3 2022 Earnings Call Transcript, p. 6.
[248] Q3 2022 Earnings Call Transcript, p. 8.
[249] I note that the April 2020 CRM is version number 7 and the revised CRM dated September 2022 is version number 8.
[250] April 20, 2020 Zio AT CRM, p. 3.
[251] April 20, 2020 Zio AT CRM, p. 3.
[252] September 26, 2022 Zio AT CRM, p. 3.
[253] April 20, 2020 Zio AT CRM, p. 9.

158.    Following the Company's November 1, 2022 disclosures, securities analysts generally reported on the September 28, 2022 Customer Advisory Notice without any accompanying negative commentary regarding Zio AT's suitability for the MCT segment.  Instead, analysts commented on the short-term implications of the notice that the Company itself discussed in the context of disclosing its lower FY 2022 revenue guidance.  Some securities analysts noted that the impact of the September 28, 2022 Customer Advisory Notice was expected to be transitory.  For example:

- *Truist Securities, November 1, 2022*:   "The company also issued a voluntary Customer Advisory Notice to ZioAT customers, updating language related to precau[t]ions in the Zio AT Clinical Reference Manual and Important Information pamphlet, relating to patient registration process and patient- and auto-triggered transmission limits — this resulted in slower growth within the qtr. and is expected to continue into Q4.  While growth of AT was strong in existing accounts, this provided an incremental headwind to opening new accounts."[254]

- *Wolfe Research, November 1, 2022*: "2022 revenue guide reduced 2% at midpoint. 4Q revenue implied $111M at midpoint, 6% below Street.  What happened? Several things … (3) Early 4Q a voluntary 'Customer Advisory Notice' sent to Zio AT customers updating precautionary language focused on patient registration process and patient and auto-triggered transmission limits."[255]

- *Canaccord Genuity, November 2, 2022*: "Short-term disruption to Zio AT in Q4 expected from Customer Advisory Notice:  On the earnings call, iRhythm called out that it voluntarily issued a Customer Advisory Notice to Zio AT customers related to the patient registration process and transmission limits.  Hitting these transmission limits is rare according to management (~1%, and the company takes preventive measures prior to them being hit by contacting the physician).  The company is seeing new customers not use AT when given the notice, and adjusted its forecast for Q4 to grow closer to approximately 20%, a step down from the upper 40% growth it had seen through the first nine months of the year (which we calculate is actually DOWN Q/Q).  IRTC expects this dynamic to be short term in nature (lasting through Q4/22 at the low end of guidance), as it will not have to provide the notice once it is able to update its packaging."[256]

- *William Blair & Company, November 2, 2022*:   "Lower AT utilization was the largest driver of the decrease in guidance as the company voluntarily issued a Customer Advisory Notice to Zio AT users, which led to a slowdown in new account adds and caused management to adjust Zio AT volumes forecasts to

---

[254] "Mixed Qtr & Lwr Guide, but +ve CMS Rate Shld Help Offset Ptn'l Headwinds Spilling into '23," *Truist Securities*, November 1, 2022, pp. 1–2.

[255] "Tricks and Treats Tonight – Revenue Miss & Lower but Final CMS Rule Rounds Input Up…Again," *Wolfe Research*, November 1, 2022, p. 1.

[256] "Q3 Light and Q4 Guidance Not Comforting – But Likely Just a Bump in the Road; Maintain BUY, Lower PT to $155," *Canaccord Genuity*, November 2, 2022, p. 1 (emphasis removed from original).

roughly 20% growth for the fourth quarter, compared to the over-40% growth seen through the prior nine months this year.  Management specifically called out two focus points in the advisory notice … 2) iRhythm made information clearer around the triggers of the Zio device that could prevent recordings (i.e., if the patient completes more than 100 push recordings, the device would need to be replaced; we note that this occurs in less than 1% of devices)."[257]

- *Truist Securities, November 14, 2022*:  "Mgmt provided more details around the underlying challenges associated with the ZioAT customer advisory notice, specifically noting that the notice required updates to information around the patient registration process and trigger transmission limits.  As previously noted, the notification primarily has been impacting the company's ability to open new accounts.… Mgmt believes that with advisory notice removed, field reps should feel confident calling on new centers again, therefore enabling new center activation to return toward historical trends & drive accretive growth."[258]

- *BTIG, December 6, 2022*:  "IRTC decided that while the label was being updated, they would refrain from adding new Zio AT accounts.  IRTC have since updated the language and no longer has to bring it up with new users.  Management added that existing users didn't change their behavior with the notice.… IRTC sent the advisory electronically to existing users who were asked to confirm its receipt through an electronic signature.  Because not all of them did so, sales reps will need to collect those signatures in person, which may divert some focus from selling the product.  While this friction seems to be lingering, we expect this issue to eventually be resolved."[259]

159.    Regarding the label change, William Blair & Company analysts specifically suggested the labeling change for Zio AT was largely inconsequential and would not affect device usage.  They noted the revision entailed "small changes related to labeling and the company is working on updating its clinical reference manual to directly address these dynamics" and that "both in [the analysts'] and management's history at other companies, **these are relatively small tactical issues that do not tend to have a long-term impact on adoption**."[260]

---

[257] "Short-Term Shortfall Manageable While CMS Final Rule Looks Better Than Expected and Clears the Way for Adoption," *William Blair & Company*, November 2, 2022, p. 2.  As noted above, I understand that once the transmission limits were reached for Zio AT, further transmissions of ECG data would cease but the data would still be captured and recorded.  *See* footnote 149 above.

[258] November 14, 2022 Truist Report, p. 11.

[259] "Near-Term Headwinds in Focus During Investor Meetings; LRP Intact," *BTIG*, December 6, 2022, p. 3.

[260] "Short-Term Shortfall Manageable While CMS Final Rule Looks Better Than Expected and Clears the Way for Adoption," *William Blair & Company*, November 2, 2022, p. 2 (emphasis added).

160.    Similarly, J.P. Morgan analysts noted, without discussion, the Company's statements about Zio AT labeling changes and that "management highlight[ed] that **the updated labeling is still in-line with that of competitors**."[261]

161.    In general, securities analysts continued to describe Zio AT as a device for the MCT segment after the transmission limits disclosures on November 1, 2022, suggesting they did not view the limits as incompatible with an MCT device.  For example:

- *Truist Securities, November 14, 2022*:  "Mgmt noted that IRTC's ZioAT device is ~7% penetrated in the MCT market."[262]

- *BTIG, December 6, 2022*:  "IRTC is developing a next-gen biosensor that combines the Bluetooth capability used in **Zio AT for mobile cardiac telemetry (MCT)** with Zio XT into one device."[263]

- *J.P. Morgan, January 9, 2023*:  "The year isn't without its tailwinds, however, as the launch of the Zio Monitor introduces a much smaller Bluetooth platform that could serve as a foundation for further enhancements such as the ability to downgrade from MCT, a key feature Zio AT has been lacking."[264]

162.    As I further describe in the sections below, securities analysts characterized Zio AT as an MCT device throughout the Putative Class Period, even as the partial corrective disclosures alleged by Plaintiff were revealed.

### C.    Securities Analyst Commentary Following the Risk Statements Indicates That Securities Analysts Did Not Change Their Views About the Type of Patients for Which Zio AT Was Indicated

163.    As explained in **Section VI.A.2**, the Risk Statements that survived the MTD Order were made on January 10, 2023 and February 23, 2023.[265]  Assuming that Plaintiff alleges that the Risk

---

[261] "Better than Expected Final PFS and Healthy Underlying Trends Outweigh Near-Term Challenges; Reiterate OW," *J.P. Morgan*, November 1, 2022, p. 1 (emphasis added).

[262] November 14, 2022 Truist Report, p. 11.

[263] "Near-Term Headwinds in Focus During Investor Meetings; LRP Intact," *BTIG*, December 6, 2022, p. 1 (emphasis added).

[264] "Highlights from a Bullish Lunch at the J.P. Morgan Healthcare Conference," *J.P. Morgan*, January 9, 2023, p. 1.

[265] As discussed in **Section VI.A.2**, the relevant impact dates for these statements are January 11, 2023 and February 24, 2023, respectively.  According to Dr. Cain's event study model, the abnormal return on January 11, 2023 was 4.53%, which is not statistically significant using a 95% confidence interval ($t$-statistic = 1.54) while the abnormal return on February 24, 2023 was 9.86%, which is statistically significant using a 95% confidence interval ($t$-statistic = 3.32).  *See* Cain Report Backup Materials.  The lack of a statistically significant abnormal return on January 11, 2023 is consistent with the Risk Statement on January 10, 2023 not providing new, value-relevant information about the Company to the market.  While Dr. Cain's event study model shows a statistically significant positive abnormal return on February 24, 2023, securities analyst commentary following the Company's Q4 2022 earnings disclosures,

Statements misled investors to think that Zio AT was indicated for patients who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death," I would expect securities analysts to explicitly revise their views and comment on the appropriate use and target population of Zio AT.  In other words, given securities analysts' view that MCT devices in general are not appropriate for this type of patient and that securities analysts are expected to comment on new, value-relevant information, if Plaintiff is correct that these statements misled investors into thinking that Zio AT was, in fact, indicated for patients who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death," I would have expected securities analysts, following the Risk Statements, to note that Zio AT purportedly was also indicated for this new patient type.

164.    However, based on my review, securities analyst commentary issued in the wake of the Risk Statements does not suggest their views about Zio AT and the type of patients for which it

---

earnings call, and filing of the 2022 Form 10-K (all after close on February 23, 2023) focused on topics other than whether Zio AT was appropriate for "patients with life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death."  These topics included the Company's Q4 2022 revenue that beat consensus estimates, iRhythm's bullish outlook on expanding its presence in the primary care segment (securities analysts highlighted the Company's commentary regarding several large primary care network signups including a nationwide agreement with OneMedical), and discussion of the expected launch of Zio Monitor in the second half of 2023, among other information. *See, e.g.,* "Strong Finish to a Bumpy Year; Good Setup for 2023 with Conservative Guidance; Reaffirm BUY, PT to $143," *Canaccord Genuity*, February 23, 2023, pp. 1–2 ("iRhythm reported Q4/22 revenue of $112.6M (37.7% Y/Y), ahead of our $108.9M estimate and consensus of $110.3M.… One of the near-term growth drivers for IRTC remains expansion into the primary care setting opportunity, where it sees immense greenfield opportunity. Management reiterated its view of the size of the opportunity, stating that there are 14M patients who present to their PCP with palpitations but only 5.5M ambulatory cardiac monitoring tests prescribed in the US. Despite still in the early stages of this new focus, the company has shown early signs of significant progress, including signing an agreement with One Medical and some other unnamed primary care networks.… Zio Monitor, the future device form factor that is 72% smaller, 55% lighter, and 20% thinner than the existing Zio XT, remains in limited market release, with the company planning to enter full market release in the US during Q3/23. The company believes that the improved form factor will increase patient comfort, thus compliance, and improve device return rates."); "IRTC: Q4 Beat; We Believe 2023 Guidance Is In Line with Investor Expectations," *Wells Fargo*, February 23, 2023, pp. 1–2 ("IRTC reported Q4 revenue that beat consensus. IRTC reported Q4 revenue of $112.6M (+37.7% y/y, +8.4% Q/Q), which was ahead of consensus and our estimate of ~$110M and within the prior implied guidance of $109-113M.… [IRTC] has seen a steady pace of new account openings so far in the year and is pleased with progress in the PCP [primary care provider] channel.… Key catalysts over the next 18 months. IRTC noted that the launch of Zio Monitor in 2H23, which will initially over time replace Zio XT. Management noted that this will be the largest product launch in IRTC's history."); "Strong Finish to 2022; Light 2023 Guide Was Anticipated and We Expect There Could Be Upside As Year Progresses," *BTIG*, February 23, 2023, p. 1 ("iRhythm reported Q4 revenue of $112.6M (+38% y/y), a $2.3M beat on consensus estimates. Registration volumes grew more than 20% y/y, device return rates improved, and this was another record quarter of Zio XT new account openings.… Commentary was also upbeat on early reaction to the new Zio Monitor next-gen biosensor. This significantly smaller, lighter form factor is in a limited U.S. market release and will enter a full launch in 2H23.… Management cited encouraging adoption within the PCP segment. Agreements like that with One Medical … and other national PCP chains are progressing well and ahead of expectations. Management envisions their Home Enrollment offering helping streamline adoption in this channel. IRTC cites ~14M patients in the PCP segment who could be candidates for the Zio technology.").

was indicated changed following these statements; securities analysts instead continued to characterize Zio AT as a product for the MCT market:[266]

- *William Blair & Company, January 10, 2023*: "[T]he company reiterated its intention to refile for its **next-generation Zio AT** device later this year, anticipating an early 2024 market launch. We expect this device to materially improve its **competitiveness in the MCT market, where the company is already underpenetrated relative to its core Zio XT** franchise."[267]

- *Canaccord Genuity, February 23, 2023*: "The company will add **its MCT service (the Zio AT business)** to the Zio Monitor in 2024."[268]

- *Oppenheimer, March 2, 2023*: "**Zio AT has only penetrated the MCOT market** to ~10% today."[269]

- *Truist Securities, May 4, 2023*: "Longer-term, mgmt. remains committed to growing top-line +20% over the 5-year horizon, which in our view will largely be driven by **increasing penetration within the primary care channel and market share gains within the MCT segment catalyzed by the launch of Zio MCT (next gen Zio AT)**."[270]

165. Moreover, an initiation report[271] issued by Wells Fargo on February 7, 2023 (after the first Risk Statement) provided a description of Zio AT that appears to be in-line with those in reports issued by other analysts prior to the Risk Statements. Wells Fargo analysts described Zio AT as "a bluetooth-enabled **mobile cardiac telemetry (MCT) offering**" and as "**compet[ing] in the**

---

[266] I understand that the Company's upgraded MCT device (Zio MCT or "next gen Zio AT") offered certain improvements over the existing at-issue Zio AT including extending the wear time from 14 days to 21 or more days, which was expected to help iRhythm increase its market share in the MCT segment. *See, e.g.*, "IRTC: Initiating Coverage at Overweight, $150 Price Target," *Wells Fargo*, February 7, 2023, p. 5 ("FDA submission to extend Zio AT wear time from 14 days to 21 days. We expect the submission in mid-2023. IRTC hopes this will help close the competitive gap with other MCT devices which can monitor for up to 30 days."); "First-Quarter Beat with Strongest Registration Growth in Nearly Two Years," *William Blair & Company*, May 5, 2023, p. 2 ("Notably, the [next-generation Zio AT device (Zio MCT)] will extend beyond the 14-day wear period it currently has and move toward 30 days (we estimate closer to 28 days) to narrow the gap between competitor MCOT devices, on top of its industry-leading algorithms and software features."); "4Q22 Ahead, 2023 Guide Behind on Return/AT Issues," *Oppenheimer*, February 24, 2023, p. 1 (emphasis added) ("However, **if Zio AT new form factor allows for 30-day usage without a larger battery**, it permits IRTC rapid share gains in the 1M MCOT scripts/yr.").

[267] "Updates and Takeaways Following Virtual Meeting with Management," *William Blair & Company*, January 10, 2023, p. 2 (emphasis added).

[268] "Strong Finish to a Bumpy Year; Good Setup for 2023 with Conservative Guidance; Reaffirm BUY, PT to $143," *Canaccord Genuity*, February 23, 2023, p. 2 (emphasis added).

[269] "More Details Emerge Zio Patch Monitor," *Oppenheimer*, March 2, 2023, p. 1 (emphasis added).

[270] "Solid Start To '23 With Above-CNS +21% y/y Rev; Guide Raise Shld Set-Up for More Beats in Our View," *Truist Securities*, May 4, 2023, p. 2 (emphasis removed from original; emphasis added).

[271] Securities analysts often provide in-depth analysis of a company's business in "initiation reports" (reports analysts issue to initiate coverage of a company and its stock). *See* Rosenbaum, J., and J. Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, Second Edition (John Wiley & Sons, Inc., 2013), p. 22 ("An initiating coverage equity research report refers to the first report published by an equity research analyst beginning coverage on a particular company. This report often provides a comprehensive business description, sector analysis, and commentary.").

**MCT portion** of the ACM [ambulatory cardiac monitoring] market."[272]  Consistent with other analysts, Wells Fargo analysts described MCT devices as suitable for "**patients with higher acuity symptoms** like syncope **that require fast notification and action**" while noting that MCT devices may suffer from "**low patient compliance for long period monitoring**" due, for example, to "[d]aily electrode changes."[273]

166.    In sum, I have seen no evidence that, after release of the Risk Statements, securities analysts changed their views regarding the nature of the patient populations for Zio AT, including that this group would include patients who "are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death."

### D.    Securities Analyst Commentary After the Alleged Corrective Disclosures on May 30, 2023 and When the Warning Letter Was Published Does Not Indicate That Securities Analysts Changed Their Views Regarding Whether Zio AT Was Appropriate for the MCT Patient Population

167.    As discussed in **Section VI.B.4**, Plaintiff alleges, as a partial corrective disclosure, the Company's May 30, 2023 disclosure that it received the Warning Letter, which "allege[d] non-conformities to regulations for medical devices, including medical device reporting requirements, relating to the Company's Zio AT System and medical device quality system requirements."[274] Although Plaintiff claims that iRhythm "share[d] certain details about the Warning Letter's contents with analysts behind the scenes," the Warning Letter itself did not become publicly available until a week later, on June 6, 2023.[275]

168.    In this section, I show that there is no evidence that the alleged corrective disclosures on May 30, 2023, any subsequent disclosures by the Company about the Warning Letter, or publication of the Warning Letter itself led securities analysts to change their views regarding

---

[272] "IRTC: Initiating Coverage at Overweight, $150 Price Target," *Wells Fargo*, February 7, 2023, pp. 3, 16 (emphasis added).

[273] "IRTC: Initiating Coverage at Overweight, $150 Price Target," *Wells Fargo*, February 7, 2023, p. 16 (emphasis added).

[274] Complaint, ¶ 137.

[275] Complaint, ¶ 137; "Warning Letter: iRhythm Technologies, Inc.," *FDA*, June 6, 2023, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/irhythm-technologies-inc-643474-05252023; "Warning Letters," *FDA*, December 23, 2025, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters.  *See also* "Warning Letter Sheds Light on FDA Issues; Zio AT (~11% of Sales) May Need a New 510(k) Clearance," *Canaccord Genuity*, June 6, 2023, p. 1 ("The FDA warning letter for iRhythm, which the company indicated in a May 30 press release that it had received, was posted to the FDA website this morning.").

whether Zio AT was suitable for the MCT segment.  Securities analyst commentary does not indicate that these events informed securities analysts that Zio AT was "inappropriate or even dangerous" for the MCT patient population or that securities analysts shared the FDA's concerns after the release of this information.  Instead, securities analysts commented on concerns about potential implications of the process the FDA might require iRhythm to follow to address and resolve its concerns.  For example, some securities analysts noted concerns arising from the Warning Letter regarding whether Zio AT would be temporarily removed from the market while FDA concerns were addressed as well as the time required to resolve those concerns.

### 1.    After the Alleged Corrective Disclosures on May 30, 2023 and Any Subsequent Company Disclosures Regarding the Warning Letter, There Is No Evidence Securities Analysts Changed Their Views Regarding Whether Zio AT Was Appropriate for the MCT Segment

169.    As explained above, according to Plaintiff, the Company filed a Form 8-K (press release) on May 30, 2023 in which it disclosed that it had received the Warning Letter and provided an indication of its contents.  In addition, Plaintiff alleges that while "iRhythm did not disclose the full contents of the Warning Letter on May 30, 2023, it did share certain details about the Warning Letter's contents with analysts behind the scenes."[276]

170.    My review of securities analyst reports issued between May 30, 2023 (the date of the alleged corrective disclosure) and June 5, 2023 (the day before the Warning Letter was published by the FDA) shows that they generally noted in factual terms the content of the disclosure and associated management commentary:

- *Truist Securities, May 30, 2023*:  **"Following our conversation with mgmt. our sense is that several issues in the [Warning Letter] may revolve around**:  (1) readdressing, or better addressing, items that the company had already made an effort to address when previously handling the 483, (2) some new items, related to patient education, awareness, and marketing literature, as well as (3) questions around the clearance process for updating the AT monitoring algorithm (i.e. whether Letter-to-File was sufficient or if a 510k is needed)."[277]

- *Wells Fargo, May 30, 2023*:  "[The Warning Letter] includes the topics outlined in the original 483 observations as well as two additional topics.… **IRTC believes**

---

[276] Complaint, ¶ 137.

