# EXHIBIT 14

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-Q

**(Mark One)**

☑  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the quarterly period ended September 30, 2022

### OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### Commission file number: 001-37918

# iRhythm Technologies, Inc.
### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **20-8149544** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |

| | |
|---|---|
| **699 8th Street Suite 600** | |
| **San Francisco, California** | **94103** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

### (415) 632-5700
### (Registrant's Telephone Number, Including Area Code)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐  No ☑

As of October 25, 2022, the number of outstanding shares of the registrant's common stock, par value $0.001 per share, was 30,110,878.
Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, Par Value $0.001 Per Share | IRTC | The Nasdaq Stock Market |

iRhythm00089759

**IRHYTHM TECHNOLOGIES, INC.**

**TABLE OF CONTENTS**

|  | Page No |
|---|---|
| **PART I. FINANCIAL INFORMATION** | 1 |
|  |  |
| Item 1. Financial Statements (Unaudited): | 1 |
| Condensed Consolidated Balance Sheets | 1 |
| Condensed Consolidated Statements of Operations | 2 |
| Condensed Consolidated Statements of Comprehensive Loss | 3 |
| Condensed Consolidated Statements of Cash Flows | 4 |
| Condensed Consolidated Statements of Stockholders' Equity | 5 |
| Notes to Condensed Consolidated Financial Statements | 7 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 3. Quantitative and Qualitative Disclosures About Market Risk | 35 |
| Item 4. Controls and Procedures | 36 |
|  |  |
| **PART II. OTHER INFORMATION** | 38 |
|  |  |
| Item 1. Legal Proceedings | 38 |
| Item 1A. Risk Factors | 38 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 76 |
| Item 3. Defaults Upon Senior Securities | 76 |
| Item 4. Mine Safety Disclosures | 76 |
| Item 5. Other Information | 77 |
| Item 6. Exhibits | 77 |
|  |  |
| Exhibit Index | 78 |
|  |  |
| Signatures | 79 |

iRhythm00089760

***Our business is dependent upon physicians adopting our Zio service and if we fail to obtain broad adoption, our business would be adversely affected.***

Our success will depend on our ability to bring awareness to the Zio service and educate physicians regarding the benefits of our Zio service over existing products and services, such as traditional, short-term Holter monitors and event monitors, or competitive technologies or services, and to provide sufficient evidence to support the selection of the Zio service as the appropriate ambulatory cardiac monitoring service for their patients. We do not know if the Zio service will be successful over the long term and market acceptance may be hindered if physicians are not presented with compelling clinical data demonstrating the effectiveness of our service compared to existing or alternative technologies. Any studies that we or others may conduct comparing our Zio service with alternative technologies will be expensive, time consuming and may not yield positive or definitive results. Clinical data may be subject to different interpretations, especially if the data involved are not drawn from head-to-head studies. Communications about our clinical data in relation to our products and services are also subject to a range of regulatory standards which vary depending on the audience and purpose of the communication; such communications can be subject to a high degree of scrutiny.

Additionally, adoption will be directly influenced by a number of financial factors, including the ability of patients or providers to obtain sufficient coverage or reimbursement from payors for the Zio service. The effectiveness, safety, performance, and affordability of our Zio service, both on a stand-alone basis and relative to competing services, will impact the availability of and access to the Zio service. We do not have direct payor contracts with contracted rates with all major payors for the Zio service. Physicians may be reluctant to prescribe the Zio service to patients who have coverage with non-contracted payors due to the inherent uncertainty surrounding reimbursement rates from such non-contracted payors and the out-of-pocket cost to the patient, as well as any associated administrative burden of engaging with patients to answer their questions and support their efforts to reduce their cost for the Zio service in such situations. If physicians do not adopt and prescribe our Zio service, our revenue will not increase and our financial condition will suffer as a result.

