# EXHIBIT 16

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-Q

**(Mark One)**

☑    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2023**

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-37918**

# iRhythm Technologies, Inc.
**(Exact Name of Registrant as Specified in its Charter)**

| | |
|---|---|
| **Delaware** | **20-8149544** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |
| **699 8th Street Suite 600** | |
| **San Francisco, California** | **94103** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(415) 632-5700**
**(Registrant's Telephone Number, Including Area Code)**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

As of April 24, 2023, the number of outstanding shares of the registrant's common stock, par value $0.001 per share, was 30,470,755.

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, Par Value $0.001 Per Share | IRTC | The Nasdaq Stock Market |

**IRHYTHM TECHNOLOGIES, INC.**
**TABLE OF CONTENTS**

|  | Page No |
|---|---|
| **PART I. FINANCIAL INFORMATION** | 1 |
| Item 1. Financial Statements (Unaudited): | 1 |
| Condensed Consolidated Balance Sheets | 1 |
| Condensed Consolidated Statements of Operations | 2 |
| Condensed Consolidated Statements of Comprehensive Loss | 3 |
| Condensed Consolidated Statements of Cash Flows | 4 |
| Condensed Consolidated Statements of Stockholders' Equity | 5 |
| Notes to Condensed Consolidated Financial Statements | 6 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 3. Quantitative and Qualitative Disclosures About Market Risk | 31 |
| Item 4. Controls and Procedures | 32 |
| **PART II. OTHER INFORMATION** | 33 |
| Item 1. Legal Proceedings | 33 |
| Item 1A. Risk Factors | 33 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 64 |
| Item 3. Defaults Upon Senior Securities | 64 |
| Item 4. Mine Safety Disclosures | 65 |
| Item 5. Other Information | 65 |
| Item 6. Exhibits | 65 |
| Exhibit Index | 66 |
| Signatures | 67 |

i

*Although our current Zio Systems are comprised of medical devices that have received FDA marketing authorization (510(k) clearance), we may regularly engage in product enhancements and in iterative changes to existing products, as well as seeking to develop new technology or use of technology for new indications for use. These medical device developments may trigger further regulatory reviews and the results of those reviews are unpredictable.*

Before a new medical device or a new intended use for a medical device can be marketed in the United States, a company must first submit an application and receive either 510(k) clearance, De Novo marketing rights or premarket approval from the FDA, unless an exemption applies. All of these processes can be expensive, lengthy and unpredictable. We may not be able to obtain the clearances or approvals we seek or may be unduly delayed in doing so, which could harm our business. Even if we are granted regulatory clearances or approvals, they may include significant limitations on the indicated uses for the product, which may limit the market for the product. Although we have obtained 510(k) clearances to market our Zio System, our clearances can be revoked if safety, efficacy, or significant regulatory compliance problems develop. Even planned changes and improvements to devices and their uses can trigger the need for a new 510(k). FDA requirements dictate that we must evaluate potential changes and document our decision-making regarding the need for additional submissions and clearances.

Significant changes or modifications in design, components, method of manufacture or the intended use or technological characteristics of our Zio System may require new FDA marketing authorization or CE Mark certification (European Union) or UKCA Mark certification (United Kingdom). Unless effectively planned for in advance of our desired marketing timeline, in some circumstances we may be required to cease marketing certain products until clearances or approvals are obtained, for example, if a change was made to reduce risk to health or remedy an FDA violation. FDA requires device manufacturers to internally analyze and document a decision that a new clearance or approval is viewed as unnecessary. We have made modifications to our Zio System in the past that we believe do not require additional clearances or approvals, and we may make additional modifications in the future. If the FDA or an EU/UK Notified/Approved Body disagrees and requires new marketing authorization for any of these modifications, we may be required to recall and to stop selling the impacted Zio System, which could harm our operating results and require us to redesign our products or services. In these circumstances, we may be subject to significant enforcement actions. We may not be able to obtain additional marketing authorizations in a timely fashion, or at all, which could harm our ability to introduce new or enhanced products in a timely manner, which in turn could harm our future growth.

*We are subject to extensive compliance requirements for the quality of the medical device we manufacture for use in our Zio Services, and for vigilance on complaint-handling, escalation, assessment, and reporting of adverse events and malfunctions. A wide range of quality, regulatory, or safety matters could trigger the need for a recall or correction to marketed products.*

Our design and manufacturing facilities and processes and those of certain third-party suppliers are subject to unannounced FDA, state, and Notified/Approved Body regulatory inspections for compliance with various medical device regulations and standards, including the Quality System Regulation ("QSR"), also known as 21 CFR Part 820, European Union Medical Device Directive ("EU MDD"), New European Union Medical Device Regulations ("EU MDR"), and UK Medical Device Regulations ("UK MDR") requirements. Developing and maintaining a compliant quality system is time consuming and investment intensive. Requirements and standards may change and evolve over time, and we will need to adapt. Failure to maintain compliance with, or not fully complying with the requirements of the FDA and state regulators could result in enforcement actions, which could include the issuance of warning letters, adverse publicity, seizures, prohibitions on product sales, recalls, and civil and criminal penalties, any one of which could significantly impact our manufacturing supply and provision of services and impair our financial results. Failure to maintain full compliance with the requirements of EU MDD, EU MDR, and UK MDR could result in similar disruptions in these markets.

