# EXHIBIT 30

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

---

**FORM 10-K**

---

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2024
OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM          TO**

---

Commission File Number 001-37918

---

# iRhythm Technologies, Inc.

**(Exact name of Registrant as specified in its Charter)**

---

| **Delaware** | | **20-8149544** |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | | **(I.R.S. Employer Identification No.)** |
| **699 8th Street, Suite 600** **San Francisco, California** | | **94103** |
| **(Address of principal executive offices)** | | **(Zip Code)** |

**Registrant's telephone number, including area code: (415) 632-5700**

---

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, Par Value $.001 Per Share | IRTC | The Nasdaq Stock Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definition of "large accelerated filer", "accelerated filer", "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Small reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the Registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the Registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of common stock on The Nasdaq Stock Market LLC on June 30, 2024, was approximately $3.3 billion.

The number of shares of Registrant's Common Stock outstanding as of February 13, 2025, was 31,409,617.

---

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the information called for by Part III of this Form 10-K is hereby incorporated by reference from the definitive Proxy Statement for our annual meeting of stockholders, which will be filed with the Securities and Exchange Commission not later than 120 days after December 31, 2024.

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| **PART I** | | | |
| | Item 1. | Business | 4 |
| | Item 1A. | Risk Factors | 22 |
| | Item 1B. | Unresolved Staff Comments | 56 |
| | Item 1C. | Cybersecurity | 56 |
| | Item 2. | Properties | 58 |
| | Item 3. | Legal Proceedings | 58 |
| | Item 4. | Mine Safety Disclosures | 59 |
| **PART II** | | | |
| | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 60 |
| | Item 6. | [Reserved] | 61 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 61 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 72 |
| | Item 8. | Financial Statements and Supplementary Data | 74 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 112 |
| | Item 9A. | Controls and Procedures | 112 |
| | Item 9B. | Other Information | 113 |
| | Item 9C | Disclosures Regarding Foreign Jurisdictions that Prevent Inspections. | 113 |
| **PART III** | | | |
| | Item 10. | Directors, Executive Officers and Corporate Governance | 115 |
| | Item 11. | Executive Compensation | 115 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 115 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | 115 |
| | Item 14. | Principal Accounting Fees and Services | 115 |
| **PART IV** | | | |
| | Item 15. | Exhibits, Financial Statement Schedules | 116 |
| | Item 16. | Form 10-K Summary | 118 |
| | | Signatures | 119 |

ii

**PART I**

**ITEM 1: BUSINESS**

**Company Background**

iRhythm Technologies Inc.[1] is a leading digital healthcare company that creates trusted solutions that detect, predict, and prevent disease. Our principal business is the design, development, and commercialization of device-based technology to provide ambulatory cardiac monitoring services that we believe allow clinicians to diagnose certain arrhythmias quicker and with greater efficiency than other services that rely on traditional technology.

Since first receiving clearance from the U.S. Food and Drug Administration ("FDA") for our technology in 2009, we have supported physician and patient use of our technology and provided ambulatory cardiac monitoring services from our Medicare-enrolled independent diagnostic testing facilities ("IDTFs") and with our qualified technicians. We have provided our Zio ambulatory cardiac monitoring services, including long-term continuous monitoring, short-term continuous monitoring, and mobile cardiac telemetry ("MCT") monitoring services (collectively, the "Zio Services"), using our Zio Systems (as defined below).

Each Zio System combines an FDA-cleared and CE-marked, wire-free, patch-based, 14-day wearable biosensor that continuously records electrocardiogram ("ECG") data with a proprietary, FDA-cleared, CE-marked cloud-based data analytic software to help physicians monitor patients and diagnose arrhythmias. Since receiving FDA clearance, we have provided the Zio Services to over eight million patients and have collected over 2 billion hours of curated heartbeat data.

The Company was incorporated in the state of Delaware in September 2006. Our principal executive offices are located at 699 8th Street, Suite 600, San Francisco, California 94103, and our telephone number is (415) 632-5700. Our common stock is listed on The Nasdaq Global Select Market under the symbol "IRTC", and we employ approximately 2,000 regular full-time employees as of December 31, 2024.

