# EXHIBIT 36

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
-------------------------------------x
GLAZING EMPLOYERS AND GLAZIERS'
UNION LOCAL # 27 PENSION AND RETIREMENT
FUND, on behalf of itself and all others
similarly situated

                         Plaintiff,

           - against -

IRHYTHM TECHNOLOGIES, INC., and QUENTIN
BLACKFORD,

                         Defendants.
-------------------------------------x

                    295 Fifth Avenue
                    New York, New York

                    December 11, 2025
                    9:01 a.m.

        VIDEOTAPED EXAMINATION BEFORE TRIAL of

MATTHEW CAIN, PhD, an Expert Witness on behalf

of the Plaintiff herein, taken by the Defendants, held

at the above-mentioned time and place, before Michelle

Lemberger, a Notary Public of the State of New

York.

Matthew Cain, PhD
December 11, 2025

A P P E A R A N C E S:


BERNSTEIN LITOWITZ BERGER & GROSSMAN, LLP
Attorneys for the Lead Plaintiff
OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT
SYSTEM
          1251 Avenue of the Americas
          New York, New York 10020
BY:       THOMAS SPERBER, ESQ.
          Thomas.sperber@blbglaw.com


          KATHERINE SINDERSON, ESQ.




QUINN EMANUEL URQUHART & SULLIVAN, LLP
Attorneys for Defendants
          295 Fifth Avenue
          New York, New York 10016
BY:       BRENNA NELINSON, ESQ.
          Brennanelinson@quinnemanuel.com

          EMILY ERICKSON, ESQ.

          AMY SHEHAN, ESQ.



ALSO PRESENT:

Jose Rivera - videographer


                *      *      *      *      *

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

Q.  And in your report, you're dealing with informational efficiency; is that right?

MR. SPERBER:  Object to the form.

A.  Yes.

Q.  In paragraphs 28 and 29 of your report, you cite two Supreme Court cases, Basic and Halliburton, in discussing the standards of efficiency that are required to invoke the fraud-on-the-market theory.

Right?

MR. SPERBER:  Object to the form.  Misstates the document.

A.  Yes, I do cite to those two cases.

Q.  And do you agree that the standards articulated in Basic and Halliburton are consistent with the definition of efficiency that you provide in your report in Exhibit 1?

MR. SPERBER:  Object to the form.  Calls for a legal conclusion.

A.  I don't see where either of these quotes provide a definition of efficiency.

Q.  What's the implication of an efficient market?

Matthew Cain, PhD

MR. SPERBER:  Object to the form.  Calls for speculation.

A.  So, as used in a market efficiency report like this, the implication is that stock prices begin to react to disclosures of new information fairly quickly, typically within a day they start reacting, and the further implication is that the value impact of alleged misrepresentations and omissions will, thus, be impounded into those stock prices during the class period.

Q.  You testified that the implication is that stock prices begin to react to disclosures of new information fairly quickly; typically, within a day, they start reacting.

What is your understanding then of when a stock price finishes reacting --

MR. SPERBER:  Object --

Q.  -- to disclosures of new information?

MR. SPERBER:  Apologies.  Object to the form.  Compound question.

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

A.   In my experience, studying disclosures and stock price movements on many, many occasions, they typically fully impound the value impact of new disclosures within two or three trading days, is the most common finding from my analyses.

Q.   Why would it take more than one trading day for information to be fully incorporated into a stock price in an efficient market?

MR. SPERBER:  Object to the form.

A.   There's a variety of reasons for why that's the case.  There's academic research that also points to some of those reasons, and those things include that it takes time for analysts and investors to digest information, particularly more complicated information, or information that is lacking in as much detail as they would prefer.

Analysts also will take time to update their valuation models, to produce new research reports, and those can, in turn, inform investor decisions.  Those may come

Matthew Cain, PhD

A.   -- to do those calculations.

Q.   Sorry.  I didn't mean to cut you off.

How do you define methodology?

A.   I don't think that I have a definition in the report here, but I'm referring to -- essentially, you could think of it as an analysis or a set of calculations.

So, for example, you could talk about event study methodology as a series of calculations in order to reach a certain output or conclusion.

And so, if we think of the out-of-pocket damages methodology, it is a series of calculations in order to reach an output or a conclusion of the amount of damages for investors.

Q.   What do you understand artificial inflation to mean?

A.   Artificial inflation refers to a distortion in the stock price, where the stock price is actually trading above its true or correct value because of alleged

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

misrepresentations or omissions or a scheme,

or some other issue like that.

MR. SPERBER:  Counsel, we've

been going -- oh, sorry, if you want

to ask your question.  I just

wanted -- we've been going for about

an hour.

