1    **BERNSTEIN LITOWITZ BERGER**
      **& GROSSMANN LLP**
2    JONATHAN D. USLANER (Bar No. 256898)
      (jonathanu@blbglaw.com)
3    2121 Avenue of the Stars, Suite 2575
      Los Angeles, CA 90067
4    Tel: (310) 819-3481

5    *Counsel for Lead Plaintiff Oklahoma Firefighters*
      *Pension and Retirement System*
6
      [Additional counsel appear on signature page.]
7

8                    **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10

11   GLAZING EMPLOYERS AND GLAZIERS'          Case No. 3:24-cv-706-JSC
      UNION LOCAL #27 Pension And Retirement
12   Fund, Individually and on Behalf of All     CLASS ACTION
      Others Similarly Situated,
13                                                **LEAD PLAINTIFF'S REPLY IN**
                             Plaintiff,            **FURTHER SUPPORT OF ITS MOTION**
14                                                **FOR CLASS CERTIFICATION**
             v.
15                                                Date: February 26, 2026
      IRHYTHM TECHNOLOGIES, INC. et al.,          Time: 10:00 a.m.
16                                                Dept.: Courtroom 8, 19th Floor
                             Defendants.          Judge: Hon. Jacqueline Scott Corley
17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ...................................................................................1

II. ARGUMENT .............................................................................................................2

    A.  Legal Standards.................................................................................................2

    B.  Defendants Fail To Prove A Complete Lack Of Price Impact ...........................3

        1.  Defendants' Specific And "Concrete" False And Misleading
             Statements Foreclose A *Goldman* Challenge .................................3

            a.  Defendants' False Statements Were Not "Generic" ......................3

            b.  Defendants' Unreliable Expert Testimony Cannot
                Be Used To Rewrite Their False And Misleading
                Statements .....................................................................................6

        2.  Defendants Fail To "Sever The Link" Between The Disclosures
             And iRhythm's Stock Price Declines .............................................9

            a.  Defendants Fail To Prove A Complete Lack Of
                Price Impact As To The Transmission Claims .............................10

                i.  Defendants Fail To Prove No Front-End Price
                    Impact .................................................................................10

                ii.  Defendants Fail To Demonstrate A Lack Of Back-
                    End Price Impact As To The Transmission Claims..........12

            b.  Defendants Fail To Prove A Complete Lack Of
                  Price Impact As To The Accuracy Claims ...................................20

    C.  Plaintiff Can Calculate Damages Through A Common Methodology.................22

    D.  The Class Period Begins On July 25, 2022.......................................................25

III. CONCLUSION..........................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*In re Allergan PLC Sec. Litig.*,

5
    2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)................................................................18

6

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,

7
    568 U.S. 455 (2013)........................................................................................15, 16

8

*In re Apple Inc. Sec. Litig.*,
    2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ............................................. *passim*

9

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,

10
    77 F.4th 74 (2d Cir. 2023) (*Goldman II*) ............................................... *passim*

11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................................14

12

*In re Carbon Dioxide Indus. Antitrust Litig.*,

13
    229 F.3d 1321 (11th Cir. 2000) .............................................................6

14

*In re CenturyLink Sales Pracs. & Sec. Litig.*,

15
    337 F.R.D. 193 (D. Minn. 2020)...........................................................9

16

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
    2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)..........................................23

17

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,

18
    348 F.R.D. 372 (S.D. Cal. 2024) .....................................................10, 16

19

*Comcast Corporation v. Behrend*,

20
    569 U.S. 27 (2013)................................................................................2, 22, 23

21

*In re Concho Res., Inc.*,
    2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ..........................................22

22

*Cooper v. Thoratec Corp.*,

23
    2018 WL 2117337 (N.D. Cal. May 8, 2018) ..........................................11

24

*In re Credit Suisse Sec. Fraud Class Actions*,
    2025 WL 1866293 (S.D.N.Y. July 7, 2025) ..........................................22

25

*Crews v. Rivian Auto., Inc.*,

26
    2024 WL 3447988 (C.D. Cal. July 17, 2024)....................................13, 14, 17, 21

27

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab.*
    *Litig.*,

28
    2000 WL 876900 (E.D. Pa. June 20, 2000) ..........................................7

*El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*,
   2025 WL 853296 (D. Co. Jan. 9, 2025) ..........................................................23, 24, 25

*Ferris v. Wynn Resorts Ltd.*,
   2023 WL 2337364 (D. Nev. Mar. 1, 2023) ....................................................11, 24

*In re Finisar Corp. Sec. Litig.*,
   2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ..........................................................11

*Gambrill v. CS Disco, Inc.*,
   2025 WL 3771433 (W.D. Tex. Dec. 16, 2025) ......................................................22

*Gen. Elec. Co. v. Joiner*,
   552 U.S. 136 (1997) ...................................................................................................7

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
   97 F.4th 1171 (9th Cir. 2024) ..................................................................................14

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ...................................................................................11

*Goldman. Jaeger v. Zillow Grp, Inc.*,
   2025 WL 2741642 (9th Cir. Sept. 26, 2025) ................................................ *passim*

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
   594 U.S. 113 (2021) ...................................................................................... *passim*

*Hall v. Johnson & Johnson*,
   2023 WL 9017023 (D.N.J. Dec. 29, 2023) ...........................................................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ...................................................................................................3

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
   2023 WL 7285167 (E.D. Pa. Nov. 3, 2023) ..........................................................18

*Hasthantra v. CleanSpark, Inc.*,
   2025 WL 2717308 (S.D.N.Y. Sept. 24, 2025) .......................................................14

*Holley v. Gilead Scis., Inc.*,
   2023 WL 2469632 (N.D. Cal. Feb. 27, 2023) .........................................................7

*Homyk v. ChemoCentryx*,
   2024 WL 1141699 (N.D. Cal. Mar. 6, 2024) .............................................3, 6, 9, 23

*Homyk v. ChemoCentryx, Inc.*,
   2025 WL 1547625 (N.D. Cal. May 30, 2025) ...................................................7, 15

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
   87 F. Supp. 3d 928, 939 (N.D. Cal. 2015) ..............................................................8

*Int'l Bhd. of Elec. Workers Loc. 98 Pension Fund v. Deloitte & Touche LLP*,
  348 F.R.D. 35 (D.S.C. 2024) ...................................................................................................23

*In re Intuitive Surgical Sec. Litig.*,
  2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .........................................................14, 16, 22

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014) .........................................................................................4

*In re Key Energy Servs., Inc. Sec. Litig.*,
  166 F. Supp. 3d 822 (S.D. Tex. 2016) ....................................................................................16

*Lloyd v. CVB Financial Corporation*,
  811 F.3d 1200 (9th Cir. 2016) ..........................................................................................15, 21

*Loritz v. Exide Techs.*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015) ........................................................................23

*Malriat v. QuantumScape Corp.*,
  2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) ......................................................................23

*In re Mattel, Inc. Sec. Litig.*,
  2021 WL 470578 (C.D. Cal. Oct. 6, 2021) .............................................................................15

*Mauss v. NuVasive, Inc.*,
  2016 WL 3681831 (S.D. Cal. July 12, 2016) .........................................................................15

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ...........................................................................................10

*In re Nat'l Instruments Sec. Litig.*,
  2025 WL 2682172 (S.D.N.Y. Sept. 19, 2025) .......................................................................23

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) .............................................................................................4

*Pardi v. Tricida, Inc.*,
  2024 WL 4336627 (N.D. Cal. Sept. 27, 2024) .......................................................9, 15, 16, 17

*Pearlstein v. BlackBerry Ltd.*,
  2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ...........................................................................11

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ........................................................................................10, 12

*Purple Mountain Tr. v. Wells Fargo & Co.*,
  2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ...............................................................3, 6, 25

*In re Qualcomm Inc. Sec. Litig.*,
  2023 WL 2582206 (S.D. Cal. Mar. 20, 2023) ..........................................................................3

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013)..................................................................................23

*In re Restasis Antitrust Litig.*,
   2020 WL 2280144 (E.D.N.Y. May 5, 2020) .............................................................8

*Ret. Fund v. J.P. Morgan Chase & Co.*,
   301 F.R.D. 116 (S.D.N.Y. 2014).............................................................................23

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................7

*Robb v. Fitbit Inc.*,
   216 F. Supp. 3d 1017 (N.D. Cal. Oct. 26, 2016) .......................................................4

*S.E.C. v. SolarWinds Corp.*,
   741 F. Supp. 3d 37 (S.D.N.Y. 2024)........................................................................25

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   349 F.R.D. 606 (S.D.N.Y. 2025).............................................................................22

*In re SandRidge Energy, Inc. Sec. Litig.*,
   2019 WL 4752268 (W.D. Okla. Sept. 30, 2019) ......................................................24

