# Exhibit D

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GLAZING EMPLOYERS AND GLAZIERS' UNION LOCAL #27 PENSION AND RETIREMENT FUND, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> IRHYTHM TECHNOLOGIES, INC., et al., <br><br> Defendants. | Case No. 3:24-cv-706-JSC |

EXPERT REPLY REPORT OF MATTHEW D. CAIN, PH.D.

February 9, 2026

**Table of Contents**

I. **Introduction**.................................................................................................................1

II. **Summary of Opinions**..................................................................................................2

III. **Background on the Fraud-on-the-Market Theory and Stock Prices**.........................6

IV. **Price Impact of the Alleged Misstatements** ..............................................................8

    A. Evidence that the Alleged Misrepresentations Regarding the Zio AT's
        Capabilities Had Front-End Price Impact ................................................................8

    B. Fundamental Principles of Finance and Economics Demonstrate the
        Price Impact of the Alleged Misrepresentations....................................................12

        i. Price Impact from the Transmission Claims.............................................. 13

        ii. Price Impact from the Accuracy Claims.................................................... 14

    C. The Alleged Misrepresentations are Economically Connected to the
        Relevant Truth Revealed by the Alleged Corrective Disclosures .........................16

    D. Analyst Commentary Following the Alleged Misrepresentations
        Provides Further Front-End Evidence of Price Impact.........................................23

        i. Analyst Commentary on Transmission Claims ........................................ 23

        ii. Analyst Commentary on Accuracy Claims............................................... 30

    E. Analyst Commentary Regarding the Alleged Revelations of the
        Relevant Truth Provides Further Back-End Evidence of Price Impact.................36

        i. Analyst Commentary on Transmission Claims ........................................ 36

        ii. Analyst Commentary on Accuracy Claims............................................... 48

    F. Statistical Evidence of Price Impact Following the Alleged Revelations
        of the Relevant Truth .............................................................................................52

V. **The Out-of-Pocket Damages Methodology is Widely Accepted by Courts at the
Class Certification Stage and I will Address Dr. Skinner's Concerns About Specific
Levels of Artificial Inflation at the Loss Causation and Damages Stage**....................55

VI. **Conclusion** .................................................................................................................59

## I.        Introduction

1.        On November 3, 2025, I submitted an expert report in this matter (my "Opening Report"), in which I concluded that the market for iRhythm's Common Stock was efficient throughout the Class Period, July 25, 2022 to August 9, 2024, inclusive. I also concluded that damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiff's pending claims.[1]

2.        Following the submission of my Opening Report, Plaintiff's Counsel provided me with the January 5, 2026 Expert Report of Professor Douglas Skinner Ph.D. (the "Skinner Report") and Defendants' Opposition to Plaintiff's Motion for Class Certification ("Defendants' Opp. Brief" or "Opp. Brief"). I have been asked to review, evaluate, and respond to the Skinner Report and certain arguments made in Defendants' Opp. Brief.

3.        My qualifications and rate of compensation for work in this matter were identified in my Opening Report, and I do not repeat them here. I have attached an updated version of my curriculum vitae as Appendix A.

4.        In formulating my opinions set forth in this Expert Reply Report, I have relied upon the analyses already described in my Opening Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this matter. All of the materials I have considered in forming my opinions are identified in Appendix B to this Reply Report, in addition to those previously identified in Appendix B to my Opening Report.

5.        I reserve the right to amend this report to reflect new information that becomes

---

[1] *See* Opening Report ¶ 3. I continue to hold the opinions expressed in my Opening Report and reiterate them herein. Capitalized terms in this report have the same meaning as in my Opening Report.

available to me in light of the discovery process or future rulings from the Court.

## II.    Summary of Opinions

6.    Nothing in the Skinner Report or Defendants' Opp. Brief disturbs the opinions expressed in my Opening Report.

7.    The Skinner Report and Defendants' Opp. Brief do not dispute the conclusion I reached in my Opening Report that iRhythm Common Stock traded in an efficient market throughout the entirety of the Class Period.[2] In my Opening Report, I tested the efficiency of the market for iRhythm Common Stock by evaluating the standard *Cammer* and *Krogman* factors.[3] Dr. Skinner does not dispute my analyses of or my conclusions regarding **any** of these factors. Indeed, all of Dr. Skinner's opinions in the Skinner Report rely on the market for iRhythm Common Stock being efficient.[4]

8.    Dr. Skinner does not offer any criticism of the event study regression specified in my Opening Report, and does not conduct his own event study regression. Dr. Skinner does not dispute that I performed a valid event study regression that controls for market and industry effects and accurately measures the abnormal returns exhibited by iRhythm Common Stock during the Class Period and on the alleged revelation event dates. Indeed, Dr. Skinner relies on the results of my event study in making his arguments.[5]

9.    Dr. Skinner does not dispute that the general damages framework and methodology (*i.e.*, the out-of-pocket method) that I detail in my Opening Report is standard, reasonable, and relied upon in virtually all securities class action matters alleging fraud claims under §§ 10(b) and

---

[2] Skinner Report ¶ 46, 81.

[3] Opening Report **Section V**.

[4] *See*, *e.g.*, Skinner Report ¶ 46.

[5] *See*, *e.g.*, Skinner Report ¶¶ 101, 102, 138, fn. 171, 198, 208, 229, 265, Exhibit 1 and Exhibit 2.

20(a) of the Exchange Act.[6] Nor does he articulate any alternative approach that would be more suitable in this matter.

10.     Dr. Skinner does claim, however, that (i) statements he terms "Timing Statements" (a subset of the Transmission Claims I identified in my Opening Report) did not have any price impact after November 2, 2022,[7] (ii) statements he terms "Risk Statements" (the remaining Transmission Claims) had no price impact during the Class Period,[8] (iii) my damages methodology cannot reliably measure damages on a class-wide basis consistent with Plaintiff's theory of liability,[9] and (iv) that the Accuracy Claims could not have been reported prior to the FDA inspection in July 2024.[10] Relying on the Skinner Report, Defendants assert that none of the Transmission Claims (either the Timing Statements or Risk Statements) had any impact on the price of iRhythm Common Stock.[11]

11.     Defendants' Opp. Brief also claims that (i) none of the Accuracy Claims had any price impact, and (ii) there is a "mismatch" between the alleged misstatements and the alleged truth revealed by the corrective disclosures. However, the Skinner Report offers no opinions or support for these claims.

12.     I have analyzed Defendants' Opp. Brief and the Skinner Report, and I conclude they are flawed and unreliable. In this report I document reliable economic evidence consistent with price impact for both the Transmission Claims and the Accuracy Claims. I further illustrate that there is no mismatch between the alleged misrepresentations put forward by Plaintiff and the subsequent revelations of the relevant truth provided by the alleged corrective disclosures. This

---

[6] Opening Report, **Section VII**.
[7] Skinner Report ¶¶ 12-16, 89-140.
[8] Skinner Report ¶¶ 17-22, 141-185.
[9] Skinner Report ¶¶ 23-27, 186-217.
[10] Skinner Report ¶¶ 76-80, 203-206.
[11] Defendants' Opp. Brief, pp. 10-22. My categorization of the misstatements and corrective disclosures as the Accuracy Claims and Transmission Claims is explained in **Section III** of my Opening Report.

evidence includes the following:

a. I document evidence that the alleged misrepresentations had front-end price impact. Following the August 2, 2017 disclosure of the FDA's approval for iRhythm's next-generation product with "timely data transmission capabilities," the price of iRhythm Common Stock increased by a statistically significant amount. Contemporaneous analyst reports raised their price targets for the Company and explicitly relied on and referenced the device's "timely transmission" capabilities and its appropriateness for high-risk patients—features Plaintiff alleges were misrepresented.

b. My analysis indicates no such "mismatch" between the alleged misstatements and alleged corrective disclosures, for both the Transmission Claims and the Accuracy Claims. The alleged misstatements in this case were specific, detailed, and economically connected to the alleged corrective disclosures. The economic connection between the alleged misrepresentations and omissions and the corrective information is further supported by: (i) fundamental principles of finance and economic analysis, and (ii) analyst discussions, forecast changes, and price target changes, which explicitly referenced the same economic information pertaining to the alleged misrepresentations and the resulting alleged corrective disclosures. Moreover, Dr. Skinner does not present any evidence of such a mismatch in support of Defendants' assertions.

c. The Transmission Claims were value relevant and by their nature had price impact. Moreover, numerous analysts referenced and relied on the Transmission Claims throughout the Class Period.

d. The Accuracy Claims were value relevant and by their nature had price impact. Moreover, on earnings calls, analysts asked questions related to the Accuracy Claims, which Defendants replied to with alleged misrepresentations, and numerous analysts referenced and relied on the Accuracy Claims throughout the Class Period.

e. I document reliable economic evidence of back-end price impact of the Transmission Claims and the Accuracy Claims. The alleged corrective disclosures were followed by statistically significant declines in the price of iRhythm Common Stock, for both the Transmission Claims and the Accuracy Claims. Moreover, analysts referenced and relied on the alleged revelations of the relevant truth contained within the alleged corrective disclosures. Contrary to Dr. Skinner's assertions, I document clear evidence of back-end price impact from the alleged corrective disclosures, including those after November 1, 2022. Furthermore, Dr. Skinner offers no opinions or evidence disputing front-end or back-end price impact of the Accuracy Claims.

13.     Dr. Skinner further claims that I have failed to adequately describe a methodology to measure class-wide damages consistent with Plaintiff's theory of liability.[12] First, he claims that my methodology fails to account for the specific timing of regulatory events, such as when iRhythm could have plausibly disclosed FDA inspection results.[13] Second, he asserts that complaints related to the Zio AT device increased during the Class Period and that, as a result, artificial inflation related to Plaintiff's claims would be expected to vary over time.[14] He asserts my methodology fails to account for such changes.[15] Defendants' Opp. Brief also claims my damages methodology fails to account for confounding information.[16]

14.     Dr. Skinner's and Defendants' concerns are unpersuasive and their opinions regarding the out-of-pocket damages methodology lack foundation.

15.     Dr. Skinner's concerns about varying inflation over the Class Period and disclosure timing do not affect whether the out-of-pocket damages framework fits Plaintiff's liability theory or its uniform application to all class members. Rather, his questions relate to the precise amount of artificial inflation that a jury or finder of fact may eventually attribute to Defendants' misconduct, and thus determines was present in iRhythm Common Stock throughout the Class Period. These concerns are not unique to this case, but rather are common in securities litigation matters and are addressed in a loss causation analysis and damages assessment following merits discovery. As I detail below, these issues can all be handled on a class-wide basis with common information within the out-of-pocket damages framework, and there are well-accepted valuation techniques that regularly and effectively address these questions at the loss causation and damages stage.[17] Further, the determination of inputs to the out-of-pocket damages methodology — such as

---

[12] Skinner Report ¶¶ 23, 187-217.
[13] Skinner Report ¶¶ 26, 202-211.
[14] Skinner Report ¶¶ 27, 215-216.
[15] Skinner Report ¶¶ 212-217.
[16] Defendants' Opp. Brief, pp. 23-24.
[17] Opening Report, **Section VI**.

the daily level of artificial inflation in iRhythm Common Stock — is a factual question to be resolved at the loss causation and damages stage. Moreover, these inputs to the formula are all calculated in a manner that is common across all Class members.

16.    As a result, Dr. Skinner's critiques do not alter my opinion that every aspect of damages in this case can be calculated on a class-wide basis, consistent with Plaintiff's liability theory. The out-of-pocket methodology is widely accepted by courts at the class certification stage and I will address Dr. Skinner's concerns about specific levels of artificial inflation at the loss causation and damages stage.

## III.    Background on the Fraud-on-the-Market Theory and Stock Prices

17.    In my Opening Report, I explained how the fraud-on-the-market theory relates directly to the price of a given security.[18] This theory posits that if a company's stock price reflects all public widely available information, then all purchasers and sellers of that company's stock implicitly rely on any misrepresentations or omissions because those statements or omissions have distorted the transaction price. I further explained how the fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to claims made under § 10(b) of the Exchange Act and was adopted by the U.S. Supreme Court in *Basic* and reaffirmed in its *Halliburton II* decision.

18.    I analyzed the *Cammer*, *Krogman*, and other relevant factors relating to iRhythm Common Stock in my Opening Report, and I ultimately found that these factors support a conclusion of market efficiency.[19] Thus, it follows that purchasers of iRhythm Common Stock implicitly relied on Defendants' alleged misrepresentations and/or omissions because the value of that information was impounded into the price of iRhythm Common Stock. Dr. Skinner does not dispute my analyses of any of the 11 relevant factors or my conclusion that iRhythm Common

---

[18] Opening Report, **Section IV**.
[19] Opening Report, **Section V**.

Stock traded in an efficient market during the entirety of the Class Period.

19.    As part of the analysis in my Opening Report, I performed an event study to analyze the stock price movements of the iRhythm Common Stock throughout the Class Period. To perform the event study, I used a regression analysis to measure the relationship between iRhythm Common Stock price returns and: (i) changes in market-wide factors that would be expected to impact all stocks; and (ii) changes in industry-wide factors that would be expected to impact stocks in iRhythm's industry. By modeling how iRhythm's stock price returns typically moves relative to an overall market index and an industry index, I can measure its "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

20.    Dr. Skinner offers no criticisms of my event study analysis. Nor does he dispute that it accurately measures the abnormal returns exhibited by iRhythm Common Stock during the Class Period and on the alleged corrective disclosure dates. The results of my event study show that there were statistically significant price declines in iRhythm Common Stock, after controlling for market and industry effects, following multiple alleged corrective disclosures. Further, for both the Transmission Claims and the Accuracy Claims, I document statistically significant cumulative abnormal returns upon the revelations of the relevant truth.[20]

---

[20] I note that Dr. Skinner criticizes my damages methodology because I have not yet committed to a specific event study and calculation of artificial inflation and damages (Skinner Report ¶¶ 24, 188, 192). While it is premature to opine on what a loss causation analysis would demonstrate, I would identify, review, evaluate, and empirically analyze all of the events that were alleged in the Complaint as revealing corrective information (including by conducting an event study analysis). This, along with an analysis of the alleged misstatements and omissions in this matter, would allow me to determine the amount of artificial inflation impounded into the Common Stock price on each day of the Class Period that subsequently dissipated out of the Common Stock price when the market began to learn the relevant truth. This amount of artificial inflation would apply to every member of the Class who purchased on a given day during the Class Period.

### IV.    Price Impact of the Alleged Misstatements

21.    I understand that Defendants bear the burden of establishing that the alleged misrepresentations had no price impact. Defendants attempt to rebut the "fraud-on-the-market" presumption by demonstrating that the alleged misstatements and revelations "did not impact the stock price" of iRhythm's Common Stock.[21] Nonetheless, as I explain below, reliable economic evidence indicates that the alleged misrepresentations did have price impact.

22.    Additionally, Defendants' Opp. Brief cites to the *Goldman* decision and asserts that I make no attempt to address a supposed mismatch between the alleged misrepresentations and the subsequent alleged corrective disclosures.[22] Defendants' Opp. Brief argues that such a mismatch indicates a lack of price impact and thus renders the calculation of damages unreliable. For the reasons explained below, this claim is without basis—the Skinner Report provides no evidence of a mismatch. Moreover, I document reliable economic evidence indicating that the alleged misstatements were not generic, but rather specific technical claims about the Zio AT's accuracy and real-time capabilities, which match the specific technical failures allegedly revealed in the corrective disclosures.

23.    Furthermore, fundamental principles of economics and finance, as well as commentary from research analysts indicate the presence of both front-end and back-end price impact of the alleged misstatements.

### A. Evidence that the Alleged Misrepresentations Regarding the Zio AT's Capabilities Had Front-End Price Impact

24.    On August 2, 2017, in conjunction with its earnings announcement for the second quarter of 2017, iRhythm disclosed in an SEC filing that it had "[r]eceived FDA clearance for a

---

[21] Defendants' Opp. Brief, at p. 10.
[22] Defendants' Opp. Brief, at pp. 1, 11-15.

8

next-generation product with timely data transmission capabilities," the Zio AT.[23] Following this news, iRhythm's stock price increased by 9.7% after controlling for market and industry effects, a return that was statistically significant at the 99% confidence level.

26. The market's reaction indicates that the specific features allegedly misrepresented by Defendants, including real-time transmission and suitability for high-risk patients, were value-relevant.[24]

26. In their reports released following the announcement, analysts noted the Zio AT's transmission capabilities and its suitability for higher-risk patients, features that could expand the Company's Total Addressable Market ("TAM").[25] Analysts identified these factors as catalysts for the Company's valuation, directly linking them to expected revenues and financial performance. For example:

> BTIG (August 2, 2017): "Early commentary on ZIO AT seems promising… **Transmission capabilities are expected to be similar/better than what is currently marketed.**"[26]

> Canaccord Genuity (August 3, 2017, price target increased from $42 to $49): "Led by Zio XT – and soon to be augmented by the full launch of the Gen2 Zio AT platform, which **expands IRTC's T[otal] A[ddressable] M[arket]** by at least 10% … We believe the uniqueness and robustness of … new products/new markets on the come (e.g., Zio AT timely transmission…) - portends three significant growth opportunities for the firm: 1) continued share gain within ~2/3 of the existing 4.6M ECG tests/year market to which ZIO is currently applicable; 2) **expansion of ZIO's applicability into the remaining 1/3 of the existing market (syncope, pre-syncope, VT);** via Zio AT; and 3**) future penetration**

---

[23] *See* iRhythm Technologies, Inc. Form 8-K, EX-99.1, August 2, 2017, *available at* https://www.sec.gov/Archives/edgar/data/1388658/000156459017014894/irtc-ex991_6.htm
[24] Complaint ¶ 3.
[25] Complaint ¶ 64.
[26] "Q2 Strong And Likely In-Line With Buy-Side Expectations; Underlying Business Remains Sound," *BTIG*, August 2, 2017, at 1.

