QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
Kristin Tahler (Bar No. 261908)
kristintahler@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

Christopher Porter (*pro hac vice*)
chrisporter@quinnemanuel.com
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7000

Jesse Bernstein (*pro hac vice*)
Brenna Nelinson (*pro hac vice*)
Amy Shehan (*pro hac vice*)
Emily M. Erickson (*pro hac vice*)
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
amyshehan@quinnemanuel.com
emilyerickson@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| GLAZING EMPLOYERS AND GLAZIERS' UNION LOCAL #27 PENSION AND RETIREMENT FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IRHYTHM TECHNOLOGIES, INC. and QUENTIN BLACKFORD,<br><br>Defendants. | Case No. 3:24-cv-706-JSC<br><br>**DEFENDANTS' SUR-REPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL**<br><br>Date: February 26, 2026<br>Time: 10:00 a.m.<br>Location: Courtroom 8, 19th Floor<br>Before: Hon. Jacqueline Scott Corley |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .................................................................................................................................1

I.     PRICE IMPACT BEFORE THE CLASS PERIOD IS IRRELEVANT ...............................2

II.    THE ALLEGED CORRECTIVE DISCLOSURES DID NOT PROVIDE NEW INFORMATION AND ARE MISMATCHED UNDER *GOLDMAN* ...................................4

    A.    The Alleged Corrective Disclosures Did Not Reveal New, Corrective Information .................................................................................................................4

        1.    The Transmission Limits Were Disclosed No Later Than November 1 ...............................................................................................................5

        2.    Investors' Understanding Of The Zio AT Patient Population Did Not Change ......................................................................................................7

    B.    The Alleged Misstatements Are Mismatched In Specificity From The Disclosures ............................................................................................................8

    C.    There Are Substantive Mismatches—Which Plaintiff's Reply Ignores ...................9

III.   DR. THOMAS'S OPINION SUPPORTS THE LACK OF PRICE IMPACT .....................10

CONCLUSION ............................................................................................................................10

**TABLE OF AUTHORITIES**

Page(s)

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,
    568 U.S. 455 (2013) ........................................................................................................... 3

Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc. ("Goldman II"),
    77 F.4th 74 (2d Cir. 2023) ....................................................................................... 3, 5, 7, 8, 9

In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.,
    2000 WL 876900 (E.D. Pa. 2000) ..................................................................................... 10

In re FibroGen Sec. Litig.,
    2024 WL 1064665 (N.D. Cal. 2024) ............................................................................. 1, 4, 6

Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,
    618 F.3d 1025 (9th Cir. 2010) ............................................................................................ 10

Gambrill v. CS Disco, Inc.,
    2025 WL 3771433 (W.D. Tex. 2025) .................................................................................. 8, 9

Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys. ("Goldman I"),
    594 U.S. 113 (2021) ........................................................................................................ 3, 4

Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II"),
    573 U.S. 258 (2014) ........................................................................................................ 1, 4

Holley v. Gilead Sciences, Inc.,
    2023 WL 2469632 (N.D. Cal. 2023) ................................................................................. 10

Homyk v. ChemoCentryx, Inc.,
    2025 WL 1547625 (N.D. Cal. 2025) ................................................................................. 10

Jaeger v. Zillow Group, Inc.,
    2025 WL 2741642 (9th Cir. 2025) ...................................................................................... 8

In re Kirkland Lake Gold Sec. Litig.,
    2024 WL 1342800 (S.D.N.Y. 2024) .............................................................................. 9, 10

In re Mattel, Inc. Sec. Litig.
    2021 WL 4704578 (C.D. Cal. 2021) .................................................................................... 7

Pardi v. Tricida, Inc.,
    2024 WL 4336627 (N.D. Cal. 2024) ................................................................................... 8

Pirnik v. Fiat Chrysler Autos., N.V.,
    327 F.R.D. 38 (S.D.N.Y. 2018) ........................................................................................ 2, 4

*In re Qualcomm Inc. Sec. Litig.*,
  2023 WL 2583306 (S.D. Cal. 2023) ................................................................ 3, 5, 6, 7, 8

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................................. 2, 3

*Sneed v. Talphera, Inc.*,
  147 F.4th 1123 (9th Cir. 2025) ..................................................................................... 9

