**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Lead Plaintiff Oklahoma Firefighters Pension and Retirement System and Lead Counsel for the Settlement Class*

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

GLAZING EMPLOYERS AND GLAZIERS' UNION LOCAL #27 PENSION AND RETIREMENT FUND, on behalf of itself and all others similarly situated,

Plaintiff,

v.

IRHYTHM TECHNOLOGIES, INC., et al.,

Defendants.

Case No. 3:24-cv-706-JSC

**LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

**<u>CLASS ACTION</u>**

Date: November 5, 2026
Time: 9:00 a.m.
Judge: Hon. Jacqueline Scott Corley

# TABLE OF CONTENTS

PAGE


TABLE OF AUTHORITIES ..... ii

STATEMENT OF ISSUES TO BE DECIDED ..... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

PRELIMINARY STATEMENT ..... 2

ARGUMENT ..... 4

I. The Proposed Settlement Warrants Final Approval ..... 4

A. Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class ..... 5

B. The Settlement Was Reached After Arm's-Length Negotiations Between Experienced Counsel, and with the Assistance of an Experienced Mediator ..... 7

C. The Relief that the Settlement Provides for the Settlement Class Is Adequate, Taking into Account the Costs and Risks of Further Litigation ..... 8

1. The Amount of the Proposed Settlement ..... 9

2. The Strengths and Weaknesses of the Case and the Significant Risks of Continued Litigation ..... 11

3. The Duration of Continued Litigation ..... 14

4. All Other Factors in Rule 23(e)(2)(C) Support Approval of the Settlement ..... 15

D. The Settlement Treats Settlement Class Members Equitably ..... 17

E. The Views of Counsel and the Positive Reaction of the Settlement Class Support Approval of the Settlement ..... 17

II. The Plan of Allocation Is Fair and Reasonable ..... 19

III. The Court Should Certify the Settlement Class ..... 22

IV. Notice to the Settlement Class Satisfied the Requirements of Rule 23 and Due Process ..... 22

V. Report on Claims Received ..... 23

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abadilla v. Precigen, Inc.*, 2023 WL 7305053 (N.D. Cal. Nov. 6, 2023) ....7

*In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) ....12, 14, 15, 18

*In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299 (N.D. Cal. 2018) ....7

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ....14

*Baker v. SeaWorld Ent., Inc.*, 2020 WL 4260712 (S.D. Cal. July 24, 2020) ....14

*Bhangal v. Haw. Elec. Indus., Inc.*, No. 23-cv-04332-JSC (N.D. Cal. Sept. 17, 2026), Dkt. No. 141 ....24

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ....7, 8

*Churchill Vill. L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ....5, 17, 23

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ....19

*Destefano v. Zynga, Inc.*, 2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ....9, 15

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ....5

*In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770 (N.D. Cal. July 22, 2019) ....10

*Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ....4

*Giroux v. Essex Prop. Tr., Inc.*, 2019 WL 2106587 (N.D. Cal. May 14, 2019) ....19

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021) ....13

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ........................................................................ passim

*Hardy v. Embark Tech., Inc.*,
2024 WL 1354416 (N.D. Cal. Mar. 29, 2024)..........................................................19

*Hartless v. Clorox Co.*,
273 F.R.D. 630 (S.D. Cal. 2011) ........................................................................15

*In re Hawaiian Elec. Indus., Inc., S'holder Derivative Litig.*,
2026 WL 1500862 (D. Haw. May 28, 2026).............................................................7

*Hayes v. MagnaChip Semiconductor Corp.*,
2016 WL 6902856 (N.D. Cal. Nov. 21, 2016) .........................................................23

*Hefler v. Wells Fargo & Co.*,
2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ..........................................................17

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) ....................................................14, 19

*In re HP, Inc. Sec. Litig.*,
No. 3:20-cv-01260-SI (N.D. Cal. Feb. 28, 2025), Dkt. No. 145-2 ...........................24, 25

*Jaffe Pension Plan v. Household Int'l, Inc.*,
No. 1:02-cv-05893 (N.D. Ill. May 7, 2009), Dkt. No. 1611.......................................15

*Kirkorian v. Borelli*,
695 F. Supp. 446 (N.D. Cal. 1988) ......................................................................18

*Knapp v. Art.com, Inc.*,
283 F. Supp. 3d 823 (N.D. Cal. 2017). ...................................................................11

*Lerwill v. Inflight Motion Pictures, Inc.*,
582 F.2d 507 (9th Cir. 1978) ...............................................................................6

*Leventhal v. Chegg, Inc.*,
2025 WL 1481382 (N.D. Cal. May 21, 2025).....................................................5, 17, 18

*In re LinkedIn User Priv. Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015).........................................................................14

*Luna v. Marvell Tech. Grp.*,
2018 WL 1900150 (N.D. Cal. Apr. 20, 2018) ..........................................................23

*In re Lyft Inc. Sec. Litig.*,
2023 WL 5068504 (N.D. Cal. Aug. 7, 2023) ...........................................................21

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ...............................................................................9

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
221 F.R.D. 523 (C.D. Cal. 2004) ........................................................................18

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*,
688 F.2d 615 (9th Cir. 1982) ........................................................................9

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................................4, 19

*In re Oracle Sec. Litig.*,
1994 WL 502054 (N.D. Cal. June 18, 1994) ........................................................................19

*In re Plantronics, Inc. Sec. Litig.*,
No. 4:19-cv-07481-JST (N.D. Cal. Mar. 10, 2026), Dkt. No. 263 ..................................21, 24

*In re Polaroid ERISA Litig.*,
240 F.R.D. 65 (S.D.N.Y. 2006) ........................................................................6

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ........................................................................17

*In re Splunk Inc. Sec. Litig.*,
2024 WL 923777 (N.D. Cal. Mar. 4, 2024) ........................................................................23, 25

*In re Splunk, Inc. Sec. Litig.*,
Case No. 4:20-cv-08600-JST (N.D. Cal. July 23, 2024), Dkt. No. 145 ................................24

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008) ........................................................................4

*Torrisi v. Tucson Elec. Power Co.*,
8 F.3d 1370 (9th Cir. 1993) ........................................................................6, 14

*Vataj v. Johnson*,
2021 WL 5161927 (N.D. Cal. Nov. 5, 2021) ........................................................................10, 19

*Villanueva v. Joyce*,
2025 WL 5089308 (N.D. Cal. Aug. 25, 2025) ........................................................................8

*In re Vivendi Universal, S.A. Sec. Litig.*,
No. 1:02-cv-05571 (S.D.N.Y. Feb. 2, 2010), Dkt. No. 998........................................................15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
2019 WL 2077847 (N.D. Cal. May 10, 2019) ........................................................................5

*Wong v. Arlo Techs., Inc.*,
2021 WL 1531171 (N.D. Cal. Apr. 19, 2021) ........................................................................10

**STATUTES AND RULES**

Fed R. Civ. P. 23:

Rule 23 .......... 7, 19, 23

Rules 23(a) .......... 22

Rule 23(b)(3) .......... 22, 23

Rule. 23(c)(2)(B) .......... 23

Rule 23(e) .......... 4

Rule 23(e)(1)(B) .......... 23

Rule 23(e)(2) .......... *passim*

Rule 23(e)(2)(A) .......... 5

Rule 23(e)(2)(B) .......... 7

Rule 23(e)(2)(C) .......... 7, 15, 16

Rule 23(e)(2)(D) .......... 17

Rule 23(e)(3) .......... 16

**NOTICE OF MOTION FOR FINAL APPROVAL**
**<u>OF SETTLEMENT AND PLAN OF ALLOCATION</u>**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure and the Court's Order re: Motion for Preliminary Approval (Dkt. No. 156) (the "Preliminary Approval Order"), Lead Plaintiff Oklahoma Firefighters Pension and Retirement System will and hereby does move the Court, before the Honorable Jacqueline Scott Corley, on November 5, 2026, at 9:00 a.m. Pacific time by Zoom videoconference, or at such other location and time as set by the Court, for (1) entry of a judgment granting final approval of the proposed settlement of this Action (the "Settlement") and (2) entry of an order granting approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").

