UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GLAZING EMPLOYERS AND GLAZIERS UNION LOCAL #27 PENSION AND RETIREMENT FUND,

Plaintiff,

v.

IRHYTHM TECHNOLOGIES, INC., et al.,

Defendants.

Case No. 3:24-cv-00706-JSC

**ORDER RE: MOTIONS FOR FINAL APPROVAL AND FOR AWARD OF ATTORNEYS' FEES, COSTS, AND COMPENSATORY AWARD**

Re: Dkt. Nos. 157, 158

Plaintiff brings this Private Securities Litigation Reform Act ("PSLRA") putative class action against iRhythm Technologies ("iRhythm") and its CEO, Quentin Blackford, for allegedly false or misleading statements regarding iRhythm's Zio AT, a device which transmits heart event data for physician monitoring. Following briefing and the hearing on Plaintiff's motion for class certification, the parties notified the Court they had reached a settlement and the Court subsequently granted Plaintiff's motion for preliminary approval of the class action settlement. (Dkt. No. 156.[1]) Plaintiff's' motion for final approval and motion for attorneys' fees, costs, and a compensatory award for the class representative are now pending before the Court. (Dkt. Nos. 157, 158.) Having reviewed the briefing and having had the benefit of oral argument on November 5, 2026, the Court GRANTS final approval of the settlement, and GRANTS IN PART the motion for attorneys' fees, costs, and a compensatory award.

## BACKGROUND

The Court assumes the parties' familiarity with the factual and procedural background and

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

incorporates its prior discussion by reference. (Dkt. No. 118 at 2-4.)

## THE SETTLEMENT AGREEMENT

### A. The Settlement Class

The Agreement defines the Settlement Class as

> all persons and entities who purchased or acquired iRhythm common stock during the period from July 25, 2022 through August 9, 2024, inclusive (the "Class Period"), and were allegedly damaged thereby.

(Dkt. No. 147-1, Settlement Agreement at ¶ 1(qq). The following individuals are excluded:

> (i) Defendants; (ii) members of the Immediate Families of Quentin Blackford or any Former Individual Defendant; (iii) any person who was an Officer or director of iRhythm (including the former Individual Defendants) during the Class Period; (iv) any firm, trust, corporation, or other entity in which any person or entity excluded in subsections (i)–(iii) has or had a controlling interest; (v) iRhythm's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, heirs, successors, or assigns of any such excluded persons and entities, in their capacities as such. Payment Terms.

(*Id.*)

### B. Payment Terms

Under the Settlement Agreement, Defendants will pay $45,000,000 ("Settlement Fund"). (*Id.* at ¶¶ 1(ss).) The (1) notice and administration costs; (2) litigation expenses; (3) attorneys' fees; (4) taxes; and (5) a compensatory award for the Lead Plaintiff under 15 U.S.C. § 78u-4(a)(4), are deducted from the Settlement Fund before the remaining funds, the Net Settlement Amount, is divided in pro rata shares among authorized claimants pursuant to the specified plan of allocation. (*Id.* at ¶ 1(bb).)

### C. Scope of the Release

Settlement Class Members release

> any and all claims and causes of action of every nature and description, including known claims and Unknown Claims, contingent or absolute, mature or not mature, liquidated or unliquidated, accrued or not accrued, concealed or hidden, regardless of legal or equitable theory and whether arising under federal, state, common, or foreign law or any other law, rule, or regulation, whether foreign or domestic, that Lead Plaintiff or any other member of the Settlement Class (i) asserted in the Action; or (ii) could have asserted in the Action, or in any other action or in any other forum, that arise



United States District Court
Northern District of California

> out of, are based upon, are related to, or are in consequence of both (a) the allegations, transactions, facts, matters or occurrences, representations, omissions, disclosures, non-disclosures, matters that would have been barred by res judicata had the Action been fully litigated to a final judgment, or failures to act that were involved, set forth, or referred to in the complaints filed in the Action; and (b) the purchase or acquisition of iRhythm common stock during the Class Period. This release does not cover, include, or release (i) any claims asserted in any related shareholder derivative action; (ii) any claims related to enforcement of the Settlement; or (iii) any claims of any person or entity who or which submits a request for exclusion from the Settlement Class that is accepted by the Court.