[277] "Zio AT Warning Letter an Incremental Overhang & Likely to Pressure the Stock," *Truist Securities*, May 30, 2023, p. 1 (emphasis in original).

**there is nothing in the [Warning Letter] that would have material financial impact**.… The [Warning Letter] does not relate to the manufacturing process."[278]

- *William Blair & Company, May 31, 2023*: "While the warning letter has not yet been posted on the FDA's website, management suggested that in addition to the topics outlined in the initial Form 483 there were several additional topics, namely around the company's past changes to Zio AT under a letter to file approach and terminology used to describe Zio AT."[279]

- *Oppenheimer, June 1, 2023*: "The warning letter hasn't been posted yet. Warning letter noted 3 issues: 1) untimely patient registration; 2) device construct (trigger warning limits, traditional MCOT definition); 3) letter to file (device changes)."[280]

171. Securities analysts noted that the Company's Warning Letter disclosure was likely to "pressure" the stock by creating uncertainty regarding the FDA's demands and how they might be resolved. In particular, some securities analysts commented that shipments of Zio AT may have to be suspended pending resolution of the issues raised by the FDA:

- *Truist Securities, May 30, 2023*: "Zio AT Warning Letter an Incremental Overhang & Likely to Pressure the Stock… The [Warning Letter]'s outcome could ultimately be benign/limited while a more severe outcome could require AT (which represents ~13% of our estimated 2023E rev and a growth engine) to be removed from the market for some period of time.… Still, **we recognize that without greater clarity around timing of resolution---which could be weeks/months---this [Warning Letter] could very well serve as an extended overhang on shares.… Mgmt. noted that the company has been in touch with the FDA and dealing with/in dialogue with respect to many of these issues for 9 months. This could mean that since a recall was not issued alongside this [Warning Letter], it may be a sign that the product will not need to come off of the market.** But ultimately it seems like this all took mgmt. by surprise and full ramifications of potential remediation are unknown."[281]

- *J.P. Morgan, June 2, 2023*: "We expect to see **these challenges pressuring the stock given how difficult it is to risk-adjust for these types of binary events**, but we believe fears around a potential Zio AT shipment hold are overdone.… [W]e think an appropriate base case should factor in little to no disruption from the warning letter with confidence in the full-year guide."[282]

---

[278] "IRTC: We See Limited Impact from Zio AT Warning Letter," *Wells Fargo*, May 30, 2023, p. 1 (emphasis partially removed from original).

[279] "Warning Letter Regrettable but Manageable with Likely Minimal Impact to Results," *William Blair & Company*, May 31, 2023, p. 1.

[280] "Correction: FDA Warning Letter Received," *Oppenheimer*, June 1, 2023, p. 1.

[281] "Zio AT Warning Letter an Incremental Overhang & Likely to Pressure the Stock," *Truist Securities*, May 30, 2023, p. 1 (emphasis partially removed from original).

[282] "Additional Regulatory Risk is Never Good, but Ship Hold Fears Are Likely Overblown," *J.P. Morgan*, June 2, 2023, p. 1 (emphasis added).

172.    In contrast, based on my review, no analyst commentary suggested the Warning Letter disclosures revealed to securities analysts that Zio AT was "inappropriate or even dangerous" for the MCT patient population.  In fact, to the contrary, William Blair & Company analysts explicitly stated they were "comfortable that the patient impact was minimal."[283]

> **2.    There Is No Evidence Securities Analysts Changed Their Views as to Whether Zio AT Was Appropriate for the MCT Patient Population After the FDA Published the Warning Letter on June 6, 2023**

173.    In the Warning Letter, the FDA claimed iRhythm was in violation of several medical device regulations and that the Company's "marketing materials and other documentation" for Zio AT "state that the Zio AT Patch System is intended for 'near real-time monitoring' as a 'mobile cardiac telemetry monitor,' can provide notification 'immediately,' and that it is intended for 'high-risk patients.'"[284]   The FDA alleged "labeling [for Zio AT] describes a new patient population … by using the term 'near real-time reporting' and 'high-risk,' **instead of non-critical care**," which "**could** significantly affect the safety or effectiveness of the device because it suggests that the device is intended for a new patient population – high-risk patients" and, as such, "required the submission of a new 510(k)."[285]

174.    I understand the FDA included additional claims in the Warning Letter including that iRhythm made "changes to [Zio AT] without submission of a new 510(k),"[286] that it failed to "identify the actions needed to correct and prevent recurrence of quality problems,"[287] and that it

---

[283] "Warning Letter Regrettable but Manageable with Likely Minimal Impact to Results," *William Blair & Company*, May 31, 2023, p. 1.

[284] Warning Letter, p. 2.

[285] Warning Letter, p. 2 (emphasis added).  I understand that iRhythm had previously proposed changing the "high-risk" language to "[n]ear real-time monitoring," which the FDA noted in the Warning Letter it found insufficient based on its view that "'near real time cardiac event monitoring' implies that the device provides monitoring for high-risk patients that require clinically actionable, timely notification of life-threatening arrythmias to prevent serious injury or death."  *See* Warning Letter, p. 3.

[286] Warning Letter, p. 3.

[287] Warning Letter, p. 5.  I understand the FDA pointed to, among other things, iRhythm purportedly being "aware of customer complaints related to [Zio AT transmission limits] since at least 2019," which "revealed two deaths as well as significant arrythmias that were not reported to physicians" and "revealed that the device was hitting the transmission limit more often than expected."  *See* Warning Letter, p. 5.

violated Medical Device Reporting ("MDR") requirements.[288]  The FDA also claimed that Zio AT labeling failed to "bear adequate directions related to the device's transmission limit."[289]

175.   My review of securities analyst reports issued after the FDA posted the Warning Letter indicates securities analysts reported on the FDA's allegations in factual terms.  Moreover, securities analyst commentary suggests that availability of the Warning Letter did not lead them to determine that Zio AT was "inappropriate or even dangerous" for the MCT patient population.  That is, there is no evidence the Warning Letter led securities analysts to change their views as to whether Zio AT was suitable for the MCT segment.

176.   Although securities analyst commentary does not suggest they expected longer-term, ongoing effects on the marketing or use of Zio AT as an MCT device, some did express or report investor concerns about the potential implications of the process required to address the FDA's concerns for the Company's short-term financial performance.

177.   Securities analysts generally conveyed the FDA's claims in factual terms without stating that they shared these concerns, while also discussing possible ramifications:

- *Canaccord Genuity, June 6, 2023*:  "The FDA noted that Zio AT marketing was not in line with its labeling – and therefore Zio AT is not approved for the marketed indications and could require a new 510(k) clearance.  We believe that given this is related to Zio AT's marketing (for both near-time monitoring and high-risk patient population), there is a risk the FDA could decide to take further regulatory action against the company."[290]

- *William Blair & Company, June 6, 2023*:  "[The FDA states that] According to the company's website and marketing material on the Zio AT device, the intended use of the device is as a mobile cardiac telemetry monitor (MCT) and implies the device is intended for high-risk patients and near real-time monitoring.  That said, the FDA suggested that the device was initially cleared for long-term monitoring of arrhythmia events for 'non-critical' patients where real-time monitoring is not

---

[288] Warning Letter, pp. 8–9.  I understand the FDA alleged iRhythm failed to "submit a report to FDA no later than 30 calendar days after the day that iRhythm … received or otherwise became aware of information, from any source, that reasonably suggests that a device that it markets may have caused or contributed to a death or serious injury" and failed to "report an MDR for an event where [its] device ha[d] malfunctioned and is likely to cause or contribute to death or serious injury if this malfunction recurred."

[289] Warning Letter, p. 5.  I understand the FDA considered this necessary because "when the transmission limit is hit, the device can no longer be used for its intended purpose of transmitting patient ECG for reporting" and "when the transmission limit is hit, the device can no longer provide near-real time monitoring for high-risk patients."  *See* Warning Letter, p. 4.  I note that, even after the FDA cleared the current 510(k) submission, Zio AT continues to carry the same transmission limit warnings.  *See* "Clinical Reference Manual: Zio AT," *iRhythm Technologies, Inc.*, https://go.irhythmtech.com/hubfs/Instructions%20for%20Use%20(IFUs)/US/2025/October%20Updates/ALB0031.1 4%20-%20ZIO%20AT%20CLINICAL%20REFERENCE%20MANUAL%20LTE.pdf, p. 4.

[290] "Warning Letter Sheds Light on FDA Issues; Zio AT (~11% of Sales) May Need a New 510(k) Clearance," *Canaccord Genuity*, June 6, 2023, p. 1.

needed for reporting timeliness.… In management's view, MCTs are not used on high-risk patients, and management instead suggested the company was comparing Zio XT to Zio AT patients, which is where the 'higher-risk' categorization comes from.  Instead, high-risk patients that require near-real-time monitoring would be patients that are in the hospital and actively managed."[291]

- *BTIG, June 8, 2023*:  "According to the agency, labeling used in IRTC's marketing materials and other documents for Zio AT is inconsistent with its indications for use, since it describes or implies use in a new patient population — high risk patients.… The FDA added that describing a new patient population likely requires a new 510(k) submission… [and a]dditional FDA concerns."[292]

- *Oppenheimer, June 7, 2023*:  "IRTC will try to negotiate with the FDA and there might be interim solutions plausible.… Misbranding … In essence, the FDA is saying that the original Zio AT clearances … were not really for 'real-time monitoring' in critical care patients, a core requirement for MCOT.  Additionally, FDA alleges changes to algorithm, hardware/firmware warrant new 510k's. *Translation:  Product redesign needed, followed by new 510k…* FDA alleges inadequate quality reporting systems due to 1) transmission limits being reached more often than expected.… *Translation: Zio-AT not satisfying real-time monitoring…*"[293]

178.    William Blair & Company analysts reported management's view that Zio AT was not suitable for "high-risk patients that require near-real-time monitoring," that is, "patients that are in the hospital and actively managed,"[294] which appears consistent with securities analysts' view on the relevant patient population for Zio AT discussed in prior sections.

179.    Securities analyst commentary indicated concerns regarding the possibility the FDA might require iRhythm to temporarily remove Zio AT from the market while it addressed the issues raised in the Warning Letter:

- *Truist Securities, June 6, 2023*:  "**We think the stock is already pricing in AT coming off the market [for six quarters]** … and it's entirely possible that AT wouldn't need to be off the market for a full 6 [quarters] either."[295]

---

[291] "Thoughts After Talking to Management on Published Warning Letter," *William Blair & Company*, June 6, 2023, p. 2.

[292] "We View FDA Warning Letter as a Potential Risk to Near-term Zio AT Growth Trajectory; Reducing PT from $165 to $140," *BTIG*, June 8, 2023, p. 1.

[293] "Warning Letter More Worrisome than Expected," *Oppenheimer*, June 7, 2023, p. 1 (emphasis partially removed from original).

[294] "Thoughts After Talking to Management on Published Warning Letter," *William Blair & Company*, June 6, 2023, p. 2.

[295] "Warning Letter Published, We Think Stock Largely Pricing in a Worst Case," *Truist Securities*, June 6, 2023, p. 1 (emphasis in original).

- *Oppenheimer, June 7, 2023*: "Our View:  1) **Reasonable to expect a Zio-AT recall**… [and] at least one new 510(k) which can take 12-24 months."[296]

- *William Blair & Company, June 8, 2023*: "While [iRhythm management] are **unable to say that Zio AT will not get pulled with 100% certainty**, there has been no mention of pulling the product nor halting Zio AT distribution in its conversations with the FDA thus far, which management is taking as an encouraging sign."[297]

180. BTIG analysts noted that "there [was] potential for near-term commercial disruptions for the AT business, particularly IRTC's ability to open new accounts [although] IRTC management [did] not expect disruption [and BTIG analysts did] not change [their] forecasts at [the] time."[298]

181. Securities analysts also noted that the process required for iRhythm to address the issues raised by the FDA could be lengthy with an uncertain timeline:

- *Canaccord Genuity, June 6, 2023*: "We believe that given this is related to Zio AT's marketing (for both near-time monitoring and high-risk patient population), there is a **risk the FDA could decide to take further regulatory action against the company**.… [O]ur biggest concern would be the labeling/marketing issue for Zio AT, as this **could take longer to resolve**."[299]

- *BTIG, June 8, 2023*: "The FDA added that describing a new patient population likely requires a new 510(k) submission… If we assume IRTC submits a new 510(k) in mid-to-late July, **we could see a potential clearance sometime in Q4**. IRTC anticipates AT will remain on the market during this process."[300]

- *Canaccord Genuity, June 26, 2023*: "Last week, we had the opportunity to host a call with Leland Keyt, a regulatory expert, to hear her thoughts on iRhythm's recent warning letter from the FDA related to Zio AT … [S]he expected timelines necessary to clear the FDA issues to **run from 6-24 months.… [T]his will require company focus, resources, and time to fully resolve**.… Overall, we believe that … Ms. Keyt was **overall positive on the situation**."[301]

182. In sum, there is no evidence that the FDA's posting of the Warning Letter led securities analysts to change their views regarding whether Zio AT was suitable for the MCT segment.

---

[296] "Warning Letter More Worrisome than Expected," *Oppenheimer*, June 7, 2023, p. 1 (emphasis removed from original; emphasis added).

[297] "Highlights From the 43rd Annual Growth Stock Conference," *William Blair & Company*, June 8, 2023, p. 1 (emphasis added).

[298] "We View FDA Warning Letter as a Potential Risk to Near-term Zio AT Growth Trajectory; Reducing PT from $165 to $140," *BTIG*, June 8, 2023, p. 1.

[299] "Warning Letter Sheds Light on FDA Issues; Zio AT (~11% of Sales) May Need a New 510(k) Clearance," *Canaccord Genuity*, June 6, 2023, p. 1 (emphasis added).

[300] "We View FDA Warning Letter as a Potential Risk to Near-term Zio AT Growth Trajectory; Reducing PT from $165 to $140," *BTIG*, June 8, 2023, p. 1 (emphasis added).

[301] "Regulatory Expert Call Provides Perspective on Path Forward from FDA Warning Letter," *Canaccord Genuity*, June 26, 2023, p. 1 (emphasis added).

E.    **After the FDA Published the Warning Letter, and Throughout the Rest of the Putative Class Period, Securities Analysts Continued to Describe Zio AT as Suitable for the MCT Market**

183.    Consistent with the lack of evidence that the Company's transmission limits disclosures (including its November 1, 2022 disclosures along with the September 28, 2022 Customer Advisory Notice and September 26, 2022 Zio AT CRM) or publication of the Warning Letter changed securities analysts' views regarding whether Zio AT was appropriate for the MCT segment, securities analyst commentary throughout the rest of the Putative Class Period continued to describe Zio AT as an MCT device:

- *Morgan Stanley, July 11, 2023*:  "The Zio MCT is IRTC's next generation longer duration MCT device, which will eventually replace the ZIO AT."[302]

- *Baird, July 18, 2023*:  "We see a durable and linear high-teens to 20% growth outlook over the next five years, with plenty of upside potential.  Launched in 2009, IRTC's Zio[-]Service including patch-based, wire-free, ZioXT (long-term continuous monitor) and **Zio AT (mobile cardiac telemetry)** biosensors help physicians monitor and diagnose patients with suspected arrhythmias."[303]

- *Needham & Company, August 4, 2023*:  "It offers Zio XT, is a wearable patch-based biosensor, continuously records and stores ECG data from every patient heartbeat for up to 14 consecutive days; and **Zio AT**, also provides ECG data but also **provides physicians with actionable notifications during the wear period**."[304]

- *William Blair & Company, September 27, 2023*:  "[iRhythm] introduces its **next-generation Zio AT (Zio MCT)** in late 2024/early 2025.… We believe the Zio MCT will allow the company to close the gap on other competitive devices and **increase its low-single-digit market share within the MCT market today**."[305]

- *Truist Securities, December 11, 2023*:  "[M]gmt. said that the overall longer-term wear (long-term continuous [XT/Monitor] & **MCT [AT**/MCT]) would continue to grow.… If MCT growth does decelerate, mgmt. felt confident that AT/Monitor

---

[302] "Beat it? Evaluating IRTC's 20% CAGR LRP; Reiterate OW.," *Morgan Stanley*, July 11, 2023, p. 14.

[303] "'Getting Back into Rhythm': Initiate Outperform and $130 PT," *Baird*, July 18, 2023, p. 1 (emphasis removed from original; emphasis added).  Baird included the same language in subsequent reports issued throughout the rest of the Putative Class Period, including August 3, 2023, November 3, 2023, February 22, 2024, May 2, 2024, and August 2, 2024.

[304] "IRTC: Fundamentals Were Strong in 2Q23," *Needham & Company*, August 4, 2023, p. 2 (emphasis added). Needham included the same language in subsequent reports issued throughout the rest of the Putative Class Period, including November 3, 2023, February 23, 2024, and May 3, 2024.

[305] "Third-Quarter Preview: Stock Pullback Should Provide an Attractive Entry Point for Upcoming Catalysts," *William Blair & Company*, September 27, 2023, p. 2 (emphasis added).

could still grow as the company has significant room to grow share in this segment."[306]

- *William Blair & Company, January 9, 2024*: "iRhythm can still continue to make design changes to its next-gen Zio MCT and submit once MCT's next-generation features are complete.… We continue to believe this device and its enhanced capabilities from **today's AT should drive meaningful share gains from the less than 10% share it has today in the $500 million plus domestic MCT market** (in comparison its market share in LTCM is 70%)."[307]

- *Canaccord Genuity, February 23, 2024*: "Management expects that the two [510(k)] clearances will be gained in the next six months, and further believes that it can still make meaningful share gains in 2024 with its **Zio AT product, which has approximately 7% of penetration in the MCT market** and comprises ~11% of sales."[308]

- *Canaccord Genuity, May 2, 2024*: "The company will still launch **its next generation Zio MCT, which will replace Zio AT** … **The next generation product could help IRTC grow in the MCT marketplace**, where it only has 7% share."[309]

- *Wolfe Research, May 2, 2024*: "Illustrative Product DCF," in which the Wolfe Research analyst presented cash flow forecast for the Zio AT/MCT based on size of MCT market.[310]

- *Canaccord Genuity, August 1, 2024*: "[T]he market access team achieved six new payor contracts, adding 2.9M covered lives to Zio services as well as updated exiting policies **to improve MCT utilization (with Zio AT)**."[311]

184.    In fact, less than two months after the Warning Letter was made public, iRhythm reported it had largely reached agreement with the FDA about appropriate labeling changes for Zio AT, allowing the Company to continue to market Zio AT as an MCT device.  As part of its Q2 2023

---

[306] "Truist Securities MedTech WC Bus Tour - Takeaways & Sentiment Reads from Our 13 Meetings (10 Public & 3 Private)," *Truist Securities*, December 11, 2023, p. 9 (emphasis added; brackets in original).

[307] "Multiple Catalysts Point to Upside in Initial 2024 Guidance of 18% to 20% Growth; First 510(k) for Zio AT Submitted," *William Blair & Company*, January 9, 2024, p. 2 (emphasis added).

[308] "Look Past the Near-Term Margin Headwinds Driven by Higher-than-Expected New Product Adoption; Reiterate BUY, PT to $133," *Canaccord Genuity*, February 23, 2024, p. 2 (emphasis added).

[309] "Q1 Revenue Beat with Opex Spend Higher, Forward Guidance Unchanged; Maintain BUY, PT to $122," *Canaccord Genuity*, May 2, 2024, p. 2 (emphasis added).