***If we are unable to keep up with demand for the Zio service, our revenue could be impaired, market acceptance for the Zio service could be harmed and physicians may instead order our competitors' services.***

As demand for the Zio service increases, we may encounter production or service delays or shortfalls. Such production or service delays or shortfalls may be caused by many factors, including the following:

- while we intend to continue to expand our manufacturing capacity, our production processes may have to change to accommodate this growth, potentially involving significant capital expenditures;

- key components of the Zio monitors are provided by a single supplier or limited number of suppliers, and we do not maintain large inventory levels of these components; if we experience a shortage or quality issues in any of these components, we would need to identify and qualify new supply sources, which could increase our expenses and result in manufacturing delays;

- global demand and supply factors concerning commodity components common to all electronic circuits, including Zio monitors, could result in shortages that manifest as extended lead times for circuit boards, which could limit our ability to sustain and/or grow our business;

- shelter-in-place orders and other restrictions in effect in California and elsewhere due to the COVID-19 public health emergency;

- we may experience a delay in completing validation and verification testing for new production processes and/or equipment at our manufacturing facilities;

- we are subject to state, federal and international regulations and standards, including, but not limited to, the FDA's Quality System Regulation ("QSR"), the EU's Medical Device Directive ("MDD") and the EU's Medical Device Regulation ("MDR"), and the developing regulations by Medicines & Healthcare Regulatory Agency (MHRA) post Brexit in the United Kingdom for both the manufacture of the Zio monitors and the provision of the Zio service, noncompliance with which could cause an interruption in our manufacturing and services or adverse publicity, warning letters, fines, injunctions, consent decrees and civil money penalties;

- to increase our manufacturing output significantly and scale our services, we will have to attract and retain qualified employees for our operations; and

iRhythm00089803

- in response to unexpectedly rapid growth of our business, clinical operations capacity may not meet demand while new resources are being recruited and trained, which could negatively impact our volume capacity for the Zio service.

If we were unable to successfully manufacture our Zio monitors in sufficient quantities, or to maintain sufficient capacity to provide the Zio service, it could materially harm our business.

Our design and manufacturing facilities and processes and those of our third-party suppliers are subject to unannounced FDA, state and Notified Body regulatory inspections for compliance with various regulations and standards, including the QSR, MDD, MDR, UK MDR requirements. Developing and maintaining a compliant quality system is time consuming and investment intensive. Requirements and standards may change and evolve over time and we will need to adapt. For example, the FDA has proposed revisions to the Quality System Regulation aimed at aligning with the international standard ISO 13485. Failure to maintain compliance with, or not fully complying with the requirements of the FDA and state regulators could result in enforcement actions against us or our third-party suppliers, which could include the issuance of warning letters, adverse publicity, seizures, prohibitions on product sales, recalls and civil and criminal penalties, any one of which could significantly impact our manufacturing supply and provision of services and impair our financial results. Failure to maintain compliance with, or not fully complying with the requirements of EU MDD, EU MDR, and UK MDR could result in similar disruptions in these markets.

***We depend on third-party vendors to manufacture some of our components, which could make us vulnerable to supply shortages and price fluctuations that could harm our business.***

We rely on third-party vendors for components and sub-assemblies used in our Zio monitors. Our reliance on third-party vendors subjects us to a number of risks, including:

- inability to obtain adequate supply in a timely manner or on commercially reasonable terms;

- interruption of supply, including shortages and delays, resulting from modifications to, or discontinuation of, a supplier's operations, including those caused by pandemics such as COVID-19, or by military conflict or political or economic disruption, including shortages impacting our PCBAs;

- production delays related to the evaluation and testing of products from alternative suppliers and corresponding regulatory qualifications;

- inability of the manufacturer or supplier to comply with our quality criteria and specifications and, where applicable, the QSR, state regulatory authorities, and, in some cases, the Notified Body audits;

- miscommunication of design specifications due to errors/omissions by either the vendor or our company, resulting in delayed delivery of acceptable materials or components for incorporation into our products;

- delays in product shipments resulting from product quality issues or defects, reliability issues, or a supplier's failure to consistently produce quality components;

- an outbreak of disease or similar public health threat, such as the existing threat of coronavirus, particularly as it may impact our supply chain;

- price fluctuations due to a lack of long-term supply arrangements with our suppliers for key components;

- inability to control the quality of products manufactured by third parties;

- delays in delivery by our suppliers due to changes in demand from us or their other customers; and

- delays in obtaining required materials and components that are in short supply within the time frames we require, at an affordable cost, or at all.

Any significant delay or interruption in the supply of components or sub-assemblies, or our inability to obtain substitute components, sub-assemblies or materials from alternate sources at acceptable prices and in a timely manner could impair our ability to meet the demand for our Zio service and harm our business.