40

There is also a risk that due to regulatory changes or changes to federal or state law, such as suspensions on the use of NOLs, or other unforeseen reasons, our existing NOLs could expire or otherwise be unavailable either in whole or in part to offset future income tax liabilities. For example, under the Coronavirus Aid, Relief, and Economic Security Act of 2020, which amended certain provisions of the Tax Cuts and Jobs Act ("TCJA"), NOLs arising in taxable years beginning after December 31, 2017 may offset no more than 80% of current taxable income annually for taxable years beginning after December 31, 2020. Therefore, we may be required to pay U.S. federal income taxes in future years despite the NOL carryforwards we have accumulated.

## Risks Related to Other Legal and Regulatory Matters

### We are subject to legal proceedings and government investigations that could adversely affect our business, financial condition, and results of operations.

We are involved in legal proceedings related to securities litigation and may become involved in other legal proceedings that arise from time to time in the future. For example, as discussed further in Note 8, *Commitments and Contingencies,* to our condensed consolidated financial statements included in this Quarterly Report on Form 10-Q, a putative securities class action lawsuit has been filed against the Company and certain current officers or former officers of the Company alleging violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

Any claims against us, whether meritorious or not, can be time-consuming, result in costly litigation, be harmful to our reputation, require significant management attention, and divert significant resources. In addition, the expense of litigation and the timing of this expense from period to period are difficult to estimate and subject to change. Litigation and other claims are subject to inherent uncertainties and management's view of these matters may change in the future. Given the uncertain nature of legal proceedings generally, we are not able in all cases to estimate the amount or range of loss that could result from an unfavorable outcome. We could incur judgments or enter into settlements of claims that could have a material adverse effect on our results of operations in any particular period.

In addition, healthcare companies are subject to numerous investigations and inquiries by various governmental agencies. For example, as discussed further in Note 8, *Commitments and Contingencies*, to our condensed consolidated financial statements, in March 2021, we received a grand jury subpoena from the U.S. Attorney's Office for the Northern District of California requesting information related to communications with the FDA and our Zio Systems, and, in October 2021, received a subpoena requesting additional information. More recently, on April 4, 2023, we received a Subpoena Duces Tecum from the Consumer Protection Branch, Civil Division of the U.S. Department of Justice, requesting production of various documents regarding our products and services. We are cooperating fully in connection with these matters. Any future investigations of our executives, our managers, or our company could result in significant liabilities or penalties to us, as well as adverse publicity. Even if we are found to have complied with applicable law, the investigation or litigation may pose a considerable expense and would divert management's attention, and have a potentially negative impact on the public's perception of us, all of which could negatively impact our financial position and results of operations. Further, should we be found out of compliance with any of these laws, regulations, or programs, depending on the nature of the findings, our business, our financial position, and our results of operations could be negatively impacted.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

iRhythm Technologies, Inc.

| | | |
|---|---|---|
| Date: May 4, 2023 | By: | /s/ Quentin S. Blackford |
| | | Quentin S. Blackford |
| | | President and Chief Executive Officer |
| | | |
| | | (Principal Executive Officer) |

| | | |
|---|---|---|
| Date: May 4, 2023 | By: | /s/ Brice A. Bobzien |
| | | Brice A. Bobzien |
| | | Chief Financial Officer |
| | | |
| | | (Principal Financial Officer) |

67

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a),**
**As Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Quentin S. Blackford, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of iRhythm Technologies, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 4, 2023                              By:  _____/s/ Quentin S. Blackford_____

**Quentin S. Blackford,**
**President and Chief Executive Officer**
**(Principal Executive Officer)**

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a),**
**As Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Brice A. Bobzien, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of iRhythm Technologies, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 4, 2023                                          By:  _____/s/ Brice A. Bobzien_____

                                                                          **Brice A. Bobzien**
                                                                          **Chief Financial Officer**
                                                                          **(Principal Financial Officer)**

**Exhibit 32.1**

## CERTIFICATIONS OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER
**PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of iRhythm Technologies, Inc. (the "Company") on Form 10-Q for the period ended March 31, 2023, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 4, 2023

By: _____/s/ Quentin S. Blackford_____
**Quentin S. Blackford**
**President and Chief Executive Officer**
**(Principal Executive Officer)**

By: _____/s/ Brice A. Bobzien_____
**Brice A. Bobzien**
**Chief Financial Officer**
**(Principal Financial Officer)**

This certification accompanies the Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of iRhythm Technologies, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.