Our website address is https://www.irhythmtech.com, and our investor relations website is located at https://investors.irhythmtech.com. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Exchange Act are available free of charge on our investor relations website as soon as reasonably practicable after we file such material with the SEC.

iRhythm investors and others should note that we announce material information to the public about our company, products, and services, and other issues through a variety of means – including via our website, our investor relations website, press releases, SEC filings, and public conference calls – to achieve broad, non-exclusionary distribution of information to the public and to comply with our disclosure obligations under Regulation FD. We encourage our investors and others to review the information we make public in these locations as such information could be deemed material. Please note that this information may be updated from time to time.

**Cardiac Arrhythmias and the Ambulatory Cardiac Monitoring Market**

*Cardiac Arrhythmias*

Every year, millions of patients experience symptoms potentially associated with cardiac arrhythmias, a condition in which the electrical impulses that coordinate heartbeats do not occur properly, causing the heart to beat too quickly, too slowly, or irregularly. There are many different types of arrhythmias which are typically categorized based on where in the heart they originate - in either the atria or ventricles - and their speed - tachycardia for fast rhythms, bradycardia for slow rhythms. The causes of arrhythmias are diverse, and they can be triggered by conditions such as heart disease, high blood pressure, electrolyte imbalances, drug use, or stress. Some arrhythmias may not show symptoms, while others may lead to dizziness, shortness of breath, fainting, or chest pain.

The most common sustained type of arrhythmia is atrial fibrillation ("Afib"), a condition which causes the upper chambers of the heart to beat irregularly and blood not to flow properly to the lower chambers of the heart. It is estimated that more than 50 million patients worldwide have Afib with at least one-third of these patients presenting as asymptomatic at the time of their diagnosis, and the condition contributes to an estimated 350,000 deaths globally each year. The prevalence of Afib in the United States is estimated to increase from approximately 5.2 million in 2010 to 12.1 million in 2030, and more than 450,000 hospitalizations occur each year in the United States because of Afib. Since Afib is more common among people over the age of 60, these numbers are expected to increase as the U.S. population ages. In Europe, the prevalence of arrhythmias is also expected to continue to rise with atrial fibrillation affecting an estimated 7.6 million people over 65 in the EU in 2016 and projections indicating a surge to 9.5% of individuals over 65 by 2060.

---

[1] As used throughout the text of Items 1 to 7, on Form 10-K, the term "iRhythm,", "the Company," "we" or "us," refers to iRhythm Technologies, Inc., a Delaware corporation, or iRhythm Technologies Inc. and its consolidated subsidiaries, as the context requires.

After we receive the Zio patch at our IDTF, the ECG data is uploaded to our secure cloud and preliminary findings are generated by our proprietary FDA-cleared deep learning algorithms. Each report is then validated by qualified technicians and sent to the patient's prescribing physician who may access the Zio report on our proprietary, web-based portal, referred to as ZioSuite, and also through our Electronic Health Record ("EHR") connections or ZioSuite mobile apps. Our technicians also notify physicians of potential urgent arrhythmias according to the ordering physician's specified notification criteria.

*ZioSuite web portal via desktop or mobile application*



For the Zio MCT Services, the Zio AT patch and wireless gateway also offer the additional capability of providing actionable transmissions during the wear period to assist physicians in diagnosing and treating patients in situations where their physician has determined that there is a medical need to receive more timely, clinically actionable information. For the MCT services, physicians will receive daily reports, routine reports, and notifications from qualified technicians if there are significant events that meet predetermined and physician-specified notification criteria.