MS. NELINSON:  I'm going to

just ask a couple of related

questions, and then we can take a

break, if that's all right?

MR. SPERBER:  If it's good with

Matt, it's good with me.

THE WITNESS:  Yes, sure.

Q.  Okay.  How would you quantify
artificial inflation in this case?

A.  I talk about that in paragraphs 102,
103, 104, 105 and 106.  So I've not committed
to the exact calculation, but I explain the
tools and techniques that are commonly used
in that calculation.

For example, in paragraph 103, I
explain that artificial inflation
calculations often start with an event study

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

that measures stock price drops following

alleged revelations of the relevant truth.

There can be a disaggregation

process to control for any non-fraud-related

impacts on the price, stock prices on those

dates, and then a backcasting process as an

inflation ribbon is constructed backwards in

time, starting with the corrective events at

the end of the class period and then moving

towards the start of the class period.

Q.  Is it fair to say that, to determine

the amount of artificial inflation, as you

just described in the several paragraphs of

your report, you need to undertake a detailed

loss causation analysis?

MR. SPERBER:  Objection to

form.  Misstates the testimony.

A.  Yes, I always undertake a detailed

loss causation analysis in order to quantify

artificial inflation.

Q.  And in paragraph 112, you write

that, I have not been asked to calculate

damages in this matter.  Such analysis would

depend on information produced in discovery

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

class-wide basis.

          Do you see that?

     A.   Yes.

     Q.   So, do you agree that your report
contemplates that the amount of inflation may
have changed during the class period?

               MR. SPERBER:  Objection.

      Misstates the document.

     A.   What I explain -- well, what I
explain in my reports is that it is possible
that artificial inflation fluctuated over the
course of a class period, and that can be for
a variety of reasons, such as multiple
corrective disclosures, it can be inflation
creating events, there can be other economic
circumstances that lead to changes in
inflation over the class period.

          This particular section of my report
is explaining how, even if I put forward a
loss causation and damages report with a
specific artificial inflation ribbon, if the
jury comes to an alternative finding that
differs from my artificial inflation ribbon,
those types of alternative findings simply

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

plug in to the out-of-pocket damages

methodology.

So the methodology remains valid,

even if the jury reaches a decision that

differs from my own calculations.

Q.  How do you determine whether

artificial inflation varied over the course

of the class period?

A.  So, at the loss causation stage of a

case, I will start with evaluating the

totality of the information environment over

the full class period, also considering the

allegations of the complaint, the motion to

dismiss order.

And then I'll look at alleged

misstatements and ask and evaluate whether

any of those introduced artificial inflation

into the stock at any point during the class

period.

I'll look at the corrective

disclosures; as I mentioned earlier, that's

one way in which inflation varies, just by

virtue of different corrective disclosures,

removing or dissipating artificial inflation.

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

And then I'll also consider the economic circumstances of the company itself, and ask whether the value impact or value relevance or the pricing level of the alleged fraud changed over time in a way that would necessitate changing the amount of artificial inflation in the stock over time.

Q.  And so, if, in fact, artificial inflation did vary over the course of the class period, how do you model that to figure out what artificial inflation was on any given day of the class period?

A.  It's based on that very extensive loss causation and damages analysis.  It incorporates principles of finance, economics, valuation analysis, it might rely on additional academic research, analyst reports, SEC filings, other company-specific information that's unique to the information environment of the given company to carry out an analysis.

You can think of it like a valuation analysis of the artificial inflation.  So, for exam -- as one example, I've worked on

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

cases in which I concluded that artificial

inflation was proportional to the value of

the company, but the value of the company

changed significantly over the class of --

over the course of a class period, and,

therefore, the constant percentage

methodology is one approach that allows for

inflation to fluctuate throughout the class

period.

So, it really just depends on the

nature of the information environment for a

given company.

Q.   And so you have modeled inflation

changing on a daily basis previously?

A.   Yes.

Q.   And what case were you just

referring to?

A.   That example was from Chemocentryx.

I've also modeled changing inflation in the

Vaxart case as well.  And then I've got a

number of other cases in which inflation

fluctuated by virtue of the alleged

misstatements and inflation-creating events,

and multiple corrective disclosure events;

Matthew Cain, PhD

confounding information.

Q. And do you agree that any calculation of artificial inflation needs to take into account confounding factors?

MR. SPERBER: Objection to form.

A. Yes. I would say that every time that I have calculated artificial inflation, I have controlled for confounding factors.

Q. And if you look at paragraph 105 of your report, which is on page 35, you write that, It may be necessary to adjust the inflation ribbon representing the inflation measure during the class period.