*Sayce v. Forescout Techs., Inc.*,
   754 F. Supp. 3d 878 (N.D. Cal. 2024)......................................................................23

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
   335 F.R.D. 276 (N.D. Cal. 2020).......................................................................24, 25

*Sheet Metal Workers Nat'l Pension Fund v. Aktiengesellschaft*,
   2023 WL 3569981 (N.D. Cal. May 19, 2023) .....................................................23, 24

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
   798 F. Supp. 3d 416 (S.D.N.Y. 2025).........................................................................3

*In re SLM Corp. Sec. Litig.*,
   2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) .............................................................25

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2026 WL 100576 (S.D.N.Y. Jan. 14, 2026) .............................................................10

*In re Tesla, Inc. Sec. Litig.*,
   477 F. Supp. 3d 903 (N.D. Cal. 2020)......................................................................15

*In re Teva Sec. Litig.*,
   2021 WL 872156 (D. Conn. Mar. 9, 2021) ..............................................................22

*In re Under Armour Sec. Litig.*,
   631 F. Supp. 3d 285 (D. Md. 2022)..........................................................................23

*United States v. iRhythm Techs. Inc.*,
   3:24-cv-03967 (N.D. Cal. July 1, 2024) ................................................................................. 19

*In re Upstart Holdings, Inc. Sec. Litig.*,
   348 F.R.D. 612 (S.D. Ohio 2025) ..................................................................................... 23, 24

*In re Vaxart, Inc. Sec. Litig.*,
   738 F. Supp. 3d 1259 (N.D. Cal. 2024) .................................................................................. 16

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ............................................................................................... 17, 18

**Statutes and Rules**

Fed. R. Civ. P.:

   Rule 23 ............................................................................................................................. 2, 22

   Rule 23(a) ............................................................................................................................... 2

## I.    **PRELIMINARY STATEMENT**

Lead Plaintiff's Motion for Class Certification established that this litigation is tailor-made for class action treatment.[1] In response, Defendants recycle the same arguments this Court rejected at the motion to dismiss stage—that their false and misleading statements were "generic" and did not "match" the corrective disclosures that led to investor losses—now repackaged with inadmissible expert testimony. Defendants' arguments should be rejected.

Defendants' mismatch challenge to the Transmission Claims under *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113, 126 (2021) fails on two fronts. ***First***, the misstatements are far from "generic"—a threshold factual finding necessary to establish a lack of price impact under *Goldman*. The Court already correctly held that the Transmission Claims were material and "susceptible to a plain meaning that can be proved true or false." iRhythm internally recognized that ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████— demonstrating the materiality of these claims. Then, after the FDA privately warned iRhythm that these statements were misleading, iRhythm ███████████████████████████████████ ██████████████████████████████████████████████████████████.

Defendants' "expert" electrophysiologist—who impermissibly seeks to testify regarding the prescribing patterns and mental state of all clinicians—does not resuscitate Defendants' failing arguments. His entire opinion relies on the assertion that, notwithstanding iRhythm's public statements, clinicians "widely understood" ***all*** MCTs to be appropriate only for low-risk patients and capable of sending only delayed transmissions and alerts. This stands in stark contrast to Defendants' argument at the motion to dismiss stage that "MCT" has "no widely-accepted definition." Defendants cannot have it both ways, particularly where their new position contradicts discovery confirming that ███████████████████████████████████.

---

[1] Capitalized terms not otherwise defined have the same meaning set forth in Lead Plaintiff's Motion for Class Certification (ECF No. 114) (the "Motion"). "Cain Rpt." refers to the Expert Report of Dr. Matthew Cain (ECF No. 114-3). "Cain RR" refers to the Rebuttal Expert Report of Dr. Matthew Cain, attached hereto as Exhibit D. "D.Ex. _" refers to exhibits to the Declaration of Kristin Tahler in Opposition to Plaintiff's Motion for Class Certification (ECF No. 120-1). Unless otherwise specified, all emphasis is added, and all internal quotations, citations, and subsequent history are removed.

***Second***, Defendants utterly fail to establish a lack of price impact. Defendants ***admit*** statistically significant price reactions to several misstatements on the front-end and nearly all of the corrective disclosures. These concessions are dispositive. Defendants' arguments also contradict the Court's prior rulings and the discovery record. For example, Defendants argue that even if the disclosure of the Customer Advisory Notice ("CAN") impacted the stock price, the "posting" of the CAN corrected the misstatements, and any subsequent price declines from other disclosures were not linked to the misstatements. But iRhythm's internal documents demonstrate that the CAN was ███████████████████████████████████████████████ ██████.

Defendants further argue that the FDA's Warning Letter did not "match" the misstatements. But the Warning Letter provides a rare "mirror image disclosure": the very claims Defendants made about "near real-time" monitoring and appropriateness for "high-risk" patients are the same claims the FDA determined were "misbranded," and that the Zio AT was "not remotely capable of." This finding forecloses Defendants' *Goldman* challenge.

Defendants' *Goldman* challenge to the Accuracy Claims (for which they offer no expert opinion) are even more attenuated: they claim a mismatch because the Accuracy Claims did not mention the Zio AT specifically and were instead about iRhythm's Zio service broadly. But the August 2024 disclosures that iRhythm had received over 4,000 complaints about Zio accuracy were ***also*** regarding the Zio service broadly, rendering it a perfect match.

Defendants' criticism of Plaintiff's proposed damages methodology fares no better. The out-of-pocket damages methodology is used in "virtually every" securities class action, and easily satisfies Rule 23 and the Supreme Court's ruling in *Comcast Corporation v. Behrend*, 569 U.S. 27 (2013). None of the tired loss causation challenges Defendants raise—which have been rejected by ***every*** court to which their expert has presented them—require a different finding.

Defendants' opposition thus fails at every turn. The Court should certify the class.

## II.    ARGUMENT

### A.    Legal Standards

Defendants do not challenge, and thus concede, all elements of Rule 23(a). They also

concede that Plaintiff established market efficiency for iRhythm common stock—the foundation of the fraud-on-the-market presumption of reliance and the critical cornerstone for establishing predominance in a securities class action. The question before the Court is whether Defendants have rebutted the presumption by proving a complete lack of price impact. A "price impact" challenge should "impose no heavy toll on securities-fraud plaintiffs." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014) (Ginsburg, J., concurring). Defendants must disprove *both* "front-end" (misstatements causing or maintaining inflation) *and* "back-end" (corrective disclosures causing price declines) price impact by a preponderance of the evidence. *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *7 (N.D. Cal. Feb. 4, 2022); *Goldman*, 594 U.S. at 126. Defendants must show "a *complete* lack of price impact" during the entire Class Period. *Homyk v. ChemoCentryx*, 2024 WL 1141699, at *4 (N.D. Cal. Mar. 6, 2024). Courts consider "all probative evidence—qualitative as well as quantitative," and apply "a good dose of common sense." *Id.* Class certification is "not an alternative form of summary judgment." *Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *1 (N.D. Cal. Aug. 15, 2022).

**B.    Defendants Fail To Prove A Complete Lack Of Price Impact**

**1.    Defendants' Specific And "Concrete" False And Misleading Statements Foreclose A *Goldman* Challenge**

The "*threshold*" factual inquiry under *Goldman* asks, "how generic are the alleged misrepresentations?" *See Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 93 (2d Cir. 2023) (*Goldman II*). Because Defendants' misstatements were "concrete" and specific— *far* surpassing the generic statements analyzed in *Goldman*[2]—the Court need not engage in a "searching price impact analysis." *See, e.g.*, *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 442–43 (S.D.N.Y. 2025) (price impact analysis necessary *only* if "considerable gap in front-end–back-end genericness"). Defendants' challenge fails before it even starts.

**a.    Defendants' False Statements Were Not "Generic"**

Defendants' Transmission Claims, as this Court and the FDA have already held, were

---

[2] *See Goldman* 594 U.S. at 120 ("[i]ntegrity and honesty are at the heart of our business"). Defendants' reliance on *In re Qualcomm Inc. Sec. Litig.*, is equally misplaced. 2023 WL 2583306, at *12 (S.D. Cal. Mar. 20, 2023) (licensing model "broad," "fair," and "reasonable").