9

**into new ECG markets (asymptomatic AF, post-stroke, post-AF ablation, pre-op cardiac surgery…"**[27]

Morgan Stanley (August 3, 2017, price target increased from $47 to $50): "The commercialization of **ZIO AT is on track** and we see a series of product and data driven catalysts leading to inflection. **We raise our estimates, reiterate Overweight and increase PT to $50**."[28]

"… We also see the combination of ZIO AT with the existing ZIO XT establishing iRhythm as a broader provider of rhythm diagnostic solutions and driving higher penetration of XT in the existing total addressable market (TAM). **Real time ZIO is only the first of a number of TAM expansive catalysts**…"[29]

J.P. Morgan (August 2, 2017): After a strong quarter and "the early launch of the Zio AT device, we reiterate our OW rating and our $54 price target."[30]

"With the Zio XT and AT sharing a common platform that includes biosensor design, workflow tools, and comprehensive reporting, we believe this broader product offering will give iRhythm a competitive advantage when engaging with accounts and securing coverage."[31]

27.     Furthermore, after August 2, 2017, my event study identified additional days in which there were statistically significant increases in the Company's stock price following alleged misrepresentations about the Transmission Claims and the Accuracy Claims:

Q2 2018 Earnings Call (August 1, 2018) (Abnormal Stock Price Increase on August 2: 9.59%, Confidence Level: >99%): Former CEO Kevin King in response to Cicilia Furlong, analyst at Canaccord Genuity, "So in our view and our experience, we find legacy MCT prescribing patterns moving in two directions. One direction has been towards Zio XT for quite a while, and that is because the replacements or the alternatives for MCT were either shorter term Holter Monitoring or intermittent event monitoring and there was a gap. So we've taken a lot from MCT traditionally. That said, we don't – **we didn't meet**

---

[27] "Zio-rrific– upside revenue & GM trends continue (with more to come); target to $49 – BUY," *Canaccord Genuity*, August 3, 2017, at 1 (emphasis added).

[28] "Not Missing a Beat; Reiterate Overweight," *Morgan Stanley*, August 3, 2017, at 1.

[29] *Id* at 2 (emphasis added).

[30] "Strong Beat and Raise with Room for More," *J.P. Morgan*, August 2, 2017, at 1.

[31] *Id* at 2. See also "Momentum Drives Another Beat and Raise," *J.P. Morgan*, November 2, 2017, at 2.

**the need for life critical alerting of arrhythmias and we now do that with Zio AT.**"[32]

Q4 2018 Earnings Call (February 12, 2019) (Abnormal Stock Price Increase on February 13: 6.34%, Confidence Level: >99%): Former CEO Kevin King's opening statements to analysts "Zio AT is another key component to our market penetration strategy. Zio AT allows us to address an important subset of patients who have **higher acuity conditions** such as syncope or unexplained loss of consciousness and may require **more immediate physician notification**. Zio AT provides a meaningful opportunity to gain account penetration by enabling us to offer an even more complete solution for our customers."[33]

Canaccord Growth Conference (August 7, 2019) (Abnormal Stock Price Increase on August 7: 5.21%, Confidence Level: >98%): Former CEO Kevin King's remarks included "it comes **fully charged for the duration of wear** and it **communicates from Bluetooth** to the gateway and gateway cellular to us. So it annunciates **when there are life-critical arrhythmia and other than life critical arrhythmia**"[34]

28.    The Company allegedly repeated the Transmission Claims and the Accuracy Claims throughout the Class Period, and analysts continued to rely upon these statements in assessing the Company and its Common Stock valuation.[35] This pattern is consistent with the price maintenance theory of artificial inflation during the Class Period. Moreover, as demonstrated above, the statistically significant price increases following the August 2, 2017 and other Company statements about the Zio AT's capabilities, along with evidence from analyst reports, is consistent with front-end price impact.[36]

---

[32] iRhythm Technologies, Inc. Q2 2018 Earnings Call, August 1, 2018. (emphasis added). Note that the earnings call took place after market hours, thus the market impact date is August 2, 2018.

[33] iRhythm Technologies, Inc. Q4 2018 Earnings Call, February 12, 2019. (emphasis added). Note that the earnings call took place after market hours, thus the market impact date is February 13, 2019.

[34] Canaccord Genuity Growth Conference, August 7, 2019, at pp. 3-4.

[35] *See* **Section IV.C** and **Section IV.D**.

[36] To be clear, I am not currently opining on the specific amount of artificial inflation, if any, that may have been present in the price of iRhythm Common Stock at any point in time.

**B. Fundamental Principles of Finance and Economics Demonstrate the Price Impact of the Alleged Misrepresentations**

29.    A core principle of finance and economics is that the value of a company's common stock reflects the market's expectations of the firm's future cash flows, discounted to present value. When new information alters investors' assessment of a company's ability to generate future revenues or profits, the firm's stock price must therefore adjust accordingly.[37] For instance, when investors learn that previously accepted information was false or misleading, the stock price will fall to reflect the corrected expectations of future cash flows.

30.    As I document below, there is a direct economic connection between the information allegedly misrepresented by Defendants' Transmission Claims and Accuracy Claims and the Company's ability to generate revenues and cash flows. Defendants repeatedly tied the Transmission Claims to the Company's ability to access a new market comprised of "high-risk" patients, and tied the Accuracy Claims to the Company's ability to expand into the primary care market. To the extent, therefore, that the alleged Transmission and Accuracy misrepresentations were viewed by the market as altering the Company's future expected revenues and profits, these misrepresentations must have affected iRhythm's share price. It follows directly from fundamental principles of economics and finance that if these claims were false, the Company's stock price would be expected to decline as the market repriced the stock to reflect the diminished revenue potential and more limited market opportunity. As I show below, this was indeed the case.

---

[37] *See, e.g.*, David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert* (3rd ed. 2001) ("the price of an efficiently traded stock is equal to the present value of the discounted future stream of free cash flow"); *See also* Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (John Wiley & Sons, 1996), at p.11 ("This [DCF] approach has its foundation in the present value rule, where the value of any asset is the present value of expected future cashflows on it.").

### i.    Price Impact from the Transmission Claims

31.    Prior to and throughout the Class Period, Defendants repeatedly asserted that the Zio AT was appropriate for high-risk patients, those who "need near real-time monitoring because they are more likely to have a life-threatening arrhythmia, which requires timely treatment to prevent serious injury or death."[38] Defendants emphasized these capabilities when touting the Zio AT's "timely transmission" and "real-time" features.

32.    Defendants allegedly misrepresented the device as suitable for "high-risk" patients on its website,[39] and issued statements regarding the Zio AT's capabilities, claiming the device "aimed at increasing our served market with the addition of **timely data transmission** capabilities to serve patients who have **more critical symptoms** such as syncope, pre-syncope and ventricular tachycardia."[40] Throughout the Class Period, iRhythm allegedly misrepresented the device as offering "**near real-time monitoring**" specifically for "more acute patients that require **timely notification**."[41]

33.    Furthermore, the Company itself identified these "high-risk" groups as critical to the Zio AT's available market. In investor communications, the Company identified and reported on the progress of expanding the Zio AT's market to specific groups requiring constant monitoring, including Transcatheter Aortic Valve Replacement ("TAVR") patients.[42]

34.    The Company also reinforced the value-relevance of the Transmission Claims in investor presentations and financial filings. For example, in its 2022 Analyst and Investor Day

---

[38] MTD Opinion, p. 11.

[39] Complaint ¶ 58, 74, 167, 208.

[40] iRhythm Technologies, Inc. Q2 2017 Earnings Call, August 2, 2017. (emphasis added).

[41] Complaint ¶ 193.

[42] *See, e.g.,* "ACC 2022: Solidifying Zio's Clinical Backing and Thoughts on First Quarter" *Wiliam Blair*, April 4, 2022. "We were also encouraged to see two new Zio AT studies highlighted at the ACC Meeting (one **in post-TAVR monitoring** and another in early patient discharge) that we believe can provide another tailwind to AT adoption and potentially **expand the real-time monitoring** opportunity."

13

presentation and in its 10-K filing for fiscal year 2021, the Company recognized the market opportunity provided by the real-time transmission the device allegedly provided by comparing the device's capabilities to other available solutions.[43, 44]

36.    Following the Company's representations, Analysts also commented on the Company's ability to market the Zio AT device to high-risk patients, estimating that expanding into this market segment could increase the Company's TAM by approximately 10%.[45] Moreover, analysts updated their price targets and the Company's prospects based on the misrepresentations, as shown when the device was introduced in **Section IV.A** and also when it was revealed that the FDA did not support the product's use in "high-risk" patients in **Section IV.D.ii**.

36.    Fundamental principles of finance and economics therefore establish that the Transmission Claims were value relevant and had price impact. Because these claims directly determined the size of the high-risk patient market available to the Company, they were central to investors' assessments of the Company's potential to generate future cash flows. Thus, it follows that, if the Transmission Claims were misrepresented, then the Company's stock price would be expected to fall on the revelation of that, due to the loss in expected future revenues, cash flows, and profits from the "high-risk" patient market.

### ii.    Price Impact from the Accuracy Claims

37.    Throughout the Class Period, Defendants emphasized the value-relevance of the

---

[43] Complaint ¶ 114.

[44] *See* iRhythm Technologies, Inc. 2022 Analyst & Investor Day. Available as Exhibit 99.2 to Form 8-K. September 21, 2022, *see also* iRhythm Technologies, Inc. Form 10-K for the fiscal year ended December 31 filed Feb. 28, 2022, https://www.sec.gov/Archives/edgar/data/1388658/000138865822000020/irtc-20211231.htm.

[45] *See e.g.* "Zio-rrific– upside revenue & GM trends continue(with more to come); target to $49 – BUY" *Canaccord Genuity*, November 1, 2017, at 1 "the full launch of the Gen2 Zio AT platform, which expands IRTC's TAM by at least 10%…" *See also* "The rhythm shall continue; BUY, target to $59 from $55," *Canaccord Genuity*, November 1, 2017, at 1.

Accuracy Claims.[46] Specifically, Defendants repeatedly explained how the accuracy and quality of the final reports delivered to physicians could expand the market for the Company's products into the primary care market (or "PCP" market). iRhythm touted a "deep-learned neural network algorithm" and "skilled clinical staff," Certified Cardiographic Technicians ("CCTs"), who ensured "quality in clinical reports,"[47] that supposedly matched the diagnostic accuracy of a "panelist of cardiologists." Backed by these statements, the Company explained its market opportunity, with management stating, "I remain convinced that you're going to **see this market expand dramatically** as we continue to **push into the primary care setting**, just **given how easy it is to use the product**, **how accurate it is** and the downstream benefits that you get with monitoring these patients sooner."[48]

38.　　In relation to the Accuracy Claims, the Company also touted the high diagnostic yield, which represented "the number of arrhythmia events and the percentage of patients in whom an arrhythmia was detected."[49] On May 2, 2024, on an earnings call for the first quarter of 2024, Defendant Blackford stated that this diagnostic yield would be a part of the Company's expansion into the primary care market: "**[P]rimary care** is absolutely the place that this device is ultimately going to get applied into the future, just with its **ease of use, its high diagnostic yield, its**

---

[46] According to Company filings, the diagnostic data produced by both Zio AT and the Zio XT was processed by the same system, the Zio Service (*See e.g.,* iRhythm Technologies, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 3). Analysts also made the connection between the two devices and the reporting on the Zio service (*See, e.g.,* "Momentum Drives Another Beat and Raise," *J.P. Morgan*, November 2, 2017, at 2. "… the Zio XT and AT shar[e] a common platform that includes biosensor design, workflow tools, and comprehensive reporting…") Therefore, Company statements about Zio Service accuracy applied to both the Zio AT and the Zio XT.

[47] Complaint ¶ 224.

[48] Complaint ¶¶ 225-227 (emphasis added).

[49] iRhythm Technologies, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 17. February 28, 2022. *See* https://www.sec.gov/Archives/edgar/data/1388658/000138865822000020/irtc-20211231.htm

**incredible accuracy**."[50] The Complaint alleges that in reality, iRhythm's reports to patients and doctors routinely included inaccurate arrhythmia data or failed to include arrhythmias altogether, among other accuracy-related problems.[51]

39.    The Company also reinforced the value-relevance of the Accuracy Claims in investor presentations and financial filings. For example, in its 2022 Analyst and Investor Day presentation and in its 10-K filing for fiscal year 2021, the Company recognized the superior accuracy of the Zio Service compared to other available products.[52, 53]

40.    Moreover, research analysts repeatedly pointed to the primary care market as a growth area for the Company. As shown in **Section IV.D.ii**, analysts tracked the Company's progress in expanding the market for the Company's devices in the primary care setting.

41.    Fundamental principles of finance and economics therefore establish that the Accuracy Claims were also value relevant and had price impact. Because these claims directly related to the Company's ability to expand into the primary care market, they were central to investors' assessments of the Company's potential to generate future cash flows. Thus, it stands to reason that if the Accuracy Claims were misrepresented, the Company's stock price would be expected to fall upon the revelation of the relevant truth, due to the loss in expected future revenues, cash flows, and profits from the primary care market.

C. **The Alleged Misrepresentations are Economically Connected to the Relevant Truth Revealed by the Alleged Corrective Disclosures**

42.    Defendants' Opp. Brief asserts there is a "mismatch" between the alleged

---

[50] Complaint ¶ 231 (emphasis added)
[51] Complaint ¶ 232.
[52] Complaint ¶ 114.
[53] *See* iRhythm Technologies, Inc. 2022 Analyst & Investor Day. Available as Exhibit 99.2 to Form 8-K. September 21, 2022, *see also* iRhythm Technologies, Inc. Form 10-K for the fiscal year ended December 31 filed Feb. 28, 2022, https://www.sec.gov/Archives/edgar/data/1388658/000138865822000020/irtc-20211231.htm.

misstatements and the alleged truth revealed by the corrective disclosures.[54] However, the Skinner

Report offers no evidence, opinions, or support for this claim. As I explain in this section, the

mismatch claim made by Defendants lacks foundation and is unpersuasive.

43.     As an initial matter, I understand that the *Goldman* case Defendants point to

involved a mismatch between generic misstatements and highly specific corrective disclosures.

Examples of the generic challenged statements in the *Goldman* case include:

- "Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow."

- "Integrity and honesty are at the heart of our business."

- "Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses."

- "Our reputation is one of our most important assets."[55]

44.     The Complaint in this matter alleges that Defendants misled investors, and made

materially false and misleading statements and omissions relating to two categories of alleged

misrepresentations:

a.  the Transmission Claims, including allegedly marketing the Zio AT as suitable for "high-risk" patients, even though the device suffered from (i) a transmission limitation that capped the number of events that could be sent, and (ii) a lag in the time between when data was transmitted from the device to the time it was reviewed by technicians.[56]

b.  the Accuracy Claims, including allegedly over-stating the accuracy-related capabilities of its devices by representing that its proprietary algorithms "provide[] accurate analytics and clinical results" and that its clinical staff "ensure quality in clinical results."[57] The Complaint alleges these claims were false because (i) technicians routinely misread critical data, and were allegedly instructed to prioritized "clean" results over clinical accuracy, often resulting in the amendment of critical data, and (ii) the Company

---

[54] Defendants' Opp. Brief ¶¶ 1, 13-14, 18, 20-21.
[55] *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74 (2023).
[56] Complaint ¶¶ 57, 75, 109.
[57] Complaint ¶ 224.

17

withheld over 4,000 patient complaints regarding these inaccuracies from the FDA.[58]

45.    As can be seen from the examples below, the alleged misstatements in this matter were not simply boilerplate, generic claims about the importance of integrity or putting clients' interests first, but rather pertained to specific details of the Transmission Claims and Accuracy Claims. Furthermore, many of the statements were specific statements made by Defendants at investor conferences and in reply to specific questions from analysts on earnings calls. And, for both the Transmission Claims and Accuracy Claims, the alleged misstatements and the subsequent corrective disclosures addressed the same economic issue: the available markets for the Company's devices.