*Weston Fam. P'ship v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ........................................................................................ 3

**PRELIMINARY STATEMENT**

Plaintiff's Reply In Further Support Of Its Motion For Class Certification ("Reply") is an exercise in misdirection. Plaintiff relies on contradictions that do not exist and case law and evidence that do not apply to the discrete inquiry of whether Defendants have proven a lack of price impact. Plaintiff misrepresents evidence, mischaracterizes Defendants' arguments, and treats this Court's motion to dismiss ruling as a "get out of jail free card" to evade the issues that render class certification improper here. The price impact arguments Plaintiff ignores—and therefore concedes—outline the reasons the Court should reject certification. For example, Plaintiff does not dispute that the relevant truth underlying the Timing Statements was the transmission limits, does not dispute that the transmission limits were fully disclosed no later than November 1, 2022, and, even while arguing that the CAN and CRM were not available to the public, concedes that the relevant information in those documents was provided to analysts, as shown by documents *Plaintiff* cites. The pleading stage is over. Favorable inferences based on disproven allegations cannot save Plaintiff's class certification argument. Plaintiff must "prove—not simply plead"—that it has satisfied Rule 23. *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 275 (2014). Plaintiff's Reply reveals its inability to do so.

**ARGUMENT**

Defendants can defeat back-end price impact, and therefore class certification, by showing that no putative corrective disclosure was corrective, new, or value-relevant. *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. 2024); Opp. 10-11. Defendants have shown all the alleged corrective disclosures are mismatched and thus not "corrective" because none were a "truthful, equally generic substitute" for the truth that Plaintiff alleged was concealed. Opp. 13-15, 20-22. Defendants have further shown that the alleged disclosures after November 1, 2022 were neither "new" nor "value-relevant" because iRhythm had already disclosed the alleged truth underlying the Timing and Risk Statements. *Id.* 15-20. And with respect to the Accuracy Statements, Defendants have shown that the purported corrective disclosures are not close enough in substance to the corresponding statements to support an inference of price impact. *Id.* 20-21.

Plaintiff's effort falls far short and the Motion should be denied.

## I. PRICE IMPACT BEFORE THE CLASS PERIOD IS IRRELEVANT

In a last-ditch effort to respond to Defendants' price impact arguments, Plaintiff attempts to expand the scope of its allegations to include conduct that it admits occurred *prior to* the Class Period. Defendants are aware of *no court* that has ever credited such an argument. Plaintiff's theory of falsity is narrow: the Timing and Risk Statements were purportedly false because of the transmission limits and lag time,[1] ECF No. 77 ("Order") at 16, and the Accuracy Statements were false because of CCT errors, *id.* at 20. The Court should not allow Plaintiff to expand its narrow claims *ad infinitum* by looking beyond what it actually pleaded and what the securities laws permit.

Plaintiff argues that price increases prior to the Class Period "doom[]" Defendants' position on price impact with respect to all three categories of statements. Reply 10, 20 n.15. This position is legally baseless and factually unsupported. Plaintiff relies on a single case to support this argument, *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018). But Plaintiff misrepresents *Pirnik*, which is a garden variety price maintenance case. The court there articulated the principle on which *all* price maintenance cases rest—that the lack of front-end price impact during the class period is "unexceptional." *Nowhere*, however, does the court suggest that showing price impact prior to the class period negates the need to conduct a back-end price impact analysis. *Id.*; *see also id.* at 46-47 (defendants failed to rebut back-end price impact). To be clear, Plaintiff's made-up rule that pre-class period impact is dispositive is not supported *by a single case*, and for good reason: Plaintiff has alleged a specific theory of fraud that began on August 5, 2022[2] and ended on August 9, 2024—i.e.,

---

[1] Because the purported lag time was never disclosed during the class period, Defendants have rebutted any inference of price impact based on it. Opp. 18. In any case, "lag time" presumably refers to the time it takes for transmissions to be analyzed, and no evidence suggests that the market was confused about that timing. To the contrary, Defendants have shown that the market's understanding was consistent with alleged "corrective" disclosures. *Id.* 18-20; *infra* 7-8.