This Motion is based on the following Memorandum of Points and Authorities, the accompanying Declaration of Katherine M. Sinderson in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation ("Sinderson Declaration" or "Sinderson Decl.") and its exhibits, all other prior pleadings and papers in this Action, arguments of counsel, and any additional information or argument that may be required by the Court. The proposed Judgment and a proposed Order approving the Plan of Allocation are filed herewith.

**<u>STATEMENT OF ISSUES TO BE DECIDED</u>**

1. Whether the Court should approve the proposed Settlement of this securities class action as fair, reasonable, and adequate under Rule 23(e)(2); and

2. Whether the Court should approve the Plan of Allocation as fair and reasonable.

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

Lead Plaintiff, on behalf of itself and the Settlement Class, respectfully submits this memorandum in support of its motion for final approval of the proposed Settlement and approval of the proposed Plan of Allocation.[1]

[1] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated June 3, 2026 (Dkt. No. 147-1) (the "Stipulation") or in the Sinderson Declaration. Citations to "¶ __" herein refer to paragraphs in the Sinderson Declaration and citations to "Ex. __" refer to exhibits to the Sinderson Declaration.

**PRELIMINARY STATEMENT**

Lead Plaintiff is pleased to present for the Court's final approval its agreement to settle this securities class action in exchange for a cash payment of $45,000,000 for the benefit of the Settlement Class. In July 2026, the Court preliminarily approved the Settlement in its Preliminary Approval Order, authorizing delivery of notice to members of the Settlement Class, and, in August 2026, iRhythm, on behalf of all Defendants, caused the Settlement Amount to be paid into an Escrow Account, where it is earning interest for the benefit of the Settlement Class.

Lead Plaintiff respectfully submits that the proposed Settlement is an excellent result for the Settlement Class. As detailed in the accompanying Sinderson Declaration and summarized herein, the proposed Settlement provides a substantial, certain, and near-term recovery for the Settlement Class while avoiding the significant risks of continued litigation, including the risk that the Settlement Class could recover less than the Settlement amount—or nothing at all—after years of additional litigation, appeals, and delay.

The proposed Settlement is the result of Lead Plaintiff's and Lead Counsel's substantial litigation efforts. Lead Counsel conducted an extensive investigation, including interviews with dozens of former iRhythm employees; prepared a detailed amended complaint based on that investigation; opposed a heavily contested motion to dismiss through briefing and oral argument; opposed Defendants' motion for judgment on the pleadings; fully briefed Lead Plaintiff's motion for class certification; and conducted substantial fact discovery, which included obtaining over 400,000 pages of documents and taking or defending seven depositions. As a result of these efforts, Lead Plaintiff and Lead Counsel possessed a well-developed understanding of the strengths and weaknesses of the claims when the Settlement was reached.

In addition, the proposed Settlement resulted from extensive arm's-length negotiations, including a full-day mediation session before David M. Murphy of Phillips ADR Enterprises and the exchange of detailed mediation statements. ¶¶ 54-58. While the Parties were unable to reach a resolution at the mediation session, they continued their settlement negotiations with the assistance of Mr. Murphy. Mr. Murphy ultimately made a mediator's recommendation that the Parties settle the Action for $45,000,000, which the Parties accepted. ¶ 56.

The proposed Settlement is a very favorable result for the Settlement Class given the significant risks that Lead Plaintiff faced in proving its securities fraud claims. As discussed below and in the Sinderson Declaration, Lead Plaintiff faced significant challenges in proving that Defendants' statements about iRhythm's Zio AT heart monitoring device—including its purported near real-time data transmission, appropriateness for high-risk patients, and accuracy—were false and made with scienter, and in connecting the stock price declines at issue with the alleged misstatements. ¶¶ 61-87. For example, there was a risk that the Court or jury might find that Defendants' statements were not misleading given public disclosures of the device's transmission limits by November 2022. ¶ 73. In addition, Lead Plaintiff faced risks that the Court or jury might find that Defendant Blackford lacked scienter on a complete record at summary judgment or trial. ¶¶ 76-77. There were also material risks that the Court might eliminate from recovery one or more of the alleged corrective disclosures at class certification, summary judgment, or trial, or that the Court or a jury would find that significant portions of the price declines on the alleged corrective disclosure dates were due to factors unrelated to the alleged fraud. ¶¶ 78-83. The risks of the Action were further highlighted by the fact that the Company never restated any of its financials; and there was no parallel SEC enforcement action ever brought relating to the alleged misstatements to investors. In light of all these risks, Lead Plaintiff and Lead Counsel believe that the $45 million Settlement is a favorable outcome for the Settlement Class.

The proposed Settlement also has the full support of Lead Plaintiff—an institutional investor that took an active role in supervising the litigation. ¶ 5. The reaction of the Settlement Class also strongly supports approval of the Settlement. After completion of a notice process that included mailing of the Notice to over 84,000 potential Settlement Class Members and nominees, there have been ***no objections to any aspect of the Settlement*** and just three requests for exclusion from the Settlement Class. In contrast, over 34,000 Claims have been received and the valid Claims submitted include 97% of the estimated total number of iRhythm damaged shares—demonstrating that the vast majority of eligible Settlement Class Members have participated in the Settlement. ¶ 113.

In light of all of these considerations and the other factors discussed below, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiff requests that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members. The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on losses they suffered on purchases of iRhythm common stock related to the alleged fraud, and no Settlement Class Members have objected to the proposed Plan.

## ARGUMENT

### I. The Proposed Settlement Warrants Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims. *See* Fed. R. Civ. P. 23(e). A class-action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit recognizes "a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) ("Ninth Circuit[] policy favor[s] settlement, particularly in class action law suits"). Class actions readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation. The settlement of complex cases like this one also promotes efficient utilization of scarce judicial resources and the speedy resolution of claims. *See Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010) ("Settlement avoids the complexity, delay, risk and expense of continu[ed] … litigation" and allows "a prompt, certain, and substantial recovery" for the class).

In determining whether a proposed settlement is "fair, reasonable, and adequate," the Court should consider whether:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;

> (C) the relief provided for the class is adequate, taking into account, [among other things,] the costs, risks, and delay of trial and appeal […]; and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In addition, the Ninth Circuit has held that district courts should consider the following factors in evaluating the fairness of a class action settlement:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill. L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2019 WL 2077847, at *1 (N.D. Cal. May 10, 2019) (approving settlement after considering both the "Rule 23(e)(2) factors . . . and the factors identified in" Ninth Circuit case law).