(Dkt. No. 147-1 at ¶ 1(ll).)

**D. Notice**

Plaintiff selected Strategic Claims Services (SCS) as the Settlement Administrator following a competitive bidding process. (Dkt. No. 147 at 27; Dkt. No. 147-5, Mulholland Decl. at ¶ 6.) SCS disseminated a total of 84,409 notice packets to potential settlement class members and nominees. (Dkt. No. 158-3, Supp. Evans Decl. at ¶ 3.) Throughout the notice period, SCS has maintained the settlement website and toll-free number. (*Id.* at ¶¶ 5-6.)

**E. Objections and Requests for Exclusion**

Requests for exclusion and objections to the settlement or motion for attorneys' fees and costs were due October 1, 2026. Three requests for exclusion and no objections were received. (Dkt. No. 158-3, Supp. Evans Decl. at ¶ 7.)

**DISCUSSION**

The approval of a settlement is a multi-step process. At the preliminary approval stage, the court should grant such approval only if it is justified by the parties' showing that the court will likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve the proposal under Rule 23(e)(2)." Fed. R. Civ P. 23(e)(B). If the court preliminarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified, and a final fairness hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

At the second stage, "after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of

United States District Court
Northern District of California

the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must finally determine whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

## I. CLASS CERTIFICATION

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019–1022 (9th Cir. 1998). Because no facts that would affect these requirements have changed since the Court preliminarily approved the class on July 13, 2026, this Order incorporates by reference the Court's prior analysis under Rules 23(a) and (b) as set forth in the Order granting preliminary approval. (Dkt. No. 156 at 4-6.)

## II. ADEQUACY OF NOTICE

Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Notice includes "[n]otice of the motion [for attorneys' fees which] must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1).

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The notice must "clearly and concisely state in plain, easily understood language" the nature of the action, the class definition, and the class members' right to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2)(B); *see also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (cleaned up). Although Rule 23 requires reasonable efforts be made to reach all class members, it does not require that each class member actually receive notice. *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (noting the standard for class notice is "best practicable"

notice, not "actually received" notice).

The Court finds the notice plan previously approved by the Court, as implemented by the Claims Administrator SCS, complied with Rule 23(c)(2)(B). The Claims Administrator provided two types of notice: email notice and mail notice. (Dkt. No. 158-3 at ¶ 3, n.2.) In accordance with Rule 23(e)(1)(A), the notice clearly and concisely provided an overview of the lawsuit, Class Members options under the settlement including the Plan of Allocation, the process for requesting exclusion or objecting to all or part of the settlement including the request for attorneys fees and costs, provided contact information for Class Counsel and the Claims Administrator, and directed Class Members to the website, email, and toll-free number for additional information. (Dkt. No. 158-3 at 11-42.) SCS has maintained the website and the toll-free number throughout the notice period.

Out of the 84,406 notice packets mailed, a total of 1,814 were returned to SCS as undeliverable. (*Id*. at ¶ 4.) SCS remailed notice packets to 563 claimants at updated addresses leaving 1,183 notice packets or 1.4 percent of all total notice packets undeliverable. (*Id*.) SCS represents this is a comparable rate to other similar class actions. (*Id*.) To date, SCS has received 34,619 claims, 20,058 (50 percent) have been found valid. SCS provides a detailed description of why the other claims were rejected and the process for allowing claimants to dispute this determination. (*Id*. at ¶¶ 9-14.) No objections and only three requests for exclusion were received.

Given the above, the Court concludes the parties have sufficiently provided the best practicable notice to Class Members.

## III. FINAL APPROVAL

To grant final approval, the Court must find the terms of the parties' settlement are fair, adequate, and reasonable under Rule 23(e). *In re California Pizza Kitchen Data Breach Litig*., 129 F.4th 667, 674 (9th Cir. 2025). In making this determination, courts generally must consider the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount

> offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill*, 361 F.3d at 575. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co*., 8 F.3d 1370, 1376 (9th Cir. 1993).

Under the revised Rule 23(e), the Court must also consider whether the settlement resulted from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (holding that courts must apply the collusion factors set forth in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011), to post-class action settlements as well as those settled before certification).