[310] "IRTC: Small Beat & Raise; 2H+ Setup Continues to Intrigue," *Wolfe Research*, May 2, 2024, p. 5.  Wolfe Research appears to use a multi-step calculation to estimate "US Zio AT/MCT Revenue."  First, it estimates "US Mobile Cardiac Telemetry Cases" as the product of its estimates for "Ambulatory Cardiac Monitoring Rx US" and "MCT Rx Penetration."  Wolfe Research then appears to estimate "Total serviceable Zio AT/MCT Cases" as the product of its estimates for "US Mobile Cardiac Telemetry Cases" and "Zio AT/MCT Market Share."  The last portion of the calculation appears to estimate "US Zio AT/MCT Revenue" as the product of Wolfe Research's estimates for "Total serviceable Zio AT/MCT Cases" and "Average Selling Price."  Wolfe Research included similar analyses in subsequent reports issued on June 19, 2024 and August 1, 2024.

[311] "Financials Solid; FDA and DOJ Wrinkles Create a Bit of Uncertainty; Maintain BUY and $122 PT," *Canaccord Genuity*, August 1, 2024, p. 2 (emphasis added).

earnings disclosures on August 3, 2023, iRhythm reported that it had "agreed to make [the FDA's] requested labeling changes that will allow [the Company] to continue to market Zio AT as a device for ambulatory and CT [cardiac telemetry] services."[312]  In response to a securities analyst's question during the same earnings call, iRhythm further indicated that:

> We worked through with the FDA sort of our suggested labeling changes.  They've had some suggested labeling changes as well to which we're in full alignment with and we're in the process of working those into the label as we speak.  And most of that is just around clarifying more clearly for the patient and the physician matters around trigger limits, duration of the life of the product, those sort of things.  So it's nothing that's going to impede our ability to sell the products or market the product.  And to your point, yes, we've reached alignment there that we can continue to monitor or start to market as an MCT monitor into the future.[313]

185.    Securities analysts commented on this:

- *Baird, August 3, 2023*:  "Management noted they've already submitted a response to the FDA and believe they've clarified with the agency (and made) **labeling modifications that will allow IRTC to continue to market ZioAT**."[314]

- *BTIG, August 3, 2023*:  "An update on [the Warning Letter] issue **was largely positive**, with IRTC getting clarification on **necessary labeling revisions that importantly will allow Zio AT to continue being marketed as a mobile cardiac telemetry monitor**."[315]

- *Canaccord Genuity, August 3, 2023*:  "On the warning letter front, management continues to engage with the FDA regarding Zio AT.… **IRTC added additional language to its labeling for the product per the agency's request, and it remains on market as a MCT device**."[316]

- *Oppenheimer, August 4, 2023*:  "[I]n light of the FDA Warning letter, we had preemptively lowered our FY23 and FY24 numbers to account for the potential of a Zio-AT recall… **Well....we were wrong.  Based on company representation on the call, Zio-AT will remain on the market as-is, with some label changes based**

---

[312] iRhythm Technologies, Inc., "FQ2 2023 Earnings Call Transcripts," *S&P Global Market Intelligence*, August 3, 2023, 4:30 PM ET ("Q2 2023 Earnings Call Transcript"), p. 6.

[313] Q2 2023 Earnings Call Transcript, p. 9.

[314] "Positive Warning Letter Update on an Above CNS Revenue/Profit in Q2," *Baird*, August 3, 2023, p. 1 (emphasis added).

[315] "Volumes Buoy Up Sales, Conservative Guide Anchors 2H Expectations; Progress on Warning Letter with Zio AT Remaining Firmly on the Market," *BTIG*, August 3, 2023, p. 1 (emphasis added).

[316] "Strong Q2 as Company Overpowers Headwinds from FDA Warning Letter; Reaffirm BUY & Lower PT to $136," *Canaccord Genuity*, August 3, 2023, p. 1 (emphasis added).

**on discussions with the FDA. Hence, we are reincorporating Zio-AT contributions back**."[317]

### IX. Dr. Cain Fails to Provide a Reliable Damages Methodology Consistent with Plaintiff's Theory of Liability in This Matter

186.    Dr. Cain opines that "[d]amages in this matter can be calculated on a class-wide basis subject to a standard, common methodology" and that "the out-of-pocket damages methodology, which is routinely used in § 10(b) securities class actions, is reasonable and applicable given Plaintiff's theory of liability."[318]  I understand that, at the class certification stage, plaintiffs are required to put forth a methodology that can be used to measure damages on a class-wide basis in a manner consistent with their theory (or theories) of liability.[319]

187.    As explained in this section, as a matter of economics, Dr. Cain fails to provide a methodology that can be used to reliably measure damages on a class-wide basis for iRhythm common stock in a manner consistent with Plaintiff's theory of liability in this matter.[320]

### A. Summary of Dr. Cain's Opinion Regarding a Purported Methodology to Calculate Damages on a Class-Wide Basis

188.    Dr. Cain opines that "[c]ommon [s]tock damages in this matter under §§ 10(b) and 20(a) claims can be calculated on a class-wide basis utilizing common methodologies."[321]  As summarized below, the only reference to a specific methodology that Dr. Cain offers is to an event study.  Dr. Cain opines that a damages measure often "begins with" an event study.[322]  However, beyond an entirely generic reference to an event study, Dr. Cain fails to provide any indication of how an event study could actually be applied to measure damages in this matter, and provides no analytical support for his claim that, if necessary given the facts and circumstances at issue, adjustments to the event study results can be made; Dr. Cain fails to indicate which methodology

---

[317] "2Q Strong; Zio-AT Status Quo," *Oppenheimer*, August 4, 2023, p. 1 (emphasis removed from original; emphasis added).

[318] Cain Report, ¶ 3.

[319] I also understand that Plaintiff and Dr. Cain are not required to measure damages at this stage of the litigation.

[320] I summarize my understanding of Plaintiff's theory of liability in **Section VI**.

[321] Cain Report, ¶ 113.

[322] Cain Report, ¶¶ 101–103.

or methodologies he could use to make such adjustments. [323]   Because Dr. Cain offers no methodology beyond his generic reference to an event study, my analysis focuses on whether an event study can reliably measure class-wide damages in this matter in a manner consistent with Plaintiff's theory of liability.  As I explain, it cannot.  As a result, Dr. Cain fails to provide a damages methodology consistent with Plaintiff's theory of liability in this matter.

189.   Dr. Cain proposes to use the "out-of-pocket" formula to calculate damages for violations of Section 10(b) and states that "out-of-pocket" damages equal "the artificial inflation in the prices of the Company's Common Stock at the time of purchase minus the artificial inflation in the prices of the Company's Common Stock at the time of sale."[324]  Dr. Cain defines artificial inflation on a given day during the Putative Class Period as "the difference between the actual prices paid on that day for iRhythm Common Stock and the true or 'but-for' values of the security absent the alleged misrepresentations and omissions."[325]  In other words, to measure artificial inflation, one must use the estimated stock price that would have prevailed on each day during the Putative Class Period had iRhythm disclosed the relevant truth that Plaintiff alleges was concealed on that date (*i.e.*, the alleged relevant "but-for" disclosures).

190.   As an initial matter, I note that Dr. Cain's characterization of the "out-of-pocket" formula as a methodology is devoid of economic substance; he points to a *formula*—a tautological definition of a concept—as opposed to a *methodology* that describes how the formula could be applied to measure damages (saying that one will apply the "out-of-pocket" formula as a methodology for measuring damages is the same as saying that one will measure artificial inflation as artificial inflation, or that one will calculate "but-for" prices as "but-for prices").  In other words, by simply referencing the "out-of-pocket" formula, Dr. Cain fails to provide any indication of the methodology he proposes to use to calculate "but-for" prices, which are, almost invariably, not

---

[323] Cain Report, ¶¶ 105, 107 ("It may be necessary to adjust the 'inflation ribbon' representing the inflation measure during the Class Period.… The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period.").

[324] Cain Report, ¶ 101.  Dr. Cain also notes a limit on damages for securities "not sold prior to the full revelation of the fraud" based on a "90-day lookback period under the [Private] Securities Litigation Reform Act of 1995."  *See* Cain Report, ¶ 101.

[325] Cain Report, ¶ 102.  *See also* Cain Deposition, 218:22–219:3 ("Artificial inflation refers to a distortion in the stock price where the stock price is actually trading above its true or correct value because of alleged misrepresentations or omissions or a scheme, or some other issue like that.").

prices that can be observed in the actual world and that, consequently, require a methodology to be implemented to estimate damages.

191.    Dr. Cain appears to understand that estimating damages using the out-of-pocket formula requires a methodology to reliably measure artificial inflation.  Thus, to measure inflation, Dr. Cain points to event study–based measures of stock price reactions at the time of alleged corrective disclosures, stating that "the level of artificial inflation in the prices of the [*sic*] iRhythm Common Stock caused by Defendants' alleged misstatements and omissions can be calculated based on the abnormal price reaction [estimated using an event study] to disclosures revealing these alleged misstatements and omissions."[326]  He goes on to state that "[o]nce the dissipation of artificial inflation via the corrective disclosures has been estimated, daily levels of inflation can be calculated by 'back-casting.'"[327]  He notes, with respect to back-casting, that:

> One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation."  This assumes that per-share inflation equaled a constant dollar amount above the correct share price over the Class Period.  This input to the out-of-pocket damages formula often calculates artificial inflation based upon the abnormal dollar value of a stock price decline utilizing an event study conducted around one or more corrective disclosures.  Alternatively, one can measure "constant percentage inflation," which assumes that each day's share price was inflated by a constant percentage amount above the correct stock price over the Class Period.  This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in the stock price as calculated through an event study around one or more corrective disclosures.[328]

192.    Dr. Cain implicitly acknowledges the limitations of event studies to estimate artificial inflation:  "[i]t may be necessary to adjust the 'inflation ribbon' representing the inflation measure during the Class Period to account for the evolution of inflation during the Class Period (*e.g.*, the evolving economic materiality, or timing, of alleged misrepresentations or omissions) or to account for any portion of the price decline on an alleged corrective disclosure date that is not attributable to the alleged fraud (disaggregation of confounding information)."[329]  However, given the facts and circumstances at issue here, Dr. Cain fails to provide any indication as to what

---

[326] Cain Report, ¶ 103.
[327] Cain Report, ¶ 104.
[328] Cain Report, footnote 100.
[329] Cain Report, ¶ 105.

methodology or methodologies he would use to "adjust the 'inflation ribbon'" or to explain how such methodologies would allow him to measure damages consistent with Plaintiff's theory of liability. Instead, Dr. Cain simply asserts that whatever the inflation ribbon may be, it will be "common to all class members."[330]

### B. By Itself, an Event Study Can Only Reliably Measure Artificial Inflation in Limited Circumstances

193.    As discussed in **Section IX.A** above, the only reference to something like a methodology that Dr. Cain puts forth is his reference to an event study. Dr. Cain claims that he would use an event study to estimate abnormal stock price declines (*i.e.*, what Dr. Cain labels as "abnormal price reaction[s]"[331]) that follow the alleged corrective disclosures and use those abnormal stock price declines as his estimate of artificial inflation in the price of iRhythm common stock over the course of the Putative Class Period.[332]

194.    However, as explained in this section, by itself, an event study can only reliably measure artificial inflation over the course of a class period in limited circumstances. Thus, Dr. Cain's purported damages approach, which relies on an event study, will only serve to reliably estimate artificial inflation in this matter if the facts and circumstances at issue here correspond to those limited circumstances in which an event study can reliably measure artificial inflation. Dr. Cain fails to establish this and, as explained below in **Section IX.C** and **Section IX.D**, those limited circumstances are not present in this matter. Thus, in order to provide a class-wide methodology to reliably measure damages consistent with Plaintiff's theory of liability, Dr. Cain would need to identify a methodology (or methodologies) and establish that it could be applied here to reliably estimate artificial inflation consistent with Plaintiff's theory of liability. Dr. Cain fails to do this and, consequently, has failed to provide a class-wide methodology to measure damages consistent with Plaintiff's theory of liability in this matter.

---

[330] Cain Report, ¶ 105.

[331] *See* Cain Report, ¶ 103. Dr. Cain defines "abnormal return" as "the component of the daily stock price return that is not attributable to market-wide or industry-wide movements." *See* Cain Report, ¶ 67.

[332] Cain Report, ¶¶ 103–104 ("Using the results of the event study, along with disclosures of firm-specific information, the level of artificial inflation in the prices of the [*sic*] iRhythm Common Stock caused by Defendants' alleged misstatements and omissions can be calculated based on the abnormal price reaction to disclosures revealing these alleged misstatements and omissions.… Once the dissipation of artificial inflation via the corrective disclosures has been estimated, daily levels of inflation can be calculated by 'back-casting' and adjusting the inflation measure for each day throughout the Class Period.").

195.    An event study is, in essence, a statistical tool used to estimate the abnormal return of a security on a specified event date (*i.e.*, the change in the security's price on that date after removing the effect of market and industry factors).  This abnormal return is a measure of the effect of company-specific information on its security price on a given date (the event or impact date) conditional on the overall mix of information in the market at that time.[333]  Under the event study approach that Dr. Cain describes, the level of any artificial inflation in the price of iRhythm stock will only change when an alleged corrective disclosure causes the Company's stock price to decline.

196.    As a matter of economics, negative abnormal returns that follow alleged corrective disclosures may serve as a reliable measure of inflation during a class period when certain conditions hold.  The key economic assumptions that underlie such an approach include that, absent the alleged fraud:  (i) any new, corrective information revealed on the alleged corrective dates would have been publicly disclosed or fully anticipated by the market from the beginning of the Putative Class Period and so, in an efficient market, fully reflected in the Company's stock price at that time (in other words, the information that allegedly should have been disclosed instead of, or in addition to, the alleged misrepresentations (the relevant truth Plaintiff alleges was concealed) on each date of the Putative Class Period is the same as that which Plaintiff alleges as corrective); (ii) the implications for value (and so the stock price) of this information would not have changed over time, regardless of any changes in the Company's business, operations, or the macroeconomic environment in which it operates; and (iii) negative abnormal returns following the alleged corrective dates exclusively represent the implications for value of the information that would have been available or anticipated at the beginning of the Putative Class Period (*i.e.*, no other, non-allegation-related "confounding" information was released on the alleged corrective dates).

197.    Dr. Cain fails to provide any economic analysis that might support the validity of these assumptions—which are a necessary basis for the use of an event study to reliably measure inflation—in this matter.  To the extent these assumptions are not satisfied here, then, as a straightforward matter of economics, the "abnormal price reaction to disclosures revealing [the]

---

[333] *See* MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1, 1997, pp. 13–39.

alleged misstatements and omissions"[334] (*i.e.*, the abnormal return) will not reliably measure inflation throughout the Putative Class Period. Below, I provide examples that illustrate why these assumptions can be violated.

198. With respect to the *first* assumption, I note that the abnormal return on a given day provides a measure of the effect on a security's value of all company-specific information that comes to the market that day. It does not measure the valuation effect of some other piece of information, even if that other piece of information is related in some way to that which is disclosed or otherwise revealed. Thus, if, as a matter of economics, the relevant truth that Plaintiff alleges was concealed differs from information Plaintiff alleges as corrective, an abnormal stock price decline following the alleged corrective disclosure may not reliably measure any artificial inflation that dissipated on the alleged corrective disclosure date, much less inflation earlier in the class period. Suppose a plaintiff alleges investment losses from a stock price reaction to news of an adverse regulatory action that plaintiff alleges as corrective, and that the regulatory action occurred after a months-long investigation plaintiff alleges should have been disclosed. Unless the regulatory action was certain to occur once the investigation began, this is not information that plaintiff could reasonably allege the company could have disclosed previously, while the investigation was ongoing. Thus, any abnormal stock price decline in response to disclosure of the regulatory action would not reliably measure the possibly less negative (or zero) stock price reaction, if any, that would have occurred had the company disclosed what it could at the relevant time, namely, the existence of an ongoing investigation.

199. With respect to the *second* assumption, I note that the abnormal return on a given day provides a measure of the effect on a security's value of the new company-specific information revealed that day conditional on the mix of publicly available information on that day, including then-existing market, industry, and company conditions. Any changes in the mix of information over time, including during a class period, can change the valuation effect of a given specific piece of information. Thus, the market's reaction to allegedly corrective information at the time of an alleged corrective disclosure may differ from how it would have reacted had the same allegedly

---

[334] Cain Report, ¶ 103.

corrective information been disclosed at a different point in time.[335]  Suppose a company allegedly failed to disclose a limitation in one of its products at a time that product was expected to account for 5% of company revenues.  Over time, sales of that product increased to the point it accounted for half the company's revenues, after which it disclosed the product limitation.  Here, the stock price decline when the limitation was disclosed would reflect the market's understanding the product accounted for 50% of the company's revenue and so would not properly measure how the stock price would have responded had the company instead disclosed the limitation at an earlier date when the product only represented 5% of company revenues.

200.    With respect to the *third* assumption, I note that because the abnormal return on a given day measures the combined effect of all company-specific information released that day, it will not measure the impact of a particular item of company-specific information if a number of value-relevant items of company-specific information are disclosed or otherwise become known to the market that day.  Thus, if the allegedly corrective information is only one of several pieces of value-relevant company-specific information that became available to the market on a particular day, an additional method is required to remove the effects of the non-allegation-related (confounding) information.[336]  Suppose that, on the same day a company disclosed allegedly corrective information regarding a product limitation, it also announced an unexpected downward revision of its revenue guidance due to worsening macroeconomic conditions.  The abnormal stock price decline that day (estimated using an event study) would capture the *combined* effect of the product limitation news and news of the impact of worsening macroeconomic conditions on

---

[335] Dr. Cain acknowledges that the amount of artificial inflation estimated using an event study may need to be adjusted "to account for the evolution of inflation during the Class Period (*e.g.*, the evolving economic materiality, or timing, of alleged misrepresentations or omissions)."  *See* Cain Report, ¶ 105.  Dr. Cain further acknowledged at deposition that an event study "does not provide all of the information regarding this question of whether inflation evolved over the class period."  *See* Cain Deposition, 245:6–17.

[336] Dr. Cain acknowledges that the amount of artificial inflation estimated using an event study may need to be adjusted "to account for any portion of the price decline on an alleged corrective disclosure date that is not attributable to the alleged fraud (disaggregation of confounding information)."  *See* Cain Report, ¶ 105.  Dr. Cain further acknowledged at deposition that "there are times when the residual stock price movements reflect more than just the corrective information that [he is] trying to measure" and that "every time that [he has] calculated artificial inflation, [he has] controlled for confounding factors."  *See* Cain Deposition, 240:3–12, 244:3–10.  At deposition, Dr. Cain claimed that "valuation analysis, principles of finance in economics, internal discovery documents, academic research, [and] analyst reports" "would be examples of tools and techniques that [he has] employed in disaggregating confounding information."  *See* Cain Deposition, 245:18–246:3.  However, beyond this generic reference to a grab bag of tools, he did not provide any analysis or articulate any methodology to determine which "tools and techniques" would be appropriate given the facts and circumstances at issue in the current matter.

company guidance (*i.e.*, it would not isolate the effect of the allegedly corrective disclosure of the product limitation).

201.    If one or more of the economic assumptions discussed above do not hold, a methodology or methodologies beyond an event study would be required to reliably measure artificial inflation. The next two subsections illustrate how the first of the three assumptions discussed above fails to hold and that Dr. Cain has not provided an alternative or supplementary reliable damages methodology to his proposed event study method.[337]  As a result, Dr. Cain fails to provide a class-wide methodology that can be used to reliably measure damages consistent with Plaintiff's theory of liability.

**C.    Dr. Cain Fails to Provide a Methodology to Account for Economic Differences Between Information Plaintiff Alleges as Corrective and Information That iRhythm Would Have Been Able to Disclose Earlier in the Putative Class Period**

202.    The first assumption (discussed above) fails to hold because there are a number of instances in which there are economic differences between the information that iRhythm would have been able to disclose at the time of the Challenged Statements (*i.e.*, the relevant truth that Plaintiff alleges was concealed) and what Plaintiff alleges as corrective.  Below, I provide examples of such economic differences with respect to both the Accuracy Statements and the Timing Statements and Risk Statements (Dr. Cain combines the Timing and Risk Statements and refers to them as "Transmission Claims"[338]).  As a result of these economic differences, event study-based measures

---

[337] While I do not explicitly address reasons the second and third assumptions would fail in the body of my report, that does not mean those assumptions hold in this matter.  For example, with respect to the second assumption, Dr. Cain would have to provide a methodology that can reliably measure inflation accounting for any changes in market expectations of the contribution of Zio AT to iRhythm's profitability over the two years of the Putative Class Period. With respect to the third assumption, for example, Dr. Cain would have to provide a reliable methodology to remove any portion of the abnormal return following disclosure of the Company's Q3 2022 results attributable to non-allegation-related issues, such as staffing challenges and macro factors, negatively impacting the financial performance and outlook measures the Company disclosed at that time (as discussed in footnote 150 above).  Dr. Cain has not described a methodology or methodologies that could address these issues.