42

iRhythm00089804

***If we fail to obtain and maintain necessary regulatory clearances or approvals for, or fail to meet ongoing compliance conditions related to, the Zio monitors and Zio service, or if clearances or approvals for future products and indications are delayed or not issued, our commercial operations would be harmed.***

The Zio monitors, including the associated device software and algorithm, and the Zio service are subject to extensive regulation by the FDA and CMS in the United States, and by the Competent Authorities in the European Union and the United Kingdom. Such regulations are wide ranging and govern, among other things:

- product design, development, manufacture, and release;
- laboratory, preclinical and clinical testing, labeling, packaging, storage and distribution;
- premarketing clearance or approval;
- service operations, including IDTF locations;
- enrollment, billing and record keeping requirements;
- product marketing, promotion and advertising, sales and distribution; and
- post-market surveillance, including complaint handling and reporting of deaths or serious injuries and certain categories of field correction and removals.

Before a new medical device or service, or a new intended use for an existing product or service, can be marketed in the United States, a company must first submit an application for and receive either 510(k) clearance, De Novo marketing rights or premarket approval from the FDA, unless an exemption applies. All of these processes can be expensive, lengthy and unpredictable. We may not be able to obtain the necessary clearances or approvals or may be unduly delayed in doing so, which could harm our business. Furthermore, even if we are granted regulatory clearances or approvals, they may include significant limitations on the indicated uses for the product, which may limit the market for the product. Although we have obtained 510(k) clearance to market the Zio monitors and associated device software, our clearance can be revoked if safety, efficacy, or significant regulatory compliance problems develop. Even planned changes and improvements to devices and their uses can trigger the need for a new 510(k). FDA requirements dictate that we must evaluate potential changes and document our decision-making regarding the need for additional submissions and clearances.

In addition, we are required to file various reports with the FDA, and E.U. or U.K. regulators, including reports required by each jurisdiction's adverse event and field action reporting regulations. These reports are often required if our Zio monitors or associated device software may have caused or contributed to a death or serious injury or malfunctioned in a way that would likely cause or contribute to a death or serious injury if the malfunction were to recur. They may also be necessary or prudent for a range of other reasons relating to the importance of gathering information in the post marketing setting and managing risk throughout the product lifecycle. If these reports are not filed in a timely manner, regulators may impose sanctions and we may be subject to product liability or regulatory enforcement actions, all of which could harm our business. These reports are typically publicly available information in most jurisdictions, including the United States.

If we initiate a field action (whether a "correction" made relative to a device that remains in the field, which could be through a labeling or software update, or "removal" or "recall" and return of that device to us, or field advisory notices) to reduce a risk to health posed by the Zio monitors or associated device software, we would be required to report the Correction or Removal to the FDA and, in many cases, similar reports to other regulatory agencies. If these reports are not filed in a timely manner, regulators may impose sanctions and we may be subject to product liability or regulatory enforcement actions, all of which could harm our business. These reports are typically publicly available information in most jurisdictions, including the United States.

For example, on September 28, 2022, we initiated a Customer Advisory Notice to Zio AT customers regarding a Zio AT labeling correction; the labeling changes involve additions and modifications to the Zio AT labeling precautions relating to the device's maximum transmission limits during wear, and also to the need for HCPs to complete registration to initiate monitoring services. We reported this Customer Advisory Notice and related information to the FDA under 21 C.F.R., Part 806, and are in ongoing communication with the FDA on this matter. This labeling correction follows our assessment of topics raised in an FDA inspection focused on Zio AT. We have been in dialogue with the FDA in relation to the inspection process, and in connection with our Customer Advisory Notice and 806 report. These communications and discussions are continuing at this time, following our 483 responses submitted in September of 2022. Although we do not expect this Zio AT labelling correction or the activities associated with the topics raised in the FDA inspection to present a material risk to our business at this time, FDA observation responses, field action or corrections and the 806 process can be unpredictable and can present regulatory and commercial risks and uncertainties relating to matters including product labeling, the scope and approach of the correction, and/or customer and patient perception of our technologies and services.

68

iRhythm00089830

Depending on the reason for the correction or removal and the potential severity of the impact to patient safety or the effectiveness of the device, the FDA may require differing degrees of communication to alert those who may be in possession of an impacted device. We would generally be subject to similar requirements in jurisdictions outside the United States where the Zio products are used. Furthermore, even if we adhere to regulatory standards and expectations in our corrective actions, the public nature of such actions can result in broader negative publicity and perceptions, which could harm our reputation.