While wearing a Zio patch, patients can mark when symptoms occur by pressing a trigger button on the device and separately recording contextual data like activities and circumstances in a written symptom diary or digitally via the myZio application. This allows physicians to match symptoms and activity with ECG-based findings. The Zio patches are not available for sale outside of use with our Zio Services. The Zio patches include the following features:

- patented clear, flexible, lightweight, wire-free design;
- unobtrusive and inconspicuous profile;
- proprietary adhesive backing designed to keep the Zio patch securely in place for the duration of the prescribed wear period;
- water-resistant functionality, allowing patients to shower, sleep, and perform normal daily activities, including moderate exercise;
- hydrogel electrodes and a compliant mechanical design to deliver a clear ECG with minimal artifact from movement;
- large symptom button, or patient trigger, that is easy to find and press;
- indicated single application wear period of up to 14 days (for longer prescribed wear periods for MCT services, additional Zio AT patches and gateways can be provided); and
- sufficient battery power for the entire wear period, without the need to recharge or replace batteries.

### The Zio Platform for Clinical-grade Wearables

We believe a clinical need and an opportunity exists to expand our Zio platform into clinical-grade wearables to detect and characterize arrhythmias while integrating with clinicians' workflows. As part of this expansion strategy, we partnered with Verily Life Sciences LLC, an Alphabet Company ("VLS") and Verity Ireland Limited ("VIL," and together with VLS, "Verily") to develop their Verily Study Watch wearable device into a clinical platform. We developed the Zio® Watch (Study Watch with Irregular Pulse Monitor) with our clinically integrated ZEUS System, a solution that is intended to be integrated into clinical care delivery and to assist healthcare providers in identifying and monitoring Afib.

In 2024, the European Society for Cardiology updated their practice guidelines for management of Afib to include recommended screening in all patients 75 years and older and for those 65 and older with additional risk factors. We have participated in multiple clinical studies, including SCREEN-AF, GUARD-AF, and mHealth Screening to Prevent Strokes ("mSToPS") which have demonstrated significant increases in Afib detection using Zio LTCM Services versus routine clinical care. During a three-year follow-up period in the mSToPS study, Afib screening with the Zio LTCM Service was associated with a reduction in the rate of the combined endpoint of stroke, death, systemic emboli, and myocardial infarction as compared to an observational cohort that did not participate in active screening.

In patients who have suffered an ischemic stroke, identification of the underlying cause is important in prevention of recurring strokes and to improve patient outcomes. The 2024 American College of Cardiology expert consensus decision statement on arrhythmia monitoring after stroke now recommends ambulatory cardiac monitoring of 14 or more days as the primary modality for use in detection of Afib in cases of stroke of unknown origin. The Zio LTCM Service was shown to be superior to Holter monitoring for detection of Afib in post-stroke patients as part of the Early Prolonged Ambulatory Cardiac Monitoring in StrokeTrial.

*Utility of Zio Long-term Continuous Monitoring in Ventricular Rhythms*

Recently published literature has also demonstrated the value of 14-day long-term continuous monitoring in assessment of ventricular rhythms, including ventricular tachycardia and premature ventricular contractions ("PVC"). Hypertrophic cardiomyopathy ("HCM") is among the most common genetic heart diseases and patients are at increased risk for ventricular tachycardia and sudden cardiac death. A 2024 study conducted by Rowin et al. assessed the incidence of ventricular tachycardia in 236 HCM patients and concluded that 14-day continuous monitoring with Zio LTCM Services identified three times as many patients with high-risk episodes as compared to Holter monitoring over 48 hours, the standard duration for Holter monitoring. Additionally, a 2024 study conducted by Krumerman et al. assessed 106,705 patients with elevated PVC burden and demonstrated reduced error in determining the burden of PVC with 14-day continuous monitoring as compared to short-term monitoring durations. This enabled improved classification of patients with respect to burden level, which is associated with increased risk for reduced ejection fraction and heart failure.

We believe that these studies together illustrate that 14-day continuous monitoring with the Zio Services may improve sensitivity for risk identification in ventricular rhythms and provides additional data valuable in clinical decision-making, such as determining the need for the implantable cardioverter defibrillator implant to reduce risk of sudden cardiac death in HCM patients, or the use of ablation procedures to reduce heart failure risks in patients with elevated PVC burden.