And then there's a parenthetical that reads, The evolving economic materiality or timing of alleged misrepresentations or omissions or to account for any portion of the price decline on an alleged corrective disclosure date that is not attributable to the alleged fraud, in parentheses, disaggregation of confounding information.

Do you see that?

A. Yes.

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

Q.  So, you would need to account for this -- this confounding information using certain economic techniques; is that right?

A.  Yes.

Q.  Am I right that an event study standing alone doesn't account for evolving inflation over the course of a class period?

MR. SPERBER:  Object to form.

A.  It's -- it's one of the steps in that process, and it does control for confounding information from the control market and industry movements, but it is not the only step.  It's not -- it does not provide all of the information regarding this question of whether inflation evolved over the class period.

Q.  What are some examples of techniques that you can use to account for confounding information?

A.  Those would include valuation analysis, principles of finance in economics, internal discovery documents, academic research, analyst reports.

Those would be examples of tools and

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

techniques that I've employed in

disaggregating confounding information.

Q.  So, some of these look like sources

of information.  For example, internal

discovery documents, academic research,

analyst reports, but aren't necessarily

techniques.

Are there specific techniques that

you use to account for confounding

information?

MR. SPERBER:  Objection to

form.  Compound question.

A.  So I think that these things

interact with each other.  So I'll give you

an example.

I've had cases in which there's an

earnings announcement, the stock price drops,

but the company points to, let's say, four

different pieces of bad news that led to the

disappointing earnings announcement, but only

one of those things is fraud-related.

Internal documents can be helpful,

because those might provide a breakdown of

what portion of the earnings miss was driven

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

lower than expected Zio AT growth.

Q.   And it's your understanding that these are factors that plaintiff alleges to be corrective of prior misstatements?

MR. SPERBER:  Object to the form.  Calls for a legal conclusion.

A.   Well, for at least components of the -- the relevant truth that was revealed, yes.

Q.   And, similarly, on -- in paragraph 20, you write that, On November 4, 2022, iRhythm disclosed that the customary advisory notice it had previously issued was in response to an FDA Form 483 and related to a, quote, labeling correction, concerning the Zio AT's, quote, maximum transmission limits and registration requirements.

Do you see that?

A.   I do.

Q.   And is it your understanding, based on your understanding of plaintiff's theory of liability, that the information disclosed on November 4, 2022 corrected prior alleged misstatements?

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

MR. SPERBER:  Objection to form.  Calls for a legal conclusion.

A.  Again, my recollection is that plaintiff's point to this as part of the relevant truth that was revealed on this date.

Q.  And is it your understanding that the November 1st and the November 4th, 2022 disclosures contained information that were corrective to the accuracy claims, as they're referred to in your report?

MR. SPERBER:  Objection to form.  Calls for a legal conclusion.

A.  My recollection is that the complaint is pointing to these as containing relevant truth relating to the transmission claims.

Q.  Do you know whether there was new corrective information that was disclosed in the November 4th 10Q that was not disclosed three days earlier in the November 1st earnings release?

MR. SPERBER:  Objection of form.  Calls for a legal conclusion.

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

A.   Ultimately, I have not conducted an analysis to determine or form any opinions on what corrective information was, in fact, newly disclosed on this, or any dates; I'm simply summarizing the allegations in the complaint in this section.

Q.   What would the implication be for your analysis if the information disclosed on those dates was exactly the same?

MR. SPERBER:  Objection to form.  Calls for speculation.  Vague.

A.   I'd have to conduct an analysis and conclude whether there was, in fact, no new information disclosed on November 4th that is related to the allegations of the case, and that's something that I would take into consideration when assessing the amount of artificial inflation that was dissipated around this period of time.

Q.   And let's see, in paragraph 21, you refer to a May 4, 2023 disclosure.  In particular, you write, The company disclosed that it had received a subpoena from the Consumer Protection Branch, Civil Division of

Matthew Cain, PhD
December 11, 2025

Matthew Cain, PhD

the U.S. Department of Justice, allegedly related to the company's claims about the Zio systems availability -- sorry, the Zio systems ability to timely transmit patient data to physicians.

Do you see that?

A.  Yes.

Q.  And it's your understanding that the May 4, 2023 disclosure corrected prior alleged misstatements?

MR. SPERBER:  Objection to form.  Calls for a legal conclusion.

A.  Like I said before, my understanding is that the complaint alleges that a portion of the relevant truth was revealed through this disclosure.

Q.  In prior cases that you have provided expert testimony for, have you determined that the announcement of investigations provided new information to the market that corrected prior alleged misstatements?

MR. SPERBER:  Object to the form.  Vague.