"susceptible to a plain meaning that can be proved true or false," ECF No. 77 at 13 ("Order"), and sufficiently "concrete" to both mislead investors and patients and require correction.[3] *Id.* at 13-14. These binding, dispositive holdings remove Defendants' statements from the realm of vague puffery and thus defeat a *Goldman* challenge. *See Goldman II*, 77 F.4th at 96 (courts "assess a statement's generic nature by referencing case law bearing on materiality"); *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014) (rejecting puffery challenge to statements that "could be objectively assessed through safety reports such as the MDRs"); *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) ("near real-time" alerts actionable); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1029 (N.D. Cal. Oct. 26, 2016) (devices have "highly accurate measurements" actionable). Importantly, Defendants do not argue that their misstatements about "high risk" patients (set forth at ¶¶207-08, 210-11) were generic.[4]

The Transmission Claims were central to the Company's ability to market the device to high-risk patients. Cain RR ¶¶24-36; 51-62. For example, on August 1, 2018, iRhythm explained that prior to the Zio AT, iRhythm was unable to target patients with underlying "***life critical*** . . . ***arrhythmias***." Cain RR ¶27. As Baird summarized on September 1, 2020, "The launch of Zio AT was an ***important development*** . . . . Prior to the Zio AT service, some ***physicians were reluctant*** to fully lean into Zio since ***high-risk patients*** would need to be monitored using an alternative solution." Cain RR ¶54; *see id.* (William Blair noting use of Zio AT for "inpatient" and "outpatient monitoring of high-risk patients" and "***near-real-time monitoring***" capability as supporting "long-term tailwind" for iRhythm); Ex. E at 3 ("Zio AT is a real-time monitor used for ***higher-risk patients*** . . . . The use of Zio AT allowed physicians ***to monitor patients without keeping them in the hospital***.").

Similarly, fundamental principles of economics indicate that the Accuracy Claims were "economically important to iRhythm's value." Cain RR ¶¶37-41; 57-62. For example, on February

---

[3] Defendants dissect the Transmission Claims into Timing (*i.e.*, Zio AT capable of "near-real-time" transmission) and Risk (*i.e.*, Zio AT appropriate for "high risk" patients) Statements. Both sub-categories were misleading for the same reasons and were corrected by the same disclosures.

[4] Defendants also incorrectly claim that the only "remaining" Risk Statements are alleged at ¶¶210-12 and ignore Risk Statements at ¶¶207-08. DB 18-19; *see also* Order at 15 (dismissing "spectrum of care" statements, distinguishing them from "high-risk" and "at-risk" statements).

23, 2023, Defendants indicated that the market for Zio would "expand dramatically as we continue to push into the primary care setting, just given how easy it is to use the product, ***how accurate it is***." Cain RR ¶¶37, 47. Consequently, multiple analysts discussed Defendants' Accuracy Claims in their assessment of iRhythm prior to and through the Class Period. *See* ¶¶57-62; e.g. *id.* ¶60; (August 24, 2020 Citi report: "iRhythm is changing the status quo with its current Zio platform . . . provid[ing] . . . ***the most accurate detection*** in cardiac arrhythmias.").

The discovery record demonstrates that the Transmission Claims were material and eviscerate Defendants' argument that "high risk" purportedly "bears no relationship to whether a patient has 'life-threatening heart conditions.'" *See* ECF No. 51 at 7. For instance, ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮, the Transmission Claims were used by ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. Ex. F at 4-5 (showing ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also* Ex. G at 6 (▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Because Defendants used the Transmission Claims ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*see* Ex. T at -5231, 5248-52), clinicians credited them. Indeed, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮. *See, e.g.*, ¶201; Ex. I at -8190-94 (▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Similarly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at -8197. The representative to whom this complaint was directed was instructed internally to stop "digging." Ex.CC at -7637. Similarly, clinicians stopped using the Zio AT once they observed its repeated failures to "quickly report" "high degree life threatening events." Ex. J at -6919 (▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1    ███████████████████); *see also* Ex. N (█████████████████████████).

2    Internal Company documents also establish that the Accuracy Claims were ███████████

3    ███. For instance, ███████████████████████████████. *See, e.g.*, Ex. G at 2 (██

4    ████████████████████████████████████████████████████████████████

5    ███████████████████). 

6    ██████████████████████████████████████████. *See* Ex. K at -6783.

### b.    Defendants' Unreliable Expert Testimony Cannot Be Used To Rewrite Their False And Misleading Statements

In a novel twist on the narrow challenge permitted by *Goldman*, Defendants advance the opinion of Dr. Thomas to challenge falsity and rewrite their false statements. *See, e.g.*, DB 19 ("Plaintiff's **theory of falsity** is inconsistent with industry practice."). Specifically, Dr. Thomas contends that all clinicians believe that (1) the Zio AT's transmission limit is irrelevant, (2) "up to a few hours" for MCT alerts is "typical and expected," and that (3) "real time" means "daily." D.Ex. 2; *see also* DB 2 (mischaracterizing Plaintiff's theory as "the Zio AT provided immediate transmission of data for critical care patients"). Defendants' challenge fails.

As a threshold matter, Defendants' use of Dr. Thomas to challenge falsity is "procedurally improper" and should be rejected. *ChemoCentryx*, 2024 WL 1141699, at *4; *Wells Fargo*, 2022 WL 3357835, at *6 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988)) ("falsity or misleading nature of the . . . [alleged] statements" is a "common question"). Indeed, it is the **same** challenge Defendants unsuccessfully raised in seeking dismissal of the Complaint (*see* ECF No. 51 at 7-9), only now packaged as an unreliable opinion by an unqualified expert.

To the extent Defendants advance Dr. Thomas's testimony to argue that the Transmission Claims were **interpreted** by an undefined population of "clinicians" to be generic—i.e., consistent with the intended use of "MCTs" generally—Defendants attempt to fill an interpretation void that does not exist and in a manner that is contradicted by direct evidence.

**First**, the Court credited Defendants' repeated argument that "there is no widely-accepted definition of 'MCT.'" *See* ECF No. 70 at 7; Order at 19. Defendants cannot now claim that they were wrong, "[h]aving induced the court to rely on [that] particular erroneous proposition." *See In re Carbon Dioxide Indus. Antitrust Litig.*, 229 F.3d 1321, 1326 (11th Cir. 2000).

**Second**, Dr. Thomas's sweeping "expert" opinion as to what every "clinician" thinks is unreliable. *See, e.g.*, *Holley v. Gilead Scis., Inc.*, 2023 WL 2469632, at *11 (N.D. Cal. Feb. 27, 2023). Courts consistently find that opinions by physicians as to "what doctors in general think" are not permissible. *Homyk v. ChemoCentryx, Inc.*, 2025 WL 1547625, at *7 (N.D. Cal. May 30, 2025) (excluding doctor's opinion in securities class action as to the "interpretation and impact of the [drug labeling] within her own practice and those of her physician colleagues"); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 2000 WL 876900, at *12 (E.D. Pa. June 20, 2000); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 555 (S.D.N.Y. 2004) (physicians not qualified to testify to other doctors' understanding).[5]

Dr. Thomas is uniquely incapable of opining as to what all prescribers "think" about the Zio AT. He is just one of approximately ███ electrophysiologists ("EP"), a highly specialized subspeciality of cardiology—████████████████████████████████████████████████ ██████████████████████████. Ex. L at 31:18-32:20. Zio AT use among EPs is ███ ███████████████████████████. *See* Ex. H at 3 (J.P. Morgan: "Cardiologists use Zio AT more actively, pegging Zio AT at 59% of the overall Zio mix, compared to 13% of the mix with electrophysiologists."); Ex. N at -1421 (████████████████████████████████████████ ████████████████████).[6] Dr. Thomas also ████████████████████████████████ ██████████████████████████. Ex. M at 105:18-22. ████████████████████████████ █████████████████████ (*id.* at 106:21-107:2), ████████████████████████████████ ███████ (*id.* at 34:18), ████████████████████████████ (Ex. L at 48:9-15). He cannot reliably testify as to how internists and cardiologists, ████████████████████████████, understood the Zio AT. Ex. N at -1421.

---

[5] Defendants' sole case to the contrary, DB 19 (citing *Kirkland*, 2024 WL 1342800, at *9, *12 (S.D.N.Y. Mar. 29, 2024)), is inapposite as the expert there opined based on his experience in the mining industry concerning basic strategic business principles guiding one mining company. Dr. Thomas's opinion concerns scientific principles and the prescribing behavior of an unenumerated universe of doctors, including generalists. *See Gen. Elec. Co. v. Joiner*, 552 U.S. 136, 146 (1997) ("[T]here is simply too great an analytical gap between the data and the opinion proffered.").

[6] Defendants openly touted ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████.