46.    For example, the Transmission Claims included specific and detailed statements, such as:

   a. Prior to the Class Period and as of the beginning of the Class Period on July 25, 2022, the Company published on its website a chart misrepresenting the Zio AT as being appropriate "for high-risk patients."[59] This alleged misrepresentation would serve to maintain any artificial inflation in iRhythm's Common Stock price at the start of the Class Period.

   b. On August 5, 2022 the Company filed its quarterly report on Form 10-Q for the second quarter of 2022, signed by Defendants Blackford and Devine. The filing stated that the Zio AT "service offers the option of **timely transmission** of patient-triggered and automatically detected arrhythmia events data" and "**[d]uring the patient wear period**, the Zio AT monitoring system is intended to capture, analyze and report symptomatic and asymptomatic cardiac events and continuous ECG information."[60]

   c. On August 11, 2022, at the Canaccord Growth Conference, a Company Presentation misrepresented the Zio AT as providing "more **continuous communication** of results back to the physician," and being appropriate for "High Risk" patients.[61]

---

[58] Complaint ¶¶ 82-85, 117-121.
[59] Complaint ¶ 208.
[60] Complaint ¶ 184.
[61] Complaint ¶¶ 185, 207 (emphasis added).

d. On September 21, 2022 the Company held an Investor Day where Defendants described the Zio AT as "putting information into the hands of the patient on **a near real-time basis**," "allow[ing] transmissions during the patient's wear time" and enabling "**timely monitoring**."[62]

e. On November 4, 2022 the Company filed its quarterly report on Form 10-Q, signed by Defendants Blackford and Bobzien, where they stated that the Zio AT "is designed to provide **timely transmission** of patient information and reportable events" and "for the Zio AT monitor, we rely on the provision of cellular communication services for the **timely transmission** of patient information and reportable events."[63]

f. On November 14, 2022, in a Nasdaq interview, Defendant Blackford stated, "We have a device that **provides near real-time capability** and can put that information right at their fingertips."[64]

g. On January 10, 2023, at the JP Morgan Healthcare Conference, Defendant Blackford stated that the Zio AT was appropriate for "some of the most at-risk patients," and that with the Zio AT, "**you're monitoring some of the most at-risk patients**."[65]

h. On February 23, 2023, the Company filed its annual report on Form 10-K, where they stated that the Zio AT "includes **near real-time monitoring**, [and] is **appropriate for more acute patients** that require timely notification."[66]

47. The Accuracy Claims also included specific and detailed statements, such as:

a. On August 11, 2022, at an investor conference Defendants stated that the Zio Service was "able to diagnose heart rate arrhythmias **with the accuracy of a panelist of cardiologists**."[67]

b. On September 21, 2022, the Company held an Investor Day where Defendants presented the Zio AT as providing "**superior clinical accuracy** while reducing the cost of care."[68]

c. On February 23, 2023, on an earnings call for the fourth quarter of 2022, in

---

[62] Complaint ¶¶ 186-189 (emphasis changed).
[63] Complaint ¶ 190 (emphasis added).
[64] Complaint ¶ 191.
[65] Complaint ¶ 210.
[66] Complaint ¶ 193, 211 (emphasis changed).
[67] Complaint ¶ 225 (emphasis added).
[68] Complaint ¶ 226 (emphasis added).

response to a question about "success" in the primary care market, Defendants indicated that this market for Zio would "expand dramatically as we **continue to push into the primary care setting**, just given how easy it is to use the product, **how accurate it is**."[69]

d. In an April 12, 2023 report Defendants stated that the Zio Systems, including the Zio AT, "**more accurately measures** Afib burden…"[70]

e. On May 4, 2023, on an earnings call for the first quarter of 2023, Defendant Blackford stated, "Our ability to deliver value across the continuum of care by quickly and **accurately detecting arrhythmias** for benefit of patients by enabling better clinical outcomes and even more important in today's environment."[71]

f. On February 22, 2024, on an earnings call for the fourth quarter of 2023, Defendant Blackford stated in response to an analyst question, "Ease of use, **accuracy**, and simple workflow of Zio Monitor and ZioSuite digital products is **resonating within the primary care channel**."[72]

g. On May 2, 2024, on an earnings call for the first quarter of 2024, Defendant Blackford stated "**[P]rimary care is absolutely the place that this device is ultimately going to get applied** into the future, just with its ease of use, its high diagnostic yield, **its incredible accuracy**." He further stated "the service offering that we've become known for, which is easy to use and highly predictable, **highly accurate**."[73]

48.    Furthermore, the alleged misstatements in this matter are clearly linked to the alleged truth revealed by the corrective disclosures. For example, as shown below, each of the alleged corrective disclosures related to the Transmission Claims included specific and detailed statements, that directly related to and impacted the Company's ability to market the device to "high-risk" patients:

a. November 1, 2022 (Press Release and Q3 2022 Earnings Call): The Company revised its revenue guidance downwards, citing in part a "Customer Advisory Notice" that the Company had voluntarily issued for

---

[69] Complaint ¶ 227. iRhythm Technologies, Inc. Q4 2022 Earnings Call, February 23, 2023, at 16.

[70] Complaint ¶ 228 (emphasis removed).

[71] Complaint ¶ 229.

[72] Complaint ¶ 230 (emphasis added).

[73] Complaint ¶ 231 (emphasis removed).

20

the Zio AT regarding "event trigger limits" for the device.[74] Plaintiff alleges this served as a partial correction to the Transmission Claims that the Zio AT provided "near real-time" and "continuous" monitoring by beginning to reveal the existence of undisclosed transmission limits.

b. November 4, 2022 (Q3 2022 Earnings Report): The Company further disclosed that the Customer Advisory Notice was issued in response to an FDA Form 483 and related to a "labeling correction" concerning the Zio AT's "maximum transmission limits" and registration requirements. Plaintiff alleges that this partially corrects the Transmission Claims by revealing the existence of a Form 483 regarding the Zio AT's capabilities.[75]

c. May 4, 2023 (Q1 2023 Earnings Report): The Company disclosed that it had received a subpoena from the Department of Justice ("DOJ"), which sought communications and documents related to issues with the Zio AT.[76] Plaintiff alleges this revelation, while not fully detailing the investigation's scope at the time, indicated the severity of the underlying alleged misstatements present in the Transmission Claims.

d. May 30, 2023 (Form 8-K): The Company disclosed that it had received a Warning Letter from the FDA, which alleged regulatory non-conformities related to the Zio AT.[77] The Warning Letter allegedly revealed that the FDA's requests were directly related to the Transmission Claims, with analysts stating that the Warning Letter "noted 3 issues: 1) untimely patient registration; 2) device construct (trigger warning limits, traditional MCOT definition); 3) letter to file (device changes)."[78] Plaintiff alleges this refutes the Transmission Claims regarding the device's suitability for high-risk or acute patients and its "near real-time" and "continuous" monitoring capabilities.

e. July 1, 2024 (the DOJ files suit): The DOJ filed court documents revealing that it was seeking to enforce a subpoena against iRhythm, as the Company had refused to provide certain documents. The court filing further revealed that the previously disclosed DOJ inquiry on May 4, 2023, related to the

---

[74] Complaint ¶ 125.

[75] Complaint ¶ 129.

[76] Complaint ¶ 134.

[77] Complaint ¶¶14-17, 137-138.

[78] "Correction: FDA Warning Letter Received," *Oppenheimer & Co*, June 1, 2023, at 1. "This warning letter includes topics from the 483 (August 2022) in addition to others. The warning letter hasn't been posted yet. Warning letter noted 3 issues: 1) untimely patient registration; 2) **device construct (trigger warning limits, traditional MCOT definition)**; 3) letter to file (device changes)" (emphasis added).

"Thoughts After Talking to Management on Published Warning Letter," *William Blair*, June 6, 2023. "The details largely followed what the company had disclosed **and discussed with us on May 30**" (emphasis added).

Zio AT "failing to timely transmit patient cardiac data."[79] Plaintiff alleges this filing provides a substantive link to the Transmission Claims by confirming that the DOJ's investigation was explicitly focused on the Zio AT's failure to provide the "near real-time" and "continuous" monitoring capabilities Defendants had promised.

49.     The alleged corrective disclosures pertaining to the Accuracy Claims also included specific and detailed statements that directly related to and impacted the Company's ability to expand the market for its devices to a primary care setting:

a.  August 1, 2024 (Q2 2024 Earnings Report and Form 8-K): The Company disclosed receipt of new Form 483s which "broadly evaluated medical device quality system requirements and other medical device regulatory topics, and the observations generally centered on complaint handling and medical device reporting, risk analysis regarding the involvement of the technicians to prepare the Zio ECG reports"[80] Plaintiff alleges that this served as an initial correction to the Accuracy Claims by revealing that the FDA had identified regulatory violations regarding the very technicians and processes iRhythm relied upon to ensure its "high diagnostic yield, its incredible accuracy." However, the correction was allegedly partial, as Defendants downplayed the findings by claiming there were no conversations with the FDA "around the overall safety or efficacy" of the product.[81]

b.  August 9, 2024 (the Capitol Forum Report): An article published by the Capitol Forum revealed that the FDA had identified over 4,000 complaints since May 2022 related to technicians misreading arrhythmia data and providing misclassified information to doctors for diagnosis.[82] The article further stated that the Company allegedly directed its CCTs to provide inaccurate reports to ensure the final report matched the data transmitted during the wear period.[83] Plaintiff alleges this corrected the Accuracy Claims by presenting factual evidence of high complaint volumes and internal practices that contradicted the Company's representations of "superior clinical accuracy" and "high diagnostic yield."[84]

50.     The evidence thus demonstrates that, contrary to Defendants' "mismatch"

---

[79] Complaint ¶¶ 18, 141-145.
[80] Complaint ¶ 146.
[81] Complaint ¶ 149.
[82] Complaint ¶¶ 117, 152.
[83] Complaint ¶ 170.
[84] Complaint ¶¶ 152-153.

assertions, both the Transmission Claims and the Accuracy Claims show (i) no mismatch between the specificity of the alleged misstatements and corrective disclosures, and (ii) a direct economic connection between the alleged misstatements and corrective disclosures.

### D. Analyst Commentary Following the Alleged Misrepresentations Provides Further Front-End Evidence of Price Impact

51.     As noted above, many of the Alleged Misrepresentations were specific statements made by Defendants at investor conferences and in reply to questions from analysts on earnings calls.[85] Because Defendants made these statements in response to analyst inquiries, this fact alone demonstrates that analysts viewed the Accuracy Claims as value relevant, and provides clear front-end evidence of price impact.

52.     Moreover, as detailed below, analysts referenced and relied upon on the economic information at issue within both categories of the alleged misrepresentations. This provides additional economic evidence of the front-end price impact of the Transmission Claims and the Accuracy Claims.

#### i.     Analyst Commentary on Transmission Claims

53.     Multiple analysts relied upon and discussed Defendants' statements about the "real-time transmission" or "timely transmission" capabilities of the Zio AT in their assessment of iRhythm throughout the Class Period. Furthermore, analysts connected those claims to the Company's ability to expand its TAM, generate revenues and profits, and support the Company's Common Stock price.

54.     When the product first launched, as discussed previously in **Section IV.A**, and continuing throughout the Class Period, analysts referenced and relied upon Defendants'

---

[85] *See e.g.,* iRhythm Technologies, Inc. Q4 2022 Earnings Call, February 23, 2023, at 16. *And See e.g.,* iRhythm Technologies, Inc. Q1 2024 Earnings Call, May 2, 2024, at 12, 14.

statements about the Zio AT's transmission capabilities and reported on potential market expansion into high-risk groups. This included references to the Company's progress with new patient groups who required constant monitoring such as TAVR patients.[86] This consistent focus indicates that analysts and investors viewed the Transmission Claims as economically important to iRhythm's value. For example:

> Canaccord Genuity (September 21, 2017): "The approval and launch of ZIO AT allows IRTC to address 100% of physician A-ECG needs. While **timely transmission** today only represents ~10% of the overall A-ECG market, we see the real value of the AT addition to be implicit in iRhythm's ability to become a full-line supplier for its customers, targeting both first- and second-line A-ECG monitoring."[87]

> Canaccord Genuity (November 1, 2017): "What's more, as we look toward 2018, we see strength in the Zio XT platform paired with the full launch of IRTC's Gen2 **Zio AT launch – anticipated to expand IRTC's TAM by at least 10%** and offered at a higher ASP – driving the same type of upside potential to our upwardly-revised top-line growth and GM estimates."[88]

> J.P. Morgan (November 2, 2017): "When including indications that require **timely data transmission of suspected arrhythmias, something iRhythm will be able to address with the new AT device** (currently in limited launch), the total US ambulatory ECG market is $1.5B in 2016 at Zio pricing and should grow 10-15% annually." [89]

> Morgan Stanley (November 2, 2017): "As for **real time monitoring with ZIO AT**, management reported favorable feedback in the early access program, including the benefits from the shared platform with ZIO XT, which should help drive penetration. **For more details on these TAM expansion catalysts**..."[90]

---

[86] *See* **Section IV.B.i.**

[87] "Notes from the road – competitive moat is huge, TAMs even bigger; take estimates & target up, reiterate BU," *Canaccord Genuity*, September 21, 2017, at 2 (emphasis added).

[88] "The rhythm shall continue; BUY, target to $59 from $55," *Canaccord Genuity*, November 1, 2017, at 1 (emphasis added).

[89] "Momentum Drives Another Beat and Raise," *J.P. Morgan*, November 2, 2017, at 3 (emphasis added).

[90] "Visibility on TAM Expansion Improving; Raising PT to $65," *Morgan Stanley*, November 2, 2017, at 2 (emphasis added).

Dougherty & Company (December 1, 2017): "Beginning this quarter, it is also entering the $3 billion mobile telemetry space, bringing to the market a near **real-time continuous transmission patch called Zio AT**."[91]

… "IRTC sets its sights on the MCT market with Zio AT …Zio AT leverages the same **form factor and machine learning algorithms as the 14-day Zio XT, but extends the capabilities to include 24/7 continuous monitoring** …the Zio AT service eliminates the stigma of IRTC being a "one-trick pony" with Zio XT, and this product diversification gets them in sales opportunities they may not have had otherwise."[92]

RBC Capital Markets (December 4, 2017): "The Zio AT is IRTC's next-generation ECG monitoring system. The monitor is designed to provide **real-time transferable data** during the wear period by utilizing Bluetooth connectivity. IRTC received FDA clearance in early June and began providing early access shortly thereafter. **The product is a premium device compared to the Zio XT, which does not provide real-time reporting**.[93]

… **Event monitors, mobile telemetry, and ILRs are for more severe individuals who have more critical symptoms such as syncope, pre-syncope, and ventricular tachycardia. These products compete with the ZIO AT** [94]

… **The Zio AT targets 10% of the total addressable market (TAM) that was unaddressable with the Zio XT**, adding approximately 450,000 to 500,000 tests per year. **The Zio AT is designed for patients who have more critical symptoms of atrial fibrillation** (AF), such as syncope, pre-syncope, and ventricular tachycardia. The current TAM in the US is approximately 4.6M tests per year, including both the Zio XT and Zio AT patches." [95]

…The Zio AT is considered largely a second-line testing monitor, which would therefore minimize cannibalizing the Zio XT; it **competes instead with more premium products, such as Implantable Loop Recorders (ILRs) and Mobile Cardiac Telemetry (MCOTs).**"[96]

Dougherty & Company (May 3, 2018): "IRTC is the best growth story in our coverage universe and we envision revenue growth accelerating from 2018 to

---

[91] ""Blame it on Zio"; IRTC Disrupting Conventional Cardiac Arrhythmia Detection, Initiating with Neutral," *Dougherty & Company*, December 1, 2017, at 2 (emphasis added).

[92] *Id* at 7 (emphasis removed).

[93] "Initiating Coverage with an Outperform rating," *RBC Capital Markets*, December 4, 2017, at 10 (emphasis added).

[94] *Id* at 9 (emphasis added).

[95] *Id* at 10 (emphasis added).

[96] *Id*.

2019 as ZIO AT gets further penetration, given the 2x+ price difference between AT and XT."[97]

BTIG (July 31, 2019): "a patch monitoring device called **ZIO AT, which adds real-time functionality**."[98]

Morgan Stanley (August 1, 2019): "Our Overweight thesis rests on continued sales momentum driven primarily by XT, expansion into post-ablation monitoring and asymptomatic markets, AT driving utilization of XT as accounts consolidate under the iRhythm umbrella, and **AT driving TAM expansion** into the MCOT market[.]"[99]

Canaccord Genuity (November 6, 2019): "In the initial days of IRTC's AT launch, the firm has seen rapid conversion to Zio (both AT & XT) following AT account introduction, with XT volume growth in new AT accounts exceeding IRTC's overall XT unit growth rates (recently averaging ~50% XT volume growth one month following AT introduction), **highlighting the compelling benefit of being a full-service provider across the high-risk arrhythmia patient population**."[100]

SunTrust Robinson Humphrey (January 7, 2020): "Recently, the company has expanded its offering to include **ZioAT**, a … solution **for patients who require real-time monitoring/communication**. Longer-term, we expect the company will leverage its established base in cardiac monitoring to extend into the domestic asymptomatic (silent) AF market, which is estimated to include about ten million potential patients."[101]

William Blair (January 9, 2020): "iRhythm recently started (end of third quarter 2019) the full launch of Zio AT, suggesting the potential for accelerating momentum as the entire salesforce ramps up its AT efforts. The product has a

---

[97] "IRTC Raises Revenue Guidance on Higher Zio Adoption, Growth Prospects; Reiterate Neutral on Valuation," *Dougherty & Company*, May 3, 2018, at 2.

[98] BTIG repeated this in their analyst reports through May 4, 2023. *See e.g.,* "And The Beat Goes On – Q2 Again Delivers; Maintain Buy," *BTIG*, July 31, 2019, at 2 (emphasis added). *See also* "We Expected Great Results and Conservative Guide; Impact of DoJ Subpoena in AECG Harder to Predict But We Are Not Panicking; Trimming Multiple, PT from $170 to $165," *BTIG*, May 29, 2024, at 2.

[99] "Penetration Continues into AMA Panel," *Morgan Stanley*, August 1, 2019, at 2 (emphasis added). *See also* "Verily and Cash...What do they Mean?," *Morgan Stanley*, September 6, 2019, at 2 (emphasis added). *See also* "ZIO Traction Continues into February RVU Update," *Morgan Stanley*, November 6, 2019, at 2 (emphasis added).

[100] "Several reasons to add to positions; stellar Q3 print – BUY, target to $107," *Canaccord Genuity*, November 6, 2019, at 2 (emphasis added).