[2] The Class Period cannot begin before August 5, 2022 because that is the date of the first remaining alleged misstatement, ¶ 184, and therefore the earliest date on which iRhythm's stock price could have been artificially inflated. Opp 25. Plaintiff is wrong that the website statement in ¶ 208 (dated "before the Class Period") is actionable. Reply 25. The Court held that scienter does not begin until July 25, 2022, Order at 22 n.8, and under Section 10(b), defendants are liable for misstatements made *with* scienter—not statements made *before* scienter attached. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1236 (S.D. Cal. 2010) ("[P]laintiff must establish that each defendant made the allegedly false or misleading statements with scienter."). Defendants learning some fact that

the Class Period. Purported inflation that occurred *prior to* the Class Period—as far as August 2017, see P.Ex. D ¶ 24—is, by definition, not caused by the alleged fraud. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 472 (2013) ("A security's market price cannot be affected by a misrepresentation not yet made[.]"). Price increases associated with earlier statements regarding the Zio AT, as Dr. Cain purports to show, P.Ex. D ¶¶ 24-28, are irrelevant to Plaintiff's claims.

Plaintiff nonetheless presses the idea that since the pre-Class Period statements also mention the Zio AT and its capabilities, price maintenance based on Plaintiff's specific theory should be assumed. Reply 11-12, 18. That indefensible idea underlies Dr. Cain's baffling opinion that *all* statements on the same topic have a corresponding price impact. *See, e.g.*, P.Ex. D ¶¶ 48-49. In other words, according to Dr. Cain, a price reaction associated with one statement on a given topic is evidence that different statements on the same topic had a price impact. This position is contrary to law and common sense. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.* ("*Goldman I*"), 594 U.S. 113, 122-23 (2021) ("[A] more-general statement will affect a security's price less than a more-specific statement on the same question."); *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, ("*Goldman II*"), 77 F.4th 74, 102 (2d Cir. 2023) (plaintiff cannot "(a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud, unless the front-end disclosure is sufficiently detailed in the first place"). Dr. Cain performed no analysis connecting the pre-Class Period statements in his Reply Report to the alleged misstatements that purportedly maintained the claimed corresponding inflation. Dr. Cain does not even attempt to establish that the pre-Class Period inflation was caused by statements about the Zio AT's capabilities. *See In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12 (S.D. Cal. 2023) (rejecting plaintiffs' speculation about how the market "interpreted the[] generic statements"). Nor could he: Dr. Cain points to increases in iRhythm's stock price when iRhythm *first announced* the

---

purportedly contradicts their prior statements does not transform those prior statements into fraudulent ones, even if they remain in the public domain. *See REMEC*, 702 F. Supp. at 1236. Section 10(b) does not impose a duty of continuous disclosure. *Weston Fam. P'ship v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) ("While society may have become accustomed to being instantly in the loop about the latest news . . . our securities laws do not impose a similar requirement. Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." (quotations omitted)). To hold otherwise would be a massive and unprincipled expansion of liability.

release of the Zio AT. The explanation for the increase is unremarkable—the price responded to the announcement of a new product, *see* P.Ex. D ¶ 24, and positive earnings results, *see id.* ¶¶ 25-28.

Plaintiff theorizes that fraudulent statements maintained pre-class period inflation. That means, *at most*, that front-end impact (or lack thereof) is irrelevant to Plaintiff's theory (as in *every price maintenance case*). *Pirnik*, 327 F.R.D. at 45. It does not mean that Plaintiff can demonstrate price impact for the alleged misstatements by pointing to statistically significant increases that occurred *before* the alleged fraud began. A back-end price drop caused by the correction of the alleged misstatements is the *only* potential evidence of price impact in connection with their theory of fraud. *Goldman I*, 594 U.S. at 126; *see also Pirnik*, 327 F.R.D. at 45-47. Without such a drop—which, as explained below and in the Opposition (Opp. 12-18, 19-22), did not occur—there is no price impact that can be connected to the fraudulent statements Plaintiff alleges in this litigation.