The Ninth Circuit has explained that courts' review of class-action settlements should be "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon*, 150 F.3d at 1027.

### A. Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class

The first Rule 23(e)(2) consideration is whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). To determine adequacy, courts consider (1) if the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) if the named plaintiffs and their counsel have prosecuted or will prosecute the action vigorously on behalf of the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011); *Leventhal v. Chegg, Inc.*, 2025 WL 1481382, at *5 (N.D. Cal. May 21, 2025).

Here, Lead Plaintiff's claims are typical of and coextensive with those of the Settlement Class, and Lead Plaintiff does not have any interests that are antagonistic to the interests of other

members of the Settlement Class. *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *Hanlon*, 150 F.3d at 1020. Lead Plaintiff—like all other Settlement Class Members—purchased shares during the Class Period at prices that are alleged to have been artificially inflated by Defendants' misstatements and suffered damages as a result. Like all Settlement Class Members, Lead Plaintiff has an interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Further, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class in their vigorous prosecution of the Action, including in the negotiation and achievement of the proposed Settlement. Lead Plaintiff played an active role in supervising and participating in the litigation and retained counsel who are highly experienced in securities litigation and have successfully prosecuted many complex class actions throughout the United States. *See* Dkt. No. 157-8 (Lead Counsel's firm resume). Lead Plaintiff and Lead Counsel vigorously prosecuted the Settlement Class's claims, which included: (1) conducting an extensive investigation into the claims asserted; (2) researching and drafting a detailed Amended Complaint and a subsequent Second Amended Complaint based on this investigation; (3) researching, briefing and arguing Lead Plaintiff's opposition to Defendants' motion to dismiss; (4) successfully opposing Defendants' motion for judgment on the pleadings; (5) briefing and arguing Lead Plaintiff's motion for class certification; (6) engaging in extensive fact and class-certification discovery, including obtaining and reviewing over 400,000 pages of documents and conducting seven depositions; (7) working with experts on complex issues of loss causation and damages and FDA regulation of medical devices; and (8) participating in extensive arm's-length settlement negotiations to achieve the Settlement, which included detailed mediation statements and a full-day mediation session with a professional mediator. ¶¶ 10-58.

### B. The Settlement Was Reached After Arm's-Length Negotiations Between Experienced Counsel, and with the Assistance of an Experienced Mediator

The next Rule 23 consideration is whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). This includes consideration of related circumstances bearing on the procedural fairness of the settlement, including (i) counsel's understanding of the strengths and weaknesses of the case, *Hanlon*, 150 F.3d at 1026; (ii) the presence or absence of any indicia of collusion, *see In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011); and (iii) the involvement of a mediator.

Here, the proposed Settlement was reached only after a full-day mediation session before David Murphy of Phillips ADR Enterprises, an experienced mediator of class actions and other complex litigation. ¶¶ 54-56. In advance of the mediation, the Parties prepared and exchanged detailed mediation statements that detailed their views of the merits and risks of the case. ¶ 55. Although no agreement was reached at the mediation session, the Parties continued their negotiations with the assistance of Mr. Murphy for several weeks. Thereafter, Mr. Murphy made a mediator's recommendation that the Action be settled for $45 million, which the Parties accepted. ¶ 56. Mr. Murphy has submitted a declaration discussing his experience as a mediator and the history of the mediation process in the Action, and attesting that "the Settlement reached by the Parties was the product of arm's-length, adversarial negotiation and that all parties were represented by seasoned, well-informed counsel." Ex. 1 at ¶ 10.

The fact that the Parties reached a settlement through extended negotiations between experienced counsel strongly supports a finding that the Settlement was negotiated at arm's length and is procedurally fair. *See Abadilla v. Precigen, Inc.*, 2023 WL 7305053, at *9 (N.D. Cal. Nov. 6, 2023) (where settlement was reached by experienced counsel after a session with an independent mediator, those facts were "highly probative of an arms-length negotiation free of collusion"). The involvement of an experienced mediator in the settlement process, like Mr. Murphy, further "confirms that the settlement is non-collusive." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018); *see also In re Hawaiian Elec. Indus., Inc., S'holder Derivative Litig.*, 2026 WL 1500862, at *9 (D. Haw. May 28, 2026) (finding Mr. Murphy to be a "highly experienced

mediator" and approving settlement reached following mediation before him as "the product of arm's-length and adversarial negotiations"); *Villanueva v. Joyce*, 2025 WL 5089308, at *6 (N.D. Cal. Aug. 25, 2025) (finding that a settlement reached following mediation with Mr. Murphy was "reached with the 'assistance of an experienced mediator,'" and this provided "further evidence that the 'settlement is non-collusive'").

In addition, as noted above, Lead Plaintiff possessed a thorough understanding of the strengths and weaknesses of the case before reaching the proposed Settlement. As detailed in the Sinderson Declaration, Lead Counsel had conducted an extensive investigation, including interviews with dozens of former iRhythm employees; prepared a detailed amended complaint based on that investigation; opposed a heavily contested motion to dismiss through briefing and oral argument; opposed Defendants' motion for judgment on the pleadings; fully briefed Lead Plaintiff's motion for class certification; and engaged in substantial fact discovery, including obtaining over 400,000 pages of documents and taking or defending seven depositions. ¶¶ 10-53.

Moreover, the proposed Settlement has none of the indicia of possible collusion identified by the Ninth Circuit (*see Bluetooth*, 654 F.3d at 947), such as a "clear sailing" fee agreement or a provision that would allow settlement proceeds to revert to Defendants. *See* Stipulation ¶ 17 ("Lead Counsel's application for attorneys' fees and/or Litigation Expenses is not the subject of any agreement between Defendants and Lead Plaintiff other than what is set forth in this Stipulation."); Stipulation ¶ 15 ("The Settlement is not a claims-made settlement. Upon the occurrence of the Effective Date, no Defendant, Defendants' Releasee, or any other person or entity who or which paid any portion of the Settlement Amount shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever . . . .").

### C. The Relief that the Settlement Provides for the Settlement Class Is Adequate, Taking into Account the Costs and Risks of Further Litigation

Next, Rule 23(e)(2) requires courts to consider whether a class-action settlement is "fair, reasonable, and adequate," including by "taking into account . . . the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). This analysis essentially encompasses four of the eight factors of the traditional *Hanlon* analysis: (1) the strength of

plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class-action status throughout the trial; and (4) the amount offered in settlement. *See Hanlon*, 150 F.3d at 1026. Here, each of these factors supports approval.

**1. The Amount of the Proposed Settlement**

The amount of a settlement "is generally considered the most important [factor], because the critical component of any settlement is the amount of relief obtained by the class." *Destefano v. Zynga, Inc.*, 2016 WL 537946, at *11 (N.D. Cal. Feb. 11, 2016). However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). In assessing the recovery, a fundamental question is how the value of the settlement compares to the amount the class potentially could recover at trial, discounted for risk, delay, and expense. "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 624 (9th Cir. 1982).