## A. The Fairness Factors

### 1. The Strength of Plaintiff's Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court first considers "the strength of [Plaintiff's] case on the merits balanced against the amount offered in the settlement." *See Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 526 (C.D. Cal. 2004) (internal quotation marks and citation omitted). The Court need not reach an ultimate conclusion about the merits of the dispute to resolve this factor "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id*. (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id*.

Here, although Plaintiff believes it has a strong case, it recognizes the expense, risk, and length of continued proceedings necessary to prosecute the action through trial and potential appeal. *See Hefler v. Wells Fargo & Co*., 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018)



United States District Court
Northern District of California

(recognizing securities class actions "are highly complex and [litigating] securities class litigation is notably difficult and notoriously uncertain"), aff'd sub nom. *Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020). At the time the parties settled the action, Plaintiff's motion for class certification was pending. While Plaintiff believed the motion would be granted, Defendants argued they could rebut the fraud-on-the-market presumption of reliance and demonstrate the alleged misstatements had no impact on iRhythm's stock price. (Dkt. No. 158-1 at ¶ 85.) Even beyond class certification challenges, Plaintiff recognizes, "this Action presented meaningful risks to establishing liability, loss causation, and damages from the outset that could have prevented Lead Plaintiff and the class from achieving any recovery given Defendants' "vigorous[] argu[ments] that their challenged statements about the Zio AT were not false or misleading when made, and, in any event, even if any of their statements were false or misleading, Defendants did not have any intent to mislead investors." (*Id*. at ¶ 70.)

Given the risks posed by continuing to litigate Plaintiff's claims, the certainty of class member recovery under the settlement weighs in favor of granting final approval.

**2. Settlement Amount**

When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV, Inc*., 221 F.R.D. at 527. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id*. (collecting cases).

The Court previously concluded the amount of the settlement, $45 million, was within the range of possible approval. (Dkt. No. 156 at 8-9.) According to Plaintiff's damages expert, Dr. Matthew Cain, the maximum possible damages—assuming Plaintiff prevailed on all liability issues and obtained the maximum possible stock price declines on all corrective disclosure dates—would be approximately $698 million. (Dkt. No. 147-3 at ¶ 18.) But there were "credible risks" Plaintiff would have recovered much less, and in fact, if the jury were to credit Defendant's argument that the entirety of the alleged fraud was disclosed in connection with the first corrective disclosure on November 1, 2022 such that no damages would be attributable to later disclosures,

the maximum possible damages would fall to $34.3 million. (Dkt. No. 147 at 19; Dkt. No. 147-3 at ¶ 23.)

The $45,000,000 Settlement Amount represents approximately 6.4% to 10.5% of what Lead Plaintiff considers realistic maximum class-wide damages (ranging from $428 million to an absolute maximum of $698 million). (Dkt. No. 158-1 at ¶ 93.) Class Counsel attests this amount is well within the range of typical recovery. (*Id.* (citing *Vataj v. Johnson*, 2021 WL 1550478, at *9 (N.D. Cal. Apr. 20, 2021) (settlement amounting to 2% of damages was "consistent with the typical recovery in securities class action settlements"); *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *9 (N.D. Cal. July 22, 2019) (approving gross settlement amount equal to between "5% and 9.5% of non-disaggregated damages"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (settlement equal to 6% to 9% of damages "higher than the median percentage of investor losses recovered in recent shareholder class action settlements")).)

This factor thus likewise weighs in favor of final approval.

**3. Extent of Discovery Completed and Stage of Proceedings**

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather, a court's focus is on whether "the parties carefully investigated the claims before reaching a resolution." *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014). According to Plaintiff's counsel, the pre-settlement efforts include:

> (1) conducting a detailed investigation into the alleged fraud, including a thorough review of public information such as filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles; consultation with experts; and interviews with dozens of former iRhythm employees; (2) researching and drafting a detailed Complaint based on Lead Counsel's extensive investigation; (3) successfully defeating in part Defendants' motion to dismiss the Complaint through extensive briefing and oral argument; (4) successfully defeating Defendants' motion for judgment on the pleadings; (5) fully briefing and arguing Lead Plaintiff's motion for certification of the class; (6) conducting substantial fact discovery which included exchanging initial disclosures, propounding thorough document requests, issuing subpoenas to eight non-parties, reviewing over 400,000 pages produced by Defendants and non-parties, and taking or defending

> seven depositions; (7) consulting with experts, including financial experts on issues of damages, loss causation, and market efficiency as well as experts on the regulation of medical devices by the Food and Drug Administration ("FDA"); and (8) engaging in extended arm's-length settlement negotiations overseen by an independent mediator.