[338] Cain Report, ¶¶ 18–23.  *See also* Cain Report, ¶ 16 ("The Complaint alleges that Defendants misled investors by making materially false and misleading statements in relation to: Zio AT's near-real-time transmission of arrhythmia data and appropriateness of the device's use for 'high-risk' patients, and concealed the dangerous condition caused by the device's transmission limit and other flaws ('Transmission Claims').").  *See also* Cain Deposition, 27:10–28:15 ("Q.… I'd just like to understand what your understanding is of plaintiff's claims.… A.… My recollection is that there are transmission claims and accuracy claims, and, under the transmission claims, that also includes the appropriateness for high-risk patients, and it relates to … the Zio AT product by iRhythm … and that it involves alleged misrepresentations pertaining to the timeliness of the transmission of that data as well as the resulting appropriateness for high-risk patients.").

of abnormal returns that follow the alleged corrective disclosures, which Dr. Cain proposes to use to measure artificial inflation, cannot serve as a reliable measure of artificial inflation consistent with Plaintiff's theory of liability, and Dr. Cain has not provided an alternative methodology to account for those economic differences.

### 1.    Examples of Economic Differences with Respect to the Accuracy Statements

203.    Dr. Cain identifies two alleged corrective events Plaintiff alleges revealed the relevant truth that was concealed with respect to the Accuracy Statements ("Accuracy Statements Alleged Corrective Disclosures"[339]):  (i) an August 1, 2024 Company disclosure that "the FDA had issued new Form 483s concerning inspections of facilities in Cypress and San Francisco related to their investigation of the Zio Systems" and that the Company's "Chief Financial Officer ('CFO') was resigning";[340] and (ii) an August 9, 2024 *Capitol Forum* article that purportedly provided "details of the new FDA Form 483s, including that the Company had received over 4,000 complaints since May 2022 about [certified cardiographic] technician misreading of data."[341]  According to Dr. Cain, "[t]he disclosures allegedly revealed the existence of and details pertaining to a regulatory investigation into the Company and the alleged overstatement of accuracy-related capabilities of the Company's Zio AT device,"[342] and the August 9, 2024 disclosure further revealed that iRhythm "failed to report complaints about the devices to regulators."[343]

204.    I understand that Plaintiff specifically alleges as corrective in the Accuracy Statements Alleged Corrective Disclosures information regarding the Form 483 that iRhythm received following the FDA inspection of the Company's San Francisco facility, which took place between July 15, 2024 and July 31, 2024 (*i.e.*, the San Francisco 2024 Form 483).[344, 345]  This Form 483 was issued on July 31, 2024, when the inspection concluded.[346]  I further understand that, in light of the Court's determination in the MTD Order, the first actionable Accuracy Statement occurred on

---

[339] Cain Report, ¶ 24.

[340] Cain Report, ¶ 25.

[341] Cain Report, ¶ 26.

[342] Cain Report, ¶ 24.

[343] Cain Report, ¶ 26.

[344] iRhythm Technologies, Inc., San Francisco, Form 483, July 31, 2024 ("San Francisco 2024 Form 483"), p. 1.

[345] In discussing the Accuracy Statements Alleged Corrective Disclosures, I understand from counsel that Plaintiff focuses on issues related to iRhythm's CCTs, including how they prepared reports.  *See* Complaint, ¶¶ 148, 152.

[346] San Francisco 2024 Form 483, p. 1.

September 21, 2022 while the last occurred on May 2, 2024.[347]   Thus, the surviving Accuracy Statements occurred before the FDA began the relevant inspection in July 2024.

205.    It is not the case that all of a company's manufacturing facilities are being inspected by the FDA all of the time or that FDA inspections always lead to a Form 483.  According to the FDA, "[f]ollowing an inspection, the agency evaluates inspection findings to determines [*sic*] if the facility is in compliance with applicable laws and regulations and classifies the inspection" as either:  "No action indicated (NAI)"; "Voluntary action indicated (VAI)"; or "Official action indicated (OAI)."[348]  When the inspection is classified as NAI, no Form 483 is issued.[349]  Consider iRhythm's San Francisco facility.  The FDA website provides records of four inspections of this facility since 2010 (inspections that ended on December 14, 2010, February 28, 2013, June 29, 2016, and July 31, 2024), only one of which led to a Form 483 (the July 31, 2024 inspection).[350] Thus, inspections are relatively infrequent and do not necessarily result in a Form 483.  Moreover, my understanding is that Plaintiff does not allege otherwise with respect to the Company's San Francisco facility.

206.    Consequently, the 2024 FDA inspection and associated San Francisco 2024 Form 483 allegedly revealed in the Accuracy Statements Alleged Corrective Disclosures are not information that Plaintiff could reasonably claim iRhythm should have disclosed at the time any of the actionable Accuracy Statements were made.  In other words, as a matter of economics, whatever Plaintiff may reasonably claim iRhythm should have disclosed during the Putative Class Period, the information revealed by the Accuracy Statements Alleged Corrective Disclosures differs from that which iRhythm would have been able to disclose at the time of the Accuracy Statements.

---

[347] *See* **Exhibit 2**.  *See also* Complaint, ¶¶ 225–231, which summarizes the alleged misrepresentations in Plaintiff's Accuracy Claims alleged to have occurred after July 2022.  I understand that the Court, in its MTD Order, dismissed all alleged misrepresentations before July 2022.  *See* MTD Order, p. 24 ("Because of Mr. Blackford's involvement in iRhythm's Response to the first FDA Form 483, his knowledge of the Warning Letter, and his statements showing knowledge of the Forms 483, the Court, drawing all inferences in Plaintiff's favor, holds Plaintiff adequately alleges scienter as to him beginning in July 2022.").

[348] According to the FDA, NAI means "no objectionable conditions or practices were found during the inspection"; VAI means "objectionable conditions or practices were found, but the agency is not prepared to take or recommend any administrative or regulatory action"; and OAI means "regulatory and/or administrative actions are recommended." *See* "Inspection Classifications," *FDA*, April 18, 2024, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-basics/inspection-classifications.

[349] According to the FDA, "No Action Indicated (NAI) classification indicates a facility is in an acceptable state of compliance.  The facility, usually, was not issued a Form FDA 483 or FDA-4056 at the conclusion of the inspection." *See* "Inspections Database Frequently Asked Questions," *FDA*, September 13, 2024, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/inspections-database-frequently-asked-questions.

[350] "Inspections," *FDA*, https://datadashboard.fda.gov/oii/cd/inspections.htm.

Thus, the event study approach that Dr. Cain proposes, by itself, is unlikely to be capable of reliably measuring artificial inflation, if any, that Plaintiff attributes to the Accuracy Statements.[351]

[351] An additional challenge that Dr. Cain faces in quantifying artificial inflation, if any, arising from the Accuracy Statements is that, following the Accuracy Statements Alleged Corrective Disclosures, none of the securities analysts raised concerns that CCT interpretation of Zio AT reports was less accurate than previously expected. Instead, following the August 1, 2024 Q2 2024 earnings disclosures and Form 10-Q filing, analysts commented on other information, including positive developments such as revenue and profitability results that beat consensus estimates as well as negative developments such as newly announced Form 483 observations for the Cypress and San Francisco facilities and the announcement of a leadership transition with the CFO stepping down, among other disclosures. *See, e.g.*, "CFO Change & New Form 483s Add Noise To an Otherwise Solid 2Q Beat; Key 510K/MCT Timelines On Track," *Truist Securities*, August 1, 2024, p. 1 ("2Q upside included a big GM beat & was [operationally] 'clean,' but several new form 483 observations (following a late July FDA inspection) & an announced CFO transition could distract from an otherwise solid result.") (emphasis removed from original); "Another Dose of Regulatory Risk Overshadows a Strong 2Q24," *J.P. Morgan*, August 1, 2024, p. 1 ("iRhythm posted another solid quarter after the close on Thursday headlined by sales of $148M (+19%) that beat consensus by $2.0M and helped drive a significant beat on profitability as well with EBITDA of $5.0M relative to expectations for close to $0M.… However, we still expect the stock to trade off tomorrow as investor concerns are likely to fall more on (1) the newly announced 483s for the company's Cypress and San Francisco facilities that we walk through more below, (2) the scheduled hearing for the DOJ lawsuit set to begin on October 10th, and (3) the announcement that CFO Brice Bobzien would be stepping down.… New 483s are clearly not ideal, but we view this round of observations as being a step better than the ones seen for AT even if they're not completely benign. To clarify, these observations boil down to [] how differences of opinion between the certified cardiographic technicians (CCT) and the treating physician should be treated from a reporting perspective. As an example, if a physician disagrees with the diagnosis or type of arrhythmias highlighted by a CCT in a final report delivered by iRhythm, it would not be recognized as a device-related safety incident currently. Although the report should ultimately be viewed as a tool the physician is using to diagnose patients (ie. AI), we think this type of occurrence should be recognized as a safety concern given the chance for misdiagnosis. We believe the current scope of the FDA's request is limited to establishing clear processes for handling and recognizing these types of complaints. Importantly, management does not see it as an indictment of device safety or accuracy in the same way as the AT warning letter was, a belief that's corroborated by the body of data we have highlighting the accuracy of diagnoses made by the Zio offering.") (emphasis removed from original); "New FDA Update Clouds Q2 Growth Acceleration Beat/Raise, but Drivers in Place," *Baird*, August 2, 2024, p. 1 ("2Q24 beat on revenue by ~1% (+19% Y/Y), while adj EBITDA came in significantly ahead of expectations.… Perhaps the biggest surprise was the new 483 observation from the FDA (yesterday), though our sense is that the update is less worrisome than prior 483/Warning Letter updates/delays.… Dan Wilson, who has served as an Executive VP with IRTC since 2019, and remains one of IRTC's most tenured senior members (since CEO Blackford's 2021 appointment) will take over as CFO, following Brice Bobzien's decision to step down due to personal matters.") (emphasis removed from original). Following the August 9, 2024 *Capitol Forum* Article, I identified one analyst report issued in the subsequent seven calendar days; that report did not comment on the *Capitol Forum* Article and did not note concerns that CCT interpretation of Zio AT reports was less accurate than previously expected. Instead, the analyst report discussed opinions from an FDA consultant regarding iRhythm's recently announced Form 483 observations, noting that "[o]ur consultant does not believe the new 483s impact the resolution of the preexisting Zio AT warning letter," and that it was unlikely the FDA would seek a product recall or a consent decree related to the new Form 483 observations, among other comments. *See* "Takeaways from FDA Consultant's Review of the New 483 Observations," *Wells Fargo*, August 15, 2024, p. 1 ("Our FDA consultant evaluated IRTC's recent 483 observations and believes these are unlikely to lead to a product recall but there is a possibility of another warning letter. Our expert notes the 483s could potentially be resolved in less than a year… Our consultant does not believe the new 483s impact the resolution of the preexisting Zio AT warning letter. With IRTC's ongoing process through the filing of two catch-up 510(k)'s for Zio AT, the company should be able to separate the lifting of that warning letter from the new 483s.") (emphasis removed from original).

### 2.    Examples of Economic Differences with Respect to the Timing Statements and Risk Statements

207.    According to Dr. Cain, there are five alleged corrective disclosures that Plaintiff alleges revealed the relevant truth that Plaintiff alleges was concealed with respect to the Timing Statements and Risk Statements ("Timing and Risk Statements Alleged Corrective Disclosures").[352]  As with the Accuracy Statements, there are economic differences between the relevant truth that Plaintiff alleges was concealed that iRhythm would have been able to disclose at the time of the Timing Statements and Risk Statements and information that Plaintiff alleges as corrective of those statements.

208.    For example, Dr. Cain identifies two alleged corrective events related to the DOJ Subpoena that was issued to iRhythm on April 4, 2023 by "the Consumer Protection Branch, Civil Division of the U.S. Department of Justice ('DOJ')" that allegedly revealed, in part, the relevant truth with respect to the Timing Statements and Risk Statements:  (i) a May 4, 2023 Company disclosure that "it had received a subpoena from the [DOJ] allegedly related to the Company's claims about the Zio Systems' ability to timely transmit patient data to physicians";[353] and (ii) a July 1, 2024 court filing by the DOJ, which purportedly revealed that it "was seeking to enforce [the] subpoena against iRhythm, as the Company had refused to provide certain documents" and that the "DOJ inquiry related to the Zio AT 'failing to timely transmit patient cardiac data.'"[354]

209.    I understand that, in light of the Court's determination in the MTD Order, the earliest surviving Timing Statement occurred on August 5, 2022 and that the surviving Risk Statements occurred in January and February 2023.[355]  Thus, some of the Timing Statements and both Risk Statements occurred months before the DOJ Subpoena was issued on April 4, 2023.  Consequently, the DOJ Subpoena and subsequent developments that resulted from the subpoena (such as the alleged corrective disclosures on May 4, 2023 and July 1, 2024) are not information that Plaintiff could reasonably claim iRhythm should have disclosed at the time of the earlier Timing Statements or either of the surviving Risk Statements.

---

[352] Cain Report, ¶¶ 18–23.
[353] Cain Report, ¶ 21.
[354] Cain Report, ¶ 23.
[355] *See* **Section VI.A**, **Exhibit 1**.

210.    As a matter of economics, whatever Plaintiff may reasonably allege iRhythm should have disclosed during the Putative Class Period, the information purportedly revealed by the May 4, 2023 and July 1, 2024 alleged corrective events differs from that which iRhythm would have been able to disclose before the date it received the DOJ Subpoena, on April 4, 2023.  Thus, the event study proposed by Dr. Cain, by itself, is unlikely to be capable of reliably measuring artificial inflation, if any, arising from these Timing Statements or either of the Risk Statements.

211.    In sum, because of economic differences between the information disclosed on certain alleged corrective disclosure dates and the relevant truth that Plaintiff alleges was concealed, an alternative or supplementary methodology beyond an event study method that can reliably measure inflation consistent with Plaintiff's theory of liability would be required.  However, Dr. Cain fails to offer such a methodology.

### D.    Dr. Cain Fails to Provide a Methodology to Account for How Alleged Artificial Inflation May Have Evolved During the Putative Class Period

212.    The first assumption (discussed in **Section IX.B** above) that must hold for abnormal returns from an event study to reliably measure artificial inflation fails for the additional reason that the economic implications (for the value of the stock) of the relevant truth that Plaintiff alleges was concealed (and thus any artificial inflation) may have changed over time as the alleged issues underlying the relevant truth evolved during the two years of the Putative Class Period.  Thus, even if the abnormal returns following the alleged corrective disclosures reliably measured the value implications of the relevant truth that Plaintiff alleges was concealed at the time of the alleged corrective disclosures (a proposition Dr. Cain fails to support), there would still be economic differences between the allegedly corrective information and the relevant truth that Plaintiff alleges was concealed earlier in the Putative Class Period.  As an example, I discuss how the value implications of the relevant truth that Plaintiff alleges was concealed regarding the Accuracy Statements may have changed during the Putative Class Period.  If the value implications of the relevant truth that Plaintiff alleges was concealed changed during the Putative Class Period, the abnormal returns following the alleged corrective disclosures measured using an event study, which Dr. Cain proposes to use to measure artificial inflation, cannot serve as a reliable measure of artificial inflation consistent with Plaintiff's theory of liability.  Moreover, Dr. Cain fails to

provide a methodology that can account for changes in the value implications of the relevant truth that Plaintiff alleges was concealed.

213.     As discussed in **Section II** and **Section VI**, I understand that the Putative Class Period comprises a period of approximately two years from August 5, 2022 through August 9, 2024, during which Plaintiff alleges six Accuracy Statements, made between September 21, 2022 and May 2, 2024, that survived the MTD Order.[356]  The relevant truth that Plaintiff alleges was concealed by the Accuracy Statements was, in part, that "iRhythm received thousands of complaints regarding the accuracy of the Zio AT [(the Accuracy Complaints)], because iRhythm's reports to patients and doctors routinely included inaccurate arrhythmia data or failed to include arrhythmias altogether due to misinterpretation by the Company's technicians."[357]  Plaintiff alleges that iRhythm received "approximately 4,014 complaints" between May 2, 2022 and July 19, 2024 (the Accuracy Complaints Period).[358]

214.     According to the Form 483 issued after the FDA's inspection of the Company's San Francisco facility in July 2024, at least some Accuracy Complaints occurred after the date of the earliest surviving Accuracy Statement, on September 21, 2022, and at least some of these complaints occurred after the date of the latest surviving Accuracy Statement, on May 2, 2024.[359] The San Francisco 2024 Form 483 identifies specific examples of the Accuracy Complaints dated August 29, 2023, June 19, 2024, and June 24, 2024.[360]

215.     Counsel has provided me with certain iRhythm data regarding the Accuracy Complaints. These data provide information on the timing of the Accuracy Complaints during the Putative Class Period.[361]  First, as shown in **Exhibit 3**, these data show that the cumulative number of complaints increased over time.  By the end of Q3 2022 (September 30, 2022), the data reflect a total of 368 complaints whereas by the end of Q2 2024 (June 30, 2024), they reflect a total of 3,906 complaints.[362]  Second, these data also show that the per-quarter *rate* of complaints increased over the course of the Putative Class Period.[363]  Specifically, there were 253 complaints during Q3 2022

---

[356] *See* **Exhibit 2**.
[357] Complaint, ¶ 232. *See also* MTD Order, pp. 4, 20; San Francisco 2024 Form 483, pp. 1, 7.
[358] Complaint, ¶ 117. *See also* MTD Order, p. 20; San Francisco 2024 Form 483, p. 1.
[359] *See* **Exhibit 2**.
[360] San Francisco 2024 Form 483, pp. 7–8.
[361] iRhythm00254002.
[362] *See* **Exhibit 3**.
[363] *See* **Exhibit 3**.

(three months ended September 30, 2022, which includes the first part of the Putative Class Period), which increased by more than three times—to 789 complaints—by Q2 2024 (three months ended June 30, 2024, the last full quarter before the end of the Putative Class Period).[364]

216.   Because Plaintiff alleges that iRhythm failed to disclose it had received "thousands of complaints regarding the accuracy of the Zio AT,"[365] Plaintiff appears to allege that, at the time each of the Accuracy Statements was made, iRhythm should have disclosed the number of Accuracy Complaints it had received at each respective date.  Because that number increased over time, as shown in **Exhibit 3**, the number of the Accuracy Complaints Plaintiff appears to allege as part of the relevant truth iRhythm should have disclosed at the date of each Accuracy Statement would also have increased over time.  In addition, the higher per-quarter *rate* of Accuracy Complaints received later in the Accuracy Complaints Period may have indicated that any alleged issues with respect to "misinterpretation by the Company's technicians" that allegedly led to the Accuracy Complaints had become more severe later in the Accuracy Complaints Period.[366]  To the extent any alleged issues with respect to "misinterpretation by the Company's technicians" that allegedly led to the Accuracy Complaints became more severe over time, any implications for the value of the stock may also have also changed over time.[367]

217.   Dr. Cain fails to provide a methodology to analyze the value implications of the relevant truth that Plaintiff alleges was concealed regarding the Accuracy Statements on each day during the Putative Class Period, taking into account that the alleged technician issues underlying the relevant truth that Plaintiff alleges was concealed by the Accuracy Statements may have evolved over time.  Because the abnormal stock price decline estimated using an event study is a single number, it cannot, by definition, capture changes in artificial inflation over time.  Consequently, because these alleged technician issues may have evolved over time, an alternative methodology beyond an event study would be required to account for any changes in the valuation effect of the relevant truth that Plaintiff alleges was concealed over time to reliably measure artificial inflation,

---

[364] *See* **Exhibit 3**.
[365] Complaint, ¶ 232.
[366] Complaint, ¶ 232.
[367] Based on the iRhythm data, it appears that only 1,559 of the 4,013 Accuracy Complaints (approximately 39%) relate to technician misses.  *See* **Exhibit 3**.  To the extent Plaintiff alleges that only complaints that relate to technician issues are corrective, any abnormal stock price decline attributable to news of complaints that relate to other issues would need to be removed from the stock price decline on the relevant alleged corrective date, which would require a methodology other than an event study.  Dr. Cain has not provided such a methodology.

if any, arising from the Accuracy Statements over the course of the Putative Class Period. Although Dr. Cain acknowledges that "[i]t may be necessary to adjust the 'inflation ribbon' representing the inflation measure during the Class Period to account for the evolution of inflation during the Class Period (*e.g.*, the evolving economic materiality, or timing, of alleged misrepresentations or omissions)[,]" he fails to put forth a damages methodology that can reliably account for how artificial inflation, if any, arising from the Accuracy Statements may have changed over the course of the Putative Class Period to reflect how the alleged technician issues identified by Plaintiff may have evolved over time. [368]

Executed this 5th day of January, 2026

_____

Douglas Skinner, Ph.D.