We have several monitoring centers throughout the United States that analyze the data obtained from cardiac monitors and report related preliminary observation to physicians. In order for us to receive reimbursement from Medicare and some commercial payors, our monitoring centers must be enrolled as IDTFs in the Medicare program. Enrollment as an IDTF requires that we follow strict regulations governing how our monitoring centers operate, such as requirements regarding qualifications of the technicians who review data transmitted from our monitors. These rules can vary from location to location and are subject to change. If they change, we may have to change the operating procedures at our monitoring centers, which could increase our costs significantly. If we fail to obtain and maintain our IDTF enrollment, our services may no longer be reimbursed by Medicare and some commercial payors, which could have a material adverse impact on our business.

If we assess a potential quality issue or complaint or product enhancement as not requiring either field action or notification, respectively, regulators may review documentation of that decision during a subsequent audit. If regulators disagree with our decision, or take issue with either our investigation process or the resulting documentation or course of action, we may be subject to a range of potential regulatory enforcement actions or required to take corrective actions, which depending on their nature and scope could harm our business.

The FDA and FTC also regulate the advertising and promotion of our products and services, requiring not only that our claims be truthful and not misleading, but also that claims about our devices and services are consistent with 510(k) clearances and that data and studies we use to support such claims are scientifically appropriate and statistically sound. More generally, we must have a reasonable basis and adequate substantiation for claims made in our advertising. If the FDA or FTC determines that any of our advertising or promotional claims are misleading, not substantiated or not permissible, we may be subject to enforcement actions, including warning letters, and we may be required to revise our promotional claims and make other corrections or restitutions. Similar to the FDA and FTC, the European Union under the EU Medical Device Regulations and the United Kingdom under the UK Medical Device Regulations have similar requirements and enforcement action regarding promotional material.

The FDA, CMS, FTC, and state and international authorities have broad enforcement powers. Our failure to comply with applicable regulatory requirements could result in enforcement action by any such agency, which may include any of the following sanctions:

- adverse publicity, warning letters, fines, injunctions, consent decrees and civil money penalties;

- suspension or termination of participation in federal health care programs;

- repair, replacement, or refund requirements, recall or seizure of our products;

- operating restrictions, partial suspension or total shutdown of either production, distribution or service operation;

- restrictions to our ability to export or import any medical devices or components thereof;

- denial of our requests for regulatory clearance or premarket approval of new products or services, new intended uses or modifications to existing products or services;

- withdrawal or restriction of regulatory clearance or premarket approvals that have already been granted; and

- criminal prosecution.

If any of these events were to occur, our business and financial condition could be harmed.

69

iRhythm00089831

***Changes or modifications to the Zio monitors, labeling of the Zio monitors or associated device software may require new 510(k) clearances, CE Mark, UKCA Mark or other premarket approvals or may require us to recall or cease marketing our products and services until clearances are obtained.***

Significant changes or modifications in design, components, method of manufacturer or the intended use or technological characteristics of the Zio monitors or associated device software may require new 510(k) clearances, De Novo applications, premarket approvals or CE Mark certification (E.U.) or UKCA Mark certification (U.K.). Unless effectively planned for in advance of our desired marketing timeline, in some circumstances we may be required to cease marketing certain products until clearances or approvals are obtained, for example, if a change was made to reduce risk to health or remedy an FDA violation. Based on FDA published guidelines, the FDA requires device manufacturers to initially make and document a determination of whether or not a modification requires a new clearance or approval; however, the FDA can review a manufacturer's decision. We may not be able to obtain additional 510(k) clearances, or De Novo or premarket approvals for new products or for modifications to, or additional indications for, the Zio monitors or associated device software in a timely fashion, or at all. Delays in obtaining required future clearances would harm our ability to introduce new or enhanced products in a timely manner, which in turn would harm our future growth. We have made modifications to the Zio monitors and associated device software in the past that we believe do not require additional clearances or approvals, and we may make additional modifications in the future. If the FDA or a E.U./U.K. Notified Body disagrees and requires new clearances or approvals for any of these modifications, we may be required to recall and to stop selling or marketing the Zio monitors and associated device software as modified, which could harm our operating results and require us to redesign our products or services. In these circumstances, we may be subject to significant enforcement actions.