## Our Strategy

Our mission is to boldly innovate to create trusted solutions that detect, predict, and prevent disease. The key elements of our strategy include:

- **Further penetrating and expanding the U.S. ambulatory cardiac monitoring market**. Our goal is to be the leading provider of ambulatory cardiac monitoring for patients at risk for arrhythmias. We intend to expand our market penetration by targeting the large existing ambulatory cardiac monitoring market in the United States and driving broader awareness of its advantages. We plan to leverage our portfolio of products, including the Zio Monitor System and Zio AT System, and position Zio Services as providing certainty in a single test due to high patient compliance and superior quality of uninterrupted data. The Zio Monitor System, which provides continuous long-term ECG monitoring, is designed to be appropriate for the majority of patients that require ambulatory cardiac monitoring while the Zio AT System, which includes near real-time monitoring, is intended for more acute patients that require timely notification. We estimate our current market penetration in the United States to be over 30%.

Marketing and education throughout the medical community are key to bringing awareness and communicating the strong clinical evidence backing Zio Services. In addition, we expect to continue developing and publishing clinical evidence to demonstrate the potential advantages of Zio Services relative to legacy and competitive monitoring technologies. Within existing accounts, we expect to continue to introduce our Zio Services beyond cardiology and electrophysiology into other departments, including primary care, neurology, and emergency room. To enable this broader adoption within a hospital system, we have successfully interfaced the Zio ordering and report posting processes into a number of large health systems' electronic health record ("EHR") systems. This seamless integration of Zio workflow processes has proven to be a key factor in spurring growth within existing and new accounts and is an important part of our ongoing market penetration strategy.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

iRhythm Technologies, Inc.

Date: February 20, 2025

By:    /s/ Quentin S. Blackford

Quentin S. Blackford
President and Chief Executive Officer
(Principal Executive Officer)

119

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Quentin S. Blackford<br>Quentin S. Blackford | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | February 20, 2025 |
| /s/ Daniel G. Wilson<br>Daniel Wilson | Chief Financial Officer<br>(Principal Financial Officer) | February 20, 2025 |
| /s/Marc Rosenbaum<br>Marc Rosenbaum | Chief Accounting Officer<br>(Principal Accounting Officer) | February 20, 2025 |
| /s/ Abhijit Y. Talwalkar<br>Abhijit Y. Talwalkar | Director and Chairman of the Board | February 20, 2025 |
| /s/ Bruce Bodaken<br>Bruce G. Bodaken | Director | February 20, 2025 |
| /s/ Ralph Snyderman<br>Ralph Snyderman M.D. | Director | February 20, 2025 |
| /s/ C. Noel Bairey Merz<br>C. Noel Bairey Merz, M.D. | Director | February 20, 2025 |
| /s/ Mark Rubash<br>Mark J. Rubash | Director | February 20, 2025 |
| /s/ Karen Ling<br>Karen Ling | Director | February 20, 2025 |
| /s/ Brian Yoor<br>Brian Yoor | Director | February 20, 2025 |
| /s/ Mojdeh Poul<br>Mojdeh Poul | Director | February 20, 2025 |

120

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a),**
**As Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Quentin S. Blackford, certify that:

1.    I have reviewed this Annual Report on Form 10-K of iRhythm Technologies, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 20, 2025

By:  _____  /s/ Quentin S. Blackford

**Quentin S. Blackford,**
**President and Chief Executive Officer**
**(Principal Executive Officer)**

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**Pursuant to**
**Securities Exchange Act Rules 13a-14(a) and 15d-14(a),**
**As Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Daniel Wilson, certify that:

1.  I have reviewed this Annual Report on Form 10-K of iRhythm Technologies, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 20, 2025                                                    By:  _____/s/ Daniel Wilson_____

                                                                                        **Daniel Wilson**
                                                                                        **Chief Financial Officer**

**Exhibit 32.1**

**CERTIFICATIONS OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER**
**PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of iRhythm Technologies, Inc. (the "Company") on Form 10-K for the year ending December 31, 2024 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 20, 2025

By:  _____
/s/ Quentin S. Blackford
**Quentin S. Blackford**
**President and Chief Executive Officer**
**(Principal Executive Officer)**

By:  _____
/s/ Daniel Wilson
**Daniel Wilson**
**Chief Financial Officer**
**(Principal Financial Officer)**