***Third***, even if Dr. Thomas were qualified to testify about the purported views of relevant "MCT" prescribers (he is not), his opinions are still inadmissible because they are not based on a reliable scientific method. Dr. Thomas admitted at his deposition that his sweeping opinions about the thoughts of all "clinicians" is based on ████████████████████████ (Ex. M at 70:7-25), ████████████████████████████████ (*id.* at 41:11-42:17), ██████████ ██████████████████████ (*e.g.*, *id.* 93:4-101:2). ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *Id.* at 87:5-88:12. Courts consistently find such methods are not "good science" and "not reliable." *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 939 (N.D. Cal. 2015); *see also In re Restasis Antitrust Litig.*, 2020 WL 2280144, at *4 (E.D.N.Y. May 5, 2020) (anecdotal conversations with doctors are not a "sound methodology"). Dr. Thomas also bases his opinion on American Heart Association ("AHA") guidelines—but when confronted with the fact that 43% of patients across 10 studies were not treated under the guidelines, Dr. Thomas conceded that ██████████████████████████████████████████ *See* Ex. M at 73:12-25 (████████████████████████████████████); Ex. Q at 1.

***Last***, Dr. Thomas's opinion is irrelevant and highly likely to mislead because it (1) requires the Court to incorrectly assume that the ***general*** characteristics of a product category (MCTs) replaced the purported ***specific*** characteristics of the Zio AT in the minds of clinicians and (2) that the word "real-time" means "daily," or, at minimum, "hours." Notably, Dr. Thomas relies on AHA guidelines that define MCT as being indicated for "***high-risk*** patients whose rhythm ***requires real-time monitoring***." D.Ex. 2 at 11 n.28 (citing Ex. R). The guidelines elaborate: "it is ***important*** for the appropriate infrastructure to be present to facilitate ***timely notification*** . . . when a ***potentially dangerous*** abnormality is identified." Ex. R at 69. And Dr. Thomas conceded during his deposition that ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████ (Ex. M at 64:10-65:5), consistent with the plain meaning of "real time." Indeed, ██████████████████████████████████████████████████

██████, how investors understood it was being used, why the Zio AT was purportedly appropriate for "high-risk" patients, and why the FDA barred use of the Transmission Claims. *See supra* §II.B.1.a.

Finally, Dr. Thomas claims that every clinician knows that a "few hours is typical and expected" to receive actionable alerts. D.Ex. 2 at ¶14. This knowledge is ████████████████ ████████████████████████████████████████████████████████ (*id.* at 42:1-4), ███████████████████████ (*id.* at 46:1-5), █ ██████████████████ (*id.* at 41:11-14 █████████████). Dr. Thomas does opine that ██ ████████████████████████ (*id.* at 42:17), █████████████████████████ ████████████████████████████████████████████████████████ *id. at* 41:15-18. But evidence confirms that ████████████████████████████████. *See, e.g.,* Ex. I at -8190, -8197. (███████████████████████████████ ████████████████████████████████████████████████████████ ██████████); *see also supra* II.B.1.a. Dr. Thomas' opinion—which contradicts how the ***Zio AT*** was marketed and defined and ignores critical facts and scientific evidence of the actual perceptions of clinicians contradicting the opinion—is both irrelevant and unreliable.

### 2. Defendants Fail To "Sever The Link" Between The Disclosures And iRhythm's Stock Price Declines

To sever the link between the disclosures and investor losses, Defendants must prove a "complete lack of price impact" at both the "front-end" (i.e., the misstatements did not cause stock price inflation) ***and*** the "back-end" (i.e., the corrective disclosures did not cause stock price declines). *See ChemoCentryx*, 2024 WL 1141699, at *4-5; *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 210 (D. Minn. 2020) (rejecting price impact challenge in price maintenance case where defendants did not produce evidence of lack of front-end price impact). If Defendants fail to disprove the back-end price impact of just one corrective disclosure, they will not have completely severed the link, and a class must still be certified. *See Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *12 (N.D. Cal. Sept. 27, 2024) (price impact of final disclosure only sufficient for

certification).[7] A corrective disclosure "need not precisely mirror" misrepresentations to match under *Goldman*. *Jaeger v. Zillow Grp, Inc.*, 2025 WL 2741642, at *1 (9th Cir. Sept. 26, 2025).

### a.     Defendants Fail To Prove A Complete Lack Of Price Impact As To The Transmission Claims

#### i.     Defendants Fail To Prove No Front-End Price Impact

While not bearing the burden, Plaintiff may counter Defendants' challenge by "produc[ing] evidence to show that the[] alleged misrepresentations and omissions affected [iRhythm's stock] price," including by submitting an expert opinion showing that "there was a statistically significant price increase" following an alleged misstatement. *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372, 386 (S.D. Cal. 2024). Even pre-Class Period price impact dooms Defendants' challenge. *See, e.g.*, *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018). Critically, Defendants do not advance (and thus waive) any argument ***at all*** as to the front-end impact of the "high-risk" statements alleged at ¶¶207-08. As for the Timing Statements, Plaintiff has shown front-end impact both during and before the Class Period. *See* Cain RR ¶¶24-27; 31-36; 51-56.

***First***, Plaintiff has demonstrated front-end price impact for the Transmission Claims during the Class Period. *See* ECF No. 114-3 ("Cain Rpt.") ¶80 & p. E-6; DB at 11, 20 (conceding statistically significant stock price increases on multiple misstatement days). While Defendants argue that the statistically significant return associated with ***one*** of these misstatements is attributable "exclusively" to other factors, and that the misstatements on those days were not "new" (DB 11), they cannot demonstrate a ***complete*** lack of price impact. *See, e.g.*, *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2026 WL 100576, at *7 (S.D.N.Y. Jan. 14, 2026) ("it isn't relevant that [defendant's] stock price may have risen because of other positive news on the earnings call.").

Despite this definitive evidence of front-end price impact, Defendants argue that no analyst

---

[7] Defendants' own authority confirms lack of front-end price impact is insufficient to meet their burden. *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (finding lack of price impact only where no statistically significant increase in the price on both the front- and back-end). Defendants further rely on *Moody's* to argue that misrepresentations repeating the "status quo" cannot have price impact. DB 19. But *Moody's*, like *Goldman*, addressed generic statements concerning "independence and integrity" that investors, by default, assumed were true. *Moody's*, 274 F.R.D. at 489. The claims at issue here are concrete and specific. *Supra* §II.B.1.a.

repeated the Transmission Claims during the Class Period. DB at 11-12; 18-20. But an absence of analyst commentary on misstatement days is "***not*** a scientifically accepted method" for disproving price impact. *See, e.g.*, *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at \*21 (S.D.N.Y. Jan. 26, 2021). Moreover, analysts ***did*** repeat these statements, echoing Defendants' view that the Zio AT was for "high-risk" patients with "suspected high-risk arrhythmias" because of its "real time" capabilities. *See, e.g.*, Cain RR ¶55 (Wells Fargo February 7, 2023); *supra* at 4-5.

***Second***, assuming *arguendo* that Defendants could establish that their misstatements were generic ***and*** had no front-end price impact, which they cannot, their challenge still fails. Plaintiff alleges a widely accepted "price maintenance" theory of artificial inflation. *See, e.g.*, *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at \*7 (D. Nev. Mar. 1, 2023) ("It is hardly illogical or inconsistent with precedent to find that a statement may cause inflation not simply by adding it to a stock, but by maintaining it.") (*quoting In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016)). Under this theory, a misrepresentation during the Class Period "cause[s] the stock price to remain higher than it would have been had the statements been truthful." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 419 (7th Cir. 2015); *see also Goldman*, 594 U.S. at 126. Defendants' sole authority to the contrary "is inapposite." *See* DB 11 (citing *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at \*8 (N.D. Cal. Dec. 5, 2017)); *Cooper v. Thoratec Corp.*, 2018 WL 2117337, at \*4 & n.2 (N.D. Cal. May 8, 2018) ("Because the plaintiff in *In re Finisar Corp. Sec. Litig.*, was 'not proceeding on a price maintenance theory,' that case is inapposite.").

Since 2017, Defendants repeatedly used the Transmission Claims to tout the Zio AT as a material growth driver. ¶¶44-50; *supra* at 4-5. iRhythm's stock price increased in a statistically significant manner on four dates when Defendants touted virtually the same Transmission Claims as during the Class Period. Cain RR ¶¶24-27 (August 2, 2017: "timely data transmission capabilities"; August 1, 2018: "meet[s] the need for life critical alerting of arrhythmias"; February 12, 2019: appropriate for "patients who have higher acuity conditions . . . and may require more immediate physician notification"; August 7, 2019: appropriate for detecting "life-critical arrhythmia").

As iRhythm was newly describing the device's capabilities, analysts took note. ¶¶47-48

(identifying four pre-class period analyst reports); Cain RR ¶54 (William Blair June 21, 2020: "Management highlighted the use of Zio AT … for inpatient monitoring … and outpatient monitoring of **high-risk patients**"; RBC December 4, 2017: "The Zio AT is designed for patients who have more critical symptoms of atrial fibrillation"). It is both expected and consistent with Plaintiff's price maintenance theory that as of 2022, five years later, investors did not react every time these misstatements were repeated. *See* Cain RR §IV.D. Yet Dr. Skinner ███████████ ███████████████████████████████████████████. Ex. S at 131:18-134:21. Thus, even if Defendants could prove a complete lack of Class Period front-end price impact here (they cannot), such a showing remains insufficient. *See Fiat*, 327 F.R.D. at 45 (price impact where inflation caused by "misrepresentations that occurred before the Class Period began").