[101] "Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust Robinson Humphrey*, January 7, 2020, at 3 (emphasis added).

smaller end-market in units, but with an ASP three times higher than XT **its adoption can have a meaningful impact on top-line growth**."[102]

Dougherty & Company (February 28, 2020): "**The ZIO AT, iRhythm's real time monitoring solution** for extended periods of wear up to 30 days, was released for general availability."[103]

William Blair (June 21, 2020): "Management highlighted the use of Zio AT at three Montefiore New York City hospitals used for inpatient monitoring (Zio AT) and outpatient monitoring of **high-risk patients** (Zio AT and XT). Zio's unique ability to streamline care and potentially improve safety (near-real-time monitoring and no cleaning of reusable devices) while still delivering the benefits of Zio's artificial-intelligence-backed algorithms and summary reports is ultimately pulling in some incremental demand during the pandemic. Zio AT use not only can provide some near-term benefits (nearly 3 times higher ASP than XT), but also should prove to be a long-term tailwind to Zio XT growth (more than 95% of annual volumes)."[104]

Baird Equity Research (September 1, 2020): "The launch of Zio AT was an important development in that it enabled iRhythm to provide a fuller suite of services to physicians. **Prior to the Zio AT service, some physicians were reluctant to fully lean into Zio since high-risk patients would need to be monitored using an alternative solution**. In other words, Zio became a full-service offering with the launch of AT. Early data suggests launch of AT is enabling further lift in XT penetration."[105]

Needham & Company (September 11, 2020): "Zio AT was initially introduced in 2H17 and only moved to a full launch in 4Q19. We believe current Zio XT accounts represent "low-hanging fruit" for **the Zio AT launch** and **could result in both market share gains** (in both the Holter monitor and MCT market categories) **and market expansion**. However, commentary suggests that some accounts have adopted Zio AT first which has resulted in pull-through of Zio XT over time. Given that the Zio AT is priced meaningfully higher than the Zio XT,

---

[102] "More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage With Outperform Rating," *William Blair*, January 9, 2020, at 6 (emphasis added).
[103] "Beats the Top-Line Again; Sets Guidance Bracketing Consensus; Maintain Neutral," *Dougherty & Company*, February 28, 2020, at 1 (emphasis added).
[104] "Virtual Meetings With Management; Digital Platform and Pipeline Execution Can Weather the Storm and Drive Long-Term Growth," *William Blair*, June 21, 2020, at 2 (emphasis added).
[105] "Unlikely to Miss Many Beats but Seems Fairly Valued; Initiate at Neutral," *Baird Equity Research*, September 1, 2020, at 4 (emphasis added).

iRhythm has seen ASPs move higher as **Zio AT volumes continue to increase**."[106]

William Blair (November 5, 2020): "iRhythm is still relatively early into the launch of its Zio AT device that has a 2-3x higher ASP than Zio XT and has historically increased pull-through of Zio XT (~95% of sales). **IRhythm is also expected to present two randomized control trials on the use of Zio in the asymptomatic market this month, and while this won't immediately open up this new TAM, they can potentially help make some early inroads into the market** (further discussed below)." [107]

Baird Equity Research (November 17, 2020): "Recent launch of Zio AT extended iRhythm's portfolio into telemetry which includes **real-time connectivity to a monitoring center for high-risk patients.**"[108]

J.P. Morgan (April 4, 2022): "**We view the TAVR opportunity as compelling given today's under-penetration and usage cases for both XT and AT**. iRhythm currently plays in less than 10% of TAVR centers across the US today, with management (a) XT used to map out and document the condition you're really trying to address before the procedure, and (b) **AT used to give you real-time feedback** on the patient's condition and any adverse events post-procedure."[109]

William Blair (April 4, 2022): "We were also encouraged to see two new Zio AT studies highlighted at the ACC Meeting (**one in post-TAVR monitoring and another in early patient discharge) that we believe can provide another tailwind to AT adoption and potentially expand the real-time monitoring opportunity**."[110]

… "The second study was a single-center experience that used risk scores to identify appropriate syncope patients in the emergency department and send them home (rather than keep them inpatient) with **Zio AT for real-time monitoring**."[111]

---

[106] "IRTC: Growth Trajectory and Profitability Already Priced In; Initiate at Hold," *Needham & Company*, September 11, 2020, at 6 (emphasis added).

[107] "Patient Volume Rebounds Plus Share Gains Lead to Solid Third-Quarter Beat; Catalysts for Growth in 2021 Plus Remain Strong," *William Blair*, November 5, 2020, at 2.

[108] "Three-Year mSToPS Clinical Outcomes Data Encouraging," *Baird Equity Research*, November 17, 2020, at 2 (emphasis added).

[109] "Positive Data Readouts at ACC Support Our Bullish Thesis on Durable Near- and Long-Term Growth," *J.P. Morgan*, April 4, 2022, at 1 (emphasis added).

[110] "ACC 2022: Solidifying Zio's Clinical Backing and Thoughts on First Quarter," *William Blair*, April 4, 2022, at 1 (emphasis added).

[111] *Id* at 3 (emphasis added).

… "According to Kaiser estimates, the average inpatient expense per day ranges from $1,000 to $4,000 depending on the state, demonstrating the meaningful savings potential in **using Zio AT for early discharge and real-time monitoring**."[112]

Canaccord Genuity (April 5, 2022, price target increased from $153 to $185): "Lastly, we'd also highlight another data presentation at the conference, which studied use of **continuous ambulatory ECG monitoring (using Zio AT) in post -TAVR patients discharged to home at a single center**."[113]

Canaccord Genuity (May 5, 2022): "IRTC is also looking to help with the shift to **early discharge from TAVR procedures, with utilizing Zio AT post-discharge for patient monitoring for complications**."[114]

55.    After the first alleged corrective disclosure on November 1, 2022, analysts continued to reference and rely upon the Transmission Claims, which continued to be made by Defendants through the middle of 2023. This contradicts the Skinner Report opinion that the Transmission Claims had no price impact after November 2, 2022. For example:

BTIG (November 2, 2022): "a patch monitoring device called **ZIO AT, which adds real-time functionality**."[115]

William Blair (November 2, 2022): [T]he company clarified the registration process for the physician, so all fields are completed during the registration (if this was not completed, it may have delayed **the ability to gain access to real-time patient data**).[116]

Truist Securities (November 14, 2022): "Mgmt noted that IRTC's ZioAT device is ~7% penetrated **in the MCT market**, vs the ~25% penetration with the ZioXT

---

[112] *Id* (emphasis added).

[113] "ACC takeaways: EW CLASP TR EFS positive, IRTC compliance high in GUARD-AF, & NARI new products interesting," *Canaccord* Genuity, April 5, 2022, at 3.

[114] "Solid Q1; higher reimbursement from NGS MAC lifts ASP more beginning 2H/22; reaffirm BUY and $185 PT," *Canaccord Genuity*, May 5, 2022, at 2.

[115] BTIG repeated this in their analyst reports through May 4, 2023. *See e.g.,* "Reimbursement Saga Ends with Final Rule Payment Rates Slightly Higher Than Proposal," *BTIG*, November 2, 2022, at 2 (emphasis added). *See also* "We Expected Great Results and Conservative Guide; Impact of DoJ Subpoena in AECG Harder to Predict But We Are Not Panicking; Trimming Multiple, PT from $170 to $165," *BTIG*, May 29, 2024, at 2.

[116] "Short-Term Shortfall Manageable While CMS Final Rule Looks Better Than Expected and Clears the Way for Adoption," *William Blair*, November 2, 2022, at 2 (emphasis added).

device and ultimately expects ZioAT penetration will move closer toward ZioXT penetration over time"[117]

Wells Fargo (February 7, 2023): "[P]hysicians prescribe MCT for up to 30 days for **patients with higher acuity symptoms like syncope that require fast notification and action** … **IRTC's Zio AT competes in the MCT portion of the ACM market**…indicat[ed] [for] [s]uspected **high-risk arrhythmia** (e.g. ventricular tachycardia) **that can be identified and addressed in real time**."[118]

… The Zio AT competes in the MCT space and **is designed to improve the speed and accuracy relative to traditional MCT** … The Zio AT is the same for factor as the Zio XT and offers the same functionality plus the additional capability of **transmissions via Bluetooth during wear for more timely action**."[119]

56.     As documented above, analysts referenced and relied upon on the Transmission Claims. This provides reliable economic evidence that the Transmission Claims had front-end price impact. Moreover, as I document in **Section IV.E.i** below, following the alleged corrective disclosure events, analysts referenced and relied upon on the relevant truth related to the Transmission Claims, and they correspondingly lowered their expectations for iRhythm's revenues and price targets for iRhythm Common Stock. This further demonstrates the price impact of the Transmission Claims, and supports the economic connection between the Transmission Claims and the alleged subsequent revelations of the relevant truth.

### ii.    Analyst Commentary on Accuracy Claims

57.     Multiple analysts relied upon and discussed Defendants' Accuracy Claims of the Zio AT in their assessment of iRhythm throughout the Class Period. Furthermore, analysts connected those claims to the Company's ability to expand its TAM to the primary care market, generate revenues and profits, and support the Company's Common Stock price.

---

[117] "MedTech Bay Area Bus Tour Takeaways - In Our View Mtgs Incrementally +ve Across The Board For ISRG, PEN, IRTC, PRCT," *Truist Securities*, November 14, 2022, at 11.

[118] "IRTC: Initiating Coverage at Overweight, $150 Price Target," *Wells Fargo*, February 7, 2023, at 16-17.

[119] *Id* at 21 (emphasis added).

58.    Prior to and throughout the Class Period, Defendants consistently touted the Accuracy Claims, emphasizing that the Company's proprietary AI and human-led verification process created a clinical service of superior quality.[120] Plaintiff alleges that these statements were important because they assured investors that the Zio AT was not merely an automated algorithm, but rather a validated clinical service safeguarded by human experts.[121] Defendants explicitly tied the Accuracy Claims to their ability to expand into the primary care market.[122] By repeatedly assuring the market of the Zio AT's accuracy, Defendants allegedly maintained the artificial inflation in the stock price until the corrective disclosures revealed the technician and algorithmic failures that undermined this yield.[123]

59.    Following Defendants' alleged misstatements, analysts reiterated the Accuracy Claims, underscoring their importance to iRhythm's business. Throughout the Class Period analysts relied on and repeated Defendants' statements about the Zio AT's accuracy capabilities.

60.    This consistent focus indicates that analysts and investors viewed the Accuracy Claims as economically important to iRhythm's value. For example:

> Dougherty & Company (December 1, 2017): "The higher sensitivity, **greater diagnostic yield** and associated data analytics support the higher reimbursement."[124]

> RBC Capital Markets (December 4, 2017): "**IRTC's unique platform includes a proprietary machine-learning algorithm that arranges the ECG data into actionable information for physicians.** … After the data has been distilled, a preliminary report is created**. IRTC's process transforms 30,000 pages of ECG strips into a 10- to 15-page report known as the ZIO Report**.

---

[120] Complaint ¶¶ 4, 224.
[121] Complaint ¶¶ 224.
[122] *See e.g.,* **Section IV.C**.
[123] Complaint ¶¶ 152, 232.
[124] "Blame it on Zio; IRTC Disrupting Conventional Cardiac Arrhythmia Detection, Initiating with Neutral," *Dougherty & Company*, December 1, 2017, at 7 (emphasis added).

Afterwards, **a certified cardiac technician performs a quality review of the data** before the final ZIO Report is sent to the patient's physician."[125]

**"The competitive advantage of the Zio System is transforming the ECG data into a simplistic repor**t. Currently, after second-line testing is complete with an ILR or MCOT device, a large number of technicians is required to dig through the data and organize it into actionable information. IRTC alleviates this step with its machine-learning algorithms, thus lowering cost and increasing efficiency."[126]

Morgan Stanley (August 1, 2019): "iRhythm's ZIO is poised to be a disruptive technology in a large, growing market for ambulatory electrocardiogram monitoring in the US **with better diagnostic yield** and cost effectiveness versus current monitoring modalities."[127]

Citi Research (August 24, 2020): "iRhythm is changing the status quo with its current Zio platform that offers hospitals a comprehensive offering through its Zio XT and Zio AT devices. Together under one service, they replace three separate technologies (Holter Monitors, Event Monitors, and MCTs) to provide **not only the most accurate detection** in cardiac arrhythmias, but also a more streamlined reporting system that allows more testing with less resources"[128]

William Blair (November 5, 2020): "iRhythm can be a major driver and beneficiary in the next wave of digital health, where **devices can augment clinician judgmen**t and help identify patients who can be managed at an earlier stage of disease (**which also has the potential to meaningfully increase the company's TAM**)."[129]

William Blair (December 17, 2020): "[W]e believe it is a testament to the unique value of Zio's platform that can deliver quality and streamlined clinical outcomes in several different environments."[130]

Canaccord Genuity (December 20, 2021): "[P]rocessed through the company's cloud-based, FDA-cleared deep-learned algorithms for **highly accurate ECG**

---

[125] "Initiating Coverage with an Outperform rating," *RBC Capital Markets*, December 4, 2017, at 11 (emphasis added).

[126] *Id* at 11 (emphasis added).

[127] "Penetration Continues into AMA Panel," *Morgan Stanley*, August 1, 2019, at 3 (emphasis added).

[128] "Of Hearts and Minds: Moving Up and to the Right, Raising our Target Price in the Process to $250 from $215," *Citi Research*, August 24, 2020, at 1 (emphasis added).

[129] "Patient Volume Rebounds Plus Share Gains Lead to Solid Third-Quarter Beat; Catalysts for Growth in 2021 Plus Remain Strong," *William Blair*, November 5, 2020 at 3 (emphasis added).

[130] "Fireside Chat Takeaways: Zio Digital Platform Offers Durable Growth," *William Blair*, December 17, 2020, at 2.

**analysis**. After technician review, a report is generated for a physician (see below for an example). **IRTC's process can take the equivalent of 30,000 pages of ECG strips and create a summary report of 10-15 pages** that is delivered electronically to a physician for review."[131]

"…**For providers: iRhythm's value proposition to providers is receipt of high-quality, easy-to-read, actionable digital reports that help them diagnose patients and streamline clinical workflow**. Zio has been shown in multiple peer-reviewed clinical studies to detect more arrhythmias compared to Holter monitoring during a patient's respective prescribed wear period. **Accurate detection and higher diagnostic yield** allow physicians to prescribe the appropriate treatment options more quickly for patients, while also minimizing the amount of repeat testing."[132]

J.P. Morgan (September 27, 2022): "Overcoming relationships with these competitors represents a challenge in certain accounts, **but a superior offering from Zio and its algorithm** has helped it hold market share at ~70%."[133]

Wells Fargo (February 7, 2023): "IRTC's current offering comprises the patch monitors, Zio XT and Zio AT, which have demonstrated leading patient compliance and **diagnostic yield** metrics."[134]

"… The Zio AT competes in the MCT space and is **designed to improve the speed and accuracy relative to traditional MCT**."[135]

Canaccord Genuity (May 2, 2024): "These centers saw that Zio services had a positive impact on patient wait times, hospital resource utilization, **clinical diagnostic yield**, and pathway costs savings."[136]

---

[131] "CMS payment challenges baked in, higher CMS payment and Verily wearable are upside; reinstating coverage with BUY, $125 PT," *Canaccord Genuity*, December 20, 2021, at 5 (emphasis added).

[132] *Id* at 7 (emphasis added).

[133] "Management Reiterates Bullish Stance on LRP and PFS at Recent Investor Meetings," *J.P. Morgan*, September 27, 2022, at 1.

[134] "IRTC: Initiating Coverage at Overweight, $150 Price Target," *Wells Fargo*, February 7, 2023, at 1 (emphasis added).

[135] *Id* at 21 (emphasis added).

[136] "Q1 revenue beat with opex spend higher, forward guidance unchanged; maintain BUY, PT to $122," *Canaccord Genuity*, May 2, 2024, at 2-3 (emphasis added).

<u>William Blair (May 6, 2024)</u>: "In comparison, iRhythm's Zio is used for its medical specificity and **accuracy** to identify discrete episodes of atrial fibrillation and other types of arrhythmias over other competitive devices"[137]

61.     Further, highlighting the importance of the Company's strategy to expand the use of their devices into the primary care market, analysts commented on the Company's progress with this market. For example:

<u>William Blair (February 24, 2022)</u>: "On top of iRhythm's typical tailwinds (growing same-store utilization, ramping up new account openings, an underpenetrated XT market, and increasing AT pull-through), **management indicated it is working on new commercial initiatives focused on driving adoption in new channels such as post-TAVR monitoring, additional hospital wings, primary care physicians (PCPs),** and other specialty channels that can drive momentum through 2022 and beyond. **Comments around a PCP focus are especially interesting given the potential for iRhythm to expand its core market given estimates for PCPs to see up to 40% more patients with palpitations who are not receiving traditional cardiac monitoring devices today**. Some of the company's top reps are already having success in reaching PCPs and management is working to formalize a commercial strategy into this market in the coming quarters."[138]

<u>William Blair (June 9, 2022)</u>: "New commercial channels: Despite meaningful greenspace in today's core prescribing channels (not even in 50% of cardiology accounts), management is identifying new opportunities that are less penetrated and can deliver another leg of Zio growth. **This includes PCP offices and TAVR centers**…"[139]

<u>Canaccord Genuity (May 5, 2022)</u>: "Expansion into PCP and post-TAVR – still in early stages: Management recently expanded its commercial strategy to **begin embracing primary care physicians** as a call point for IRTC's salesforce (embracing a strategy that the company's top performing reps were already doing)."[140]

---

[137] "Apple Watch Update Not a Thesis Changer," *William Blair*, May 6, 2024, at 2 (emphasis added).

[138] "Entering 2022 With Strong Momentum and an Initial Guide We Think Can Prove Conservative," *William Blair*, February 24, 2022, at 2.

[139] "Highlights From the 42nd Annual Growth Stock Conference," *William Blair*, June 9, 2022, at 1.