## II. THE ALLEGED CORRECTIVE DISCLOSURES DID NOT PROVIDE NEW INFORMATION AND ARE MISMATCHED UNDER *GOLDMAN*

Plaintiff argues that there is no need to consider Defendants' price impact arguments because the Court already decided that Plaintiff had adequately pled falsity, materiality, and loss causation. The error in this argument is clear. Motions for class certification occur *only* where a court finds the plaintiff has adequately pled its allegations, in every case following the denial of a motion to dismiss where one has been filed. Class certification is thus not a forgone conclusion just because a case has survived a motion to dismiss, both because its prerequisites must be "prove[n]—not simply plead[ed]," *Halliburton II*, 573 U.S. at 275, and because the price impact analysis is distinct from determinations of falsity, materiality, and loss causation. Plaintiff cannot use the Court's Order as a shield against substantively responding to the very real price impact issues raised by their theory.

### A. The Alleged Corrective Disclosures Did Not Reveal New, Corrective Information

If a disclosure does not reveal new information related to the "alleged truth" to the market, it cannot be corrective, and any associated price drop cannot support an inference of price impact. *See FibroGen*, 2024 WL 1064665, at *12. Plaintiff attempts misdirection by arguing that because the Court found that Plaintiff adequately pled loss causation, there is no need to assess whether the alleged disclosures were new at the class certification stage. *See* Reply 15. But contrary to Plaintiff's

argument, "the question here—whether there is a basis to infer that the back-end price equals front-end inflation—is a *different question than loss causation*, and, in light of *Goldman*, requires a closer fit (even if not precise) between the front- and back-end statements." *Goldman II*, 77 F.4th at 99 n.11. This red herring is all Plaintiff puts forth, and it is insufficient.

### 1. The Transmission Limits Were Disclosed No Later Than November 1

Dr. Cain does not dispute Dr. Skinner's analysis of the alleged truth underlying the Timing Statements and thus concedes that the truth underlying the alleged misstatements was revealed no later than November 1, 2022. That the transmission limits were disclosed *no later than November 1* eliminates price impact for all Timing and Risk Statements after that date because the transmission limits are the underlying truth that allegedly rendered those statements false.[3] As such, the November 1 disclosure eliminated any artificial inflation associated with the alleged concealment of the transmission limit from iRhythm's stock price. Later disclosures that repackaged the transmission limits were not corrective, even if they contained other "new" information. *Qualcomm*, 2023 WL 2583306, at *12-13 (no price impact where "[t]he alleged corrective disclosures only repeated already public information" despite new elements, including government complaints). Plaintiff *does not point to any other corrective information*, nor can it look beyond its pleadings to do so.

Plaintiff's Reply mischaracterizes the documents that purportedly show the CRM and CAN were not publicly available. Plaintiff states these documents show that iRhythm refused to provide the CAN to investors (Reply 14), but what they actually show is that iRhythm provided *all* the allegedly relevant details to investors who asked, P.Exs. U; V, and withheld the CAN only while the Company awaited final sign-off from the FDA, *see* Ex. 41. Specifically, iRhythm provided "additional detail aligned with what [it] discussed on [its] public call," including (1) the existence of

---

[3] Plaintiff cannot expand its bases for falsity beyond what was pled in its Complaint. Plaintiff pled, and the Court accepted, that the statements now styled as "Transmission Claims" were false because of the transmission limits and lag time (*supra* note 1). Order 16. A fact can be correctively disclosed *only one time*: once the market knew about the transmission limits, all associated inflation dissipated. *See Qualcomm*, 2023 WL 2583306, at *12-13. For example, Plaintiff cannot expand its theory of falsity to include the two deaths when discovery has shown that the relevant doctors were aware of the transmission limits and that they did not cause the deaths. Ex. 39 at 5-6 (iRhythm called doctor regarding transmission limits and displayed notifications repeatedly in daily reports); Ex. 40 at 1 (doctor ordered new device before transmission limits were hit and before patient died).

the transmission limits, (2) the nature of the transmission limits (that the device would stop transmitting data after 100 symptomatic and 500 asymptomatic transmissions), and (3) that the updates followed questions raised by the FDA during an inspection. P.Ex. U; *see also* P.Ex. V (similar). Other documents confirm iRhythm shared the same details repeatedly. *E.g.*, Exs. 42; 43. It is beyond dispute that these details—which were allegedly concealed by the Timing and Risk Statements and revealed by later disclosures, Order at 16—*were public no later than November 1*.