Here, the proposed Settlement amount—$45 million in cash, plus interest—represents a very favorable outcome for the Settlement Class in light of the risks of the claims and the realistic maximum damages that could be recovered at trial. Lead Plaintiff's damages expert, Dr. Matthew Cain, has calculated that the absolute maximum damages amount that could be obtained at trial on the remaining claims in the Action would be approximately $698 million. *See* Declaration of Matthew Cain (Dkt. No. 147-3), at ¶ 18. This number assumes that Lead Plaintiff would succeed in prevailing over <u>all</u> liability and class certification challenges, that <u>the entire</u> Class Period would be sustained, and that Lead Plaintiff would establish the maximum possible stock price declines on all corrective disclosure dates—all of which was far from certain. *Id.* ¶ 19.

There were very credible risks that the maximum obtainable damages could be considerably reduced. For example, the maximum damages estimate above incorporates multi-day stock price declines after several of the alleged corrective disclosures. If Defendants prevailed on their argument that only the stock price declines on the first trading day following each alleged

corrective disclosure could be attributed to the disclosure, maximum damages would be reduced to approximately $591 million. *Id.* ¶ 20. In addition, if the Court or a jury concluded that the May 30, 2023 Warning Letter fully disclosed the fraud concerning the Zio AT's transmission limit, then maximum damages would fall to $526 million. *Id.* ¶ 21. If Lead Plaintiff were unable to establish liability as to the statements concerning the accuracy of the Zio AT—whether because those statements were too generic and/or aspirational to have impacted the price of iRhythm's stock, or were not made with scienter—maximum damages would be reduced to approximately $428 million. *Id.* ¶ 22.

The $45 million Settlement represents approximately 6.4% to 10.5% of what Lead Plaintiff considers realistic maximum class-wide damages (ranging from $428 million to an absolute maximum of $698 million) that could be recovered for the Settlement Class at trial. ¶ 93. Courts have routinely approved settlements with comparable or lower percentage recoveries than obtained here as fair and reasonable. *See, e.g.*, *Vataj v. Johnson*, 2021 WL 5161927, at *6 (N.D. Cal. Nov. 5, 2021) (approving settlement recovering "slightly more than 2% of [] estimated damages" and noting that it was "consistent with the 2-3% average recovery that the parties identified in other securities class action settlements"); *Wong v. Arlo Techs., Inc.*, 2021 WL 1531171, at *9 (N.D. Cal. Apr. 19, 2021) (recovery of 2.35% "weighs in favor of approval"); *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *9 (N.D. Cal. July 22, 2019) (approving settlement representing "between 5% and 9.5%" of maximum potential damages).

Notably, Defendants had arguments that could push the maximum potential damages significantly lower. For example, if the Court accepted Defendants' argument that the alleged misrepresentations were fully corrected by the alleged November 1, 2022 corrective disclosure, damages would have been further reduced to only approximately $51.5 million (Dkt. No. 147-3, at ¶ 23), and the $45 million settlement would represent 87% of those damages. If the Court determined that the alleged misrepresentations were fully corrected by the alleged November 1, 2022 corrective disclosure and found that only the stock price declines on November 2, 2022 and November 3, 2022 should be considered (but not the November 4, 2022 decline), damages would have been reduced to approximately $34.3 million (*id.*), and the Settlement would represent 131% of those damages.

Moreover, these maximums assume that Lead Plaintiff would prevail at trial and appeal on the elements of falsity and scienter. ¶ 89. Such success was not certain. As discussed further below and detailed in the Sinderson Declaration, Defendants advanced substantial arguments regarding all elements of liability that, if accepted, could have substantially lowered damages or eliminated them entirely.

### 2. The Strengths and Weaknesses of the Case and the Significant Risks of Continued Litigation

Courts evaluating proposed class action settlements consider the strength of the plaintiff's case and the risks of further litigation. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). To determine whether the proposed Settlement is fair, reasonable, and adequate, the Court "must balance the risks of continued litigation, including the strengths and weaknesses of plaintiff's case, against the benefits afforded to class members, including the immediacy and certainty of recovery." *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017).

In considering whether to agree to the proposed Settlement, Lead Plaintiff, represented by counsel with considerable experience in securities litigation, weighed the risks inherent in establishing the elements of its claims, including risks at trial of proving to a jury the elements of falsity, scienter, loss causation, and damages. Each of these elements is addressed below.

***Falsity.*** While Lead Plaintiff had prevailed on this issue at the motion to dismiss stage, Lead Plaintiff recognized that it may have been unable to establish the falsity of Defendants' challenged statements at trial. ¶¶ 72-75. Defendants have contended and would continue to argue that the statements about Zio AT's transmission limits were not false because those transmission limits were disclosed no later than November 2022. ¶ 73. Defendants would further argue that, even if the Court found that the transmission limits were not publicly disclosed, Lead Plaintiff could not show that the transmission limits impacted the Zio AT's functionality enough to render their statements false. *Id.* Defendants would also assert that prescribing physicians understood the Zio AT's technical limitations and that their marketing claims complied with FDA regulations and were consistent with those of companies with competing mobile cardiac telemetry devices. *Id.*

Lead Plaintiff would also face challenges in proving that Defendants' statements concerning the Zio AT's suitability for high-risk patients were false. Defendants would argue that these statements were not actionably false because they were vague and were qualified by the Company's express warnings that the device was not intended for use in critical care patients or patients with a known history of life-threatening arrhythmias. ¶ 74.

Finally, with respect to the alleged misstatements about the accuracy of the Zio monitor, Defendants have argued, and would continue to argue, that their statements were literally true as far as Defendants knew at the time the statements were made, including because Defendants had evidence of periodic reports provided to Defendant Blackford reflecting accuracy rates between 98% and 99%. ¶ 75. The risk that the accuracy misstatements might not be sustained was particularly significant because, if those statements were dismissed, the Class Period would be substantially shortened and the potential damages for the class would be greatly reduced. *Id*. While Lead Plaintiff and Lead Counsel believed that they had responses to each of these challenges, they presented significant risks at future stages of the litigation.

***Scienter***. Assuming Lead Plaintiff were able to prove to a jury that Defendants' statements were materially false or misleading, it would still need to prove that Defendants made the alleged false statements with the intent to mislead investors or with deliberate recklessness. As courts have recognized, a defendant's state of mind in a securities case "is the most difficult element of proof and one that is rarely supported by direct evidence." *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016).

Lead Plaintiff faced risks that the Court or jury might find that Defendants lacked scienter on a complete record at summary judgment or trial. ¶¶ 76-77. In particular, Lead Plaintiff anticipates that Defendants would have argued that the Company's disclosures about the transmission limits and their impact on the Zio AT's functionality undermine any allegations that Defendants intentionally misled investors. ¶ 77. Similarly, Defendants would argue that the positive reports that Defendant Blackford received concerning the device's accuracy during the Class Period tended to establish that Defendant Blackford honestly believed his statements about the Zio AT's accuracy and, therefore, he did not act with scienter. *Id*.

***Loss Causation and Damages***. Even if Lead Plaintiff overcame Defendants' falsity and scienter arguments, it would have still confronted additional challenges in establishing loss causation and damages. ¶¶ 78-82.