(Dkt. No. 158-1 at ¶ 3.)

Given the above, the Court concludes the extent of the investigation and the stage of the proceedings support approval of the settlement.

**4. Experience and Views of Counsel**

The experience and views of counsel also weigh in favor of approving the settlement. Class Counsel has extensive experience in the securities litigation field and strongly supports approval of the settlement given the risks and challenges involved. (Dkt. No. 158-1 at ¶ 94.)

**5. Presence of a Government Participant**

No government entity is a party to this action.

**6. Reaction of Class Members**

As previously discussed, the Claims Administrator received 34,619 claims, 20,058 (58 percent) of which were found valid. (Dkt. No. 158-1 at ¶ 113.) The eligible claims include 23,734,648 damaged shares of iRhythm common stock purchased in the Class Period (that is, shares that calculate to a Recognized Loss Amount under the Plan of Allocation and are eligible for a portion of the settlement proceeds). (*Id.*) According to Class Counsel, "[t]his represents 97% of the total number of damaged iRhythm shares as estimated by Lead Plaintiff's damages expert based on publicly available trading information (24,534,934)." (*Id.*)

The Claims Administrator included a detailed explanation for the rejected claims; namely, that the claims were based on (1) no purchases during the class period; or (2) had no Recognized Loss Amount under the Plan of Allocation; or (3) appeared fraudulent; or (4) were short sales. (Dkt. No. 158-3 at ¶¶ 10-12.) The Claims Administrator indicated that because many claims are filed by third-party's on behalf of a large number of beneficial owners, the third-party likely filed the claim without first determining if the claimant was eligible. (*Id.* at ¶ 12.) No objections have been filed and only three requests for exclusion were received. (*Id.* at ¶ 7.)

Given the above, the reaction of the class weighs in favor of final approval of the



United States District Court
Northern District of California

settlement.

***

In sum, the fairness factors weigh in favor of granting Plaintiff's motion for final approval of the class action settlement.

### A. The *Bluetooth* Factors

Finally, the Court must determine whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). In determining whether the settlement is the result of collusion, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id.* The Ninth Circuit has identified three such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> (2) when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* at 947 (internal quotation marks and citations omitted).

For the first *Bluetooth* factor, the Court compares the class payout to class counsel's fees claim. *See In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 675 (9th Cir. 2025) ("class counsel receiving a disproportionately large fee award compared to what the class members received signals potential collusion."). The gross settlement amount is $45 million and Class Counsel seeks 25 percent of this amount for attorneys' fees which is within the range of reasonableness. *See Bluetooth*, 654 F.3d at 942 ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award.").

The second warning sign—a "clear sailing" provision—is not present. *See Bluetooth*, 654 F.3d at 940, n.6 ("a 'clear sailing agreement,' wherein the defendant agrees not to oppose a

petition for a fee award up to a specified maximum value.”). Defendants did not agree they would not oppose the fees request, although they have not done so. (Dkt. No. 147-1, Settlement Agreement at ¶¶ 17-18.)

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to the defendant rather than be added to the settlement fund, *see Bluetooth*, 654 F.3d at 948—is also not present here. The Settlement Agreement is non-reversionary—all of the funds will be distributed to the class members and any funds remaining after a second distribution to Settlement Class Members will be distributed to a *cy pres* recipient. (*Id*. at ¶ 28.)

The Court thus concludes the Settlement Agreement did not result from, nor was it influenced by, collusion. Instead, the Settlement Agreement adequately satisfies the Settlement Class Members’ claims.

* * *

In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not indicate collusion. The Court is therefore satisfied the Settlement Agreement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel. For each of these reasons, the Settlement Agreement passes muster under Rule 23(e) and final approval is appropriate.