---

[368] Cain Report, ¶ 105.

**Appendix A**

**DOUGLAS J. SKINNER**
Sidney Davidson Distinguished Service Professor of Accounting
The University of Chicago Booth School of Business
5807 South Woodlawn Avenue
Chicago, IL 60637
Phone: 773-702-7137
dskinner@uchicago.edu
Google Scholar
SSRN

## Education

B.Ec. (First Class Honours), Accounting/Finance, Macquarie University, 1985.
M.S., Applied Economics, University of Rochester, 1988.
Ph.D., Accounting (major area), Finance (minor area), University of Rochester, 1989.

## Appointments

University of Chicago, Booth School of Business
Sidney Davidson Distinguished Service Professor of Accounting, 2023-
Deputy Dean for Faculty, 2015-2016, 2017-2024.
Interim Dean, 2016-2017.
Eric J. Gleacher Distinguished Service Professor of Accounting, 2014-2022.
John P. and Lillian A. Gould Professor of Accounting, 2006-2013.
Executive Director, Accounting Research Center, 2011-2016.
Professor of Accounting and Neubauer Family Faculty Fellow, 2005-2006.
Neubauer Faculty Fellow and Visiting Professor of Accounting, 2003-2004.

Independent Trustee and Audit Committee Chair, Harbor Funds, Harbor Funds II, and
Harbor ETF Trust, 2020-

Senior Fellow, Asian Bureau of Finance and Economic Research (ABFER), 2017-

*Journal of Accounting Research*
Senior Editor, 2006-2021.

*Journal of Accounting & Economics*
Editor, 2000-2005.
Associate Editor, 1994-2000.

University of Michigan Business School (now Ross School of Business)
KPMG Professor of Accounting, 1998-2005
Accounting Area Chair, 2001-2003
Professor of Accounting, 1997-2005
Associate Professor of Accounting, 1993-1997
Assistant Professor of Accounting, 1989-1993

**Appendix A**

Coopers & Lybrand (Sydney)
Auditor, 1980-82.

## Scholarly Honors and Awards

FARS 2020 Best Paper Prize for "Run EDGAR Run: SEC Dissemination in a High Frequency World."  With Jonathan L Rogers and Sarah L. C. Zechman.

Distinguished Ph.D. Mentoring Award, 2020, Financial Reporting Section, American Accounting Association.

BlackRock prize for best paper, 2015 Review of Accounting Studies conference ("The role of the media in disseminating insider trading news."  With Jonathan Rogers and Sarah Zechman.)

Hillel J Einhorn Excellence in Teaching Award, 2014.

Emory Williams Award for Teaching Excellence, 2013.

FARS 2009 Best Paper Prize for "Earnings Momentum and Earnings Management."  With James Myers and Linda Myers.

Jensen Prize for best paper in Corporate Finance and Organizations published in the *Journal of Financial Economics* in 2004.  ("Are Dividends Disappearing?  Dividend Concentration and the Consolidation of Earnings." With Harry DeAngelo and Linda DeAngelo.)

CQA/IBES Research Competition, 1998. ("Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio."  With Richard Sloan.  Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.)

KPMG Peat Marwick Faculty Fellow 1993-1996.
KPMG Peat Marwick Research Fellow 1991-1993.
Deloitte Haskins & Sells Foundation Doctoral Fellow 1986-88.
University of Rochester Sproull Fellow 1985-1987.

## Main Publications

"Options Markets and Stock Return Volatility."  Journal of Financial Economics 23, 1, June 1989: 61-78.

"Options Markets and the Information Content of Accounting Earnings Releases."  Journal of Accounting & Economics 13, 3, October 1990: 191-211.

**Appendix A**

"Dividends and Losses."  With Harry DeAngelo and Linda DeAngelo.  Journal of Finance 47, 5, December 1992: 1837-1863.

"The Investment Opportunity Set and Accounting Procedure Choice: Preliminary Evidence."  Journal of Accounting & Economics 16, 4, October 1993: 407-445.

"Accounting Choice in Troubled Companies."  With Harry DeAngelo and Linda DeAngelo.  Journal of Accounting & Economics 17, 1-2, January 1994: 113-143.

"How Do Taxes Affect Investors' Stock Market Realizations? Evidence from Tax-Return Panel Data."  With H. Nejat Seyhun.  Journal of Business 67, 2, April 1994: 231-262.

"Why Firms Voluntarily Disclose Bad News."  Journal of Accounting Research 32, 1, Spring 1994: 38-60.  (This article is abstracted in The CFA Digest 24, 4, Fall 1994.)

"Reversal of Fortune: Dividend Policy and the Disappearance of Sustained Earnings Growth."  With Harry DeAngelo and Linda DeAngelo.  Journal of Financial Economics 40, 3, March 1996: 341-371.

"Earnings Disclosures and Stockholder Lawsuits."  Journal of Accounting & Economics 23, 3, November 1997: 249-282.

"Determinants of the Valuation Allowance for Deferred Tax Assets under SFAS-109."  With Gregory S. Miller.  The Accounting Review 73, 2, April 1998: 213-233.

"An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium."  With Richard Frankel and Marilyn Johnson.  Journal of Accounting Research 37, 1, Spring 1999: 133-150.

"Earnings Management: Reconciling the Views of Accounting Academics, Practitioners, and Regulators."  With Patricia Dechow.  Paper delivered at the AAA/FASB Financial Reporting Issues Conference in December, 1999.  Accounting Horizons, 14, 2, June 2000: 235-250.

"Special Dividends and the Evolution of Dividend Signaling."  With Harry DeAngelo and Linda DeAngelo.  Journal of Financial Economics, 57, 3, September 2000: 309-354.

"Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio."  With Richard Sloan.  Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.
- *Winner, 1998 Chicago Quantitative Alliance/IBES Research Competition.*

"Large Sample Evidence on the Debt Covenant Hypothesis."  With Ilia Dichev.  Journal of Accounting Research, 40, 4, September 2002: 1091-1123.

**Appendix A**

"The Role of Supplementary Statements with Management Earnings Forecasts."  With Amy P. Hutton and Gregory S. Miller.  <u>Journal of Accounting Research</u> 41, 5, December 2003: 867-890.

"Employee Stock Options, EPS Dilution, and Stock Repurchases."  With Daniel Bens, Venky Nagar, and M. H. Franco Wong.  <u>Journal of Accounting and Economics</u>, 36, 1-3, December 2003: 51-90.

"Are Dividends Disappearing?  Dividend Concentration and the Consolidation of Earnings."  With Harry DeAngelo and Linda DeAngelo.  <u>Journal of Financial Economics</u>, 72, 3, June 2004: 425-456.
- *Jensen Prize for best paper, Corporate Finance and Organizations*.

"Earnings Momentum and Earnings Management."  With James Myers and Linda Myers.  <u>Journal of Accounting, Auditing and Finance</u>, 22, 2, Spring 2007: 249-284.
- *FARS Best paper prize, 2009.*

"Does Earnings Guidance Affect Market Returns?  The Nature and Information Content of Aggregate Earnings Guidance."  With Carol Anilowski and Mei Feng.  <u>Journal of Accounting and Economics</u> 44, 1-2, September 2007: 36-63.

"The Evolving Relation between Earnings, Dividends, and Stock Repurchases."  <u>Journal of Financial Economics</u> 87, 3, March 2008: 582-609.

"Accounting for Intangibles – A Critical Review of Policy Recommendations."  <u>Accounting and Business Research</u> 38, 3, 2008: 191-204.

"A reply to Lev's rejoinder to 'Accounting for Intangibles – A Critical Review of Policy Recommendations.'"  <u>Accounting and Business Research</u> 38, 3, 2008: 215-216.

"The Rise of Deferred Tax Assets in Japan: The Role of Deferred Tax Accounting in the Japanese Banking Crisis." <u>Journal of Accounting and Economics </u> 46, 2-3, 2008: 218-239.  Lead article.

"Corporate Payout Policy."  With Harry DeAngelo and Linda DeAngelo.  <u>Foundations and Trends in Finance</u> 3, 2-3, 2008: 95-287.

"Management Forecasts in Japan: An Empirical Study of Forecasts that are Effectively Mandated" (Previously titled "When Voluntary Disclosure Isn't Voluntary: Management Forecasts in Japan.")  With Kazuo Kato and Michio Kunimura.  <u>The Accounting Review</u> 84, 5 (September 2009): 1575-1606.

"Earnings Guidance and Market Uncertainty."  With Jonathan Rogers and Andrew Van Buskirk.  <u>Journal of Accounting and Economics</u> 48, 1 (October 2009): 90-109.

**Appendix A**

"Implications for GAAP from an analysis of positive research in accounting."  With S. P. Kothari and Karthik Ramanna.  (Previously titled: "What Should GAAP Look Like?  A Survey and Economic Analysis.")  Journal of Accounting and Economics 50, 2-3 (December 2010): 246-286.  (Invited review paper.)

"What Do Dividends Tell Us About Earnings Quality?"  With Eugene Soltes.  Review of Accounting Studies 16, 1 (March 2011): 1-28.

"Measuring Securities Litigation Risk."  With Irene Kim.  Journal of Accounting and Economics 53, 1-2 (February-April 2012): 290-310.

"Audit Quality and Auditor Reputation:  Evidence from Japan."  With Suraj Srinivasan.  The Accounting Review 87, 5 (September 2012): 1737-1765.

"The Politics of Accounting Standard-Setting: A Review of Empirical Research."  With Brandon Gipper and Brett J. Lombardi.  Australian Journal of Management 38, 3 (December 2013): 523-551.

"Payout policy through the financial crisis: The growth of repurchases and the resilience of dividends."  With Eric Floyd and Nan Li. Journal of Financial Economics 118, 2 (November 2015): 299-316.

"The role of the media in disseminating insider trading news."  With Jonathan L. Rogers and Sarah L. C. Zechman. Review of Accounting Studies 21, 3 (September 2016): 711-739.
- *BlackRock prize for best paper, Review of Accounting Studies conference, 2015.*

"Is Japan Really a "Buy"?  The Corporate Governance, Cash Holdings, and Economic Performance of Japanese Companies."  With Kazuo Kato and Meng Li.  Journal of Business Finance & Accounting 44, 3 & 4 (March/April 2017): 480-523.

"Run EDGAR Run: SEC Dissemination in a High Frequency World."  With Jonathan L Rogers and Sarah L. C. Zechman.  Journal of Accounting Research 55, 2 (May 2017): 459-505.
- *FARS Best paper prize, 2020.*

"Importing Activists: Determinants and Consequences of Increased Cross-border Shareholder Activism."  With Mark G. Maffett and Anya Nakhmurina.  Journal of Accounting & Economics 74, 2-3 (November-December 2022): 101538.

"Corporate Managers' Perspectives on Forward-Looking Guidance: Survey Evidence."  With Andrew C. Call, Paul Hribar, and David Volant.  Journal of Accounting & Economics, 78, 2-3 (November-December 2024): 101731.

"Why Did the Big 4 Get So Large?  Evidence from Australia."  (Previous title, "The Evolution of Audit Market Structure and the Emergence of the Big Four: Evidence from Australia.")  With Matthew Pinnuck and Colin Ferguson (deceased).  Review of Accounting Studies 30 (September 2025): 2508-2554.

**Appendix A**

"Agency Costs of Free Cash Flow, Capital Allocation, and Payouts."  With Harry DeAngelo and Kathleen Kahle. Journal of Financial Economics 172 (October 2025): 104117.


**Conference Proceedings**

"Stock Returns, Trading Volume, and Bid-Ask Spreads Around Earnings Announcements: Evidence from the NASDAQ National Market System."  Proceedings: Seminar on the Analysis of Security Prices, 36, 1, May 1991: 289-329.  SSRN version https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2143649


**Current Working Papers**

"Moving Forward: Management Guidance and Earnings Announcement Returns."  With Yao Lu.  April 2020, Revised September 2020. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3687764

"Do Actions Speak Louder than Words?  The Relation Between Payouts and Guidance Since 2000."  With Yao Lu.  August 2023.  Revised November 2024.  Under revision. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4322036


**Invited Discussions and Commentaries (non-refereed)**

"Are Disclosures About Bank Derivatives and Employee Stock Options 'Value Relevant'?" Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 393-405.

"What Motivates Managers' Choice of Discretionary Accruals?"  With Victor L. Bernard. Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 313-325.

"Do Options Markets Improve Informational Efficiency?"  Contemporary Accounting Research 14, 2, Summer 1997: 193-201.

"How Well Does Net Income Measure Firm Performance?  A Discussion of Two Studies." Journal of Accounting & Economics, 26, 1-3, January 1999: 105-111.

"Should Firms Disclose Everything to Everybody? A Discussion of 'Open versus closed conference calls: The determinants and effects of broadening access to disclosure.'" Journal of Accounting and Economics 34, 1-3, January 2003: 181-187.

'Comments on "The Effects of Taxes on Market Responses to Dividend Announcements and Payments: What Can We Learn from the 2003 Dividend Tax Cut?"' by Raj Chetty, Joseph Rosenberg, and Emmanuel Saez, in Alan J. Auerbach, James R. Hines, Jr., and

**Appendix A**

Joel Slemrod, eds., <u>Taxing Corporate Income in the 21st Century</u> (Cambridge University Press, 2007): 36-40.

'Discussion of "The implications of unverifiable fair-value accounting: Evidence from the political economy of goodwill accounting"' <u>Journal of Accounting and Economics</u> 45, 2-3, August 2008, 282-288.

'Discussion of "Accounting standards and debt covenants: Has the "Balance Sheet Approach" led to a decline in the use of balance sheet covenants?"' <u>Journal of Accounting and Economics</u> 52, 2-3, November 2011: 203-208.

"Accounting research in the Japanese setting." <u>The Japanese Accounting Review</u>, 1, 2011: 135-140.

"How should we think about earnings quality?  A discussion of "Earnings quality: Evidence from the field."  With Mark W. Nelson.  <u>Journal of Accounting and Economics</u> 56, 2-3 (December 2013): 34-41.

"The Evolving Disclosure Landscape: How Changes in Technology, the Media, and Capital Markets Are Affecting Disclosure."  With Gregory S. Miller.  <u>Journal of Accounting Research</u> 53, 2 (May 2015): 221-239.

**Other Publications**

"Are the SEC's Safe Harbor Provisions Effective in Encouraging the Disclosure of Forward-Looking Information?"  <u>Financial Analysts Journal</u> 51, 4, July-August 1995: 38-44.

"Issues in Foreign Exchange Hedge Accounting."  With Michael H. Moffett.  <u>Journal of Applied Corporate Finance</u> 8, 5, Fall 1995: 82-94.

"Bad News Rings True."  With Amy P. Hutton and Gregory S. Miller.  <u>Investor Relations Quarterly</u> 6, 2, 2004: 49-56.

"Japan's Window Dressing Hid Olympus Fraud,"  Bloomberg Opinion, November 30, 2011, https://www.bloomberg.com/opinion/articles/2011-12-01/japan-s-window-dressing-hid-olympus-fraud-commentary-by-douglas-skinner

"Why U.S. Companies Continue to Pay Dividends," Bloomberg Opinion, April 11, 2012, https://www.bloomberg.com/opinion/articles/2012-04-11/why-u-s-companies-continue-to-pay-dividends

"Corporate America is Enriching Shareholders at the Expense of the Economy." fivethirtyeight.com  July 15, 2014. http://fivethirtyeight.com/features/corporate-america-is-enriching-shareholders-at-the-expense-of-the-economy/

**Appendix A**

The Financial Accounting Standards Committee of the AAA is charged with responding to requests by standards setters on issues related to financial reporting. As a member of that Committee from 1999 until 2002 I contributed to comment letters to the Financial Accounting Standards Board (FASB), the International Accounting Standards Committee (IASC), and the U.S. Securities and Exchange Commission (SEC).  Published versions of these comment letters for which I served as principal author are as follows:

- Response to the FASB Preliminary Views: Reporting Financial Instruments and Certain Related Assets and Liabilities at Fair Value.  (with J. M. Wahlen, Chair, J. R. Boatsman, R. H. Herz, G. J. Jonas, K. G. Palepu, S. G. Ryan, K. Schipper, and C. M. Schrand). Accounting Horizons December 2000, Vol. 14, No. 4, pp. 501-508.
- Implications of Accounting Research for the FASB's Initiatives on Disclosure of Information about Intangible Assets.  With L. A. Maines, Chair, E. Bartov, P. M. Fairfield, D. E. Hirst, T. E. Iannaconi, R. Mallett, C. M. Schrand, L. Vincent. Accounting Horizons June 2003, Vol. 17, No. 2, pp. 175-185.

**Selected Media Coverage**

"Dividends, Wall Street's Battered Status Symbol," The New York Times, February 13, 2016.

"As Stock Prices Slump, Don't Count on Buybacks," Wall Street Journal, January 25, 2016.

"Fast Traders Are Getting Data From SEC Seconds Early," Wall Street Journal, October 29, 2014.

"High-frequency traders said to get SEC filings early," Financial Times, October 29, 2014.

"Certain Traders May Get Early Looks at S.E.C. Filings, Paper Finds," The New York Times, October 29, 2014.

"Flush with Cash, Apple Plans Buyback and Dividend," The New York Times, March 19, 2012.

**Professional Activities**

*Journal of Accounting Research:* Senior Editor, 2006-2021.

*Accounting and Finance*, Editorial Board, 2012-2016.

*Asia-Pacific Journal of Accounting & Economics*, Associate Editor, 1999-2005.

*Journal of Accounting & Economics*:
Editor, 2000-2005.
Associate Editor, 1994-2000.

*The Accounting Review*, Editorial Advisory and Review Board, 1992-1996; 1997-1999.

*Review of Accounting Studies*, Co-Editor, 1999-2000.

**Appendix A**

Ad hoc referee for numerous accounting and finance journals.

Member: American Accounting Association, American Finance Association.

American Accounting Association Committees:
- Financial Accounting Standards Committee, 1999-2002.
- AAA/FASB Annual Financial Reporting Issues Conference Organizing Committee, 1999, 2000, 2005.
- 2001-2002 Competitive Manuscript Prize Committee.


**Ph.D. Committees (chronological order with initial placements)**

*At Michigan:*
Arun Kumar (Finance)
Christine Botosan.  Washington University, St Louis.
Li Li Eng.  Singapore National University.
Karen Nelson.  Stanford.
Lillian Mills.  Arizona.
Brian Bushee.  Harvard Business School.
Marlene Plumlee (Chair).  Utah.
David Heike (Finance).  Western Ontario.
Timothy Burch (Finance).  Miami (FL).
Gregory Miller (Chair).  Harvard Business School.
Mark Bradshaw.  Harvard.
Anchada Charoenrook (Finance). Vanderbilt.
Darren Roulstone (Co-chair).  Chicago.
Linda Myers (Chair).  Washington (Seattle).
Irem Tuna (Chair).  Wharton.
Scott Richardson.  Wharton.
Fai Cang (Finance).  Vanderbilt.
Jef Doyle.  Utah.
Irene Kim (Chair).  Duke.
Mei Feng (Chair).  Pittsburgh.
Wei Tang (Chair).  Georgetown.