***If we or our suppliers fail to comply with the FDA's QSR or the European Union's Medical Device Directive and Medical Device Regulations, or United Kingdom's Medical Device Regulations, our manufacturing or distribution operations could be delayed or shut down and our revenue could suffer.***

Our manufacturing and design processes and those of our third-party suppliers are required to comply with the FDA's Quality System Regulation ("QSR") and the EU's Medical Device Directive ("MDD"), through May 2021, after which time compliance with the MDR transitional provisions will be required until full transition to MDR compliance is achieved. Additionally, the UK will require the UKCA marking per new policies released by MHRA. All of these regulations cover procedures and documentation requirements for the design, testing, production, control, quality assurance, labeling, packaging, storage, shipping, and post-market surveillance of Zio monitors and associated software. We are also subject to similar state requirements and licenses, and to ongoing ISO 13485 and ISO 14971 compliance in all operations to maintain our CE Mark. In addition, we must engage in extensive recordkeeping and reporting and must make available our facilities and records for periodic announced or unannounced inspections by governmental agencies, including the FDA, state authorities, Notified Bodies and comparable agencies in other countries. Inspections may be initiated on a routine or for-cause basis. If regulatory inspections result in allegations of significant noncompliance that we are unable to address to the satisfaction of applicable regulatory authorities, it is possible that our operations could be disrupted and our manufacturing interrupted. Depending on the matters involved, failure to take adequate corrective action in response to an adverse regulatory inspection could result in, among other things, a shutdown of our manufacturing or product distribution operations, significant fines, suspension of marketing clearances and approvals, seizures, or large-scale recalls of our device, operating restrictions, warning letters, and criminal prosecutions, any of which would cause our business to suffer. Furthermore, our key component suppliers may not currently be or may not continue to be in compliance with applicable regulatory requirements, which may result in manufacturing delays for our product and cause our revenue to decline.

We are registered with the FDA as a medical device specifications developer and manufacturer. This is in addition to our CMS-regulated status as an IDTF. The FDA has broad post-market and regulatory enforcement powers. We are subject to announced or unannounced inspections by the FDA and the Food and Drug Branch of the California Department of Public Health ("CDPH") to determine our compliance with the QSR and other regulations at both our design and manufacturing facilities, and these inspections may include the manufacturing facilities of our suppliers. During the course of the COVID-19 pandemic, FDA in some cases utilized Remote Regulatory Assessments ("RRAs") and in July 2022 draft guidance it has indicated plans to continue using RRAs to supplement on-site inspection in the near term, while still budgeting and planning for increased in-person inspections now that most significant pandemic limitations on travel and in-person interactions have been lifted in many areas.

70

iRhythm00089832

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

iRhythm Technologies, Inc.

Date: November 4, 2022

By:     /s/ Quentin S. Blackford

Quentin S. Blackford
President and Chief Executive Officer

(Principal Executive Officer)

Date: November 4, 2022

By:     /s/ Brice Bobzien

Brice Bobzien
Chief Financial Officer

(Principal Financial Officer)

79

iRhythm00089841

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
Pursuant to
Securities Exchange Act Rules 13a-14(a) and 15d-14(a),
As Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002

I, Quentin S. Blackford, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of iRhythm Technologies, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Quentin S. Blackford
**Quentin S. Blackford**
Chief Executive Officer
(Principal Executive Officer)

Date: November 4, 2022

iRhythm00089842

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
Pursuant to
Securities Exchange Act Rules 13a-14(a) and 15d-14(a),
As Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002

I, Brice Bobzien, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of iRhythm Technologies, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Brice Bobzien
**Brice Bobzien**
Chief Financial Officer
(Principal Financial Officer)

Date: November 4, 2022

iRhythm00089843

**Exhibit 32.1**

**CERTIFICATIONS OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER**
PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of iRhythm Technologies, Inc. (the "Company") on Form 10-Q for the period ended September 30, 2022, as filed with the Securities and Exchange Commission (the "Report"), Quentin S. Blackford, as Chief Executive Officer of the Company, Brice Bobzien, as Chief Financial Officer of the Company, each hereby certifies, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), to his knowledge:

1.  The Report, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act of 1934, as amended; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


/s/ Quentin S. Blackford
_____

**Quentin S. Blackford**
Chief Executive Officer
(Principal Executive Officer)


Date: November 4, 2022


/s/ Brice Bobzien
_____

**Brice Bobzien**
Chief Financial Officer
(Principal Financial Officer)


Date: November 4, 2022


This certification accompanies the Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of iRhythm Technologies, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.

iRhythm00089844