### ii. Defendants Fail To Demonstrate A Lack Of Back-End Price Impact As To The Transmission Claims

**November 1 and 4, 2022: The Existence Of The CAN & 2022 Form 483**. Defendants revealed on November 1 that (i) iRhythm had issued a Customer Advisory Notice ("CAN") concerning a transmission limit and (ii) the CAN resulted in "reduced growth with Zio AT" and reduced guidance. ¶¶123-24. Defendants revealed neither the details from the CAN nor any updates to the Clinical Reference Manual ("CRM"). Defendants also downplayed its significance. ¶128 (CAN effects would "start[] to subside" with updates to "packaging" and "labeling").

On November 4, 2022 (after market close), Defendants revealed for the first time that the CAN addressed criticisms by the FDA in a Form 483. ¶129. Neither the language of the CAN, the updated CRM, nor the FDA's troubling Form 483 observations were disclosed. Defendants again attempted to assuage investors, claiming that neither the Zio AT labeling correction nor the activities associated with the FDA inspection presented a "material risk." ¶131.

In response to these "vague at best" disclosures (Order at 24), iRhythm's stock price fell sharply. Cain RR ¶88, Ex. 1. Analysts attributed the multi-day decline to the CAN's impact on guidance, the 483, and revelations concerning the Zio AT's transmission limits. ¶¶125-26; Cain RR ¶66. As analysts contemporaneously confirmed, the information disclosed was complex, and investors took multiple days to fully digest it. Cain RR ¶92. Defendants and their experts make no attempt to offer any alternative explanation for the stock price decline. *See Hall v. Johnson &*

*Johnson*, 2023 WL 9017023, at *14 (D.N.J. Dec. 29, 2023) (finding price impact where defendants did not "offer[] any other explanation" for the stock drop). Nor does Dr. Skinner contend that the disclosure of the CAN had no price impact. Defendants argue only that the Timing Statements were generic and do not "match" the disclosure. DB 14. This argument fails.

 **First**, as explained above, the Transmission Claims were not generic (*see supra* §II.B.1.a.), a "threshold" finding to engage with *Goldman* mismatch analysis. *Goldman II*, 77 F.4th at 93.

 **Second**, there is no mismatch. As the Court has explained, "[I]f arrhythmia events are *never* reported . . . the transmissions are not timely." Order at 16. Thus, the existence of the CAN, transmission limit, and Form 483 concerned the *same issues* that "render[ed] *some aspect* of the [Timing] statements false." *Zillow*, 2025 WL 2741642, at *2 (disclosure of "new information" concerning "home-pricing struggles" was "matched enough" to misstatements regarding progress "strengthening [company's] pricing models"). Courts consistently find a "match" for *Goldman* purposes between misstatements and corrective disclosures more attenuated than these. *See id.* at *2; *Crews v. Rivian Auto., Inc.*, 2024 WL 3447988, at *14 (C.D. Cal. July 17, 2024) (no mismatch between description of "Rivian's path to profitability" and disclosure of base price increases).

 **Third**, Defendants do not argue that the Risk Statements were generic or mismatched. Defendants claim that the only "corrective disclosure" of the Risk Statements was the May 30, 2023 Warning Letter. DB 19. This misreads Plaintiff's allegations that the Risk Statements were misleading in part because of the transmission limit. *See* Order at 13-14 (crediting allegations that transmission limit rendered "high-risk" statements false or misleading); ECF No. 71 at 9 (same). And discovery now confirms that iRhythm understood this link—which is why ███████

████████████████████████████████████████████████

███████████. *See, e.g.*, Ex. T at -5231, -5248 (██████████████████████

████████████████████████████████████████████).[8]

 Defendants also fail to disprove price impact as to the ongoing disclosure on November 4.

---

[8] Defendants suggest that the FDA was always aware of the transmission limit, reviewed the CAN and CRM, ignored updated CRM language, and now permits iRhythm to market the Zio AT as an "MCT." DB 3-5, 7-8, 17. At best, these factual assertions are relevant only to scienter, not to price impact, and in any event are class-wide defenses.

***First***, Defendants argue that there was no statistically significant price decline. DB 17. But the combined decline over the relevant trading days (November 2, 3, 4, and 7) following these closely related disclosures is statistically significant at the 99% level. Cain RR ¶¶88, Ex. 1.[9]

***Second***, Defendants wrongly argue that the November 4 disclosure contained no "new" corrective information, but merely "repeated the same information disclosed on November 1, 2022." DB 17. November 4 is the first time that Defendants revealed that the FDA had launched a site inspection, issued a Form 483, or raised issues concerning the Zio AT's transmission limit.

Defendants' argument rests on their unsupportable claim that iRhythm fully disclosed all relevant information concerning the transmission limit on November 1. Not so. Blackford did not "direct" investors to either the CAN or the CRM, nor were such documents "accessible to investors." *See* DB 5, 16.[10] Dr. Skinner testified that ███████████████████ ████████████████████████████████████████████████ ████████████ Ex. S at 87:3, 98:13-15. But, in reality, when ████████████████ ████████████████████████████████████ *See* Exs. U, V (November 2 ████████████████████); Ex. W (confirming iRhythm ████████████████). And Dr. Thomas testified that ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ Ex. M at 29:19-20:13.[11] In any event, the CAN and CRM both omit the FDA's

---

[9] The fact that the November 7, 2022 price reaction is not statistically significant at the 95% level does not disprove price impact. *Rivian*, 2024 WL 3447988, at *15 (lack of statistically significant price drop is not necessarily evidence of lack of price impact); Cain RR Ex. 1 (November 7 price drop significant at 68%); *Hasthantra v. CleanSpark, Inc.*, 2025 WL 2717308, at *8 (S.D.N.Y. Sept. 24, 2025) (finding no *Basic* rebuttal where expert "concluded that it is more likely than not that the alleged misrepresentations had price impact").

[10] Despite mentioning the September 2022 CRM and CAN "disclosures," Defendants do not argue that they establish truth-on-the-market, likely because they were not "widely discussed or accessible" to investors. *Zillow*, 2025 WL 2741642, at *2; *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1186 (9th Cir. 2024) ("[S]ecurities issuers should not escape liability for misrepresentations merely because . . . corrective information was publicly available on some webpage tucked in a deep corner of the internet."); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *11 (N.D. Cal. Dec. 22, 2016) ("significant difference between sending an instructional letter to certain entities . . . and publicly disclosing critical safety issues").

[11] The FDA also did not "publicly post[] the CAN on its website" on November 4. DB 5. Rather, the FDA posted ***about*** the CAN, including a brief description of the transmission limit, but not

observations of Defendants' false marketing of the Zio AT and patient complaints.

**May 4, 2023: The DOJ Subpoena**. Defendants revealed on May 4, 2023, their receipt of a subpoena from the Department of Justice concerning iRhythm's "product and services." ¶134. The disclosure resulted in a statistically significant stock price decline. Cain RR ¶88, Ex. 1. Although Defendants provided no detail as to the focus of the subpoena, investors learned (in 2024) that it concerned issues underlying the 2022 483, as well as the failure to "*timely* transmit patient cardiac data." *Id.* The Court held that under *Lloyd v. CVB Financial Corporation*, the disclosure was corrective. Order at 27-28 (citing *Lloyd*, 811 F.3d 1200, 1210 (9th Cir. 2016)); *see Zillow*, 2025 WL 2741642, at *1 (rejecting price impact arguments based on loss causation principles not error); *In re Mattel, Inc. Sec. Litig.*, 2021 WL 470578, at *6 (C.D. Cal. Oct. 6, 2021) (price impact where existence (but not content) of whistleblower letter was public).

Defendants' sole argument as to the May 4 disclosure is that it was not corrective because they could not have disclosed the subpoena at the same time as their misstatements. DB 15. This nonsensical argument is foreclosed by settled Ninth Circuit law holding that disclosures of government or regulatory actions that are the *result* of misconduct can be corrective. *See Lloyd*, 811 F.3d at 1210; *see also Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *9-11 (S.D. Cal. July 12, 2016) (disclosure of subpoena received after alleged false statements corrective); *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 934 (N.D. Cal. 2020) (disclosure of SEC investigation launched after misstatements corrective); *Apple*, 2022 WL 354785, at *9 (that information revealed in corrective disclosure "did not exist at the time the challenged statement was made" irrelevant). None of Defendants' inapposite cases overrule this well-settled precedent.[12]

---

including details set forth in the CAN, including potential risks. D.Ex. 17. It appears that the first time the CAN was ever publicly posted on the internet was by Defendants filing it *in this litigation*.