[140] "Solid Q1; higher reimbursement from NGS MAC lifts ASP more beginning 2H/22; reaffirm BUY and $185 PT," *Canaccord Genuity*, May 5, 2022, at 2 (emphasis added).

Baird (July 18, 2023): "Bottom Line: iRhythm Technologies, whose market leading ZioService is on way to becoming standard of care in the ~6M annual US ambulatory cardiac monitoring (ACM) tests (~25% penetrated). We see a durable high-teens/20% top-line growth trajectory as the company continues to **1) onboard new accounts -- particularly in the primary care provider (PCP) channel**, where IRTC is ~11% penetrated; 2) benefits from an established CMS reimbursement code; and 3) expands to international markets (ramping in late '24/early '25E). Longer term, we see upside optionality potential from adjacent markets."[141]

"… Conversations with physicians at high volume centers already suggest that IRTC's ZioXT/AT (primarily AT) have become standard of care within their center. And new account opening, ongoing expansion into the primary care channel should continue to drive ongoing growth."[142]

Canaccord Genuity (August 1, 2024): "**Primary care channel is a budding success: Expanding into the primary care channel is a key opportunity for IRTC** … Management reiterated that **Zio can be very beneficial in the primary care channel**, and that it is starting to drive conversions from competitors and other modalities, such as shorter term Holter. **Expanding into primary care will give Zio direct access to over 15M patients who visit their PCP with heart palpitations.**"[143]

62. As documented above, analysts referenced and relied upon on the Accuracy Claims. This provides reliable economic evidence that the Accuracy Claims had front-end price impact. Moreover, as I document in **Section IV.E.ii** below, following the alleged corrective disclosure events, analysts referenced and relied upon on the relevant truth related to the Accuracy Claims, and they correspondingly lowered their expectations for iRhythm's revenues and price targets for iRhythm Common Stock. This further demonstrates the price impact of the Accuracy Claims, and supports the economic connection between the Accuracy Claims and the alleged subsequent revelations of the relevant truth.

---

[141] ""Getting Back into Rhythm": Initiate Outperform and $130 PT" *Baird*, July 18, 2023, at 33 (emphasis added).

[142] *Id* at 7.

[143] "Financials solid; FDA and DOJ wrinkles create a bit of uncertainty; maintain BUY and $122 PT," *Canaccord Genuity*, August 1, 2024, at 2.

**E. Analyst Commentary Regarding the Alleged Revelations of the Relevant Truth Provides Further Back-End Evidence of Price Impact**

63.     Following the alleged corrective disclosures for both the Transmission Claims and the Accuracy Claims, analysts referenced the economic information at issue within both categories of the alleged misrepresentations. This provides economic evidence of the back-end price impact of both the Transmission Claims and the Accuracy Claims.

### i.     Analyst Commentary on Transmission Claims

64.     Plaintiff alleges that the relevant truth behind the Transmission Claims came to light over a series of corrective disclosures, as described below.[144] Analyst commentary following the alleged corrective disclosures supports the economic connection between the Transmission Claims and the alleged corrective disclosures, and provides further support of the price impact resulting from the Transmission Claims. Moreover, despite Dr. Skinner's assertions about lack of price impact regarding the Transmission Claims outside of November 1, 2022 and June 6, 2023,[145] the evidences shows that he ignores (i) Defendants' continued misstatements and (ii) analyst commentary demonstrating the economic connection between the alleged misrepresentations and alleged corrective disclosures following each of the corrective disclosures.

65.     First, after market close on November 1, 2022, iRhythm released earnings for the third quarter of 2022. The Company revised its revenue guidance downwards, citing in part a "Customer Advisory Notice" that the Company had voluntarily issued for the Zio AT regarding "event trigger limits" for the device.[146]

66.     Analysts following the Company attributed part of the drop in revenue guidance and the lower-than-expected Zio AT growth to this notice. They also noted that there was "a lot to

---

[144] Complaint ¶¶ 122, 233.
[145] Skinner Report ¶¶ 13, 15.
[146] Complaint ¶¶ 123-125.

digest" in the announcement and some analysts lowered their price targets for the Company. For instance:

> J.P. Morgan (November 1, 2022, price target reduced from $190 to $186): "**There's a lot to digest** as we await the release of the actual updates to RVUs, but our preliminary view on the night is that … **it can't be denied that the quarter itself was disappointing**, especially given the magnitude of the negative revision and its proximity to the recent analyst day."[147]

> "…It's worth breaking down the ~$6.5M in headwinds that are driving the negative guidance revision in 4Q, with **(1) a ~$2.0M headwind from new account onboarding postponed from October to late in December; (2) a $3.5-4.0M headwind from the AT customer advisory notice** around battery limitation caps for symptomatic and asymptomatic transmissions, with management highlighting that the updated labeling is still in-line with that of competitors."[148]

> Truist Securities (November 1, 2022): "IRTC's 3Q22 miss & lowered FY22 guide was **disappointing** — and **putting pressure on shares in the aftermarket…"**[149]

> "… The company also issued a voluntary Customer Advisory Notice to ZioAT customers, updating language related to precautions in the Zio AT Clinical Reference Manual and Important Information pamphlet, relating to patient registration process and patient- and auto-triggered transmission limits — **this resulted in slower growth within the qtr**. and is expected to continue into Q4. While growth of AT was strong in existing accounts, this provided an incremental headwind to opening new accounts. Account staffing and capacity challenges also appeared to play a factor in the lowered FY22 guide."[150]

> Wolfe Research (November 1, 2022): "And now the trick… **3Q22 revenue missed and 2022 guidance was reduced due to several volume-related issues** … Early 4Q a voluntary "Customer Advisory Notice" sent to Zio AT customers

---

[147] "Better than Expected Final PFS and Healthy Underlying Trends Outweigh Near-Term Challenges; Reiterate OW," *J.P. Morgan*, November 1, 2022, at 1 (emphasis added).
[148] *Id* (emphasis added).
[149] "Mixed Qtr & Lwr Guide, but +ve CMS Rate Shld Help Offset Ptn'l Headwinds Spilling into '23," *Truist Securities*, November 1, 2022, at 1 (emphasis removed).
[150] *Id* at 1-2 (emphasis added).

updating precautionary language focused on patient registration process and patient and auto-triggered transmission limits."[151]

BTIG (November 1, 2022, price target reduced from $175 to $168): "Additionally, IRTC issued a voluntary Customer Advisory Notice to its Zio AT customers in Q4 that **has resulted in lower growth so far and is now expected to represent a $3.5M-$4M headwind in Q4**."[152]

William Blair (November 2, 2022): "Management's updated guidance of $407 million to $411 million is down from $415 million to $420 million previously. Outside the roughly $1.5 million decline related to our estimates this quarter, management suggested that the delta in the decline in guidance was: 1) a $1.0 million decline related to softness of returned devices, **2) $2.0 million decline related to challenges in ramping new accounts related to staffing issues, and 3) $3.5 million to $4.0 million in lower AT utilization due to a voluntary customer advisory notice** related to the device. The decrease is disappointing and naturally **leads to questions around why management did not provide these updates at its mid-September analyst day**."[153]

Needham & Company (November 2, 2022, price target reduced from $185 to $140): "Management lowered its 2022 revenue guidance by ~$8.5M and the mid-point, which included: 1) ~$2M from the 3Q22 miss, 2) **~$3.5M from the Zio AT advisory notice impacting MCT volumes** (still expected to be >20% Y/Y in 4Q22), 3) **~$2M from slower new account onboarding**, and 4) ~$1M from residual impact of lower monitor return rates."[154]

Oppenheimer & Co (November 2, 2022, price target reduced from $175 to $166): "Suffice it to say, given the short gap since the late-September Investor Day, **the surprise shortfall in the quarter is a head scratcher**."[155]

"… iRhythm cited three factors for $1.5-2M Q3 miss/$6M Q4 softness: … Zio-AT growth slowed to 20% (4Q22E), **driven by Customer Advisory notice** on

---

[151] "Tricks and Treats Tonight – Revenue Miss & Lower but Final CMS Rule Rounds Input Up…Again," *Wolfe Research*, November 1, 2022, at 1 (emphasis removed).
[152] "Staffing Challenges Drive Small Sales Miss and Guide Cut; PFS Final Rule Appears to Resolve Reimbursement; Reducing PT from $175 to $168," *BTIG*, November 1, 2022, at 1 (emphasis added).
[153] "Short-Term Shortfall Manageable While CMS Final Rule Looks Better Than Expected and Clears the Way for Adoption," *William Blair*, November 2, 2022, at 1 (emphasis added).
[154] "IRTC: 2H22 Issues Should Be Transitory; Underlying Momentum Remains Strong," *Needham & Company*, November 2, 2022, at 1 (emphasis added).
[155] "3Q Miss and 4Q Guide Down Disappoints," *Oppenheimer & Co*, November 2, 2022, at 1 (emphasis added).

managing event trigger limits, necessitating interventions by IRTC call staff[.]"[156]

"…Our new $166 PT is based on 10x our **revised FY23 revenue estimate** of $500M. Our prior $175 PT was based on 10.1x our prior FY23 revenue estimate of $519M."[157]

Canaccord Genuity (November 2, 2022, price target reduced from $198 to $155): "Short-term disruption to Zio AT in Q4 expected from Customer Advisory Notice. … The company is **seeing new customers not use AT when given the notice, and adjusted its forecast for Q4** to grow closer to approximately 20%, a step down from the upper 40% growth it had seen through the first nine months of the year… **IRTC expects this dynamic to be short term in nature** (lasting through Q4/22 at the low end of guidance)"[158]

67.     On November 4, 2022, the Company further disclosed that the Customer Advisory Notice was issued in response to an FDA Form 483 and related to a "labeling correction" concerning the Zio AT's "maximum transmission limits" and registration requirements.[159]

68.     While iRhythm acknowledged specific technical "maximum transmission limits," it continued to market the device for use in "high-risk" or "at-risk" patient populations, and continued to emphasize the device's ability to "timely transmit" data.[160] As noted in **Section IV.C**, Defendants made alleged misrepresentations both before and after the November 2022 alleged partial corrective disclosures, including on August 5, 2022, August 11, 2022, September 21, 2022, November 4, 2022, November 14, 2022, and February 23 2023. Consequently, contrary to Dr. Skinner's claims, there is evidence from analyst commentary consistent with Plaintiff's allegation that the November 1, 2022 disclosure was only a partial revelation of the truth regarding the Transmission Claims.[161]

---

[156] *Id* (emphasis added).
[157] *Id* at 2 (emphasis added).
[158] "Q3 light and Q4 guidance not comforting – but likely just a bump in the road; maintain BUY, lower PT to $155," *Canaccord Genuity*, November 2, 2022, at 1.
[159] Complaint ¶¶ 12, 129-133.
[160] Complaint ¶¶ 109, 114.
[161] Skinner Report **Section VII.A.1**.

69.     Analysts continued to model robust growth for the Zio AT, citing management's assurances that the issues were "manageable" and would only be "short term in nature" and distinct from the device's core utility.[162] For example:

> Truist Securities (November 14, 2022): "For our part, we thought there were several (positive) takeaways from the mtg: (1) mgmt believes it has a good handle on the 2-main issues that led to the FY22 guide down, and CEO Blackford expressed a **high level of confidence the impact from these issues are transient and should likely be (mostly) resolved by early 2023 if not sooner. (2) The ZioAT customer advisory notice, specifically should be fully remediated in December.**"[163]

> … "Our sense is that even though underlying ZioXT return rates were lower than historical averages, the unexpected ZioAT advisory notice, played a part in the inability for the company to hit their initial guide. Simply put, we think that ZioAT growth (without the advisory notice) could have been enough to offset ZioXT weakness & ultimately enable the company to hit the initial guide for FY22."[164]

> … "Our sense from the discussion is that this headwind is very manageable. Mgmt has a very good handle on the pathway to resolution, however, it could linger as a headwind into part of 1Q."[165]

70.     On May 4, 2023, the Company disclosed in that it had received a subpoena from the Consumer Protection Branch, Civil Division of the U.S. Department of Justice ("DOJ") allegedly related to the Company's claims about the Zio AT. The subpoena sought communications and documents related to issues with the Zio AT, including the product's ability to "timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event."[166]

---

[162] "Q3 light and Q4 guidance not comforting – but likely just a bump in the road; maintain BUY, lower PT to $155," *Canaccord Genuity*, November 2, 2022, at 1.

[163] "MedTech Bay Area Bus Tour Takeaways - In Our View Mtgs Incrementally +ve Across The Board For ISRG, PEN, IRTC, PRCT," *Truist Securities*, November 14, 2022, at 2 (emphasis changed).

[164] *Id* at 10.

[165] *Id* at 11 (emphasis removed).

[166] *Complaint* ¶ 134.

71.     Analysts were surprised by the subpoena and stated that the news meant that the issues around the Zio AT would remain an "overhang" for the Company, with some analysts lowering their price targets. For instance,

> BTIG (May 4, 2023, price target reduced from $170 to $165): "**The big surprise on the call with the disclosure of receipt of a subpoena** from the Consumer Protection Branch (CPB) of the Civil Division of the Dept. of Justice."[167]

> "… [I]t is difficult to predict what next steps for this inquiry could be, any potential impact on the company's commercial operations, or timelines. We do not see any reason for panic at this point, but acknowledge that this is unsettling and that **it may be a small overhang on the stock**."[168]

> Truist Securities (May 4, 2023): "**DOJ Inquiry something to monitor** though too early to tell what it may or may not mean … Until we get resolution **it could serve as a stock overhang** on some level, but our initial read is that it shouldn't be a major issue."[169]

> J.P. Morgan (May 5, 2023): "Management plans to provide updates as its communications with the DOJ continue, but **we wouldn't be surprised to see this represent a modest overhang** until we get further details into the nature of the investigation."[170]

> William Blair (May 5, 2023): "**Offsetting some of the commercial performance and outlook, management disclosed that it received a request from the Department of Justice (DOJ) on April 4 seeking information on the company's products/services**. … While it is unclear what the ultimate outcome will be here, we note that iRhythm has elevated its focus on regulatory and compliance within the last 12 to 18 months since CEO Quentin Blackford joined the company including hiring a chief risk officer one year ago (May

---

[167] "We Expected Great Results and Conservative Guide; Impact of DoJ Subpoena in AECG Harder to Predict But We Are Not Panicking; Trimming Multiple, PT from $170 to $165," *BTIG*, May 4, 2023, at 1 (emphasis added).

[168] *Id* (emphasis added).

[169] "Solid Start To '23 With Above-CNS +21% y/y Rev; Guide Raise Shld Set-Up For More Beats In Our View," *Truist Securities*, May 4, 2023, at 2 (emphasis added).

[170] "A 1Q Beat with Plenty Left in the Tank; DOJ Subpoena is Asymptomatic For Now, but Monitoring is Warranted," *J.P. Morgan*, May 5, 2023, at 1 (emphasis added).

41

2022). That said, this news adds a new wrinkle to the story/ market and is **likely to remain an overhang** until we gain more information on the matter."[171]

72.    On that same day, the Company held an earnings call. Analysts posed questions regarding DOJ subpoena. For example:

J.P. Morgan: "And then for last one question, this Department of Justice inquiry is new to us. I believe you said it was civil [ph], but hopefully downside it's kind of limited. But when I think about -- do you have any sense of what they're actually looking into? The kind of timelines that you should expect for any updates on the process, and just kind of what the downside could be to the inquiries? Thank you."[172]

73.    Throughout subsequent earnings calls, analysts repeatedly indicated their interest in the DOJ subpoena:

J.P. Morgan (August 3, 2023): "Great, that's helpful. And then maybe just on the DOJ inquiry. Is there anything new that you'd be willing to share in terms of what they are actually looking into, any timeline we should be keeping in mind and how you're thinking about this impacting the business? Thanks so much."[173]

Citibank (May 2, 2024): "Good afternoon. Thank you for taking the questions. Just a few catch up here. Where are you on FDA warning letter resolution? Anything new on the Department of Justice? And what is the current thinking of timing for monitor for AT? Thank you."[174]

Wells Fargo (August 1, 2024): "Hi. Thanks for taking the question. Brice, it has been a pleasure working with you and Dan, congrats on the new role. I just wanted to touch on the DOJ subpoena just one more time. The wording in the recent core document that was posted seems to suggest that it might just relate to Zio AT. Is there anything in the documentation that was requested from you that would suggest inquiry extends to Zio XT as well?"[175]

74.    On May 30, 2023, the Company disclosed that it had received a Warning Letter

---

[171] "First-Quarter Beat With Strongest Registration Growth in Nearly Two Years," *William Blair*, May 5, 2023, at 1 (emphasis added).
[172] iRhythm Technologies, Inc. Q1 2023 Earnings Call, May 4, 2023, at 7.
[173] iRhythm Technologies, Inc. Q2 2023 Earnings Call, August 3, 2023, at 8.
[174] iRhythm Technologies, Inc. Q1 2024 Earnings Call, May 2, 2024, at 10.
[175] iRhythm Technologies, Inc. Q2 2024 Earnings Call, August 1, 2024, at 13.

from the FDA, which alleged regulatory non-conformities related to the Zio AT.[176] Additional details about the FDA Warning Letter continued to leak into the marketplace over the next week, as analysts reported on details that the Company shared with them.[177] The Warning Letter was then published on the FDA website on June 6, 2023.[178]

75.    The Warning Letter allegedly revealed that the FDA's requests were directly related to Plaintiff's allegations, specifically that the device may have been inappropriately marketed as appropriate for 'at risk' or 'high-risk' patients.[179] Analyst reactions to the disclosures indicate that the Warning Letter conveyed new, negative information to investors regarding the capabilities and regulatory status of the Zio AT, which also resulted in analysts lowering their price targets and revenue projections for the Company.