As such, Plaintiff's argument that the Warning Letter and DOJ subpoena were "new," Reply 15-18, ignores the law and economic reality. The appropriate inquiry is whether the Warning Letter revealed new *corrective* information—in other words, did the Warning Letter reveal new information that rendered the prior statements false. *FibroGen*, 2024 WL 1064665, at *12. It did not. Plaintiff's purported "mirror image" disclosure—the claim that "the Zio AT was 'misbranded' because it was 'not remotely capable of delivering near-real time monitoring for high-risk patients,'" Reply 16—was *not* new. The FDA explained that the transmission limits were the basis for this finding, P.Ex. X at 4, 6, and those limits were disclosed no later than November 1, 2022, Opp. 15-17. Plaintiff's arguments that the Warning Letter was "surprising" and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Reply 16-17) are red herrings. "Surprise" is not the standard, and ▇▇▇▇▇▇▇▇▇▇▇▇ *see* P.Ex. Y, were not corrective because they do not (and could not) underlie Plaintiff's theory of falsity, Opp. 17. What was "new" was "[t]he FDA's characterization," which "was not available to investors, nor to [the Company]" prior to the Warning Letter, "and was therefore not a 'corrective disclosure.'" *FibroGen*, 2024 WL 1064665, at *14; *see also Qualcomm*, 2023 WL 2583306, at *12-13 (investigations related to information the market was already "privy to" not corrective). What was not new was the transmission limits: Indeed, Plaintiff's investment advisor ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. 3 at 156:16-23. That is why ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* at 218:10-18, 221:8-16; *see also* Ex. 44 at 121:3-13 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

And Plaintiff *concedes* that the disclosure of the DOJ subpoena did not reveal any details at all, let alone new corrective information. Reply 15 ("Defendants provided *no detail as to the focus*

*of the subpoena* [in the May 4, 2023 disclosure]."). Indeed, on May 4, 2024, the market learned only that the DOJ had issued a subpoena; it learned ***nothing*** that could have been corrective. Plaintiff again seeks cover in the Court's motion to dismiss decision with respect to loss causation, but "the question here—whether there is a basis to infer that the back-end price equals front-end inflation—is a ***different question than loss causation***." *Goldman II*, 77 F.4th at 99 n.11. The ***only*** class certification case Plaintiff cites for its apparent position that a disclosure containing no substance can nonetheless contain new and corrective information is *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *6 (C.D. Cal. 2021), which is inapposite on its face. There, Mattel disclosed the receipt of a whistleblower letter but not its contents, which were later disclosed to reveal a "substantiated fraud"—a fact central to that court's analysis. A company affirmatively concealing a "substantiated fraud" is not comparable to iRhythm's timely disclosure of a DOJ subpoena which, to Defendants' knowledge, are never routinely publicized when received. A finding of price impact in connection with iRhythm's disclosure of the DOJ subpoena would be to hold that every time a company announces a government investigation, there is price impact, even if the underlying information is already known. The law is the opposite. *Qualcomm*, 2023 WL 2583306, at *12-13.

### 2. Investors' Understanding Of The Zio AT Patient Population Did Not Change

There is also no price impact for the Transmission Claims because those statements were consistent with the market's understanding of the Zio AT patient population. No disclosure provided new or corrective information related to those statements. Indeed, Plaintiff's theory assumes that the market interpreted iRhythm's statements to mean that the Zio AT is appropriate for critical care patients at risk of life-threatening arrhythmias, but Plaintiff does not support that interpretation with ***any document***. And it cannot, because Plaintiff's view was customized for this litigation.

To the contrary, Defendants have shown—with evidentiary support—that ***at no point*** through the entire Class Period did the market change its view of the Zio AT or the appropriate patient population. Ex. 1 ¶¶ 141-85. In other words, Plaintiff cannot point to a single analyst who commented that ***any*** disclosure suggested the proper patient population was not as iRhythm previously represented. Nor does Plaintiff point to a shred of evidence that physicians changed their prescribing habits following any of these disclosures, and that such changes threatened iRhythm's

value proposition for the Zio AT. Even Plaintiff's own investment advisor testified that ███████ ███████████████████████████████████████████████ Ex. 3 at 241:13-19. Plaintiff's lack of evidence is unsurprising given iRhythm's clear disclosures before and throughout the Class Period: "This device is *not intended for use in critical care patients* because the *reporting timeliness is not consistent with life-threatening arrhythmias* such as ventricular fibrillation." ECF No. 51-18 (April 2018 Zio AT CRM) at 7; *see also* Ex. 6 at 15. In the absence of *any evidence* showing that the market was misled as to the proper patient population and that the alleged disclosures corrected that understanding, Defendants have shown a lack of price impact. *See Qualcomm*, 2023 WL 2583306, at *13 (no price impact where "the market was not misled").