Lead Plaintiff anticipates that Defendants would argue at summary judgment and at trial that factors unrelated to the alleged misstatements caused the stock price decline following the alleged corrective disclosures. Specifically, Defendants were expected to argue, following *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113, 123 (2021), that the alleged misstatements were too "generic" and vague to have impacted the price of the stock, or that there was a substantial "mismatch" between the alleged misrepresentations and the subsequent disclosure that caused the price decline, so that the price impact of the alleged misrepresentations could not be established by the subsequent declines in iRhythm's stock following the disclosures. ¶ 79. For example, at class certification, Defendants had argued there was a "mismatch" between their relatively generic front-end statements concerning the Zio AT's "near real time" and "timely transmission" capabilities and the subsequent detailed corrective disclosures, and thus the market reaction to those disclosures could not demonstrate the "price impact" of the alleged misstatements. *Id.*

Defendants would have also argued that the FDA warning letter, published on May 30, 2023, fully disclosed the alleged misrepresentations concerning the Zio AT's transmission limits and therefore none of the declines associated with the later alleged corrective disclosures could be recoverable as damages for those misstatements. ¶ 80. If this argument were accepted, it would have reduced maximum recoverable damages by nearly 25%. *Id*. Finally, if a Court or a jury agreed with Defendants' argument that the November 1, 2022 disclosure effectively corrected Defendants' statements concerning the "near real time" and "timely transmission" of the device, and that subsequent disclosures did not reveal new corrective information, damages would be substantially reduced. ¶ 82. Defendants would have further argued that Lead Plaintiff could not isolate the impact of the alleged fraud from confounding information and non-fraud-related factors that may have contributed to iRhythm's stock price declines, and thus could not prove the amount of recoverable damages. ¶ 81.

Moreover, the resolution of these disputed issues regarding damages and loss causation would have boiled down to a "battle of experts," and Defendants would certainly have been able to present a well-credentialed expert (or experts) to opine at trial that the class's damages were nonexistent or very limited. As courts have long recognized, the uncertainty as to which side's expert's view might be credited by the jury presents a substantial litigation risk in securities actions. *See Baker v. SeaWorld Ent., Inc.*, 2020 WL 4260712, at *7 (S.D. Cal. July 24, 2020) (the fact that "Plaintiffs' ability to prove loss causation and damages would 'come down to an unpredictable battle of the experts,'" supported approval of settlement); *Amgen*, 2016 WL 10571773, at *3 (finding that risks related to the "battle of experts" weighed in favor of settlement approval). In light of all of these litigation risks, the proposed Settlement is fair, reasonable, and adequate.

**3. The Duration of Continued Litigation**

Courts consistently recognize that the likely duration of continued litigation is a key factor in evaluating the reasonableness of a settlement. *See, e.g.*, *Torrisi*, 8 F.3d at 1376 (finding that "the cost, complexity and time of fully litigating the case" rendered the settlement fair). "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015). Due to the "notorious complexity" of securities class actions in particular, settlement is often appropriate because it "circumvents the difficulty and uncertainty inherent in long, costly trials." *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006); *see also In re Heritage Bond Litig.*, 2005 WL 1594403, at *6 (C.D. Cal. June 10, 2005) (finding that securities class actions have a well-deserved reputation for complexity).

Here, without the proposed Settlement, continued litigation would have required, among other things: (i) the completion of fact discovery, including additional depositions such as the depositions of the Individual Defendants and other members of iRhythm senior management; (ii) an expert discovery process that was expected to include, at a minimum, experts on loss causation and damages from both Lead Plaintiff and Defendants, as well as possible experts on the

medical device industry; (iii) an expected motion for summary judgment; (iv) extensive pre-trial motion practice, such as motions *in limine* and *Daubert* motions; (v) a trial requiring a substantial amount of detailed factual and expert testimony; (vi) post-verdict challenges to individual class members' damages; and (vii) appeals. The continued litigation and appeals would have substantially delayed any recovery for Settlement Class Members, likely for years. *See Zynga*, 2016 WL 537946, at *10; *Amgen*, 2016 WL 10571773, at *3 ("A trial of a complex, fact-intensive case [as here] could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation."). And, even if a favorable trial verdict was affirmed on appeal, the Settlement Class would have faced a potentially complex, lengthy, and contested claims-administration process.[2]

Accordingly, absent the proposed Settlement, there is no question that the resolution of this case would take considerable time and require additional expenses for the Settlement Class, with the end result not remotely certain. *See Hartless v. Clorox Co.*, 273 F.R.D. 630, 640 (S.D. Cal. 2011) ("Considering these risks, expenses and delays, an immediate and certain recovery for class members . . . favors settlement of this action."), *aff'd*, 473 Fed. App'x 716 (9th Cir. 2012).

The present value of a certain and substantial recovery now, as opposed to the mere chance of a possibly greater one years later, supports approval of a settlement that eliminates the expense and delay of continued litigation and the risk that the Settlement Class could receive no recovery.

### 4. All Other Factors in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of

[2] In other securities-fraud class actions that have gone to trial, the time from a verdict to a final judgment has been as long as seven years. *See* Verdict Form, *Jaffe Pension Plan v. Household Int'l, Inc.*, No. 1:02-cv-05893 (N.D. Ill. May 7, 2009), Dkt. No. 1611 & Final Judgment and Order of Dismissal with Prejudice (N.D. Ill. Nov. 10, 2016), Dkt. No. 2267; *see also* Jury Verdict Form, *In re Vivendi Universal, S.A. Sec. Litig.*, No. 1:02-cv-05571 (S.D.N.Y. Feb. 2, 2010), Dkt. No. 998 (jury verdict issued on Jan. 29, 2010) & Final Judgment Approving Class Action Settlement of All Remaining Claims (S.D.N.Y. May 9, 2017), Dkt. No. 1317.

attorney's fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the proposed Settlement.

***First***, the procedures for processing Settlement Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in securities class action litigation. The proceeds of the Settlement will be distributed to Settlement Class Members who submit eligible Claim Forms with required documentation to the Court-approved Claims Administrator, Strategic Claims Services ("SCS"). SCS, an independent company with extensive experience administering securities class actions, will review and process the claims under Lead Counsel's supervision, and mail or wire claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court. This type of claims processing is standard in securities class actions and has long been used and found to be effective. This claim procedure is necessary because neither Lead Plaintiff nor Defendants possess data regarding investors' transactions in iRhythm common stock that would allow the Parties to create a claims-free process to distribute Settlement funds.

***Second***, the relief provided for the Settlement Class is also adequate when the terms and timing of the proposed award of attorneys' fees are taken into account. As discussed in the Fee Memorandum, the 25% fee requested, to be paid upon approval of the Settlement and fee motion, is the same as the benchmark for percentage fee awards in the Ninth Circuit and is well within the range of percentage fees that courts within this Circuit award for similarly sized settlements. *See* Dkt. No. 157, at 5-7. The fee percentage is also reasonable in light of Lead Counsel's efforts, the recovery obtained, and the risks in the litigation. *Id.* at 7-18. Moreover, neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 18.

***Lastly***, Rule 23(e)(2)(C) asks the Court to consider the proposed Settlement's fairness in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). As previously disclosed, the only agreement the Parties entered into in addition to the Stipulation itself was a confidential Supplemental Agreement regarding requests for exclusion.

*See* Stipulation ¶ 44. The Supplemental Agreement gave iRhythm the right to terminate the Settlement if the valid requests for exclusion received exceeded an amount agreed to by the Parties. *Id*. "This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement." *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020); *see also Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair.").