## IV. FINAL APPROVAL OF PLAN OF ALLOCATION AND CY PRES

“Approval of a plan of allocation of settlement proceeds in a class action ... is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate.” *In re Oracle Sec. Litig*., No. C–90–0931–VRW, 1994 WL 502054, at *1-2 (N.D. Cal. June 18, 1994) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992)). “A settlement in a securities class action case can be reasonable if it fairly treats class members by awarding a pro rata share to every Authorized Claimant, but also sensibly makes interclass distinctions based upon, inter alia, the relative strengths and weaknesses of class members’ individual claims and the timing of purchases of the securities at issue.” *Hampton v. Aqua Metals, Inc*., No. 17-CV-07142-HSG, 2021 WL 4553578, at *10 (N.D. Cal. Oct. 5, 2021) (internal quotation omitted). “[C]ourts recognize that an allocation formula need only have a

reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Id*

The Plan of Allocation here uses a "recognized loss" value that tailors the recovery of each Class Member to the "purchase or acquisition of iRhythm common stock during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided." (Dkt. No. 158-1 at ¶ 100 (citing Notice ¶¶ 76-77).) "A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in iRhythm common stock transactions during the Class Period, and Claimants who have an overall market gain are not eligible for a recovery." (*Id*. at ¶ 101.) The Net Settlement Fund will be distributed to claimants in pro rata shares based on the relative size of their Recognized Claim. (*Id*. at ¶ 102.) All of the Net Settlement Fund will be distributed to Authorized Claimants. (*Id*. at ¶ 103.) The Claims Administrator will attempt two distributions and only if there are funds remaining after the second distribution will funds be donated to the *cy pres* recipient. (*Id*.) Given the above, the Court finds no reason to reconsider its prior approval of the Plan of Allocation. (Dkt. No. 156 at 9-10.)

Plaintiff proposes the Bluhm Legal Clinic Complex Civil Litigation and Investor Protection Center at the Northwestern Pritzker School of Law ("IPC") as the *cy pres* recipient if there are any residual funds remaining after all cost-effective distributions to Settlement Class Members have been completed. (Dkt. No. 158-1 at ¶ 104.) Plaintiff describes the IPC as "a law school clinic that provides law students with the opportunity to represent clients with limited income in securities matters against stockbrokers, investment advisers, or securities firms. IPC also provides case-screening services to regulators, including FINRA, the SEC, and state regulators, as well as brokerage houses trying to identify legitimate claims." (*Id*. (citing https://www.law.northwestern.edu/legalclinic/investorprotection/).) Plaintiff contends "the IPC is an appropriate *cy pres* recipient because of the nature of the securities fraud claims at issue in the Action." *Id*. "Cy pres distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011). Given the circumstances of this case, the Court agrees IPC is an appropriate *cy pres* beneficiary here.

## V. MOTION FOR ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE AWARD

### A. Attorneys' Fees

Rule 23 permits a court to award "reasonable attorneys' fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination of whether the settlement is 'fundamentally fair, adequate, and reasonable.'" *Staton v. Boeing Co*., 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P. 23(e)). The Ninth Circuit has approved two methods of determining attorneys' fees in cases where the amount of the attorneys' fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method. *Id*. Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

#### 1. Percentage-of-Recovery Method

The Ninth Circuit uses a 25 percent of the fund "benchmark" for awarding fees. *Bluetooth*, 654 F.3d at 942. "An adjustment, either up or down, must be accompanied by a reasonable explanation of why the benchmark is unreasonable under the circumstances." *Reyes v. Experian Information Services, Inc*., 856 Fed. App'x. 108, 110 (9th Cir. 2021) (cleaned up). Class counsel seeks 25 percent of common fund ($11,250,000) for attorneys' fees which they contend is "well within the range of percentage fees typically awarded in securities class actions in this District with recoveries comparable to the $45 million achieved here." (Dkt. No. 157 at 13 (collecting cases).) Counsel also offer evidence that among all PSLRA settlements from 2016 to 2025 "the median fee award in settlements ranging from $25 million to $100 million was 25%." (*Id*. at 14 (citing NERA ECONOMIC CONSULTING, RECENT TRENDS IN SECURITIES CLASS ACTION LITIGATION: 2025 FULLYEAR REVIEW, at 31 (2026)).)