*At Chicago:*
Regina Wittenberg Moerman.  Wharton.
Yu Gao.  Minnesota.
Eugene Soltes (Chair).  Harvard Business School.
Ningzhong Li.  London Business School.
Lawrence Takeuchi (finance).
Pepa Kraft.  NYU.
Jeff Ng.  Chinese University of Hong Kong.
Anna Costello. (Chair).  MIT.

**Appendix A**

Alon Kalay. Columbia.
Jonathan Milian.  (Chair). Florida International University.
Meng Li (Co-chair). UT-Dallas.
Joao Granja.  MIT.
Christine Cuny.  NYU.
Joshua Madsen (Chair).  Minnesota.
Marina Niessner (finance). Yale.
Eric Floyd.  Rice.
Nan Li (Chair).  Toronto.
Gerardo Perez Cavazos (Chair).  Harvard Business School.
Frank Zhou (Chair).  Wharton.
Matthew Bloomfield.  Wharton.
Brett Lombardi (Chair).  Monash (Australia).
Oleg Kuriukhin.  Cornerstone Research.
Anya Nakhmurina.  Yale SOM.
Johanna Shin.  Capital Group.
Yao Lu. Cornell.
Yvonne (Yanzi) Han.  Cornerstone Research.

**Recent presentations, discussions, and talks.**

2024:  ABFER Singapore (discussant); FASB Financial Reporting Conference (discussant); Tulane mini-accounting conference; Japan Accounting Research Symposium, Tokyo (keynote), Yale School of Management.

2025:  National University of Singapore, LSU Regional Research Conference, Michigan Ross, UNSW Corporate Finance Conference (Coogee, NSW).

**Appendix B**

**Douglas J. Skinner, Testimony**

Deposition. *In Re Google Play Developer Antitrust Litigation*, United States District Court Northern District of California, Case No. 3:20-cv-05792-JD (2022).

Deposition. *In Re Google Play Store Antitrust Litigation*, United States District Court Northern District of California, Case No. 3:21-md-02981-JD (2023).

Trial testimony. *Epic Games, Inc. vs. Google, LLC., et al.*, United States District Court Northern District of California, No. 3:20-cv-05671-JD (2023).

Deposition. *United States of America et al. vs. Google LLC*, United States District Court for the Eastern District of Virginia, Civil Action No. 1:23cv00108 (2024).

Deposition. *Richard J. Tornetta, individually and on behalf of all others similarly situated and derivatively on behalf of nominal defendant Tesla, Inc., v. Elon Musk, et al., and Tesla, Inc., Nominal Defendant.* In the Court of Chancery of the State of Delaware, Civil Action No. 2018-0408-KSJM (2024).

Deposition. *The State of Texas, et al., vs. Google LLC*. United States District Court Eastern District of Texas Sherman Division, Civil No. 4:20-CV-957-SDJ (2024).

Deposition. *John Harvey Schneider et al., Individually and on behalf of others similarly situated v. Natera, Inc., et al.* United States District Court Western District of Texas, Austin Division, Civil Action No. 1:22-cv-00398-DAE (2024).

Deposition. *In re Upstart Holdings, Inc. Securities Litigation*. United States District Court Southern District of Ohio, Eastern Division. Case No. 2:22-cv-02935-ALM-EPD (2024).

Deposition. *In re: Google Digital Advertising Antitrust Litigation.* Case No. 1:21-md-3010 (PKC). Report relates to: *In re: Google Digital Publisher Litigation.* Case No. 1:21-cv-7034 (PKC) and *Inform Inc., vs. Google LLC; Alphabet Inc.; and YouTube, LLC.* Case No. 1:23-cv-01530 (PKC). United States District Court for the Southern District of New York. (2025).

Deposition. *Subhash Patel, Individually and on behalf of all others similarly situated v. Koninklijke Philips N.V. and Frans Van Houten.* United States District Court Eastern District of New York, Civil Action No. 1:21-cv-04606-ERK-MMH (2025).

Deposition. *In re Fidelity National Information Services, Inc. Securities Litigation*. United States District Court Middle District of Florida, Jacksonville Division. Case No. 3:23-cv-252-TJC-PDB (2025).

**Appendix C**

# List of Documents Considered

## Academic Articles

- Busse, Jeffrey A., and Green, T. Clifton, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3, 2002, pp. 415–437

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, 1970, pp. 383–417

- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617

- Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1, 1996, pp. 19–42

- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1, 1997, pp. 13–39

## Analyst Reports[1]

- "Unique 'Device-Enabled' Services Business, But Stock Is Pricing-In Expected Share Gains; Initiate With Perform," *Oppenheimer*, October 21, 2019

- "Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust*, January 7, 2020

- "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage With Outperform Rating," *William Blair & Company*, January 9, 2020

- "Unlikely to Miss Many Beats but Seems Fairly Valued; Initiate at Neutral," *Baird*, September 1, 2020

- "IRTC: Growth Trajectory and Profitability Already Priced In; Initiate at Hold," *Needham & Company*, September 11, 2020

---

[1] Analyst reports considered include those obtained from counsel or from searches in *Capital IQ* and *LSEG Workspace* for iRhythm Technologies, Inc. reports that met either of the two following sets of criteria: (i) reports issued between August 5, 2022 and October 14, 2024; (ii) coverage initiation reports issued between October 1, 2019 (consistent with the approximate timing of the commercial launch of Zio AT) and the beginning of the Putative Class Period on August 5, 2022. Reports from low-value contributors have been excluded, including those from BuySellSignals Research, CFRA Quantitative Report, Disclosure Insights, Ford Equity Research, GlobalData, Jefferson Research & Management, LSEG StreetEvents, New Constructs, Pechala's Reports, PriceTarget Research, Probes Reporter, Plunkett Research, Quant IP, S&P Global Compustat, Sadif Analytics, Sadif Analytics Prime, SADIF-Investment Analytics S.A., Stock Traders Daily Research, The Economy Matters, TheScreener, Validea, ValuEngine, Inc, Wright Investors Service Inc., and Wright Reports.

**Appendix C**

- "Transfer of Coverage - Glaukos (GKOS), iRhythm (IRTC), NuVasive (NUVA), TransMedics (TMDX)," *J.P. Morgan*, October 14, 2021

- "CMS Payment Challenges Baked In, Higher CMS Payment and Verily Wearable are Upside; Reinstating Coverage with BUY, $125 PT," *Canaccord Genuity*, December 20, 2021

- "Initiate Coverage with Underperform Rating," *Wolfe Research*, April 5, 2022

- "Clean 2Q & Consistent Reimbursement Commentary; Raising our FY23 Est, & Establishing FY24 Est," *Truist Securities*, August 5, 2022

- "IRTC: Another Solid Quarter In 2Q22," *Needham & Company*, August 5, 2022

- "Refocus on Strong Underlying Fundamentals," *Morgan Stanley*, August 5, 2022

- "Second Quarter 2022 Model Update," *William Blair & Company*, August 5, 2022

- "Slight Beat, Conservative Bump in FY22 Guide," *Oppenheimer*, August 5, 2022

- "US Morning Summary," *Canaccord Genuity*, August 5, 2022

- "Quick Thoughts Following Our Conversation with IRTC at CGGC 2022," *Canaccord Genuity*, August 11, 2022

- "Model Update Post Publication of 10Q to Reflect Minor Adjustments to Revenue Mix; No Impact to Outlook," *Canaccord Genuity*, September 1, 2022

- "Summer is Over! Four Back-to-Work Tuesday Tidbits (ABT, IRTC, RMD, SHC)," *Wolfe Research*, September 6, 2022

- "MCDA Comments on Proposed 2023 PFS," *Oppenheimer*, September 8, 2022

- "Analyst Day Preview: Refreshing the Story as Longer-Term Opportunities Come into Focus," *J.P. Morgan*, September 12, 2022

- "+ve LT (+20% Top-Line; 15% adj EBITDA) Financial Guidance Issued At IRTC Investor Day," *Truist Securities*, September 21, 2022

- "Analyst Day Takeaways: A Familiar Setup for Beating and Raising Keeps Us Bullish," *J.P. Morgan*, September 21, 2022

- "I-Day Highlights LT New Mkt Oppty's, 5-Yr +20% Rev Growth & 15% LT Margin; Upside Potential Abounds," *Truist Securities*, September 21, 2022

- "Investor Day: LRP Provides Granularity on Business and Guidance; Stock Move Disconnected from Reality; Reaffirm BUY and $198," *Canaccord Genuity*, September 21, 2022

- "Solid 5-Year LRP Headlined by 20% Top-Line CAGR and 15% EBITDA Largely as Expected," *J.P. Morgan*, September 21, 2022

**Appendix C**

- "We View Share Selloff As Excessive Given Large Opportunity and Seemingly Conservative Metrics for Both Revenue and Margins," *BTIG*, September 21, 2022

- "Inaugural Analyst Day Frames a Prudent LRP with Avenues for Upside," *Morgan Stanley*, September 22, 2022

- "IRTC: Investor Day Highlights," *Needham & Company*, September 22, 2022

- "LRP Provides Glimpse into Strategy & Challenges," *Oppenheimer*, September 22, 2022

- "More Than a Patch (Analyst Day Edition); Multiple Levers Add to 20% Core Long-Range Growth Plan," *William Blair & Company*, September 22, 2022

- "Mulling CMS National Pricing Debate Over for Potentially One Last Time," *Wolfe Research*, September 26, 2022

- "Management Reiterates Bullish Stance on LRP and PFS at Recent Investor Meetings," *J.P. Morgan*, September 27, 2022

- "Q3/22 preview for BSX, EW, SWAV, PEN, NARI, IRTC, STAA, MMSI, ATRC, NVRO, TMDX, LUNG, CVRX, STIM, VAPO & AFIB," *Canaccord Genuity*, October 16, 2022

- "What is this Novitas Coverage Review About?," *Wolfe Research*, October 19, 2022

- "Better than Expected Final PFS and Healthy Underlying Trends Outweigh Near-Term Challenges; Reiterate OW," *J.P. Morgan*, November 1, 2022

- "Mixed Qtr & Lwr Guide, but +ve CMS Rate Shld Help Offset Ptn'l Headwinds Spilling into '23," *Truist Securities*, November 1, 2022

- "Staffing Challenges Drive Small Sales Miss and Guide Cut; PFS Final Rule Appears to Resolve Reimbursement; Reducing PT from $175 to $168," *BTIG*, November 1, 2022

- "Tricks and Treats Tonight – Revenue Miss & Lower but Final CMS Rule Rounds Input Up…Again," *Wolfe Research*, November 1, 2022

- "3Q Miss and 4Q Guide Down Disappoints," *Oppenheimer*, November 2, 2022

- "CMS Addendum Files Confirms Our Initial Take on +ve Reimb Update; Updating Est.'s & Maintain $167 PT," *Truist Securities*, November 2, 2022

- "CMS National Rates Established," *Morgan Stanley*, November 2, 2022

- "FY23 Final Rates Out," *Oppenheimer*, November 2, 2022

- "IRTC: 2H22 Issues Should Be Transitory; Underlying Momentum Remains Strong," *Needham & Company*, November 2, 2022

**Appendix C**

- "National Pricing a Long-term Tailwind vs. Near-Term Macro Headwinds," *Morgan Stanley*, November 2, 2022

- "Q3 Light and Q4 Guidance Not Comforting – But Likely Just a Bump in the Road; Maintain BUY, Lower PT to $155," *Canaccord Genuity*, November 2, 2022

- "Quick Calculations on CMS Rates for 2023," *Canaccord Genuity*, November 2, 2022

- "Reimbursement Saga Ends with Final Rule Payment Rates Slightly Higher Than Proposal," *BTIG*, November 2, 2022

- "Short-Term Shortfall Manageable While CMS Final Rule Looks Better Than Expected and Clears the Way for Adoption," *William Blair & Company*, November 2, 2022

- "Upgrade to Peer Perform," *Wolfe Research*, November 6, 2022

- "MedTech Bay Area Bus Tour Takeaways - In Our View Mtgs Incrementally +ve Across The Board For ISRG, PEN, IRTC, PRCT," *Truist Securities*, November 14, 2022

- "Recent Stock Volatility Offers Compelling Opportunity: Reviewing Recent Updates Around Reimbursement and Economic Data," *William Blair & Company*, November 22, 2022

- "Model Update Post 10-Q Review Reflects Minor Adjustments to Revenue Mix, No Impact to Outlook; BUY, PT to $153," *Canaccord Genuity*, November 29, 2022

- "Near-Term Headwinds in Focus During Investor Meetings; LRP Intact," *BTIG*, December 6, 2022

- "Model Update," *J.P. Morgan*, December 12, 2022

- "Our Survey/Analysis Suggests a Return to +20% Rev Grwth During '23, but Expecting a Sub-20% Guide," *Truist Securities*, January 5, 2023

- "First Look at Q4: Metrics Look Favorable, No Revenue Provided for Q4," *Canaccord Genuity*, January 9, 2023

- "Highlights from a Bullish Lunch at the J.P. Morgan Healthcare Conference," *J.P. Morgan*, January 9, 2023

- "IRTC Highlights Prelim 4Q Metrics, Which We Think Suggest Achievable Q4; Recovery On Track," *Truist Securities*, January 9, 2023

- "IRTC Pre-Releases 4Q22 Operational Highlights," *Oppenheimer*, January 9, 2023

- "Not Quite a Pre-Announcement, but 4Q22 Patient Registrations in Line with Prior Expectations," *J.P. Morgan*, January 9, 2023

**Appendix C**

- "Wolfe Med Tech: Initial Takes from INSP, IRTC, & NVRO Pre-Announcements," *Wolfe Research*, January 9, 2023

- "Updates and Takeaways Following Virtual Meeting With Management," *William Blair & Company*, January 10, 2023

- "IRTC: Initiating Coverage at Overweight, $150 Price Target," *Wells Fargo*, February 7, 2023

- "Med Tech Earnings Preview - Week of 2/20/23: IRTC, LIVN, MDT, PEN, STAA, & More," *Needham & Company*, February 17, 2023

- "IRTC: 4Q22 Review," *Wolfe Research*, February 23, 2023

- "IRTC: Q4 Beat; We Believe 2023 Guidance Is In Line with Investor Expectations," *Wells Fargo*, February 23, 2023

- "It's Not +20%, but Clear Upside to Conservative Guidance Keeps Us Constructive," *J.P. Morgan*, February 23, 2023

- "Strong Finish to 2022; Light 2023 Guide Was Anticipated and We Expect There Could Be Upside As Year Progresses," *BTIG*, February 23, 2023

- "Strong Finish to a Bumpy Year; Good Setup for 2023 with Conservative Guidance; Reaffirm BUY, PT to $143," *Canaccord Genuity*, February 23, 2023

- "4Q Slightly Ahead; Constructive Initial '23 Guide," *Morgan Stanley*, February 24, 2023

- "4Q22 Ahead, 2023 Guide Behind on Return/AT Issues," *Oppenheimer*, February 24, 2023

- "IRTC: Headwinds Eased in 4Q22; Multiple Upcoming Catalysts," *Needham & Company*, February 24, 2023

- "Starting '23 With Below CNS Guide (16-18% Rev Grwth), But We Have Confidence in a Return to 20%," *Truist Securities*, February 24, 2023

- "Steady Progress on Operational Execution with a Series of Catalysts to Come in Second Half 2023," *William Blair & Company*, February 24, 2023

- "More Details Emerge Zio Patch Monitor," *Oppenheimer*, March 2, 2023

- "More Data Suggesting Long-Term Patch Devices Should Be Broadly Adopted; Next-Gen Device and PCP Expansion a Positive for 2H23," *William Blair & Company*, March 6, 2023

- "IRTC: SVB Exposure Doesn't Impact Operations or Liquidity," *Wells Fargo*, March 12, 2023

**Appendix C**

- "IRTC: COO Resignation Part of Previously Announced Transformation," *Wells Fargo*, March 15, 2023

- "Management Transitions Part of Broader Restructuring Objectives," *Morgan Stanley*, March 15, 2023

- "Broader Organizational Restructuring Aligns With Strategic Initiative," *William Blair & Company*, March 16, 2023

- "Assumptions of Coverage (AXNX, IRTC, PEN, SIBN)," *Truist Securities*, March 17, 2023

- "Model Update Following Fourth-Quarter Earnings," *William Blair & Company*, March 31, 2023

- "First-Quarter Preview: Easing Headwinds Suggest Achievable and Beatable Estimate With Catalysts to Come," *William Blair & Company*, April 26, 2023

- "IRTC: Final Novitas LCD Posted – Reads like Throttle Risk… Whether it Matters? TBD," *Wolfe Research*, April 27, 2023

- "Finalized Novitas LCD Largely as Expected and Neutral to iRhythm; Ahead, 1Q23 Looks Like a Beat," *J.P. Morgan*, April 28, 2023

- "Novitas LCD a Non-Issue," *Oppenheimer*, April 28, 2023

- "IRTC: Good Update but Can't Tell if Fourth Strong Enough or if Stock Could Cinco in Mayo," *Wolfe Research*, May 4, 2023

- "IRTC: Solid Q1 Beat & Raise; Guidance Seems Conservative," *Wells Fargo*, May 4, 2023

- "Solid Start To '23 With Above-CNS +21% y/y Rev; Guide Raise Shld Set-Up For More Beats In Our View," *Truist Securities*, May 4, 2023

- "Strong Q1 Driven by Resurging Volume Growth as Challenges Resolved; Reaffirm BUY, PT to $153," *Canaccord Genuity*, May 4, 2023

- "We Expected Great Results and Conservative Guide; Impact of DoJ Subpoena in AECG Harder to Predict But We Are Not Panicking; Trimming Multiple, PT from $170 to $165," *BTIG*, May 4, 2023

- "1Q Beat, with Guidance Raise Still Striking a Conservative Tone," *Morgan Stanley*, May 5, 2023

- "A 1Q Beat with Plenty Left in the Tank; DOJ Subpoena is Asymptomatic For Now, but Monitoring is Warranted," *J.P. Morgan*, May 5, 2023

- "First-Quarter Beat With Strongest Registration Growth in Nearly Two Years," *William Blair & Company*, May 5, 2023

**Appendix C**

- "In-line 1Q; OpEx Leverage Ahead," *Oppenheimer*, May 5, 2023

- "IRTC: 1Q23 Showed Improving Underlying Trends," *Needham & Company*, May 5, 2023

- "Model Updates for Two Companies Following First-Quarter Earnings," *William Blair & Company*, May 10, 2023

- "IRTC: Survey Implies Zio XT 3Yr CAGR Slightly Above Our Forecast; New PCP Prescribers ~1/2 the Growth," *Wells Fargo*, May 16, 2023

- "IRTC: We See Limited Impact from Zio AT Warning Letter," *Wells Fargo*, May 30, 2023

- "Zio AT Warning Letter an Incremental Overhang & Likely to Pressure The Stock," *Truist Securities*, May 30, 2023

- "Warning Letter Regrettable but Manageable With Likely Minimal Impact to Results," *William Blair & Company*, May 31, 2023

- "Correction: FDA Warning Letter Received," *Oppenheimer*, June 1, 2023

- "IRTC: Key Takeaways from the Wells Fargo 2023 MedTech West Coast Bus Tour," *Wells Fargo*, June 1, 2023

- "Additional Regulatory Risk Is Never Good, but Ship Hold Fears Are Likely Overblown," *J.P. Morgan*, June 2, 2023

- "IRTC: Discussion with FDA Consultant Supports Our View that Zio AT Recall Risk is Low," *Wells Fargo*, June 5, 2023

- "IRTC: Warning Letter Seems Manageable; Reiterate Overweight," *Wells Fargo*, June 6, 2023

- "Thoughts After Talking to Management on Published Warning Letter," *William Blair & Company*, June 6, 2023

- "Warning Letter Published, We Think Stock Largely Pricing in a Worst Case," *Truist Securities*, June 6, 2023

- "Warning Letter Sheds Light on FDA Issues; Zio AT (~11% of Sales) May Need a New 510(k) Clearance," *Canaccord Genuity*, June 6, 2023

- "Warning Letter More Worrisome than Expected," *Oppenheimer*, June 7, 2023

- "Highlights From the 43rd Annual Growth Stock Conference," *William Blair & Company*, June 8, 2023

- "We View FDA Warning Letter As a Potential Risk to Near-term Zio AT Growth Trajectory; Reducing PT from $165 to $140," *BTIG*, June 8, 2023