[12] Unlike *FibroGen*, Defendants here already knew that the Transmission Claims were false as of, at the very latest, the FDA inspection. Thus, Defendants also knew (but concealed) the issues raised by the subpoena. 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024); *see also ChemoCentryx*, 2025 WL 1547625, at *18 (distinguishing *FibroGen* on similar grounds). The court in *Tricida* **granted** class certification and found the disclosure of an FDA Complete Response Letter not corrective because it did "not encompass the specific substantive concerns" previously raised to the Company. 2024 WL 4336627, at *10-11. Here, the FDA already raised to Defendants the "specific substantive concerns" implicated by the subpoena. Defendants' cherry-picked language from *Amgen* stands only for the uncontroversial proposition that "a plaintiff whose relevant transactions were not executed" during a class period cannot have relied on defendants'

**May 30 to June 6, 2023 Disclosures: The Warning Letter**. On May 30, 2023, Defendants disclosed that iRhythm had received the Warning Letter. The Warning Letter itself was made public on June 6. Therein, the FDA explicitly identified the Transmission Claims as false and misleading: the Zio AT was "misbranded" because it was "***not remotely capable of delivering near-real time monitoring for high-risk patients***." Ex. X at 4. These disclosures also revealed dozens of complaints about the Zio AT's transmission limit preventing transmission of serious (and even fatal) arrhythmias. The stock price decline in response is statistically significant. Cain RR ¶88, Ex. 1. Defendants' attempt to sever the link with this "mirror image" disclosure fails.

*First*, Defendants argue that the Warning Letter disclosures revealed no "new" information. DB 17-18. But the Court has already found that this disclosure contained "new information." Order at 27-28. Defendants have presented no evidence to upset that finding, nor can they. *See, e.g.*, Ex. Y (███████████████████████████ ████████████████); *Apple*, 2022 WL 354785, at *9 (partial corrective disclosure not "completely" curative where later disclosure "reveals much more about the iPhone's performance in China"); *Tricida,* 2024 WL 4336627, at *11 (previous disclosures "did not allow the reasonable investor to conclude that the FDA had specifically raised substantive concerns"); *Acadia Pharms.,* 348 F.R.D. at 390-91 (sufficient for disclosure to contain "information regarding the FDA's focus" on certain data "that was not previously disclosed"). Defendants' cases are inapt. *See In re Vaxart, Inc. Sec. Litig.*, 738 F. Supp. 3d 1259, 1266-67 (N.D. Cal. 2024) (fully corrective information disclosed in "smaller text" on same day as misstatements).

*Second*, Defendants argue that the Warning Letter was merely the materialization of "a previously disclosed risk." DB 17.[13] But whether investors speculated that iRhythm **could** receive a Warning Letter after the 483 is irrelevant. *Intuitive*, 2016 WL 7425926, at *16 (price impact for warning letter after disclosure of Form 483, noting "a warning letter is an indication that the

---

misrepresentations. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 472 (2013).

[13] Defendants' sole authority for the proposition that a materialization of a known risk cannot be corrective is an out-of-circuit order on motion to dismiss finding that the announcement of an FCPA investigation did not correct statements that were "forward-looking" or "mere puffery." *See In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 865 (S.D. Tex. 2016).

company reply to the Form 483 has been insufficient"). The Warning Letter revealed what Defendants had concealed: iRhythm "misbranded" the Zio AT as a "near real-time" device for "high risk" patients, with fatal consequences. *Tricida*, 2024 WL 4336627, at *12 (rejecting Defendants' argument where "the FDA informed Tricida of the substantive concerns about the issues that Tricida had only warned investors 'might' arise"). Tellingly, the market was surprised by both the warning letter and its contents. *See* Cain RR ¶76 (Wells Fargo: "The warning letter (WL) was ***unexpected***"; Oppenheimer: "Misbranding: This is perhaps the biggest ***surprise***"; Truist: "This WL comes off an Advisory Notice issue/impact (in 4Q22-1Q23) that ***we had assumed was in the rearview***.").

***Third***, Defendants claim a *Goldman* mismatch (DB 14-15), but the Warning Letter literally stated that the Zio AT was "***not remotely capable of delivering near real-time monitoring for high-risk patients***," Ex. X at 5. This perfectly mirrors the Transmission Claims. *Goldman II*, on which Defendants rely, demonstrates there is no mismatch here. There, the court contrasted the facts before it (where a mismatch existed) with *Waggoner v. Barclays PLC*, 875 F.3d 79, 104-05 (2d Cir. 2017). In *Waggoner*, "the corrective disclosure directly implicated not just the same topic, ***but the alleged misstatements themselves***—a ***notable distinction*** from the misrepresentation-corrective disclosure relationship here." *Goldman II*, 77 F.4th at 97. Defendants' argument would otherwise require the Court to determine that "the stock price dropp[ed] ***only***" because of ***other unrelated*** revelations in the Warning Letter, and not the FDA's finding that the Transmission Claims were misleading. *Rivian*, 2024 WL 3447988, at *14. Defendants made no such showing.[14]

***Fourth***, Defendants argue that the Warning Letter "did not change the market's views" of the Zio AT's patient population because "analysts viewed the Zio AT as suitable for the ***MCT market*** both before and after the Warning Letter." DB 19-20. Again, this argument stands in stark contrast to Defendants' earlier claim that there was "no widely-accepted definition of 'MCT.'"

---

[14] Defendants cite *Sneed v. Talphera, Inc.* for the proposition that iRhythm had "no duty to disclose" adverse events referenced in the Warning Letter. DB 14 n.3 (citing 147 F.4th 1123, 1133 (9th Cir. 2025)). The *Sneed* warning letter concerned omitted instructions for use, including step "[1] TEAR OPEN the notched pouch." *Sneed*, 147 F.4th at 1133. Here, the omitted information included ***patient deaths*** implicating iRhythm's false marketing. These cases are not similar.

ECF No. 70 at 7. Defendants' dramatic shift from arguing that the term "MCT" is so vague that it was immaterial, to asserting that investors heard iRhythm's **specific** claims about the Zio AT and replaced them with an alternative understanding of an "MCT's" capabilities, should be rejected.

In any event, whether the Zio AT was appropriately marketed as an **MCT** is a straw man. Defendants misrepresented the appropriate patient population for the Zio AT as "high-risk" and the "most at-risk" patients. iRhythm ███████████████████████████████████████. Ex. Z at 10; Ex. AA at slide 38; Ex. BB at 2 (███████████████████████ ██████████). The "high-risk" patient population was significant to analysts' assessment of the Zio AT's value proposition. *See* Cain RR ¶54 (Canaccord: the Zio AT's expansion into "the high-risk arrhythmia patient population" was a "compelling benefit"; Baird: "Prior to the Zio AT … high-risk patients would need to be monitored using an alternative solution"; Baird: Zio AT intended "for high-risk patients"). After the Warning Letter, analysts corrected this analysis. *See id.* ¶76 (Canaccord: noting FDA finding of mis-marketing "for both near-real time monitoring and high-risk patient population"). Defendants present no admissible evidence to the contrary. *See* §II.B.1.b.

**Fifth**, Defendants suggest that some of the price reaction to the May 30 disclosure "reflects regulatory risk, not a correction" of any misstatements." DB 20. Even assuming "regulatory risk" should eventually be disaggregated (which Plaintiff disputes), that would not preclude certification. *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2023 WL 7285167, at *23 (E.D. Pa. Nov. 3, 2023) (failure to disaggregate "potential exposure to fines and penalties" did not preclude certification); *Apple*, 2022 WL 354785, at *10 ("Claims that other factors also contributed in part to the price drop are insufficient."). Because Defendants have not demonstrated "that the other events explain the **entire** price drop," they have not met their burden. *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *10 (S.D.N.Y. Sept. 8, 2021); *see also Waggoner* 875 F.3d at 104-05 (price impact where decline partially attributed to regulatory risk).