76.    While Dr. Skinner claims that the disclosure on May 30, 2023 was attributable only to his articulation of "Alleged Truth #1" (the existence of transmission limits), which he asserts was fully disclosed on November 1, 2022 and thus could not have had any price impact,[180] analyst commentary following the disclosures reveals that analysts were concerned and surprised by the revelation of the Warning Letter. Furthermore, analysts connected the Warning Letter to the issues relating to the August 2022 FDA inspection and the prior disclosures in November 2022. Moreover, the fact that analysts continued to report on the Warning Letter in the following days, including

---

[176] Complaint ¶¶14-17, 137-138.

[177] "Correction: FDA Warning Letter Received," *Oppenheimer & Co*, June 1, 2023, at 1. "This warning letter includes topics from the 483 (August 2022) in addition to others. **The warning letter hasn't been posted yet. Warning letter noted 3 issues**: 1) untimely patient registration; 2) device construct (trigger warning limits, traditional MCOT definition); 3) letter to file (device changes)" (emphasis added).
"Thoughts After Talking to Management on Published Warning Letter," *William Blair*, June 6, 2023. "The details largely followed what the company had disclosed **and discussed with us on May 30**" (emphasis added).

[178] *Available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/irhythm-technologies-inc-643474-05252023.

[179] Complaint ¶¶ 137-140.

[180] Skinner Report Section VII.A.2.c.

details of the Warning Letter shared with them by Defendants, demonstrates further evidence of back-end price impact, and indicates that new value-relevant information pertaining to the Transmission Claims was revealed by the Warning Letter. For example:

> Wells Fargo (May 30, 2023): "**W[arning ]L[etter]** includes the topics outlined in the original 483 observation as well as two additional topics. Two new updates are (1) past changes to Zio AT under the letter to file approach vs new 510k, and (2) **specific terminology IRTC uses in its marketing to describe Zio AT** within the MCT space."[181]

> Truist Securities (May 30, 2023): "The announcement that the FDA issued a Warning Letter (WL) related to IRTC's Zio AT system on 5/25 is an incremental negative and **could see shares underperform tomorrow**. This WL comes off of an Advisory Notice issue/impact (in 4Q22-1Q23) that **we had assumed was in the rearview**. The news also follows a recent DOJ subpoena (announced on the 1Q23 call), which is likely unrelated but has nonetheless added to a now growing list of regulatory considerations. The WL's outcome could ultimately be benign/limited while **a more severe outcome could require AT (which represents ~13% of our estimated 2023E rev and a growth engine) to be removed from the market for some period** of time. On the latter, we take some consolation that mgmt. did not feel the need to withdraw guidance, and currently expects no financial impact from the WL at this time---i.e. if a recall were imminent it could have been required with the WL, and it wasn't. Still, we recognize that without greater clarity around timing of resolution---which could be weeks/months---**this WL could very well serve as an extended overhang on shares**.

> … Mgmt. noted that the company has been in touch with the FDA and dealing with/in dialogue with respect to many of these issues **for 9 months**."

> … "[The] full ramifications of potential remediation are unknown."[182]

> William Blair (May 31, 2023): "**The letter specifically relates to the Zio AT Device** … **and is an escalation of a Form 483** [the Company] received in August 2022"[183]

---

[181] "IRTC: We See Limited Impact from Zio AT Warning Letter," *Wells Fargo*, May 30, 2023, at 1 (emphasis changed).

[182] "Zio AT Warning Letter an Incremental Overhang & Likely to Pressure The Stock," *Truist Securities*, May 30, 2023, at 1 (emphasis added).

[183] "Warning Letter Regrettable but Manageable With Likely Minimal Impact to Results," *William Blair*, May 31, 2023, at 1 (emphasis added).

Wells Fargo (June 1, 2023): "**The warning letter (WL) was unexpected and resulted from the Aug '22 inspection.**"[184]

Oppenheimer & Co (June 1, 2023): "Risks: Out of the three issues, we believe that the "Device Construct" issue is the trickiest and could pose the most difficulty in rectifying. IRTC noted that since it has been working with the FDA over the past nine months (since customer advisory notice) …"[185]

J.P. Morgan (June 2, 2023): "[W]e also understand investor frustration with what feels like a never-ending series of external pressures that threaten to disrupt the growth story, with reimbursement challenges addressed and replaced with a DOJ investigation and Zio AT warning letter. **We expect to see these challenges pressuring the stock** given how difficult it is to risk-adjust for these types of binary events"[186]

Canaccord Genuity (June 6, 2023): "The FDA noted that **Zio AT marketing was not in line with its labeling – and therefore Zio AT is not approved for the marketed indications and could require a new 510(k) clearance. We believe that given this is related to Zio AT's marketing (for both near-time monitoring and high-risk patient population)**, there is a risk the FDA could decide to take further regulatory action against the company. **The FDA's letter made clear the Zio AT's clearance was "for long-term monitoring of arrhythmia events for non-critical care patients where real-time monitoring is not needed as reporting timeliness is not consistent with life-threatening arrhythmias," and not for mobile cardiac telemetry – which it had been marketed as.**"[187]

William Blair (June 6, 2023): "On June 6, 2023, the FDA publicly released iRhythm's previously disclosed warning letter, **which we believe has led the stock to trade down** as much 8% during the day. Recall that the warning letter specifically relates to its Zio AT device (about 10% of sales), not its core Zio XT platform. The details largely followed what the company had disclosed and discussed with us on May 30."[188]

---

[184] "IRTC: Key Takeaways from the Wells Fargo 2023 MedTech West Coast Bus Tour," *Wells Fargo*, June 1, 2023, at 1 (emphasis removed).

[185] "Correction: FDA Warning Letter Received," *Oppenheimer & Co*, June 1, 2023, at 1 (emphasis removed).

[186] "Additional Regulatory Risk Is Never Good, but Ship Hold Fears Are Likely Overblown," *J.P. Morgan*, June 2, 2023, at 1 (emphasis added).

[187] "Warning letter sheds light on FDA issues; Zio AT (~11% of sales) may need a new 510(k) clearance," *Canaccord Genuity*, June 6, 2023, at 1 (emphasis added).

[188] "Thoughts After Talking to Management on Published Warning Letter," *William Blair*, June 6, 2023, at 1.

Truist Securities (June 6, 2023): "The Warning Letter (WL) related to IRTC's Zio AT system … was published to the FDA website today. WL language always tends to read in a concerning fashion, and **we do think investors have become increasingly skeptical about what underlaid mgmt. confidence in reiterating full-year guidance** (when it disclosed the receipt of the WL last week)."[189]

Oppenheimer & Co (June 7, 2023, price target reduced from $166 to $125): "**Misbranding: This is perhaps the biggest surprise. In essence, the FDA is saying that the original Zio-AT clearances … were not really for "real-time monitoring" in critical care patients …**"[190]

"Our new $125 PT (was $166) is based on 8.4x our **revised FY24 estimate of $450M** (was 9.1x our FY24 revenue estimate of $550M)."[191]

… "Our View: 1) Reasonable to expect a Zio-AT recall, ~10% of revenues at risk. 2) Throttling of events (transmission limits) do not satisfy the spirit of real-time monitoring, hence sending multiple patches in same config questionable strategy; 3) Redesign likely with at least one new 510(k) which can take 12–24 months. 4) Medicare billing using CPT 93229 could open up a Pandora's box."[192]

BTIG (June 8, 2023, price target reduced from $165 to $140): "**We View FDA Warning Letter As a Potential Risk to Near-term Zio AT Growth Trajectory; Reducing PT from $165 to $140** … **Shares of IRTC have fallen** ~15% since the company disclosed the warning letter after market close on May 30 and ~25% since the Q1 earnings call on May 4; shares now trade at 6x NTM sales."[193]

Wolfe Research (June 20, 2023): "Recently we tried on the 'bull hat' for the first time in a while on this stock. [] the stock gave up like 20 points over the course of 10 days on **what screened initially as a 'potentially fixable, likely transitory item'** … **[W]e read the FDA warning letter, which posted publicly 7 days after the company's 8-K. Then, our enthusiasm for urgent buying of the dip waned**… **Warning letter-induced dip in stock** also catalyzed reflection on broader backdrop here, further limiting conviction. *i.e.*, (1) effective June 11

---

[189] "Warning Letter Published, We Think Stock Largely Pricing in a Worst Case," *Truist Securities*, June 6, 2023, at 1 (emphasis removed).

[190] "Warning Letter More Worrisome than Expected," *Oppenheimer & Co*, June 7, 2023, at 1 (emphasis added).

[191] *Id.* at 2 (emphasis added).

[192] *Id* (emphasis removed).

[193] "We View FDA Warning Letter As a Potential Risk to Near-term Zio AT Growth Trajectory; Reducing PT from $165 to $140," *BTIG*, June 8, 2023, at 1 (emphasis added).

the new Novitas LCD plays and (2) company received subpoena from Department of Justice on April 4. Plenty of folks waived us away on #1 – fine. But since we are writing on yet another IRTC snafu…worth a reminder since the potential 'risk' from this sits in front. And on #2 – **yet unclear if that DoJ inquiry relates to this Zio AT matter or something else** … if FDA doesn't think Zio AT consistently/reliably provides mobile cardiac telemetry (MCT) services…might payers think similar? *i.e.,* is there risk of claw back and/or financial/legal remedy? And then prospectively similar question – let's say Zio AT stays on market until Zio MCT gets going 2H24+ but company now less comfortable billing for MCT services opting instead for say event monitoring? Might also mean lower numbers/estimate revisions."[194]

77.    Finally, on July 1, 2024, the DOJ filed court documents revealing that it was seeking to enforce a subpoena against iRhythm, as the Company had refused to provide certain documents. The court filing further revealed that the previously disclosed DOJ inquiry related to the Zio AT "failing to timely transmit patient cardiac data."[195],[196] This disclosure allegedly represented a continuation of the information previously disclosed on May 4, 2023, revealing publicly for the first time that the DOJ subpoena seeking communications and documents related to issues with the Zio AT, including the product's ability to "timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event."

78.    Analysts recognized that the DOJ inquiry could impact the Company over several quarters:

---

[194] "IRTC: Our Letter to File Away on this Zio AT Warning Letter Snafu," *Wolfe Research*, June 20, 2023, at 1 (emphasis added).

[195] Complaint ¶¶ 18, 141-145.

[196] While analysts had originally questioned whether the DOJ subpoena disclosed by the Company in April 2023 pertained to an industry-wide inquiry, Boston Scientific, the other firm that received a subpoena, did not have a suit filed against the company, in contrast to iRhythm. *See e.g.,* "We Expected Great Results and Conservative Guide; Impact of DoJ Subpoena in AECG Harder to Predict But We Are Not Panicking; Trimming Multiple, PT from $170 to $165," BTIG, May 4, 2023 at 1 : "A similar subpoena was also disclosed by Boston Scientific (BSX, Buy, $55 PT) related to its ambulatory ECG (AECG) monitoring business. We view it as a positive that this *seems to be related to the industry and is not IRTC-specific*."

William Blair (August 2, 2024): "The ongoing DOJ inquiry, Zio AT warning letter, and Form 483 from the FDA could take several quarters to resolve and delay next-gen product launches."[197]

79.    In summary, following the alleged corrective disclosure events, analysts referenced and relied upon on the relevant truth related to the Transmission Claims, and correspondingly lowered price targets for iRhythm Common Stock. This further demonstrates the price impact of the Transmission Claims, and supports the economic connection between the Transmission Claims and the alleged subsequent revelations of the relevant truth.

### ii.    Analyst Commentary on Accuracy Claims

80.    Plaintiff alleges that the relevant truth behind the Accuracy Claims also came to light over a series of corrective disclosures, described below. Analyst commentary following the alleged corrective disclosures supports the economic connection between the Accuracy Claims and the alleged corrective disclosures, and provides further support of the price impact resulting from the Accuracy Claims. Moreover, contrary to Dr. Skinner's claims about the timing of the FDA investigations pertaining to the Accuracy Claims,[198] Plaintiff alleges that the ***relevant truth*** relating to these misrepresentations could have been disclosed by the start of the Class Period in July 2022, and that these corrective disclosures provided this relevant truth.[199]

81.    Plaintiff alleges that on August 1, 2024, in announcing results for the second quarter of 2024, iRhythm disclosed that it had been issued additional Form 483s by the FDA concerning inspections.[200] The Form 483 observations "generally centered on complaint handling and medical device reporting, risk analysis regarding the involvement of the technicians to prepare the Zio ECG reports, the corrective and preventive action process, process controls and statistical

---

[197] "Record Registrations Lead to Increased Guide Ahead of Several Catalysts Heading Into 2025," *William Blair*, August 2, 2024 at 3.
[198] Skinner Report fn.351.
[199] Complaint ¶ 9.
[200] Complaint ¶¶ 146.

48

techniques."[201] On the same day, the Company announced that Defendant Bobzien had resigned as CFO.[202] While Defendants attempted to downplay the revelation of the Form 483, stating that the inspection did not reveal anything "specific to safety or efficacy of the product whatsoever," the disclosure specifically implicated the "involvement of the technicians" who were central to the Company's claims of high diagnostic accuracy.[203]

82.     Despite Defendants' assurances and a quarterly earnings report that exceeded sales expectations, analysts were surprised by the revelation of additional Form 483s and immediately connected the regulatory observations to the core accuracy and safety of the device. Analysts commented on the risks associated with the Zio System's reporting process. Specifically, analysts interpreted the FDA's observations regarding "technician involvement" and "complaint handling" as indicative of potential diagnostic failures:

> J.P. Morgan (August 1, 2024, price target reduced from $133 to $100): "However, we still expect the stock to trade off tomorrow as **investor concerns are likely to fall more on (1) the newly announced 483s for the company's Cypress and San Francisco facilities** that we walk through more below, (2) the scheduled hearing for the DOJ lawsuit set to begin on October 10th, and (3) the announcement that CFO Brice Bobzien would be stepping down.
>
> … **Although the report should ultimately be viewed as a tool the physician is using to diagnose patients (ie. AI), we think this type of occurrence should be recognized as a safety concern given the chance for misdiagnosis**."[204]
>
> Truist (August 1, 2024 price target reduced from $134 to $117): "Some new form 483s announced … **one of the issues is around how CCTs process Zio data and if/how regulators should interpret issues such as when the CCT's analysis differs from the physician** -- rather than related to device specific issues. Nevertheless, this latest salvo from FDA creates another distraction."[205]

---

[201] Complaint ¶¶ 146.
[202] Complaint ¶¶ 147.
[203] Complaint ¶¶ 146,149.
[204] "Another Dose of Regulatory Risk Overshadows a Strong 2Q24," *J.P. Morgan*, August 1, 2024, at 1 (emphasis added).
[205] "CFO Change & New Form 483s Add Noise To an Otherwise Solid 2Q Beat; Key 510K/MCT Timelines On Track," *Truist*, August 1, 2024, at 1 (emphasis added).

49

Canaccord Genuity (August 1, 2024): "While Q2 demonstrated that IRTC is performing very well operationally, **there is uncertainty due to regulatory and legal overhangs** - the two pending 510(k) submissions to clear past issues**, a new 483 letter post a recent site visit**, and a document request dispute attached to the DOJ inquiry… While we are encouraged by the operational success on both the top and bottom lines, **we do believe activity on the regulatory and legal front and executive transition could hold the stock back in the near-term given the uncertainty created**."[206]

"…483 issues after most recent site visit adds uncertainty: The FDA was on site at IRTC's San Francisco and Orange County facilities in July for inspections. These inspections finished yesterday, and several 483 observations were presented post inspection**. These observations questioned quality system and regulatory compliance, medical device reporting, and risk analysis regarding the company's certified cardiac technicians (CCTs) – CCTs prepare the ECG reports**. … As a result, we believe there is a risk this will not be resolved quickly and could result in another warning letter."[207]

Wells Fargo (August 2, 2024 price target reduced from $135 to $110): "Today (8/1), IRTC reported a Q2 beat and a guidance raise by the amount of the beat. IRTC also disclosed new 483 observations during FDA's recent facility inspection. Due to the recency of this, mgmt did not provide an outlook for remediation."[208]

83.     Finally, on August 9, 2024, an article was published in the *Capitol Forum*, which revealed further details regarding the Accuracy Claims that were the subject of the Form 483s disclosed on August 1, 2024.[209] While iRhythm's initial disclosure on August 1, 2024 had downplayed the findings as not "specific to safety or efficacy of the product whatsoever," the *Capitol Forum* revealed that the FDA had identified over 4,000 complaints since May 2022 related to technicians misreading arrhythmia data and providing misclassified information to doctors for diagnosis.[210]

---

[206] "Financials solid; FDA and DOJ wrinkles create a bit of uncertainty; maintain BUY and $122 PT," *Canaccord Genuity*, August 1, 2024, at 1 (emphasis added).
[207] *Id* at 1-2 (emphasis added).
[208] "Q2 Beat & Raise; New 483 Observations Increase Uncertainty," *Wells Fargo*, August 2, 2024, at 1.
[209] Complaint ¶ 22, 72, 80-82, 152.
[210] Complaint ¶ 117.