### B.   The Alleged Misstatements Are Mismatched In Specificity From The Disclosures

Plaintiff's framing of the "threshold" inquiry under *Goldman* as a bright-line, generic-or-not assessment, Reply 3, 13, 20 (citing *Goldman II*, 77 F.4th at 93), is wrong. *Goldman* requires courts to assess, at the "threshold," "*how* generic [] the alleged misrepresentations [are]," *Goldman II*, 77 F.4th at 93, and compare that to the genericness of the corrective disclosures, *id.* at 93, 102 (assessing whether a "a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price"). In other words, what matters is whether the alleged misrepresentations are "*more* generic" than the corresponding disclosures. *Id.* at 99. Absent a "close[] fit," there can be no inference of back-end price impact. *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *8 (N.D. Cal. 2024); *see also Jaeger v. Zillow Group, Inc.*, 2025 WL 2741642 (9th Cir. 2025) (price impact analysis "may demand a closer fit in the level of generality and substance when comparing front-and back-end statements"); *Gambrill v. CS Disco, Inc.*, 2025 WL 3771433, at *11 (W.D. Tex. 2025) (no price impact where there was "too great a distinction in the specificity of the matters discussed").

Plaintiff capitalizes on its misstatement of the law to argue that the alleged misstatements are too "concrete and specific" to be mismatched. Reply 3, 10 n.7. This characterization does not survive scrutiny, *see* Opp. 11-12, 18-20, but it is also irrelevant because *Goldman* turns on *relative* specificity. *Goldman II*, 77 F.4th at 93; *see also, e.g.*, *Gambrill*, 2025 WL 3771433, at *11. Regardless of their absolute genericness, the statements at issue are that the Zio AT was capable of "timely transmission," was intended for "at-risk" patients, or that Zio devices more broadly were "highly accurate." Opp.

11, 18, 20. These statements are each significantly more generic than disclosures that revealed details about transmission limits, customer complaints, and purported CCT issues, *id.* 13-15, 21, meaning that a "truthful, equally generic substitute," *Goldman II*, 77 F.4th at 103, would not include the information provided in the alleged corrective disclosures. Nor should the Court accept Plaintiff's invitation to defy *Goldman* and "substitute in" "the details and severity of the [alleged] misconduct . . . in place of the challenged, more generic statements." *Id.* at 100.

Plaintiff invites the Court to further compound the error by forgoing the "threshold" inquiry entirely because the Court found Plaintiff adequately pled that the misstatements were false and material—completely separate issues. *See* Reply 1-4.[4] But as explained above, motion to dismiss determinations and case law do not even begin the *Goldman* inquiry.[5]

### C. There Are Substantive Mismatches—Which Plaintiff's Reply Ignores

While Plaintiff attempts misdirection with respect to the mismatches in specificity, it simply ignores Defendants' substantive mismatch arguments, which separately establish the lack of price impact. *In re Kirkland Lake Gold Sec. Litig.*, 2024 WL 1342800, at *11 (S.D.N.Y. 2024); *Gambrill*, 2025 WL 3771433, at *11; Opp. 14-15, 19-21. For example, Defendants demonstrated that the Accuracy Statements refer to Zio products broadly, not the Zio AT, while the alleged corrective disclosures conveyed discrete issues that only affected the Zio AT, Opp. 20, and that the 2024 Form 483 and the Capital Forum article—the disclosures that allegedly corrected the Accuracy Statements—conveyed specific issues that did not correct the Accuracy Statements, *id.* 21. This mismatch is clear from a simple review of the Accuracy Statements alongside the alleged corrective disclosures. Plaintiff nonetheless characterizes the lack of expert testimony as "[n]otabl[e]," Reply 20, but does not (and cannot) provide any authority supporting its position that expert testimony is

---

[4] It is not clear what Plaintiff means when it says the FDA "held" the alleged misstatements were "susceptible to a plain meaning" and capable of misleading investors. To the extent this refers to the Warning Letter, that document reflects only the FDA's position that the Zio AT was "misbranded" under the FDCA, a separate legal regime with different standards from the securities laws. P.Ex. X at 4-6, 10; *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1133 (9th Cir. 2025) ("The FDCA imposes different legal requirements and targets a different audience. FDA warning letters are thus not dispositive or even necessarily probative of falsity claims under the Exchange Act.").