The Supplemental Agreement is now moot because the three investors who requested exclusion from the Settlement Class purchased just 1,056 shares of iRhythm common stock during the Class Period—far below the threshold that would permit iRhythm to terminate the Settlement under the Supplemental Agreement.

### D. The Settlement Treats Settlement Class Members Equitably

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must also consider whether the Settlement treats class members equitably relative to each other. *See* Fed. R. Civ. P. 23(e)(2)(D). Here, the proposed Settlement does so. As discussed below in Part II, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery under the Plan of Allocation based on damages they suffered that were attributable to the alleged fraud. No subset of the Settlement Class is receiving any special treatment and Lead Plaintiff will receive the same level of *pro rata* recovery as all other Settlement Class Members.

### E. The Views of Counsel and the Positive Reaction of the Settlement Class Support Approval of the Settlement

Two additional factors considered by the Ninth Circuit in assessing a proposed settlement are "the experience and views of counsel" and "the reaction of the class members to the proposed settlement." *Churchill Vill.*, 361 F.3d at 575. Both of these factors also support the Settlement.[3]

As courts in this Circuit have explained, "[t]he recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement."

[3] The final *Churchill* factor—the presence of a governmental participant—is "neutral because there is no governmental participant in this case." *Chegg*, 2025 WL 1481382, at *7

*Kirkorian v. Borelli*, 695 F. Supp. 446, 450-51 (N.D. Cal. 1988); *see Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is accorded to the recommendation of counsel . . . because 'parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation'"). Here, Lead Counsel has extensive experience litigating similar cases and concluded—based on a thorough understanding of the strengths and weaknesses of the Action—that the proposed Settlement represents a very favorable outcome for Settlement Class Members given the risks of continued litigation and the range of potential outcomes. Accordingly, this factor further supports approval of the Settlement. *See Chegg*, 2025 WL 1481382, at *7.

Likewise, the positive reaction of the class to the proposed Settlement to date is another factor that strongly supports approval of the Settlement. *See Amgen*, 2016 WL 10571773, at *4. Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, SCS, has disseminated a total of 84,409 copies of the Court-approved Notice and Claim Form (collectively, the "Notice Packet") to potential Settlement Class Members and nominees as of October 22, 2026. *See* Suppl. Evans Decl. (Ex. 2) at ¶ 3. In addition, the Court-approved Summary Notice was published in *The Wall Street Journal* and over the *PR Newswire* on August 6, 2026. *See* Dkt. No. 157-4, at ¶ 12. The Notice set out the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to request exclusion from the Settlement Class or object to any aspect of the proposed Settlement.

Following the completion of this extensive notice process, no Settlement Class Members have objected to any aspect of the Settlement or the Plan of Allocation. *See* Sinderson Decl. ¶ 112. In addition, just three requests for exclusion from the Settlement Class have been received. *See id.*; Suppl. Evans Decl. ¶ 7. Two of the requests for exclusion were submitted by individual investors who collectively purchased fewer than 1.1 shares of iRhythm during the Class Period. Suppl. Evans Decl. Exs. D, E. The third request was submitted by a company that purchased 1,055 shares during the Class Period. *Id.* Ex. C. The shares collectively purchased by the three opt-outs during the Class Period represent less than 0.005% of the total number of damaged shares as estimated by Lead Plaintiff's expert—a minuscule percentage of the Settlement Class.

The absence of any objections along with the low number of requests for exclusion further supports a finding that the proposed Settlement is fair, reasonable, and adequate. *See, e.g., Vataj*, 2021 WL 5161927, at *7 (the "absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members"); *Giroux v. Essex Prop. Tr., Inc.*, 2019 WL 2106587, at *5 (N.D. Cal. May 14, 2019) ("[T]he absence of objections and very small number of opt-outs indicate overwhelming support among the Class Members and weigh in favor of approval.").

In addition, as discussed further in Part V below, SCS has received 34,619 Claims to participate in the Settlement. Of these Claims, 20,058 have been found to be eligible. The damaged shares in the eligible Claims received represent 97% of the total number of damaged iRhythm shares as estimated by Lead Plaintiff's damages expert (¶ 113), testifying to the success of the notice program and the robust participation of class members in the Settlement. This provides further strong support for approval of the Settlement. *See Hardy v. Embark Tech., Inc.*, 2024 WL 1354416, at *6 (N.D. Cal. Mar. 29, 2024) ("The Court also looks at the claims rate as a sign of class member sentiment regarding the settlement.").

In sum, all of the factors to be considered under Rule 23(e)(2) support a finding that the proposed Settlement is fair, reasonable, and adequate.

## II. The Plan of Allocation Is Fair and Reasonable

In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation for the Settlement proceeds. The Plan of Allocation is set forth at pages 16 to 21 of the Notice mailed to Settlement Class Members.

The standard for approval of a plan of allocation in a class action under Rule 23 is the same as the standard applicable to the settlement as a whole: the plan must be "fair, reasonable, and adequate." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992); *see also Omnivision*, 559 F. Supp. 2d at 1045. An allocation formula need only have a reasonable basis, particularly if recommended by experienced class counsel. *See Heritage Bond*, 2005 WL 1594403, at *11. "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994).

Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiff's damages expert. ¶ 96. The Plan provides for the distribution of the Net Settlement Fund to Settlement Class Members on a *pro rata* basis based on the extent of their injuries related to the alleged fraud. *Id*. In developing the Plan of Allocation, Lead Plaintiff's expert calculated the estimated amount of artificial inflation in iRhythm common stock that was allegedly proximately caused by Defendants' alleged false and misleading statements and omissions during the Class Period. ¶ 98. To calculate the estimated artificial inflation, Lead Plaintiff's damages expert considered the price changes in iRhythm common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces on those days. *Id*.

The Plan of Allocation calculates a "Recognized Loss Amount" for each purchase of iRhythm common stock during the Class Period that is listed in the Claim Form and for which adequate supporting documentation is provided. The calculation of Recognized Loss Amounts depends upon several factors, including when the claimant's stock was purchased and sold and the purchase or sale price. Claimants who purchased shares during the Class Period but did not hold those shares through the initial alleged corrective disclosure (after the close of trading on November 1, 2022) will have no Recognized Loss Amount as to those transactions because any loss they suffered would not have been caused by revelation of the alleged fraud. *See* Notice ¶¶ 75, 77.A. For shares sold from November 2, 2022 through the end of the Class Period, Recognized Loss Amounts will be the lesser of: (i) the difference between the amount of artificial inflation on the date of purchase or acquisition and the amount of artificial inflation on the date of sale; or (ii) the difference between the purchase price and the sale price. *See id.* ¶ 77.B. For shares sold during the 90-day period after the Class Period, Recognized Loss Amounts will be the least of (i) the artificial inflation per share on the date of purchase; (ii) the purchase price *minus* the sales price; or (iii) the purchase price *minus* the average closing price of the stock from August 12, 2024 through the date of sale, consistent with the PSLRA. *See id.* ¶ 77.C. For shares held until the end of the 90-day period after the Class Period (or later), Recognized Loss Amounts will be the lesser

of (i) the estimated artificial inflation on the date of purchase; or (ii) the purchase price *minus* $70.38, the average closing price for iRhythm common stock during the 90-day period. *Id.* ¶ 77.D.