United States District Court
Northern District of California

United States District Court
Northern District of California

**2. Lodestar Method**

The lodestar method "requires multiplying a reasonable hourly rate by the number of hours reasonably expended on the case." *Shirrod v. Dir., Office of Workers' Comp. Programs*, 809 F.3d 1082, 1086 (9th Cir. 2015). "In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Chalmers City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), amended on denial of reh'g, 808 F.2d 1373 (9th Cir. 1987).

Class counsel calculates their lodestar as $6,243,750 based on 8,700 hours of work. (Dkt. No. 157-1 at ¶ 110.)

**a. Reasonable Hourly Rate**

"In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers*, 796 F.2d at 1210-11 (citation omitted). The relevant community for the purposes of determining the prevailing market rate is generally the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted). In addition to affidavits from the fee applicant, other evidence of prevailing market rates may include affidavits from other area attorneys or examples of rates awarded to counsel in previous cases. *See Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (citation omitted). Civil Local Rule 54-5(b)(3) requires the party seeking fees to submit "[a] brief description of relevant qualifications and experience and a statement of the customary hourly charges of each such person or of comparable prevailing hourly rates or other indication of value of the services."

In support of the motion for attorneys' fees, Class Counsel submits evidence their hourly rates range from $1,100 to $1,800 for partners and senior counsel; $425 to $875 for associates, $425 to $525 for staff attorneys and senior staff attorneys, and $450 for case managers. (Dkt. No. 157-5 at 2.) Class Counsel identifies several cases where their rates have been accepted for use in a lodestar crosscheck as well as other cases in this District approving similar hourly rates in complex class actions. (Dkt. No. 157 at 24.) *See also In re Alphabet, Inc. Sec. Litig.*, No. 18-CV-

United States District Court
Northern District of California

06245-TLT, 2024 WL 4354988, at *7 (N.D. Cal. Sept. 30, 2024) (approving hourly rates from $110 to $1400 in a securities class action settlement); *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (rates from $650 to $1,250 for partners or senior counsel, $400 to $650 for associates); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (billing rates ranging from $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals reasonable "given the complexities of this case and the extraordinary result achieved for the Class."). While the Court need not and does not decide that the exact rates requested by counsel are reasonable, they are at least within the range of reasonableness required to use the lodestar figure as a cross check. *Joh v. Am. Income Life Ins. Co.*, No. 18-CV-06364-TSH, 2021 WL 66305, at *7 (N.D. Cal. Jan. 7, 2021) ("Where a lodestar is merely being used as a cross-check, the court may use a rough calculation of the lodestar.") (internal quotation marks and citation omitted).

**b. Reasonable Hours Expended**

Class Counsel's declaration also provides a detailed description of the hours spent on this litigation, which are broken down into "16 major litigation tasks" including (1) investigation and pre-filing case analysis; (2) initial complaint; (3) lead plaintiff motion; (4) complaints; (5) motion to dismiss opposition; (6) motion for judgment on the pleadings opposition; (7) discovery—communications and disputes; (8) class certification; (9) written discovery; (10) deposition discovery; (11) expert work; (12) mediation and settlement; (13) case management; (14) case strategy & analysis; (15) docket/news monitoring; and (16) client communications. (Dkt. No. 157-1 at ¶ 111.) Class counsel attached a chart indicating the amount of hours spent in each category as well as detailed contemporaneous billing records. (Dkt. Nos. 157-6; 157-7.) Upon review, the 8,700 reported hours spent litigating this case are not plainly unreasonable.

**c. Multiplier**

Based on the current lodestar calculations, Class Counsel seeks a 1.8 lodestar multiplier. (Dkt. No. 157 at 23; Dkt. No. 157-1 at ¶ 110.) In the Ninth Circuit, a multiplier of 1.0-4.0 is within the range of multipliers applied in common fund cases. *See Vizcaino v. Microsoft Corp.*,

290 F.3d 1043, 1051 (9th Cir. 2002) (approving a 3.65 multiplier). In evaluating whether a lodestar multiplier is appropriate, district courts in the Ninth Circuit analyze a number of factors, including, but not limited to: (i) the quality of the representation; (ii) the benefit obtained for the class; (iii) the complexity and novelty of the issues presented; and (iv) the risk of nonpayment. *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1029 (9th Cir. 1998); *see also Kerr v. Screen Extras Guild, Inc*., 526 F.2d 67, 70 (9th Cir. 1975). "Foremost among these considerations, however, is the benefit obtained for the class." *Perez v. Rash Curtis & Assocs*., No. 4:16-CV-03396-YGR, 2020 WL 1904533, at *21 (N.D. Cal. Apr. 17, 2020). Taking into account each of the factors, and in particular, the benefit to the class of the $45 million settlement given the risk of non-recovery and the complexity of the legal issues involved, the Court concludes multiplier of 1.8 is reasonable.