**Appendix C**

- "IRTC: Our Letter to File Away on this Zio AT Warning Letter Snafu," *Wolfe Research*, June 20, 2023

- "Regulatory Expert Call Provides Perspective on Path Forward from FDA Warning Letter," *Canaccord Genuity*, June 26, 2023

- "Beat it? Evaluating IRTC's 20% CAGR LRP; Reiterate OW.," *Morgan Stanley*, July 11, 2023

- "Q2/23 earnings preview for BSX, EW, SWAV, PEN, IRTC, STAA, NARI, MMSI, ATRC, NVRO, TMDX, LUNG, CVRX, STIM, VAPO, & AFIB," *Canaccord Genuity*, July 12, 2023

- "CMS Publishes CY24 Physician Fee Schedule Proposal; IRTC Payment Rates Slightly Lower in Key San Francisco Location," *BTIG*, July 13, 2023

- "CMS 2024 Proposed Schedule in Line With Expectations," *William Blair & Company*, July 14, 2023

- "CMS Releases FY24 Proposed PFS," *Oppenheimer*, July 14, 2023

- "FLASH: AXNX & IRTC: Two More Quick Flags from Outpatient/ASC and PFS Rules," *Wolfe Research*, July 14, 2023

- "'Getting Back into Rhythm': Initiate Outperform and $130 PT," *Baird*, July 18, 2023

- "IRTC: Strong Q2 Beat; Guidance Raise Seems Conservative; Positive Tone on Warning Letter Resolution," *Wells Fargo*, August 3, 2023

- "Positive Warning Letter Update on an Above CNS Revenue/Profit in Q2," *Baird*, August 3, 2023

- "Steady Does It as Management Pairs a Good Quarter with Positive Zio AT Updates," *J.P. Morgan*, August 3, 2023

- "Strong Q2 as Company Overpowers Headwinds from FDA Warning Letter; Reaffirm BUY & Lower PT to $136," *Canaccord Genuity*, August 3, 2023

- "Volumes Buoy Up Sales, Conservative Guide Anchors 2H Expectations; Progress on Warning Letter with Zio AT Remaining Firmly on the Market," *BTIG*, August 3, 2023

- "2Q Strong; Zio-AT Status Quo," *Oppenheimer*, August 4, 2023

- "Beat & Raise and +ve WL Commentary; Reit. Buy w/ Shrs Overly Discounted; PT to $138 (from $155)," *Truist Securities*, August 4, 2023

- "IRTC: Fundamentals Were Strong In 2Q23," *Needham & Company*, August 4, 2023

**Appendix C**

- "IRTC: Long-Time Bear Felt a Shiver, Wonders about Cave," *Wolfe Research*, August 4, 2023

- "Q2 Results: Comfortable Beat with Upside to New Guide," *Morgan Stanley*, August 4, 2023

- "Strong Second-Quarter Beat, Better-Than-Expected Clarity Around Warning Letter, and Conservative Guide Makes Us More Positive," *William Blair & Company*, August 4, 2023

- "Model Update for Four Companies Following Second-Quarter Earnings," *William Blair & Company*, August 9, 2023

- "Model Update," *Canaccord Genuity*, August 25, 2023

- "Takeaways From the 16th Annual West Coast Field Trip: Meetings With iRhythm and Penumbra," *William Blair & Company*, September 1, 2023

- "2023 MS Healthcare Conference Takeaways," *Morgan Stanley*, September 13, 2023

- "Third-Quarter Preview: Stock Pullback Should Provide an Attractive Entry Point for Upcoming Catalysts," *William Blair & Company*, September 27, 2023

- "Q3 Preview: Thrills Unlikely; Q4 Momentum in Focus," *Morgan Stanley*, October 11, 2023

- "Fears Prove Unfounded as Durable Momentum Supports Another Good Quarter," *J.P. Morgan*, November 2, 2023

- "IRTC: Margin Miss...Gross? Eh...Worth a Monitor but Otherwise No Leaks to Patch Up," *Wolfe Research*, November 2, 2023

- "Strong Quarter Despite Device Transition Headwinds; Zio AT Regulatory Submissions Coming Soon and PFS Final Rule Unchanged from Proposal," *BTIG*, November 2, 2023

- "Warning Letter Issues Begin to Subside, and Primary Care Channel Starts to Grow; Maintain BUY & Lower PT to $88," *Canaccord Genuity*, November 2, 2023

- "Another 20% Growth Qtr, 2024 Setup Looks Increasingly Attractive," *Truist Securities*, November 3, 2023

- "In-Line 3Q; In-Line Q4 Guidance a Relief," *Oppenheimer*, November 3, 2023

- "IRTC: Q3 Beats and Guidance Seems Conservative; Zio Monitor Launch Starts Strong," *Wells Fargo*, November 3, 2023

- "IRTC: Strength Continued in 3Q23; AT Staying On Market," *Needham & Company*, November 3, 2023

**Appendix C**

- "Q3 Beats on Sustained 20% Growth; Warning Letter Overhang Continues to Derisk," *Baird*, November 3, 2023

- "Q3 Results: Small Beat and Raise as ZioMonitor Takes the Stage," *Morgan Stanley*, November 3, 2023

- "Third-Quarter Beat With Underlying Fundamentals Encouraging for 2024-Plus," *William Blair & Company*, November 3, 2023

- "Model Updates for Two Companies Following Third-Quarter Earnings," *William Blair & Company*, November 7, 2023

- "NDR Takeaways: Core Business Momentum at Its Strongest in Years; Margin Expansion on the Horizon," *William Blair & Company*, November 16, 2023

- "Truist Securities MedTech WC Bus Tour - Takeaways & Sentiment Reads From Our 13 Meetings (10 Public & 3 Private)," *Truist Securities*, December 11, 2023

- "Model Update," *J.P. Morgan*, December 17, 2023

- "IRTC: Apptopia iRhythm Tracker Implies ~12% Upside to Consensus Q4 Revenue," *Wells Fargo*, January 2, 2024

- "22%+ Patient Registrations and Better Guide to Close Out 2023," *J.P. Morgan*, January 8, 2024

- "4Q23 Operational Highlights; FY24 Guide In-Line," *Oppenheimer*, January 8, 2024

- "4Q23 Pt Registration Grew 22%+ Y/Y; FY24 Rev Guide Brackets CNS; Remains a Favorite SMID Name," *Truist Securities*, January 8, 2024

- "First Look: 22% Y/Y Growth of Q4 Patient Registrations, 510(k) Submitted, and 2024 Guidance Issued," *Canaccord Genuity*, January 8, 2024

- "First Take on 2024 Guidance - Targets in Sight," *Morgan Stanley*, January 8, 2024

- "IRTC: 2024 Revenue Guidance Initiated with Midpoint Above Street," *Wells Fargo*, January 8, 2024

- "IRTC: Provides In Line 2024 Revenue Guidance; Strengthens Balance Sheet," *Needham & Company*, January 8, 2024

- "IRTC: Key Takeaways from Management Meeting," *Wells Fargo*, January 9, 2024

- "Multiple Catalysts Point to Upside in Initial 2024 Guidance of 18% to 20% Growth; First 510(k) for Zio AT Submitted," *William Blair & Company*, January 9, 2024

- "Model Update," *J.P. Morgan*, February 15, 2024

- "IRTC: 4Q Rev Beat but Margin Missed, 1Q Rev Talked Down Slightly, 2024 Overall Intact," *Wolfe Research*, February 22, 2024

**Appendix C**

- "IRTC: Q4 Top Line Beat; 2024 Rev Guidance Range Reiterated," *Wells Fargo*, February 22, 2024

- "Q1 Quirk, but Outlook Intact; Attractive Profit Improvement into 2H24/'25," *Baird*, February 22, 2024

- "Reiterated Growth Outlook Keeps Us Constructive Despite Margin Disappointment," *J.P. Morgan*, February 22, 2024

- "Solid Q4 Sales with Maintained 2024 Guide Despite January Storms; Warning Letter Efforts on Track," *BTIG*, February 22, 2024

- "4Q Strong; OUS Expansion Approaching," *Oppenheimer*, February 23, 2024

- "IRTC: Strong Revenue In 4Q23; Sales & Margins Should Ramp Through 2024," *Needham & Company*, February 23, 2024

- "Look Past the Near-Term Margin Headwinds Driven by Higher-Than-Expected New Product Adoption; Reiterate BUY, PT to $133," *Canaccord Genuity*, February 23, 2024

- "Lots to Like in 2024+ Despite Conservative Guidance," *William Blair & Company*, February 23, 2024

- "Modest 4Q Rev Beat But GM Miss (& 2H24-Wghtd GM Ramp) a Setback; WL Remediation Efforts On Track," *Truist Securities*, February 23, 2024

- "Q4 Results: A Balancing Act," *Morgan Stanley*, February 23, 2024

- "IRTC: Signify Health Launches Afib Screening with Zio; We See Upside to 2024 Guidance," *Wells Fargo*, February 27, 2024

- "Model Update Following Fourth-Quarter Earnings," *William Blair & Company*, February 27, 2024

- "IRTC: Update on Signify Health," *Wells Fargo*, February 28, 2024

- "Risk Reward Update," *Morgan Stanley*, February 28, 2024

- "IRTC: Announced $450M Convertible Debt Offering," *Wells Fargo*, March 4, 2024

- "Expect Positive Near- and Long-Term Outlook for Zio Following ACC Discussions and Historical Seasonality Analysis," *William Blair & Company*, April 8, 2024

- "A Good Quarter as Previewed Paves the Way Towards International, MCT, and Epic," *J.P. Morgan*, May 2, 2024

- "Clean Beat and Raise; Exciting Potential Revenue/Profit Catalysts in 2H24/FY25," *Baird*, May 2, 2024

**Appendix C**

- "IRTC: Small Beat & Raise; 2H+ Setup Continues to Intrigue," *Wolfe Research*, May 2, 2024

- "IRTC: Strong Q1 Beat; We Believe 2024 Guidance Is Conservative," *Wells Fargo*, May 2, 2024

- "Q1 Revenue Beat with Opex Spend Higher, Forward Guidance Unchanged; Maintain BUY, PT to $122," *Canaccord Genuity*, May 2, 2024

- "Sales Guidance Increase Reflects Q1 Beat; Warning Letter, MCT Submission Timelines on Track," *BTIG*, May 2, 2024

- "'Clean' 1Q Result With Solid Early Rev Upside; Margin Expansion & Regulatory Timelines on Track," *Truist Securities*, May 3, 2024

- "IRTC: Strong Revenue Growth In 1Q24 Should Continue w/Adj. EBITDA Also Ramping," *Needham & Company*, May 3, 2024

- "Model Update Following First-Quarter Results," *William Blair & Company*, May 3, 2024

- "Model Update Post-Q1," *Morgan Stanley*, May 3, 2024

- "Q1 Results: Starting the Year Right," *Morgan Stanley*, May 3, 2024

- "Steady-Eddy Growth: 1Q In Line, FY24 Guide Nudged," *Oppenheimer*, May 3, 2024

- "Strong First-Quarter Beat Raises Full-Year Outlook With Catalysts Building Over Next 12-18 Months," *William Blair & Company*, May 3, 2024

- "Stock Pressure Related To Apple Watch Headline Creates a Buying Oppty In Our View," *Truist Securities*, May 5, 2024

- "Apple Watch Update Not a Thesis Changer," *William Blair & Company*, May 6, 2024

- "IRTC: Takeaways from Medtech Innovation Spotlight Webinar," *Wells Fargo*, May 13, 2024

- "IRTC: Our Initial Take Is Stock Overreacted to Zio AT Media Report," *Wells Fargo*, May 17, 2024

- "Sell-Off Unwarranted, In Our View (Buying Oppty); Quick Thoughts After Mgmt. Catch-up," *Truist Securities*, May 17, 2024

- "We Dive into the Sleep Apnea Detection Landscape as IRTC Dips a Toe into This Potential Adjacent Market," *BTIG*, May 29, 2024

- "Highlights From William Blair's 44th Annual Growth Stock Conference," *William Blair & Company*, June 5, 2024

**Appendix C**

- "IRTC: Never Have We Ever Recommended this Stock, Until Now – Upgrade to Outperform," *Wolfe Research*, June 19, 2024

- "IRTC: The DOJ Wants Three More Reports & that Means Delete >10% from this Stock? What?," *Wolfe Research*, July 3, 2024

- "CMS Publishes CY25 Physician Fee Schedule Proposal; Payment Rates up LSD for Zio Monitor," *BTIG*, July 10, 2024

- "Quick Clarification on IRTC PFS Calculations," *BTIG*, July 10, 2024

- "Another Dose of Regulatory Risk Overshadows a Strong 2Q24," *J.P. Morgan*, August 1, 2024

- "CFO Change & New Form 483s Add Noise To an Otherwise Solid 2Q Beat; Key 510K/MCT Timelines On Track," *Truist Securities*, August 1, 2024

- "Financials Solid; FDA and DOJ Wrinkles Create a Bit of Uncertainty; Maintain BUY and $122 PT," *Canaccord Genuity*, August 1, 2024

- "IRTC: Classic IRTC Print – Good Numbers, Some Hair Growth," *Wolfe Research*, August 1, 2024

- "Sales, Adj. EBITDA Beat and Raise; CFO Transition Announced; Facility Inspections Turn Up Form 483 Observations; Trimming PT to $125," *BTIG*, August 1, 2024

- "In-Line 2Q, FY24 Guide Bumped," *Oppenheimer*, August 2, 2024

- "IRTC: Solid 2Q24; CFO Transition; 483s Received But Zio AT 510(k)s On Track," *Needham & Company*, August 2, 2024

- "New FDA Update Clouds Q2 Growth Acceleration Beat/Raise, but Drivers in Place," *Baird*, August 2, 2024

- "Q2 Beat & Raise; New 483 Observations Increase Uncertainty," *Wells Fargo*, August 2, 2024

- "Q2 Results: Plenty to Discuss," *Morgan Stanley*, August 2, 2024

- "Record Registrations Lead to Increased Guide Ahead of Several Catalysts Heading Into 2025," *William Blair & Company*, August 2, 2024

- "Model Updates Following Second-Quarter Earnings," *William Blair & Company*, August 5, 2024

- "Takeaways from FDA Consultant's Review of the New 483 Observations," *Wells Fargo*, August 15, 2024

- "Takeaways From the 17th Annual West Coast Field Trip: Meetings With DexCom and iRhythm," *William Blair & Company*, August 28, 2024

**Appendix C**

- "GUARD-AF Trial Results Released," *Oppenheimer*, September 3, 2024

- "2024 MS Healthcare Conference Takeaways," *Morgan Stanley*, September 5, 2024

- "Key Takeaways from the 2024 Wells Fargo Healthcare Conference," *Wells Fargo*, September 5, 2024

- "Notes from the Road: Clearing Skies = Great Set-Up for 2025; Expect FDA & DOJ Clarity by Q3 Call; Reaffirm BUY, PT to $137," *Canaccord Genuity*, September 24, 2024

- "Suspending Coverage: ITGR, IRTC, NVRO, PRCT," *Wells Fargo*, September 27, 2024

**Bates Stamped Documents**

- Email from Sarah Keenan to Michael Elton, et al., "Follow-up: Zio AT Update Call," with attachments, September 27, 2022, iRhythm00004866–81

- Email chain from Jason Shaw to ORA Devices3 Recalls, "RE: [EXTERNAL] April 2023 Update - RES 90954 (iRhythm)," with attachment, March 31, 2023, iRhythm00004954–5169

- Email from Jason Shaw to ORA Devices Recalls, "3021769057-09/28/22-001-C," with attachments, October 4, 2022, iRhythm00005806

- "Voluntary Recall # 3021769057-09/28/22-001-C," iRhythm00005807–16

- iRhythm00005821

- iRhythm00254002

**Books**

- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (McGraw-Hill/Irwin, 2011)

- Fama, Eugene F., *Foundations of Finance: Portfolio Decisions and Securities Prices* (Basic Books, Inc., 1976)

- Rosenbaum, J., and J. Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, Second Edition (John Wiley & Sons, Inc., 2013)

**Clinical Reference Manuals and Customer Advisory Notices**

- "Clinical Reference Manual: Zio AT," *iRhythm Technologies, Inc.*, April 11, 2018

- "Clinical Reference Manual: Zio AT," *iRhythm Technologies, Inc.*, April 20, 2020

**Appendix C**

- "Clinical Reference Manual: Zio AT," *iRhythm Technologies, Inc.*, September 26, 2022

- "Urgent Field Advisory Notice:  Zio AT Labeling Correction," *iRhythm Technologies, Inc.*, September 28, 2022

- "Clinical Reference Manual: Zio AT," *iRhythm Technologies, Inc.*, https://go.irhythmtech.com/hubfs/Instructions%20for%20Use%20(IFUs)/US/2025/Oc tober%20Updates/ALB0031.14%20- %20ZIO%20AT%20CLINICAL%20REFERENCE%20MANUAL%20LTE.pdf

**Conference and Earnings Call Transcripts**

- "iRhythm Technologies Inc at Morgan Stanley Global Healthcare Conference (Virtual)," *Refinitiv StreetEvents*, September 9, 2021, 5:00 PM ET

- iRhythm Technologies, Inc., "FQ3 2022 Earnings Call Transcripts," *S&P Global Market Intelligence*, November 1, 2022, 4:30 PM ET

- "iRhythm Technologies, Inc. Company Conference Presentation," *S&P Global Market Intelligence*, January 10, 2023, 4:30 PM ET

- iRhythm Technologies, Inc., "FQ1 2023 Earnings Call Transcripts," *S&P Global Market Intelligence*, May 4, 2023, 4:30 PM ET

- "iRhythm Technologies Inc at William Blair Growth Stock Conference," *Refinitiv StreetEvents*, June 7, 2023, 5:00 PM ET

- iRhythm Technologies, Inc., "FQ2 2023 Earnings Call Transcripts," *S&P Global Market Intelligence*, August 3, 2023, 4:30 PM ET

- "iRhythm Technologies Inc Company Conference Presentation," *S&P Global Market Intelligence*, January 8, 2024, 7:30 PM ET

- All other iRhythm Technologies, Inc. conference and earnings call transcripts available from *LSEG Workspace* and *Capital IQ* published between August 5, 2022 and October 14, 2024

**Depositions**

- Deposition of Matthew D. Cain, Ph.D., December 11, 2025

**Expert Reports**

- Expert Report of Matthew D. Cain, Ph.D., November 3, 2025, and Backup Materials

- Expert Report of Dr. George Thomas, M.D., January 5, 2026

**Appendix C**

**FDA Documents**

- iRhythm Technologies, Inc., Cypress, Form 483, August 12, 2022

- iRhythm Technologies, Inc., Cypress, Form 483, July 31, 2024

- iRhythm Technologies, Inc., San Francisco, Form 483, July 31, 2024

- "Warning Letter: iRhythm Technologies, Inc.," *FDA*, June 6, 2023, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/irhythm-technologies-inc-643474-05252023

- "Warning Letters," *FDA*, December 23, 2025, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters

**Legal Documents**

- Subpoena Duces Tecum No. 23-395-001, *United States Department of Justice*, April 4, 2023

- Complaint for Violations of the Federal Securities Laws, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, February 6, 2024

- Petition for Order to Show Cause and Application for Enforcement of Administrative Subpoena, *United States of America v. iRhythm Technologies, Inc.*, July 1, 2024

- Amended Class Action Complaint for Violations of Federal Securities Laws, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, July 19, 2024

- Second Amended Class Action Complaint for Violations of Federal Securities Laws, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, October 11, 2024

- Defendants' Notice of Motion and Motion to Dismiss Second Amended Complaint, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, December 10, 2024, and Exhibit B

- Order Re: Defendants' Motion to Dismiss, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, June 3, 2025

- Defendants' Notice of Motion and Motion for Judgment on the Pleadings, *Glazing Employers and Glaziers Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, July 18, 2025

**Appendix C**

- Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Lead Plaintiff's Memorandum of Points and Authorities In Support Thereof, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, November 3, 2025

**Press Releases**

- iRhythm Technologies, Inc. Press Release, "iRhythm Technologies Announces Third Quarter 2022 Financial Results," *GlobeNewswire*, November 1, 2022, 4:05 PM ET