**July 1, 2024 Disclosure: The DOJ Petition**. On July 1, 2024, the DOJ filed a petition to enforce its April 4, 2023 subpoena to iRhythm, including (for the first time publicly) the subpoena itself, revealing that it concerned "███████████████████████████████████████ ███████████████████████" Ex. GG at 3. The subpoena demanded documents concerning "██

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ███████████████████████████████████████████" Ex. HH. As

4  iRhythm admits, this disclosure caused its "stock [price to] drop[] over 10% in just two days,"

5  ECF No. 22 at 4, *United States v. iRhythm Techs. Inc.*, 3:24-cv-03967 (N.D. Cal. July 1, 2024),

6  which is statistically significant. Cain RR ¶88, Ex. 1. Before the July 1 disclosure, the market did

7  not know that the subpoena concerned the same issues raised previously by the FDA, and

8  "questioned whether the DOJ subpoena … pertained to an industry-wide inquiry." *See* Cain RR

9  ¶¶76, 77 n.196 (analyst noting that it was "yet unclear if that DoJ inquiry relates to this Zio AT

10 matter or something else"; analyst noting that subpoena "seems to be related to the industry and is

11 not IRTC-specific"); Ex. DD at -30040 (████████████████████████████████

12 █████████████████████████████████). The July 1 disclosure

13 corrected that impression. Cain RR ¶78 (analyst noting on August 2, 2024 link between "ongoing

14 DOJ inquiry, Zio AT warning letter, and Form 483 from the FDA").

15      In response, Defendants recycle their argument from above, stating that the July 1, 2024

16 disclosure cannot be corrective because the Petition did not exist at the time of their misstatements.

17 DB 15. As explained above, the question is not whether Defendants falsely concealed the Petition,

18 but whether what was disclosed provided new information correcting Defendants' Transmission

19 Claims. By announcing that the subject of the DOJ Investigation was ████████████████

20 ███████████████████, the July 1 Petition corrected Defendants' earlier misstatements.

21      Defendants also argue that the full truth was disclosed by June 6, 2023, when the FDA

22 published the Warning Letter." DB 17-18. But the Court has already determined that the July 1,

23 2024 disclosure revealed new information concerning the subject of the DOJ investigation.

24 Defendants present no evidence to disturb this holding. ECF No. 77 at 27.

25      Finally, Defendants argue that the "lag time" allegations cannot be relied on to infer price

26 impact because they were not corrected during the Class Period. DB 18. Defendants state no legal

27 basis to deny certification based on a lack of price impact for a single concealed fact that made

28 statements false or misleading. Even so, the July 1 disclosure *did* reveal such "████████

████████." iRhythm was aware that such "lag time" existed, and customers who experienced it believed it rendered the Timing Statements false. Ex. I at -8197 (customer: iRhythm's reporting time "████████████████████████████████████████████████.").

### b. Defendants Fail To Prove A Complete Lack Of Price Impact As To The Accuracy Claims

Defendants do little to dispute the front-end price impact of the Accuracy claims, except to argue that they are generic statements about other iRhythm products and services (including "Zio Monitor(s)" and the "Zio Service") and not otherwise accompanied by statistically significant stock price increases or analyst commentary. DB 20. But the statements were not generic. *See* §II.B.1.a. And Defendants' argument that the statements were not accompanied by a statistically significant stock price increase or analyst commentary[15] is insufficient to "sever the link" because, in a price maintenance case, Defendants must *also* prove a lack of back-end price impact. *See supra* §II.A; *Advanced Micro Devices, Inc.*, 2016 WL 104502, at *7. Notably, ████████████ ████████████████████████████████████████. *See* Ex. S at 170:5-10. As set forth below, Defendants' legal arguments do not disprove price impact on the back-end either.

**August 1 and 9, 2024: The 2024 Form 483 And Capitol Forum Report**. On August 1, 2024, Defendants disclosed the receipt of new Form 483s that included observations concerning "risk analysis regarding the involvement of the technicians to prepare the Zio ECG reports." ¶146. On August 9, 2024, the Capitol Forum disclosed the substance of these Form 483s and reports from current and former employees. Investors learned that iRhythm received over 4,000 complaints concerning iRhythm's CCT operations, including that technicians regularly misread arrhythmia data and reported misclassified data. Analysts reacted to these disclosures, noting that the Form 483s "should be recognized as a safety concern given the chance for misdiagnosis." The stock drop after these disclosures was statistically significant. Cain RR ¶89, Ex. 2.

Defendants advance *Goldman* mismatch arguments (DB 20-22), which the Court need not consider because the Accuracy Claims are not generic. §II.B.1.a. Even so, there is no mismatch.

---

[15] Defendants are wrong: analysts did rely on the purported accuracy of iRhythm's monitors prior to the corrective disclosures. *See* Cain RR ¶60 (August 24, 2020 report: "the most accurate detection in cardiac arrhythmias"; December 20, 2021 report: "accurate detection").

**_First,_** Defendants argue mismatch because the August 1 disclosure did not "mention[] accuracy at all." DB 21. But a corrective disclosure need not "mirror" its misstatement. _Rivian_, 2024 WL 3447988, at *14; _Zillow_, 2025 WL 2741642, at *1 (sufficient for disclosure to "reveal true facts concealed by such misrepresentation."). The FDA's focus on "the involvement of the technicians to prepare the Zio ECG reports," revealed on August 1, directly implicates the accuracy of iRhythm's products. Further, August 1 is a **_partial_** disclosure date—the August 9 disclosure makes it clear that the Form 483 concerned the system's accuracy. _See Lloyd_, 811 F.3d at 1210 (announcement of investigation corrective where later disclosures reveal concealed information).

**_Second_**, Defendants assert mismatch because the Accuracy Statements refer "generally" and "broadly" to the Zio products. DB 20-21. This argument **_supports_** a close match because the accuracy issue observed by the FDA applied "broadly" to the "Zio AT, Zio XT, Zio Monitor, and Zeus." Ex. EE at 3, 5. Likewise, Defendants' observation that analysts were not focused on "purported implications about the accuracy of the device" (DB 22) as opposed to the monitoring operations is consistent with this match. Monitors and reporting were not distinct when Defendants made the Accuracy Claims, nor did the FDA treat them as such in the 483. _See_ Ex. EE at 3 ("CCT personnel operations" are "a function of [iRhythm's] medical devices"). And the fact that the August 9 Capitol Forum report discussed "reports provided to physicians for Zio AT patients" (DB 21), does not create a mismatch. That one of iRhythm's two monitors had accuracy issues corrects Defendants' misrepresentations about the accuracy of both monitors. Defendants have failed to prove that no part of the disclosure corrected the Accuracy Claims. _Zillow_, 2025 WL 2741642 at *2 (only requiring disclosure to correct "some aspect" of misstatements).

**_Third_**, Defendants claim mismatch because both August 2024 disclosures are "significantly more specific" than the Accuracy Claims. DB 21-22. But, as Defendants admit (DB 8), the FDA observed that CCT personnel were "misreading arrhythmia data" and "providing such misclassified data to end users," i.e., **_inaccurate_** data. Unlike in _Goldman II_, where the corrective disclosures and misstatements merely "bore on the same subject," the FDA here corrected Defendants' claims that the Zio monitors were "highly accurate." 77 F.4th at 100-01.

Defendants' authority (DB 20-21) is inapposite. In _Gambrill_, a corrective disclosure

attributing a revenue decline to several large client accounts did not correct a misstatement about a single client or "typical clients." 2025 WL 3771433, at *10-11 (W.D. Tex. Dec. 16, 2025). The disclosure at issue here concerns serious accuracy issues with both of iRhythm's monitors, which utilized the same CCT operations at the heart of the revelations. And in *In re Concho Res., Inc. Sec. Litig.*, the court found that "[s]ome, but not all" statements constituted, as in *Goldman*, "general business principles and/or puffery," and were thus too generic to match the disclosures. 2025 WL 1040379, at *14 (S.D. Tex. Apr. 7, 2025). The Accuracy Claims were material and made measurable assertions about specific products, not general corporate cheerleading.

Accordingly, Defendants have failed to completely disprove any price impact for the Accuracy Claims, and the Class Period should end on August 9, 2024 as alleged.

### C.    Plaintiff Can Calculate Damages Through A Common Methodology

Consistent with Rule 23 and *Comcast*, Plaintiff will advance a damages formula at the merits stage based on the out-of-pocket damages methodology. 569 U.S. 27. This methodology calculates damages using an event study to measure the amount of artificial inflation on each day of the Class Period. Cain Rpt. ¶102. The key input is "the daily level of artificial inflation," which is "calculated as the difference between the actual prices paid and the true or 'but-for' values of the security" absent the alleged misrepresentations." *Id.* Under *Comcast*, Plaintiff need only "show that their damages stemmed from the defendant's actions that created the legal liability.'" *Intuitive*, 2016 WL 7425926, at *17 (citing *Levya v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). *Comcast* thus "does not impose a high hurdle" in securities class actions, which are wholly unlike the "nearly endless" "permutations" of antitrust claims at issue in *Comcast*. *In re Teva Sec. Litig.,* 2021 WL 872156, at *41 (D. Conn. Mar. 9, 2021).