84.     The article further stated that the Company allegedly directed and trained its CCTs to provide inaccurate reports to ensure the final report matched the data transmitted during the wear period.[211] Plaintiff alleges that according to former employees interviewed for the report, if a technician discovered a life-threatening arrhythmia during the final analysis that had been missed during the initial "near real-time" wear period, they were instructed not to mention it in the final report to avoid alerting doctors to the device's prior failure.[212]

85.     Following the *Capitol Forum's* revelations, market analysts noted the FDA's concerns and how they related to the Accuracy Claims:

> Wells Fargo (August 15, 2024): "**While IRTC made the case that CCT's are separate from its Zio product, our consultant and we believe that they are an integral part of IRTCs product/service**. Our expert believes remediation will require IRTC to revamp training and risk controls for its CCT's … Our expert believes **there is risk that IRTC receives another warning letter for these observations**. In part, this will depend on IRTC's remediation efforts and if the recent inspection is classified as "Official Action Indicated (OAI)", which still has not been posted to the FDA website … Before 2022, all inspections were classified with the less stringent "No Action Indicated (NAI)" and one was "Voluntary Action Indicated (VAI)". We are uncertain what has changed in IRTC's products or processes, or at the FDA, that led to the OAI but **we believe this is something IRTC should address for investors**."[213]

86.     In summary, following the alleged corrective disclosure events, analysts referenced and relied upon the relevant truth related to the Accuracy Claims, and correspondingly lowered price targets for iRhythm Common Stock. This further demonstrates the price impact of the Accuracy Claims, and supports the economic connection between the Accuracy Claims and the alleged subsequent revelations of the relevant truth.

---

[211] Complaint ¶ 170.

[212] *Id* ¶¶ 82, 121, 170.

[213] "Takeaways from FDA Consultant's Review of the New 483 Observations," *Wells Fargo*, August 15, 2024 at 1 (emphasis added).

**F. Statistical Evidence of Price Impact Following the Alleged Revelations of the Relevant Truth**

87.    My event study analysis reveals that the price of iRhythm Common Stock declined by a statistically significant amount following the alleged corrective disclosures for both the Transmission Claims and the Accuracy Claims.[214] The price declines in iRhythm Common Stock following the alleged revelations of the relevant truth relating to both the Transmission Claims and the Accuracy Claims are jointly statistically significant at better than the 99% level.

88.    **Exhibit 1** documents the abnormal stock price declines observed on the dates following the alleged corrective disclosures related to the Transmission Claims (collectively November 1, 2022, November 4, 2022, May 4, 2023, May 30, 2023, and July 1, 2024). If instead of being spread across multiple, separate disclosures, the same relevant truth had been disclosed in a single corrective disclosure, my event study analysis indicates that this would represent a combined price impact of -42.52% after controlling for market and industry effects. This decline is statistically significant at better than the 99% level. Thus, my event study analysis provides reliable economic evidence of a strong market reaction to the alleged revelation of the relevant truth relating to the Transmission Claims. My event study thus provides statistical evidence of back-end price impact of the Transmission Claims.

89.    **Exhibit 2** documents the abnormal stock declines observed on the dates following the alleged corrective disclosures related to the Accuracy Claims (collectively August 1, 2024, and August 9, 2024). If instead of being spread across multiple, separate disclosures, the same relevant truth had been disclosed in a single corrective disclosure, my event study analysis indicates that this would represent a combined price impact of -20.04% after controlling for market and industry effects. This decline is statistically significant at better than the 99% level. Thus, my event study

---

[214] My analysis in this section relies on the output of the event study in my Opening Report, which Dr. Skinner does not contest and relies on in his analysis.

analysis provides reliable economic evidence of a strong market reaction to the alleged revelation of the relevant truth relating to the Accuracy Claims. My event study thus provides statistical evidence of back-end price impact of the Accuracy Claims.

90.    While Dr. Skinner does not dispute the validity of my event study methodology, he repeatedly asserts that if iRhythm Common Stock traded in an efficient market, as he assumes, then the information in the alleged corrective disclosures would have been "fully reflected" by the market close on the next business day.[215] Dr. Skinner's opinions on such a narrow price impact event window are flawed. Dr. Skinner fails to appreciate that information may be released over varying time periods, in varying degrees, and/or be incorporated into stock prices over differing intervals. For example, in one case an earnings announcement issued before market hours may be fully impounded into the stock price by the close of trading on that day. Yet in another instance, an announcement may take multiple days to be fully reflected in stock prices.

91.    Academic research commonly uses multi-day windows to measure stock price reactions via estimation of abnormal returns in event studies. For example, multi-day event windows (and not only single-day windows) are common in peer-reviewed academic research, including my own, where I have estimated abnormal returns over both three- and five-day windows.[216] Research has also shown that managers engage in strategic disclosures (or leakage) of negative news in order to minimize, delay, or spread out the stock price impacts from negative disclosures.[217] Similarly, a publication on event study methodology by MacKinlay – relied upon in both my Opening Report and the Skinner Report – explains the use of both single-day and multi-

---

[215] *See e.g.* Skinner Report ¶¶ 13, 83, 86, 89, 101, 122, 129, 137.

[216] *See, e.g.*, Kothari, S.P., Susan Shu, and Peter D. Wysocki, 2009, "Do Managers Withhold Bad News?," *Journal of Accounting Research* 47 (relying on a five-day event window); Cain, Matthew D. and David J. Denis, 2013, "Information Production by Investment Banks: Evidence from Fairness Opinions," *Journal of Law and Economics* 56.

[217] *See, e.g.*, Kothari, S.P., Susan Shu, and Peter D. Wysocki, 2009, "Do Managers Withhold Bad News?," *Journal of Accounting Research* 47.

day event windows for measuring abnormal returns over multi-day windows.[218] Finally, I note that Dr. Skinner has also used multi-day event windows in his own peer-reviewed research.[219]

92.     As noted in **Section V.E.i**, the relevant information from the November 1, 2022 and the May 30, 2023 corrective disclosures regarding the Transmission Claims was reported over several days subsequent to the initial disclosure date. Moreover, the Complaint's allegations of multi-day price impacts following the November 1, 2022 alleged corrective disclosure and the May 30, 2023 alleged corrective disclosure are consistent with contemporaneous analyst commentary. For example, the series of disclosures following the initial May 30, 2023 FDA Warning Letter indicate that analysts updated their assessments following these incremental disclosures.[220] In the case of the November 1, 2022 alleged corrective disclosure, one analyst indicated that "there's a lot to digest" in the announcement, which is consistent with the observed multi-day price reaction.[221] This evidence is consistent with academic literature, which documents that more complex information can take longer to be fully digested by analysts and investors and be fully reflected in stock prices.[222]

---

[218] *See* Skinner fn 333, *and* Opening Report fn 65, Craig A. MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at p. 15 ("In practice, the period of interest is often expanded to multiple days, including at least the day of the announcement and the day after the announcement."); at p. 21 ("The concept of a cumulative abnormal return is necessary to accommodate a multiple period event window."); at p. 30 ("This case corresponds roughly to either a multi-day event window or to a one-day event window with the event leading to increased variance which is accommodated as part of the null hypothesis.").

[219] *See e.g.,* Douglas J. Skinner, 1994, "Why Firms Voluntarily Disclose Bad News," *Journal of Accounting Research* 32, at p. 56 using a multi day event window, *and* Douglas J. Skinner, 1997, "Earnings Disclosures and Stockholder Lawsuits," *Journal of Accounting and Economics* 23 at 264 "Stock price response is the raw stock return computed over the **three trading days** centered on the date of the first earnings disclosure for the quarter."

[220] *See e.g.,* "Correction: FDA Warning Letter Received," *Oppenheimer & Co*, June 1, 2023, *and see* "Warning Letter More Worrisome than Expected," *Oppenheimer & Co*, June 7, 2023.

[221] *See e.g.,* "Better than Expected Final PFS and Healthy Underlying Trends Outweigh Near-Term Challenges; Reiterate OW," *J.P. Morgan*, November 1, 2022.

[222] *See*, *e.g*., Feng Gu and Weimin Wang, 2005, "Intangible Assets, Information Complexity, and Analysts' Earnings Forecasts," *Journal of Business Finance & Accounting* 32.

93.     In summary, my event study analysis demonstrates back-end price impact of the Transmission Claims and the Accuracy Claims, which resulted in corrective disclosures that caused declines in iRhythm's Common Stock price, with joint levels of statistical significance at better than the 99% level.

V.      **The Out-of-Pocket Damages Methodology is Widely Accepted by Courts at the Class Certification Stage and I will Address Dr. Skinner's Concerns About Specific Levels of Artificial Inflation at the Loss Causation and Damages Stage**

94.     Dr. Skinner does not challenge my Opening Report opinion that the out-of-pocket method of calculating damages represents a standard and well-accepted methodology under §§ 10(b) and 20(a) of the Exchange Act. As I explain in my Opening Report, the out-of-pocket method calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale.[223]

95.     Rather than taking issue with the out-of-pocket methodology, Dr. Skinner expresses concerns that I have not provided the specific approach that I will use to calculate the artificial inflation per share, which is an input to this formula. Specifically, Dr. Skinner criticizes the damages methodology described in my Opening Report by claiming that I have not adequately explained how I would appropriately account for potential changes throughout the Class Period in overall macroeconomic conditions and in iRhythm's business conditions.[224] As I explain below, such concerns relate to the specific calculation of artificial inflation which occur at the loss causation and damages stage.

96.     It is important to draw a distinction between two concepts that are part of a damages methodology: the damages formula itself and the inputs to the damages formula. In my Opening Report, I presented the standard well-accepted damages formula. Further, I make clear in my

---

[223] Opening Report, **Section VI.A**.
[224] Skinner Report ¶¶ 25, 27, 212-217.

Opening Report that quantifying artificial inflation per share for each day in the Class Period and the dissipation of artificial inflation through corrective disclosures – the inputs to the damages formula – are questions separate and apart from whether there is a common, class-wide method for computing damages. As discussed in my Opening Report, there are a number of valuation techniques that can be employed to conduct such an evaluation of inputs.[225] All of these calculations are applied in the same manner across Class members.

97.    Moreover, the assertions made by Defendants' Opp. Brief and Dr. Skinner regarding the need for an artificial inflation estimate that controls for changes in the number of complaints iRhythm received, the Company's ability to disclose inspections, or other changes in the environment over time relate to whether case-specific adjustments may ultimately be needed at the loss causation and damages stage and not at the class certification stage of litigation. Dr. Skinner fails to provide any foundation for his assertion that such a methodology must be specified at an earlier stage of litigation, and he does not suggest that my methodology could not be applied consistently to all Class members. His concerns relate to issues that are routinely addressed in the loss causation and damages stage of a case – including whether a jury or trier of fact determines that artificial inflation was caused by Defendants' misconduct, and if so, calculating the amount of artificial inflation the misconduct caused in iRhythm Common Stock throughout the Class Period.

98.    Further, Dr. Skinner's assertion that an increasing number of complaints about the Zio AT during the Class Period would somehow alter the amount of inflation in the price of iRhythm Common Stock is unsupported. When a product is defective, complaints could be expected to increase over time, as more customers used the product, experienced the defects, and reported on these issues by submitting complaints. Even if in some other circumstance such a

---

[225] Opening Report, **Section VI.A**.

pattern indicated a changing amount of artificial inflation over time, such changes in inflation would apply equally across Class members and would be calculated formulaically as the input to the out-of-pocket methodology.

99.      In addition, Dr. Skinner's assertion that the Company could not have disclosed the results of the 2024 FDA inspection related to the Accuracy Claims or the DOJ subpoena related to the Transmission Claims prior to the investigation or the issuance of the subpoena lacks foundation.[226] In essence, Dr. Skinner requires a corrective disclosure be a mirror image of alleged misrepresentations. In this case, the alleged FDA and DOJ concerns related directly to the Transmission Claims and the Accuracy Claims. Plaintiff alleges the Company could have disclosed the ***relevant truth*** relating to these misrepresentations by the start of the Class Period in July 2022, and that these corrective disclosures provided this relevant truth.[227]

100.      Furthermore, addressing potential confounding information is a loss causation issue that is standard practice in economic analysis. As explained in my Opening Report there are many potential ways to disaggregate such confounding information – one can utilize a variety of well-accepted valuation techniques including, but not limited to, event studies, valuation analysis, published academic research studies, analyst research, or other case-specific documents. This is an issue of fact that would need to be considered as part of any loss causation analysis. However, Dr. Skinner, without support, is suggesting that such an analysis needs to be designed and/or explained without regard to what evidence may become available in discovery. If such a disaggregation analysis becomes necessary, the standard out-of-pocket damages model can readily incorporate such issues, and such analysis would be conducted on a class-wide basis.[228]

101.      As a purely hypothetical example, suppose a fact-finder determines at the loss

---

[226] Skinner Report ¶¶ 204-211.
[227] Complaint ¶ 9.
[228] *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011) (holding that securities fraud plaintiffs need not prove loss causation in order to obtain class certification).

causation and damages stage that the price of iRhythm Common Stock declined by $5.00 per share, after controlling for market and industry effects, on an alleged corrective disclosure date. Further assume that a loss causation analysis determines that 20% of that price decline was due to confounding factors and therefore needs to be disaggregated from the total abnormal price decline. Thus, $4.00 of the abnormal price decline (80% of $5.00) could be attributed to the alleged corrective information on that date and thus one could reasonably conclude that $4.00 of artificial inflation dissipated from the price of iRhythm Common Stock on that date. Whether a disaggregation analysis at the loss causation stage determines that 0%, 20%, or some other percentage of a price decline is due to confounding factors, the resulting artificial inflation can easily be updated and incorporated into the out-of-pocket methodology.

102.    Dr. Skinner observes that analyst commentary mentioned other confounding factors that may have affected iRhythm's financial performance around the Q3 2022 disclosures, such as staffing challenges and macroeconomic factors.[229] To the extent that any such changes ultimately require disaggregation, I will appropriately conduct such analysis during the loss causation and damages stage of a case in a manner that is common across all Class members. I also note that, as explained in my Opening Report, event studies reasonably control for changes in market-wide factors through the Market Index and industry-wide factors through the Industry Index.[230] Thus, Dr. Skinner's concerns are unfounded.

103.    Furthermore, Defendants' Opp. Brief mischaracterizes my Opening Report by claiming that I "concede[] that time-varying inflation is a problem [my] proposed methodology cannot solve."[231] This is false. In my Opening Report I explain that:

> "It may be necessary to adjust the "inflation ribbon" representing the inflation measure during the Class Period to account for the evolution of inflation during

---

[229] Skinner Report fn. 150, 337.
[230] Opening Report ¶¶ 67-72.
[231] Defendants' Opp. Brief, at p 23.

the Class Period (e.g., the evolving economic materiality, or timing, of alleged misrepresentations or omissions) or to account for any portion of the price decline on an alleged corrective disclosure date that is not attributable to the alleged fraud (disaggregation of confounding information). These inputs (i.e., the inflation ribbon) into the damages formula will be common to all class members and applied class-wide. Thus, the "out-of-pocket" method does not involve any individualized issues. No matter how the inflation ribbon is constructed, the techniques used to estimate the true price (and thus calculate artificial inflation) will be common to all putative class members and will be applied on a class-wide basis."[232]

104.    As I explain in my Opening Report, the out-of-pocket damages methodology is "flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period…including, but not limited to any: (1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) the first actionable fraudulent conduct or misstatement."[233] As a result, Defendants' Opp. Brief and Dr. Skinner's concerns about this methodology are unfounded and unpersuasive.

## VI.    Conclusion

105.    In summary, Dr. Skinner's opinions and Defendants' Opp. Brief's critiques of my Opening Report are flawed and unpersuasive. In this report I document reliable economic evidence consistent with price impact for both the Transmission Claims and the Accuracy Claims. I further illustrate that there is no mismatch between the alleged misrepresentations put forward by Plaintiff and the subsequent revelations of the relevant truth provided by the alleged corrective disclosures.

106.    I have also provided a reasonable and concrete damages methodology, and I have also explained how the out-of-pocket damages methodology is widely employed in cases like this one precisely because it is capable of reliably calculating damages on a class-wide basis in a manner consistent with Plaintiff's theory of liability. The out-of-pocket damages methodology is

---

[232] Opening Report ¶ 105.
[233] Opening Report ¶ 107.

flexible enough to consider and incorporate the concerns raised by Dr. Skinner and in Defendants' Opp. Brief.

I declare under the penalty of perjury that the foregoing is true and correct.

_____

Matthew D. Cain

**Appendix A**

# Matthew D. Cain, Ph.D.                                February 2026

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

## Education

Ph.D., Finance, August 2007                Purdue University, West Lafayette, IN
B.S., Finance, May 2001                     Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

What is Price Impact? How the *Goldman* Decisions are Reshaping Shareholder Class Actions (with Per Axelson), *Berkeley Business Law Journal* 22:2, 441-465 (2025).

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

A-1

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway

- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

A-3

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31: Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2026

    LAW 251.52: Economics of Corporate and Securities Litigation, Fall: 2020-2023


University of Notre Dame, Mendoza College of Business

    FIN 70400: Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410: Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *City of Fort Lauderdale General Employees' Retirement System, et al. v. Holley Inc., et al.*, Case No. 1:23-cv-00148-GNS (W.D. Ky.). Report January 2026.

- *Securities and Exchange Commission v. Anthem Hayek Blanchard and Anthem Holdings Company*, Case No. 2:24-cv-02437-KHV-GEB (D. Kan.). Report January 2026.

- *In re SVB Financial Group Securities Litigation*, Case No. 3:23-cv-01097-NW (N.D. Ca.). Report January 2026.

- *In re Seagate Technology Holdings plc Securities Litigation*, Case No. 3:23-cv-03431-RFL (N.D. Ca.). Report December 2025. Deposition January 2026.

- *United States of America v. Andrew Left*, CR No. 2:24-cr-00456-TJH (C.D. Ca.). Declaration December 2025.

- *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund, et al. v. iRhythm Technologies, Inc., et al.*, Case No. 3:24-cv-706 (N.D. Ca.). Report November 2025. Deposition December 2025.