[5] Accordingly, this Court should, at the very least, make a factual finding that there was no price impact for the "Transmission Claims" after November 1 and decline to certify as to those statements.

necessary to prove a mismatch. Beyond this strawman critique, Plaintiff has no response.

## III. DR. THOMAS'S OPINION SUPPORTS THE LACK OF PRICE IMPACT

Dr. Thomas is the Director of the New York-Presbyterian Hospital – Weill Cornell Medicine Cardiac Device Clinic and a board-certified cardiac electrophysiologist who has been prescribing AECG devices, including MCT products, in his practice for 16 years. Ex. 2 ¶¶ 2, 5. Dr. Thomas provided opinions about that industry based on his extensive clinical experience and principles that guide the practice of medicine generally. Opp. 12, 19; *see* Ex. 2 ¶¶ 8, 10-15. Plaintiff's attempt to undermine Dr. Thomas by stating he provided unscientific opinions about "every clinician knows" and what "all prescribers 'think'" (Reply 7-9) is unavailing because he did not. In any event, it is uncontroversial that experience in a relevant industry can form the basis of a valid and reliable expert opinion regarding practices and knowledge in that industry, including in the price impact inquiry under *Goldman*. *Kirkland*, 2024 WL 1342800, at *9, *12. Dr. Thomas drew on his experience to provide opinions regarding the capabilities of different AECG devices (including MCTs). *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1043 (9th Cir. 2010) (expert's industry testimony is admissible where his expertise "is one based on experience").

The cases Plaintiff relies on (Reply 7) change nothing. *Holley v. Gilead Sciences, Inc.* excluded testimony that "a different label" would have changed physicians' behavior while holding that the expert "may testify about what knowledge was available" to physicians generally. 2023 WL 2469632, at *9-11 (N.D. Cal. 2023). Plaintiff's other cases reached similar conclusions. *Homyk v. ChemoCentryx, Inc.*, 2025 WL 1547625, at *7 (N.D. Cal. 2025) (excluding opinion regarding the expected physician response to specific drug label language); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 2000 WL 876900, at *11-12 (E.D. Pa. 2000) (excluding opinions regarding other doctors' perceptions but allowing opinions regarding "risks and benefits of the diet drugs in issue"). Unlike the excluded opinions in these cases, Dr. Thomas did not opine as to what physicians "thought." Instead, Dr. Thomas's opinion addresses the different types of devices used in the field in which he is a highly qualified and experienced specialist.

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiff's Motion for Class Certification.

| | | |
|---|---|---|
| DATED: March 2, 2026 | | **QUINN EMANUEL URQUHART & SULLIVAN, LLP** |
| | By: | /s/ *Kristin Tahler* |

          Kristin Tahler (Bar No. 261908)
          kristintahler@quinnemanuel.com
          865 S. Figueroa Street, 10th Floor
          Los Angeles, CA 90017
          Telephone: (213) 443-3000

          Christopher Porter (*pro hac vice*)
          chrisporter@quinnemanuel.com
          700 Louisiana Street, Suite 3900
          Houston, TX 77002
          Telephone: (713) 221-7000

          Jesse Bernstein (*pro hac vice*)
          Brenna Nelinson (*pro hac vice*)
          Amy Shehan (*pro hac vice*)
          Emily M. Erickson (*pro hac vice*)
          jessebernstein@quinnemanuel.com
          brennanelinson@quinnemanuel.com
          amyshehan@quinnemanuel.com
          emilyerickson@quinnemanuel.com
          295 5th Avenue
          New York, NY 10016
          Telephone: (212) 849-7000

          *Attorneys for Defendants*