The sum of a Claimant's Recognized Loss Amounts for all his, her, or its Class Period purchases is the Claimant's "Recognized Claim." Notice ¶ 78. The Plan of Allocation also limits Claimants' Recognized Claim based on whether they had an overall market loss in their transactions in iRhythm common stock during the Class Period. A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in iRhythm common stock transactions during the Class Period, and Claimants who have an overall market gain are not eligible for a recovery. *Id.* ¶¶ 85-86. The Net Settlement Fund will then be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. *Id.* ¶ 87.

One hundred percent of the Net Settlement Fund will be distributed to Settlement Class Members who submit eligible claims. If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions will also be conducted. Notice ¶ 89.

In the event that any residual funds remain after all cost-effective distributions of the Net Settlement Fund to eligible claimants have been completed, the Plan of Allocation identifies the Bluhm Legal Clinic Complex Civil Litigation and Investor Protection Center at the Northwestern Pritzker School of Law ("IPC") as the proposed *cy pres* recipient. *Id.* The IPC is a law school clinic that provides law students with the opportunity to represent clients with limited income in securities matters against stockbrokers, investment advisers, or securities firms. IPC also provides case-screening services to regulators, including FINRA, the SEC, and state regulators. *See* https://www.law.northwestern.edu/legalclinic/investorprotection/. Lead Plaintiff believes the IPC is an appropriate *cy pres* recipient because of the nature of the securities fraud claims at issue in this Action. *See, e.g.*, Order Approving Plan of Allocation at 4-5, *In re Plantronics, Inc. Sec. Litig.*, No. 4:19-cv-07481-JST (N.D. Cal. Mar. 10, 2026), Dkt. No. 263 (approving IPC as *cy pres* recipient in securities class action because the "organization has a sufficient nexus to the objectives of the securities laws"); *In re Lyft Inc. Sec. Litig.*, 2023 WL 5068504, at *7 (N.D. Cal. Aug. 7, 2023) (approving IPC as *cy pres* recipient in securities class action because it "does work that

aligns with the objectives of the securities laws underlying this case and the class members' interest in protecting investors" and "there is a sufficient 'driving nexus' between the class and the *cy pres* recipient"). Lead Plaintiff and Lead Counsel have no relationship with the IPC.

As noted, payment will be made to the IPC only if and when the residual amount left for re-distribution to eligible claimants is so small that a further re-distribution would not be cost effective—for example, in the event the administrative costs of conducting an additional distribution would largely subsume the funds available.

As of October 22, 2026, more than 84,000 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the Plan, were mailed to potential Settlement Class Members, *see* Suppl. Evans Decl. ¶ 3, and no objections to the Plan of Allocation were received. *See* Sinderson Decl. ¶ 112. In sum, Lead Plaintiff respectfully submits that the proposed Plan of Allocation is fair and reasonable and should be approved.

## III. The Court Should Certify the Settlement Class

As set forth in Lead Plaintiff's motion for preliminary approval of the Settlement, the Settlement Class satisfies all of the requirements of Rules 23(a) and (b)(3). Dkt. No. 147, at 14-17; *see also* Preliminary Approval Order at 4-6 (preliminarily certifying the Settlement Class). None of the facts supporting certification of the Settlement Class have changed since Lead Plaintiff submitted its preliminary approval motion and the Court preliminarily certified the Settlement Class. Accordingly, Lead Plaintiff respectfully requests that the Court certify the Settlement Class under Rules 23(a) and (b)(3) for purposes of effectuating the Settlement.

## IV. Notice to the Settlement Class Satisfied the Requirements of Rule 23 and Due Process

In accordance with the Court's Preliminary Approval Order, SCS began mailing copies of the Notice Packet to potential Settlement Class Members and nominees on July 28, 2026. *See* Dkt. No. 157-4, at ¶¶ 3-7. As of October 22, 2026, SCS had disseminated a total of 84,409 copies of the Notice Packet by first-class mail or email to potential Settlement Class Members and nominees. *See* Suppl. Evans Decl. ¶ 3. In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire* on August 6, 2026. *See* Dkt. No. 157-4, at ¶ 12.

SCS also established a dedicated website, www.iRhythmSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice, Claim Form, Stipulation, and Complaint, among other documents. *Id.* ¶ 14.

The Notice mailed to the Settlement Class in accordance with the Court's Preliminary Approval Order satisfied all the requirements of due process, Rule 23, and the PSLRA. For a class certified under Rule 23(b)(3), due process and Rule 23 require that class members be given notice of the class action and their right to request exclusion that is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In addition, notice of a class action settlement must be directed "in a reasonable manner to all class members who would be bound" by the Settlement. Rule 23(e)(1)(B). The notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill*, 361 F.3d at 575; *see also Luna v. Marvell Tech. Grp.*, 2018 WL 1900150, at *2 (N.D. Cal. Apr. 20, 2018) (same).

The notice program's combination of individual first-class mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in a widely circulated publication, transmission over a business newswire, and publication on internet websites, satisfied all requirements of Rule 23 and due process. *See, e.g., In re Splunk Inc. Sec. Litig.*, 2024 WL 923777, at *4 (N.D. Cal. Mar. 4, 2024) (approving similar notice program); *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 6902856, at *4-5 (N.D. Cal. Nov. 21, 2016) (same).

## V. Report on Claims Received

The deadline for Settlement Class Members to submit a Claim to participate in the Settlement was October 1, 2026. SCS has reviewed and processed all of the Claims received. *See* Suppl. Evans Decl. ¶¶ 9-14. Of the 34,619 Claims received, 20,058 have been found eligible under the Plan of Allocation (assuming the proposed Plan is approved by the Court). *Id.* ¶ 9. The eligible Claims include a total of 23,734,648 damaged shares of iRhythm common stock (that is, shares that calculate to a Recognized Loss Amount under the Plan of Allocation and are eligible for a portion of the Settlement proceeds). *Id.* This represents 97% of the total number of damaged

iRhythm shares as estimated by Lead Plaintiff's damages expert (24,534,934). Sinderson Decl. ¶ 113.

SCS has found that 20,058 of the 34,619 Claims submitted (or 58%) are eligible, while 14,561 (42%) are ineligible. *See* Suppl. Evans Decl. ¶ 9. The reasons for the ineligibility of the Claims and number and percentage of ineligible claims are set forth below.

| **Reason for Ineligibility** | **Number of Claims** | **Pct.** |
|---|---|---|
| No Class Period Purchases | 7,965 | 54.7% |
| No Recognized Loss Amount | 3,423 | 23.5% |
| Fraudulent Claims (Bot-Filed Claims) | 2,338 | 16.1% |
| Shares Sold Short | 493 | 3.4% |
| Overall Market Gain | 331 | 2.3% |
| Withdrawn by Claimant/Filer | 11 | 0.1% |

*See* Suppl. Evans Decl. ¶ 10. The proportion of ineligible claims seen in this Action (42%) is consistent with recent experience in other securities class actions in this District and elsewhere. *See* Claim Admin. Status Update, *Bhangal v. Haw. Elec. Indus., Inc.*, No. 23-cv-04332-JSC (N.D. Cal. Sept. 17, 2026), Dkt. No. 141 (**64%** of claims submitted were ineligible); Declaration of Luiggy Segura at ¶¶ 39-42, *In re Plantronics, Inc. Sec. Litig.*, No. 4:19-cv-07481-JST (N.D. Cal. Feb. 20, 2026), Dkt. No. 261 (**47%** of claims submitted were ineligible); Declaration of Jack Ewashko at ¶¶ 33-37, *In re HP, Inc. Sec. Litig.*, Case No. 3:20-cv-01260-SI (N.D. Cal. Feb. 28, 2025), Dkt. No. 145-2 (**68%** of claims submitted were ineligible); Declaration of Jack Ewashko at ¶¶ 37-40, *In re Splunk, Inc. Sec. Litig.*, Case No. 4:20-cv-08600-JST (N.D. Cal. July 23, 2024), Dkt. No. 145 (**70%** of claims submitted were ineligible).