* * *

In sum, both the percentage-of-recovery and the lodestar analyses, as well as the excellent settlement result, support the requested fee award of $11,250,000.

**B. Litigation Costs**

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (cleaned up). Plaintiff requests $672,934.95 in litigation costs. (Dkt. No. 157-1 at ¶ 123.) The majority of these expenses—$450,926.25—are expert related costs with the remainder of the costs including mediation, research, court reporter, document hosting, among others. (*Id*. at ¶ 125; Dkt. No. 157-9.) While quite large, these costs are supported by a detailed discussion in Class Counsel's declaration. (Dkt. No. 157-1 at ¶¶ 121-128.) Class Counsel's declaration demonstrates both the reasonableness of the claimed costs and that these types of costs are generally recoverable in similar cases. Accordingly, the Court awards $672,934.95 in litigation costs.

**C. Settlement Administration Costs**

The preliminary approval order approved settlement administration costs of up to $225,000, as Plaintiff requested. (Dkt. 156 at 14; see also Dkt. No. 147 at 23 (estimating costs at

$224,000).) The Settlement Administrator now estimates the costs as $395,000 based on the fact 84,406 notice packets were sent out rather than the previously estimated 28,000, and over 34,000 claims were actually received. (Dkt. No. 158-3 at ¶¶ 15-17.) Because Plaintiff did not seek approval prior to incurring these additional costs and the notice advised class members these costs would not exceed $225,000, the Court awards the previously approved amount of $225,000.

### D. Award to Lead Plaintiff Under 15 U.S.C. § 78U-4(A)(4)

Under the PSLRA, the representative parties may not recover more than other members of the class except the representatives may recover "reasonable costs and expenses (including lost wages) directly relating to the representation of the class." *See* 15 U.S.C. § 78u-4(a)(4). Lead Plaintiff Oklahoma Firefighters Pension and Retirement System seeks reimbursement of $9,600 in costs. (Dkt. No. 157-1 at ¶ 129.) These costs are supported by a declaration from Chase Rankin, Executive Director of Oklahoma Firefighters Pension and Retirement System which details 80 hours of work Lead Plaintiff did on the case and attests the time Mr. Rankin spent would otherwise have been spent on other work for Oklahoma Firefighters Pension and Retirement System at a rate of $120 per hour. (Dkt. No. 157-2 at ¶¶ 5-12.) These costs are well-supported and properly recoverable under 15 U.S.C. § 78u-4(a)(4).

## CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's motion for final approval of the parties' class action settlement. In addition, the Court GRANTS IN PART Plaintiff's motion for attorney's fees and costs, and a compensatory award for the class representative; specifically, the Court awards $11,250,000 in attorneys' fees, $672,934.95 in litigation costs, $225,000 in settlement administration costs, and $9,600 for Lead Plaintiff under 15 U.S.C. § 78u-4(a)(4).

In accordance with the Northern District's Procedural Guidance for Class Action Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the following, to the extent applicable:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms



United States District Court
Northern District of California

> submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Class Counsel shall "summarize this information in an easy-to-read chart that allows for quick comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-read chart, on the settlement website." *See id.*

The parties shall file a proposed judgment on or before November 19, 2026. As examples, the Court directs the parties' attention to *Broadmoor Lumber & Plywood Co. et al v. Toyota Industries Corporation et al.,* Case No. 24-6640, Dkt. Nos. 109, 110; *In re California Gasoline Spot Market Antitrust Litigation,* Case No. 20-3131, Dkt. Nos. 632, 633.

This Order disposes of Docket Nos. 157, 158.

**IT IS SO ORDERED.**

Dated: November 5, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California