- iRhythm Technologies, Inc. Press Release, "New Research Confirms that Zio® by iRhythm Provides High Value From a Health Economic Perspective," *GlobeNewswire*, November 6, 2022, 12:30 PM ET

- iRhythm Technologies, Inc. Press Release, "iRhythm Technologies Announces First Quarter 2023 Financial Results," *GlobeNewswire*, May 4, 2023, 4:05 PM ET

- "iRhythm Launches Next Generation Zio Monitor and Enhanced Zio Service: Its Smallest, Lightest and Thinnest Cardiac Monitor," *GlobeNewswire*, September 26, 2023, 8:05 AM ET

- All other iRhythm Technologies, Inc. press releases published on iRhythm's website (https://www.irhythmtech.com/us/en/who-we-are/news-events) between August 5, 2022 and October 14, 2024

**Public Press**

- *Factiva* press articles that were tagged under iRhythm or IRTC or included the keywords "iRhythm," "IRTC," "Zio System," or "Zio AT" in the headline or lead paragraph of the article, and that were published between August 5, 2022 and October 14, 2024

- *Bloomberg* press articles that were tagged under iRhythm or included the keywords "iRhythm," "IRTC," "Zio System," or "Zio AT" in the headline or first 50 words of the article, and that were published between August 5, 2022 and October 14, 2024

- "iRhythm: Recent FDA Inspection Reports Obtained by Capitol Forum Detail Significant Problems with Company's Technicians and Operations; Company Received Over 4,000 Complaints Regarding Technicians Misreading Data Yet Did Nothing," *The Capitol Forum*, August 9, 2024

**SEC Filings**

- iRhythm Technologies, Inc., Form 10-Q for Quarterly Period Ended September 30, 2022, filed November 4, 2022, available at

**Appendix C**

https://www.sec.gov/Archives/edgar/data/1388658/000138865822000159/0001388658-22-000159-index.htm

- iRhythm Technologies, Inc., Form 10-K for Fiscal Year Ended December 31, 2022, filed February 23, 2023, available at https://www.sec.gov/Archives/edgar/data/1388658/000138865823000007/0001388658-23-000007-index.htm

- iRhythm Technologies, Inc., Form 10-Q for Quarterly Period Ended March 31, 2023, filed May 4, 2023, available at https://www.sec.gov/Archives/edgar/data/1388658/000138865823000051/0001388658-23-000051-index.htm

- iRhythm Technologies, Inc., Form 8-K, filed May 30, 2023, available at https://www.sec.gov/Archives/edgar/data/1388658/000138865823000070/0001388658-23-000070-index.htm

- iRhythm Technologies, Inc., Form 10-K for Fiscal Year Ended December 31, 2023, filed February 22, 2024, available at https://www.sec.gov/Archives/edgar/data/1388658/000138865824000014/0001388658-24-000014-index.htm

- iRhythm Technologies, Inc., Form 10-Q for Quarterly Period Ended June 30, 2024, filed August 1, 2024, available at https://www.sec.gov/Archives/edgar/data/1388658/000138865824000143/0001388658-24-000143-index.htm

- iRhythm Technologies, Inc., Form 8-K, filed August 1, 2024, available at https://www.sec.gov/Archives/edgar/data/1388658/000138865824000140/0001388658-24-000140-index.htm

- iRhythm Technologies, Inc., Form 10-K for Fiscal Year Ended December 31, 2024, filed February 20, 2025, available at https://www.sec.gov/Archives/edgar/data/1388658/000138865825000028/0001388658-25-000028-index.htm

- All other iRhythm Technologies, Inc., Form 10-K, Form 10-Q, and Form 8-K filings between August 5, 2022 and October 14, 2024

**Websites**

- "Behind the Bell: iRhythm," *YouTube*, uploaded by Nasdaq, November 14, 2022, https://www.youtube.com/watch?v=_VQ3ctPyrjU; archived at https://web.archive.org/web/20221115195401/https://www.youtube.com/watch?v=_VQ3ctPyrjU, *Wayback Machine*, November 15, 2022

**Appendix C**

- "Class 2 Device Recall Zio AT Clinical Reference Manual," *FDA*, November 4, 2022, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm?id=196267

- "Inspection Classifications," *FDA*, April 18, 2024, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-basics/inspection-classifications

- "Inspections Database Frequently Asked Questions," *FDA*, September 13, 2024, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/inspections-database-frequently-asked-questions

- "Inspections," *FDA*, https://datadashboard.fda.gov/oii/cd/inspections.htm

- "Syncope," *National Institute of Neurological Disorders and Stroke*, https://www.ninds.nih.gov/health-information/disorders/syncope

**Note: In addition to the documents on this list, I relied on all documents cited in my report and exhibits to form my opinions.**

**Exhibit 1**

## iRhythm Technologies, Inc.
## Surviving Timing Statements

| Date | Impact Date | Abnormal Return[1] | *t*-Statistic[1] | Cain Statistical Significance[2] | Excerpt from the Complaint Regarding Timing Statements[3] | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 8/5/22 | 8/8/22 | -0.52% | -0.19 | No | On August 5, 2022 [after market close], iRhythm filed its quarterly report on Form 10-Q for the second quarter of 2022, signed by Defendants Blackford and Devine. In that report, iRhythm repeatedly misrepresented the Zio AT as providing "timely transmission" of arrhythmia events during the wear period:<br><br>• [T]he Zio AT service offers the option of ***timely transmission*** of patient-triggered and automatically detected arrhythmia events data to a monitoring center for review and reporting according to physician-selected notification criteria<br>• Zio AT . . . is designed to provide timely transmission of data during the wear period<br>• [F]or the Zio AT monitor, we rely on the provision of cellular communication services for the ***timely transmission*** of patient information and reportable events.<br>• ***During the patient wear period***, the Zio AT monitoring system is intended to capture, analyze and report symptomatic and asymptomatic cardiac events and continuous ECG information. While continuously recording patient ECG data, both patient-triggered and automatically detected arrhythmia events are ***transmitted to a monitoring center for review and reporting according to physician-selected notification criteria***. | ¶ 184 |
| 9/21/22 | 9/21/22[4] | -12.28% | -4.56 | Yes | Nonetheless, at the Investor Day, Defendant Blackford stated, "We have a perfect product to address, ***putting information into the hands of the patient on a near real-time basis***." | ¶ 187 |
| 11/4/22 | 11/7/22 | -2.72% | -1.00 | No | On November 4, 2022 [after market close], iRhythm filed its quarterly report on Form 10-Q for the third quarter of 2022, signed by Defendants Blackford and Bobzien. In that report, iRhythm again misrepresented the Zio AT as providing "timely transmission" of arrhythmia events:<br><br>• [T]he Zio AT service offers the option of ***timely transmission*** of patient-triggered and automatically detected arrhythmia events data to a monitoring center for review and reporting according to physician-selected notification criteria<br>• Zio AT . . . is designed to provide ***timely transmission*** of patient information and reportable events<br>• [F]or the Zio AT monitor, we rely on the provision of cellular communication services for the ***timely transmission*** of patient information and reportable events.<br>• ***During the patient wear period***, the Zio AT monitoring system is intended to capture, analyze and report symptomatic and asymptomatic cardiac events and continuous ECG information. While continuously recording patient ECG data, both patient-triggered and automatically detected arrhythmia events are ***transmitted to a monitoring center for review and reporting according to physician-selected notification criteria***. | ¶ 190 |
| 11/14/22 | 11/14/22[5] | -0.56% | -0.19 | No | On November 14, 2022, in a Nasdaq interview Behind the Bell: iRhythm, Defendant Blackford stated, "We have a device that ***provides near real-time capability*** and can put that information right at their fingertips." | ¶ 191 |

**Exhibit 1**

## iRhythm Technologies, Inc.
## Surviving Timing Statements

| Date | Impact Date | Abnormal Return[1] | t-Statistic[1] | Cain Statistical Significance[2] | Excerpt from the Complaint Regarding Timing Statements[3] | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 2/23/23 | 2/24/23 | 9.86% | 3.32 | Yes | On February 23, 2023 [after market close], iRhythm filed its annual report on Form 10-K for the year 2022, signed by Defendants Blackford and Bobzien. In that report, iRhythm continued to misrepresent the Zio AT as providing "near real-time monitoring," "timely notification," "actionable transmissions during the wear period," "more immediate, clinically actionable information," "more immediate notifications . . . if there are significant events," and "timely transmission of . . . reportable events." <br><br> Specifically, in that report, iRhythm stated that the Zio AT "includes ***near real-time monitoring***, [and] is appropriate for more acute patients that require ***timely notification***." Similarly, iRhythm said that in connection with the Zio AT, "we rely on the provision of cellular communication services for the ***timely transmission of patient information and reportable events***." In the same report, iRhythm further stated: <br><br> For our MCT services, the Zio AT patch and wireless gateway also ***offer the additional capability of providing actionable transmissions during the wear period*** to assist physicians in diagnosing and treating patients in situations where their physician has determined that there is a ***medical need to receive more immediate, clinically actionable information***. For the MCT services, physicians will receive daily reports, routine reports, and ***more immediate notifications*** from CCTs [certified cardiographic technicians] if there are significant events that meet predetermined and physician-specified notification criteria. | ¶¶ 192–194 |
| 6/7/23 | 6/8/23[6] | -0.97% | -0.43 | No | On June 7, 2023, at the William Blair Growth Stock Conference, Defendant Blackford stated, "The XT product is sort of a blinded product where you return the device to us after 14 days. We download the data, do the interpretation. The AT product is more of a continuous monitoring, providing that information to the physicians on a ***near real time basis*** along the way." | ¶ 195 |
| 11/2/23 | 11/3/23 | 1.01% | 0.52 | No | On November 2, 2023 [after market close], iRhythm filed its quarterly report on Form 10-Q for the third quarter of 2023, signed by Defendants Blackford and Bobzien. That report stated: "Further, for the MCT monitoring services utilizing our Zio AT System, we rely on the provision of cellular communication services for the ***timely transmission*** of patient information and reportable events." | ¶ 196 |

**Exhibit 1**

## iRhythm Technologies, Inc.
## Surviving Timing Statements

| Date | Impact Date | Abnormal Return[1] | t-Statistic[1] | Cain Statistical Significance[2] | Excerpt from the Complaint Regarding Timing Statements[3] | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 2/22/24 | 2/23/24 | -8.92% | -4.42 | Yes | On February 22, 2024 [after market close], iRhythm filed its annual report on Form 10-K for the year 2023, signed by Defendants Blackford and Bobzien. In that report, iRhythm misrepresented the Zio AT as providing "timely notification" and "notifications" to doctors "if there are significant events" meeting the doctors' notification criteria. The report stated:<br><br>• The Zio Monitor System, which provides continuous long-term ECG monitoring, is designed to be appropriate for the majority of patients that require ambulatory cardiac monitoring while the Zio AT System, which *includes near real-time monitoring*, is intended for more acute patients that require *timely notification*.<br>• For our MCT services, the Zio AT patch and wireless gateway also offer the additional capability of providing *actionable transmissions during the wear period* to assist physicians in diagnosing and treating patients in situations where their physician has determined that there is a medical need to receive more *timely, clinically actionable information*. For the MCT services, physicians will receive daily reports, routine reports, and *notifications from CCTs if there are significant events* that meet predetermined and physician-specified notification criteria. | ¶ 197 |
| 5/2/24 | 5/3/24 | -9.35% | -3.95 | Yes | On May 2, 2024 [after market close], iRhythm filed its quarterly report on Form 10-Q for the first quarter of 2024, signed by Defendants Blackford and Bobzien. That report stated: "Further, for the MCT monitoring services utilizing our Zio AT System, we rely on the provision of cellular communication services for the *timely transmission* of patient information and reportable events." | ¶ 198 |
| 8/1/24 | 8/2/24 | -12.47% | -4.62 | Yes | On August 1, 2024 [after market close], iRhythm filed its quarterly report on Form 10-Q for the second quarter of 2024, signed by Defendants Blackford and Bobzien. That report stated: "Further, for the MCT monitoring services utilizing our Zio AT System, we rely on the provision of cellular communication services for the *timely transmission* of patient information and reportable events." | ¶ 199 |

Source: Second Amended Class Action Complaint for Violations of Federal Securities Laws, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, October 11, 2024 ("Complaint"); Order Re: Defendants' Motion to Dismiss, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, June 3, 2025; Expert Report of Matthew D. Cain, Ph.D., November 3, 2025 ("Cain Report"), and Backup Materials; *GlobeNewswire; LSEG Workspace; S&P Capital IQ; SEC EDGAR; The Wayback Machine; YouTube*

Note:
[1] Exhibit reports the one-day Abnormal Return, along with the associated *t*-Statistic, for the relevant Impact Date from Cain Report Backup Materials. The Abnormal Return is based on daily close-to-close return data.
[2] Cain Statistical Significance marked as "Yes" denotes statistical significance of the corresponding Abnormal Return using a 95% confidence interval, taken from Cain Report Backup Materials.
[3] Emphases added as per Complaint.
[4] The statement was made during iRhythm's 2022 Analyst & Investor Day that began at 9:00 AM ET on 9/21/22. Impact Date assumes the relevant statement was made during market hours on 9/21/22.
[5] The statement was made during a Nasdaq Behind the Bell interview, which was posted at approximately 3:54 PM ET on 11/14/22. Impact Date assumes the relevant statement was made during market hours on 11/14/22. If one were to assume an Impact Date of 11/15/22, then the Abnormal Return of -0.84% (*t*-Statistic = -0.29) would also not be statistically significant using a 95% confidence interval according to Cain Report Backup Materials.
[6] The statement was made during iRhythm's presentation at the William Blair Annual Growth Stock Conference that began at 5:00 PM ET on 6/7/23. Impact Date assumes the relevant statement was made after market hours on 6/7/23.

**Exhibit 2**

## iRhythm Technologies, Inc.
## Surviving Accuracy Statements

| Date | Impact Date | Abnormal Return[1] | *t*-Statistic[1] | Cain Statistical Significance[2] | Excerpt from the Complaint Regarding Accuracy Statements[3] | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 9/21/22 | 9/21/22[4] | -12.28% | -4.56 | Yes | On September 21, 2022, at iRhythm's 2022 Analyst and Investor Day where Defendants Blackford, Devine, Bobzien, Day, Patterson, and Turakhia all spoke, Defendants relied on a presentation that stated, "The Zio Service delivers superior clinical accuracy while reducing the cost of care." | ¶ 226 |
| 2/23/23 | 2/24/23 | 9.86% | 3.32 | Yes | On February 23, 2023 [after market close], iRhythm held an earnings call for the fourth quarter of 2022, during which Defendants Blackford and Bobzien spoke. Defendant Blackford stated about the Zio, "I remain convinced that you're going to see this market expand dramatically as we continue to push into the primary care setting, just given how easy it is to use the product, **how accurate it is** and the downstream benefits that you get with monitoring these patients sooner." | ¶ 227 |
| 4/12/23 | 4/13/23 | -0.59% | -0.22 | No | On April 12, 2023 [after market close], iRhythm issued a report titled 2022 Environmental, Social and Governance Report. The report stated, "Since the most common type of Afib occurs intermittently, long-term continuous patch-based monitoring, such as that performed with our Zio Systems, **more accurately measures Afib burden** because heartbeats are continuously recorded without interruption during the entire monitoring period." | ¶ 228 |
| 5/4/23 | 5/5/23 | -9.89% | -3.86 | Yes | On May 4, 2023 [after market close], iRhythm held an earnings call for the first quarter of 2023, during which Defendants Blackford and Bobzien spoke. Emphasizing the importance of accuracy to Zio's growth with primary care physicians, Defendant Blackford stated, "Our ability to deliver value across the continuum of care by quickly and **accurately detecting arrhythmias** for benefit of patients by enabling better clinical outcomes and even more important in today's environment." | ¶ 229 |
| 2/22/24 | 2/23/24 | -8.92% | -4.42 | Yes | On February 22, 2024 [after market close], iRhythm held an earnings call for the fourth quarter of 2023, during which Defendants Blackford and Bobzien spoke. Defendant Blackford again falsely touted the accuracy of the Zio AT, stating, "Ease of use, **accuracy**, and simple workflow of Zio Monitor and ZioSuite digital products is resonating within the primary care channel which represented approximately 21% of total US Zio XT registrations during 2023." | ¶ 230 |
| 5/2/24 | 5/3/24 | -9.35% | -3.95 | Yes | On May 2, 2024 [after market close], iRhythm held an earnings call for the first quarter of 2024, during which Defendants Blackford and Bobzien spoke. Defendant Blackford stated about the Zio, "[P]rimary care is absolutely the place that this device is ultimately going to get applied into the future, just with its ease of use, its high diagnostic yield, **its incredible accuracy**." Defendant Blackford further stated about the Zio, "it's natural to step into this and take advantage of what we've built to-date and the service offering that we've become known for, which is easy to use and **highly predictable, highly accurate**." | ¶ 231 |

**Exhibit 2**

## iRhythm Technologies, Inc.
## Surviving Accuracy Statements

| Date | Impact Date | Abnormal Return[1] | t-Statistic[1] | Cain Statistical Significance[2] | Excerpt from the Complaint Regarding Accuracy Statements[3] | Complaint Paragraph |
|---|---|---|---|---|---|---|

Source:  Second Amended Class Action Complaint for Violations of Federal Securities Laws, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, October 11, 2024 ("Complaint"); Order Re: Defendants' Motion to Dismiss, *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund v. iRhythm Technologies, Inc., et al.*, June 3, 2025; Expert Report of Matthew D. Cain, Ph.D., November 3, 2025 ("Cain Report"), and Backup Materials; *GlobeNewswire; LSEG Workspace; S&P Capital IQ*

Note:
[1] Exhibit reports the one-day Abnormal Return, along with the associated *t*-Statistic, for the relevant Impact Date from Cain Report Backup Materials.  The Abnormal Return is based on daily close-to-close return data.
[2] Cain Statistical Significance marked as "Yes" denotes statistical significance of the corresponding Abnormal Return using a 95% confidence interval, taken from Cain Report Backup Materials.
[3] Emphases added as per Complaint.
[4] The statement was made during iRhythm's 2022 Analyst & Investor Day that began at 9:00 AM ET on 9/21/22.  Impact Date assumes the relevant statement was made during market hours on 9/21/22.

**Exhibit 3**

# iRhythm Technologies, Inc.
# Patient Complaints Provided to the FDA[1]
## Q2 2022 – Q3 2024

| Quarter | Date | All Error Codes[2] | | Technician Miss Error Code[3] | |
|---|---|---|---|---|---|
| | | Complaints Per Quarter | Cumulative Complaints | Complaints Per Quarter | Cumulative Complaints |
| Q2 2022 | 5/2/22 – 6/30/22[4] | 115 | 115 | 39 | 39 |
| Q3 2022 | 7/1/22 – 9/30/22 | 253 | 368 | 130 | 169 |
| Q4 2022 | 10/1/22 – 12/31/22 | 379 | 747 | 181 | 350 |
| Q1 2023 | 1/1/23 – 3/31/23 | 495 | 1,242 | 186 | 536 |
| Q2 2023 | 4/1/23 – 6/30/23 | 425 | 1,667 | 135 | 671 |
| Q3 2023 | 7/1/23 – 9/30/23 | 447 | 2,114 | 148 | 819 |
| Q4 2023 | 10/1/23 – 12/31/23 | 472 | 2,586 | 169 | 988 |
| Q1 2024 | 1/1/24 – 3/31/24 | 531 | 3,117 | 198 | 1,186 |
| Q2 2024 | 4/1/24 – 6/30/24 | 789 | 3,906 | 321 | 1,507 |
| Q3 2024 | 7/1/24 – 7/19/24[5] | 107 | 4,013 | 52 | 1,559 |

Source:  iRhythm00254002

Note:
[1] This analysis incorporates data from the "List provided to FDA" and corresponding "Appended List w Investigation" sheets of iRhythm00254002.
[2] Includes all patient complaints provided to the FDA.
[3] Includes only patient complaints provided to the FDA where the "Error Code as Evaluated" field is equal to "Technician Miss."
[4] The first patient complaint is dated 5/2/22.
[5] The last patient complaint is dated 7/19/24.