Courts have universally accepted Dr. Cain's selection of this methodology. *See, e.g.*, *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 349 F.R.D. 606, 611-12 (S.D.N.Y. 2025) (Dr. Cain's model "suffices under *Comcast*," noting "it is a rare—perhaps even nonexistent—securities case that raises damages issues that are so individualized as to defeat" predominance); *In re Credit Suisse Sec. Fraud Class Actions*, 2025 WL 1866293, at *10 (S.D.N.Y. July 7, 2025) ("[T]here is no reason to believe that damages cannot be calculated via typical

techniques like . . . Dr. Cain employs [here]").[16] This methodology is used in "*virtually every*" securities class action. *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (collecting cases). The same is true here.

Relying on Dr. Skinner's "███████" (Ex. S at 49:2-5), Defendants argue that Plaintiff fails to meet its *Comcast* burden—the same failed arguments Dr. Skinner has unsuccessfully advanced in nearly every securities fraud case he has been retained in. ***First***, Defendants claim that Dr. Cain "outlines only the concept of a plan," not a "concrete model." DB 22-23. Not so. Dr. Cain "set[s] forth the out-of-pocket model of damages in his opening expert report, tied the model to the facts of this case, and identified techniques that could be used to disaggregate the effects of different misrepresentations and confounding information." *Sayce v. Forescout Techs., Inc.*, 754 F. Supp. 3d 878, 899 (N.D. Cal. 2024); *see also* Cain Rpt. at ¶¶105, 107-11. This is entirely sufficient.[17] Even if there were individualized questions requiring determination at trial (there are not), "in the Ninth Circuit, the need to engage in individualized damages calculations alone cannot defeat class certification." *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015); *see also Aktiengesellschaft*, 2023 WL 3569981, at *8.

***Second***, Defendants' argument that the methodology "does not account for the economic differences between the alleged misstatements and 'corrective' disclosures" because the supposed corrective information "post-dated" the misstatements (DB 24-25), fails. A "mirror image" is not required. *See supra* at 9-10 (citing *Zillow*, 2025 WL 2741642, at *1); *see also* Cain RR ¶¶99.

***Third***, Defendants' argument that Dr. Cain's methodology does not properly account for

---

[16] Numerous courts across the country have accepted Dr. Cain's out-of-pocket damages model in securities class actions. *See, e.g.*, *In re Nat'l Instruments Sec. Litig.*, 2025 WL 2682172, at *5 (S.D.N.Y. Sept. 19, 2025); *Int'l Bhd. of Elec. Workers Loc. 98 Pension Fund v. Deloitte & Touche LLP*, 348 F.R.D. 35, 46-47 (D.S.C. 2024); *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *15 (N.D. Cal. Dec. 19, 2022); *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022); *El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*, 2025 WL 853296, at *3-4 (D. Co. Jan. 9, 2025); *In re Upstart Holdings, Inc. Sec. Litig.*, 348 F.R.D. 612, 629 (S.D. Ohio 2025); *ChemoCentryx*, 2024 WL 1141699, at *2-4.

[17] Defendants' authorities (DB 23-24), which concerned instances where plaintiffs' expert failed to propose ***any*** actual damages model or a novel antitrust damages methodology, are wholly inapposite. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) (antitrust case); *Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (no specific damages model was proposed).

artificial inflation (DB 23-24), misunderstands the out-of-pocket damages methodology, which uses an "inflation ribbon . . . represent[ing] an estimate of the daily level of artificial inflation in the prices of [iRhythm] common stock caused by the alleged misrepresentations." Ex. FF at 211:24-212:4. Courts consistently reject the argument that an event study cannot "capture changes in artificial inflation over time" (Skinner Rpt. ¶217), including where Dr. Skinner has advanced it. *See, e.g.*, *Upstart*, 348 F.R.D. at 629-30 (certifying class: Dr. Cain "notes that the evidence may show varied rates of artificial inflation and that, if so, the variance can be incorporated into the damages model. More is not required at the class certification stage.") (cleaned up)); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020) (certifying class, finding event study accounts for daily levels of inflation through "inflation ribbon"). This methodology "can be modified" to account for "jury determinations of economic inflation." Cain Rpt. ¶¶107-12. While Dr. Skinner points to ████████████████████████████ (Ex. S at 138:9-12), including the unsurprising fact that iRhythm received a growing number of complaints about accuracy over the years, he admits that ██████████████████████████████████ *Id.* at 140:4-11.

Defendants demand a calculation of "actual inputs into the out-of-pocket method by parsing and scaling the abnormal returns[, which] requires an analysis of *loss causation*," *Symantec*, 335 F.R.D. at 288 (emphasis in original), and is therefore a question common to the class. *See* Cain Rpt. ¶105; Cain RR ¶103; *Wynn Resorts*, 2023 WL 2337364, at *12 (argument whether "inflation is . . . constant over the entire class period is premature"); *see also InnovAge*, 2025 WL 853296, at *4; *Sheet Metal Workers Nat'l Pension Fund v. Aktiengesellschaft*, 2023 WL 3569981, at *8 (N.D. Cal. May 19, 2023) (holding that "the fact that calculating damages is a complex undertaking does not undermine the use of the out-of-pocket model, nor does it militate against certifying the class"); *In re SandRidge Energy, Inc. Sec. Litig.*, 2019 WL 4752268, at *6 (W.D. Okla. Sept. 30, 2019) (model's failure "to account for inflation changes . . . would seemingly be flawed in this manner as to every member of the class.").

**Finally**, Defendants attack Dr. Cain's out-of-pocket methodology for its supposed inability to account for "confounding information," (DB at 24)—an argument that Dr. Skinner has repeatedly lodged to no avail. *See, e.g.*, *Upstart*, 348 F.R.D. at 630 (Dr. Skinner's argument that

Dr. Cain's methodology "fail[ed] to account for changing macroeconomic and business conditions" went to "loss causation rather than [] predominance"); *Wells Fargo*, 2022 WL 3357835, at *5 (Dr. Skinner's challenge that methodology cannot "disaggregate the effects of dismissed claims, confounding information, or changing knowledge or circumstances, is not a bar to certification."). As required, Dr. Cain "generally explain[s] the techniques used in an event study to adjust for confounding information's effect on share price" (*BofI Holding*, 2021 WL 3742924, at *9), including "event studies, valuation analysis, published academic research studies, analyst research, and other case-specific documents." Cain RR ¶100.[18] It is "settled among courts that the 'out-of-pocket' methodology *is* able to separate the effects of actionable misrepresentations from non-actionable confounding factors." *InnovAge*, 2025 WL 853296, at *4 (collecting cases). Further analyses constitute an impermissible "inquiry into loss causation." *Symantec*, 335 F.R.D. at 288; *see also In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *5 (S.D.N.Y. Jan. 24, 2012) (evaluating "confounding information" was "tantamount to a loss causation analysis").

### D.    The Class Period Begins On July 25, 2022

This Court dismissed without prejudice claims premised on alleged misstatements that "predate the July [25,] 2022 [FDA] investigation." Order at 22 n.8. Defendants then conceded the Class Period started on July 25, 2022. ECF No. 83 at 1. Defendants now argue that the Class Period should start on August 5, 2022, supposedly "the date of the first surviving alleged misstatement." DB 25. Defendants are wrong. The Court sustained a Transmission Claim published on iRhythm's website as of July 25, 2022. *See* SAC at ¶208; Cain RR ¶¶32, 46; *S.E.C. v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 79 (S.D.N.Y. 2024) (it is "well established" that misstatements "on public websites" are actionable). The Class Period begins as of that date. *See* ¶208.

### III.    <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court certify the proposed class.

---

[18] *Jaroslawicz v. M&T Bank Corp.* and *Kottaras v. Whole Foods Mkt., Inc.*, DB 24, are inapposite. In *Jaroslawicz*, plaintiffs' expert did not "present[] *any* methodology or argument for addressing price impact throughout the class period." 2024 WL 2975766, at *9 (D. Del. June 13, 2024). And in *Kottaras*, an antitrust case, plaintiff's expert "could not even tell the Court the precise analyses he intended to undertake." 281 F.R.D. 16, 25-26 (D.D.C. 2012). These cases bear no similarities to this securities class action.

Dated: February 9, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

*/s/ Katherine M. Sinderson*
JOHN J. RIZIO-HAMILTON (*pro hac vice*)
(johnr@blbglaw.com)
KATHERINE M. SINDERSON (*pro hac vice*)
(katiem@blbglaw.com)
ALEC T. COQUIN (*pro hac vice* forthcoming)
(alec.coquin@blbglaw.com)
THOMAS Z. SPERBER (*pro hac vice*)
(thomas.sperber@blbglaw.com)
ABBY KRITTA (*pro hac vice*)
(abygail.kritta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:   (212) 554-1444

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

*Counsel for Lead Plaintiff Oklahoma*
*Firefighters Pension and Retirement System*