- *In re Virtu Financial, Inc. Securities Litigation*, Case No. 1:23-cv-03770 (E.D. N.Y.). Report October 2025. Deposition December 2025.

- *In re SolarEdge Technologies, Inc. Securities Litigation*, Case No. 1:23-cv-09748 (S.D. N.Y.). Report October 2025. Deposition January 2026.

- *Joe Fasano, et al. v. Dangdang Holding Company, Ltd., et al.*, Case No. 01-22-0003-8285 (AAA). Report September 2025. Rebuttal Report October 2025.

- *KAYNE MICHAEL MIDDLETON v. TELUS INTERNATIONAL (CDA) INC., et al.*, Case No. S-248620 (Supreme Court of British Columbia, Vancouver Registry). Report August 2025.

- *In re Doximity, Inc., Securities Litigation*, Case No. 5:24-cv-02281 (N.D. Ca.). Report August 2025. Rebuttal Report October 2025. Deposition November 2025.

- *In re The Estee Lauder Co., Inc. Securities Litigation*, Case No. 1:23-cv-10669 (S.D. N.Y.). Report July 2025. Deposition December 2025.

- *Genesee County Employees' Retirement System, et al., v. DocGo Inc., et al.*, Case No. 1:23-cv-09476 (S.D. N.Y.). Report July 2025.

- *YVONNE DOLBEC c. BANK OF MONTREAL, et al.*, Case No. 500-06-001335-245 (Province of Quebec, District of Montreal). Report May 2025.

- *In re National Instruments Corporation Securities Litigation*, Case No. 1:23-cv-10488 (S.D. N.Y.). Report May 2025. Deposition June 2025. Report July 2025. Rebuttal Report November 2025. Deposition November 2025.

- *MOUVEMENT D'ÉDUCATION ET DE DÉFENSE DES ACTIONNAIRES c. CAE INC., MARC PARENT, and SONYA BRANCO*, Case No. 500-06-001312-244, (Province of Quebec, District of Montreal). Report April 2025.

- *In re StoneCo Ltd. Securities Litigation*, Case No. 1:21-cv-09620 (S.D. N.Y.). Report April 2025. Declaration November 2025.

- *In re UiPath, Inc. Securities Litigation*, Case No. 1:23-cv-07908 (S.D. N.Y.). Report February 2025.

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024. Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv-06339 (S.D. N.Y.). Report November 2024. Rebuttal Report February 2025. Report September 2025. Deposition October 2025.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024. Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024. Declaration November 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024. Rebuttal Report October 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024. Rebuttal Report October 2024.

A-5

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024. Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al*., Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024. Report February 2025. Rebuttal Report August 2025. Deposition August 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024. Declaration January 2026.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023. Report December 2024. Deposition March 2025.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024. Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al*., Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

A-6

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

A-7

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Appendix B**

## Documents Considered

**Case Documents:**

Second Amended Class Action Complaint for Violation of Federal Securities Laws, dated October 11, 2024, Case No. 3:24-cv-706-JSC (Doc. 43).

Order Re: Defendants' Motion to Dismiss, dated June 3, 2025, Case No. 3:24-cv-706- JSC (Doc. 77).

Expert Report of Matthew D. Cain, Ph.D., dated November 3, 2025.

Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, dated January 5, 2026, Case No. 3:24-cv-706-JSC (Doc. 120)

Expert Report of Professor Douglas Skinner, Ph.D., dated January 5, 2026.

**Academic Articles:**

Cain, Matthew D. and David J. Denis, 2013, Information Production by Investment Banks: Evidence from Fairness Opinions, *Journal of Law and Economics* 56.

Craig A. MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35.

Damodaran, Aswath, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset (John Wiley & Sons, 1996).

Gu, Feng and Weimin Wang, 2005, Intangible Assets, Information Complexity, and Analysts' Earnings Forecasts, *Journal of Business Finance & Accounting* 32.

Kothari, S.P., Susan Shu, and Peter D. Wysocki, 2009, Do Managers Withhold Bad News?, *Journal of Accounting Research* 47.

Skinner, Douglas J., 1994, Why Firms Voluntarily Disclose Bad News, *Journal of Accounting Research* 32.

Skinner, Douglas J., 1997, Earnings Disclosures and Stockholder Lawsuits, *Journal of Accounting and Economics* 23

Tabak, David I., and Frederick C. Dunbar, 2001, Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert 3rd ed., Ch. 19.

**Analyst Reports:**

"Q2 Strong And Likely In-Line With Buy-Side Expectations; Underlying Business Remains Sound," *BTIG*, August 2, 2017.

Strong Beat and Raise with Room for More," *J.P. Morgan*, August 2, 2017.

"Zio-rrific– upside revenue & GM trends continue (with more to come); target to $49 – BUY," *Canaccord Genuity*, August 3, 2017.

"Not Missing a Beat; Reiterate Overweight," *Morgan Stanley*, August 3, 2017.

"Notes from the road – competitive moat is huge, TAMs even bigger; take estimates & target up, reiterate BU," *Canaccord Genuity*, September 21, 2017.

"The rhythm shall continue; BUY, target to $59 from $55," *Canaccord Genuity*, November 1, 2017.

"Momentum Drives Another Beat and Raise," *J.P. Morgan*, November 2, 2017.

"Visibility on TAM Expansion Improving; Raising PT to $65," *Morgan Stanley*, November 2, 2017, at 2.

""Blame it on Zio"; IRTC Disrupting Conventional Cardiac Arrhythmia Detection, Initiating with Neutral," *Dougherty & Company*, December 1, 2017.

"Initiating Coverage with an Outperform rating," *RBC Capital Markets*, December 4, 2017.

"IRTC Raises Revenue Guidance on Higher Zio Adoption, Growth Prospects; Reiterate Neutral on Valuation," *Dougherty & Company*, May 3, 2018.

"And The Beat Goes On – Q2 Again Delivers; Maintain Buy," *BTIG*, July 31, 2019.

"Penetration Continues into AMA Panel," *Morgan Stanley*, August 1, 2019.

"Verily and Cash...What do they Mean?," *Morgan Stanley*, September 6, 2019.

"Several reasons to add to positions; stellar Q3 print – BUY, target to $107," *Canaccord Genuity*, November 6, 2019

"ZIO Traction Continues into February RVU Update," *Morgan Stanley*, November 6, 2019

"Initiate Buy, $102 PT; We Don't Think They'll Skip a Beat," *SunTrust Robinson Humphrey*, January 7, 2020.

More Than a Patch: Market-Disrupting Digital Health Platform; Initiating Coverage With Outperform Rating," *William Blair*, January 9, 2020.

"Beats the Top-Line Again; Sets Guidance Bracketing Consensus; Maintain Neutral," *Dougherty & Company*, February 28, 2020.

"Virtual Meetings With Management; Digital Platform and Pipeline Execution Can Weather the Storm and Drive Long-Term Growth," *William Blair*, June 21, 2020.

"Of Hearts and Minds: Moving Up and to the Right, Raising our Target Price in the Process to $250 from $215," *Citi Research*, August 24, 2020.

"Unlikely to Miss Many Beats but Seems Fairly Valued; Initiate at Neutral," *Baird Equity Research*, September 1, 2020.

"IRTC: Growth Trajectory and Profitability Already Priced In; Initiate at Hold," *Needham & Company*, September 11, 2020.

"Patient Volume Rebounds Plus Share Gains Lead to Solid Third-Quarter Beat; Catalysts for Growth in 2021 Plus Remain Strong," *William Blair*, November 5, 2020.

"Three-Year mSToPS Clinical Outcomes Data Encouraging," *Baird Equity Research*, November 17, 2020.

"Fireside Chat Takeaways: Zio Digital Platform Offers Durable Growth," *William Blair*, December 17, 2020.

"CMS payment challenges baked in, higher CMS payment and Verily wearable are upside; reinstating coverage with BUY, $125 PT," *Canaccord Genuity*, December 20, 2021.

"Entering 2022 With Strong Momentum and an Initial Guide We Think Can Prove Conservative," *William Blair*, February 24, 2022.

"Positive Data Readouts at ACC Support Our Bullish Thesis on Durable Near- and Long-Term Growth," *J.P. Morgan*, April 4, 2022.

"ACC 2022: Solidifying Zio's Clinical Backing and Thoughts on First Quarter," *William Blair*, April 4, 2022.

"ACC takeaways: EW CLASP TR EFS positive, IRTC compliance high in GUARD-AF, & NARI new products interesting," *Canaccord* Genuity, April 5, 2022.

"Solid Q1; higher reimbursement from NGS MAC lifts ASP more beginning 2H/22; reaffirm BUY and $185 PT," *Canaccord Genuity*, May 5, 2022.

"Highlights From the 42nd Annual Growth Stock Conference," *William Blair*, June 9, 2022.

"Management Reiterates Bullish Stance on LRP and PFS at Recent Investor Meetings," *J.P. Morgan*, September 27, 2022.

"Staffing Challenges Drive Small Sales Miss and Guide Cut; PFS Final Rule Appears to Resolve Reimbursement; Reducing PT from $175 to $168," *BTIG*, November 1, 2022.

"Better than Expected Final PFS and Healthy Underlying Trends Outweigh Near-Term Challenges; Reiterate OW," *J.P. Morgan*, November 1, 2022.

"Mixed Qtr & Lwr Guide, but +ve CMS Rate Shld Help Offset Ptn'l Headwinds Spilling into '23," *Truist Securities*, November 1, 2022.

"Tricks and Treats Tonight – Revenue Miss & Lower but Final CMS Rule Rounds Input Up…Again," *Wolfe Research*, November 1, 2022.

"Reimbursement Saga Ends with Final Rule Payment Rates Slightly Higher Than Proposal," *BTIG*, November 2, 2022.

"Q3 light and Q4 guidance not comforting – but likely just a bump in the road; maintain BUY, lower PT to $155," *Canaccord Genuity*, November 2, 2022.

E-3

"IRTC: 2H22 Issues Should Be Transitory; Underlying Momentum Remains Strong," *Needham & Company*, November 2, 2022.

"3Q Miss and 4Q Guide Down Disappoints," *Oppenheimer & Co*, November 2, 2022.

"Short-Term Shortfall Manageable While CMS Final Rule Looks Better Than Expected and Clears the Way for Adoption," *William Blair*, November 2, 2022.

"MedTech Bay Area Bus Tour Takeaways - In Our View Mtgs Incrementally +ve Across The Board For ISRG, PEN, IRTC, PRCT," *Truist Securities*, November 14, 2022.

"IRTC: Initiating Coverage at Overweight, $150 Price Target," *Wells Fargo*, February 7, 2023.

"We Expected Great Results and Conservative Guide; Impact of DoJ Subpoena in AECG Harder to Predict But We Are Not Panicking; Trimming Multiple, PT from $170 to $165," *BTIG*, May 4, 2023.

"Solid Start To '23 With Above-CNS +21% y/y Rev; Guide Raise Shld Set-Up For More Beats In Our View," *Truist Securities*, May 4, 2023.

"A 1Q Beat with Plenty Left in the Tank; DOJ Subpoena is Asymptomatic For Now, but Monitoring is Warranted," *J.P. Morgan*, May 5, 2023.

"First-Quarter Beat With Strongest Registration Growth in Nearly Two Years," *William Blair*, May 5, 2023.

"Zio AT Warning Letter an Incremental Overhang & Likely to Pressure The Stock," *Truist Securities*, May 30, 2023.

"IRTC: We See Limited Impact from Zio AT Warning Letter," *Wells Fargo*, May 30, 2023.

"Warning Letter Regrettable but Manageable With Likely Minimal Impact to Results," *William Blair*, May 31, 2023.

"Correction: FDA Warning Letter Received," *Oppenheimer & Co*, June 1, 2023.

"IRTC: Key Takeaways from the Wells Fargo 2023 MedTech West Coast Bus Tour," *Wells Fargo*, June 1, 2023.

"Additional Regulatory Risk Is Never Good, but Ship Hold Fears Are Likely Overblown," *J.P. Morgan*, June 2, 2023.

"Warning letter sheds light on FDA issues; Zio AT (~11% of sales) may need a new 510(k) clearance," *Canaccord Genuity*, June 6, 2023.

"Warning Letter Published, We Think Stock Largely Pricing in a Worst Case," *Truist Securities*, June 6, 2023.

"Thoughts After Talking to Management on Published Warning Letter," *William Blair*, June 6, 2023.

"Warning Letter More Worrisome than Expected," *Oppenheimer & Co*, June 7, 2023.

"We View FDA Warning Letter As a Potential Risk to Near-term Zio AT Growth Trajectory; Reducing PT from $165 to $140," *BTIG*, June 8, 2023.

"IRTC: Our Letter to File Away on this Zio AT Warning Letter Snafu," *Wolfe Research*, June 20, 2023.

""Getting Back into Rhythm": Initiate Outperform and $130 PT" *Baird*, July 18, 2023.

"Q1 revenue beat with opex spend higher, forward guidance unchanged; maintain BUY, PT to $122," *Canaccord Genuity*, May 2, 2024.

"Apple Watch Update Not a Thesis Changer," *William Blair*, May 6, 2024.

"We Expected Great Results and Conservative Guide; Impact of DoJ Subpoena in AECG Harder to Predict But We Are Not Panicking; Trimming Multiple, PT from $170 to $165," *BTIG*, May 29, 2024.

"Financials solid; FDA and DOJ wrinkles create a bit of uncertainty; maintain BUY and $122 PT," *Canaccord Genuity*, August 1, 2024.

"Another Dose of Regulatory Risk Overshadows a Strong 2Q24," *J.P. Morgan*, August 1, 2024.

"CFO Change & New Form 483s Add Noise To an Otherwise Solid 2Q Beat; Key 510K/MCT Timelines On Track," *Truist*, August 1.

"Q2 Beat & Raise; New 483 Observations Increase Uncertainty," *Wells Fargo*, August 2, 2024.

"Record Registrations Lead to Increased Guide Ahead of Several Catalysts Heading Into 2025," *William Blair*, August 2, 2024.

"Takeaways from FDA Consultant's Review of the New 483 Observations," *Wells Fargo*, August 15, 2024.

**Earnings Calls and Conferences.**

iRhythm Technologies, Inc. Q2 2017 Earnings Call, August 2, 2017

iRhythm Technologies, Inc. Q2 2018 Earnings Call, August 1, 2018.

iRhythm Technologies, Inc. Q4 2018 Earnings Call, February 12, 2019.

Canaccord Genuity Growth Conference, August 8, 2019.

iRhythm Technologies, Inc. 2022 Analyst & Investor Day, September 21, 2022.

iRhythm Technologies, Inc. Q4 2022 Earnings Call, February 23, 2023

iRhythm Technologies, Inc. Q1 2023 Earnings Call, May 4, 2023

iRhythm Technologies, Inc. Q2 2023 Earnings Call, August 3, 2023

iRhythm Technologies, Inc. Q1 2024 Earnings Call, May 2, 2024.

iRhythm Technologies, Inc. Q2 2024 Earnings Call, August 1, 2024.

**Websites:**

https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/irhythm-technologies-inc-643474-05252023

SEC EDGAR

**Other:**

All other data and documents cited or referred to within this report and Opening Report.

**Exhibit 1**

### Price Impact Following the Transmission Claims Corrective Disclosures

| Date | Closing Price | Return | Abnormal Return | T-Stat | P-Value | Sig. Level | Abnormal $ Change |
|---|---|---|---|---|---|---|---|
| 11/02/2022 | $121.17 | -4.42% | -0.08% | -0.03 | 0.976 | | -$0.11 |
| 11/03/2022 | $107.10 | -11.61% | -8.45% | -3.00 | 0.003 | *** | -$10.24 |
| 11/04/2022 | $102.87 | -3.95% | -4.90% | -1.74 | 0.084 | * | -$5.25 |
| 11/07/2022 | $100.44 | -2.36% | -2.72% | -1.00 | 0.320 | | -$2.79 |
| *Compound Return (11/02-11/07)* | | -15.38% | | -5.51 | < 0.001 | *** | -$18.39 |
| 5/05/2023 | $124.79 | -6.90% | -9.89% | -3.86 | < 0.001 | *** | -$13.26 |
| 5/31/2023 | $114.27 | -6.09% | -5.83% | -2.47 | 0.015 | ** | -$7.09 |
| 6/01/2023 | $110.35 | -3.43% | -5.67% | -2.40 | 0.018 | ** | -$6.48 |
| 6/02/2023 | $105.66 | -4.25% | -5.97% | -2.53 | 0.013 | ** | -$6.59 |
| 7/02/2024 | $98.61 | -7.36% | -7.34% | -2.79 | 0.006 | *** | -$7.81 |
| 7/03/2024 | $96.76 | -1.88% | -2.62% | -1.00 | 0.322 | | -$2.58 |
| *Compound Return (all dates):* | | -42.52% | | -16.32 | < 0.001 | *** | -$62.19 |

Notes: "*", "**", "***" denote statistical significance at the 90%, 95%, and 99% confidence levels, respectively.

**Exhibit 2**

### Price Impact Following the Accuracy Claims Corrective Disclosures

| Date | Closing Price | Return | Abnormal Return | T-Stat | P-Value | Sig. Level | Abnormal $ Change |
|---|---|---|---|---|---|---|---|
| 8/02/2024 | $73.88 | -12.28% | -12.47% | -4.62 | < 0.001 | *** | -$10.50 |
| 8/12/2024 | $64.64 | -8.94% | -8.64% | -3.20 | 0.002 | *** | -$6.14 |
| *Compound Return:* | | | -20.04% | -7.42 | < 0.001 | *** | -$16.64 |

Notes: "*", "**", "***" denote statistical significance at the 90%, 95%, and 99% confidence levels, respectively.