The relatively high incidence of ineligible claims in this Settlement and generally in securities class action settlements over the past several years is a by-product of the ease with which Claimants may submit claims electronically. It is the experience of SCS and Lead Counsel that many filers—in particular, third-party filers who file electronically on behalf of a substantial number of beneficial owners—will file Claims without taking the time to ascertain whether each individual Claimant for whom they file a Claim is eligible. *See* Suppl. Evans Decl. ¶¶ 11-12. For example, such a filer might generate a list of all of the beneficial owners it represents who owned

iRhythm common stock during the Class Period and submit electronic claims for all of them, without reviewing to determine whether each Claimant had purchases during the Class Period or if they were eligible for a claim under the Plan of Allocation. *Id.* ¶ 12.

For that reason, it is typical in these cases, and as seen here, that the great majority of the claims rejected were submitted from Claimants that either had no purchases of the eligible securities during the relevant class period or whose transactions did not calculate to a recognized loss under the court-approved plan of allocation—in other words, investors who were not damaged by the alleged fraud. *See, e.g.*, Ewashko Declaration ¶ 37, *HP, Inc.*, Case No. 3:20-cv-01260-SI (N.D. Cal. Feb. 28, 2025), Dkt. No. 145-2 (41% of the rejected claims were rejected for no class period purchases and 28% were rejected because they did not result in a Recognized Claim); Ewashko Declaration ¶ 40, *Splunk*, Case No. 4:20-cv-08600-JST (N.D. Cal. July 23, 2024), Dkt. No. 145 (55% of the rejected claims were rejected for no class period purchases).

While this "over-inclusive" approach to claim filing increases the number of claims received and thus the proportion of ineligible claims submitted, it also helps contribute to the high overall level of participation in these actions, as demonstrated by the 97% level of participation in this Settlement, as based on Lead Plaintiff's estimate of damaged shares.

If the Court grants Lead Counsel's motion for attorneys' fees and Litigation Expenses in its entirety, and assuming that the total Notice and Administration Costs are $395,000, the payment amounts made to eligible Claimants will range from a minimum of $10 to a maximum of $1,772,156.42, with an average payment of $2,302.33. *See* Suppl. Evans Decl. ¶ 13. The payment amount per damaged iRhythm share will be approximately $1.39 (*id.*), which is consistent with the estimate provided to Settlement Class Members in the Notice. *See* Notice ¶¶ 3, 5 (informing Settlement Class Members that estimated recovery per share would be $1.83 per eligible share before deduction of fees and costs, and that the per-share deduction for attorneys' fees and costs would be $0.49 per affected share, for a net estimated per-share recovery of $1.34).

## CONCLUSION

For these reasons, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement and approve the Plan of Allocation.

Dated: October 22, 2026

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Katherine M. Sinderson*
JOHN J. RIZIO-HAMILTON (*pro hac vice*)
(johnr@blbglaw.com)
KATHERINE M. SINDERSON (*pro hac vice*)
(katiem@blbglaw.com)
ALEC T. COQUIN (*pro hac vice*)
(alec.coquin@blbglaw.com)
THOMAS Z. SPERBER (*pro hac vice*)
(thomas.sperber@blbglaw.com)
ABBY KRITTA (*pro hac vice*)
(abygail.kritta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

***Counsel for Lead Plaintiff Oklahoma Firefighters Pension and Retirement System and Lead Counsel for the Settlement Class***

## Appendix A

## CHECKLIST FOR N.D. CAL. PROCEDURAL GUIDANCE FOR CLASS ACTION SETTLEMENTS

## FINAL APPROVAL PAPERS

| N.D. Cal. Procedural Guidance Provision | Where Discussed in Papers |
|---|---|
| **1) CLASS MEMBERS' RESPONSE**—The motion for final approval briefing should include information about | |
| the number of undeliverable class notices and claim packets, | Suppl. Evans Decl. ¶ 4. |
| the number of class members who submitted valid claims, | Settlement Motion at 23:23 – 24:3; Suppl. Evans Decl. ¶ 9. |
| the number of class members who opted out, and | Settlement Motion at 18:22-28; Suppl. Evans Decl. ¶ 7; Sinderson Decl. ¶ 112. |
| the number of class members who objected to or commented on the settlement | Settlement Motion at 18:20-21; Sinderson Decl. ¶ 112. |
| In addition, the motion for final approval should respond to any objections. | There were no objections. |
| **2) ATTORNEYS' FEES**—All requests for approval of attorneys' fees must include detailed lodestar information, even if the requested amount is based on a percentage of the settlement fund. Declarations of class counsel as to the number of hours spent on various categories of activities related to the action by each biller, together with hourly billing rate information may be sufficient, provided that the declarations are adequately detailed. Counsel should be prepared to submit copies of detailed billing records if the court orders. | Fee Motion (Dkt. No. 157) at 14:19 – 18:23;<br><br>Sinderson Fee Decl. (Dkt. No. 157-1), at ¶¶ 106-11 and Exs. 4, 5, and 6 (Dkt. Nos. 157-5, 157-6, 157-7). |
| Regardless of when they are filed, requests for attorneys' fees must be noticed for the same date as the final approval hearing. If the plaintiffs choose to file two separate motions, they should not repeat the case history and background facts in both motions. The motion for attorneys' fees should refer to the history and facts set out in the motion for final approval. | The Settlement Motion and Fee Motion are noticed for the same date, November 5, 2026. |

| N.D. Cal. Procedural Guidance Provision | Where Discussed in Papers |
|---|---|
| **3) SERVICE AWARDS**—All requests for service awards must be supported by evidence of the value provided by the proposed awardees, the risks they undertook in participating, the time they spent on the litigation, and any other justifications for the awards. | Fee Motion (Dkt. No. 157) at 20:19 – 21:21;<br><br>Sinderson Fee Decl. (Dkt. No. 157-1), at ¶ 129;<br><br>Rankin Decl. (Dkt. No. 157-2), at ¶¶ 3-5, 10-12. |
| **4) ELECTRONIC VERSIONS**—Electronic versions (Microsoft Word or Word Perfect) of all proposed orders and judgments should be submitted to the presiding judge's Proposed Order (PO) email address at the time they are filed. | Copies of the proposed Judgment Approving Class Action Settlement, proposed Order Approving Plan of Allocation of Net Settlement Fund, and proposed Order Awarding Attorneys' Fees and Litigation Expenses are attached to the accompanying Sinderson Declaration as Exs. 3, 4, and 5.<br><br>Consistent with the Court's Civil Standing Order (¶ D), electronic versions of the proposed orders will not be submitted electronically unless requested by the Court. |